**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) Case No. 19-56885 (JEH) |
| | ) |
| Debtors. | ) Judge John E. Hoffman, Jr. |
| | ) |
| | ) (Joint Administration Granted) |

BLACK DIAMOND COMMERCIAL
FINANCE, L.L.C., as Administrative Agent          )   Adv. Pro. No. _____
5330 Yacht Haven Grande #100
St. Thomas, USVI  00802-5032,

                     Plaintiff,

v.

MURRAY ENERGY CORP.
Attn:  Robert D. Moore
President, CEO, CFO
46226 National Road
St. Clairsville, OH  43950

MURRAY ENERGY HOLDINGS CO.
Attn:  Robert D. Moore
President, CEO, CFO
46226 National Road
St. Clairsville, OH  43950

GLAS TRUST COMPANY LLC
c/o Registered Agent Solutions, Inc.
10 Ferry Street 313
Concord, NH  03301

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

|                                          |     |
|------------------------------------------|-----|
|                                          | )   |
| -and-                                    | )   |
|                                          | )   |
| U.S. BANK, N.A.                          | )   |
| Attn:  Andrew Cecere                     | )   |
| President and CEO                        | )   |
| U.S. Bancorp Center                      | )   |
| 800 Nicollet Mall                        | )   |
| Minneapolis, MN  55402,                  | )   |
|                                          | )   |
|                       Defendants.        | )   |
|                                          | )   |

## COMPLAINT

Black Diamond Commercial Finance, L.L.C. ("BDCF"), as Administrative Agent with respect to the outstanding term loans (the "Term Loans") issued under the Credit and Guaranty Agreement dated April 16, 2015, as amended or otherwise modified from time to time (the "Credit Agreement"), by and among Murray Energy Corporation ("MEC" or the "Company") as Borrower, Murray Energy Holdings Co. ("Holdings"), certain subsidiaries of Borrower as guarantors (collectively, with MEC and Holdings, "Murray Energy"), the lenders party thereto from time to time, and BDCF (as successor to GLAS Trust Company, LLC (as successor to Deutsche Bank AG New York Branch)), by and through its undersigned counsel, hereby alleges as follows based upon information and belief:

## NATURE OF COMPLAINT

1.      In 2018, the Company wanted to extend the maturities on its Term Loans by 2.5 years.  But it knew that many of the lenders would not agree to an extension without an inducement.  And it also knew that, even if it offered such an inducement, certain lenders would not agree to an extension.

2.      That put the Company in a bind.  Under the Credit Agreement, the Company could not refinance or extend the Term Loans by providing inducements—priority, more

collateral, or new guarantors—that the Company did not likewise give to lenders that declined to refinance or extend their Term Loans.  Moreover, the Company could not even amend the Credit Agreement, under some circumstances, without the unanimous consent of the lenders.

3.      Knowing that not all lenders would agree and that consent would not be unanimous, the Company attempted to circumvent the restrictions in the Credit Agreement altogether.  It did so by falsely characterizing a textbook refinancing as a "modified Dutch auction" under the Credit Agreement—even as it openly touted the transaction as a refinancing in its public statements (and has continued to do so in its statements to the Bankruptcy Court).

4.      Had this refinancing truly been a "modified Dutch auction," MEC would have been allowed, under a separate provision of the Credit Agreement, to purchase the Term Loans on a non-pro rata basis.  By inappropriately invoking the "modified Dutch auction" provision, Murray Energy entered into an "exchange" with certain lenders in which these exchanging lenders received new loans with longer maturities, but were also granted greater priority, additional collateral, and new guarantees, none of which was given to the existing loans.

5.      This "exchange" was nothing like a "modified Dutch auction" as that term is uniformly understood in the industry.  For this reason and others catalogued below, the exchange triggered multiple Defaults or Events of Default under the Credit Agreement.  These Defaults and Events of Default rendered invalid the very agreement by which the refinancing transaction was effected and, therefore, the refinancing itself.

6.      This Action is brought by the Agent on behalf of the non-consenting lenders to this transaction continuing to hold Term Loans under the Credit Agreement, seeking, among other things, a declaratory judgment that the refinancing transaction is invalid, including (but not limited to) the creation of priority rights granted to the so-called "Superpriority" loans.  Plaintiffs

also ask this Court to declare that the Term Loan lenders are the true senior and first lien lenders with respect to collateral securing the Term Loans.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over these claims under 28 U.S.C. § 1334(b), which provides that district courts shall have original jurisdiction "of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

8.      Pursuant to Federal Rule of Bankruptcy Procedure 7008, this adversary proceeding relates to the Chapter 11 case *In re Murray Energy Holdings Co., et al.*, pending in this Court as Case No. 19-56885 (JEH).

9.      Pursuant to Federal Rule of Bankruptcy Procedure 7008, Plaintiff consents to the entry of final judgment by this Court if it is determined that, absent consent of the parties, this Court cannot enter final orders or judgment consistent with Article III of the United States Constitution.

10.     Venue is proper in this Court under 28 U.S.C. § 1409(a), 28 U.S.C. § 157(a), and Southern District of Ohio General Order No. 05-02.

11.     Venue is proper notwithstanding Section 10.16 of the Credit Agreement, and, to the extent applicable, Section 8.6(b) of the Intercreditor Agreement, and Section 7.17 of the Collateral Trust Agreement, because the determination of lien validity and priority at issue in this Complaint is intimately intertwined with the Debtors' bankruptcy cases, and the public interest in such Debtors' reorganization outweighs the parties' contractual choice of forum.

12.     This Court has personal jurisdiction over Defendants, including pursuant to Federal Rule of Bankruptcy Procedure 7004(f).

4

## PARTIES

13.     Plaintiff Black Diamond Commercial Finance, L.L.C., is Administrative Agent with respect to the Term Loans issued under the Credit Agreement and in that capacity has the authority to enforce the terms of the Credit Agreement on behalf of the holders of the Term Loans.

14.     Defendant Murray Energy Corp. ("MEC" or the "Company") is an Ohio corporation with its principal place of business in St. Clairsville, Ohio.

15.     Defendant Murray Energy Holdings Co. ("Holdings") is a Delaware corporation with its principal place of business in St. Clairsville, Ohio.

16.     Defendant GLAS Trust Company LLC ("GLAS") is Administrative Agent with respect to the term loans issued pursuant to the Superpriority Credit and Guaranty Agreement dated as of June 29, 2018 (hereinafter, "New Term Loans" and "Superpriority Credit Agreement").  GLAS also served as predecessor administrative agent with respect to the existing Term Loans under the Credit Agreement.  The allegations against GLAS are limited to its actions and role serving as Administrative Agent under these agreements.

17.     Defendant U.S. Bank, N.A. ("U.S. Bank") is collateral trustee with respect to the Second Amended and Restated Collateral Trust Agreement, dated as of June 29, 2018 (the "Collateral Trust Agreement"),  the Second Amended and Restated Intercreditor Agreement, dated as of June 29, 2018 (the "Intercreditor Agreement"), and the Specified Collateral Trust Agreement, dated as of June 29, 2018 (the "Specified Collateral Trust Agreement").  The allegations against U.S. Bank are limited to its actions and role serving as collateral trustee under these agreements.

## STATEMENT OF FACTS

### The Credit Agreement

18.     In March 2015, MEC agreed to pay cash consideration of approximately $1.37 billion to acquire an interest in Foresight Energy GP LLC and Foresight Energy LP, a producer of thermal coal that operates four mines in the Illinois Basin.

19.     In order to fund that acquisition, MEC and Holdings entered into the Credit Agreement, dated April 16, 2015 (and, as amended on August 15, 2016 and November 10, 2016, the "Credit Agreement," attached here as Exhibit 1), which created—and provided the terms that governed—a $2,000,000,000 Senior Secured Term Loan Facility. The proceeds of that facility were also intended to be used to refinance existing debt and for general corporate purposes.

20.     To secure the term loans issued pursuant to the Credit Agreement (the "Term Loans"), the lenders were granted a first priority lien on certain fixed asset collateral (such as real estate and equipment) ("Term Loan Collateral"), as well as a second priority lien on certain asset-backed loan collateral (such as accounts receivable, inventory, and cash) ("ABL Collateral").  These lien priorities were established in, among other documents, (a) the: Amended and Restated Collateral Trust Agreement, dated December 5, 2013 (the "2013 Collateral Trust Agreement," attached here as Exhibit 2), which set forth the terms on which the Collateral Trustee had been appointed to, among other things, distribute the collateral securing the Term Loans and other debt; and (b) the Amended and Restated Intercreditor Agreement, dated April 16, 2015 (the "2015 Intercreditor Agreement," attached here as Exhibit 3), which set forth the agreement between the Collateral Trustee, on behalf of the term debt holders, on the one hand, and the ABL Agent, on behalf of the asset-backed lenders, on the other, as to their respective rights and obligations in the Term Loan Collateral, ABL Collateral, and other assets.

21.     The Term Loans were also guaranteed by certain Murray Energy subsidiaries.

22.     The Credit Agreement contained multiple provisions intended to protect the lenders of the Term Loans, including their first priority lien on the Term Loan Collateral.  To this end, the Credit Agreement placed restrictions and limitations on MEC's ability to incur additional debt and liens.

23.     Section 6.2, for example, prohibited MEC from creating or incurring any new Liens[2] except under certain, limited circumstances.

24.     In addition, Section 6.1 of the Credit Agreement prohibited MEC, as well as certain subsidiaries, from incurring any Indebtedness except for certain enumerated purposes and/or subject to certain requirements.

25.     Section 6.1 also limited MEC's ability to incur debt to refinance the Term Loans, including by circumscribing the circumstances in which MEC could incur Refinancing Indebtedness and by providing that such Refinancing Indebtedness could not be senior to, or have superior rights to collateral than, the Term Loans under the Credit Agreement.

26.     For example, Section 6.1(s) provided that the Company could incur Refinancing Indebtedness but only if (i) all of the cash proceeds were applied *solely* to the prepayment of Term Loans on a dollar-for-dollar basis, and (ii) "no Default or Event of Default shall have occurred and be continuing or would result therefrom."

27.     Any Refinancing Indebtedness was also required to be equal in priority ("*pari passu*") or subordinate to Term Loans under the Credit Agreement.  The Agreement achieved this by requiring, as applicable here, Refinancing Indebtedness to be Permitted First Lien Priority Refinancing Debt, which forbade the issuance of debt senior to the Term Loans.  Specifically:

---

[2] Capitalized terms shall have the meanings ascribed to them in the respective agreements unless otherwise defined herein.

> "Permitted First Lien Priority Refinancing Debt" means any
> secured Indebtedness . . . incurred by Borrower in the form of one
> or more series of senior secured notes or loans; <u>provided</u> that such
> Indebtedness is . . . secured by Liens on the Collateral (x) on a *pari
> passu* basis . . . with the Liens securing Obligations under the
> Credit Documents pursuant to the Collateral Trust Agreement . . . .

Ex. 1, Credit Agreement, § 1.1 at p. 41.

28.    The Credit Agreement also limited the Company's ability to pledge additional

collateral, or have its subsidiaries make additional guarantees, in support of Refinancing

Indebtedness.

29.    First, the Credit Agreement restricted the ability of the Company to secure

Refinancing Indebtedness with assets other than those securing the Term Loans, unless those

assets were also made part of the collateral securing the Term Loans.    The definition of

Permitted First Lien Priority Refinancing Debt provided that such debt shall not be "secured by

any property or assets of Holdings, Borrower or any Restricted Subsidiary other than the

Collateral [*i.e.*, the property in which Liens are purported to be granted as security] unless such

property or assets are made a portion of the Collateral hereunder."    Ex. 1, Credit Agreement,

§ 1.1 at p. 41 (sub-part (ii)).

30.    Second, the Credit Agreement prohibited the Company from issuing Refinancing

Indebtedness guaranteed by additional subsidiaries, unless those subsidiaries were also made

guarantors of the Term Loans.    The definition of Refinancing Indebtedness stated that such debt

may not be "guaranteed by any Subsidiaries other than Subsidiaries that are Guarantors (unless

concurrently with or promptly after the closing of such Indebtedness, such Person becomes a

Borrower or Guarantor hereunder). . . ." Ex. 1, Credit Agreement, § 1.1 at p. 45-46.

31.    Other provisions governing the restructuring or refinancing of the loans likewise

provided protections to the Term Loan lenders.

32.    For example, although Section 2.25 permitted the Borrower to agree with one or more Lenders to extend the maturities of their Term Loans, it provided protection to the non-extending Term Loan Lenders.  Among other things, the extended term loans were not permitted to be "secured by any Collateral or other assets of any Credit Party that [did] not also secure" the existing Term Loans.  *See* Ex. 1, Credit Agreement, § 2.25(c)(ii).  The extended loans were also required to have, except as otherwise provided, the same or less restrictive terms as the existing class of loans.  *Id.*

33.    Section 10.5 permitted the refinancing of *all* outstanding Term Loans with replacement loans.  But it similarly required that, except as otherwise provided, all terms applicable to the Replacement Term Loans must be "substantially identical to," or "less favorable" to the lenders than, the Term Loans.

### The 2018 Refinancing Transaction

34.    In June 2018, MEC announced that it had agreed with certain of its lenders and noteholders—including some of its Term Loan lenders—to complete what it described in press releases as a "refinancing transaction" to "extend[] upcoming debt maturities" (the "2018 Refinancing Transaction").[3]  The transactions were consummated pursuant to the terms of a Transaction Support Agreement dated as of June 4, 2018.

---

[3] *See* Press Release, Murray Energy Corporation Announces Refinancing Transactions and Receipt of Support from More than a Majority of Lenders and Noteholders (June 4, 2018), available at https://www.prnewswire.com/news-releases/murray-energy-corporation-announces-refinancing-transactions-and-receipt-of-support-from-more-than-a-majority-of-lenders-and-noteholders-300658805.html; Press Release, Murray Energy Corporation Announces Completion of Refinancing Transactions to Extend Maturities, Reduce Indebtedness and Lower Cash Interest Payments (July 2, 2018), available at https://www.prnewswire.com/news-releases/murray-energy-corporation-announces-completion-of-refinancing-transactions-to-extend-maturities-reduce-indebtedness-and-lower-cash-interest-payments-300675501.html.

35.     As part of the 2018 Refinancing Transaction, the Company executed what it described as an "exchange" with lenders under the Credit Agreement, through which the participating lenders received New Term Loans, maturing 2022, governed by the Superpriority Credit Agreement.  The Company also executed a similar "exchange" related to certain of its outstanding notes.

36.     Notwithstanding the covenants in the Credit Agreement that restricted the Company's ability to incur Indebtedness, the New Term Loans purported to be secured by a lien on the Term Loan Collateral that ranked senior to the liens securing the Term Loans.

37.     Notwithstanding the terms of the Credit Agreement, the New Term Loans were also guaranteed by additional subsidiaries and secured by additional collateral, none of which was made available to the non-exchanging Term Lenders.  In particular, the New Term Loans were guaranteed by Murray Kentucky Energy, Inc. (and its subsidiaries) and Murray South America, Inc., in addition to existing guarantors.  They were also secured with additional collateral: a pledge of 100% of the stock of Murray South America, Inc. and Murray Kentucky Energy, Inc., liens on assets of Murray Kentucky Energy, Inc. and its subsidiaries, certain of Murray Energy Corp.'s indirect equity interests in entities with operations in Columbia, and Murray Energy Corp.'s indirect equity interests in Javelin Global Commodities Holdings LLP.

38.     Notably, MEC did not effectuate the 2018 Refinancing Transaction by invoking any of the mechanisms in the Credit Agreement providing for the refinancing or extension of the Term Loans, such as provided in Sections 2.25 or 6.1(s) above, which also would have subjected the Company to the restrictions attendant to those provisions (such as limits on its ability to grant senior liens or pledge additional collateral, and the requirement to share pro rata payments by the Borrower).  Instead, it conducted this exchange through an interrelated and interdependent series

of actions, as described in the Waiver, Consent, and Third Amendment to the Credit Agreement (the "Third Amendment"). The Third Amendment is attached here as Exhibit 4.

39.     Among other things, the Third Amendment contemplated that MEC would enter into the Superpriority Credit Agreement. This Superpriority Credit Agreement in turn enabled the creation of the New Term Loans, which, as discussed above, purported to be secured by a lien on the collateral securing the Term Loans that ranked senior to the liens securing the Term Loans, in addition to being backed by additional guarantees and collateral. As described above, all of these features—the creation of liens senior to the Term Loans and securing those liens by guarantees and collateral not available to the Term Loans—violated the refinancing and new indebtedness provisions of the Credit Agreement.

40.     The Company also proposed to conduct an auction (the "Specified Auction") in which it would offer to exchange the Term Loans for the same principal amount of New Term Loans. MEC purported to conduct this auction pursuant to Section 10.6(i) of the Credit Agreement and as outlined in the Auction Notice, attached here as Exhibit 5. Notably, MEC referred to the transaction as a refinancing in its public statements (and has continued to refer to it as part of a "refinancing" in its statements made in this Court).[4] Upon information and belief, MEC invoked the Credit Agreement's modified Dutch auction provision because it understood that this admitted "refinancing" ran afoul of many of the Credit Agreement's restrictions on and criteria for a refinancing.

---

[4] *See* Declaration of Robert D. Moore, ¶ 76 (Doc. 10), Case No. 19-56885 (Oct. 19, 2019) ("The refinancing through the 2018 TSA resulted in an extension of Murray's existing Term Loan maturities by approximately two and a half years on $1.7 billion in debt and an extension of Murray's existing 2L Notes due 2021 maturities by over three years on an additional $500 million in debt.").

41.    MEC also relied upon the modified Dutch auction provision to circumvent another restriction in the Credit Agreement:  Section 2.17 required lenders to share pro rata any payments (cash or otherwise) that they received with respect to the Term Loans.  Purchases made pursuant to the modified Dutch auction procedures in Section 10.6(i) were an exception to this rule.  Thus, MEC needed to invoke these procedures—which allowed for it to acquire Term Loans on a non-pro rata basis—because it would not otherwise have the power to enter into a debt exchange that favored some lenders at the expense of others.

42.    In addition, the Third Amendment called for the modification of several of the agreements related to the Term Loans.

43.    Among other things, Section 2 of the Third Amendment directed that the Credit Agreement be amended to permit the Superpriority Credit Agreement and New Term Loans (the "Third Amended Credit Agreement").  The Third Amended Credit Agreement also removed the covenants in Section 6, discussed above, that restricted Murray Energy Corp.'s ability to incur Indebtedness and Liens.  *See* Ex. 4, Third Amendment, § 2(*l*).

44.    Section 2 also amended the agreements establishing the debtholders' relative priority rights in the collateral.  It provided that the Collateral Trust and Intercreditor agreements would be amended and inserted into the Third Amended Credit Agreement and directed the Administrative Agent and Collateral Trustee to execute and deliver the amendments to those agreements (as well as amendments to other Collateral Documents).  *See* Ex. 4, Third Amendment, § 2(d), (e), (f), (i).  Among other things, the amendments to these agreements had the effect of granting the New Term Loans priority in the Term Loan Collateral vis-à-vis the existing Term Loans.  *See, e.g.*, Ex. 4, Third Amendment, Exhibit O, §§ 2.6 & 3.4.

45.     The Third Amendment was executed on June 29, 2018.  A majority of the Term Loan lenders consented to the Third Amendment and exchanged their Term Loans under the Credit Agreement for New Term Loans under the Superpriority Credit Agreement (the "Consenting Lenders"). But the Third Amendment did not receive unanimous consent.  The current holders of the Term Loans were not Consenting Lenders.

46.     The 2018 Refinancing Transaction resulted in Term Loans representing approximately 97 percent of principal amount outstanding being "exchange[d]" for New Term Loans.

### The Third Amendment—And The Actions It Enabled—Were Invalid

*The Third Amendment Was Ineffective Because The 2018 Refinancing Transaction Violated The Credit Agreement In Multiple Respects*

47.     Section 2 of the Third Amendment—and therefore the actions that effectuated the 2018 Refinancing—were invalid by the Third Amendment's own terms.  This is because the effectiveness of Section 2 of the Third Amendment was "subject to the substantially simultaneous satisfaction" of several conditions, including that "no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the Specified Auction."  *See* Ex. 4, Third Amendment, § 4(b).  The 2018 Refinancing violated the Credit Agreement in multiple respects, resulting in several Defaults or Events of Default that, accordingly, prevented Section 2 from taking effect.  Accordingly, the Term Loan holders retain the rights they had prior to the 2018 Refinancing Transactions, including that they are the true senior and first lien lenders with respect to the Term Loan Collateral.

48.     As an initial matter, the 2018 Refinancing Transaction violated Section 10.6(i) of the Credit Agreement.  As relevant here, Section 10.6(i) permitted MEC to acquire the existing loans, on a non-pro rata basis, through "one or more modified Dutch auctions."  As described

above, MEC invoked Section 10.6(i) to exchange the New Term Loans for the existing Term

Loans.  But the Specified Auction violated this provision, which in turn constitutes a Default

under Section 8.1(e).

49.     *First*, the 2018 Refinancing resulted in a breach of Section 10.6(i) because the so-

called "auction" in which the Consenting Lenders exchanged their existing Term Loans for New

Term Loans did not comply with the auction procedures set forth in that provision.

50.     This is because the Specified Auction was not a real "modified Dutch auction."

The Company never acquired a predetermined amount of Term Loans, as is typical in such an

auction.  Instead, it committed to purchase as many Term Loans as Lenders were willing to

exchange, regardless of whether that was all of the Term Loans under the Credit Agreement or

only a small fraction of those Term Loans.

51.     The Company also did not announce a "range" of prices at which it would be

willing to purchase the Term Loans, as would be consistent with industry practice and as

contemplated by Exhibit M to the Credit Agreement.  Instead, it offered what it called a

"Discount Range" but was in fact a single, fixed price: "Not less than $1,000 nor greater than

$1,000 [principal amount of New Term Loans] per $1,000 principal amount of [Term Loans]."

*See* Ex. 5, Auction Notice, at 1.  Accordingly, the Consenting Lenders did not in any

conventional sense submit bids for the consideration that would be paid to acquire their loans, as

is typical in a Dutch auction; instead, they simply agreed (or not) to the predetermined

consideration offered by the Company at the time it announced the Specified Auction.

52.     *Second*, the 2018 Refinancing Transaction violated Section 10.6(i) because the

Company was permitted to purchase Term Loans only "so long as no Default or Event of Default

has occurred and is continuing or would result therefrom."  A Default "would"—and did—

"result" from the Specified Auction because, in conducting this auction, the Borrower incurred indebtedness (*i.e.*, the New Term Loans) in breach of the negative covenants of Section 6.1.

53.     Specifically, as described above, the Credit Agreement prohibited MEC from incurring Indebtedness except in the circumstances and/or subject to the requirements specified in Section 6.1.  The New Term Loans did not fall within any of the enumerated exceptions.

54.     For the reasons explained above, even if the issuance of the New Term Loans did fall within any of the enumerated exceptions, the New Term Loans would not qualify as Refinancing Indebtedness permitted under the Credit Agreement because they purported to be senior to—not *pari passu*—the existing Term Loans.   In other words, the 2018 Refinancing Transaction had the effect of impermissibly subordinating the rights of the Term Loan lenders— they would no longer have the first lien priority rights in Term Loan Collateral guaranteed by the Credit Agreement.

55.     The New Term Loans also were backed by additional guarantees and were secured by additional collateral as compared to the Term Loans in plain contravention of the Credit Agreement provisions discussed above.

56.     A breach of Section 6 of the Credit Agreement constitutes an Event of Default under Section 8.1(c).   Accordingly, the Specified Auction violated Section 10.6(i) because an Event of Default "would result therefrom."

57.     All of these violations of Section 10.6(i)—the provision that governed the terms of the auction—constituted a Default under the Credit Agreement.   Because the Third Amendment provided that it would become effective only if no default resulted from the Auction, the conditions to the effectiveness of Section 2 of the Third Amendment were not satisfied.  *See* Ex. 4, Third Amendment, § 4(b).

58.     This condition to the effectiveness of the Third Amendment also was not satisfied because several other Defaults or Events of Default would have "occurred and be continuing or would result from the consummation of the Specified Auction."  *See* Ex. 4, Third Amendment, § 4(b).  In addition to violating Section 10.6(i), the Specified Auction—and, more specifically, the issuance of the New Term Loans it enabled—resulted in an independent breach of the negative indebtedness covenants in Section 6.1 of the Credit Agreement (for the same reasons explained above) and, accordingly, an Event of Default.  The Specified Auction also resulted in an Event of Default because it caused a breach of the covenants in Section 6.2 of the Credit Agreement that restrict MEC's ability to incur liens.  These violations, too, prevented the effectiveness of the Third Amendment.

*The Third Amendment Failed To Comply With The*
*Requirements For Amending The Credit Agreement*

59.     Separately, the Third Amendment was invalid because it was enacted without the requisite consent of the existing lenders in violation of Section 10.5(b) and (c) of the Credit Agreement.

60.     Section 10.5(b) of the Credit Agreement requires unanimous consent of the lenders if an amendment has "the effect" of releasing "all or substantially all" of the collateral securing the Term Loans.  It provides, in relevant part that, "[w]ithout the written consent of each Lender (other than a Defaulting Lender) that would be directly adversely affected thereby . . . no amendment . . . shall be effective if the effect thereof would . . . (ix) release all or substantially all of the Collateral."  This provision requires unanimous consent because all lenders are deemed to be "directly affected thereby with respect to" any such amendment.

61.     The 2018 Refinancing Transaction had the effect of releasing all or substantially all of the Collateral, because it purported to subordinate the Term Loans to the New Term Loans.

16

By granting to the New Term Loans "superpriority" rights in the Term Loan Collateral, the 2018 Refinancing all but assured that the collateral—or substantially all of it—would not be available for the benefit of the Term Loans. This is evidenced by the fact that none of the third-party sources with whom Murray's advisors discussed potential debtor-in-possession financing "indicated a willingness to provide the Debtors with new money financing on an unsecured, junior-lien, or *pari passu* basis." Postpetition Financing Motion, ¶ 46 (Doc. 28), Case No. 19-56885 (Oct. 29, 2019).

62.    As above, however, not all of the lenders consented to the Third Amendment.

63.    Because the Third Amendment lacked unanimous written consent, the amendments, waivers, and consents in the Third Amendment (other than in Section 1) were ineffective.

*Because The Third Amendment Was Ineffective,*
*The Actions It Authorized And Enabled Were Also Invalid*

64.    As described above, the relevant portions of the Third Amendment were ineffective either because the conditions to their effectiveness were not satisfied or because they failed to comply with the procedures for amendment set forth in the Credit Agreement.

65.    Because the relevant portions of the Third Amendment failed to become effective by either their own terms, or by violating the Credit Agreement, the actions the Third Amendment authorized and enabled were also invalid. Accordingly, the amendments to the agreements governing the relative priorities of the loans (such as the Collateral Trust and Intercreditor agreements) are unenforceable.

66.    As a result, the Term Loan holders retain the rights they had prior to the 2018 Refinancing Transactions, including that they are the true senior and first lien lenders with respect to the Term Loan Collateral. This means, among other things, that the liens granted to

the New Term Loan lenders are actually subordinate to the liens of the Term Loan lenders, notwithstanding the "superpriority" status they were purportedly granted.

## FIRST CLAIM FOR RELIEF
### (Against the Murray Energy Defendants, Defendant GLAS, and Defendant U.S. Bank)

**Declaratory Judgment That The 2018 Refinancing Was Invalid Because The Conditions To The Third Amendment Were Not Satisfied And The Specified Auction Was Not A "Modified Dutch Auction"**

67.     Plaintiff repeats the prior allegations as if the same were made part of and fully set forth at length herein.

68.     Pursuant to Federal Rule of Bankruptcy Procedure 7001(9) and 28 U.S.C. §§ 2201 and 2202, this Court is authorized to issue a declaratory judgment.

69.     The proper interpretation and application of the provisions of the relevant agreements to the case at hand, including whether the amendments thereto were valid, is a justiciable, present, and actual controversy between the parties.

70.     A condition to the effectiveness of Section 2 of the Third Amendment was that "no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the Specified Auction."  *See* Ex. 4, Third Amendment, § 4(b).

71.     The consummation of the Specified Auction, which was not a "modified Dutch auction" as that term is universally understood in the industry, violated the Credit Agreement in multiple respects, including breaches of Sections 10.6(i) and 6.

72.     Those violations in turn constituted Defaults or Events of Default under the Credit Agreement.

73.     Accordingly, the conditions to the effectiveness of Section 2 of the Third Amendment were not satisfied, because a Default or Event of Default "ha[d] occurred" or would "be continuing" or "would result from the consummation of the Specified Auction."

18

74.     Therefore, the Third Amendment, and the actions it enabled—including the Specified Auction, the creation of the New Term Loans, the Superpriority Credit Agreement, and the amendments to the 2013 Collateral Trust Agreement, 2015 Intercreditor Agreement, and other collateral documents—were also ineffective.

75.     By reason of the foregoing, the 2018 Refinancing Transaction was invalid.

76.     As a result, the Term Loan holders retain the rights they had prior to the 2018 Refinancing Transactions, including that they are the true senior and first lien lenders with respect to the Term Loan Collateral.  This means, among other things, that the liens granted to the New Term Loan lenders are actually subordinate to the liens of the Term Loan lenders, notwithstanding the "superpriority" status they were purportedly granted.

### SECOND CLAIM FOR RELIEF
**(Against the Murray Energy Defendants, Defendant GLAS, and Defendant U.S. Bank)**

**Declaratory Judgment That The 2018 Refinancing Was Invalid Because The Credit Agreement Was Amended Without Required Consents**

77.     Plaintiff repeats the prior allegations as if the same were made part of and fully set forth at length herein.

78.     Section 10.5(b) of the Credit Agreement provides that without unanimous written consent of the lenders "no amendment . . . shall be effective if the effect thereof would . . . (ix) release all or substantially all of the Collateral."

79.     The Third Amendment had the effect of "releas[ing] all or substantially all of the Collateral."

80.     The Third Amendment was not enacted with unanimous written consent of the lenders.

81.     Because the Third Amendment failed to comply with Section 10.5(b), the Third Amendment, and the actions it enabled—including the Specified Auction, the creation of the New Term Loans, and the amendments to the 2013 Collateral Trust Agreement, 2015 Intercreditor Agreement, and other collateral documents—were also ineffective.

82.     By reason of the foregoing, the 2018 Refinancing Transaction was invalid.

83.     As a result, the Term Loan holders retain the rights they had prior to the 2018 Refinancing Transactions, including that they are the true senior and first lien lenders with respect to the Term Loan Collateral.  This means, among other things, the liens granted to the New Term Loan lenders are actually subordinate to the liens of the Term Loan lenders, notwithstanding the "superpriority" status they were purportedly granted.

## PRAYER FOR RELIEF

WHEREFORE, the Agent, on behalf of the Term Loan lenders, requests that the Court grant the following relief:

A.      On the Agent's first claim for relief, an order (i) declaring that the conditions to the effectiveness of Section 2 of the Third Amendment were not satisfied; (ii) declaring that Section 2 of the Third Amendment was ineffective and any actions taken thereby (including the 2018 Refinancing Transactions and the amendment to the 2013 Collateral Trust Agreement) are null and void; (iii) declaring that the Specified Auction was not a "modified Dutch auction"; and (iv) declaring the Term Loan lenders are the true senior and first lien lenders with respect to the Term Loan Collateral.

B.      On the Agent's second claim for relief, an order (i) declaring that Section 2 of the Third Amendment did not comply with the provisions governing amendment in the Credit Agreement; (ii) declaring that Section 2 of the Third Amendment was ineffective and any actions taken thereby (including the 2018 Refinancing Transactions and the amendment to the 2013 Collateral Trust Agreement) are null and void; and (iii) declaring the Term Loan lenders are the true senior and first lien lenders with respect to the Term Loan Collateral.

Dated:  November 20, 2019      ICE MILLER LLP

        */s/ Tyson A. Crist*
        Tyson A. Crist (0071276)
        John C. Cannizzaro (0085161)
        250 West Street, Suite 700
        Columbus, OH  43215
        Telephone: (614) 462-2243
        Facsimile: (614) 224-3266
        Tyson.Crist@icemiller.com
        John.Cannizzaro@icemiller.com

        Lawrence S. Robbins
        Kathryn S. Zecca
        Ariel N. Lavinbuk
        Jack A. Herman
        ROBBINS, RUSSELL, ENGLERT,
        ORSECK, UNTEREINER & SAUBER LLP
        2000 K Street, N.W., 4th Floor
        Washington, DC 20006
        Telephone: (202) 775-4500
        Facsimile: (202) 775-4510

        *Counsel to Black Diamond Commercial Finance L.L.C.*