## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| In re:<br><br>MURRAY ENERGY HOLDINGS CO., *et al.*,[1]<br><br>         Debtors. | Chapter 11<br><br>Case No. 19-56885 (JEH)<br>(Jointly Administered)<br><br>Judge John E. Hoffman, Jr. |
| BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as Administrative Agent,<br><br>         Plaintiff,<br><br>    v.<br><br>MURRAY ENERGY CORP., MURRAY ENERGY HOLDINGS CO., GLAS TRUST COMPANY LLC, and U.S. BANK, N.A.,<br><br>         Defendants. | Adv. Pro. No. 19-02143<br><br>Related Docket No.: 1<br>Oral Argument Requested |

**DEFENDANTS MURRAY ENERGY CORP., MURRAY ENERGY HOLDINGS CO.,
AND GLAS TRUST COMPANY LLC'S
JOINT MOTION TO DISMISS THE ADVERSARY COMPLAINT OF
BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.**

---

[1]      Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy. The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

Debtor Murray Energy Corp., Debtor Murray Energy Holdings Co., and GLAS Trust

Company LLC, as administrative agent under the Superpriority Credit Agreement (as defined

herein) (collectively, "Defendants"), hereby move to dismiss the complaint of Black Diamond

Commercial Finance, L.L.C. [ECF No. 1] (the "Complaint"),[2] pursuant to Fed. R. Civ. P.

12(b)(6), for failure to state a claim upon which relief can be granted. This Motion is supported

by the accompanying Memorandum of Law and such other written or oral argument as may be

presented to the Court.

WHEREFORE, for the reasons set forth herein and in the accompanying Memorandum

of Law, the Defendants respectfully request that the Court enter an order granting the Motion.


Dated: January 17, 2020
        Columbus, Ohio

Respectfully submitted,

/s/  Andrew Goldman
Andrew Goldman (*pro hac vice*)
Craig Goldblatt (*pro hac vice*)
Benjamin Loveland (*pro hac vice*)
Christopher D. Hampson (*pro hac vice*)
Salvatore M. Daniele (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
250 Greenwich Street
New York, NY  10007
Telephone: (212) 230-8800
Facsimile:  (212) 230-8888
   andrew.goldman@wilmerhale.com
   craig.goldblatt@wilmerhale.com
   benjamin.loveland@wilmerhale.com
   chris.hampson@wilmerhale.com
   sal.daniele@wilmerhale.com

- and -

---

[2]      Capitalized terms used but not defined herein shall have the meanings given to them in the Complaint.

1

/s/ *Douglas L. Lutz*
Douglas L. Lutz (0064761)
A.J. Webb (0093655)
Bryan J.K. Sisto (0088143)
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, OH  45202
Telephone: (513) 651-6800
Facsimile:  (513) 651-6981
  dlutz@fbtlaw.com
  awebb@fbtlaw.com
  bsisto@fbtlaw.com

*Counsel to GLAS Trust Company LLC,
as Administrative Agent*


/s/ *Kim Martin Lewis*
Kim Martin Lewis (0043533)
Alexandra S. Horwitz (0096799)
DINSMORE & SHOHL LLP
255 East Fifth Street
Suite 1900
Cincinnati, OH  45202
Telephone: (513) 977-8200
Facsimile:  (513) 977-8141

- and -

Nicole L. Greenblatt
Mark McKane (*pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
  LLP
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900
  nicole.greenblatt@kirkland.com
  mmckane@kirkland.com

- and -

Ross M. Kwasteniet (*pro hac vice*)
Joseph M. Graham (*pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
 LLP
300 North LaSalle
Chicago, IL  60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200
  ross.kwasteniet@kirkland.com
  joe.graham@kirkland.com

*Counsel to Murray Energy Corp. and Murray
Energy Holdings Co. and Counsel to the
Debtors and Debtors in Possession*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing *Defendants Murray Energy Corp., Murray Energy Holdings Co., and GLAS Trust Company LLC's Joint Motion to Dismiss the Adversary Complaint of Black Diamond Commercial Finance, L.L.C.* was served electronically on the date of filing through the court's ECF System on all ECF participants registered in this case at the email address registered with the court.


/s/ *Douglas L. Lutz*
Douglas L. Lutz

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| In re:<br><br>MURRAY ENERGY HOLDINGS CO., *et al*.,[1]<br><br>                 Debtors. | Chapter 11<br><br>Case No. 19-56885 (JEH)<br>(Jointly Administered)<br><br>Judge John E. Hoffman, Jr. |
| BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as Administrative Agent,<br><br>                 Plaintiff,<br><br>    v.<br><br>MURRAY ENERGY CORP., MURRAY ENERGY HOLDINGS CO., GLAS TRUST COMPANY LLC, and U.S. BANK, N.A.,<br><br>                 Defendants. | <br><br>Adv. Pro. No. 19-02143<br><br>Related Docket No.: 1<br>Oral Argument Requested |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS MURRAY ENERGY CORP., MURRAY ENERGY HOLDINGS CO., AND GLAS TRUST COMPANY LLC'S JOINT MOTION TO DISMISS THE ADVERSARY COMPLAINT OF BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.**

---

[1]     Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy. The location of Debtor Murray Energy Holdings Co.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 3

    A.    Murray's Need For Greater Runway On Its 2015 Term Loans ............................. 3

    B.    Mechanics Of The 2018 Transaction ....................................................................... 4

    C.    Black Diamond Challenges The Transaction .......................................................... 6

ARGUMENT ...................................................................................................................... 6

I.    The Specified Auction Complied With Section 10.6(i) Of The 2015 Credit
    Agreement ........................................................................................................................ 8

II.    Black Diamond's Challenges To The Effectiveness Of The Third Amendment
    Fail ................................................................................................................................. 11

    A.    The Majority Lenders Resolved Any Default Or Event Of Default That
        Could Otherwise Have Existed ........................................................................... 12

        1.    The Text And Structure Of The Third Amendment Make Clear
            That The Specified Auction Did Not Breach Any Negative
            Covenants ................................................................................................. 13

        2.    The Purpose Of The Third Amendment And The Intent Of
            The Parties Foreclose Any Ambiguity ..................................................... 15

    B.    Nor Did The Third Amendment Require Unanimity By "Releasing"
        Collateral ............................................................................................................ 16

III.    Black Diamond Really Seeks Rescission, A Remedy Unavailable To It ........................ 18

IV.    Any Request To Leapfrog The Superpriority Lenders Is Without Basis......................... 19

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,
    948 N.Y.S.2d 292 (App. Div. 2012) ..............................................................................7, 8

*Bailey v. Fish & Neave*,
    868 N.E.2d 956 (N.Y. 2007) ..............................................................................................8

*Bavelis v. Doukas (In re Bavelis)*,
    571 B.R. 278 (Bankr. S.D. Ohio 2017) ...........................................................................18

*Beal Sav. Bank v. Sommer*
    865 N.E.2d 1210, 1215 (N.Y. 2007) ...............................................................................14

*Beardslee v. Inflection Energy, LLC*,
    31 N.E.3d 80 (N.Y. 2015) ..................................................................................................9

*Bloemker v. Laborers' Local 265 Pension Fund*,
    605 F.3d 436 (6th Cir. 2010) ...........................................................................................18

*Clearview Apartment Assocs., LP v. Ocasio*,
    844 N.Y.S.2d 558 (Sup. Ct. App. Term 2007) ...............................................................19

*CNH Diversified Opportunities Master Account, L.P. v. Cleveland Unlimited,*
    *Inc.*, No. 650140/2012, 2018 WL 437518 (N.Y. Sup. Ct. Jan. 16, 2018) ........................14

*Consolidated Jewelers, Inc. v. Standard Fin. Corp.*,
    325 F.2d 31 (6th Cir. 1963) ...............................................................................................7

*Empire State Bldg. Co. v. N.Y. Skyline, Inc. (In re N.Y. Skyline, Inc.)*,
    471 B.R. 69 (Bankr. S.D.N.Y. 2012) .................................................................................8

*Facer v. City of Toledo*,
    702 N.E.2d 1267 (Ohio C.P. 1998) ................................................................................19

*Galli v. Metz,*
    973 F.2d 145 (2d Cir. 1992) ....................................................................................... 14-15

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
    716 F.3d 302 (2d Cir. 2013) ...............................................................................................7

*Garza v. Marine Transport Lines, Inc.*,
    861 F.2d 23 (2d Cir. 1988) ...............................................................................................15

*Greenfield v. Philles Records, Inc.*,
    780 N.E.2d 166 (N.Y. 2002) ..............................................................................................7

*HCFA Assocs. Corp. v. Grosman*,
    960 F. Supp. 581 (E.D.N.Y. 1997) ..................................................................18

*Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.*,
    133 N.E. 370 (N.Y. 1921) ...................................................................... 15-16

*In re RadioShack Corp.*,
    No. 15-10197, 2015 Bank. LEXIS 4541 (Bankr. D. Del. Mar. 12, 2015).........18

*In re Tele/Resources, Inc.*,
    21 B.R. 358 (Bankr. S.D.N.Y. 1982) ..............................................................17

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re
    Ion Media Networks, Inc.)*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009)...................12

*Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Tr. Co. of N.Y.*,
    727 N.E.2d 563 (N.Y. 2000) ..........................................................................15

*Lehman Bros. Int'l (Europe) v. AG Fin. Prods., Inc.*,
    110 N.Y.S.3d 218, 2018 WL 3432593 (Sup. Ct. July 2, 2018) ...........................9

*Liberty USA Corp. v. Buyer's Choice Ins. Agency*,
    386 F. Supp. 2d 421 (S.D.N.Y. 2005)..............................................................14

*Lipper Holdings, LLC v. Trident Holdings, LLC*,
    766 N.Y.S.2d 561 (App. Div. 2003) ................................................................15

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
    639 F.3d 63 (2d Cir. 2011)..............................................................................15

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan
    Chase Bank, N.A.*, 103 A.3d 1010 (Del. 2014) ...............................................16

*On Marine Servs. Co. v. EVTAC Mining, LLC*,
    No. 2:01-CV-934, 2002 WL 31412437 (S.D. Ohio Sep. 30, 2002) ...........6, 7, 8

*Pritchard v. Dent Wizard Int'l Corp.*,
    275 F. Supp. 2d 903 (S.D. Ohio 2003) .............................................................7

*Sabilia v. Richmond*,
    No. 11 Civ. 739, 2011 U.S. Dist. LEXIS 152228 (S.D.N.Y. Oct. 26, 2011) ............. 18-19

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
    7 F.3d 1091 (2d Cir. 1993)................................................................................8

*Schmelzer v. Huntington Bancshares Fin. Corp.*,
    No. 2:16-cv-134, 2017 U.S. Dist. LEXIS 101110 (S.D. Ohio
    June 29, 2017)..................................................................................................6

*Serdarevic v. Centex Homes, LLC*,
    760 F. Supp. 2d 322 (S.D.N.Y. 2010).............................................................................8

*Silva v. GVF Cannery, Inc. (In re GNV Cannery, Inc.)*,
    188 B.R. 651 (Bankr. N.D. Cal. 1995) ...........................................................................17

*Slife v. Kundtz Props., Inc.*,
    318 N.E.2d 557 (Ohio Ct. App. 1974).............................................................................7

*Trident Int'l Ltd. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*,
    No. 06 Civ. 6136, 2008 U.S. Dist. LEXIS 47862 (S.D.N.Y. June 19, 2008)....................9

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
    807 N.E.2d 876 (N.Y. 2004)........................................................................................7, 8

*W.W.W. Assocs., Inc. v. Giancontieri*,
    566 N.E.2d 639 (N.Y. 1990)...........................................................................................7

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*,
    643 F. Supp. 2d 1014 (S.D. Ohio 2009) ..........................................................................7

*Willis v. Ronan*,
    631 N.Y.S.2d 50 (App. Div. 1995).................................................................................15

*Zaremba v. Fed. Ins. Co. (In re Cont'l Capital Inv. Servs., Inc.)*,
    439 B.R. 111 (Bankr. N.D. Ohio 2010)..........................................................................18

## RULES

Fed. R. Bankr. P. 7012(b) ...............................................................................................6

Fed. R. Civ. P. 12(b) ......................................................................................................6

Debtor Murray Energy Corp., Debtor Murray Energy Holdings Co., and GLAS Trust Company LLC, as administrative agent under the Superpriority Credit Agreement (as defined herein) (collectively, "Defendants"), hereby submit this memorandum of law in support of their joint motion to dismiss the complaint of Black Diamond Commercial Finance, L.L.C. [ECF No. 1] (the "Complaint"),[2] and respectfully state as follows:

## PRELIMINARY STATEMENT

1.    Founded in 1988, Murray Energy Holdings Co. and its debtor- and certain non-debtor-affiliates comprise the largest privately-owned coal company in the United States, employing nearly 5,500 people.  The company operates a total of eighteen coal mines in the Northern, Central, and Southern Appalachia Basins, the Illinois Basin, the Uintah Basin in Utah, and South America.  *See* Declaration of Robert D. Moore ¶¶ 6, 13, *In re Murray Energy Holdings Co.*, No. 19-56885 (Bankr. S.D. Ohio Oct. 29, 2019), ECF No. 10 (the "Moore Declaration").

2.    By 2018, Murray, along with American thermal coal markets in general, faced unprecedented economic headwinds.  *See* Moore Decl. ¶¶ 7-8.  In 2018, Murray Energy Corp. and certain of its affiliates (collectively, "Murray") reached an agreement with their lenders that provided maturity relief on almost two billion dollars of debt under an existing 2015 term loan facility (the "Term Loans").  This deal (the "2018 Transaction") was comprehensive, extensively negotiated, and fully compliant with the existing credit facility terms.

3.    As part of the 2018 Transaction, Murray commenced an auction pursuant to which all Term Loan lenders could elect to exchange their Term Loans for new, superpriority

---

[2]      Capitalized terms used but not defined herein shall have the meanings given to them in the Complaint.

loans.  At the same time, a majority of Term Loan lenders agreed to amend the 2015 Credit

Agreement to eliminate restrictions on, and waive any defaults that could arise from, the 2018

Transaction.  Lenders holding approximately 97% of the Term Loan debt—including funds

affiliated with the plaintiff—signed on to the deal.

4.      Now, more than 18 months after the 2018 Transaction, Black Diamond

Commercial Finance, L.L.C. ("Black Diamond") seeks to unwind the deal as successor agent for

Term Loan lenders that did not participate in the 2018 Transaction.  Black Diamond argues that

the 2018 Transaction is "null and void" because it contravened the 2015 Credit Agreement.

First, Black Diamond attacks the auction through which the transaction was consummated (the

"Specified Auction") as being noncompliant with the Term Loan credit documents.  Second,

Black Diamond asserts that the 2015 Credit Agreement amendment entered into as part of the

2018 Transaction was ineffective.

5.      This is a purely contractual dispute, and the unambiguous terms of the relevant

agreements attached as exhibits to the Complaint establish that Black Diamond's allegations lack

any merit.  The Specified Auction was consummated in accordance with the express provisions

of the 2015 Credit Agreement.  In addition, Section 10.5 of the 2015 Credit Agreement expressly

authorized a majority of the Term Loan lenders to amend that agreement in the manner that

occurred in the 2018 Transaction.[3]  Black Diamond's lender constituency signed up for that

governance structure.  And a majority of the lenders—far more than a majority, in fact—

supported the 2018 Transaction and approved the amendments of which Black Diamond now

complains.  Black Diamond's primary grievance—that it takes issue with the 2018 Transaction

and the amendments to the 2015 Credit Agreement that authorized it—all fail as a result.  Black

---

[3]      *See infra* note 4.

Diamond's only remaining argument—that the 2018 Transaction improperly "released" collateral without unanimous consent—fails because the 2018 Transaction did no such thing.

6.      The 2018 Transaction complied fully with the governing credit documents, and Black Diamond—who is bound by those documents and whose predecessor agent participated in it—cannot now seek to undo it.  Worse, Black Diamond seeks not only to set things back to the way they were, but also to "leapfrog" the extending lenders, a remedy that lacks any basis in law or fact.  The Court should not permit Black Diamond to pursue this disruptive sideshow at the expense of an orderly and efficient restructuring.  The Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.    Murray's Need For Greater Runway On Its 2015 Term Loans

7.      In 2015, Murray obtained up to $2 billion in financing in Term Loans that were due to mature in 2020.  *See* Compl. ¶ 19.  In 2018, as the outlook for the coal production industry darkened, Murray wanted to push back those maturity dates.  *See id.* ¶ 1.  Murray began to negotiate an extension of that 2020 maturity date, along with other modifications of its repayment obligations, with its Term Loan lenders.  *See, e.g.*, *id.* ¶ 34.

8.      The 2018 Transaction allowed Murray to keep the same rates and substantially similar terms, but with a longer maturity horizon that pushed out repayment into 2022.  *See* Compl. ¶ 35.  In exchange, the extending lenders (the "Superpriority Lenders") were granted a superpriority interest in the collateral that supported the Term Loans, plus a first-priority lien on additional collateral.  *See id.* ¶¶ 36-37.  While not all the Term Loan lenders participated, all Term Loan lenders were invited to participate on identical terms and on a 1:1 basis.  *See id.* Ex. 5 (the "Auction Notice").  The non-extending Term Loan lenders retained their security interests and the earlier, 2020 maturity dates.

3

9.      The 2018 Transaction was executed on June 29, 2018.  Although only a majority

of lenders were required to consummate the transaction, lenders holding 97% of the Term Loan

debt at the time participated, including several fund managers associated with Black Diamond.

*See* Compl. Ex. 4, Waiver, Consent and Amendment No. 3 to Credit and Guaranty Agreement

("Third Am."), ECF No. 1-4 at Page 13 of 635 - Page 404 of 635.  Indeed, Black Diamond's

founder and managing member, Stephen Deckoff, personally signed the auction notice on behalf

of four different Black Diamond funds.  *See id.* at Page 110 of 635 - Page 113 of 635.

## B.      Mechanics Of The 2018 Transaction

10.      The 2018 Transaction was a complex deal involving sophisticated market

participants.  The obligors, agent, and lenders were advised by counsel.  It was consummated

through "an interrelated and interdependent series of actions."  Compl. ¶ 38.  Specifically, it was

consummated through an auction that complied fully with the auction procedures of the 2015

Credit Agreement, and through amendments to the 2015 Credit Agreement (as defined below)

permitted with the consent of only the majority lenders.[4]

11.      Most centrally to the Complaint, Murray conducted the Specified Auction,

through which Murray purchased Term Loans from the Superpriority Lenders and exchanged

them for loans with longer maturity dates under a new credit agreement (the "Superpriority

Credit Agreement").  *See, e.g.*, Compl. ¶¶ 18-20, 34, 40.

---

[4]      Section 10.5(a) of the 2015 Credit Agreement provided that "no amendment, modification, termination or
waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in
any event be effective without the written concurrence of Requisite Lenders and Borrower".  *See* Compl. Ex. 1,
Credit and Guaranty Agreement  § 10.5(a) (the "2015 Credit Agreement").  The term "Requisite Lenders" was, in
turn, defined by the 2015 Credit Agreement as "one or more Lenders having or holding Term B-1 Loan Exposure,
Term B-2 Loan Exposure, New Term Loan Exposure and/or Incremental Revolving Exposure (if any) and
representing more than 50% of the aggregate Voting Power Determinants of all Lenders.").  *See id.* at 47.  Black
Diamond does not dispute anywhere in the Complaint that all components of the 2018 Transaction were approved
by "Requisite Lenders" under the 2015 Credit Agreement.

12.     The Third Amendment to the 2015 Credit Agreement harmonized the existing

credit documents with the terms of the 2018 Transaction.  Among other things, the Third

Amendment modified the 2015 Credit Agreement's restrictions on Murray's ability to incur new

debt and offer additional collateral to lenders.  *See* Compl. Ex. 4, Third Am. § 2(*l*).[5]  The Third

Amendment also adapted other loan documents, like the Collateral Trust Agreement,[6] the

Intercreditor Agreement,[7] and the Pledge & Security Agreement,[8] to reflect the superpriority

interests.  Each of these amendments was permitted with the consent of only the majority

lenders.

13.     Following the 2018 Transaction, all lenders—both non-extending and

superpriority—became subject to these amended documents.  The Superpriority Lenders held

loans under the Superpriority Credit Agreement.  The existing collateral for the Term Loans

remained in place and was subordinated to the liens securing the new, superpriority loans.  *See,*

*e.g.*, Compl. ¶ 44.

14.     As part of the 2018 Transaction, GLAS Trust Company LLC ("GLAS") was

appointed as the successor administrative agent to Deutsche Bank under the 2015 Credit

Agreement, in which capacity it served until being replaced by Black Diamond.  GLAS was also

appointed, and still serves, as the administrative agent under the Superpriority Credit Agreement.

---

[5]      Specifically, Sections 2.14, 5.1, and 6.1.

[6]      *See* Third Amendment, Ex. O (Collateral Trust Agreement).

[7]      *See* Third Amendment, Ex. N (Intercreditor Agreement).

[8]      *See* Third Amendment, Ex. H (Pledge and Security Agreement).

### C.      Black Diamond Challenges The Transaction

15.      On October 29, 2019, Murray and its debtor-affiliates filed for relief under

chapter 11 of the Bankruptcy Code.

16.      On November 20, 2019, eighteen months after the 2018 Transaction, Black

Diamond brought the above-captioned adversary proceeding as successor Term Loan agent,

seeking a declaration that the 2018 Transaction was ineffective and that the non-extending Term

Loan lenders enjoy a first-priority position with respect to the Term Loan collateral.  *See* Compl.

at 20 ("Prayer for Relief").

## ARGUMENT

17.      This Court can—and should—resolve this dispute at the motion-to-dismiss stage.

Bankruptcy Rule 7012(b) makes Rule 12(b) applicable in adversary proceedings.  Courts

regularly dismiss claims pursuant to Rule 12(b)(6) when "there is no law to support the claims

made, the facts alleged are insufficient to state a claim, or there is an insurmountable bar on the

face of the complaint."  *On Marine Servs. Co. v. EVTAC Mining, LLC*, No. 2:01-CV-934, 2002

WL 31412437, at *2 (S.D. Ohio Sep. 30, 2002) (granting motion to dismiss).

18.      Conclusory statements in a complaint that are contradicted by exhibits thereto are

not "well-pleaded" and will fail to support a claim.  *Schmelzer v. Huntington Bancshares Fin.*

*Corp.*, No. 2:16-cv-134, 2017 U.S. Dist. LEXIS 101110, at *5 (S.D. Ohio June 29, 2017).

Specifically, "[t]he clear and unambiguous language of a contract that is made part of the

pleadings overcomes contradictory conclusory averments of the [c]omplaint."  *On Marine Servs.*

*Co.*, 2002 WL 31412437, at *3.  In the context of a Rule 12(b)(6) motion, the Court may review

an attached agreement along with the complaint, and if the contract is so "clear and unambiguous

on its face that the Court may determine to a certainty that the plaintiff would be entitled to no

relief under any provable set of facts," the complaint should be dismissed.  *See On Marine Servs.*

6

*Co.*, 2002 WL 31412437, at *3 (citing *Slife v. Kundtz Props., Inc.*, 318 N.E.2d 557 (Ohio Ct.

App. 1974)); *Consolidated Jewelers, Inc. v. Standard Fin. Corp.*, 325 F.2d 31, 36 (6th Cir. 1963)

("General averments of conclusions stated in the pleadings do not require the District Court to

hear evidence, when the pleadings are at variance and inconsistent with the clear and

unambiguous language of the contract filed as an exhibit thereto.").

19.    Here, the parties expressly selected New York law to govern their relationship.[9]

"When interpreting a contract under New York law, the intention of the parties should control,

and the best evidence of intent is the contract itself." *Gary Friedrich Enters., LLC v. Marvel*

*Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (internal quotations and alterations omitted).

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced

according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d

166, 170 (N.Y. 2002); *see also W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642

(N.Y. 1990) (noting that a court need go no further than the "four corners" of a contract where it

is unambiguous).

20.    This rule is applied "with even greater force in commercial contracts negotiated at

arm's length by sophisticated, counseled businesspeople." *Ashwood Capital, Inc. v. OTG Mgmt.,*

*Inc.*, 948 N.Y.S.2d 292, 297 (App. Div. 2012) (citing *Vermont Teddy Bear Co. v. 538 Madison*

*Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004)). "In such cases, 'courts should be extremely

---

[9]    *See* 2015 Credit Agreement § 10.15; Amended and Restated Collateral Trust Agreement, Compl. Ex. 2
§ 7.16; Amended and Restated Intercreditor Agreement dated April 16, 2015, Compl. Ex. 3 § 8.6(a); Waiver,
Consent and Amendment No. 3 to Credit and Guaranty Agreement, Compl. Ex. 4 § 10.  District courts sitting in
Ohio will generally enforce the parties' choice of law in a contract. *See, e.g.*, *Pritchard v. Dent Wizard Int'l Corp.*,
275 F. Supp. 2d 903, 915 (S.D. Ohio 2003) ("In Ohio, a contract clause that dictates which state's law governs the
agreement is generally enforceable."); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 643 F. Supp. 2d 1014,
1022 (S.D. Ohio 2009) ("New York law governs the contractual issues in this case.").

reluctant to interpret an agreement as impliedly stating something which the parties have

neglected to specifically include.'" *Id.*

21.     Further, contract language is not made ambiguous simply because the parties urge

different interpretations.  *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,

7 F.3d 1091, 1095 (2d Cir. 1993); *Empire State Bldg. Co. v. N.Y. Skyline, Inc. (In re N.Y. Skyline,*

*Inc.)*, 471 B.R. 69 (Bankr. S.D.N.Y. 2012); *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d

322, 329 (S.D.N.Y. 2010).  The Court should also be careful not to "by construction add or

excise terms" or "distort the meaning of those used and thereby make a new contract for the

parties under the guise of interpreting the writing."  *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959

(N.Y. 2007) (quoting *Vermont Teddy Bear Co.*, 807 N.E.2d at 879).  Rather, where a contract is

"so clear and unambiguous" that the Court can "determine to a certainty that the plaintiff would

be entitled to no relief under any provable set of facts," the court must dismiss the plaintiff's

claims.  *On Marine Servs. Co.*, 2002 WL 31412437, at \*3.  That is the case here, where the 2018

Transaction complied in all respects with the clear and unambiguous language of the 2015 Credit

Agreement.

**I.      The Specified Auction Complied With Section 10.6(i) Of The 2015 Credit
         Agreement**

22.     Section 10.6(i) of the 2015 Credit Agreement expressly permitted lenders to sell

their loans back to the borrower in connection with a "modified Dutch auction."  The gravamen

of Black Diamond's complaint appears to be that the Specified Auction failed to comply with

Section 10.6(i) because it was not a true "modified Dutch auction" and was not "consistent with

industry practice."  *See* Compl. ¶¶ 49-51.

23.     That argument fails at a minimum because, in the context of the specific and

reticulated provisions of the 2015 Credit Agreement, the industry meaning of "modified Dutch

auction" is irrelevant.  To be sure, where a contract is ambiguous or the parties intentionally use a term of art, New York courts sometimes look to the meaning of a term in industry to give meaning to an otherwise ambiguous term.  *See, e.g.*, *Beardslee v. Inflection Energy, LLC*, 31 N.E.3d 80, 84 (N.Y. 2015).  Here, however, the contract laid out in detail the procedures that the Specified Auction could follow.  Since the Specified Auction fully complied with those procedures, that is the end of the analysis.  *See, e.g.*, *Trident Int'l Ltd. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, No. 06 Civ. 6136, 2008 U.S. Dist. LEXIS 47862, at *19-20 (S.D.N.Y. June 19, 2008) (any "[a]nalysis of . . . the customs and practices of the [relevant] industry does not alter the plain language of the [contract]"), *aff'd*, 331 F. App'x 77 (2d Cir. 2009); *Lehman Bros. Int'l (Europe) v. AG Fin. Prods., Inc.*, 110 N.Y.S.3d 218, 2018 WL 3432593, at *10 n.11 (Sup. Ct. July 2, 2018) (unpublished table decision) ("[T]he case law does not support using industry custom to contradict or nullify unambiguous contractual provisions ... .").

24.     Section 10.6(i) defines how an "auction" is to be conducted, and expressly allows for flexible auction procedures.  Under the procedures of Section 10.6(i), any and all lenders were permitted to sell their loans to the borrower on a "non-pro rata basis," so long as the borrower's repurchase offer was made on uniform terms across all lenders.  Specifically, Section 10.6(i) provided:

> Notwithstanding anything to the contrary contained in this Section 10.6 or any other provision of this Agreement, so long as no Default or Event of Default has occurred and is continuing or would result therefrom, each Lender shall have the right at any time to sell, assign or transfer all or a portion of its Term Loan Commitment or Term Loans owing to it to Borrower on a non-pro rata basis . . .  through (A) *one or more modified Dutch auctions conducted by Borrower (each, an "Auction") to repurchase all or any portion of the Term Loans*, <u>provided</u> that, (i) notice of the Auction shall be made to all Term Loan Lenders and (ii) the Auction shall be conducted pursuant to such procedures as the Auction Manager may establish which are consistent with this

Section 10.6(i) and the Auction Procedures set forth on Exhibit M
and are otherwise reasonably acceptable to Borrower, the Auction
Manager, and Administrative Agent *or such other procedures as
are acceptable to Borrower and Administrative Agent* or (B) open
market purchases[.]

2015 Credit Agreement § 10.6(i) (emphasis added).

25.      In other words—provided that notice of the auction was given to all lenders and

the auction was conducted pursuant to procedures approved by the Auction Manager (Goldman

Sachs Lending Partners LLC)—each lender was authorized to transfer its loans back to the

borrower by auction at any time, so long as the transfer would not result in an event of default.  It

is undisputed that no default preceded the auction.  And, while Section 10.6(i) requires only that

an auction notice be "consistent with" Exhibit M, the Auction Notice, which Black Diamond

appended to the Complaint, conforms precisely to Exhibit M.  *Compare* Compl. Ex. 5 (the

"Auction Notice"), *with* 2015 Credit Agreement, Ex. M.[10]

26.      In addition, Section 10.6(i) expressly permits the borrower to conduct an auction

pursuant to any "other procedures as are acceptable to Borrower and Administrative Agent."

Thus, even had the Specified Auction deviated from the detailed procedures set forth in Section

10.6(i)—and it did not—the Borrower's and Administrative Agent's consent to the procedures

necessarily means that the Specified Auction could not have violated Section 10.6(i).

---

[10]      Black Diamond contends that in a modified Dutch auction, the borrower specifies a predetermined amount
of loans to repurchase and announces a "range" of prices at which it is willing to do so.  *See* Compl. ¶¶ 50-51.  That
is what happened here.  The Auction Notice specified that the borrower was offering to repurchase "the entire
principal amount" of Term Loans outstanding, which is substantively no different than specifying a dollar amount of
such loans; in either event the amount of loans that the borrower is seeking to acquire is predetermined.  In addition,
the fact that the Auction Notice specified a range effectively equal to par value is irrelevant.  The purpose of an
auction is to determine the lowest price the borrower will need to pay to acquire the loans it wishes to acquire.  That
purpose is not undermined by specifying a fixed price. Indeed, the lenders in such a scenario actually receive more
certainty as to the price at which their loans may ultimately be repurchased, and they can elect to tender those
loans or not.

## II.    Black Diamond's Challenges To The Effectiveness Of The Third Amendment Fail

27.    The majority of the lenders agreed to the 2018 Transaction, and in the Third

Amendment to the 2015 Credit Agreement they waived any defaults that it could have created.

The majority lenders were authorized to amend these documents by the amendment provisions in

the 2015 Credit Agreement itself.  *See* Compl. Ex. 1 § 10.5.  Black Diamond argues, however,

that the Third Amendment to the 2015 Credit Agreement was ineffective, for two reasons.  First,

Black Diamond argues that even though a majority of the lenders authorized the Third

Amendment, a precondition of the Third Amendment (*i.e.*, that the Specified Auction not give

rise to any defaults) was not met.  Second, Black Diamond argues that unanimous consent was

required because the Third Amendment had the effect of releasing collateral.  Based on the

express provisions of the contracts that consummated the 2018 Transaction, neither argument has

merit.

28.    As a threshold matter, Black Diamond is precluded from challenging the validity

of the 2018 Transaction under the express terms of agreements that formed part of that

transaction.  Section 2.7(b) of the Collateral Trust Agreement provides that the non-extending

lenders consent to the priority of the superpriority liens and agreed to abstain from taking any

action to undermine that priority in insolvency proceedings or otherwise.[11]  Similar provisions

---

[11]    Section 2.7(b) of the Collateral Trust Agreement provides, in relevant part: [W]hether or not any
Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any Guarantor, none of
the holders of Junior Lien Obligations, the Collateral Trustee (unless acting pursuant to an Act of Required
Debtholders) or any Junior Lien Representative will, or will support any Person who does any of the following: (1)
request judicial relief, in an Insolvency or Liquidation Proceeding or in any other court, or take any other action, that
would hinder, delay, limit or prohibit the lawful exercise or enforcement of any right or remedy otherwise available
to the Senior Lien Secured Parties in respect of the Senior Liens or that would limit, invalidate, avoid or set aside
any Senior Lien or subordinate any Senior Liens to the Junior Liens or grant the Junior Liens equal ranking to any
Senior Liens; [. . .] (6) contest or support any other Person in contesting, in any proceeding (including any
Insolvency or Liquidation Proceeding) the validity, enforceability, perfection, priority or extent of any Senior Liens;
or [. . .]." Third. Am. Ex. O.  In the Complaint, Black Diamond argues only that the Collateral Trust Agreement is
unenforceable because the terms of the Third Amendment were invalid.  *See* Compl. ¶ 65.

against challenging the validity, enforceability, or priority of the liens appear in the 2015 Credit

Agreement, as amended, and the Intercreditor Agreement.[12]

29.    To be sure, Black Diamond will argue that, if it were to prevail (it should not), it

would escape out from under these provisions.  But at present those agreements are *prima facie*

valid and enforceable, and Black Diamond has yet to carry its burden of proof (or even to

advance arguments sufficient to survive a motion to dismiss).  And the fact that—if it is wrong—

Black Diamond stands in breach of numerous agreements underscores the "high risk strategy that

is being implemented" here.  *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master*

*Fund, Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 590 (Bankr. S.D.N.Y. 2009)

(describing the confirmation objection of a "sophisticated, economically motivated and woefully

out of the money creditor" who "has deliberately chosen to ignore the terms of an unambiguous

agreement that, read literally, precludes it from opposing confirmation").[13]  In any event, Black

Diamond's claims fail on the merits.

**A.    The Majority Lenders Resolved Any Default Or Event Of Default That
Could Otherwise Have Existed**

30.    In the Third Amendment to the 2015 Credit Agreement, the majority lenders

specifically addressed and resolved any defaults that otherwise could have been created by the

2018 Transaction.  Specifically, Section 2 of the Third Amendment implemented certain

modifications and waivers to restrictions on Murray's ability to incur debt and liens pursuant to

the 2018 Transaction.  Section 4(b) of the Third Amendment, "Conditions to Effectiveness,"

---

[12]      *See* Compl. Ex. 1 §§ 9.2, 9.8; Third Am. Ex. N § 2.2.

[13]      Defendants expressly reserve any and all remedies, including without limitation in this adversary
proceeding and in the main *Murray* bankruptcy case, under the Collateral Trust Agreement, the 2015 Credit
Agreement, and the Intercreditor Agreement, in connection with breaches of those agreements by parties thereto,
including without limitation the right to ask monetary damages for violations thereof.

states that the effectiveness of those modifications and waivers ... "is subject to the substantially simultaneous satisfaction of each of the following conditions ... [including that] (b) no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the Specified Auction."

31.     In the face of that clear expression of majority rule, Black Diamond argues that—despite the clear intent of the parties—the Third Amendment was not effective by its terms. Black Diamond argues that in conducting the Specified Auction, Murray incurred additional indebtedness, guarantees, and liens in breach of the negative covenants of sections 6.1 and 6.2 of the 2015 Credit Agreement, thus giving rise to multiple events of default.  *See* Compl. ¶¶ 52, 55, 58.[14]  It does ***not*** dispute that Section 2 of the Third Amendment, if effective, removed those negative covenants from the 2015 Credit Agreement and thus absolved any default that the 2018 Transaction would otherwise have created.  *See id.* Ex. 4 § 2(*l*); *id.* ¶ 43.  Black Diamond argues, however, that Section 2 was not operative at all *because of* these breaches.

32.     This contorted reading of the Third Amendment makes no sense as an ordinary matter of construction.

> **1.     *The Text And Structure Of The Third Amendment Make Clear That The Specified Auction Did Not Breach Any Negative Covenants***

33.     First—and straightforwardly—the Specified Auction did not cause Murray to incur additional indebtedness, guarantees, or liens.  It was in the Superpriority Credit Agreement and related documents that Murray actually took on its new obligations, not in the Specified

---

[14]     Black Diamond also argues that the Specified Auction failed to comply with Section 10.6(i).  *See* Compl. ¶¶ 49-50.  As argued above, though, the Specified Auction complied with Section 10.6(i) in all respects.  *See supra* Section II.

Auction itself.  Nor is it true that a default "would result from the consummation of the Specified

Auction," since the Third Amendment expressly resolved any such defaults.

34.    To be sure, the Specified Auction anticipated that Murray would incur new

obligations.  *See* Compl. ¶ 39.  The Auction Notice states that the exchange would be for

indebtedness "deemed borrowed" under the Superpriority Credit Agreement.  *See id.* Ex. 5.  But

complex transactions where multiple steps take place in a coordinated order on the same day are

not unusual.  Courts interpret the staging of the various steps in a way that is commercially

reasonable and gives the transaction its intended effect.[15]  Here, the Specified Auction, the Third

Amendment, and the Superpriority Credit Agreement all formed part of the same transaction.[16]

That is no reason to ignore the distinct role each piece plays in the transaction.

35.    Black Diamond's reading of Section 4 of the Third Amendment does violence to

the structure of the text.  Section 4's express reference to the "effectiveness of the amendments,

waivers and consent set forth in <u>Section 2</u>" makes clear that Section 4 conditions the default-

resolving provisions of Section 2 on the absence of *other* defaults—not the ones otherwise

addressed by Section 2.

36.    Any contrary reading would mean that the default-resolving provisions of Section

2 would *never* become operative in a context where they were needed.  They would have no

practical effect.  That cannot be the right interpretation of the contract.  *See Galli v. Metz,*

---

[15]    *See, e.g., Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1215 (N.Y. 2007) (concluding that a credit
agreement and a keep-well agreement had "an unequivocal collective design"); *CNH Diversified Opportunities
Master Account, L.P. v. Cleveland Unlimited, Inc.*, No. 650140/2012, 2018 WL 437518, at *7 (N.Y. Sup. Ct. Jan.
16, 2018) (holding that a consent provision in an indenture "does not unravel the collective design of this transaction
or trump the other provisions in the Collateral Trust or the Security Agreement"); *see also Liberty USA Corp. v.
Buyer's Choice Ins. Agency*, 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005) ("[I]t is the general rule that written
contracts executed simultaneously and for the same purpose must be read and interpreted together.").

[16]    Indeed, another condition to effectiveness of the Third Amendment is that the "Superpriority Credit
Agreement is or will become in full force and effect substantially contemporaneously with the effectiveness of this
Agreement."  Third Am. § 4(f).

973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has

'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will

be avoided if possible") (quoting *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.

1988)); *see also Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Tr. Co. of N.Y.*,

727 N.E.2d 563, 566-567 (N.Y. 2000).

> **2.    *The Purpose Of The Third Amendment And The Intent Of The Parties
> Foreclose Any Ambiguity***

37.    Second, to the extent the Court perceives any ambiguity in the contractual terms,

it should interpret the Third Amendment consistently with the purpose of the contract, the intent

of the parties, and common-sense commercial practice.  *See, e.g.*, *Lockheed Martin Corp. v.

Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("It is axiomatic under New York law ...

that the fundamental objective of contract interpretation is to give effect to the expressed

intentions of the parties") (internal quotation and alteration omitted).[17]  Furthermore, "a contract

should not be interpreted to produce a result that is absurd, commercially unreasonable or

contrary to the reasonable expectations of the parties." *Lipper Holdings, LLC v. Trident

Holdings, LLC*, 766 N.Y.S.2d 561, 562 (App. Div. 2003) (citations omitted).

38.    Black Diamond's reading is inconsistent with the parties' intent and would

frustrate the very purpose of the Third Amendment.  Black Diamond argues that, based on its

interpretation, the Third Amendment was ineffective and thus accomplished nothing.  *See*

Compl. at 20.  Of course, the parties to the Third Amendment did not intend for it to have no

effect whatsoever.  *See Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.*,133 N.E. 370, 371

---

[17]    New York law, moreover, does not favor constructions that create conditions precedent.  *See Willis v. Ronan*, 631 N.Y.S.2d 50, 51 (App. Div. 1995).  Here, Black Diamond urges a reading that would do something similar: dramatically overextend the conditions to effectiveness of the Third Amendment.

(N.Y. 1921) (Cardozo, J.) (interpreting a contract in light of the view that "[i]t was meant to accomplish something").[18]

### B.    Nor Did The Third Amendment Require Unanimity By "Releasing" Collateral

39.    From there, Black Diamond argues that even the majority lenders could not effectuate the Third Amendment without the consent of all of the lenders, because it somehow had the effect of "releasing" collateral.  *See* Compl. ¶ 59-61.  To be sure, if Black Diamond is right, the 2018 Transaction would have required the consent of all of the lenders.[19]  *See id.* ¶ 60. But its argument has no merit.

40.    The Third Amendment did not release any collateral as a formal matter, by (for example) agreeing to release it, redefining collateral in the deal documents, or filing a UCC termination statement.  *See, e.g.*, *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1014 (Del. 2014).  As is evident from the face of the Collateral Trust Agreement, no liens were released as a result of the Specified Auction or the Third Amendment.   Instead, new superpriority liens were created above the existing (and still extant) first liens securing the non-extending Term Loans.  Black Diamond's constituency remain secured creditors in these bankruptcy proceedings, superior to all major creditor constituencies except the superpriority lenders themselves.  Nowhere in the Complaint does it allege to the contrary.

---

[18]    Nor can Black Diamond dispute the intent of the parties.  Its predecessor agent Deutsche Bank participated in the deal and signed the Third Amendment.  Thus, even if Black Diamond is permitted to turn around and urge a contorted reading of the terms of the contract, it cannot be heard to dispute the intent of the parties.  *See infra* Section III.

[19]    Section 10.5 of the 2015 Credit Agreement governs the consents required for amendments, and provides that "[w]ithout the written consent of each Lender ... that would be directly adversely affected thereby ... no amendment ... shall be effective if the effect thereof would ... release all or substantially all of the Collateral ..." 2015 Credit Agreement § 10.5(b), Compl. Ex. 1.  Black Diamond does not otherwise dispute that the Third Amendment complied with the 2015 Credit Agreement's amendment provisions.  *See* Compl. Ex. 1 § 10.5.

41.    Instead, Black Diamond contends that "[t]he 2018 Refinancing Transaction had *the effect* of releasing all or substantially all of the Collateral, because it purported to subordinate the Term Loans to the New Term Loans." Compl. ¶ 61 (emphasis added). This is demonstrably not true. The Third Amendment did not "have the effect" of releasing collateral, but rather subordinated Black Diamond's (still extant) rights in collateral.

42.    Black Diamond attempts to conflate the concepts of subordination and release. But they are different. "Substantively, the act of release and the act of subordination perform different functions and have different results": release extinguishes interests in collateral while subordination only reorders the priority of the interests. *Silva v. GVF Cannery, Inc. (In re GNV Cannery, Inc.)*, 188 B.R. 651, 658 (Bankr. N.D. Cal. 1995), *aff'd in part, rev'd in part on other grounds sub nom. Silva v. Wells Fargo Bank, N.A. (In re GNV Cannery, Inc.)*, 202 B.R. 140 (N.D. Cal. 1996); *In re Tele/Resources, Inc.*, 21 B.R. 358, 363-364 (Bankr. S.D.N.Y. 1982) (explaining that subordination "is no more a release of its perfected secured position to any other parties than is an assignment"), *rev'd on other grounds sub nom. Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266 (2d Cir. 1983).

43.    This distinction is meaningful because "a subordinated lien continues to exist, it has the potential of rising in priority as senior encumbrances are discharged, and the lienholder remains a secured (albeit perhaps an undersecured) creditor." *GVF Cannery*, 188 B.R. at 658. Here, Black Diamond retains its liens, albeit on a subordinated basis.

44.    Had the parties to the 2015 Credit Agreement wanted to condition subordination (as opposed to or in addition to release) on the consent of all lenders, they could have done so expressly. The 2015 Credit Agreement was negotiated by sophisticated parties well-versed in

collateralization.   The 2015 Credit Agreement discusses the concept of subordination throughout, *see e.g.* §§ 6.1(h), 6.4(n), 7.7, 9.8(a), but Section 10.5 does not contain it.[20]

45.    Black Diamond's argument that the Third Amendment is invalid because it did not consent to subordination simply has no merit.

### III.    Black Diamond Really Seeks Rescission, A Remedy Unavailable To It

46.    While Black Diamond styles its claims as arising under the 2015 Credit Agreement, fundamentally, Black Diamond is seeking relief akin to the equitable remedy of rescission.[21]  This equitable remedy is unavailable to it for two reasons.

47.    First, Black Diamond's argument ignores the fact that it is bound by the actions, knowledge, and consent of its predecessor.  That fact, supported by the documents attached to the Complaint, renders the relief Black Diamond seeks inequitable: it would give them greater rights than Deutsche Bank would have had if Deutsche Bank were still the agent.  Black Diamond should be equitably estopped from seeking rescission.

48.    Equitable estoppel prevents a party from going back on its earlier word, when another party has justifiably relied on it.  *See, e.g.*, *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 442 (6th Cir. 2010); *Sabilia v. Richmond*, No. 11 Civ. 739, 2011 U.S. Dist. LEXIS 152228, at *91-92 (S.D.N.Y. Oct. 26, 2011) (applying New York law), *report and recommendation adopted*, No. 11-CV-739, 2012 U.S. Dist. LEXIS 8229 (S.D.N.Y. Jan. 24,

---

[20]    By comparison, for example, the debtor-in-possession credit facility in *RadioShack*, also from 2015, expressly said that amendments could not "release all or substantially all of the Collateral" *or* "subordinate the Obligations or the Liens securing the Obligations." *In re RadioShack Corp.*, No. 15-10197, 2015 Bankr. LEXIS 4541, at *415 (Bankr. D. Del. Mar. 12, 2015).

[21]    As a threshold matter, rescission of a contract is a remedy available only to those who relied on, and are harmed by, the misrepresentations or omissions of another.  *See Bavelis v. Doukas (In re Bavelis)*, 571 B.R. 278, 300 (Bankr. S.D. Ohio 2017); *Zaremba v. Fed. Ins. Co. (In re Cont'l Capital Inv. Servs., Inc.)*, 439 B.R. 111, 128 (Bankr. N.D. Ohio 2010); *HCFA Assocs. Corp. v. Grosman*, 960 F. Supp. 581, 585 (E.D.N.Y. 1997).  But Black Diamond does not allege any misrepresentation or omission in the Complaint.

2012).  Where a successor in interest has "knowledge of the facts creating the estoppel," courts

have applied equitable estoppel to privies as well.  *See, e.g.*, *Clearview Apartment Assocs., LP v.*

*Ocasio*, 844 N.Y.S.2d 558, 560 (Sup. Ct. App. Term 2007); *Facer v. City of Toledo*, 702 N.E.2d

1267, 1272 (Ohio C.P. 1998) ("Equitable estoppel applies to parties and privies to a

transaction.").

49.    Here, Black Diamond's predecessor Deutsche Bank participated in the 2018

Transaction with a full understanding of the contours of the deal.  Each lender under the 2015

Credit Agreement appointed Deutsche Bank to act on its behalf.  *See* Compl. Ex. 1 § 9.1.  Now

Black Diamond as Deutsche Bank's successor cries foul simply because it thinks it is

advantageous to do so.[22]

## IV.    <u>Any Request To Leapfrog The Superpriority Lenders Is Without Basis</u>

50.    Finally, Black Diamond's request for this Court to declare the non-extending

Term Loan lenders the true, first-priority lenders is without legal basis.  If the 2018 Transaction

is "null and void," as the Complaint argues it is, Compl. at 20, the only sensible remedy would

be to return the parties to the positions they would have occupied if the 2018 Transaction had

never happened.  This would make Black Diamond's lender constituency, at best, *pari passu*

with the Superpriority Lenders.

---

[22]    After the 2018 Transaction, funds associated with Black Diamond, along with other lenders, acquired a controlling interest in the non-extending Term Loans.  Shortly before the petition date, on October 10, 2019, these funds removed Defendant GLAS as agent and installed Black Diamond as successor agent.

**CONCLUSION**

51.     The Specified Auction was fully compliant with the 2015 Credit Agreement, and

the Third Amendment was effective in consummating the 2018 Transaction.  It is clear that

Black Diamond cannot plead any other facts to support its theory.  The Complaint should be

dismissed with prejudice.


Dated: January 17, 2020
      Columbus, Ohio

                                      Respectfully submitted,

                                      /s/ *Andrew Goldman*
                                      Andrew Goldman (*pro hac vice*)
                                      Craig Goldblatt (*pro hac vice*)
                                      Benjamin Loveland (*pro hac vice*)
                                      Christopher D. Hampson (*pro hac vice*)
                                      Salvatore M. Daniele (*pro hac vice*)
                                      WILMER CUTLER PICKERING
                                        HALE AND DORR LLP
                                      250 Greenwich Street
                                      New York, NY  10007
                                      Telephone: (212) 230-8800
                                      Facsimile:  (212) 230-8888
                                        andrew.goldman@wilmerhale.com
                                        craig.goldblatt@wilmerhale.com
                                        benjamin.loveland@wilmerhale.com
                                        chris.hampson@wilmerhale.com
                                        sal.daniele@wilmerhale.com

                                      - and -

                                      /s/ *Douglas L. Lutz*
                                      Douglas L. Lutz (0064761)
                                      A.J. Webb (0093655)
                                      Bryan J.K. Sisto (0088143)
                                      FROST BROWN TODD LLC
                                      3300 Great American Tower
                                      301 East Fourth Street
                                      Cincinnati, OH  45202
                                      Telephone: (513) 651-6800
                                      Facsimile:  (513) 651-6981
                                        dlutz@fbtlaw.com
                                        awebb@fbtlaw.com

bsisto@fbtlaw.com

*Counsel to GLAS Trust Company LLC,*
*as Administrative Agent*

/s/ *Kim Martin Lewis*
Kim Martin Lewis (0043533)
Alexandra S. Horwitz (0096799)
DINSMORE & SHOHL LLP
255 East Fifth Street
Suite 1900
Cincinnati, OH  45202
Telephone: (513) 977-8200
Facsimile:  (513) 977-8141

- and -

Nicole L. Greenblatt
Mark McKane (*pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
  LLP
601 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900
  nicole.greenblatt@kirkland.com
  mmckane@kirkland.com

- and -

Ross M. Kwasteniet (*pro hac vice*)
Joseph M. Graham (*pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
  LLP
300 North LaSalle
Chicago, IL  60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200
  ross.kwasteniet@kirkland.com
  joe.graham@kirkland.com

*Counsel to Murray Energy Corp. and Murray*
*Energy Holdings Co. and Counsel to the*
*Debtors and Debtors in Possession*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing *Memorandum of Law In Support of Defendants Murray Energy Corp., Murray Energy Holdings Co., and GLAS Trust Company LLC's Joint Motion to Dismiss the Adversary Complaint of Black Diamond Commercial Finance, L.L.C.* was served electronically on the date of filing through the court's ECF System on all ECF participants registered in this case at the email address registered with the court.

/s/  *Douglas L. Lutz*
Douglas L. Lutz