**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) Case No. 19-56885 (JEH) |
| | ) |
| Debtors. | ) Judge John E. Hoffman, Jr. |
| | ) |
| | ) (Joint Administration Granted) |
| | ) |
| | ) |
| BLACK DIAMOND COMMERCIAL | ) |
| FINANCE, L.L.C., as Administrative Agent | ) Adv. Pro. No. 19-02143 |
| 5330 Yacht Haven Grande #100 | ) |
| St. Thomas, USVI  00802-5032, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MURRAY ENERGY CORP. | ) |
| Attn:  Robert D. Moore | ) |
| President, CEO, CFO | ) |
| 46226 National Road | ) |
| St. Clairsville, OH  43950 | ) |
| | ) |
| MURRAY ENERGY HOLDINGS CO. | ) |
| Attn:  Robert D. Moore | ) |
| President, CEO, CFO | ) |
| 46226 National Road | ) |
| St. Clairsville, OH  43950 | ) |
| | ) |
| GLAS TRUST COMPANY LLC | ) |
| c/o Registered Agent Solutions, Inc. | ) |
| 10 Ferry Street 313 | ) |
| Concord, NH  03301 | ) |
| | ) |

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy.  The location of Debtor Murray Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

-and-                                              )
                                                   )
U.S. BANK, N.A.                                    )
Attn:  Andrew Cecere                               )
President and CEO                                  )
U.S. Bancorp Center                                )
800 Nicollet Mall                                  )
Minneapolis, MN  55402,                            )
                                                   )
                          Defendants.              )
                                                   )

## FIRST AMENDED COMPLAINT

Black Diamond Commercial Finance, L.L.C. ("BDCF"), as Administrative Agent with

respect to the outstanding term loans (the "Term Loans") issued under the Credit and Guaranty

Agreement dated April 16, 2015, as amended or otherwise modified from time to time (the

"Credit Agreement"), by and among Murray Energy Corporation (the "Company") as Borrower,

Murray Energy Holdings Co. ("Holdings"), certain subsidiaries of Borrower as guarantors

(collectively, with the Company  and Holdings, "Murray Energy"), the lenders party thereto from

time to time, and BDCF (as successor to GLAS Trust Company, LLC (as successor to Deutsche

Bank AG New York Branch)), by and through its undersigned counsel, hereby alleges as follows

based upon information and belief:

### NATURE OF COMPLAINT

1.      In 2018, the Company wanted to extend the maturities on its Term Loans by

2.5 years.  But it knew that many of the lenders would not agree to an extension without an

inducement.  And it also knew that, even if it offered such an inducement, certain lenders still

would not agree to an extension.

2.      That put the Company in a bind.  Under the Credit Agreement, the Company

could not refinance or extend the Term Loans by providing inducements—priority, more

collateral, or new guarantors—that the Company did not likewise give to lenders that declined to

refinance or extend their Term Loans.  Moreover, the Company could not even amend the Credit

Agreement, under some circumstances, without the unanimous consent of the lenders.

3.      Knowing that not all lenders would agree and that consent would not be

unanimous, the Company attempted to circumvent the restrictions in the Credit Agreement

altogether.  It did so by falsely characterizing a textbook refinancing as a "modified Dutch

auction" under the Credit Agreement—even as it openly touted the transaction as a refinancing

in its public statements (and has continued to do so in its statements to the Bankruptcy Court).

4.      Had this refinancing truly been a "modified Dutch auction," the Company would

have been allowed, under a separate provision of the Credit Agreement, to purchase the Term

Loans on a non-pro rata basis.  By inappropriately invoking the "modified Dutch auction"

provision, Murray Energy entered into an "exchange" with certain lenders in which these

exchanging lenders received new loans with longer maturities, but were also granted greater

priority, additional collateral, and new guarantees—none of which was given to the existing

loans.

5.      This "exchange" neither conformed to the basic structure of a "modified Dutch

Auction" as it is set out in the Credit Agreement nor resembled a "modified Dutch auction" as

that term is uniformly understood in the industry.  For this reason and others catalogued below,

the exchange triggered multiple Defaults or Events of Default under the Credit Agreement.

These Defaults and Events of Default rendered invalid the very agreement by which the

refinancing transaction was effected and, therefore, the refinancing itself.

6.      This Action is brought by the Agent on behalf of the non-consenting lenders to

this transaction continuing to hold Term Loans under the Credit Agreement, seeking, among

other things, a declaratory judgment that the refinancing transaction is invalid, including (but not

limited to) the creation of priority rights granted to the so-called "Superpriority" loans.  Plaintiffs

also ask this Court to declare that the Term Loan lenders are the true senior and first lien lenders

with respect to collateral securing the Term Loans.

### JURISDICTION AND VENUE

7.      The Court has jurisdiction over these claims under 28 U.S.C. § 1334(b), which

provides that district courts shall have original jurisdiction "of all civil proceedings arising under

title 11, or arising in or related to cases under title 11."

8.      The Court also has jurisdiction over these claims under 28 U.S.C. § 157(a) and

the general order of reference entered in this District—Amended General Order No. 05-02.

9.      The claims asserted herein are core proceedings under 28 U.S.C. § 157(b)(2)(A),

(B), (K), and (O).

10.      Pursuant to Federal Rule of Bankruptcy Procedure 7008, this adversary

proceeding relates to the Chapter 11 case *In re Murray Energy Holdings Co., et al.*, pending in

this Court as Case No. 19-56885 (JEH).

11.      Pursuant to Federal Rule of Bankruptcy Procedure 7008, Plaintiff consents to the

entry of final judgment by this Court if it is determined that, absent consent of the parties, this

Court cannot enter final orders or judgment consistent with Article III of the United States

Constitution.

12.      Venue is proper in this Court under 28 U.S.C. § 1409(a) and the Order Regarding

Complex Chapter 11 Cases, General Order No. 30-3.

13.      Venue is proper in this Court notwithstanding Section 10.16 of the Credit

Agreement, and, to the extent applicable, Section 8.6(b) of the Intercreditor Agreement, and

Section 7.17 of the Collateral Trust Agreement, because the determination of lien validity and

4

priority at issue in this Complaint is intimately intertwined with the Debtors' bankruptcy cases, and the public interest in such Debtors' reorganization outweighs the parties' contractual choice of forum.

14.     This Court has personal jurisdiction over Defendants, including pursuant to Federal Rule of Bankruptcy Procedure 7004(f).

## PARTIES

15.     Plaintiff Black Diamond Commercial Finance, L.L.C., is Administrative Agent with respect to the Term Loans issued under the Credit Agreement and in that capacity has the authority to enforce the terms of the Credit Agreement on behalf of the holders of the Term Loans.  BDCF was appointed as Administrative Agent on October 10, 2019.

16.     Defendant Murray Energy Corp. (the "Company") is an Ohio corporation with its principal place of business in St. Clairsville, Ohio.

17.     Defendant Murray Energy Holdings Co. ("Holdings") is a Delaware corporation with its principal place of business in St. Clairsville, Ohio.

18.     Defendant GLAS Trust Company LLC ("GLAS") is Administrative Agent with respect to the term loans issued pursuant to the Superpriority Credit and Guaranty Agreement dated as of June 29, 2018 (hereinafter, "New Term Loans" and "Superpriority Credit Agreement").  GLAS also served as predecessor administrative agent with respect to the existing Term Loans under the Credit Agreement.  The allegations against GLAS are limited to its actions and role serving as Administrative Agent under these agreements.

19.     Defendant U.S. Bank, N.A. ("U.S. Bank") is collateral trustee with respect to the Second Amended and Restated Collateral Trust Agreement, dated as of June 29, 2018 (the "Collateral Trust Agreement"),  the Second Amended and Restated Intercreditor Agreement,

dated as of June 29, 2018 (the "Intercreditor Agreement"), and the Specified Collateral Trust

Agreement, dated as of June 29, 2018 (the "Specified Collateral Trust Agreement").   The

allegations against U.S. Bank are limited to its actions and role serving as collateral trustee under

these agreements.

## STATEMENT OF FACTS

### The Credit Agreement

20.    In March 2015, the Company agreed to pay cash consideration of approximately

$1.37 billion to acquire an interest in Foresight Energy GP LLC and Foresight Energy LP, a

producer of thermal coal that operates four mines in the Illinois Basin.

21.    In order to fund that acquisition, the Company and Holdings entered into the

Credit Agreement, dated April 16, 2015 (and, as amended on August 15, 2016 and November 10,

2016, the "Credit Agreement," attached here as Exhibit 1), which created—and provided the

terms that governed—a $2,000,000,000 Senior Secured Term Loan Facility.   The proceeds of

that facility were also intended to be used to refinance existing debt and for general corporate

purposes.

22.    To secure the term loans issued pursuant to the Credit Agreement (the "Term

Loans"), the lenders were granted a first priority lien on certain fixed asset collateral (such as

real estate and equipment) ("Term Loan Collateral"), as well as a second priority lien on certain

asset-backed loan collateral (such as accounts receivable, inventory, and cash) ("ABL

Collateral").   These lien priorities were established in, among other documents, (a) the Amended

and Restated Collateral Trust Agreement, dated December 5, 2013 (the "2013 Collateral Trust

Agreement," attached here as Exhibit 2), which set forth the terms on which the Collateral

Trustee[2] had been appointed to, among other things, distribute the collateral securing the Term

Loans and other debt; and (b) the Amended and Restated Intercreditor Agreement, dated April

16, 2015 (the "2015 Intercreditor Agreement," attached here as Exhibit 3), which set forth the

agreement between the Collateral Trustee, on behalf of the term debt holders, on the one hand,

and the ABL Agent, on behalf of the asset-backed lenders, on the other, as to their respective

rights and obligations in the Term Loan Collateral, ABL Collateral, and other assets.

23.     The Term Loans were also guaranteed by certain Murray Energy subsidiaries.

24.     The Credit Agreement contained multiple provisions intended to protect the Term

Loan lenders.

25.     Critically, Section 2.17 ("Ratable Sharing") prevented the Company from

extending preferential treatment to any subset of the Term Loan Lenders (with limited

exception).  Specifically, Section 2.17 provided that if any Lender received a "payment" from

the Company, the Lender was required to share that payment on a pro rata basis with all other

Lenders.  This ensured that each Term Loan lender would receive its fair share of any payments

made on the Term Loans.  This provision applied regardless whether such "payment" came in

the form of a cash payment or otherwise:  Section 2.17 applied to, *inter alia*, any "payment or

reduction of a proportion of the aggregate amount of principal, interest, fees, and other amounts

then due and owing" whether "by voluntary payment . . . or by the enforcement of any right

under the Credit Documents *or otherwise*."  Ex. 1, Credit Agreement, § 2.17 (emphasis added).

26.     The Ratable Sharing provision prevented the Company from giving particular

Lenders preferential treatment, and was similar to Section 2.16(c)'s separate requirement that

payments be disbursed to Lenders on a pro rata basis.  The 2013 Collateral Trust Agreement

---

[2] Capitalized terms shall have the meanings ascribed to them in the respective agreements unless
otherwise defined herein.

similarly provided that proceeds from the enforcement of any collateral would be shared pro rata among Lenders holding the same priority.  *See* Ex. 2, 2013 Collateral Trust Agreement, § 3.4(a).

27.     Although ratable sharing is critical to ensure that borrowers do not extend preferential treatment to a subset of lenders, there are limited circumstances in which non-pro rata payments may be in the best interest of both the borrower and all of its lenders.  One such circumstance is when loans are trading below par.  In such a circumstance, a borrower can de-lever and improve its financial stability by repurchasing its loans at a discount to par from those lenders willing to sell, and then cancelling such loans.

28.     To accommodate such de-levering purchases by the Company, Section 10.6(i) of the Credit Agreement contained an express exception to Section 2.17's ratable sharing requirement.  It allowed the Company to repurchase loans through a "modified Dutch auction" that would be offered on equal terms to all Term Loan lenders.[3]  The Company would give notice that it intended to purchase a certain amount of loans at some price within a stated range of discounts to par.  *See* Ex. 1, Credit Agreement, § 10.6(i); Exhibit M to Credit Agreement ("Exhibit M") at M-1.  Lenders would then bid the greatest discount to par (*i.e.*, the lowest dollar value) at which they would be willing to sell.  *See* Ex. 1, Credit Agreement, § 10.6(i); Exhibit M at M-2.  The greatest discount to par that would enable the Borrower to purchase the full amount of loans it had announced was the "Applicable Threshold Price."  Exhibit M at M-2.  Any Lender who bid *lower* than the Applicable Threshold Price would sell its Term Loans at the price it bid, not the Applicable Threshold Price.  That ensured the Company would receive the highest available discount to par across the aggregate Term Loan principal it was purchasing—meaning

---

[3] "Investopedia describes a modified Dutch auction as a sales technique for selling stock shares where the purchase bid starts high and gradually drops until enough bids are placed to sell all of the available shares at once."  *See* https://www.reference.com/business-finance/modified-dutch-auction-a75058451b73339e

the Company would be de-levering to the maximum extent possible, and thus safeguarding the interests of those Lenders who elected *not* to participate in the auction.

29.     Upon repurchase pursuant to Section 10.6(i), the Term Loans would be "cancelled for all purposes and no longer outstanding," Ex. 1, Credit Agreement, § 10.6(i)(ii), ensuring both (1) that the transaction actually de-levered the company; and (2) that the Company could not exercise lender rights that might otherwise enable it to oppress non-participating Lenders (*i.e.*, by voting for self-interested Credit Document amendments or by directing action by the Administrative Agent or Collateral Trustee).  All of this ensured that, if non-pro rata payments were to be made, Term Loan lenders would be offered a meaningful choice: sell their Term Loans at an acceptable discount to par or stand pat and remain a creditor to a healthier company.

30.     To further protect the Term Loan lenders, and to safeguard their first priority lien on the Term Loan Collateral, the Credit Agreement also placed restrictions on the Company's ability to incur additional debt and liens.

31.     Section 6.2, for example, prohibited the Company from creating or incurring any new Liens except under certain, limited circumstances.

32.     In addition, Section 6.1 of the Credit Agreement prohibited the Company, as well as certain subsidiaries, from incurring any Indebtedness except for certain enumerated purposes and/or subject to certain requirements.

33.     Section 6.1 also limited the Company's ability to incur debt to refinance the Term Loans, including by circumscribing the scenarios in which the Company could incur Refinancing Indebtedness and by providing that such Refinancing Indebtedness could not be senior to, or have superior rights to collateral than, the Term Loans under the Credit Agreement.

34.     For example, Section 6.1(s) provided that the Company could incur Refinancing Indebtedness but only if (i) all of the cash proceeds were applied *solely* to the prepayment of Term Loans on a dollar-for-dollar basis, and (ii) "no Default or Event of Default shall have occurred and be continuing or would result therefrom."

35.     Any Refinancing Indebtedness was also required to be equal in priority ("*pari passu*") or subordinate to Term Loans under the Credit Agreement.   The Credit Agreement achieved this by requiring, as applicable here, Refinancing Indebtedness to be Permitted First Lien Priority Refinancing Debt, which forbade the issuance of debt senior to the Term Loans. Specifically:

> "Permitted First Lien Priority Refinancing Debt" means any secured Indebtedness . . . incurred by Borrower in the form of one or more series of senior secured notes or loans; provided that such Indebtedness is . . . secured by Liens on the Collateral (x) on a *pari passu* basis . . . with the Liens securing Obligations under the Credit Documents pursuant to the Collateral Trust Agreement . . . .

Ex. 1, Credit Agreement, § 1.1 at p. 41.

36.     The Credit Agreement also limited the Company's ability to pledge additional collateral, or to have its subsidiaries make additional guarantees, in support of Refinancing Indebtedness.

37.     First, the Credit Agreement restricted the ability of the Company to secure Refinancing Indebtedness with assets other than those securing the Term Loans, unless those assets were also made part of the collateral securing the Term Loans.   The definition of Permitted First Lien Priority Refinancing Debt provided that such debt shall not be "secured by any property or assets of Holdings, Borrower or any Restricted Subsidiary other than the Collateral [*i.e.*, the property in which Liens are purported to be granted as security] unless such

property or assets are made a portion of the Collateral hereunder." Ex. 1, Credit Agreement, §

1.1 at p. 41 (sub-part (ii)).

38.     Second, the Credit Agreement prohibited the Company from issuing Refinancing

Indebtedness guaranteed by additional subsidiaries, unless those subsidiaries were also made

guarantors of the Term Loans.  The definition of Refinancing Indebtedness stated that such debt

may not be "guaranteed by any Subsidiaries other than Subsidiaries that are Guarantors (unless

concurrently with or promptly after the closing of such Indebtedness, such Person becomes a

Borrower or Guarantor hereunder) . . . ." Ex. 1, Credit Agreement, § 1.1 at p. 45-46.

39.     Other provisions governing the restructuring or refinancing of the loans likewise

provided protections to the Term Loan lenders.

40.     For example, Section 2.25 ("Extensions of Loans") placed restrictions on the

Company's ability to extend the maturities of the Term Loans.  In particular, while Section 2.25

permitted the Company to agree with one or more Lenders to extend the maturities of their Term

Loans, it provided protections to the non-extending Term Loan lenders.  Among other things—

and consistent with the Credit Agreement's mandate that Lenders be treated equitably and on a

pro rata basis—offers to extend a Class of loans had to be made "on a pro rata basis" and "on the

same terms" to each Lender in the Class. Ex. 1, Credit Agreement, § 2.25(a).  Further, the

extended term loans were not permitted to be "secured by any Collateral or other assets of any

Credit Party that [did] not also secure" the existing Term Loans, and Extending Lenders could

not be repaid without "at least pro rata repayment of the applicable Existing Loans." Ex. 1,

Credit Agreement, § 2.25(c)(ii).  The Extended Loans were also required to have, except as

otherwise provided, the same or less restrictive terms as the existing class of loans. *Id.*

41.    Section 10.5 permitted the refinancing of *all* outstanding Term Loans with replacement loans.  But it similarly required that, except as otherwise provided, all terms applicable to the Replacement Term Loans must be "substantially identical to," or "less favorable" to the Lenders than, the Term Loans.

42.    Section 10.5 also contained a number of other provisions that circumscribed Company's ability to restructure the debt by amending the Credit Agreement.

43.    For example, Section 10.5(b)(vi) prohibited without the written consent of any "directly adversely affected" Lender an amendment whose "effect . . . would . . . reduce the principal amount of any Loan."  (Notably, this provision did not require the reduction in principal to be to the Loans of such affected Lender.)

44.    In addition, all Lenders needed to consent to an amendment that would have the effect of "releas[ing] all or substantially all of the Collateral."  *Id.* § 10.5(b)(ix).

**The 2018 Refinancing Transaction**

45.    In June 2018, the Company announced that it had agreed with certain of its lenders and noteholders—including some of its Term Loan lenders—to complete what it described in press releases as a "refinancing transaction" to "extend[] upcoming debt maturities" (the "2018 Refinancing Transaction").[4]  The transactions were consummated pursuant to the terms of a Transaction Support Agreement dated as of June 4, 2018.

---

[4] *See* Press Release, Murray Energy Corporation Announces Refinancing Transactions and Receipt of Support from More than a Majority of Lenders and Noteholders (June 4, 2018), available at https://www.prnewswire.com/news-releases/murray-energy-corporation-announces-refinancing-transactions-and-receipt-of-support-from-more-than-a-majority-of-lenders-and-noteholders-300658805.html; Press Release, Murray Energy Corporation Announces Completion of Refinancing Transactions to Extend Maturities, Reduce Indebtedness and Lower Cash Interest Payments (July 2, 2018), available at https://www.prnewswire.com/news-releases/murray-energy-corporation-announces-completion-of-refinancing-transactions-to-extend-maturities-reduce-indebtedness-and-lower-cash-interest-payments-300675501.html.

46.    As part of the 2018 Refinancing Transaction, the Company executed what it described as an "exchange" with Lenders under the Credit Agreement, through which the participating lenders received New Term Loans, maturing 2022, governed by the Superpriority Credit Agreement.  In its marketing materials, the Company described the 2018 Refinancing Transaction as a "Term Loan Extension" and asked that "existing holders amend and extend" their Term Loans.  Ex. 6, Murray Energy Corporation, *Transaction Overview*, at 4.  The Company also executed a similar "exchange" related to certain of its outstanding notes.

47.    Notwithstanding the covenants in the Credit Agreement that restricted the Company's ability to incur Indebtedness, the New Term Loans purported to be secured by a lien on the Term Loan Collateral that ranked senior to the liens securing the Term Loans.

48.    The New Term Loans were also guaranteed by additional subsidiaries and secured by additional collateral, none of which was made available to the non-exchanging Term Loan lenders.  In particular, the New Term Loans were guaranteed by Murray Kentucky Energy, Inc. (and its subsidiaries) and Murray South America, Inc., in addition to existing guarantors.  They were also secured with additional collateral: a pledge of 100% of the stock of Murray South America, Inc. and Murray Kentucky Energy, Inc., liens on assets of Murray Kentucky Energy, Inc. and its subsidiaries, certain of Murray Energy Corp.'s indirect equity interests in entities with operations in Colombia, and Murray Energy Corp.'s indirect equity interests in Javelin Global Commodities Holdings LLP.

49.    Notably, the Company did not effectuate the 2018 Refinancing Transaction by expressly invoking any of the mechanisms in the Credit Agreement providing for the refinancing or extension of the Term Loans, such as in Sections 2.25 or 6.1(s) above, because the Company knew that those refinancing provisions plainly forbade it from granting senior liens or new

guarantors in connection with the 2018 Refinancing Transaction.  So the Company attempted to circumvent those restrictions by conducting this exchange through an interrelated and interdependent series of actions, as described in the Waiver, Consent, and Amendment No. 3 to the Credit Agreement (the "Third Amendment").  The Third Amendment is attached here as Exhibit 4.

50.    Among other things, the Third Amendment contemplated that the Company would enter into the Superpriority Credit Agreement.  This Superpriority Credit Agreement in turn enabled the creation of the New Term Loans, which, as discussed above, purported to be secured by a lien on the collateral securing the Term Loans that ranked senior to the liens securing the Term Loans, in addition to being backed by additional guarantees and collateral.  As described above, all of these features—the creation of liens senior to the Term Loans and securing those liens by guarantees and collateral not available to the Term Loans—violated the refinancing and new indebtedness provisions of the Credit Agreement.

51.    The Company also proposed to conduct an auction (the "Specified Auction") in which it would offer to exchange the Term Loans for the same principal amount of New Term Loans.  The Company purported to conduct this auction pursuant to Section 10.6(i) of the Credit Agreement and as outlined in the Auction Notice, attached here as Exhibit 5.  Notably, the Company referred to the transaction as a refinancing in its public statements (and has continued to refer to it as part of a "refinancing" in its statements made in this Court).[5]  Upon information and belief, the Company invoked the Credit Agreement's modified Dutch auction provision

---

[5] *See* Declaration of Robert D. Moore, ¶ 76 (Doc. 10), Case No. 19-56885 (Oct. 19, 2019) ("*The refinancing through the 2018 TSA resulted in an extension of Murray's existing Term Loan maturities by approximately two and a half years on $1.7 billion in debt and an extension of Murray's existing 2L Notes due 2021 maturities by over three years on an additional $500 million in debt.*").

because it understood that this admitted "refinancing" ran afoul of many of the Credit Agreement's restrictions on and criteria for a refinancing.

52.      The Company also invoked the modified Dutch auction provision to circumvent another restriction in the Credit Agreement: Section 2.17's requirement that Lenders share pro rata any payments (cash or otherwise) that they received with respect to the Term Loans.  As discussed, purchases made pursuant to the modified Dutch auction procedures in Section 10.6(i) were an exception to this rule.  Thus, the Company hoped to disguise its refinancing as a modified Dutch auction—which allowed for it to acquire Term Loans on a non-pro rata basis— because Section 2.17 plainly barred a debt exchange in which participating lenders were granted valuable consideration as a condition to their participation (and thus, by definition, not extended pro rata to non-participating lenders).

53.      In addition, the Third Amendment called for the modification of several of the agreements related to the Term Loans, including the Credit Agreement itself.

54.      Among other things, Section 2 of the Third Amendment directed that the Credit Agreement be amended to permit the Superpriority Credit Agreement and New Term Loans (the "Third Amended Credit Agreement").  The Third Amendment also removed the covenants in Section 6, discussed above, that restricted the Company's ability to incur Indebtedness and Liens.  *See* Ex. 4, Third Amendment, § 2(*l*).

55.      Section 2 also amended the agreements establishing the debtholders' relative priority rights in the collateral.  It provided that the Collateral Trust and Intercreditor agreements would be amended and inserted into the Third Amended Credit Agreement and directed the Administrative Agent and Collateral Trustee to execute and deliver the amendments to those agreements (as well as amendments to other Collateral Documents).  *See* Ex. 4, Third

Amendment, § 2(d), (e), (f), (i).  Among other things, the amendments to these agreements had
the effect of granting the New Term Loans priority in the Term Loan Collateral vis-à-vis the
existing Term Loans.  *See, e.g.*, Ex. 4, Third Amendment, Exhibit O, §§ 2.6 & 3.4.

56.     The Third Amendment was executed on June 29, 2018.  A majority of the Term
Loan lenders (the "Consenting Lenders") purported to consent to the Third Amendment,
notwithstanding that they had irrevocably agreed to exchange their Term Loans under the Credit
Agreement for New Term Loans under the Superpriority Credit Agreement, and so the Existing
Term Loans that they purported to vote were to be extinguished "substantially simultaneous[ly]"
with the tabulation of those very votes.

57.     The Third Amendment did not receive unanimous consent.  The current holders
of the Term Loans were not Consenting Lenders.

58.     The 2018 Refinancing Transaction resulted in Term Loans representing
approximately 97 percent of principal amount outstanding being "exchange[d]" for New Term
Loans.

### The Third Amendment—And The Actions It Enabled—Were Invalid

*The Third Amendment Was Ineffective Because The 2018 Refinancing Transaction
Violated The Credit Agreement In Multiple Respects*

59.     Section 2 of the Third Amendment—and therefore the actions that effectuated the
2018 Refinancing—were invalid by the Third Amendment's own terms.  This is because the
effectiveness of Section 2 of the Third Amendment was "subject to the substantially
simultaneous satisfaction" of several conditions, including that "no Default or Event of Default
shall have occurred and be continuing or would result from the consummation of the Specified
Auction."  *See* Ex. 4, Third Amendment, § 4(b).  The 2018 Refinancing violated the Credit
Agreement in multiple respects, resulting in several Defaults or Events of Default that prevented

Section 2 from taking effect.  Accordingly, the Term Loan holders retain the rights they had prior to the 2018 Refinancing Transactions, including that they are the true senior and first lien lenders with respect to the Term Loan Collateral.

60.    The 2018 Refinancing Transaction violated Section 10.6(i) of the Credit Agreement in at least two respects.  As relevant here, Section 10.6(i) permitted the Company to acquire the existing loans, on a non-pro rata basis, through "one or more modified Dutch auctions."  As described above, the Company invoked Section 10.6(i) to exchange the New Term Loans for the existing Term Loans.  But the Specified Auction violated this provision, which in turn constitutes a Default under Section 8.1(e).

61.    *First*, the 2018 Refinancing resulted in a breach of Section 10.6(i) because the so-called "auction" in which the Consenting Lenders exchanged their existing Term Loans for New Term Loans was not a real "modified Dutch auction" as required by that provision.

62.    Critically, the Company did not specify a "range" of discounts to par at which it would be willing to purchase the Term Loans, as is typical in a modified Dutch auction and as is contemplated by the modified Dutch auction procedures outlined in Exhibit M to the Credit Agreement.  Rather, the Company offered a so-called "Discount Range" that was neither a "discount" nor a "range": "Not less than \$1,000 nor greater than \$1,000 [principal amount of New Term Loans] per \$1,000 principal amount of [Term Loans]."  *See* Ex. 5, Auction Notice, at 1.  Instead of seeking to purchase (and cancel) debt at a discount to par, thus de-levering the Company, the Company sought to purchase the Term Loans *at* par in exchange for *more* debt.  And instead of seeking bids to get the best price for the Company, lenders were told simply to agree (or not) to the predetermined consideration offered by the Company at the time it announced the Specified Auction.

63.    And this debt-for-debt exchange diverged sharply from the cash "repurchase" contemplated by Section 10.6(i) and Exhibit M.  That this repurchase was meant to be a ***cash*** transaction is shown by Section 2.14(d)'s mandate that the Company make prepayments out of excess cash flow—that provision subtracts "amounts actually paid to repurchase Loans pursuant to Section 10.6(i)" from the sum owed.  Ex. 1, Credit Agreement, § 2.14(d).

64.    *Second*, the 2018 Refinancing Transaction violated Section 10.6(i) because the Company was permitted to purchase Term Loans only "so long as no Default or Event of Default has occurred and is continuing or would result therefrom."  A Default "would"—and did— "result" from the Specified Auction because, in conducting this auction, the Borrower incurred indebtedness (*i.e.*, the New Term Loans) and Liens in breach of the negative covenants of Sections 6.1 and 6.2.

65.    As described above, the Credit Agreement prohibited the Company from incurring Indebtedness except in the circumstances and/or subject to the requirements specified in Sections 6.1 and 6.2.  The New Term Loans did not fall within any of the enumerated exceptions.

66.    For the reasons explained above, even if the issuance of the New Term Loans did fall within one or more of the enumerated exceptions, the New Term Loans would not qualify as Refinancing Indebtedness permitted under the Credit Agreement because they purported to be senior to—not *pari passu* with—the existing Term Loans.  In other words, the 2018 Refinancing Transaction had the effect of impermissibly subordinating the rights of the Term Loan lenders— they would no longer have the first lien priority rights in Term Loan Collateral guaranteed by the Credit Agreement.

67.     The New Term Loans also were backed by additional guarantees and were secured by additional collateral as compared to the Term Loans in plain contravention of the Credit Agreement provisions discussed above.

68.     While Section 2 of the Third Amendment purported to remove these various restrictions, those amendments were not valid for the reasons described in ¶¶ 59-90.

69.     A breach of Section 6 of the Credit Agreement constituted an Event of Default under Section 8.1(c).  Accordingly, the Specified Auction violated Section 10.6(i) because an Event of Default "would result therefrom."

70.     All of these violations of Section 10.6(i)—the provision that governed the terms of the auction—constituted a Default under the Credit Agreement.   Because the Third Amendment provided that it would become effective only if no default resulted from the Auction, the conditions to the effectiveness of Section 2 of the Third Amendment were not satisfied.  *See* Ex. 4, Third Amendment, § 4(b).

71.     This condition to the effectiveness of the Third Amendment also was not satisfied because several other Defaults or Events of Default would have "occurred and be continuing or would result from the consummation of the Specified Auction."  *See* Ex. 4, Third Amendment, § 4(b).  In addition to violating Section 10.6(i), the Specified Auction—and, more specifically, the issuance of the New Term Loans it enabled—resulted in an independent breach of the negative indebtedness covenants in Section 6.1 of the Credit Agreement (for the same reasons explained above) and, accordingly, an Event of Default.  The Specified Auction also resulted in an Event of Default because it caused a breach of the covenants in Section 6.2 of the Credit Agreement that restricted the Company's ability to incur liens.  These violations, too, prevented the effectiveness of the Third Amendment.

*The Third Amendment Failed To Comply With The
Requirements For Amending The Credit Agreement*

72.    Separately, the Third Amendment was invalid because it was enacted without the requisite consent of the existing lenders in violation of Section 10.5(b) of the Credit Agreement. This is so for three independent reasons.

73.    *First*, the Third Amendment is invalid because it was enacted without adequate consent, even assuming (incorrectly) that only a majority vote was required.  Indeed, not a single valid vote was registered in favor of the Third Amendment—the Consenting Lenders had no ability to assent to the Third Amendment because their Loans were to be extinguished in connection with the Specified Auction.

74.    With limited exception, Section 10.5(a) required (at a minimum) that lenders holding a majority of the Loans (*i.e.*, the Requisite Lenders) provide their written consent to any amendment, modification, termination or waiver of any provision of the Credit Agreement (with additional consents being required for certain amendments).

75.    Pursuant to Section 10.6(i)(ii), loans assigned to the Borrower in a modified Dutch auction—and, thus, the voting power of those loans—are extinguished.  Section 10.6(i)(ii) provides that the "Term Loans so repurchased shall, without further action by any Person, be deemed cancelled for all purposes and no longer outstanding" for "all purposes of this Agreement and all other Credit Documents, including, but not limited to . . . the making of any request, demand, authorization, direction, notice, consent or waiver under this Agreement or any other Credit Document" and "the determination of Requisite Lenders, or for any similar or related purpose, under this Agreement or any other Credit Document."

76.    The Specified Auction, the Third Amendment, and the Superpriority Credit Agreement were interdependent "part[s] of the same transaction."  Mot. to Dismiss, at 14, ¶ 34

20

(Doc. No. 40).  The Credit Documents had to be modified to accommodate the terms of the Superpriority Loans.  The Third Amendment's modifications would not take effect until, *inter alia*, "[t]he Retiring Administrative Agent shall have received a counterpart of this Agreement, executed and delivered by . . . those Consenting Term B Lenders which together constitute Requisite Lenders" and "the Retiring Administrative Agent, the Successor Administrative Agent and the Auction Manager under the Specified Auction shall have received a fully executed conformed copy of the Superpriority Credit Agreement and evidence reasonably satisfactory . . . that the Superpriority Credit Agreement is or will become in full force and effect."  Ex. 4, Third Amendment §§ 3(a), 4(f).

77.    A Lender who wished to participate in the 2018 Refinancing Transaction executed a single "Lender Consent."  Ex. 4, Third Amendment, Annex 1 at 1.  That consent required the Lender to execute four signature pages, which would be used to authorize the necessary amendments and enter into the Superpriority Credit Agreement.  *Id.*  Critically, the consent also irrevocably committed the Lender to selling its loans via the Specified Auction. Executing the Lender Consent caused a Consenting Lender's "executed signature page" to be "attached to the Return Bid."  *Id.*  That, in turn, "obligate[d] the Lender to sell" the entire principal amount of the Lender's Term Loans.  Ex. 5, Auction Notice, Return Bid.  These Lender Consents were due on June 14, 2018, more than two weeks before the 2018 Refinancing Transaction closed on June 29.  Ex. 5, Auction Notice.  The Third Amendment's modifications to the Credit Documents thus hinged on the majority vote of the very lenders who had already committed themselves to surrendering their Existing Loans to be extinguished.

78.    As discussed above, Section 10.6(i)(ii) prohibited the Company from exercising the voting rights of loans it repurchases.  And for good reason.  If a borrower could exercise

lender rights following a non-pro rata buyback, it could leverage the "rights" of lenders who no longer have any interest in the loans in order to oppress non-consenting lenders.

79.     Here, the Consenting Lenders' Term Loans had been effectively repurchased through those Lenders' irrevocable commitment to sell them in the Specified Auction.  It defies reason that the Company could evade the prohibition on exercising lender rights by buying the zombified votes of lenders who, through the very same transaction, would cease to be governed by the Credit Agreement.

80.     This is especially so because Section 10.6(i)(ii) provided that "***Following repurchase by Borrower***" and "***without further action by any Person***," the Term Loans would be "deemed cancelled for all purposes and no longer outstanding."  Ex. 1, Credit Agreement, §10.6(i)(ii) (emphasis added).  The Term Loans were, by all accounts, "repurchased" by the Company once the participating lenders and the Company committed irrevocably to the 2018 Refinancing Transaction.  That commitment occurred, by necessity, before the votes were tallied to approve the Third Amendment—at which point the Term Loans repurchased by the Company were incapable of being used to effect any "consent or waiver under [the Credit] Agreement." *Id.*

81.     The Consenting Lenders' votes therefore could not count towards the "Requisite Lenders" needed for amendment.  Because those votes were needed to achieve the majority constituting the "Requisite Lenders," the amendments, waivers, and consents in the Third Amendment were ineffective.

82.     *Second*, and in the alternative, Section 10.5(b) of the Credit Agreement required unanimous consent of the Lenders if an amendment had "the effect" of releasing "all or substantially all" of the collateral securing the Term Loans.  It provided, in relevant part, that

"[w]ithout the written consent of each Lender (other than a Defaulting Lender) that would be directly adversely affected thereby . . . no amendment . . . shall be effective if the effect thereof would . . . (ix) release all or substantially all of the Collateral."   This provision required unanimous consent because all Lenders were deemed to be "directly affected thereby with respect to" any such amendment.

83.     The 2018 Refinancing Transaction had the effect of releasing all or substantially all of the Collateral, because it purported to subordinate the Term Loans to the New Term Loans. By granting to the New Term Loans "superpriority" rights in the Term Loan Collateral, the 2018 Refinancing all but assured that the collateral—or substantially all of it—would not be available for the benefit of the Term Loans.   This is evidenced by the fact that none of the third-party sources with whom Murray Energy's advisors discussed potential debtor-in-possession financing "indicated a willingness to provide the Debtors with new money financing on an unsecured, junior-lien, or *pari passu* basis."   Postpetition Financing Motion, ¶ 46 (Doc. 28), Case No. 19-56885 (Oct. 29, 2019).

84.     However, not all of the Lenders consented to the Third Amendment.

85.     Because the Third Amendment lacked unanimous written consent, the amendments, waivers, and consents in the Third Amendment (other than in Section 1) were ineffective.

86.     *Third*, Section 10.5(b) of the Credit Agreement required the consent of all lenders "that would be directly adversely affected" if an amendment would have "the effect" of "reduc[ing] the principal amount of any Loan."   Ex. 1, Credit Agreement, § 10.5(b), (b)(vi).

87.     The 2018 Refinancing Transaction reduced the principal of each Consenting Lender's Term Loans to $0, resulting in a 97% reduction in the aggregate outstanding Term Loan principal.

88.     The Third Amendment enabled the 2018 Refinancing Transaction and thus had "the effect" of "reduc[ing] the principal amount of any Loan."

89.     The non-Consenting Term Loan lenders were "directly adversely affected" by this amendment because the 2018 Refinancing Transaction purported to subordinate their priority and encumber additional collateral and guarantors that did not secure the Term Loans.

90.     As above, because each adversely affected Lender did not consent, the amendments, waivers, and consents in the Third Amendment (other than in Section 1) were ineffective.

*The Third Amendment Failed To Comply With The
Requirements For Amending The 2013 Collateral Trust Agreement*

91.     The 2013 Collateral Trust Agreement required "the consent of the requisite percentage or number of holders of each Series of Secured Debt so affected" for amendments that would "reduce[], impair[] or adversely affect[] the rights of any holders of Secured Obligations" to "share in the order of application" of Collateral set forth in Section 3.4 of that agreement. Ex. 2, 2013 Collateral Trust Agreement, § 7.1(a)(2)(B).

92.     By adding the "Superpriority Lien Representatives" to the order of application described in Section 3.4, the Third Amendment purported to amend the 2013 Collateral Trust Agreement to subordinate non-consenting Lenders in the waterfall, and so impaired those Lenders' rights to share in the order of application set forth in the 2013 Collateral Trust Agreement.

93.     For the same reason the Consenting Lenders could not be counted towards the Requisite Lenders to amend the Credit Agreement, they could not be counted towards the "requisite number of holders of each Series of Secured Debt so affected" to amend the 2013 Collateral Trust Agreement.

94.     Because the Consenting Lenders' votes were needed to achieve the majority that, at minimum, was necessary to constitute the "requisite percentage or number of holders of each Series of Secured Debt so affected," the amendments to the 2013 Collateral Trust Agreement were ineffective.

*Because The Third Amendment Was Ineffective,*
*The Actions It Authorized And Enabled Were Also Invalid*

95.     As described above, the relevant portions of the Third Amendment were ineffective either because the conditions to their effectiveness were not satisfied or because they failed to comply with the procedures for amendment set forth in the Credit Agreement and the 2013 Collateral Trust Agreement.

96.     Because the relevant portions of the Third Amendment failed to become effective by either their own terms, or by violating the Credit Agreement and the 2013 Collateral Trust Agreement, the actions the Third Amendment authorized and enabled were also invalid. Accordingly, the amendments to the agreements governing the relative priorities of the loans (such as the 2013 Collateral Trust Agreement and 2015 Intercreditor Agreement) are unenforceable.

97.     As a result, the Term Loan holders retain the rights they had prior to the 2018 Refinancing Transaction, including that they are the true senior and first lien lenders with respect to the Term Loan Collateral.  This means, among other things, that the liens granted to the New

Term Loan lenders are actually subordinate to the liens of the Term Loan lenders, notwithstanding the "superpriority" status they were purportedly granted.

### Even If The Third Amendment Were Valid, The 2018 Refinancing Transaction Is Ineffective Because It Extended Loan Maturities Using Additional Collateral

98.     Section 2.25 of the Credit Agreement set forth requirements for extending the maturities of Term Loans.  "The consummation and effectiveness of each Extension" was conditioned, *inter alia*, on the requirement that Extended Loans may not "be secured by any Collateral or other assets of any Credit Party that does not also secure the Existing Loans."  Ex. 1, Credit Agreement, § 2.25(c), (c)(ii).

99.     In promoting the 2018 Refinancing Transaction, the Company described that transaction as a "Term Loan Extension," in which "existing holders [would] amend and extend" their Term Loans "in order to, among other things, extend the maturities by 2.5 years to October 2022."  Ex. 6, Murray Energy Corporation, *Transaction Overview*, at 4.  The Company so described the 2018 Refinancing even though the same marketing document also contemplated that "[p]articipating lenders w[ould] enter into a new super-priority credit agreement."  *Id.* at 6.  The Company thus believed that the transaction constituted a "Term Loan Extension," even though the transaction contemplated a rollover and new credit agreement.

100.    The Superpriority Loans were, in substance, Extended Loans subject to Section 2.25's requirements.  As the Company has explained, the transaction "allowed Murray to keep the same rates and substantially similar terms, but with a longer maturity horizon that pushed out repayment into 2022."  Mot. to Dismiss, at 3, ¶ 8 (Doc. No. 40).

101.    The Superpriority Loans purported to be secured by new collateral in contravention of Section 2.25's requirements.  For that reason, even assuming the Third

Amendment was effective and the Specified Auction was otherwise a bona fide modified Dutch

auction, the 2018 Refinancing Transaction was ineffective under Section 2.25(c).

## FIRST CLAIM FOR RELIEF
### (Against the Murray Energy Defendants, Defendant GLAS, and Defendant U.S. Bank)

**Declaratory Judgment That The 2018 Refinancing Was Invalid Because The Conditions To The Third Amendment Were Not Satisfied**

102.    Plaintiff repeats the prior allegations as if the same were made part of and fully

set forth at length herein.

103.    Pursuant to Federal Rule of Bankruptcy Procedure 7001(9) and 28 U.S.C. §§

2201 and 2202, this Court is authorized to issue a declaratory judgment.

104.    The proper interpretation and application of the provisions of the relevant

agreements to the case at hand, including whether the amendments thereto were valid, is a

justiciable, present, and actual controversy between the parties.

105.    A condition to the effectiveness of Section 2 of the Third Amendment was that

"no Default or Event of Default shall have occurred and be continuing or would result from the

consummation of the Specified Auction."  *See* Ex. 4, Third Amendment, § 4(b).

106.    The consummation of the Specified Auction, which was not a "modified Dutch

auction" as contemplated by the Credit Agreement or as that term is universally understood in

the industry, violated the Credit Agreement in multiple respects, including breaches of Sections

10.6(i) and 6.

107.    Those violations in turn constituted Defaults or Events of Default under the Credit

Agreement.

108.    Accordingly, the conditions to the effectiveness of Section 2 of the Third Amendment were not satisfied, because a Default or Event of Default "ha[d] occurred" or would "be continuing" or "would result from the consummation of the Specified Auction."

109.    Therefore, the Third Amendment, and the actions it enabled—including the Specified Auction, the creation of the New Term Loans, the Superpriority Credit Agreement, and the amendments to the 2013 Collateral Trust Agreement, 2015 Intercreditor Agreement, and other collateral documents—were also ineffective.

110.    By reason of the foregoing, the 2018 Refinancing Transaction was invalid.

111.    As a result, the Term Loan holders retain the rights they had prior to the 2018 Refinancing Transactions, including that they are the true senior and first lien lenders with respect to the Term Loan Collateral.  This means, among other things, that the liens granted to the New Term Loan lenders are actually subordinate to the liens of the Term Loan lenders, notwithstanding the "superpriority" status they were purportedly granted.

## SECOND CLAIM FOR RELIEF
**(Against the Murray Energy Defendants, Defendant GLAS, and Defendant U.S. Bank)**

**Declaratory Judgment That The 2018 Refinancing Was Invalid Because The Credit Agreement And The Collateral Trust Agreement Were Amended Without Required Consents**

112.    Plaintiff repeats the prior allegations as if the same were made part of and fully set forth at length herein.

113.    Section 10.6(i)(ii) of the Credit Agreement provided that the "Term Loans so repurchased [in a modified Dutch auction] shall, without further action by any Person, be deemed cancelled for all purposes and no longer outstanding" for "all purposes of this Agreement and all other Credit Documents."

114.   The Consenting Lenders' Term Loans had been repurchased when their votes were counted towards the majority needed to amend the Credit Agreement and the 2013 Collateral Trust Agreement.

115.   Because the Consenting Lenders' votes were necessary to constitute a majority required under 10.5(a), the Third Amendment's modifications to the Credit Agreement and the Collateral Trust Agreement were ineffective.

116.   Section 10.5(b) of the Credit Agreement provided that without unanimous written consent of the lenders "no amendment . . . shall be effective if the effect thereof would . . . (ix) release all or substantially all of the Collateral."

117.   The Third Amendment had the effect of "releas[ing] all or substantially all of the Collateral."

118.   The Third Amendment was not enacted with unanimous written consent of the lenders.

119.   Section 10.5(b) of the Credit Agreement required the consent of all lenders "that would be directly adversely affected" if an amendment would have "the effect" of "reduc[ing] the principal amount of any Loan." Ex. 1, Credit Agreement, § 10.5(b), (b)(vi).

120.   The Third Amendment "had the effect" of "reduc[ing] the principal amount of any Loan."

121.   The Third Amendment was not enacted with the written consent of all directly adversely affected lenders.

122.   Because the Third Amendment failed to comply with Section 10.5(a) and/or (b) of the Credit Agreement, the Third Amendment, and the actions it enabled—including the Specified Auction, the creation of the New Term Loans, and the amendments to the 2013 Collateral Trust

Agreement, 2015 Intercreditor Agreement, and other collateral documents—were also ineffective.

123.    By reason of the foregoing, the 2018 Refinancing Transaction was invalid.

124.    As a result, the Term Loan holders retain the rights they had prior to the 2018 Refinancing Transactions, including that they are the true senior and first lien lenders with respect to the Term Loan Collateral.  This means, among other things, the liens granted to the New Term Loan lenders are actually subordinate to the liens of the Term Loan lenders, notwithstanding the "superpriority" status they were purportedly granted.

**THIRD CLAIM FOR RELIEF**
**(Against the Murray Energy Defendants, Defendant GLAS, and Defendant U.S. Bank)**

**Declaratory Judgment That The 2018 Refinancing Was Invalid Because The**
**Company Issued Extended Loans Secured By Additional Collateral**

125.    Plaintiff repeats the prior allegations as if the same were made part of and fully set forth at length herein.

126.    Under Section 2.25 of the Credit Agreement, "[t]he consummation and effectiveness" of Extended Loans was conditioned on the requirement that such loans may not "be secured by any Collateral or other assets of any Credit Party that does not also secure the Existing Loans."  Ex. 1, Credit Agreement, § 2.25(c), (c)(ii).

127.    The Superpriority Loans were, in substance, Extended Loans subject to Section 2.25's requirements.

128.    The Superpriority Loans purported to be secured by Collateral that does not also secure the Existing Loans.

129.    By reason of the foregoing, the 2018 Refinancing Transaction was invalid.

130.    As a result, the Term Loan holders retain the rights they had prior to the 2018 Refinancing Transactions, including that they are the true senior and first lien lenders with respect to the Term Loan Collateral.  This means, among other things, the liens granted to the New Term Loan lenders are actually subordinate to the liens of the Term Loan lenders, notwithstanding the "superpriority" status they were purportedly granted.

## PRAYER FOR RELIEF

WHEREFORE, the Agent, on behalf of the Term Loan lenders, requests that the Court grant the following relief:

A.    On the Agent's first claim for relief, an order (i) declaring that the conditions to the effectiveness of Section 2 of the Third Amendment were not satisfied; (ii) declaring that Section 2 of the Third Amendment was ineffective and any actions taken thereby (including the 2018 Refinancing Transaction and the amendment to the 2013 Collateral Trust Agreement) are null and void; (iii) declaring that the Specified Auction was not a "modified Dutch auction"; and (iv) declaring the Term Loan lenders are the true senior and first lien lenders with respect to the Term Loan Collateral.

B.    On the Agent's second claim for relief, an order (i) declaring that Section 2 of the Third Amendment did not comply with the provisions governing amendment in the Credit Agreement and the 2013 Collateral Trust Agreement; (ii) declaring that Section 2 of the Third Amendment was ineffective and any actions taken thereby (including the 2018 Refinancing Transaction and the amendment to the 2013 Collateral Trust Agreement) are null and void; and (iii) declaring the Term Loan lenders are the true senior and first lien lenders with respect to the Term Loan Collateral.

C.    On the Agent's third claim for relief, an order (i) declaring that the Superpriority Loans constituted Extended Loans under Section 2.25 of the Credit Agreement; (ii) declaring that the issuance of the Superpriority Loans violated Section 2.25 and that the Superpriority Credit Agreement is therefore null and void; and (iii) declaring the Term Loan lenders are the true senior and first lien lenders with respect to the Term Loan Collateral.

Dated:  January 27, 2020                ICE MILLER LLP


                                        */s/ Tyson A. Crist*
                                        Tyson A. Crist (0071276)
                                        John C. Cannizzaro (0085161)
                                        250 West Street, Suite 700
                                        Columbus, OH  43215
                                        Telephone: (614) 462-2243
                                        Facsimile: (614) 224-3266
                                        Tyson.Crist@icemiller.com
                                        John.Cannizzaro@icemiller.com


                                        Lawrence S. Robbins
                                        Ariel N. Lavinbuk
                                        William J. Trunk
                                        Jack A. Herman
                                        ROBBINS, RUSSELL, ENGLERT,
                                        ORSECK, UNTEREINER & SAUBER LLP
                                        2000 K Street, N.W., 4th Floor
                                        Washington, DC 20006
                                        Telephone: (202) 775-4500
                                        Facsimile: (202) 775-4510
                                        lrobbins@robbinsrussell.com
                                        alavinbuk@robbinsrussell.com
                                        wtrunk@robbinsrussell.com
                                        jherman@robbinsrussell.com

                                        *Counsel to Black Diamond Commercial Finance L.L.C., as
                                        Administrative Agent*