# EXHIBIT 1

EXECUTION VERSION

**CREDIT AND GUARANTY AGREEMENT**

**dated as of April 16, 2015**

**among**

**MURRAY ENERGY CORPORATION,**

**MURRAY ENERGY HOLDINGS CO.,**

**CERTAIN SUBSIDIARIES OF MURRAY ENERGY CORPORATION,**
**as Guarantors,**

**VARIOUS LENDERS,**

**DEUTSCHE BANK SECURITIES, INC.,**
**and**
**GOLDMAN SACHS BANK USA,**
**as Joint Lead Arrangers and Joint Bookrunners,**

**GOLDMAN SACHS BANK USA,**
**as Sole Syndication Agent,**

**and**

**DEUTSCHE BANK AG NEW YORK BRANCH,**
**as Administrative Agent,**

_____

**$2,000,000,000 Senior Secured Term Loan Facility**

_____

CH\2051848.14

# TABLE OF CONTENTS

**Page**

SECTION 1. DEFINITIONS AND INTERPRETATION ............................................................ 1
    **1.1. Definitions**.............................................................................1
    **1.2. Accounting Terms** ..................................................................54
    **1.3. Interpretation, Etc.** ...............................................................54
    **1.4. Certain Calculations** .............................................................55
    **1.5. Limited Conditionality Acquisitions** .............................................56
    **1.6. Unrestricted Subsidiaries** .......................................................57
    **1.7. Compliance with Certain Covenants** ...............................................57

SECTION 2. LOANS ........................................................................................ 57
    **2.1. Term Loans**........................................................................57
    **2.2. [Reserved]** .......................................................................58
    **2.3. [Reserved]** .......................................................................58
    **2.4. [Reserved]** .......................................................................58
    **2.5. Pro Rata Shares; Availability of Funds** ..........................................58
    **2.6. Use of Proceeds** .................................................................59
    **2.7. Evidence of Debt; Register; Lenders' Books and Records; Notes** ..................59
    **2.8. Interest on Loans**................................................................60
    **2.9. Conversion/Continuation** ........................................................61
    **2.10. Default Interest** ...............................................................62
    **2.11. Fees** ...........................................................................63
    **2.12. Scheduled Payments** .............................................................63
    **2.13. Voluntary Prepayments** ..........................................................64
    **2.14. Mandatory Prepayments** ..........................................................66
    **2.15. Application of Prepayments** .....................................................68
    **2.16. General Provisions Regarding Payments** .........................................70
    **2.17. Ratable Sharing**................................................................71
    **2.18. Making or Maintaining Eurodollar Rate Loans** ...................................72
    **2.19. Increased Costs; Capital Adequacy** .............................................74
    **2.20. Taxes; Withholding, Etc.**.......................................................76
    **2.21. Obligation to Mitigate; Limitation on Additional Amounts, etc.** ...............80
    **2.22. Defaulting Lender Cure** ........................................................80
    **2.23. Removal or Replacement of a Lender** ............................................81
    **2.24. Incremental Facilities** ........................................................82
    **2.25. Extensions of Loans** ...........................................................84
    **2.26. Incremental Revolving Commitments** .............................................86

SECTION 3. CONDITIONS PRECEDENT ........................................................................ 88
    **3.1. Closing Date**....................................................................88

SECTION 4. REPRESENTATIONS AND WARRANTIES ............................................................. 92
    **4.1. Organization; Requisite Power and Authority; Qualification**......................92
    **4.2. Equity Interests and Ownership**.................................................93
    **4.3. Due Authorization**..............................................................93

ii

**4.4. No Conflict**................................................................................93
**4.5. Governmental Consents**............................................................94
**4.6. Binding Obligation**...................................................................94
**4.7. Historical Financial Statements**...............................................94
**4.8. Security Interest in Collateral**.................................................94
**4.9. No Material Adverse Effect**......................................................95
**4.10. [Reserved]**..............................................................................95
**4.11. Adverse Proceedings, Etc.**......................................................95
**4.12. Payment of Taxes**...................................................................95
**4.13. Properties**...............................................................................95
**4.14. Environmental Matters**..........................................................96
**4.15. Permits and Monitoring of the Environmental and Mining Laws**...................96
**4.16. [Reserved]**..............................................................................97
**4.17. Governmental Regulation**......................................................97
**4.18. Federal Reserve Regulations; Exchange Act**...........................97
**4.19. [Reserved]**..............................................................................98
**4.20. Employee Benefit Plans and the Coal Industry Retiree Health Benefit Act and the Black Lung Benefits Act**..........98
**4.21. Certain Fees**............................................................................98
**4.22. Solvency**.................................................................................98
**4.23. [Reserved]**..............................................................................98
**4.24. Compliance with Statutes, Etc.**..............................................99
**4.25. Disclosure**...............................................................................99
**4.26. Foreign Corrupt Practices Act**...............................................99
**4.27. PATRIOT Act**........................................................................99

SECTION 5. AFFIRMATIVE COVENANTS................................................ 99
**5.1. Financial Statements and Other Reports**................................100
**5.2. Existence**.................................................................................103
**5.3. Payment of Taxes**...................................................................104
**5.4. Maintenance of Properties**.....................................................104
**5.5. Insurance**................................................................................104
**5.6. Books and Records; Inspections**.............................................105
**5.7. Lenders Calls**.........................................................................105
**5.8. Compliance with Laws**...........................................................105
**5.9. Environmental**........................................................................105
**5.10. Subsidiaries**...........................................................................107
**5.11. Additional Material Real Estate Assets**.................................108
**5.12. [Reserved]**..............................................................................108
**5.13. Further Assurances**...............................................................108
**5.14. Maintenance of Ratings**........................................................108
**5.15. Designation of Subsidiaries**...................................................108
**5.16. Post-Closing Covenants**.........................................................109

SECTION 6. NEGATIVE COVENANTS ..................................................... 109
**6.1. Indebtedness**...........................................................................109
**6.2. Liens**......................................................................................114

**6.3. No Further Negative Pledges** .................................................................118
**6.4. Restricted Junior Payments** ..................................................................118
**6.5. Restrictions on Subsidiary Distributions** ..........................................121
**6.6. Investments** ..............................................................................................122
**6.7. Financial Covenant** .................................................................................125
**6.8. Fundamental Changes; Disposition of Assets** ...................................125
**6.9. [Reserved]** ................................................................................................127
**6.10. Sales and Lease-Backs** ...........................................................................127
**6.11. Transactions with Affiliates** .................................................................128
**6.12. Conduct of Business** ...............................................................................129
**6.13. Permitted Activities of Holdings** .........................................................129
**6.14. Amendments or Waivers of Organizational Documents** ..................130
**6.15. Amendments or Waivers with Respect to Certain Indebtedness** ....130
**6.16. Fiscal Year** ...............................................................................................131

**SECTION 7. GUARANTY** ........................................................................ 131
**7.1. Guaranty of the Obligations** ..................................................................131
**7.2. Contribution by Guarantors** .................................................................131
**7.3. Payment by Guarantors** ..........................................................................132
**7.4. Liability of Guarantors Absolute** ..........................................................132
**7.5. Waivers by Guarantors** ...........................................................................134
**7.6. Guarantors' Rights of Subrogation, Contribution, Etc.** ...................135
**7.7. Subordination of Other Obligations** .....................................................136
**7.8. Continuing Guaranty** ..............................................................................136
**7.9. Authority of Guarantors or Borrower** ..................................................136
**7.10. Financial Condition of Borrower** .........................................................136
**7.11. Bankruptcy, Etc.** .....................................................................................136
**7.12. Discharge of Guaranty Upon Sale of Guarantor** ...............................137
**7.13. Keepwell** ...................................................................................................137

**SECTION 8. EVENTS OF DEFAULT** ...................................................... 138
**8.1. Events of Default** ......................................................................................138

**SECTION 9. AGENTS** ............................................................................... 141
**9.1. Appointment of Agents** ...........................................................................141
**9.2. Powers and Duties** ....................................................................................142
**9.3. General Immunity** ....................................................................................142
**9.4. Agents Entitled to Act as Lender** ...........................................................144
**9.5. Lenders' Representations, Warranties and Acknowledgment** ............144
**9.6. Right to Indemnity** ...................................................................................145
**9.7. Successor Administrative Agent** .............................................................145
**9.8. Collateral Documents and Guaranty** .....................................................146
**9.9. Withholding Taxes** ....................................................................................148
**9.10. Administrative Agent May File Bankruptcy Disclosure and Proofs
of Claim** ...................................................................................................149

iv

SECTION 10. MISCELLANEOUS ............................................................................ 150
    **10.1. Notices** ............................................................................................150
    **10.2. Expenses** ..........................................................................................151
    **10.3. Indemnity** ........................................................................................153
    **10.4. Set-Off** ...........................................................................................155
    **10.5. Amendments and Waivers** ...............................................................156
    **10.6. Successors and Assigns; Participations** ............................................161
    **10.7. Independence of Covenants** .............................................................167
    **10.8. Survival of Representations, Warranties and Agreements** ...............167
    **10.9. No Waiver; Remedies Cumulative** ...................................................167
    **10.10. Termination; Collateral Trust Agreement** ......................................168
    **10.11. Marshalling; Payments Set Aside** ..................................................168
    **10.12. Severability** ...................................................................................168
    **10.13. Obligations Several; Independent Nature of Lenders' Rights** .......169
    **10.14. Headings** ......................................................................................169
    **10.15. APPLICABLE LAW** ....................................................................169
    **10.16. CONSENT TO JURISDICTION** ..................................................169
    **10.17. WAIVER OF JURY TRIAL** .........................................................170
    **10.18. Confidentiality** .............................................................................170
    **10.19. Usury Savings Clause** ...................................................................171
    **10.20. Effectiveness; Counterparts** ..........................................................172
    **10.21. PATRIOT Act** .............................................................................172
    **10.22. Electronic Execution of Assignments** .............................................172
    **10.23. No Fiduciary Duty; Trading Counterparty** ....................................172
    **10.24. Designated Coal Contracts** ...........................................................174

**APPENDICES:**    A-1    Term B-1 Loan Commitments
A-2    Term B-2 Loan Commitments
B    Notice Addresses

**SCHEDULES:**    1.1    Excluded Subsidiaries.
3.1(h)  Closing Date Mortgaged Properties
4.1    Jurisdictions of Organization and Qualification
4.2    Equity Interests and Ownership
4.13    Real Estate Assets
4.15(b) Certain Environmental and Mining Obligations
4.21    Broker's or Finder's Fees or Commissions
5.16    Post-Closing Covenants
6.1    Certain Indebtedness
6.2    Certain Liens
6.6    Certain Investments

**EXHIBITS:**    A-1    Funding Notice
A-2    Conversion/Continuation Notice
B-1    Term B-1 Loan Note
B-2    Term B-2 Loan Note
C    [Reserved]
D    Assignment Agreement
E    Certificate re Non-Bank Status
F    Closing Date Certificate
G    Counterpart Agreement
H    Pledge and Security Agreement
I    [Reserved]
J    [Reserved]
K    Intercompany Note
L    Joinder Agreement
M    Modified Dutch Auction Procedures
N    Intercreditor Agreement
O    [Reserved]
P    [Reserved]
Q    Solvency Certificate
R.    Compliance Certificate

## CREDIT AND GUARANTY AGREEMENT

This **CREDIT AND GUARANTY AGREEMENT**, dated as of April 16, 2015, is entered into by and among **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**"), **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation ("**Holdings**"), **CERTAIN SUBSIDIARIES OF BORROWER**, as Guarantors, the Lenders party hereto from time to time, **DEUTSCHE BANK SECURITIES INC.** ("**DBSI**") and **GOLDMAN SACHS BANK USA** ("**Goldman Sachs**") as Joint Lead Arrangers and as Joint Bookrunners (in such capacities, "**Arrangers**"), **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent (in such capacity, "**Syndication Agent**"), and **DEUTSCHE BANK AG NEW YORK BRANCH** ("**DBNY**"), as Administrative Agent (together with its permitted successors in such capacity, "**Administrative Agent**").

## RECITALS:

**WHEREAS**, capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, the Lenders have agreed to extend a term loan credit facility in an aggregate principal amount of $2,000,000,000.00, consisting of $300,000,000.00 aggregate principal amount of Term B-1 Loans and $1,700,000,000.00 aggregate principal amount of Term B-2 Loans, the proceeds of which will be used to fund, in part, the refinancing of the Existing Term Loan Agreement (including the payment of fees, premiums, commissions and expenses in connection therewith) and the Closing Date Acquisition (including paying fees, commissions and expenses in connection with the Closing Date Acquisition), and for general corporate purposes including ongoing working capital requirements, capital expenditures and Permitted Acquisitions; and

**WHEREAS**, Guarantors have agreed to guarantee the obligations of Borrower hereunder and Borrower and each of the Guarantors have agreed to reaffirm the Liens in favor of the Collateral Trustee, for the benefit of the Secured Parties, securing all of their respective Obligations;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.   DEFINITIONS AND INTERPRETATION

**1.1.   Definitions.**   The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**1974 Plan**" as defined in Section 4.20(a).

"**Accounting Change**" as defined in Section 1.2.

CH\2051848.14

"**Acquired Interests**" means (a) 34% of the voting interest and 77.5% of the economic interest of Foresight GP, (b) the Foresight Acquisition Option and (c) 100% of the subordinated units of Foresight LP (and an option to purchase a number of common units that, when added with such subordinated units, gives Borrower ownership of up to 51% of Foresight LP's fully diluted equity securities).

"**Acquired Debt**" means, with respect to any specified Person:

(a)      Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Subsidiary of such specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; provided that if the Indebtedness of such acquired Person is redeemed, defeased, retired or otherwise repaid immediately upon consummation of the acquisition, merger or other transaction pursuant to which such Person merges with or becomes a Subsidiary, such Indebtedness will no longer be Acquired Debt; and

(b)      Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"**Acquisition**" means, collectively, (a) the Closing Date Acquisition and (b) the purchase of all of the issued and outstanding shares of common stock of Consolidation Coal Company, a Delaware corporation ("**CCC Company**"), by Ohio Valley Resources, Inc., an Ohio corporation ("**CCC Purchaser**"), pursuant to and in accordance with that certain Stock Purchase Agreement, dated as of October 25, 2013, among CONSOL Energy Inc., a Delaware corporation, CCC Purchaser, CCC Company, and solely for purposes of Section 5.14, Section 6.03 and Section 11.16 thereof, Borrower, as amended.

"**Acquisition Agreement**" means that certain Purchase and Sale Agreement, dated as of April 7, 2015, among Foresight Reserves and Michael J. Beyer, as sellers, and Borrower, as purchaser (including the exhibits and schedules thereto), as may be further amended.

"**Additional Facilities**" as defined in Section 6.1(c).

"**Additional Facilities Amount**" means, at any time, with respect to any Additional Facility:

(a)      $150,000,000 minus the aggregate principal amount of all loans made and notes issued pursuant to Incremental Commitments pursuant to clause (a) of the term "Incremental Facilities Amount" and other Additional Facilities pursuant to this clause (a) prior to such Additional Facility; plus

(b)      unlimited additional amounts so long as immediately after giving effect to the making of such additional amounts, the Net Leverage Ratio (calculated on a pro forma basis after giving effect to such additional amounts and any transactions funded with the proceeds of such additional amounts but not including the proceeds of such additional amounts as Unrestricted Cash for the purpose of calculating Consolidated Net

Total Debt) does not exceed (i) with respect to additional amounts under a Second Lien Additional Facility, 3.00:1.00 and (ii) with respect to additional amounts under an Unsecured Additional Facility, 4.00:1.00, as of the last day of the Fiscal Quarter most recently ended.

it being understood that the amount set forth in clause (a) need not be utilized prior to the use of the incurrence test set forth in clause (b), and that the Net Leverage Ratio set forth in clause (b) may be exceeded following the utilization of amounts under clause (a).

"**Adjusted Eurodollar Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate *per annum* obtained by dividing (i) (a) the rate *per annum* equal to the rate determined by Administrative Agent to be the offered rate which appears on the page of the Reuters Screen which displays an average British Bankers Association Interest Settlement Rate (such page currently being LIBOR01 page) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (b) in the event the rate referenced in the preceding clause (a) does not appear on such page or service or if such page or service shall cease to be available, the rate *per annum* equal to the rate determined by Administrative Agent to be the offered rate on such other page or other service which displays an average British Bankers Association Interest Settlement Rate for deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period in Dollars, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, or (c) in the event the rates referenced in the preceding clauses (a) and (b) are not available, the rate *per annum* equal to the offered quotation rate to first class banks in the London interbank market by DBNY for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan of Administrative Agent, in its capacity as a Lender, for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (a) one minus (b) the Applicable Reserve Requirement; provided, however, that notwithstanding the foregoing, (x) the Adjusted Eurodollar Rate with respect to the Term Loan shall at no time be less than 1.00% *per annum* and (y) in the event that any reference rate referred to in clause (i) is less than 0%, such reference rate shall be deemed to be 0%.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Restricted Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign, whether pending or, to the actual knowledge of Holdings or any of its Restricted Subsidiaries, threatened in writing against or directly affecting Holdings or any of its Restricted Subsidiaries or any property of Holdings or any of its Restricted Subsidiaries.

"**Affected Lender**" as defined in Section 2.18(b).

"**Affected Loans**" as defined in Section 2.18(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power (i) to vote 10% or more of the Securities having ordinary voting power for the election of directors of such Person or (ii) to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Affiliate Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Annex C to Exhibit M, with such amendments or modifications as may be approved by Administrative Agent and Borrower.

"**Affiliate Transaction**" as defined in Section 6.11.

"**Affiliated Lender**" means each Lender that is an Affiliate of Borrower (other than Holdings and its Subsidiaries).

"**Agent**" means each of (i) Administrative Agent, (ii) Syndication Agent, (iii) Collateral Trustee and (iv) any other Person appointed under the Credit Documents to serve in an agent or similar capacity, including, without limitation, any Auction Manager.

"**Agent Affiliates**" as defined in Section 10.1(b)(iii).

"**Aggregate Amounts Due**" as defined in Section 2.17.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Credit and Guaranty Agreement, dated as of April 16, 2015, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**American Coal**" means The American Coal Company, a Delaware corporation.

"**Applicable Margin**" means (i) (x) with respect to any Term B-1 Loan that is a Base Rate Loan, a rate equal to 5.00%, *per annum* or (y) with respect to any Term B-1 Loan that is a Eurodollar Rate Loan, a rate equal to 6.00%, *per annum* and (ii) with respect to any Term B-2 Loan that is a Base Rate Loan, a rate equal to 5.50%, *per annum* or (y) with respect to any Term B-2 Loan that is a Eurodollar Rate Loan, a rate equal to 6.50%, *per annum*.

"**Applicable Reserve Requirement**" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors or other applicable banking regulator.  Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to

(i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate or any other interest rate of a Loan is to be determined, or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans.  A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender.  The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material that any Credit Party provides to Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to Agents or Lenders by means of electronic communications pursuant to Section 10.1(b).

"**Arrangers**" as defined in the preamble hereto.

"**Asset Sale**" means (a) the sale, lease, conveyance or other disposition of any assets by Borrower or any of Borrower's Restricted Subsidiaries and (b) the issuance of Equity Interests by any of Borrower's Restricted Subsidiaries or the sale by Borrower or any of Borrower's Restricted Subsidiaries of Equity Interests in any of Borrower's Subsidiaries. Notwithstanding the preceding, none of the following items will be deemed to be an "Asset Sale":

(i)    any single transaction or series of related transactions that involve assets having a Fair Market Value of less than $20,000,000;

(ii)    the sale, lease, conveyance or other disposition of assets between or among Borrower and Borrower's Restricted Subsidiaries that are Domestic Subsidiaries;

(iii)    an issuance of Equity Interests by a Restricted Subsidiary of Borrower to Borrower or a Restricted Subsidiary of Borrower that is a Domestic Subsidiary;

(iv)    an issuance of Equity Interests by a Restricted Subsidiary of Borrower that is a Foreign Subsidiary to another Restricted Subsidiary of Borrower that is a Foreign Subsidiary;

(v)    the sale, lease or other transfer of inventory, products, services or accounts receivable in the ordinary course of business and any sale or other disposition of damaged, worn-out or obsolete assets in the ordinary course of business (including the abandonment or other disposition of intellectual property that is, in the reasonable judgment of Borrower, no longer economically practicable to maintain or useful in the conduct of the business of Borrower and Borrower's Restricted Subsidiaries taken as whole);

(vi)    licenses and sublicenses by Borrower or any of Borrower's Restricted Subsidiaries of software or intellectual property in the ordinary course of business;

(vii)    any surrender or waiver of contract rights or settlement, release, recovery on or surrender of contract, tort or other claims in the ordinary course of business;

(viii)    the granting of Liens not prohibited by Section 6.2;

(ix)    the sale or other disposition of cash or Cash Equivalents;

(x)    a Restricted Junior Payment that does not violate Section 6.4 and an Investment that does not violate Section 6.6;

(xi)    dispositions of assets resulting from condemnation or casualty events; and

(xii)    the Royalty Drop-Down Transaction.

"**Assignment Agreement**" means, as applicable, (a) an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by Administrative Agent and Borrower or (b) an Affiliate Assignment Agreement.

"**Assignment Effective Date**" as defined in Section 10.6(b).

"**Auction**" as defined in Section 10.6(i).

"**Auction Manager**" means (a) either Administrative Agent or any Arranger, as determined by Borrower, or any of their respective Affiliates or (b) any other financial institution or advisor agreed by Borrower and Administrative Agent (whether or not an affiliate of Administrative Agent) to act as an arranger in connection with any repurchases pursuant to Section 10.6(i).

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, chief operating officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer (or other officer that is reasonably acceptable to Administrative Agent).

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Base Rate**" means, for any day, a rate *per annum* equal to the greatest of (i) the Prime Rate in effect on such day, (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (iii) the sum of (a) the Adjusted Eurodollar Rate (after giving effect to any Adjusted Eurodollar Rate "floor") that would be payable on such day for a Eurodollar Rate Loan with a one-month Interest Period plus (b) 1.00%.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

CH\2051848.14

"**Beneficial Owner**" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "**Beneficially Owns**" and "**Beneficially Owned**" have a corresponding meaning.

"**Beneficiary**" means each Agent, Lender, Commodities Hedge Provider, Lender Counterparty and Designated Coal Contract Counterparty.

"**Big Boy Representation**" means a representation from a Lender acknowledging that (a) an Affiliated Lender may have information regarding Borrower and its Subsidiaries, their ability to perform the Obligations or any other material information that has not previously been disclosed to Administrative Agent and the Lenders ("**Excluded Information**"), (b) the Excluded Information may not be available to such Lender, (c) such Lender has independently and without reliance on any other party made its own analysis and determined to assign Term Loans to an Affiliated Lender pursuant to Section 10.6(j) notwithstanding its lack of knowledge of the Excluded Information and (d) such Lender waives and releases any claims it may have against Administrative Agent, such Affiliated Lender, Borrower and its Subsidiaries with respect to the nondisclosure of the Excluded Information; or otherwise in form and substance reasonably satisfactory to Administrative Agent, such Affiliated Lender and the assigning Lender.

"**Black Lung Act**" means the Black Lung Benefits Act of 1972, 30 U.S.C. §§ 901, et seq., the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 801, et seq., the Black Lung Benefits Revenue Act of 1977, Pub. L. No. 95-227, 92 Stat. 11 (1978), the Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, 92 Stat. 95 (1978), and the Black Lung Benefits Revenue Act of 1981 and the Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119, 95 Stat. 1643 (1981) in each case as amended, if applicable.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Bona Fide Lending Affiliate**" means any bona fide debt fund, investment vehicle, regulated banking entity or non-regulated lending entity that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business.

"**Borrower**" as defined in the preamble hereto.

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other Governmental Acts to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "**Business Day**" means any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Calculation Date**" as defined in Section 1.4.

"**Capital Lease**" means, subject to Section 1.2, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is required to be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Lease Obligation**" means, at the time any determination is to be made, the amount of the liability in respect of a capital lease that would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP; *provided* that all obligations of the Borrower and its Restricted Subsidiaries that are or would be characterized as an operating lease as determined in accordance with GAAP as in effect on the Closing Date (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capital Lease Obligation) for purposes of this Agreement regardless of any change in GAAP following the Closing Date that would otherwise require such obligation to be recharacterized as a Capital Lease Obligation.

"**Capital Stock**" means (i) in the case of a corporation, corporate stock; (ii) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (iii) in the case of a partnership or limited liability company, partnership interests (whether general or limited or whether common or subordinated), including any units in Foresight GP or Foresight LP, or membership interests; and (iv) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means: (i) (a) United States dollars, euro, or any national currency of any member state of the European Union; or (b) any other foreign currency held by Borrower or its Restricted Subsidiaries in the ordinary course of business; (ii) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality of the United States government (provided that the full faith and credit of the United States is pledged in support of those securities) having maturities of not more than six months from the date of acquisition; (iii) certificates of deposit and eurodollar time deposits with maturities of six months or less from the date of acquisition, bankers' acceptances with maturities not exceeding six months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus in excess of $500.0 million and a Thomson Bank Watch Rating of "B" or better; (iv) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (ii) and (iii) above entered into with any financial institution meeting the qualifications specified in clause (iii) above; or (v) commercial paper having one of the two highest ratings obtainable from Moody's or S&P and, in each case, maturing within six months after the date of acquisition; and money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (i) through (v) of this definition.

CH\2051848.14

"**Cash Management Obligations**" means obligations in respect of cash management services (including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements), including obligations for the payment of fees, interest, charges, expenses and disbursements in connection therewith to the extent provided for in the documents evidencing such cash management services.

"**CCC Company**" as defined in the definition of the term "Acquisition".

"**CCC Purchaser**" as defined in the definition of the term "Acquisition".

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit E.

"**Change of Control**" means, (i) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of Borrower and its Subsidiaries taken as a whole to any Person (including any "person" (as that term is used in Section 13(d)(3) of the Exchange Act)) other than a Principal or a Related Party of a Principal; (ii) the adoption of a plan relating to the liquidation or dissolution of Borrower; (iii) the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any Person (including any "person" (as defined above)), other than the Principals and their Related Parties, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock in Borrower, measured by voting power rather than number of shares; (iv) the first day on which 100% of the outstanding Capital Stock of Borrower ceases to be owned directly or indirectly by Holdings or another entity that (a) is organized or existing under the laws of the United States, any state of the United States or the District of Columbia, (b) has guaranteed the Obligations and pledged all of its Equity Interests in Borrower as Collateral and (c) is a newly formed entity that conducts no other material activities other than holding Equity Interests in Borrower and has no other material assets or liabilities other than such Equity Interests; or (v) any "change of control" or similar event under the Revolving Credit Agreement, any of the Second Lien Documents or Additional Facilities.

"**Class**" means (i) with respect to Lenders, each of the following classes of Lenders: (a) Lenders having Term B-1 Loan Exposure, (b) Lenders having Term B-2 Loan Exposure, (c) Lenders having New Term Loan Exposure of each applicable Series and (d) Lenders having Incremental Revolving Commitments, and (ii) with respect to Loans, each of the following classes of Loans: (a) Term B-1 Loans, (b) Term B-2 Loans, (c) each Series of New Term Loans and (d) Incremental Revolving Loans (including any swingline loans thereunder). Additional Classes of Loans, Borrowings, Commitments and Lenders may be created pursuant to Sections 2.24, 2.25 and 2.26.

"**Closing Date**" means April 16, 2015.

"**Closing Date Acquisition**" means the purchase on the Closing Date by Borrower of the Acquired Interests pursuant to and in accordance with the Acquisition Agreement.

**"Closing Date Certificate"** means a Closing Date Certificate substantially in the form of Exhibit F.

**"Closing Date Mortgaged Property"** as defined in Section 3.1(h)(i).

**"Coal Contract"** means any agreement pursuant to which Borrower or any Guarantor Subsidiary agrees to sell and deliver (and/or purchase) a shipment of coal.

**"Coal Act"** as defined in Section 4.20(b).

**"Coal Liens"** means:

(i) Liens incurred in the ordinary course of business on any specific coal producing property or any interest therein, construction thereon or improvement thereto to secure all or any part of the costs incurred for surveying, exploration, drilling, extraction, development, operation, production, construction, alteration, repair or improvement of, in, under or on such property and the plugging and abandonment of coal mines located thereon (understood that costs incurred for "development" shall include costs incurred for all facilities relating to such coal producing properties or to projects, ventures or other arrangements of which such properties form a part or which relate to such coal producing properties or interests) as long as such Lien do not secure obligations for the payment of borrowed money or other Indebtedness;

(ii) Liens incurred in the ordinary course of business on a coal producing property to secure obligations incurred or guarantees of obligations incurred in connection with or necessarily incidental to commitments for the purchase or sale of, or the transportation or distribution of, the products derived from such coal producing property as long as such Liens do not secure obligations for the payment of borrowed money or other Indebtedness;

(iii) Liens arising in the ordinary course of business under partnership agreements, coal leases, joint operating agreements or similar agreements, net profits agreements, incentive compensation programs on terms that are reasonably customary in the coal business for geologists, geophysicists and other providers of technical services to any of Borrower or any of its Subsidiaries, master limited partnership agreements, farm−out agreements, farm−in agreements, division orders, contracts for the sale, purchase, exchange, transportation, gathering or processing of coal, unitizations and pooling designations, declarations, orders and agreements, development agreements, operating agreements, production sales contracts, area of mutual interest agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or geophysical permits or agreements, and other agreements which are customary in the coal business as long as such Liens do not secure obligations for the payment of borrowed money or other Indebtedness and attach solely to the proceeds of sales of the products derived from such coal producing property;

(iv) Liens pursuant to production payment obligations and other similar obligations with respect to coal and other natural resources of such Person, royalties, dedication of reserves under supply agreements or similar rights or interests granted, taken subject to, or otherwise imposed on properties consistent with normal practices in the mining industry; and

10

(v) Liens pursuant to contract mining agreements and leases granted in the ordinary course of business to others that do not interfere with the ordinary conduct of business of Borrower or its Restricted Subsidiaries and do not secure obligations for the payment of borrowed money  or other Indebtedness;

provided, however, that in all instances such Liens are limited to the assets that are the subject of the relevant agreement, program, order or contract.

**"Collateral"** means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for all or any part of the Obligations under the Credit Documents (subject to exceptions contained in the Collateral Documents), in each case excluding any Excluded Assets.

**"Collateral Documents"** means the Pledge and Security Agreement, the Mortgages, the Intellectual Property Security Agreements, the Intercreditor Agreement, the Collateral Trust Agreement, the Reaffirmation Agreement, and all other instruments, documents and agreements delivered by or on behalf of any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, Collateral Trustee, for the benefit of Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for all or any part of the Obligations under the Credit Documents (subject to exceptions contained in the Collateral Documents).

**"Collateral Questionnaire"** means a certificate in form reasonably satisfactory to Administrative Agent that provides information with respect to the personal or mixed property of each Credit Party.

**"Collateral Trust Agreement**" means the Amended and Restated Collateral Trust Agreement dated as of December 5, 2013, by and among Borrower, the Guarantors, the Collateral Trustee, and the additional parties thereto from time to time, as the same may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time.

**"Collateral Trustee"** means U.S. Bank National Association, its successors and assigns as Collateral Trustee pursuant to the Collateral Trust Agreement.

**"Commitment"** means any Term Loan Commitment, New Term Loan Commitment and/or Incremental Revolving Commitment, as the case may be.

**"Commodities Agreement"** means any commodity price hedging agreement or other similar agreement or arrangement, which is for the purpose of hedging commodity price exposure associated with Borrower's and its Subsidiaries' operations and not for speculative purposes.

**"Commodities Hedge Provider"** means (i) any Person that is a Lender, Agent, Arranger or an Affiliate of a Lender, Agent or Arranger at the time it entered into a Secured Commodities Agreement and (ii) each Lender, Agent, Arranger and each Affiliate of a Lender, Agent or Arranger counterparty to a Secured Commodities Agreement as of the Closing Date.

CH\2051848.14

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit R.

"**Consolidated Adjusted EBITDA**" means, for any period, an amount determined for Borrower and its Restricted Subsidiaries on a consolidated basis equal to Consolidated Net Income for such period, plus, without duplication:

(i) an amount equal to any extraordinary loss plus any net loss realized by Borrower or any of its Restricted Subsidiaries in connection with an Asset Sale, to the extent such losses were deducted in computing such Consolidated Net Income; plus

(ii) provision for taxes based on income or profits of Borrower and its Restricted Subsidiaries for such period, to the extent that such provision for taxes was deducted in computing such Consolidated Net Income; plus

(iii) the Fixed Charges of Borrower and its Restricted Subsidiaries for such period, to the extent that such Fixed Charges were deducted in computing such Consolidated Net Income; plus

(iv) any foreign currency translation losses (including losses related to currency remeasurements of Indebtedness) of Borrower and its Restricted Subsidiaries for such period, to the extent that such losses were taken into account in computing such Consolidated Net Income; plus

(v) depreciation, amortization (including amortization of intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period) and other non-cash charges and expenses (excluding any such non-cash charge or expense to the extent that it represents an accrual of or reserve for cash charges or expenses in any future period or amortization of a prepaid cash charge or expense that was paid in a prior period) of Borrower and its Restricted Subsidiaries for such period to the extent that such depreciation, amortization and other non-cash charges or expenses were deducted in computing such Consolidated Net Income; plus

(vi) to the extent deducted in computing such Consolidated Net Income, extraordinary, non-recurring or unusual losses for such period; plus

(vii) to the extent deducted in computing such Consolidated Net Income, the amortization of debt discount for such period; plus

(viii) any expenses or charges (other than depreciation or amortization expense) related to any Equity Offering, Permitted Investment, Permitted Acquisition, disposition, recapitalization or the incurrence, amendment or waiver of Indebtedness permitted to be incurred by this Agreement (including a refinancing thereof) (in each case, whether or not successful); plus

12

(ix) the amount of any restructuring charge or reserve, integration cost or cost associated with establishing new facilities that is deducted (and not added back) in such period in computing Consolidated Net Income, including any one-time costs incurred in connection with acquisitions after the Closing Date, and costs related to the closure and/or consolidation of facilities; provided that the aggregate amount of cash charges and cash costs that are added to Consolidated Adjusted EBITDA pursuant to this clause (ix) shall not exceed, together with (1) the aggregate amount of cost savings and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to clause (vi) of Section 1.4 and pursuant to clause (x) of this definition and (2) the aggregate amount of costs and expenses (including fees) added to Consolidated Adjusted EBITDA pursuant to clause (xi) of this definition, 10% of Consolidated Adjusted EBITDA in such four-Fiscal Quarter period; plus

(x) the amount of cost savings, synergies and operating efficiencies anticipated to result from the Transactions and any Specified Transaction (calculated on a pro forma basis as though such cost savings, synergies and operating efficiencies had been realized on the first day of such period as if such cost savings, synergies and operating efficiencies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; provided that (A) such cost savings, synergies and operating efficiencies are reasonably identifiable, (B) such cost savings, synergies and operating efficiencies have been realized or are anticipated by Holdings to be realized within 12 months after the Closing Date or, in the case of a Specified Transaction, within 12 months after the closing date of such Specified Transaction, (C) no cost savings, synergies and operating efficiencies shall be added pursuant to this clause (x) to the extent duplicative of any expenses or charges otherwise added to Consolidated Adjusted EBITDA, whether through a pro forma adjustment or otherwise, for such period and (D) the aggregate amount of cost savings and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to this clause (x) shall not exceed, together with (1) the aggregate amount of cost savings, synergies and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to clause (vi) of Section 1.4, (2) the aggregate amount of cash charges and cash costs added to Consolidated Adjusted EBITDA pursuant to clause (ix) of this definition and (3) the aggregate amount of costs and expenses (including fees) added to Consolidated Adjusted EBITDA pursuant to clause (xi) of this definition, 10% of Consolidated Adjusted EBITDA in such four-Fiscal Quarter period; plus

(xi) the extent deducted in computing such Consolidated Net Income, costs and expenses, including fees, incurred directly in connection with the consummation of the Transactions, including, without limitation, the Closing Date Acquisition, and any amendment or other modification thereof, in each case, deducted (and not added back) in computing Consolidated Net Income; provided that the aggregate amount of costs and expenses (including fees) added to Consolidated Adjusted EBITDA pursuant to this clause (xi) shall not exceed, together with (1) the aggregate amount of cost savings and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to clause (vi) of Section 1.4 and pursuant to clause (x) of this definition and (2) the aggregate amount of cash charges and cash costs added to Consolidated Adjusted EBITDA pursuant to clause (ix) of this definition, 10% of Consolidated Adjusted EBITDA for such four-Fiscal Quarter period; minus

(xii) non-cash items increasing such Consolidated Net Income for such period, other than the accrual of revenue in the ordinary course of business,

13

in each case, on a consolidated basis and determined in accordance with GAAP.

Notwithstanding any of the foregoing to the contrary, (x) for purposes of calculating all financial ratios and tests for any four-Fiscal Quarter period that includes the Fiscal Quarter ending on December 31, 2014, March 31, 2015, June 30, 2015 or September 30, 2015, Consolidated Adjusted EBITDA shall be based on the sum of (a) the applicable amounts specified below for such Fiscal Quarter, and (b) Consolidated Adjusted EBITDA for the portion of such four-Fiscal Quarter period not including such Fiscal Quarter:

| Fiscal Quarter Ending | Consolidated Adjusted EBITDA |
| --- | --- |
| March 31, 2014 | $247,064,000 |
| June 30, 2014 | $200,716,000 |
| September 30, 2014 | $204,976,000 |
| December 31, 2014 | $178,877,000 |

and (y) for purposes of calculating all financial ratios and tests for any four-Fiscal Quarter period that includes the Fiscal Quarter ending on March 31, 2015, Consolidated Adjusted EBITDA shall be based on the actual financial statements delivered pursuant to Section 5.1(b) calculated in a manner consistent with the calculation of Consolidated Adjusted EBITDA for the above-referenced Fiscal Quarters ending on March 31, 2014, June 30, 2014, September 30, 2014 or December 31, 2014.

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures of Borrower and its Restricted Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items, or which should otherwise be capitalized, reflected in the consolidated statement of cash flows of Borrower and its Restricted Subsidiaries.

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of Borrower and its Restricted Subsidiaries on a consolidated basis that may properly be classified as current assets (other than deferred tax assets) in conformity with GAAP, excluding Cash and Cash Equivalents.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of Borrower and its Restricted Subsidiaries on a consolidated basis that may properly be classified as current liabilities (other than deferred tax liabilities) in conformity with GAAP, excluding the current portion of long term debt (including any revolving credit loans).

"**Consolidated Excess Cash Flow**" means, for any period, an amount (if positive) equal to:

(i) the sum, without duplication, of the amounts for such period of (a) Consolidated Net Income, <u>plus</u>, (b) to the extent reducing Consolidated Net Income, the sum, without duplication, of amounts for non-Cash charges reducing Consolidated Net Income, including for depreciation and amortization (excluding any such non-Cash charge to the extent that it represents an accrual or reserve for potential Cash charge in any future period or

CH\2051848.14

amortization of a prepaid Cash gain that was paid in a prior period), plus (c) the Consolidated Working Capital Adjustment, minus

(ii) the sum, without duplication, of (a) the amounts for such period paid from Internally Generated Cash except to the extent made using the Cumulative Amount representing amounts allocated to clause (ii) of the definition of the term "Cumulative Amount" of (1) scheduled repayments of Indebtedness (other than repayments of loans under the Revolving Credit Agreement except to the extent commitments thereunder are permanently reduced in connection with such repayments) and scheduled repayments of obligations under Capital Leases (excluding any interest expense portion thereof), (2) Permitted Investments (including Permitted Acquisitions), (3) Consolidated Capital Expenditures, (4) cash payments made by Borrower or any of its Subsidiaries in such Fiscal Year in respect of any non-current mining-related liability that is not expensed in such Fiscal Year, (5) amounts added back to Consolidated Net Income in respect of cash losses, charges and expenses pursuant to clauses (i) and (vi) of the definition thereof, (6) cash payments in respect of Restricted Junior Payments permitted by Sections 6.4(e), (h) and (o), (7) deposits permitted under Section 6.2, including 6.2(d), and (8) without duplication of amounts deducted from Consolidated Excess Cash Flow in prior periods, the aggregate consideration required to be paid in cash by the Borrower or any of its Subsidiaries pursuant to binding contracts or executed letters of intent (the "**Contract Consideration**") entered into prior to or during such period relating to Permitted Acquisitions, Permitted Investments (other than Investments made pursuant to Section 6.6(a), (d) or (s)), Consolidated Capital Expenditures or acquisitions of intellectual property (to the extent not expensed) to be consummated or made, *plus* any restructuring cash expenses, pension payments or tax contingency payments that have been added to Consolidated Excess Cash Flow pursuant to clause (i)(b) above required to be made, in each case during the period of four consecutive Fiscal Quarters of Borrower following the end of such period; *provided* that to the extent the aggregate amount of Internally Generated Cash actually utilized to finance such acquisitions, Permitted Investments, Consolidated Capital Expenditures, or acquisitions of intellectual property during such period of four consecutive fiscal quarters is less than the Contract Consideration, the amount of such shortfall shall be added to the calculation of Consolidated Excess Cash Flow at the end of such period of four consecutive Fiscal Quarters, plus (b) other non-Cash gains increasing Consolidated Net Income for such period (excluding any such non-Cash gain to the extent it represents the reversal of an accrual or reserve for potential Cash gain in any prior period plus (c) to the extent paid in such year, reclamation liabilities required under law to be paid). As used in this clause (ii), "scheduled repayments of Indebtedness" does not include (x) mandatory prepayments or voluntary prepayments of the Term Loans (but does include prepayments of other Indebtedness), (y) repurchases of Term Loans pursuant to Section 10.6(i) and (z) repayments of Loans made with the Cash proceeds of any Refinancing Indebtedness.

"**Consolidated Net Income**" means, for any period, the aggregate of (a) the net income (loss) of Borrower and its Restricted Subsidiaries for such period, on a consolidated basis (for the avoidance of doubt, excluding the net income (loss) of any Unrestricted Subsidiary of such Person) plus (b) without duplication of amounts included in clause (a), cash distributions received by Borrower and its Restricted Subsidiaries from Foresight LP for such period, determined in accordance with GAAP and for the avoidance of doubt including any variable interest entity with financial results that are required by GAAP to be consolidated with

Borrower's financial results, and without any reduction in respect of preferred stock dividends; <u>provided</u> that, for purposes of clause (a):

(i) all extraordinary gains or losses and all gains (but not losses) realized in connection with any Asset Sale or the disposition of securities or the early extinguishment of Indebtedness, together with any related provision for taxes on any such gain, will be excluded;

(ii) the net income (but not loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or similar distributions paid in cash to the specified Person or a Restricted Subsidiary of the Person;

(iii) the net income (but not loss) of any Restricted Subsidiary will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that net income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders;

(iv) the cumulative effect of a change in accounting principles will be excluded;

(v) any (i) extraordinary, exceptional, unusual or nonrecurring gain, loss, charge or expense or any charges, expenses or reserves in respect of any restructuring, redundancy or severance expense and any charge or expense constituting expenses relating to the Transactions will be excluded, (ii) non-cash items in respect of reclamation liabilities, pension, OPEB and workers' compensation and other employee insurance related liabilities (excluding any active employee medical, dental or related expenses), including any withdrawal liabilities, will be excluded and (iii) cash payments (excluding the posting of letters of credit and cash collateral) in respect of reclamation liabilities, pension, OPEB and workers' compensation and other employee insurance related liabilities (excluding any active employee medical, dental or related expenses), including any withdrawal liabilities, will be deducted from Consolidated Net Income (but only to the extent not already reducing Consolidated Net Income in accordance with GAAP);

(vi) any non-cash compensation charge or expense arising from any grant of stock, stock options or other equity based awards and any non-cash deemed finance charges in respect of any pension liabilities or other provisions, will be excluded;

(vii) non-cash gains and losses attributable to movement in the mark-to-market valuation of obligations under Interest Rate Agreements, Commodities Agreements and Hedging Obligations pursuant to Financial Accounting Standards Board Statement No. 133; and

(viii) any expense (or income) as a result of adjustments recorded to earnout obligations or other contingent consideration liabilities relating to any Acquisition or any Permitted Acquisition or other Permitted Investment shall be excluded.

**"Consolidated Net Total Debt"** means, as of any date of determination, (a) the aggregate stated balance sheet amount of all Indebtedness described in clauses (i) through (iv) of the definition of the term "Indebtedness" of Borrower and its Restricted Subsidiaries (for the

avoidance of doubt, (i) excluding any undrawn portion of the Revolving Credit Agreement and (ii) for this purpose, letters of credit will be deemed to have a principal amount equal to the amount drawn and not reimbursed thereunder, if any) determined on a consolidated basis in accordance with GAAP, minus (b) the aggregate amount of Unrestricted Cash included in the consolidated balance sheet of Borrower and its Subsidiaries as of such date.

"**Consolidated Working Capital**" means, as at any date of determination, the excess of Consolidated Current Assets over Consolidated Current Liabilities.

"**Consolidated Working Capital Adjustment**" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period. In calculating the Consolidated Working Capital Adjustment there shall be excluded the effect of reclassification during such period of current assets to long term assets and current liabilities to long term liabilities and the effect of any Permitted Acquisition, the designation of any Unrestricted Subsidiary as a Restricted Subsidiary or any Restricted Subsidiary as an Unrestricted Subsidiary during such period; provided that (i) there shall be included with respect to any Permitted Acquisition during such period an amount (which may be a negative number) by which the Consolidated Working Capital acquired in such Permitted Acquisition as at the time of such acquisition exceeds (or is less than) Consolidated Working Capital at the end of such period and (ii) there shall be included with respect to any Unrestricted Subsidiary that is designated as a Restricted Subsidiary during such period an amount (which may be a negative number) by which the Consolidated Working Capital gained in such designation as at the time of such designation exceeds (or is less than) Consolidated Working Capital at the end of such period.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit A-2.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Credit Party pursuant to Section 5.10.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Notes, if any, the Collateral Documents, and all other documents, certificates, instruments or agreements executed and delivered by a Credit Party for the benefit of any Agent or any Lender in connection

herewith (other than Hedge Agreements, Commodities Agreements, Coal Contracts (including any Designated Coal Contracts)).

"**Credit Extension**" means the making of a Loan.

"**Credit Party**" means Borrower and each Guarantor from time to time party to a Credit Document.

"**Cumulative Amount**" means at any time (the "**Cumulative Amount Reference Time**"), an amount (which shall not be less than zero) equal to:

(i) $50,000,000; plus

(ii) (x) the cumulative amount of Consolidated Excess Cash Flow of Borrower and its Restricted Subsidiaries for all Fiscal Years completed after the Closing Date (commencing with the Fiscal Year ending December 31, 2015) and prior to the Cumulative Amount Reference Time, minus (y) the portion of such Consolidated Excess Cash Flow that has been (or is required to be) applied after the Closing Date and prior to the Cumulative Amount Reference Time to the prepayment of Term Loans in accordance with Section 2.14(d); plus

(iii) the amount of any cash capital contributions or Net Equity Proceeds from (A) the sale or issuance of any Equity Interests (other than Disqualified Equity Interests) received or made by Holdings (or any direct or indirect parent thereof) and contributed to Borrower or (B) the sale or issuance of Disqualified Equity Interest of Borrower or debt securities of Borrower, in each case that have been converted into or exchanged for Equity Interests (other than Disqualified Equity Interests) of Borrower (other than Equity Interests or debt securities sold to a Subsidiary of Borrower) and contributed to Borrower; plus

(iv) 50% of any dividends received in cash by Borrower or a Restricted Subsidiary of Borrower that is a Guarantor Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Cumulative Amount Reference Time from an Unrestricted Subsidiary of Borrower, to the extent such amount is not already included in Consolidated Excess Cash Flow for purposes of clause (ii) of this definition; plus

(v) to the extent that any Unrestricted Subsidiary of Borrower designated as such after the Closing Date is re-designated as a Restricted Subsidiary after the date of the Closing Date or merged into a Restricted Subsidiary after the Closing Date, the Fair Market Value of Borrower's and Restricted Subsidiaries' Investment in such Unrestricted Subsidiary as of the date of such re-designation or merger, to the extent such amount is not already included in Consolidated Excess Cash Flow for purposes of clause (ii) of this definition;

(vi) without duplication of any other clauses contained in this definition, to the extent that any Investment that was made after the Closing Date pursuant to Sections 6.6(j), (r), (s) or (t) is (a) sold for cash or otherwise cancelled, liquidated or repaid for cash, or (b) made in an entity that subsequently becomes a Restricted Subsidiary of Borrower, the initial amount of such Investment (if less, the amount of cash received upon repayment or sale); plus

18

(vii) the amounts of any prepayments of Term Loans required to be made by Borrower pursuant to Section 2.14(a), (b) or (d) that Term Loan Lenders have declined pursuant to Section 2.15(c), except to the extent such declined amounts are then required to be applied to prepay other Indebtedness and are not declined by the holders of such other Indebtedness; <u>minus</u>

(viii) the aggregate amount of any Investments made pursuant to Section 6.6(t), any Restricted Junior Payment made pursuant to Section 6.4(f) (and any intercompany loan to a Subsidiary that is not a Guarantor Subsidiary made pursuant to Section 6.6(d)(C) in reliance on Section 6.4(f)) and any Restricted Junior Payment made pursuant to 6.4(g), in each case, during the period commencing on the Business Days immediately following the Closing Date and ending on or prior to the Cumulative Amount Reference Time (and, for purposes of this clause (ix), without taking account of the intended usage of the Cumulative Amount at such Cumulative Amount Reference Time).

"**DBNY**" as defined in the preamble hereto.

"**DBSI**" as defined in the preamble hereto.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Declining Lender**" as defined in Section 2.23.

"**Default**" means a condition or event that constitutes an Event of Default, or after notice or expiration of any grace period set forth in Section 8 or both, would constitute an Event of Default.

"**Defaulting Lender**" means subject to Section 2.22, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies Administrative Agent and Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (which conditions precedent, together with the applicable default, if any, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified Borrower or Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lenders' obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with the applicable default, if any, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by Administrative Agent or Borrower, to confirm in writing to Administrative Agent and Borrower that it will comply with its prospective funding obligations hereunder (<u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Administrative Agent and Borrower), or (d)

Administrative Agent has received notification that such Lender is, or has a direct or indirect parent company that is (i) insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors or (ii) the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding or otherwise subject to any proceeding under Debtor Relief Laws, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its direct or indirect parent company, or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or otherwise or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Designated Coal Contract**" means (i) the Existing Designated Coal Contract and (ii) any other Coal Contract entered into from time to time by Borrower or any of its Guarantor Subsidiaries with a Designated Coal Contract Counterparty that has been designated by Borrower and such Designated Coal Contract Counterparty as a "Designated Coal Contract" by notice to Administrative Agent delivered on or prior to the tenth Business Day following the later of (a) the Closing Date, (b) the date that such Coal Contract is entered into, or (c) the date that the Person that is a party to such Coal Contract becomes a Lender, Agent or Arranger (or an Affiliate of a Lender, Agent or Arranger).

"**Designated Coal Contract Counterparty**" means (i) the Existing Designated Coal Contract Counterparty and (ii) any other Person that is a Lender, an Agent or Arranger or an Affiliate of a Lender, an Agent or Arranger at the time it entered into a Designated Coal Contract and any Person who is an Agent, Arranger or a Lender (and any Affiliate thereof) as of the Closing Date but subsequently, whether before or after entering into a Designated Coal Contract, ceases to be an Agent, Arranger or a Lender, as the case may be.

"**Designated Non-Cash Consideration**" means the Fair Market Value of non-cash consideration received by Borrower or a Restricted Subsidiary of Borrower in connection with an Asset Sale that is so designated as Designated Non-Cash Consideration in an officers' certificate executed by the principal executive officer and the principal financial officer of Borrower setting forth the basis of such valuation, less the amount of cash and Cash Equivalents received in connection with any sale of such Designated Non-Cash Consideration.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily

redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments or dividends in cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case of the foregoing clauses (i) - (iv), prior to the date that is 91 days after the Latest Maturity Date at the time of issuance thereof, except, in the case of clauses (i) and (ii), if as a result of a change of control, initial public offering or asset sale, so long as any rights of the holders thereof upon the occurrence of such a change of control or asset sale event are subject to compliance with Section 6.4 or the prior payment in full of all Obligations under this Agreement.

"**Disqualified Lender**" means (a) the Persons identified by name in writing to Administrative Agent on or prior to March 20, 2015, (b) any competitor of Borrower or any of its Subsidiaries or any affiliate of such Person, in the case of this clause (b), identified by Borrower to Administrative Agent and Lenders by name in writing from time to time and (c) any affiliates (other than affiliates that are Bona Fide Lending Affiliates) of the foregoing that are readily identifiable on the basis of such affiliate's name (it being acknowledged and agreed by Borrower that all such disclosures under clauses (a) and (b) will be made available to any Lender upon its request); provided that neither Administrative Agent nor any Arranger shall have any responsibility for monitoring compliance with any provisions of this Agreement with respect to Disqualified Lenders.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States, any State thereof or the District of Columbia.'

"**Drop-Down Transaction**" means any Asset Sale by Borrower or its Restricted Subsidiaries to Foresight GP, Foresight LP or any of its Subsidiaries; provided that (i) if, as of the last day of the most recently ended Fiscal Quarter, the Secured Net Leverage Ratio (calculated on a pro forma basis after giving effect to such Asset Sale and any related repayment of Indebtedness from the proceeds thereof) (x) exceeds 2.50:1.00, Borrower or such Restricted Subsidiary shall receive Cash consideration equal to not less than 75% of the Net Enterprise Value of such assets and (y) otherwise, Borrower or such Restricted Subsidiary shall receive Cash consideration equal to not less than 50% of the Net Enterprise Value of such assets, (ii) the Net Asset Sale Proceeds thereof shall be applied as required by Section 2.14(a)(ii), (iii) immediately prior to, and after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing or would result therefrom, (iv) the consideration received for such assets shall be in an amount at least equal to the Fair Market Value thereof, and (v) any Capital Stock received by Borrower or any Guarantor in consideration for such Drop-Down Transaction shall become Collateral in accordance with Section 5.10(a). For the avoidance of doubt, the Royalty Drop-Down Transaction shall not constitute a Drop-Down Transaction.

"**Eligible Assignee**" means (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof) and (ii) any commercial bank, insurance company, investment or mutual fund

or other fund or entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit, buys or invests in loans, securities or other financial assets in the ordinary course of business; provided, no natural person, Defaulting Lender, Disqualified Lender, Credit Party or Affiliate of a Credit Party shall be an Eligible Assignee (except assignments to Borrower pursuant to Section 10.6(i) and assignments to Affiliated Lenders pursuant to Section 10.6(j)).

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA, other than a Multiemployer Plan, which is sponsored, maintained or contributed to by, or required to be contributed by a Credit Party or, with respect to employee benefit plans for which a Credit Party could reasonably be expected to have any actual or potential liability, any of their respective ERISA Affiliates.

"**Engagement Letter**" as defined in Section 10.3(d).

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive, by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law or any Governmental Authorization issued thereto; (ii) in connection with any Release or threatened Release of any Hazardous Material or any actual or alleged Hazardous Materials Activity; (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment that could give rise to any liability or obligation under applicable Environmental Law or (iv) in connection with any contractual agreement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Laws**" means, any and all applicable federal, state and local laws, ordinances, regulations, and common law, or any enforceable administrative or judicial order, consent, decree or judgment or Governmental Authorizations relating to (i) pollution or the preservation and protection of the environment, including laws relating to the Release of any Hazardous Materials; (ii) the generation, use, storage, transportation or disposal of, or exposure to, Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare (with respect to Hazardous Materials), in any manner applicable to Borrower or any of its Restricted Subsidiaries or any Facility.

"**Environmental and Mining Laws**" means any and all applicable federal, state and local laws, ordinances, regulations and common law, or any enforceable administrative or judicial order, consent, decree or judgment, relating to pollution or the protection of the environment, including, without limitation, those relating to, regulating, or imposing liability or standards of conduct concerning (i) the emission, discharge, release, generation, processing, use, treatment, storage, disposal,  transport or handling of, or exposure to, Hazardous Materials, (ii) the investigation, remediation or cleanup of any Hazardous Materials, (iii) surface or underground coal mining, including any related reclamation, or (iv) coal workers' pneumoconiosis disease (black lung).

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"**Equity Offering**" means a sale either (a) of Equity Interests of Borrower by Borrower (other than Disqualified Equity Interests and other than to a Subsidiary of Borrower or a Guarantor) or (b) of Equity Interests of Holdings or a direct or indirect parent entity of Borrower (other than to Holdings or a Subsidiary of Holdings) to the extent that the net proceeds therefrom are contributed to the common equity capital of Borrower.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"**ERISA Affiliate**" means, as applied to any Person: (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) solely for purposes of Section 412 and 430 of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person is a member. Any former ERISA Affiliate of any Credit Party shall continue to be considered an ERISA Affiliate of such Credit Party within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Credit Party solely with respect to liabilities arising after such period for which such Credit Party could reasonably be expected to be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means: (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure of any Pension Plan to meet the minimum funding standard of Section 412 or Section 430 of the Internal Revenue Code (or Section 302 or 303 of ERISA, in each case whether or not waived) or the failure by a Credit Party or any of its ERISA Affiliates to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure of any of the Credit Parties or any of their respective ERISA Affiliates to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by any Credit Party or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to a Credit Party or any of its ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which would reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on any of the Credit Parties or any of their respective ERISA Affiliates pursuant to Section 4062 or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal of any of the Credit Parties or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of

Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by any of the Credit Parties or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could reasonably be expected to give rise to the imposition on Holdings, any of its Restricted Subsidiaries or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 406, Section 409, Sections 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan or the assets thereof, or against any of the Credit Parties or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; (xi) the imposition of a Lien on the assets of any of the Credit Parties or any of their respective ERISA Affiliates pursuant to Section 430(k) of the Internal Revenue Code or pursuant to Section 303(k) of ERISA with respect to any Pension Plan; (xii) a determination that the aggregate benefit liabilities under any Pension Plan exceed the aggregate current value of the assets of such Pension Plan, as of the end of any plan year, on the basis of the actuarial assumptions specified for funding purposes in the most recent actuarial valuation for such Pension Plan at the time of such determination; (xiii) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Internal Revenue Code or Section 305 of ERISA, to the extent such Multiemployer Plan is not in such status as of the date hereof; or (xiv) failure of Holdings, any of its Restricted Subsidiaries or any of their ERISA Affiliates to comply with the requirements of Section 515 of ERISA with respect to a Multiemployer Plan.

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Asset**" has the meaning ascribed to such term in the Pledge and Security Agreement.

"**Excluded Damages**" as defined in Section 10.3.

"**Excluded Hedge Obligation**" means, with respect to any Guarantor, any guarantee of any Swap Obligations under a Secured Hedge Agreement if, and only to the extent that and for so long as, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation under a Secured Hedge

Agreement (or any guarantee thereof) or under Designated Coal Contract (or any guarantee thereof) is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Guarantor or the grant of such security interest would otherwise have become effective with respect to such Swap Obligation under a Secured Hedge Agreement or a Designated Coal Contract but for such Guarantor's failure to constitute an "eligible contract participant". If a Swap Obligation under a Secured Hedge Agreement or a Designated Coal Contract arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation under a Secured Hedge Agreement or a Designated Coal Contract that is attributable to swaps for which such Guarantee or security interest is or becomes illegal or unlawful under the Commodity Exchange Act or any rule, regulation or order of the Commodity Future Trading Commission (or the application or official interpretation of any thereof).

"**Excluded Subsidiary**" means (i) a Foreign Subsidiary, (ii) any direct or indirect Domestic Subsidiary of a Foreign Subsidiary, (iii) Unrestricted Subsidiaries, (iv) captive insurance companies, (v) special purpose entities established for purposes of an accounts receivable factoring arrangement, (vi) Immaterial Subsidiaries, (vii) any other Person to the extent a guarantee by such Person is prohibited or restricted by contracts or applicable law (including any requirement to obtain Governmental Authority or third party consent, approval, license or authorization) or could result in adverse tax consequences as reasonably determined by Borrower and (viii) those Persons listed on Schedule 1.1 hereto.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Lender or Administrative Agent or required to be withheld or deducted from a payment to a Lender or Administrative Agent: (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Lender or the Administrative Agent being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (ii) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (a) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.23) or (b) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Lender's or Administrative Agent's failure to comply with Section 2.20(d), (iv) any U.S. federal withholding Taxes imposed under FATCA and (v) Taxes that are Other Connection Taxes.

"**Existing Class**" as defined in Section 2.25(a).

"**Existing Designated Coal Contract**" means General Terms & Conditions for DES Sales and Purchase of Coal, dated May 24, 2013, including the Margin Annex thereto and

all Confirmations thereunder, between American Coal and the Existing Designated Coal Contract Counterparty, as amended by the Letter of Amendment, dated December 5, 2013 and as the same may be further amended, restated, supplemented, replaced or otherwise modified from time to time.

"**Existing Designated Coal Contract Counterparty**" means J. Aron & Company and its successors.

"**Existing Loans**" as defined in Section 2.25(c).

"**Existing Term Loan Agreement**" means the Credit and Guaranty Agreement, dated as of December 5, 2013, by and among Borrower, Holdings, certain Subsidiaries of Borrower as guarantors, the lenders party thereto from time to time, Goldman Sachs, as administrative agent, and Goldman Sachs and DBSI as joint lead arrangers, joint bookrunners and co-syndication agents, as the same may have been amended, supplemented or otherwise modified prior to the date hereof.

"**Extended Loans**" as defined in Section 2.25(c).

"**Extended Maturity Date**" as defined in Section 2.25(a).

"**Extension**" as defined in Section 2.25(a).

"**Extension Amendment**" as defined in Section 2.25(e).

"**Extension Offer**" as defined in Section 2.25(a).

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Borrower or any of its Restricted Subsidiaries.

"**Fair Market Value**" means the value (which, for the avoidance of doubt, will take into account any liabilities associated with related assets) that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by Borrower.  Any determination of Fair Market Value in respect of a transaction or series of related transactions involving aggregate consideration in excess of $35.0 million shall be evidenced by a resolution of the Board of Directors of Borrower and shall be approved by a majority of the disinterested members of the Board of Directors of Borrower. Any determination of Fair Market Value in respect of a transaction or series of related transactions involving aggregate consideration in excess of $100.0 million shall be accompanied by an opinion supporting such valuation from a financial point of view issued by an accounting, appraisal or investment banking firm of regional standing.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code as of the date of this Agreement (and any successor or future version thereof that is substantially comparable) and any current or future regulations or official interpretations thereof.

"**Federal Funds Effective Rate**" means for any day, the rate *per annum* (expressed as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate charged to Administrative Agent, in its capacity as a Lender, on such day on such transactions as reasonably determined by Administrative Agent.  If the Federal Funds Effective Rate is ever less than 0%, then for purposes of this Agreement the Federal Funds Effective Rate shall be deemed to be 0%.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer, senior vice president of finance or treasurer of Holdings or Borrower that such financial statements fairly present, in all material respects, the financial condition of Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments and the absence of footnotes.

"**Financial Plan**" as defined in Section 5.1(i).

"**First Lien Net Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Net Total Debt that is secured by a Lien on the assets of Borrower or any of its Restricted Subsidiaries (other than Indebtedness secured on a junior basis to the Liens securing the Obligations under the Credit Documents, including Second Lien Indebtedness and Second Lien Additional Facilities) as of such day to (ii) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien ranks first in priority to all other Liens, other than Liens permitted under clauses (b), (c), (d), (i), (j), (k), (p), (q), (s), (x), (y) and (z) of Section 6.2.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Borrower and its Subsidiaries ending on December 31 of each calendar year.

"**Fixed Amounts**" as defined in Section 1.7.

"**Fixed Charges**" means, with respect to Borrower or any of its Restricted Subsidiaries for any period, the sum, without duplication, of:

(i) the consolidated interest expense of Borrower and its Restricted Subsidiaries for such period, whether paid or accrued, including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Interest Rate Agreements; plus

(ii) the consolidated interest expense of Borrower and its Restricted Subsidiaries that was capitalized during such period; plus

(iii) any interest on Indebtedness of another Person that is guaranteed by Borrower or one of its Restricted Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries, whether or not such Guarantee or Lien is called upon; plus

(iv) the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of preferred stock of Borrower or any of its Restricted Subsidiaries, other than dividends on Equity Interests payable solely in Equity Interests of Borrower (other than Disqualified Equity Interest) or to Borrower or a Restricted Subsidiary of Borrower, times (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal, in each case, determined on a consolidated basis in accordance with GAAP.

"**Flood Certificate**" means a "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Trustee, for the benefit of Secured Parties, with improvements located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Flood Program**" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, in each case as amended from time to time, and any successor statutes.

"**Flood Zone**" means areas having special flood hazards as described in the National Flood Insurance Act of 1968, as amended from time to time, and any successor statute.

"**Foreign Subsidiary**" means (i) any Subsidiary that is not a Domestic Subsidiary and (ii) any direct or indirect Domestic Subsidiary the primary assets of which are Equity Interests in Foreign Subsidiaries and, if applicable, Indebtedness of such Foreign Subsidiaries.

"**Foresight Acquisition Option**" means the option of Borrower to purchase 46% of the voting interest of Foresight GP pursuant to and in accordance with the Foresight Acquisition Option Agreement.

"**Foresight Acquisition Option Agreement**" means that certain Option Agreement, dated as of April 16, 2015, among Foresight Reserves and Michael J. Beyer, as sellers, and Borrower, as purchaser (including the exhibits and schedules thereto), as may be amended in accordance with the terms hereof.

"**Foresight GP**" means Foresight Energy GP LLC, a Delaware limited liability company.

"**Foresight LP**" means Foresight Energy LP, a Delaware limited partnership.

"**Foresight Reserves**" means Foresight Reserves, LP, a Nevada limited partnership.

"**Funding Guarantors**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A-1.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Goldman Sachs**" as defined in the preamble hereto.

"**Governmental Acts**" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"**Governmental Authority**" means any foreign or domestic, federal, state, municipal, supranational, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Grantor**" has the meaning ascribed to such term in the Pledge and Security Agreement.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each of Holdings and each wholly-owned Restricted Subsidiary of Holdings (other than Borrower and any Excluded Subsidiaries).

"**Guarantor Subsidiary**" means each Guarantor other than Holdings.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic materials, substances or wastes or other contaminants or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, and all other materials, substances or wastes of any nature prohibited, limited or regulated by any Governmental Authority or under any Environmental Law or any Environmental and Mining Laws due to its toxic or deleterious properties or characteristics (including, without limitation, any chemical, material or substance exposure to which is prohibited, limited or regulated by Environmental and Mining Laws).

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hedge Agreement**" means an Interest Rate Agreement entered into with a Lender Counterparty that has been designated by Borrower and such Lender Counterparty as a "Hedge Agreement" by notice to Administrative Agent delivered on or prior to the tenth Business Day following the later of (a) the Closing Date, (b) the date that such Hedge Agreement is entered into, or (c) the date that the Person party to such Hedge Agreement becomes a Lender Counterparty.

"**Hedging Obligations**" means, with respect to any specified Person, the obligations of such Person under: (i) interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements, and interest rate collar agreements; (ii) other agreements or arrangements designed to manage interest rates or interest rate risk; and (3) other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.  For the avoidance of doubt, Hedging Obligations do not include obligations under coal sales contracts requiring the delivery of coal that is priced pursuant to an established index created for the purposes of establishing a market price for the underlying commodity.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means as of the Closing Date, (i) the audited financial statements of Borrower and its Subsidiaries, for the immediately preceding three Fiscal Years, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years, and (ii) the unaudited financial

CH\2051848.14

statements of Borrower and its Subsidiaries for each of the first three Fiscal Quarters ended after the date of the most recent audited financial statements and at least 45 days prior to the Closing Date, consisting of a balance sheet and the related consolidated statements of income, stockholders' equity and cash flows for the three-, six- or nine-month period, as applicable, ending on such date, and, in the case of clauses (i) and (ii), certified by the chief financial officer of Borrower that they fairly present, in all material respects, the financial condition of Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in each case on a consolidated basis, subject to changes resulting from audit and normal year-end adjustments.

"**Holdings**" as defined in the preamble hereto.

"**Immaterial Subsidiary**" means each Restricted Subsidiary to the extent that (i) the assets of all such Restricted Subsidiaries do not in the aggregate represent more than 4.00% of Total Assets and (ii) the total revenues of all such Restricted Subsidiaries for the most recent 12 month period do not represent more than 4.00% of the total revenues of the Borrower and its Restricted Subsidiaries, taken as a whole, for such 12-month period, determined on a pro forma basis in accordance with Section 1.4.

"**Increased Amount**" as defined in Section 6.2.

"**Increased Amount Date**" as defined in Section 2.24.

"**Incremental Commitments**" as defined in Section 2.24.

"**Increased-Cost Lenders**" as defined in Section 2.23.

"**Incremental Creditor**" as defined in Section 2.24.

"**Incremental Facility**" means New Term Loans made pursuant to any New Term Loan Commitments and Incremental Pari Notes issued pursuant to any Incremental Pari Note Commitments, in each case in accordance with Section 2.24.

"**Incremental Facilities Amount**" means, at any time, with respect to any New Term Loan Commitments or any Incremental Pari Note Commitments:

(a)    $150,000,000 <u>minus</u> the aggregate principal amount of all Indebtedness issued pursuant to Incremental Commitments pursuant to this clause (a) and Additional Facilities issued pursuant to clause (a) of the definition of the term "Additional Facilities Amount" prior to such New Term Loans or Incremental Pari Note Issuances, as applicable; <u>plus</u>

(b)    unlimited additional amounts so long as immediately after giving effect to the making of such additional amounts, the First Lien Net Leverage Ratio (calculated on a pro forma basis after giving effect to such additional amounts and any transactions funded with the proceeds of such additional amounts and any related transactions but not including the proceeds of such additional amounts as Unrestricted Cash for the purposes

31

of calculating Consolidated Net Total Debt) does not exceed 1.50:1.00 as of the last day of the Fiscal Quarter most recently ended for which financial statements are available;

; it being understood that the amount set forth in clause (a) need not be utilized prior to the use of the incurrence test set forth in clause (b), and that the First Lien Net Leverage Ratio set forth in clause (b) may be exceeded following the utilization of amounts under clause (a).

"**Incremental Pari Note Agreement**" as defined in Section 2.24.

"**Incremental Pari Note Commitments**" as defined in Section 2.24.

"**Incremental Pari Note Issuance**" as defined in Section 2.24.

"**Incremental Pari Notes**" as defined in Section 2.24.

"**Incremental Revolver Amendment**" as defined in Section 2.26.

"**Incremental Revolver Date**" as defined in Section 2.26.

"**Incremental Revolving Commitment**" as defined in Section 2.26.

"**Incremental Revolving Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Incremental Revolving Loan of such Lender plus the unused Incremental Revolving Commitment of such Lender.

"**Incremental Revolving Lender**" as defined in Section 2.26.

"**Incremental Revolving Loan**" as defined in Section 2.26.

"**Incurrence Based Amounts**" as defined in Section 1.7.

"**Indebtedness**" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables), whether or not contingent:

(i)      in respect of borrowed money;

(ii)      evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof);

(iii)      in respect of banker's acceptances;

(iv)      representing Capital Lease Obligations;

(v)      representing the balance deferred and unpaid of the purchase price of any property or services due more than twelve months after such property is acquired or such services are completed, other than trade payables incurred in the ordinary course of business; or

(vi)      representing any Hedging Obligations.

32

If and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet of the specified Person prepared in accordance with GAAP. In addition, the term "Indebtedness" includes all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) (provided that the amount of any such Indebtedness shall not exceed the lesser of the amount of such Indebtedness and fair market value of the assets subject to such Lien) and, to the extent not otherwise included, the Guarantee by the specified Person of any Indebtedness of any other Person. Indebtedness shall be calculated without giving effect to the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under the indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness. In no event shall obligations under any Designated Coal Contract or any other Coal Contract be deemed "Indebtedness" or, except for the purposes of the definition of "Excluded Hedge Obligation", a Hedging Obligation for any purpose under this Agreement.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims (including Environmental Claims), actions, judgments, suits, costs (including the reasonable and documented costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), expenses and disbursements of any kind or nature whatsoever (including the reasonable and documented out-of-pocket fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any reasonable and documented out of pocket fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions, the syndication of the credit facilities provided for herein or the use or intended use of the proceeds thereof, any amendments, waivers or consents with respect to any provision of this Agreement or any of the other Credit Documents, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the Engagement Letter (and any related provisions for fees) delivered by any Agent or any Lender to Borrower with respect to the transactions contemplated by this Agreement to occur on the Closing Date; or (iii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Restricted Subsidiaries; provided that "Indemnified Liabilities" shall not include any Taxes, which are the subject of Section 2.20.

"**Indemnitee**" as defined in Section 10.3(a).

"**Installment**" as defined in Section 2.12.

"**Intellectual Property**" as defined in the Pledge and Security Agreement.

"**Intellectual Property Asset**" means, at the time of determination, any interest (fee, license or otherwise) then owned by any Credit Party in any Intellectual Property.

"**Intellectual Property Security Agreements**" has the meaning assigned to that term in the Pledge and Security Agreement.

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit K evidencing Indebtedness owed among Credit Parties and their Subsidiaries.

"**Intercreditor Agreement**" means an amended and restated intercreditor agreement substantially in the form of Exhibit N, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Interest Payment Date**" means with respect to (i) any Loan that is a Base Rate Loan, the last Business Day of March, June, September and December of each year, commencing on the first such date to occur after the Closing Date and the final maturity date of such Loan; and (ii) any Loan that is a Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided, in the case of each Interest Period of longer than three months "Interest Payment Date" shall also include each date that is three months, or an integral multiple thereof, after the commencement of such Interest Period.

"**Interest Period**" means, in connection with a Eurodollar Rate Loan, an interest period of one, two, three or six-months (or to the extent available to, and not prohibited by the customary lending policies applicable to similar credits of, all Lenders, two weeks or twelve months), as selected by Borrower in the applicable Funding Notice or Conversion/Continuation Notice, (i) initially, commencing on the Credit Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c), of this definition, end on the last Business Day of a calendar month; (c) no Interest Period with respect to any portion of any Class of Loans shall extend beyond such Class's Maturity Date.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Borrower's and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two Business Days prior to the first day of such Interest Period.

34

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute (in each case, unless otherwise indicated).

"**Internally Generated Cash**" means, with respect to any period, any cash of Borrower or any Restricted Subsidiary generated during such period, excluding Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds and any cash that is generated from an incurrence of Indebtedness (other than proceeds of any revolving loans), an issuance of Equity Interests by or a capital contribution to such Person (other than capital contributions among Borrower and its Restricted Subsidiaries).

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Borrower or any of its Restricted Subsidiaries of, or of a beneficial interest in, any of the Equity Interests or Securities of any other Person (other than a Guarantor Subsidiary); (ii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Holdings or any of its Restricted Subsidiaries to any other Person (other than Holdings or any Guarantor Subsidiary) and (iii) any purchase or other acquisition (other than purchases or other acquisitions of inventory, materials and equipment in the ordinary course of business and capital expenditures), of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  The amount of any Investment of the type described in clauses (i), (ii) and (iii) shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.  Except as otherwise provided in the Agreement, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value and net of any dividends, distributions, repayments or redemptions received in respect of such Investment.

"**Joinder Agreement**" means an agreement substantially in the form of Exhibit L, with such changes as are necessary to specify, in compliance with Section 2.24, the terms of any New Term Loan Commitments, and extensions of credit thereunder.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement with a third party non-Affiliate, whether in corporate, partnership or other legal form.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity date applicable to any Loan hereunder at such time, including the latest maturity date of any New Term Loans, in each case as extended in accordance with this Agreement from time to time.

"**LCA Election**" means Borrower's election to treat a specified Investment as a Limited Condition Acquisition.

"**LCA Test Date**" shall have the meaning assigned to such term in Section 1.05.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to

CH\2051848.14

time by Administrative Agent or Collateral Trustee in its sole discretion as not being required to be included in the Collateral.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement, a Joinder Agreement or an Incremental Revolver Amendment.

"**Lender Counterparty**" means each Lender, each Agent, Arranger and each of their respective Affiliates counterparty to a Hedge Agreement (including any Person who is an Agent, Arranger or a Lender (and any Affiliate thereof) as of the Closing Date but subsequently, whether before or after entering into a Hedge Agreement, ceases to be an Agent, Arranger or a Lender, as the case may be); provided, at the time of entering into a Hedge Agreement, no Lender Counterparty shall be a Defaulting Lender.

"**Lien**" means any lien, mortgage, pledge, collateral assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease or license in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"**Limited Condition Acquisition**" means any Permitted Acquisition or other Permitted Investment by Borrower or one or more of its Restricted Subsidiaries whose consummation is not conditioned on the availability of, or on obtaining, third party financing.

"**Loan**" means a Term B-1 Loan, a Term B-2 Loan, a New Term Loan or an Incremental Revolving Loan.

"**Margin Stock**" as defined in Regulation U.

"**Material Adverse Effect**" means a material adverse effect on (i) the business, operations, properties, assets or financial condition of Holdings and its Restricted Subsidiaries taken as a whole; (ii) the ability of the Credit Parties, taken as a whole, to fully and timely perform their Obligations; (iii) the legality, validity, binding effect or enforceability against a Credit Party of a Credit Document to which it is a party; or (iv) the rights, remedies and benefits available to, or conferred upon, any Agent and any Lender or any Secured Party under any Credit Document.

"**Material Real Estate Asset**" means any fee-owned Real Estate Asset acquired after the Closing Date having a fair market value equal to or in excess of $5,000,000 as of the date of the acquisition thereof or any Leasehold Property leased after the Closing Date having annual rent payments equal to or in excess of $5,000,000 as of the date of the lease thereof; provided that if the aggregate amount of Real Estate Assets acquired or Leasehold Property leased after the Closing Date with respect to which the Borrower has not complied with Section 5.11 exceeds $25,000,000 (determined in accordance with this definition), then the Borrower shall comply with Section 5.11 with respect to Material Real Estate Assets with a value (determined in accordance with this definition) at least equivalent to such excess amount.

36

"**Maturity Date**" means, except to the extent extended pursuant to Section 2.25, (i) with respect to the Term B-1 Loan, the earlier of (a) the second anniversary of the Closing Date and (b) the date on which all Term B-1 Loans shall become due and payable in full hereunder, whether by acceleration or otherwise, (ii) with respect to the Term B-2 Loan, the earlier of (a) the fifth anniversary of the Closing Date, and (b) the date on which all Term B-2 Loans shall become due and payable in full hereunder, whether by acceleration or otherwise, (iii) with respect to New Term Loans, the date on which New Term Loans of a Series shall become due and payable in full hereunder, as specified in the applicable Joinder Agreement, including by acceleration or otherwise and (iv) with respect to Incremental Revolving Loans, the date on which the Incremental Revolving Loans shall become due and payable in full hereunder, as specified in the Incremental Revolver Amendment, including by acceleration or otherwise.

"**Mining Financial Assurances**" means performance bonds for reclamation or otherwise, surety bonds or escrow agreements and any payment or prepayment made with respect to, or certificates of deposit or other sums or assets required to be posted by Borrower under Mining Laws for reclamation or otherwise.

"**Mining Laws**" means any and all current or future foreign or domestic, federal, state or local statutes, ordinances, orders, rules, regulations, judgments, governmental authorizations, or any other requirements of governmental authorities relating to surface or subsurface mining operations and activities, including, but not limited to, the Federal Coal Leasing Amendments Act; the Surface Mining Control and Reclamation Act; all other applicable land reclamation and use statutes and regulations; the Federal Mine Safety Act of 1977; the Black Lung Act; and the Coal Act; each as amended, and any comparable state and local laws or regulations.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a mortgage in form and substance reasonably satisfactory to Borrower and Administrative Agent.

"**Multiemployer Plan**" means any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which a Credit Party or any of its ERISA Affiliates is required to contribute or could reasonably be expected to have any actual or potential liability.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a management's summary describing the operations of Borrower and its Restricted Subsidiaries for the applicable Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Holdings or any of its Restricted Subsidiaries from such Asset Sale, minus (ii) any

direct costs, fees and expenses relating to such Asset Sale, including (a) Taxes paid or payable by the seller as a result of any gain recognized in connection with such Asset Sale, (b) all reasonable fees, legal fees, brokerage fees, commissions, costs, relocation expenses and other expenses in connection with such Asset Sale, (c) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (d) cash held in escrow from the sale price and any reasonable reserve taken in connection with such Asset Sale, including for any purchase price adjustments, or any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by Holdings or any of its Restricted Subsidiaries in connection with such Asset Sale; underline provided that upon release of any such reserve, the amount released shall be considered Net Asset Sale Proceeds.

"**Net Enterprise Value**" means, with respect to any Asset Sale, (a) the value therefor, which shall not be less than the Fair Market Value of the assets (either in the form of Equity Interests, physical assets or other assets) that are the subject of such Asset Sale minus (b) the aggregate amount of liabilities (as determined in good faith by Borrower), of Borrower or any of its Restricted Subsidiaries (other than contingent liabilities not reserved for on the balance sheet and liabilities that are by their terms subordinated to the Obligations), that the transferee of such assets or any of its Affiliates (other than Holdings, Borrower or any of its Restricted Subsidiaries) agrees to assume or be responsible for in connection with such transaction (other than by operation of the acquisition of Equity Interests).

"**Net Equity Proceeds**" means an amount equal to any Cash proceeds from a capital contribution to, or the issuance of any Equity Interests of, Holdings or any of its Restricted Subsidiaries other than pursuant to any employee stock or stock option compensation plan), net of underwriting discounts.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to:  (i) any Cash payments or proceeds received by Holdings or any of its Restricted Subsidiaries (a) under any property or casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of Holdings or any of its Restricted Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, underline minus (ii) (a) any actual and reasonable costs incurred by Holdings or any of its Restricted Subsidiaries in connection with the adjustment or settlement of any claims of Holdings or such Restricted Subsidiary in respect thereof, (b) any bona fide direct costs, fees and expenses incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, including Taxes payable as a result of any gain recognized or otherwise in connection therewith and (c) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the assets subject to the relevant event described in clause (i)(a) or (b) above that is required that to be repaid as a result of such event.

"**Net Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Net Total Debt as of such day to (ii) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date.

"**Net Mark-to-Market Exposure**" means, in respect of any one or more Hedge Agreements, Commodities Agreements or other Hedging Obligations, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreements, Commodities Agreements or other Hedging Obligations, (a) for any date on or after the date such Hedge Agreements, Commodities Agreements or other Hedging Obligations have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark to market value(s) for such Hedge Agreements, Commodities Agreements or other Hedging Obligations, as determined in accordance with the terms thereof and in accordance with customary methods for calculating mark-to-market values under similar arrangements by the Lender Counterparty or Commodities Hedge Provider (or the Borrower, if no Lender Counterparty or Commodities Hedge Provider is party to such Hedge Agreements, Commodities Agreements or other Hedging Obligations).

"**New Term Loan Commitments**" as defined in Section 2.24.

"**New Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the New Term Loans of such Lender.

"**New Term Loan Lender**" as defined in Section 2.24.

"**New Term Loans**" as defined in Section 2.24.

"**Non-Consenting Lender**" as defined in Section 2.23.

"**Non-Public Information**" means material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to Borrower or its Subsidiaries or their respective Securities.

"**Non-Public Lenders**" means Lenders that wish to receive Non-Public Information with respect to Holdings, its Subsidiaries or their Securities.

"**Non-Recourse Debt**" means Indebtedness (i) as to which none of Borrower, any Guarantor or any of Borrower's Restricted Subsidiaries is directly or indirectly liable as a guarantor (except as a Permitted Investment) and (ii) as to which the lenders with respect thereto have been notified in writing that they will not have any recourse to the Equity Interests or assets of Borrower, any Guarantor or any of Borrower's Restricted Subsidiaries (other than the Equity Interests of an Unrestricted Subsidiary).

"**Non-US Lender**" as defined in Section 2.20(c).

"**Note**" means a Term B-1 Loan Note or a Term B-2 Loan Note.

"**Notice**" means a Funding Notice or a Conversion/Continuation Notice.

"**Obligations**" means (i) all obligations of every nature of each Credit Party, including obligations from time to time owed to Agents (including former Agents), Lenders or any of them and Lender Counterparties, under any Credit Document or Hedge Agreement,

whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise, (ii) all Secured Commodities Hedge Obligations and (iii) all Secured Designated Coal Contract Obligations; provided that Obligations shall not include any obligations with respect to any Commodities Agreement or Interest Rate Agreement that constitute secured obligations under the Revolving Credit Agreement; provided, further, that Obligations of any Guarantor shall not include any Excluded Hedge Obligations of such Guarantor.

"**Obligee Guarantor**" as defined in Section 7.7.

"**OPEB**" means post-employment benefits other than pension benefits, including, as applicable, medical, dental, vision, life and accidental death and dismemberment.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official in such official's relevant jurisdiction.

"**Other Applicable Indebtedness**" as defined in Section 2.15(b).

"**Other Connection Taxes**" means, with respect to any Lender or Administrative Agent, Taxes imposed as a result of a present or former connection between such Lender or Administrative Agent and the jurisdiction imposing such Tax (other than connections arising solely from such Lender or Administrative Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or enforced any Credit Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.23).

"**Participant Register**" as defined in Section 10.6(g)(i).

"**PATRIOT Act**" as defined in Section 3.1(r).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA and which a Credit Party or any of its ERISA Affiliates sponsors, maintains or is required to contribute to or could reasonably be expected to have any actual or potential liability to.

"**Permitted Acquisition**" means any acquisition by Borrower or any of its Restricted Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the property and assets or businesses of (or the assets constituting a business line, unit or division of) any Person, or any Equity Interests of any Person that, upon consummation thereof, will be a Restricted Subsidiary of Borrower; provided that,

(i) immediately prior to, and after giving effect thereto, no Event of Default shall have occurred and be continuing or would immediately result therefrom on the date of consummation of such Permitted Acquisition (or, at the Borrower's option, at the time of execution of a binding agreement in respect thereof);

(ii) Borrower shall have taken, or caused to be taken, each of the actions set forth in Sections 5.10 and/or 5.11, to the extent required thereby within the time periods specified therein; and

(iii) any Person or assets or division as acquired in accordance herewith shall be in same business or lines of business in which Borrower and/or its Subsidiaries are engaged as of the Closing Date or similar or related businesses or businesses ancillary, complementary, or incidental thereto or a reasonable extension or expansion thereof;

provided, further, that each Acquisition shall be deemed to be a Permitted Acquisition.

"**Permitted Business**" means any business that is the same as, or reasonably related, ancillary or complementary to, any of the businesses in which Borrower and its Restricted Subsidiaries are engaged on the Closing Date.

"**Permitted First Lien Priority Refinancing Debt**" means any secured Indebtedness (including any Registered Equivalent Notes) incurred by Borrower in the form of one or more series of senior secured notes or loans; provided that such Indebtedness (i) is secured by Liens on the Collateral (x) on a *pari passu* basis (but without regard to the control of remedies) with the Liens securing Obligations under the Credit Documents pursuant to the Collateral Trust Agreement and (y) granted pursuant to security documents substantially similar to the Collateral Documents, (ii) is not secured by any property or assets of Holdings, Borrower or any Restricted Subsidiary other than the Collateral unless such property or assets are made a portion of the Collateral hereunder and (iii) constitutes Refinancing Indebtedness.

"**Permitted Investments**" means each of the Investments permitted pursuant to Section 6.6.

"**Permitted Joint Venture**" means any agreement or other arrangement between Borrower or its Restricted Subsidiary and any other Person engaged in any business that is a Permitted Business consistent with the agreements and arrangements of Borrower and its Restricted Subsidiaries in effect on the Closing Date, that permits one party to share risks or costs, comply with regulatory requirements or satisfy other business objectives customarily achieved through the conduct of such Permitted Business jointly with third parties.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Payments to Holdings**" means, without duplication as to amounts:

(i)     payments to Holdings to permit payment of reasonable accounting, legal and administrative expenses of Holdings when due, in an aggregate amount not to exceed $250,000 in any Fiscal Year; less the amount of Investments made in any such Fiscal Year pursuant to Section 6.6(d)(B) in reliance on this clause (i);

(ii)     for so long as Borrower is a member of a group filing a consolidated or combined tax return with Holdings, payments to Holdings in respect of an allocable portion of the tax liabilities of such group that is attributable to Borrower and its Subsidiaries ("**Tax Payments**"). The Tax Payments shall not exceed the lesser of (i) the amount of the relevant tax (including any penalties and interest) that Borrower would owe if Borrower were filing a separate tax return (or a separate consolidated or combined return with its Subsidiaries that are members of the consolidated or combined group), taking into account any carryovers and carrybacks of tax attributes (such as net operating losses) of Borrower and such Subsidiaries from other taxable years and (ii) the net amount of the relevant tax that Holdings actually owes to the appropriate taxing authority; provided that any Tax Payments received from Borrower shall be paid over to the appropriate taxing authority within 30 days of Holdings' receipt of such Tax Payments or refunded to Borrower;

(iii)     customary indemnification obligations of Holdings, directors' fees and expense reimbursements, in each case, owing to directors, officers, employees or other Persons under its charter or by-laws or pursuant to written agreements with any such Person to the extent relating to Borrower and its Subsidiaries;

(iv)     obligations of Holdings in respect of director and officer insurance (including premiums therefor) to the extent relating to Borrower and its Subsidiaries; and

(v)     expenses incurred by Holdings in connection with any public offering or other sale of Capital Stock or Indebtedness (x) where the net proceeds of such offering or sale are intended to be received by or contributed to Borrower or a Restricted Subsidiary, (y) in a pro-rated amount of such expenses in proportion to the amount of such net proceeds intended to be so received or contributed or (z) otherwise on an interim basis prior to completion of such offering so long as Holdings shall cause the amount of such expenses to be repaid to Borrower or the relevant Restricted Subsidiary out of the proceeds of such offering promptly if completed.

"**Permitted Refinancing Indebtedness**" means any Indebtedness of Borrower or any of Borrower's Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge other Indebtedness of Borrower or any of Borrower's Restricted Subsidiaries (other than intercompany Indebtedness); <u>provided</u> that:

(i) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness renewed, refunded, refinanced, replaced, defeased or discharged (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including penalties or premiums, in connection therewith);

(ii) such Permitted Refinancing Indebtedness has a final maturity date later than the final maturity date of, and has a weighted average life to maturity that is (a) equal to or greater than the remaining weighted average life to maturity of, the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged or (b) more than 90 days after the Latest Maturity Date;

(iii) if the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged is subordinated in right of payment to the Obligations, such Permitted Refinancing Indebtedness is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged; and

(iv) such Indebtedness is incurred either by Borrower or by the Restricted Subsidiary of Borrower that was the obligor on the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged and is guaranteed only by Persons who were obligors on the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged.

"**Permitted Repricing Amendment**" as defined in Section 10.5(c).

"**Permitted Second Lien Priority Refinancing Debt**" means any secured Indebtedness (including any Registered Equivalent Notes) incurred by Borrower in the form of one or more series of secured notes or loans; <u>provided</u> that such Indebtedness (i) is secured by Liens on the Collateral (x) on a *pari passu* basis with the Liens securing Second Lien Indebtedness but subordinated to the Lien securing Obligations under the Credit Documents pursuant to the Collateral Trust Agreement and (y) granted pursuant to security documents substantially similar to the security documents that are Second Lien Documents, (ii) is not secured by any property or assets of Holdings, Borrower or any Restricted Subsidiary other than the Collateral unless such property or assets are made a portion of the Collateral hereunder and (iii) constitutes Refinancing Indebtedness.

"**Permitted Unsecured Refinancing Debt**" means unsecured Indebtedness (including any Registered Equivalent Notes) incurred by Borrower in the form of one or more series of senior unsecured notes or loans; <u>provided</u> that such Indebtedness constitutes Refinancing Indebtedness.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Platform**" as defined in Section 5.1(o).

"**Pledge and Security Agreement**" means the Second Amended and Restated Priority Lien Pledge and Security Agreement executed by Borrower and each Guarantor, dated as of the Closing Date, substantially in the form of Exhibit H, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Prime Rate**" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate. If the Prime Rate is ever less than 0%, then for purposes of this Agreement the Prime Rate shall be deemed to be 0%.

"**Principals**" means Robert E. Murray, Brenda L. Murray, Robert Edward Murray (son), Jonathan Robert Murray and Ryan Michael Murray (or any of their estates, or heirs or beneficiaries by will).

"**Principal Office**" means, for Administrative Agent, such Person's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as such Person may from time to time designate in writing to Borrower, Administrative Agent and each Lender.

"**Pro Rata Share**" means (i) with respect to all payments, computations and other matters relating to the Term B-1 Loan of any Lender, the percentage obtained by dividing (a) the Term B-1 Loan Exposure of that Lender by (b) the aggregate Term B-1 Loan Exposure of all Lenders; (ii) with respect to all payments, computations and other matters relating to the Term B-2 Loan of any Lender, the percentage obtained by dividing (a) the Term B-2 Loan Exposure of that Lender by (b) the aggregate Term B-2 Loan Exposure of all Lenders; (iii) with respect to all payments, computations, and other matters relating to New Term Loan Commitments or New Term Loans of a particular Series, the percentage obtained by dividing (a) the New Term Loan Exposure of that Lender with respect to that Series by (b) the aggregate New Term Loan Exposure of all Lenders with respect to that Series; and (iv) with respect to all payments, computations and other matters relating to the Incremental Revolving Commitment or Incremental Revolving Loan of any Lender (or any letters of credit issued thereunder or participations purchased therein by any Lender or any participations in any swingline loans thereunder purchased by a Lender), the percentage obtained by dividing (a) the Incremental Revolving Exposure of that Lender by (b) the Incremental Revolving Exposure of all Lenders. For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage

obtained by dividing (A) an amount equal to the sum of the Term B-1 Loan Exposure, the Term B-2 Loan Exposure, the New Term Loan Exposure and the Incremental Revolving Exposure of that Lender, by (B) an amount equal to the sum of the aggregate Term B-1 Loan Exposure, the aggregate Term B-2 Loan Exposure, the aggregate New Term Loan Exposure and the aggregate Incremental Revolving Exposure of all Lenders.

"**Projections**" means the projections of Borrower and its Subsidiaries for the period of Fiscal Year 2015 through and including Fiscal Year 2019 delivered to Administrative Agent prior to the Closing Date.

"**Public Lenders**" means Lenders that do not wish to receive Non-Public Information with respect to Holdings, its Subsidiaries or their Securities.

"**Qualified ECP Guarantor**" means, in respect of any Swap Obligation under a Secured Hedge Agreement, each Credit Party that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation under a Secured Hedge Agreement or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified IPO**" means the issuance by Holdings or any direct or indirect parent company of Holdings of its common Equity Interests (and the contribution of any proceeds of such issuance to Borrower) in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the U.S. Securities and Exchange Commission (or any Governmental Authority succeeding to any of its principal functions) in accordance with the Securities Act (whether alone or in connection with a secondary public offering) and such Equity Interests are listed on a nationally-recognized stock exchange in the United States.

"**Reaffirmation Agreement**" means the Reaffirmation Agreement, substantially in the form of Exhibit 1 to Additional Secured Debt Designation to the Collateral Trust Agreement, executed by Borrower and each Guarantor as of the Closing Date.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property.

"**Refinancing Indebtedness**" means (i) Permitted First Lien Priority Refinancing Debt, (ii) Permitted Second Lien Priority Refinancing Debt or (iii) Permitted Unsecured Refinancing Debt in each case, issued, incurred or otherwise obtained (including by means of the extension or renewal of existing Indebtedness) in exchange for, or to extend, renew, replace or refinance, in whole or part, existing Term Loans, or any then existing Refinancing Indebtedness ("**Refinanced Debt**"); provided that (a) such Indebtedness has a later maturity and a weighted average life to maturity equal to or greater than the remaining weighted average life to maturity of the Refinanced Debt, (b) such Indebtedness is not at any time incurred by any borrower other than Borrower or guaranteed by any Subsidiaries other than Subsidiaries that are Guarantors

(unless concurrently with or promptly after the closing of such Indebtedness, such Person becomes a Borrower or Guarantor hereunder), and the terms of such guarantee shall be no more favorable in any material respect to the secured parties in respect of such Indebtedness than the terms of the Guaranty unless the Guaranty shall be amended to the extent required to ensure that the Guaranty is as favorable to the Lenders in all material respects as such guarantee, (c) such Indebtedness has covenants, default and remedy provisions and other terms and conditions (other than interest, fees, premiums, funding discounts, other pricing terms or optional prepayment or redemption provisions) that are substantially identical to, or not materially more favorable in the aggregate to the investors providing such Indebtedness, taken as a whole, than those set forth in this Agreement (except for covenants or other provisions applicable only to periods after the Latest Maturity Date of the Loans existing at the time of incurrence of such Indebtedness) or such terms and conditions that are, taken as a whole, on current market terms for such Indebtedness as determined by Borrower, (d) such Indebtedness shall not have a greater principal amount than the principal amount of the Refinanced Debt plus any undrawn commitments plus accrued interest, capitalized interest, fees, premiums and penalties (if any) thereon, upfront fees, original issue discount and reasonable fees and expenses associated with the refinancing and (e) such Refinanced Debt shall be repaid, defeased or satisfied and discharged on a dollar-for-dollar basis, and all accrued interest, fees and premiums (if any) in connection therewith shall be paid, substantially concurrently with the incurrence of such Refinancing Indebtedness in accordance with the provisions of Section 2.13, if applicable.

"**Refinanced Term Loans**" as defined in Section 10.5(c).

"**Register**" as defined in Section 2.7(b).

"**Registered Equivalent Notes**" means, with respect to any notes originally issued in a Rule 144A or other private placement transaction under the Securities Act, substantially identical notes (having the same guaranties) issued in a dollar-for-dollar exchange therefor pursuant to an exchange offer registered with the U.S. Securities and Exchange Commission.

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation FD**" means Regulation FD as promulgated by the U.S. Securities and Exchange Commission under the Securities Act and Exchange Act as in effect from time to time.

"**Regulation T**" means Regulation T of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

CH\2051848.14

"**Related Agreements**" means, collectively, the Acquisition Agreement, the Revolving Credit Agreement, the Revolving Credit Agreement Amendment and each Senior Secured Notes Indenture.

"**Related Fund**" means, with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Related Party**" means (i) any controlling stockholder, majority owned subsidiary, or immediate family member (in the case of an individual) of any Principal; or (ii) any trust, corporation, partnership, limited liability company or other entity, the beneficiaries, stockholders, partners, members, owners or Persons beneficially holding a majority (and controlling) interest of which consist of any one or more Principals and/or such other Persons referred to in the immediately preceding clause (i).

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the migration of any Hazardous Material through the air, soil, surface water or groundwater.

"**Replacement Lender**" as defined in Section 2.23.

"**Replacement Term Loans**" as defined in Section 10.5(c).

"**Repricing Transaction**" as defined in Section 2.13(b)(i).

"**Required Prepayment Date**" as defined in Section 2.15(c)**.**

"**Requisite Lenders**" means one or more Lenders having or holding Term B-1 Loan Exposure, Term B-2 Loan Exposure, New Term Loan Exposure and/or Incremental Revolving Exposure (if any) and representing more than 50% of the aggregate Voting Power Determinants of all Lenders; <u>provided</u> that amount of Voting Power Determinants shall be determined with respect to any  Defaulting Lender by disregarding the Voting Power Determinants of such Defaulting Lender.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Holdings or Borrower now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of Equity Interests of Holdings or Borrower now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Equity Interests of Holdings or Borrower now or hereafter outstanding; (iv) [reserved] and (v) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including covenant or legal defeasance), sinking fund or similar payment with respect to the Second Lien Indebtedness or Additional Facilities (other than

47

in exchange for or with proceeds of Permitted Refinancing Indebtedness in accordance with Section 6.1). Solely for purposes of clause (ii) of the definition of the term "Permitted Payments to Holdings" relating to Restricted Junior Payments, in the event that any Credit Party or Restricted Subsidiary makes a cash distribution, such distribution shall not be a "Restricted Junior Payment" to the extent that such distribution (x) discharges the federal, state, local and/or foreign tax liabilities of an Unrestricted Subsidiary and (y) was funded in cash by an Unrestricted Subsidiary.

"**Restricted Subsidiary**" means any subsidiary other than an Unrestricted Subsidiary; underline provided that upon the occurrence of any Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such subsidiary shall be included in the definition of "Restricted Subsidiary".

"**Revolving Agent**" means Goldman Sachs, in its capacities as the administrative and collateral agent under the Revolving Credit Agreement and related collateral documents, and any successor administrative or collateral agent permitted pursuant to the terms thereof, hereof and in the Intercreditor Agreement or any similar agent under any replacement or refinancing of the Revolving Credit Agreement.

"**Revolving Credit Agreement**" means the Revolving Credit Agreement, dated as of December 5, 2013, by and among Borrower, Holdings, certain Subsidiaries of Borrower, as guarantors, the lenders party thereto from time to time, Revolving Agent, and the other parties thereto, as amended through the Revolving Credit Agreement Amendment and as may hereafter be amended, modified, supplemented, refinanced, restated, or replaced in accordance with the terms of the Intercreditor Agreement; provided, that for the avoidance of doubt, the Incremental Revolving Commitments and Incremental Revolving Loans shall not constitute the "Revolving Credit Agreement".

"**Revolving Credit Agreement Amendment**" means that certain Amendment No. 2 to Revolving Credit Agreement, dated as of the Closing Date, by and among Borrower, Holdings, certain Subsidiaries of Borrower, as guarantors, Revolving Agent, the "Required Lenders" (as defined in the Revolving Credit Agreement) and the other parties thereto.

"**Revolving Credit Documents**" means the Revolving Credit Agreement and each other instrument or agreement executed in connection with the Revolving Credit Agreement (including all security agreements, collateral assignments, mortgages, control agreements or other grants or transfers for security in favor of the Revolving Agent, for the benefit of the holders of Revolving Credit Obligations) and any instrument or agreement executed in connection with any refinancings and replacements thereof to the extent permitted under Section 6.1, as each such instrument or agreement may be amended, restated, supplemented, replaced or otherwise modified from time to time.

"**Revolving Credit Obligations**" means the "Secured Obligations" as defined in the Security Agreement (as defined in the Revolving Credit Agreement).

"**Revolving Loan Priority Collateral**" has the meaning assigned to "ABL Collateral" in the Intercreditor Agreement.

"**Royalty Drop-Down Transaction**" means, collectively, (i) the sale to Foresight GP, Foresight LP or any of its Subsidiaries of the preparation plant and certain other mine infrastructure assets of American Energy Corporation's Century Mine in exchange for $75,000,000 in cash consideration, (ii) the lease of such assets from Foresight GP, Foresight LP or any of its Subsidiaries to the Borrower for the Borrower's continued use of the assets in exchange for royalty payments payable by the Borrower to Foresight GP, Foresight LP or any of its Subsidiaries in an aggregate amount not to exceed approximately $12,000,000 per year, and (iii) to the extent funded with such cash consideration, the payment by Borrower to Foresight Reserves in an aggregate amount not to exceed $75,000,000, in each case occurring on the Closing Date in accordance with the terms of the Acquisition Agreement.

"**S&P**" means Standard & Poor's, a Division of The McGraw-Hill Companies, Inc.

"**Sale and Leaseback Transaction**" as defined in Section 6.10.

"**Second Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than First Priority Liens to secure the Indebtedness under the Revolving Credit Agreement and any other Permitted Lien.

"**Second Lien Additional Facility**" as defined in Section 6.1(c).

"**Second Lien Documents**" means each Senior Secured Notes Indenture and each other instrument or agreement executed in connection with the Senior Secured Notes and any instrument or agreement executed in connection with any refinancings and replacements thereof to the extent permitted under Section 6.1, as each such material instrument or agreement may be amended, restated, supplemented, replaced or otherwise modified from time to time in accordance with Section 6.15.

"**Second Lien Indebtedness**" means the Indebtedness of Borrower and the other Credit Parties incurred pursuant to or evidenced by the Second Lien Documents.

"**Secured Designated Coal Contract Obligations**" means obligations owed by Borrower or any of its Guarantor Subsidiaries to any Designated Coal Contract Counterparty pursuant to or evidenced by any Designated Coal Contract.

"**Secured Commodities Agreement**" means any Commodities Agreement entered into from time to time by Borrower or any of its Guarantor Subsidiaries with a Commodities Hedge Provider that has been designated by Borrower and such Commodities Hedge Provider as a "Secured Commodities Agreement" by notice to Administrative Agent delivered on or prior to the tenth Business Day following the later of (a) the Closing Date, (b) the date that such Commodities Agreement is entered into, or (c) the date that the Person providing such Commodities Agreement becomes a Lender or Administrative Agent (or an Affiliate of a Lender or Administrative Agent).

"**Secured Commodities Hedge Obligations**" means obligations owed by Borrower or any of its Guarantor Subsidiaries to any Commodities Hedge Provider pursuant to or evidenced by any Secured Commodities Hedge Agreement.

"**Secured Hedge Agreement**" means any Hedge Agreement and any Secured Commodities Agreement.

"**Secured Net Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Net Total Debt secured by a Lien on the assets of Borrower or any of its Restricted Subsidiaries as of such day to (ii) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date.

"**Secured Parties**" has the meaning assigned to that term in the Pledge and Security Agreement.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Senior Secured Notes**" means, collectively, (a) the 11.25% senior secured notes of Borrower due 2021 issued from time to time pursuant to the Senior Secured Notes Indenture under clause (a) of the definition thereof, (b) the 8.625% senior secured notes of Borrower due 2021 issued from time to time prior to the Closing Date pursuant to the Senior Secured Notes Indenture under clause (b) of the definition thereof and (c) the 9.50% senior secured notes of Borrower due 2020 issued from time to time prior to the Closing Date pursuant to the Senior Secured Notes Indenture under clause (c) of the definition thereof.

"**Senior Secured Notes Indenture**" means (a) the Indenture, dated as of April 16, 2015, among Borrower, the Guarantors (as defined therein) party thereto, The Bank of New York Mellon Trust Company, N.A., as Trustee, and the Collateral Trustee, (b) the Indenture, dated as of May 24, 2013, among Borrower, the Guarantors (as defined therein) party thereto, The Bank of New York Mellon Trust Company, N.A., as Trustee, and the Collateral Trustee and (c) the Indenture, dated as of May 8, 2014, among Borrower, the Guarantors (as defined therein) party thereto, The Bank of New York Mellon Trust Company, N.A., as Trustee, and the Collateral Trustee, in each case, as amended, restated, supplemented, replaced, refinanced or otherwise modified from time to time in accordance with Section 6.15.

"**Series**" as defined in Section 2.24.

"**Solvent**" means, with respect to all Credit Parties, taken as a whole, on a consolidated basis, that as of the date of determination, (a) the sum of the Credit Parties' debt

(including contingent liabilities) does not exceed the present fair saleable value, taken on a going concern basis, of the Credit Parties' present assets; (b) the Credit Parties' capital is not unreasonably small in relation to its business as contemplated on the Closing Date and reflected in the Projections or with respect to any transaction contemplated or undertaken after the Closing Date; and (c) the Credit Parties have not incurred and do not intend to incur, or believe (nor should they reasonably believe) that they will incur, debts beyond their ability to pay such debts as they become due (whether at maturity or otherwise).  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standards No. 5).

**"Specified Transaction"** means any Investment that results in a Person becoming a Restricted Subsidiary, any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary, any Permitted Acquisition or any Disposition that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower, any Investment constituting an acquisition of assets constituting a business unit, line of business or division of, or all or substantially all of the Equity Interests of, another Person or any disposition of a business unit, line of business or division of the Borrower or a Restricted Subsidiary, in each case whether by merger, consolidation, amalgamation or otherwise.

**"subsidiary"** means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership) of which more than 50% of the total voting power of shares of Capital Stock entitled to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other subsidiaries of that Person (or a combination thereof), or (2) any partnership of which such Person or any subsidiary of such Person is a controlling general partner or otherwise controls such entity.

**"Subsidiary"** means, unless the context otherwise requires, a subsidiary of Borrower.

**"Swap Obligation"** means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**"Syndication Agent"** as defined in the preamble hereto.

**"Taxes"** means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

**"Term B-1 Loan"** means a Term B-1 Loan made by a Lender to Borrower pursuant to Section 2.1(a)(i).

**"Term B-1 Loan Commitment"** means the commitment of a Lender to make or otherwise fund a Term B-1 Loan and **"Term B-1 Loan Commitments"** means such

commitments of all Lenders in the aggregate. The amount of each Lender's Term B-1 Loan Commitment, if any, is set forth on Appendix A-1 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Term B-1 Loan Commitments as of the Closing Date is $300,000,000.

"**Term B-1 Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term B-1 Loans of such Lender; provided, at any time prior to the making of the Term B-1 Loans, the Term B-1 Loan Exposure of any Lender shall be equal to such Lender's Term B-1 Loan Commitment.

"**Term B-1 Loan Note**" means a promissory note in the form of Exhibit B-1, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Term B-2 Loan**" means a Term B-2 Loan made by a Lender to Borrower pursuant to Section 2.1(a)(ii).

"**Term B-2 Loan Commitment**" means the commitment of a Lender to make or otherwise fund a Term B-2 Loan and "**Term B-2 Loan Commitments**" means such commitments of all Lenders in the aggregate. The amount of each Lender's Term B-2 Loan Commitment, if any, is set forth on Appendix A-2 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Term B-2 Loan Commitments as of the Closing Date is $1,700,000,000.

"**Term B-2 Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term B-2 Loans of such Lender; provided, at any time prior to the making of the Term B-2 Loans, the Term B-2 Loan Exposure of any Lender shall be equal to such Lender's Term B-2 Loan Commitment.

"**Term B-2 Loan Note**" means a promissory note in the form of Exhibit B-2, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Term Loan**" means a Term B-1 Loan and a Term B-2 Loan.

"**Term Loan Asset Proceeds Account**" has the meaning assigned to "Fixed Asset Collateral Proceeds Account" in the Intercreditor Agreement.

"**Term Loan Commitment**" means the Term B-1 Loan Commitment or the Term B-2 Loan Commitment of a Lender, as applicable, and "**Term Loan Commitments**" means such commitments of all Lenders.

"**Term Loan Priority Collateral**" has the meaning assigned to "Fixed Asset Collateral" in the Intercreditor Agreement.

"**Terminated Lender**" as defined in Section 2.23.

"**Termination Amount**" has the meaning assigned to such term in the Existing Designated Coal Contract or any other similar amount to be received or paid as a result of a termination, breach or default of a Designated Coal Contract.

CH\2051848.14

"**Total Assets**" means, as of any date, the total consolidated assets of Borrower and its Restricted Subsidiaries on a consolidated basis, as shown on the most recent consolidated balance sheet of Borrower and its Restricted Subsidiaries, determined on a pro forma basis in a manner consistent with the pro forma basis contained in Section 1.4.

"**Trading Counterparties**" as defined in Section 10.23.

"**Trading Transactions**" as defined in Section 10.23.

"**Transactions**" means the transactions contemplated by the Credit Documents and the Related Agreements, including the Closing Date Acquisition, to be consummated on or prior to the Closing Date.

"**Type of Loan**" means a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Unrestricted Cash**" means the aggregate amount of cash and Cash Equivalents held in accounts on the consolidated balance sheet of Borrower and its Restricted Subsidiaries that is "unrestricted" in accordance with GAAP.

"**Unrestricted Subsidiary**" means (a) any subsidiary of Borrower designated by the Borrower as an Unrestricted Subsidiary pursuant to Section 5.15 subsequent to the date hereof,  but only to the extent that such Subsidiary (i) has no Indebtedness other than Non-Recourse Debt; (ii) except as permitted by Section 6.11 hereof, is not party to any agreement, contract, arrangement or understanding with Borrower or any Restricted Subsidiary unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to Borrower or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of Borrower; and (iii) is a Person with respect to which neither Borrower nor any of its Restricted Subsidiaries has any direct or indirect obligation (A) to subscribe for additional Equity Interests or (B) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results; and (b) Foresight GP, Foresight LP and their subsidiaries, to the extent any such entity is a Subsidiary of Borrower, until any such entity is designated as a Restricted Subsidiary pursuant to Section 5.15.

"**Unsecured Additional Facility**" as defined in Section 6.1(c).

"**Voting Power Determinants**" means, collectively, the sum of the Term B-1 Loan Exposure, the Term B-2 Loan Exposure, the New Term Loan Exposure and the Incremental Revolving Exposure.

"**Voting Stock**" of any specified Person as of any date means the Equity Interest of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Waivable Mandatory Prepayment**" as defined in Section 2.15(c).

"**Weighted Average Yield**" means with respect to any loan or note, on any date of determination, the weighted average yield to maturity, in each case, based on the interest rate applicable to such loan or note on such date and giving effect to any applicable interest rate floor as well as original issue discount and all upfront or similar fees (which shall be deemed to constitute like amounts of original issue discount) payable by Borrower to all of the lenders or note holders generally with respect to such loan or note in the initial primary syndication thereof (with original issue discount being equated to interest based on assumed four-year life to maturity), but excluding customary arrangement, structuring, underwriting, amendment, commitment fees or other fees not paid generally to all lenders of such Loans or payable to the Arrangers (or their affiliates) or other arranger or agent (or their respective affiliates) in connection with such loans or note (and not payable to lenders or note holders generally).

**1.2.   Accounting Terms.**  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Financial statements and other information required to be delivered by Borrower to Lenders pursuant to Sections 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable).  In the event that any Accounting Change (as defined below) results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Borrower and Administrative Agent agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made.  Until such time as such an amendment shall have been executed and delivered by Borrower and the Requisite Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred.  "**Accounting Change**" refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of certified Public Accountants or, if applicable, the U.S. Securities and Exchange Commission and/or the Public Company Accounting Oversight Board (or successors thereto or agencies with similar functions).  Anything in this Agreement to the contrary notwithstanding, any obligation of a Person under a lease (whether existing now or entered into in the future) that is not (or would not be) required to be classified and accounted for as a capital lease on the balance sheet of such Person under GAAP as in effect on the Closing Date shall not be treated as a capital lease solely as a result of (a) the adoption of any changes in, or (b) changes in the application of, GAAP after the Closing Date.

**1.3.   Interpretation, Etc.**  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

CH\2051848.14

The terms "lease" and "license" shall include sub-lease and sub-license, as applicable. References to the "Arranger," any "Agent," the "Collateral Trustee," any "Credit Party," any "Lender," any "obligor," any "party" or any other persons shall be construed so as to include successors in title, permitted assigns and permitted transferees. References to "assets" include present and future properties, revenues and rights of every description. Unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries, and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person. References to a "Credit Document" or any other agreement or instrument is a reference to that Credit Document or other agreement or instrument as amended, novated, supplemented, extended or restated, strictly in accordance with the terms thereof.

**1.4. Certain Calculations.** For purposes of calculating the Net Leverage Ratio, Secured Net Leverage Ratio, the First Lien Net Leverage Ratio, Consolidated Adjusted EBITDA, revenue and Total Assets:

(i) acquisitions that have been made by the specified Person or any of its Restricted Subsidiaries, including the Closing Date Acquisition and including through mergers or consolidations, or any Person or any of its Restricted Subsidiaries acquired by the specified Person or any of its Restricted Subsidiaries, and including all related financing transactions and including increases in ownership of Restricted Subsidiaries, during the four-Fiscal Quarter reference period or subsequent to such reference period and on or prior to the date on which the event for which the calculation of the Net Leverage Ratio, the Secured Net Leverage Ratio, the First Lien Net Leverage Ratio, Consolidated Adjusted EBITDA, revenue and Total Assets is made (the **"Calculation Date"**), or that are to be made on the Calculation Date, will be given pro forma effect as if they had occurred on the first day of the four-Fiscal Quarter reference period;

(ii) the Consolidated Adjusted EBITDA attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

(iii) the Fixed Charges attributable to discontinued operations, as determined in accordance with GAAP, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded, but only to the extent that the obligations giving rise to such Fixed Charges will not be obligations of the specified Person or any of its Restricted Subsidiaries following the Calculation Date:

(iv) any Person that is a Restricted Subsidiary on the Calculation Date will be deemed to have been a Restricted Subsidiary at all times during such four-Fiscal Quarter period;

(v) any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such four-Fiscal Quarter period;

(vi) whenever pro forma effect is to be given to a transaction, the pro forma calculations shall be made in good faith by a responsible financial or chief accounting officer of Holdings (and may include cost savings, synergies and operating efficiencies that are reasonably

identifiable and expected to result from such transaction which is being given pro forma effect that have been realized or are anticipated by Holdings to be realized within 12 months after the date of such transaction; provided that the aggregate amount of such cost savings, synergies and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to this clause (vi) shall not exceed, together with (a) the aggregate amount of cash charges and cash costs added to Consolidated Adjusted EBITDA pursuant to clause (ix) of the definition thereof, (b) the aggregate amount of cost savings, synergies and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to clause (x) of the definition thereof and (c) the aggregate amount of costs and expenses, including fees, added to Consolidated Adjusted EBITDA pursuant to clause (xi) of the definition thereof, 10% of Consolidated Adjusted EBITDA in any four-Fiscal Quarter period).  If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness). Interest on a Capital Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of Holdings to be the rate of interest implicit in such Capital Lease Obligation in accordance with GAAP; and

(vii)    if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness if such Hedging Obligation has a remaining term as at the Calculation Date in excess of 12 months).

**1.5.  Limited Conditionality Acquisitions.**  Notwithstanding anything to the contrary in this Agreement, solely for the purpose of (A) measuring the relevant financial ratios and basket availability with respect to the incurrence of any Indebtedness (including any New Term Loans or New Term Loan Commitments) or Liens or the making of any Investments or Dispositions or the designation of any Restricted Subsidiaries or Unrestricted Subsidiaries or (B) determining compliance with representations and warranties or the occurrence of any Default or Event of Default, in each case, in connection with a Limited Condition Acquisition, if Borrower has made an LCA Election with respect to such Limited Condition Acquisition, the date of determination of whether any such action is permitted hereunder shall be deemed to be the date on which the definitive agreements for such Limited Condition Acquisition are entered into (the **"LCA Test Date"**), and if, after giving effect on a pro forma basis to the Limited Condition Acquisition and the other transactions to be entered into in connection therewith as if they had occurred at the beginning of the most recent test period ending prior to the LCA Test Date, Borrower could have taken such action on the relevant LCA Test Date in compliance with such financial ratio, basket, representation or warranty, such financial ratio, basket, representation or warranty shall be deemed to have been complied with.  For the avoidance of doubt, if Borrower has made an LCA Election and any of  the ratios or baskets for which compliance was determined or tested as of the LCA Test Date are exceeded as a result of fluctuations in any such ratio or basket, including due to fluctuations in Consolidated EBITDA or Total Assets of the Borrower or the Person subject to such Limited Condition Transaction, at or prior to the consummation of the relevant transaction or action, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the relevant transaction or action is permitted to be consummated or taken.  If Borrower has made an LCA Election for any

Limited Condition Acquisition, then in connection with any subsequent calculation of any financial ratio (except the financial covenant in Section 6.7) or basket availability with respect to any other Specified Transaction on or following the relevant LCA Test Date and prior to the earlier of (x) the date on which such Limited Condition Acquisition is consummated or (y) the date that the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such financial ratio or basket availability shall be calculated  on a pro forma basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated until such time as the applicable Limited Condition Acquisition has actually closed or the definitive agreement with respect thereto has been terminated or has expired.

**1.6. Unrestricted Subsidiaries.**  For the avoidance of doubt, the Indebtedness and preferred stock and Fixed Charges of any Unrestricted Subsidiary shall not be treated as Indebtedness, preferred stock or Fixed Charges of Borrower and its Restricted Subsidiaries, and Investments of, or dividends or distributions by, an Unrestricted Subsidiary shall not be treated as Investments of, or dividends or distributions by, Borrower and its Restricted Subsidiaries.

**1.7. Compliance with Certain Covenants.**  Notwithstanding anything to the contrary herein, with respect to any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that does not require compliance with a financial ratio or test (including, without limitation, pro forma compliance with Section 6.7 hereof, any Net Leverage Ratio test, any Secured Net Leverage Ratio test and any First Lien Net Leverage Ratio test) (any such amounts, the **"Fixed Amounts"**) substantially concurrently with any amounts incurred or transactions entered into (or consummated) in reliance on a provision of this Agreement that requires compliance with any such financial ratio or test (any such amounts, the **"Incurrence Based Amounts"**), it is understood and agreed that the Fixed Amounts (and any cash proceeds thereof) shall be disregarded in the calculation of the financial ratio or test applicable to the Incurrence-Based Amounts in connection with such substantially concurrent incurrence.

## SECTION 2.  LOANS

**2.1. Term Loans**.

(a)  <u>Loan Commitments</u>.  Subject to the terms and conditions hereof,

(i)   each Lender severally agrees to make, on the Closing Date, a Term B-1 Loan to Borrower in an amount equal to such Lender's Term B-1 Loan Commitment; and

(ii)   each Lender agrees to make, on the Closing Date, a Term B-2 Loan to Borrower in an amount equal to such Lender's Term B-2 Loan Commitment.

Borrower may make only one borrowing under each of the Term B-1 Loan Commitment and the Term B-2 Loan Commitment, which shall be on the Closing Date.  Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.  Subject to

Sections 2.13(a) and 2.14, all amounts owed hereunder with respect to the Term Loans shall be paid in full no later than the Maturity Date applicable to such Term Loans.  Each Lender's Term Loan Commitment shall terminate immediately and without further action on the Closing Date after giving effect to the funding of such Lender's Term Loan Commitment on such date.

(b)   <u>Borrowing Mechanics for Term Loans</u>.

(i)   Borrower shall deliver to Administrative Agent a fully executed Funding Notice no later than (x) the Closing Date with respect to Base Rate Loans and (y) three days prior to the Closing Date with respect to Eurodollar Rate Loans (or such shorter period as may be acceptable to Administrative Agent).  Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

(ii)   Each Lender shall make its Term Loan available to Administrative Agent not later than 12:00 p.m. (New York City time) on the Closing Date, by wire transfer of same day funds in Dollars, at the principal office designated by Administrative Agent.  Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Term Loans available to Borrower on the Closing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to the account of Borrower at the Principal Office designated by Administrative Agent or to such other account as may be designated in writing to Administrative Agent by Borrower.

**2.2.   [Reserved]**.

**2.3.   [Reserved]**.

**2.4.   [Reserved]**.

**2.5.   Pro Rata Shares; Availability of Funds**.

(a)   <u>Pro Rata Shares</u>.  All Loans shall be made by Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder nor shall any Term Loan Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder.

(b)   <u>Availability of Funds</u>.  Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Borrower a corresponding amount on such Credit Date.  If such corresponding amount is not in fact made available to Administrative Agent by such

CH\2051848.14

Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three Business Days and thereafter at the Base Rate.  In the event that (i) a Lender fails to fund to Administrative Agent all or any portion of the Loans required to be funded by such Lender hereunder prior to the time specified in this Agreement and (ii) such Lender's failure results in Administrative Agent failing to make a corresponding amount available to Borrower on the Credit Date, at Administrative Agent's option, such Lender shall not receive interest hereunder with respect to the requested amount of such Lender's Loans for the period commencing with the time specified in this Agreement for receipt of payment by Borrower through and including the time of Borrower's receipt of the requested amount.  If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Borrower and Borrower shall promptly pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for Base Rate Loans for such Class of Loans.  Nothing in this Section 2.5(b) shall be deemed to relieve any Lender from its obligation to fulfill its Term Loan Commitments hereunder or to prejudice any rights that Borrower may have against any Lender as a result of any default by such Lender hereunder.

2.6.  **Use of Proceeds**.  The proceeds of the Loans shall be applied by Borrower to fund, in part, the refinancing of the Existing Term Loan Agreement, including the payment of fees, premiums, commissions and expenses in connection therewith, and the Closing Date Acquisition (including paying fees, commissions and expenses in connection with the Closing Date Acquisition) and for general corporate purposes of Borrower and its Subsidiaries, including Permitted Acquisitions.

2.7.  **Evidence of Debt; Register; Lenders' Books and Records; Notes.**

(a)  Lenders' Evidence of Debt.  Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Borrower, absent manifest error; provided, that the failure to make any such recordation, or any error in such recordation, shall not affect Borrower's Obligations in respect of any applicable Loans; and provided further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)  Register.  Administrative Agent (or its agent or sub-agent appointed by it, acting for this purpose as agent of Borrower) shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and Loans (and any interest thereon) of each Lender from time to time (the **"Register"**).  The Register shall be available for inspection at Administrative Agent's Principal Office (or via delivery by Administrative Agent) by (1) any Lender (with respect to (i) any entry relating to such Lender's Loans and (ii) the identity of the other Lenders (but not any information with

59

respect to such other Lenders' Loans)) and (2) by Borrower, in each case at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record, or shall cause to be recorded, in the Register the Loans and any interest outstanding in accordance with the provisions of Section 10.6, and each repayment or prepayment in respect of the principal amount of the Loans and any interest outstanding, and any such recordation shall be conclusive and binding on Borrower and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect Borrower's Obligations in respect of any Loan. Borrower hereby designates Administrative Agent to serve as Borrower's agent solely for purposes of maintaining the Register as provided in this Section 2.7, and Borrower hereby agrees that, to the extent Administrative Agent serves in such capacity, Administrative Agent and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "Indemnitees."

(c)   Notes.  If so requested by any Lender by written notice to Borrower (with a copy to Administrative Agent) at least two Business Days prior to the Closing Date, or at any time thereafter, Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Term B-1 Loan, Term B-2 Loan or New Term Loan to Borrower, as the case may be.

**2.8.   Interest on Loans**.

(a)   Except as otherwise set forth herein, each Class of Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(1) if a Base Rate Loan, at the Base Rate plus the Applicable Margin; or

(2) if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate plus the Applicable Margin;

(b)   The basis for determining the rate of interest with respect to any Loan and the Interest Period with respect to any Eurodollar Rate Loan shall be selected by Borrower and notified to Administrative Agent pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be; provided, until the earlier of the date on which Syndication Agent notifies Borrower that the primary syndication of the Loans has been completed, as determined by Syndication Agent, and 90 days after the Closing Date, the Term Loans shall be maintained as either (1) Eurodollar Rate Loans having an Interest Period of no longer than one month or (2) Base Rate Loans.

(c)   In connection with Eurodollar Rate Loans there shall be no more than seven (7) Interest Periods outstanding at any time.  In the event Borrower fails to specify between a Base Rate Loan or a Eurodollar Rate Loan in the applicable Funding Notice or

Conversion/Continuation Notice, such Loan (if outstanding as a Eurodollar Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan).  In the event Borrower fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, Borrower shall be deemed to have selected an Interest Period of one month.  As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrower and each Lender.

(d)   Interest payable pursuant to Section 2.8(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Term Loan, the last Interest Payment Date with respect to such Term Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)   Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such Interest Payment Date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans; provided, however, with respect to any voluntary prepayment of a Base Rate Loan, accrued interest shall instead be payable on the applicable Interest Payment Date.

**2.9.   Conversion/Continuation**.

(a)   Subject to Section 2.18, Borrower shall have the option:

(i)   to convert at any time all or any part of any Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a Eurodollar Rate Loan may only be converted on the

expiration of the Interest Period applicable to such Eurodollar Rate Loan unless Borrower shall pay all amounts due under Section 2.18 in connection with any such conversion; or

(ii) upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount as a Eurodollar Rate Loan.

If an Event of Default has occurred and is continuing and the Requisite Lenders have determined, in their sole discretion, not to permit such conversion or continuation and have notified Borrower of such determination, then no conversion of any such Loan to, or continuation of such Loan as, a Eurodollar Rate Loan shall be permitted and, upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, such Loan shall be converted to a Base Rate Loan.

(b) Borrower shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan (or telephonic notice in lieu thereof)). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Eurodollar Rate Loans shall be irrevocable on and after the related Interest Rate Determination Date, and Borrower shall be bound to effect a conversion or continuation in accordance therewith. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c) Any Notice shall be executed by an Authorized Officer in a writing delivered to Administrative Agent. In lieu of delivering a Notice, Borrower may give Administrative Agent telephonic notice by the required time of any proposed borrowing or conversion/continuation, as the case may be; provided each such telephonic notice shall be promptly confirmed in writing by delivery of the applicable Notice to Administrative Agent on or before the applicable date of borrowing or continuation/conversion. In the event of a discrepancy between the telephonic notice and the written Notice, the written Notice shall govern. In the case of any Notice that is irrevocable once given, if Borrower provides telephonic notice in lieu thereof, such telephonic notice shall also be irrevocable once given. Neither Administrative Agent nor any Lender shall incur any liability to Borrower in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by an Authorized Officer or other person authorized on behalf of Borrower or for otherwise acting in good faith.

**2.10. Default Interest.** Upon the occurrence and during the continuance of an Event of Default under Section 8.1(a), (f) or (g), any overdue amounts in respect of the Loans and, to the extent permitted by applicable law, any overdue interest payments on the Loans or any overdue

CH\2051848.14

fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under Debtor Relief Laws) payable on demand at a rate that is 2% *per annum* in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% *per annum* in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall upon the request of the Required Lenders become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2% *per annum* in excess of the interest rate otherwise payable hereunder for Base Rate Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.10 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

**2.11.  Fees**.

(a)  Borrower agrees to pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for the funding of (i) such Lender's Term B-1 Loan, a closing fee in an amount equal to 1.00% of the stated principal amount of such Lender's Term B-1 Loan, payable to such Lender from the proceeds of its Term B-1 Loan as and when funded on the Closing Date and (ii) such Lender's Term B-2 Loan, a closing fee in an amount equal to 3.00% of the stated principal amount of such Lender's Term B-2 Loan, payable to such Lender from the proceeds of its Term B-2 Loan as and when funded on the Closing Date.  Such closing fees will be in all respects fully earned, due and payable upon the funding of the Loans on the Closing Date and non-refundable and non-creditable thereafter.

(b)  In addition to any of the foregoing fees, Borrower agrees to pay to Agents such other fees in the amounts and at the times separately agreed upon.

**2.12.  Scheduled Payments.**  The principal amounts of the Term Loans shall be repaid in consecutive quarterly installments and at final maturity (each such payment, an **"Installment"**) (a) in the case of the Term B-1 Loans, in the aggregate amounts set forth below on the four quarterly scheduled Interest Payment Dates applicable to Term B-1 Loans, commencing September 30, 2015:

| Amortization Date | Installments |
| --- | --- |
| September 30, 2015 | $750,000.00 |
| December 31, 2015 | $750,000.00 |
| March 31, 2016 | $750,000.00 |
| June 30, 2016 | $750,000.00 |
| September 30, 2016 | $750,000.00 |
| December 31, 2016 | $750,000.00 |
| Maturity Date | Remainder |

and (b) in the case of the Term B-2 Loans, in the aggregate amounts set forth below on the four

quarterly scheduled Interest Payment Dates applicable to Term B-2 Loans, commencing September 30, 2015:

| Amortization Date | Installments |
|---|---|
| September 30, 2015 | $4,250,000.00 |
| December 31, 2015 | $4,250,000.00 |
| March 31, 2016 | $4,250,000.00 |
| June 30, 2016 | $4,250,000.00 |
| September 30, 2016 | $4,250,000.00 |
| December 31, 2016 | $4,250,000.00 |
| March 31, 2017 | $4,250,000.00 |
| June 30, 2017 | $4,250,000.00 |
| September 30, 2017 | $4,250,000.00 |
| December 31, 2017 | $4,250,000.00 |
| March 31, 2018 | $4,250,000.00 |
| June 30, 2018 | $4,250,000.00 |
| September 30, 2018 | $4,250,000.00 |
| December 31, 2018 | $4,250,000.00 |
| March 31, 2019 | $4,250,000.00 |
| June 30, 2019 | $4,250,000.00 |
| September 30, 2019 | $4,250,000.00 |
| December 31, 2019 | $4,250,000.00 |
| March 31, 2020 | $4,250,000.00 |
| Maturity Date | Remainder |

; provided, in the event any New Term Loans are made, such New Term Loans shall be repaid on each Amortization Date occurring on or after the applicable Increased Amount Date to the extent and in the manner specified in the Joinder Agreement.

Notwithstanding the foregoing, (x) such Installments shall be reduced in connection with any voluntary or mandatory prepayments of the Term Loans, as the case may be, in accordance with Sections 2.13, 2.14 and 2.15, as applicable; and (y) the Term Loans, together with all other amounts owed hereunder with respect thereto, shall, in any event, be paid in full no later than the Maturity Date applicable to such Term Loans.

### 2.13.  Voluntary Prepayments.

(a)  Voluntary Prepayments.

(i)   Any time and from time to time:

(1)      with respect to Base Rate Loans, Borrower may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount (unless a lesser amount is required to repay such Loan in full); and

(2)      with respect to Eurodollar Rate Loans, Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount (unless a lesser amount is required to repay such Loan in full).

(ii)   All such prepayments shall be made:

(1)      upon not less than one Business Day's prior written or telephonic notice in the case of Base Rate Loans; and

(2)      upon not less than three Business Days' prior written or telephonic notice in the case of Eurodollar Rate Loans;

in each case given to Administrative Agent, as the case may be, by 1:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (and Administrative Agent will promptly transmit such telephonic or written notice by telefacsimile or telephone to each Lender). Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied as specified in Section 2.15(a).

(b)   Call Protection.

(i)   In the event that all or any portion of the Term B-1 Loans are (x) repaid, prepaid, refinanced or replaced or (y) repriced or effectively refinanced through any waiver, consent or amendment (in the case of clause (x) and clause (y), in connection with any waiver, consent or amendment to the Term B-1 Loans the primary result of which is the lowering of the effective interest cost or the Weighted Average Yield of the Term B-1 Loans or the incurrence of any syndicated term loans that are secured by Liens on a pari passu basis with the Liens securing the Obligations having an effective interest cost or Weighted Average Yield that is less than the effective interest cost or Weighted Average Yield of the Term B-1 Loans (or portion thereof) so repaid, prepaid, refinanced, replaced or repriced (in each case other than in connection with a change of control) (a **"Repricing Transaction"**)) occurring on or prior to the first anniversary of the Closing

Date, such repayment, prepayment, refinancing, replacement or repricing will be made at 101.0% of the principal amount so repaid, prepaid, refinanced, replaced or repriced. If all or any portion of the Term B-1 Loans held by any Lender is repaid, prepaid, refinanced or replaced pursuant to a "yank-a-bank" or similar provision in the Credit Documents as a result of, or in connection with, such Lender not agreeing or otherwise consenting to any waiver, consent or amendment referred to in clause (y) above (or otherwise in connection with a Repricing Transaction), such repayment, prepayment, refinancing or replacement will be made at 101.0% of the principal amount so repaid, prepaid, refinanced or replaced.

(ii) In the event that all or any portion of the Term B-2 Loans are (x) repaid, prepaid, refinanced or replaced (other than pursuant to Section 2.14, but including pursuant to Section 2.14(c)) or (y) repriced or effectively refinanced through any waiver, consent or amendment occurring on or prior to the second anniversary of the Closing Date, such repayment, prepayment, refinancing, replacement or repricing shall be made at (A) on or prior to the first anniversary of the Closing Date, 102.0% of the principal amount so repaid, prepaid, refinanced, replaced or repriced and (B) after the first anniversary of the Closing Date but on or prior to the second anniversary of the Closing Date, 101.0% of the principal amount so repaid, prepaid, refinanced, replaced or repriced. If all or any portion of the Term B-2 Loans held by any Lender are repaid, prepaid, refinanced, replaced or repriced pursuant to a "yank-a-bank" or similar provision in the Credit Documents as a result of, or in connection with, such Lender not agreeing or otherwise consenting to any waiver, consent or amendment referred to in clause (y) above (or otherwise in connection with any such repayment, prepayment, refinancing, replacement or repricing), such repayment, prepayment, refinancing, replacement or repricing will be made (x) on or prior to the first anniversary of the Closing Date, at 102.0% and (y) after the first anniversary of the Closing Date but on or prior to the second anniversary of the Closing Date, 101.0%, in each case, of the principal amount so repaid, prepaid, refinanced, replaced or repriced.

**2.14. Mandatory Prepayments**.

(a) <u>Asset Sales</u>.

(i) No later than five Business Days following the date of receipt by Borrower or any of its Restricted Subsidiaries of any Net Asset Sale Proceeds (other than Net Asset Sale Proceeds in respect of a Drop-Down Transaction or the Royalty Drop-Down Transaction) in an aggregate amount in excess of $5,000,000 in any Fiscal Year, Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to such Net Asset Sale Proceeds; <u>provided</u>, so long as no Event of Default shall have occurred and be continuing on the date such Net Asset Sale Proceeds are received, Borrower shall have the option, directly or through one or more of its Restricted Subsidiaries, to invest such Net Asset Sale Proceeds within one year of receipt thereof (or, if committed to be reinvested within such year, within one hundred eighty days thereafter) in assets that are useful in the business of Borrower and its Restricted Subsidiaries, in Permitted Acquisitions and in Permitted Investments; <u>provided</u> <u>further</u>, that pending any such investment all such Net Asset Sale Proceeds shall be held in the

Term Loan Asset Proceeds Account.

(ii)   No later than five Business Days following the date of receipt by Borrower or any of its Restricted Subsidiaries of any Net Asset Sale Proceeds in respect of a Drop-Down Transaction, Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such Net Asset Sale Proceeds.

(b)   Insurance/Condemnation Proceeds.   No later than five Business Days following the date of receipt by Borrower or any of its Restricted Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds in an aggregate amount in excess of $5,000,000 in any Fiscal Year, Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; provided, so long as no Event of Default shall have occurred and be continuing on the date of receipt of such proceeds, Borrower shall have the option, directly or through one or more of its Restricted Subsidiaries to invest such Net Insurance/Condemnation Proceeds within one year of receipt thereof (or, if committed to be reinvested within such year, within one hundred eighty days thereafter) in assets that are useful in the business of Borrower and its Restricted Subsidiaries (which investment may include the repair, restoration or replacement of the applicable assets thereof) or in Permitted Acquisitions and in Permitted Investments; provided further, pending any such investment all such Net Asset Sale Proceeds shall be held in the Term Loan Asset Proceeds Account.

(c)   Issuance of Debt.   Within five Business Days of receipt by Holdings or any of its Restricted Subsidiaries of any Cash proceeds from the incurrence of any Indebtedness of Holdings or any of its Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1), Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts, debt issuance and commitment fees and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(d)   Consolidated Excess Cash Flow.   In the event that there shall be Consolidated Excess Cash Flow for any Fiscal Year (commencing with the Fiscal Year ending December 31, 2015), Borrower shall, no later than one hundred days after the end of such Fiscal Year, prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to (i) 75% of such Consolidated Excess Cash Flow minus (ii) the sum of (x) voluntary repayments of the Loans made with Internally Generated Cash (including the amounts actually paid to repurchase Loans pursuant to Section 10.6(i) but excluding, for the avoidance of doubt, repayments of Loans made with the Cash proceeds of any Refinancing Indebtedness), (y) repayments of Permitted First Lien Priority Refinancing Debt and (z) repayments of Incremental Pari Notes, in each case made on or prior to the date such prepayment is due; provided, that if, as of the last day of the most recently ended Fiscal Year, the Secured Net Leverage Ratio (determined for any such period by reference to the Compliance Certificate delivered pursuant to Section 5.1(d) calculating the Secured Net Leverage Ratio as of the last day of such Fiscal Year) shall be (1) 2.50:1.00 or less, Borrower shall only be required to make the prepayments and/or

67

reductions otherwise required hereby in an amount equal to 50% of such Consolidated Excess Cash Flow or (2) 2.00:1.00 or less, Borrower shall only be required to make the prepayments and/or reductions otherwise required hereby in an amount equal to 25% of such Consolidated Excess Cash Flow, in each case, <u>minus</u> the sum of (x) voluntary repayments of the Loans made with Internally Generated Cash (including the amounts actually paid to repurchase Loans pursuant to Section 10.6(i) but excluding, for the avoidance of doubt, repayments of Loans made with the Cash proceeds of any Refinancing Indebtedness), (y) repayments of Permitted First Lien Priority Refinancing Debt and (z) repayments of Incremental Pari Notes, in each case made on or prior to the date such prepayment is due.

(e)   <u>Prepayment Certificate</u>.   Concurrently with any prepayment of the Loans pursuant to Sections 2.14(a) through 2.14(d), Borrower shall deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds or Consolidated Excess Cash Flow, as the case may be.   In the event that Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess to the extent not otherwise permitted to be reinvested in the case of Net Asset Sale Proceeds and Net Insurance/Condemnation Proceeds, and Borrower shall concurrently therewith deliver to Administrative Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

(f)   <u>Revolving Credit Agreement</u>. Notwithstanding anything to the contrary in Sections 2.14(a) and 2.14(b), if any Indebtedness under the Revolving Credit Agreement is outstanding, to the extent a prepayment or cash collateralization of letters of credit is required under the Revolving Credit Agreement due to any Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds constituting the proceeds of Revolving Loan Priority Collateral, no prepayment shall be required under Sections 2.14(a) and 2.14(b).

## 2.15.   **Application of Prepayments**.

(a)   <u>Application of Voluntary Prepayments by Type of Loans</u>.   Any prepayment of any Loan pursuant to Section 2.13(a) shall be applied as specified by Borrower in the applicable notice of prepayment; <u>provided</u> in the event Borrower fails to specify the Loans to which any such prepayment shall be applied, such prepayment shall be applied, <u>first</u> to repay outstanding Incremental Revolving Loans (if any, including any swingline loans made thereunder in the order set forth in the Incremental Revolver Amendment) to the full extent thereof (without a corresponding reduction in the Incremental Revolving Commitments), and, <u>second</u>, to prepay the Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof); and further applied in direct order of maturity to reduce the scheduled remaining Installments of principal of the Term Loans.

(b)   <u>Application of Mandatory Prepayments by Type of Loans</u>.   Any amount required to be paid pursuant to Sections 2.14(a) through 2.14(d) shall be applied

to prepay Term Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof) and further applied <u>first</u> in direct order of maturity to the next eight remaining Installments of principal of the Term Loans (or such fewer remaining Installments thereof as applicable) and <u>second</u> on a pro rata basis to the scheduled Installments of principal of the Term Loans remaining thereafter; <u>provided</u> that so long as any Term B-1 Loans are outstanding, any amount required to be paid pursuant to Section 2.14(a)(ii) first shall be applied to prepay Term B-1 Loans in direct order of maturity to the remaining Installments of principal of the Term B-1 Loans until the Term B-1 Loans are repaid in full and then to prepay Term B-2 Loans in accordance with the preceding sentence; <u>provided</u>, <u>further</u> that if at the time any amount is required to be paid pursuant to Section 2.14(a) through (d) (excluding any amounts required to be paid pursuant to Section 2.14(a)(ii)), Borrower is required to offer to repurchase Permitted First Lien Priority Refinancing Debt or Incremental Pari Notes pursuant to the terms of the documentation governing such Indebtedness (such Permitted First Lien Priority Refinancing Debt or Incremental Pari Notes required to be offered to be so repurchased, **"Other Applicable Indebtedness"**), then Borrower may apply such prepayment on a pro rata basis (determined on the basis of the aggregate outstanding principal amount of the Term Loans and Other Applicable Indebtedness at such time; <u>provided</u>, <u>further</u> that the portion of such Cash proceeds allocated to Other Applicable Indebtedness shall not exceed the amount of such Cash proceeds required to be allocated to the Other Applicable Indebtedness pursuant to the terms thereof, and the remaining amount, if any, of such Cash proceeds shall be allocated to the Term Loans in accordance with the terms hereof) to the prepayment of the Term Loans and to the repurchase of Other Applicable Indebtedness, and the amount of prepayment of the Loans that would have otherwise been required pursuant to Section 2.14(a)(i), (b), (c) or (d) as applicable, shall be reduced accordingly; <u>provided</u> <u>further</u> that to the extent the holders of Other Applicable Indebtedness decline to have such Indebtedness repaid, the declined amount shall promptly (and in any event within 10 Business Days after the date of such rejection) be applied to prepay the Term Loans in accordance with the terms hereof.

(c)    <u>Waivable Mandatory Prepayment</u>.  Anything contained herein to the contrary notwithstanding, so long as any Term B-2 Loans are outstanding, in the event Borrower is required to make any mandatory prepayment pursuant to Section 2.14(a), (b) or (d) (a **"Waivable Mandatory Prepayment"**) of the Term B-2 Loans, not less than five Business Days prior to the date (the **"Required Prepayment Date"**) on which Borrower is required to make such Waivable Mandatory Prepayment, Borrower shall notify Administrative Agent of the amount of such prepayment, and Administrative Agent will promptly thereafter notify each Lender holding an outstanding Term B-2 Loan of the amount of such Lender's Pro Rata Share of such Waivable Mandatory Prepayment and such Lender's option to refuse such amount.  Each such Lender may exercise such option by giving written notice to Borrower and Administrative Agent of its election to do so on or before the Business Day prior to the Required Prepayment Date (it being understood that any Lender which does not notify Borrower and Administrative Agent of its election to exercise such option on or before the third Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option).  On the Required Prepayment Date, Borrower shall pay to Administrative Agent the amount of the Waivable Mandatory Prepayment, which amount

shall be applied (i) in an amount equal to that portion of the Waivable Mandatory Prepayment payable to those Lenders that have not elected to exercise such option to decline, to prepay the Term B-2 Loans of such Lenders (which prepayment shall be applied to the scheduled Installments of principal of the Term B-2 Loans in accordance with Section 2.15(b)), (ii) in an amount equal to that portion of the Waivable Mandatory Prepayment otherwise payable to those Lenders that have elected to exercise such option with respect to any mandatory prepayment pursuant to Section 2.14(d), to prepay the Term B-2 Loans of the Lenders who have not elected to exercise such option and the Term B-1 Loans, on a pro rata basis (which prepayment shall be further applied to the scheduled Installments of principal of the Term Loans in accordance with Section 2.15(b)), (iii) in an amount equal to that portion of the Waivable Mandatory Prepayment otherwise payable to those Lenders that have elected to exercise such option with respect to any mandatory prepayment other than a mandatory prepayment pursuant to Section 2.14(d), to prepay the Term B-1 Loans (which prepayment shall be further applied to the scheduled Installments of principal of the Term B-1 Loans in accordance with Section 2.15(b)) and (iv) Borrower may, subject to any requirement to offer such prepayment amount to the holders of Term Loans (as contemplated by clauses (ii) and (iii) above) or Second Lien Indebtedness, retain an amount equal to that portion of the Waivable Mandatory Prepayment otherwise payable to those Lenders that have elected to exercise such option with respect to any mandatory prepayment pursuant to Section 2.14(a) or (b).

(d) <u>Application of Prepayments of Loans to Base Rate Loans and Eurodollar Rate Loans</u>.  Considering each Class of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Borrower pursuant to Section 2.18(c).

## 2.16. **General Provisions Regarding Payments**.

(a) All payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 2:00 p.m. (New York City time) on the date due at the Principal Office of Administrative Agent for the account of Lenders; for purposes of computing interest and fees, funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding Business Day.

(b) All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(c) Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in

writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by Administrative Agent.

(d)   Notwithstanding the foregoing provisions hereof, if any Conversion/ Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e)   Whenever any payment to be made hereunder with respect to any Loan shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day; provided, that if such extension would cause such payment to be made in the next succeeding Fiscal Quarter, such payment shall be made on the immediately preceding Business Day instead.

(f)   Administrative Agent shall deem any payment by or on behalf of Borrower hereunder that is not made in same day funds prior to 4:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  Administrative Agent shall give prompt telephonic notice to Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming.  To the extent not made in same day funds no later than 6:00 p.m. (New York City time), any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a).   Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.10 from the date such amount was due and payable until the date such amount is paid in full.

(g)   If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.1 or pursuant to any sale of, any collection from, or other realization upon all or any part of the Collateral as a result thereof, all payments or proceeds received by Agents hereunder in respect of any of the Obligations shall be applied in accordance with the application arrangements described in Section 9.2 of the Pledge and Security Agreement.

**2.17.   Ratable Sharing.**  Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans or non pro rata purchase permitted by Section 10.6(i), in each case made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code or any other applicable legislation, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender

hereunder or under the other Credit Documents (collectively, the **"Aggregate Amounts Due"** to such Lender) resulting in such Lender receiving payment of a greater proportion of the Aggregate Amounts due to such Lender than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders ratably in accordance with the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder. The provisions of this Section 2.17 shall not be construed to apply to (a) any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement (for the avoidance of doubt, as in effect from time to time) (including the application of funds arising from the existence of a Defaulting Lender) or (b) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it.

**2.18.   Making or Maintaining Eurodollar Rate Loans**.

(a)   <u>Inability to Determine Applicable Interest Rate</u>.   In the event that Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Borrower), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of "Adjusted Eurodollar Rate", Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Borrower and each Lender of such determination, whereupon (i) no Loans may be made as, or converted to, Eurodollar Rate Loans until such time as Administrative Agent notifies Borrower and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Funding Notice or Conversion/Continuation Notice given by Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by Borrower.

(b)   <u>Illegality or Impracticability of Eurodollar Rate Loans</u>.   In the event that on any date (i) any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Borrower and Administrative Agent) that the making, maintaining, converting to or continuation of its Eurodollar Rate Loans has become unlawful as a

result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) Administrative Agent is advised by the Requisite Lenders (which determination shall be final and conclusive and binding upon all parties hereto) that the making, maintaining, converting to or continuation of its Eurodollar Rate Loans has become impracticable, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of the Lenders in that market, then, and in any such event, such Lenders (or in the case of the preceding clause (i), such Lender) shall be an **"Affected Lender"** and such Affected Lender shall on that day give notice (in writing by telefacsimile or by telephone confirmed in writing) to Borrower and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender).  If Administrative Agent receives a notice from (x) any Lender pursuant to clause (i) of the preceding sentence or (y) Lenders constituting Requisite Lenders pursuant to clause (ii) of the preceding sentence, then (1) the obligation of the Lenders (or, in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) to make Loans as, or to convert Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by each Affected Lender, (2) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Lenders (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (3) the Lenders' (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender's) obligations to maintain their respective outstanding Eurodollar Rate Loans (the **"Affected Loans"**) shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, Borrower shall have the option, subject to the provisions of Section 2.18(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by promptly giving notice (in writing by telefacsimile or by telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender).  Except as provided in the immediately preceding sentence, nothing in this Section 2.18(b) shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms hereof.

(c)  <u>Compensation for Breakage or Non-Commencement of Interest Periods</u>.  Borrower shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable, actual out-of-pocket losses, expenses and liabilities (including any interest paid by such Lender to Lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans

and any actual out-of-pocket loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits and excluding any interest rate floor in such determination) which such Lender sustains: (i) if for any reason (other than a default by such Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Borrower.

(d)  <u>Booking of Eurodollar Rate Loans</u>.  Subject to Sections 2.20 and 2.21, any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)  <u>Assumptions Concerning Funding of Eurodollar Rate Loans</u>. Calculation of all amounts payable to a Lender under this Section 2.18 and under Section 2.19 shall be made as though such Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of "Adjusted Eurodollar Rate" in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of such Lender to a domestic office of such Lender in the United States; <u>provided</u>, <u>however</u>, each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.18 and under Section 2.19.

**2.19.  Increased Costs; Capital Adequacy**.

(a)  <u>Compensation For Increased Costs and Taxes</u>.  Subject to the provisions of Section 2.20 (which shall be controlling with respect to the matters covered thereby), in the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that (A) any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (regardless of whether the underlying law, treaty or governmental rule, regulation or order was issued or enacted prior to the date hereof), including the introduction of any new law, treaty or governmental rule, regulation or order but excluding solely proposals thereof, or any determination of a court or Governmental Authority, in each case that becomes effective after the date hereof (provided that the introduction of any new law, treaty or governmental rule, regulation or order, or any determination of a court or Governmental Authority with respect to the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the

Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, in each case that becomes effective after the Closing Date shall be considered a change in law whether promulgated before or after the Closing Date), or (B) any guideline, request or directive by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law) or any implementation rules or interpretations of previously issued guidelines, requests or directives, in each case that is issued or made after the date hereof: (i) subjects such Lender (or its applicable lending office) to any additional Tax (other than any Excluded Taxes or any tax in respect of which such Lender is indemnified or receives additional amounts pursuant to Section 2.20) with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, fees or any other amount payable hereunder or thereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, liquidity, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to Eurodollar Rate Loans that are reflected in the definition of "Adjusted Eurodollar Rate") or any company controlling such Lender; or (iii) imposes any other condition (other than with respect to Taxes) on or affecting such Lender (or its applicable lending office) or any company controlling such Lender or such Lender's obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Eurodollar Rate Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Borrower shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or in a lump sum or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder.  Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.19(a), which statement shall be conclusive and binding upon all parties hereto absent manifest error; provided, that, with respect to a Lender other than a Lender listed on the signature pages hereof on the Closing Date, no such additional amount shall be required to be paid unless such law, treaty, governmental rule, regulation, order, change therein, interpretation, administration or application thereof, or determination becomes effective, or such guideline, request or directive is issued or made, after the effective date of the Assignment Agreement pursuant to which such Lender became a Lender.

(b)  <u>Capital Adequacy Adjustment</u>.  In the event that any Lender shall have determined (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that (A) the adoption, effectiveness, phase-in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, but including the Dodd-Frank Wall Street

Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith (whether or not promulgated before or after the Closing Date) and all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III (whether or not promulgated before or after the Closing Date), or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or (B) compliance by any Lender (or its applicable lending office) or any company controlling such Lender with any guideline, request or directive regarding capital adequacy or liquidity (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, in each case after the date hereof, has or would have the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of, or with reference to, such Lender's Loans or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling company could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling company with regard to capital adequacy), then from time to time, within five Business Days after receipt by Borrower from such Lender of the statement referred to in the next sentence, Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling company on an after-tax basis for such reduction. Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.19(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

### 2.20.   Taxes; Withholding, Etc.

(a)   <u>Payments to Be Free and Clear</u>.   Subject to Section 2.20(b), all sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than Excluded Taxes) imposed, levied, collected, withheld or assessed by any Governmental Authority or any political subdivision or taxing authority thereof or therein.

(b)   <u>Withholding of Taxes</u>. If any Credit Party or the Administrative Agent is required by law to make any deduction or withholding on account of any Tax from any sum paid or payable by or on behalf of any Credit Party to Administrative Agent, or any Lender under any of the Credit Documents:  (i) Borrower shall notify Administrative Agent or Administrative Agent shall notify Borrower, as applicable, of any such requirement or any change in any such requirement as soon as reasonably possible after Borrower or Administrative Agent becomes aware of it; (ii) Borrower or Administrative Agent (or other relevant Credit Party) shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender; (iii) the

sum payable by such Credit Party in respect of which the relevant deduction or withholding is required shall be increased to the extent necessary to ensure that, after the making of that deduction or withholding, Administrative Agent or such Lender, as the case may be, receives on the relevant due date a net sum equal to what it would have received had no such deduction or withholding been required or made; and (iv) within thirty days after paying any sum from which any deduction or withholding has been made, Borrower shall deliver to Administrative Agent evidence reasonably satisfactory to Administrative Agent of such deduction or withholding and of the remittance thereof to the relevant tax or other authority; provided, no such additional amount shall be required to be paid under clause (iii) above with respect to any Excluded Taxes.

(c)  <u>Payment of Other Taxes</u>.  In addition, Borrower shall indemnify Administrative Agent and Lenders for and pay any Other Taxes.

(d)  <u>Evidence of Exemption From U.S. Withholding Tax</u>.  Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**Non-US Lender**") shall deliver to Administrative Agent and Borrower, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of Borrower or Administrative Agent (each in the reasonable exercise of its discretion), (i) two original copies of Internal Revenue Service Form W-8BEN (claiming the benefits of any applicable income tax treaty), W-8EXP, W-8ECI and/or W-8IMY (or any successor forms), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code or reasonably requested by Borrower or Administrative Agent to establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of United States federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable under any of the Credit Documents, or (ii) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and is relying on the so-called "portfolio interest exemption," a Certificate re Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN and/or W-8IMY (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code or reasonably requested by Borrower or Administrative Agent to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of interest payable under any of the Credit Documents.  If any Lender provides an Internal Revenue Service Form W-8IMY, such Lender must also attach the additional documentation that must be transmitted with Internal Revenue Service Form W-8IMY, including the appropriate forms described in this Section 2.20(d).  Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) and whose name does not indicate that it is an "exempt recipient" (as such term is defined in Section 1.6049-4(c) of the United States Treasury Regulations) shall deliver to Borrower and Administrative Agent on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the

77

determination of Borrower and Administrative Agent (each in the reasonable exercise of its discretion) two original copies of Internal Revenue Service Form W-9 (or successor forms). Notwithstanding anything to the contrary contained herein, a Non-US Lender shall not be required to deliver any form or statement pursuant to this Section 2.20(d) that such Non-US Lender is not legally able to deliver.  Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.20(d) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to Administrative Agent for transmission to Borrower two new original copies of Internal Revenue Service Form W-8BEN, W-8EXP, W-8ECI, W-8IMY or W-9, or a Certificate re Non-Bank Status and two original copies of Internal Revenue Service Form W-8BEN or W-8IMY (or any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code or reasonably requested by Borrower or Administrative Agent to confirm or establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of United States federal income tax with respect to payments to such Lender under the Credit Documents, or notify Administrative Agent and Borrower of its inability to deliver any such forms, certificates or other evidence.  Borrower shall not be required to pay any additional amount to any Non-US Lender under Section 2.20(b)(iii) if such Lender shall have failed (1) to deliver the forms, certificates or other evidence in accordance with this Section 2.20(d), or (2) to notify Administrative Agent and Borrower of its inability to deliver any such forms, certificates or other evidence, as the case may be; provided, if such Lender shall have satisfied the requirements of the first and second sentences of this Section 2.20(d) on the Closing Date or on the date of the Assignment Agreement pursuant to which it became a Lender, as applicable, nothing in this last sentence of this Section 2.20(d) shall relieve Borrower of its obligation to pay any additional amounts pursuant this Section 2.20 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender is not subject to withholding as described herein. Administrative Agent shall provide documentation to Borrower pursuant to this Section 2.20(d) as if it were Lender.

(e)   Evidence of Exemption from Non-U.S. Withholding Tax.  A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which Borrower is subject to tax, or any tax treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver, within a reasonable period of time, to Borrower (with a copy to Administrative Agent), as reasonably requested by Borrower, such properly completed and executed documentation prescribed by applicable law (including, if relevant, a certificate of residence) as will permit such payments to be made without withholding or at a reduced rate, provided that such Lender is able to complete, execute and deliver such documentation legally and without undue prejudice.

(f)   Borrower Indemnification for Failure to Pay Required Taxes, etc.  If Borrower fails to pay (or cause to be paid) any Taxes required to be paid by it pursuant to

Section 2.20(b)(ii) or (c) when due to the appropriate tax authority or fails to remit to Administrative Agent the required receipts or other required documentary evidence, Borrower shall indemnify Administrative Agent and the Lenders for any Taxes that may become payable by Administrative Agent or any Lender as a result of any such failure. Payment under this indemnification must be made within fifteen days from the date any of Administrative Agent or any Lender or any of their respective Affiliates makes written demand therefore accompanied by appropriate evidence of the Tax and its payment.

(g)   Treatment of Certain Refunds.   If Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by a Credit Party or with respect to which the Credit Party has paid additional amounts pursuant to this Section 2.20, it shall pay to such Credit Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Credit Party under this Section 2.20 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of Administrative Agent or such Lender, as applicable, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Credit Party, upon the request of Administrative Agent or such Lender, agrees to repay the amount paid over to the Credit Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent or such Lender in the event Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.   Notwithstanding anything to the contrary in this paragraph (g), in no event will Administrative Agent or any Lender be required to pay any amount to any Credit Party pursuant to this paragraph (g) the payment of which would place Administrative Agent or such Lender, as applicable, in a less favorable net after-Tax position than Administrative Agent or such Lender would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.   This paragraph shall not be construed to require Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party or any other Person.

(h)   FATCA.   If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by Borrower or Administrative Agent as may be necessary for Borrower and Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.   Solely for purposes of this Section 2.20(h), "FATCA" shall include any amendments made to FATCA after the Closing Date that are not already included in the definition of "FATCA."

(i)   Survival.   Each party's obligations under this Section 2.20 shall survive

79

the resignation or replacement of Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of any Commitment and the repayment, satisfaction or discharge of all obligations under any Credit Document.

**2.21.    Obligation to Mitigate; Limitation on Additional Amounts, etc.**.

(a)    <u>Obligation to Mitigate</u>. Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.18, 2.19 or 2.20, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.18, 2.19 or 2.20 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or the interests of such Lender; <u>provided</u>, such Lender will not be obligated to utilize such other office pursuant to this Section 2.21 unless Borrower agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described above.  A certificate as to the amount of any such expenses payable by Borrower pursuant to this Section 2.21 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Borrower (with a copy to Administrative Agent) shall be conclusive absent manifest error.

(b)    <u>Limitation on Additional Amounts, etc</u>.  Notwithstanding anything to the contrary contained in Sections 2.18(c), 2.19 and 2.20 of this Agreement, unless Administrative Agent or a Lender gives notice to Borrower that it is obligated to pay an amount under any such Section within 180 days after the later of (x) the date the Lender incurs the respective increased costs, taxes, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital or (y) the date such Lender has actual knowledge of its incurrence of the respective increased costs, taxes, loss, expense or liability reductions in amounts received or receivable or reduction in return on capital, then such Lender shall only be entitled to be compensated for such amount by Borrower pursuant to Sections 2.18(c), 2.19 and 2.20, as the case may be, to the extent the costs, taxes, loss, expense or liability, reduction in amounts received or receivable or reduction in return on capital are incurred or suffered on or after the date which occurs 180 days prior to such Lender giving notice to Borrower that it is obligated to pay the respective amounts pursuant to Sections 2.18(c), 2.19 and 2.20, as the case may be. This Section 2.21(b) shall have no applicability to any Section of this Agreement other than Sections 2.18(c), 2.19 and 2.20.

**2.22.    Defaulting Lender Cure.**  If Borrower and Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions

set forth therein, that Lender will, to the extent applicable, fund any Loans that such Lender has failed to fund, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; and provided further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

**2.23.   Removal or Replacement of a Lender.**   Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an **"Increased-Cost Lender"**) shall give notice to Borrower that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.18, 2.19 or 2.20, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within five Business Days after Borrower's request for such withdrawal; or (b) (i) any Lender shall become and continues to be a Defaulting Lender, and (ii) such Defaulting Lender shall fail to cure the default pursuant to Section 2.22 within five Business Days after Borrower's request that it cure such default; (c) any Lender refuses to accept an Extension Offer pursuant to Section 2.25 (each a "**Declining Lender**") or (d) (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Credit Documents or agree to any amendment thereto (including a Permitted Repricing Amendment), (ii) the consent, waiver or amendment in question requires the agreement of each affected Lender or each Lender of a Class in accordance with the terms of Section 10.5 or all the Lenders with respect to a certain Class of the Loans or each Lender holding Loans subject to a Permitted Repricing Amendment and (iii) the Required Lenders (or, in the case of a consent, waiver or amendment (1) involving all the Lenders with respect to a certain Class, the Lenders required to consent thereto or (2) involving a Permitted Repricing Amendment, all other Lenders holding Loans actually subject to such repricing that will continue as repriced or modified Term Loans) have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a **"Non-Consenting Lender"**, and with respect to each such Increased-Cost Lender, Defaulting Lender, Declining Lender or Non-Consenting Lender (the **"Terminated Lender"**), Borrower may, by giving written notice to Administrative Agent and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans (or the relevant Class of its outstanding Loans) in full to one or more Eligible Assignees (each a **"Replacement Lender"**) in accordance with the provisions of Section 10.6 except no fee shall be payable thereunder in connection with any such assignment from an Increased Cost Lender or a Non-Consenting Lender and the Defaulting Lender shall pay the fees, if any, payable thereunder in connection with any such assignment from such Defaulting Lender; provided, (1) on the date of such assignment, the Replacement Lender shall pay to Terminated Lender an amount equal to the principal of, and all accrued but unpaid interest on, all outstanding Loans of the Terminated Lender; (2) on the date of such assignment, Borrower shall pay any amounts payable to such Terminated Lender pursuant to Section 2.18(c), 2.19 or 2.20; or otherwise as if it were a prepayment (including a prepayment pursuant to Section 2.13(b)) and (3) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender.  Upon the prepayment of all amounts owing to any Terminated Lender,

such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; provided, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.  Each Lender agrees that if Borrower exercises its option hereunder to cause an assignment by such Lender as a Terminated Lender, such Lender shall, promptly after receipt of written notice of such election, execute and deliver all documentation necessary to effectuate such assignment in accordance with Section 10.6.  In the event that a Lender does not comply with the requirements of the immediately preceding sentence within one Business Day after receipt of such notice, each Lender hereby authorizes and directs Administrative Agent to execute and deliver such documentation as may be required to give effect to an assignment in accordance with Section 10.6 on behalf of a Terminated Lender and any such documentation so executed by Administrative Agent shall be effective for purposes of documenting an assignment pursuant to Section 10.6.  Any removal of DBNY or its successor as a Defaulting Lender pursuant to this Section shall, at the option of the Borrower, constitute the removal of DBNY or its successor as Administrative Agent pursuant to Section 9.7.

2.24.  **Incremental Facilities**.  Borrower may from time to time on one or more occasions by written notice to Administrative Agent elect to request, the establishment of one or more new term loan commitments (which may be in the form of an increase or addition to the Term Loans or any New Term Loan hereunder (the **"New Term Loan Commitments"**) or an issuance of or addition of, or an increase to, notes under one or more separate secured pari passu note facilities (the "**Incremental Pari Note Commitments**"; and together with the New Term Loan Commitments, the "**Incremental Commitments**"), by an amount not in excess of the Incremental Facilities Amount in the aggregate and, in the case of New Term Loan Commitments, not less than $10,000,000 individually (or such lesser amount which shall be approved by Administrative Agent), and integral multiples of $5,000,000 in excess of that amount.  Each such notice shall specify (A) the date (each, an **"Increased Amount Date"**) on which Borrower proposes that the Incremental Commitments shall be effective, which shall be a date not less than 5 Business Days after the date on which such notice is delivered to Administrative Agent; provided that if Borrower requests Administrative Agent to arrange such New Term Loan Commitment Administrative Agent may elect or decline to arrange such New Term Loan Commitments in its sole discretion and any Lender approached to provide all or a portion of the New Term Loan Commitments may elect or decline, in its sole discretion, to provide a New Term Loan Commitment and any Person that Borrower proposes to become a New Term Lender, if such Person is not then a Lender, must be an Eligible Assignee and (B) in the case of the Incremental Pari Note Commitments, the amount thereof together with a reasonably detailed description of the other material terms and conditions of such Indebtedness or drafts of the documentation relating thereto.  Such New Term Loan Commitments shall become effective, and notes may be issued pursuant to the Incremental Pari Note Commitments (each such issuance, an **"Incremental Pari Note Issuance"** and collectively, the **"Incremental Pari Note Issuances"**; and the Persons making such loan or purchasing such notes, each, an **"Incremental Creditor"** and collectively, the **"Incremental Creditors"**), as of such Increased Amount Date; provided that (1) no Default or Event of Default shall exist on such Increased Amount Date immediately before or after giving effect to such Incremental Commitments, (2) both before and after giving effect to the making of any Series of New Term Loans, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of such Increased Amount Date to the same extent as though made on and as of that date, except to the extent such representations and warranties

specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; provided further that if agreed by the relevant New Term Loan Lenders, or, in the case of an Incremental Note Issuance, at the election of Borrower such conditions in clauses (1) and (2) shall be subject to customary "Sungard" limitations if the proceeds of such New Term Loans or Incremental Pari Note Issuances are used to fund Permitted Acquisitions; (3) the New Term Loan Commitments shall be effected pursuant to one or more Joinder Agreements executed and delivered by Borrower, each Lender or other Person to whom any portion of such New Term Loan Commitments is allocated (each, a **"New Term Loan Lender"**) and Administrative Agent, and each of which shall be recorded in the Register and each New Term Loan Lender shall be subject to the requirements set forth in Section 2.20(c); (4) Borrower shall make any payments required pursuant to Section 2.18(c) in connection with the New Term Loan Commitments; (5) in the case of any New Term Loan Commitment, Borrower shall deliver or cause to be delivered any legal opinions or other customary closing documents of the type required by Section 3.1(b) reasonably requested by Administrative Agent in connection with any such transaction; (6) any Incremental Note Issuance shall be secured by Liens on the Collateral on a *pari passu* basis (but without regard to the control of remedies) with the Liens securing Obligations pursuant to the Collateral Trust Agreement and such Liens shall be granted pursuant to security documents substantially similar to the Collateral Documents (such Incremental Note Issuance as so secured, the **"Incremental Pari Notes"**); (7) such Incremental Notes shall not be secured by any property or assets of Holdings, Borrower or any Restricted Subsidiary other than the Collateral unless such property or assets are made a portion of the Collateral hereunder; and (8) such Incremental Notes shall not at any time be guaranteed by any Restricted Subsidiaries other than Restricted Subsidiaries that are Guarantors or will become Guarantors and the terms of such guarantee shall be no more favorable to the secured parties in respect of such Indebtedness than the terms of the Guaranty.

Any New Term Loans made on an Increased Amount Date shall be designated a separate series (a **"Series"**) of New Term Loans (or a part of an existing Series of Term Loan or New Term Loans, as applicable) for all purposes of this Agreement.

On any Increased Amount Date on which any New Term Loan Commitments of any Series are effective, subject to the satisfaction of the foregoing terms and conditions, (i) each New Term Loan Lender of any Series shall make a Loan to Borrower (a **"New Term Loan"**) in an amount equal to its New Term Loan Commitment of such Series (provided that, if Borrower and the applicable New Term Loan Lenders shall agree, such New Term Loans may be funded on a date following the applicable Increased Amount Date), and (ii) each New Term Loan Lender of any Series shall become a Lender hereunder with respect to the New Term Loan Commitment of such Series and the New Term Loans of such Series made pursuant thereto.

Administrative Agent shall notify Lenders promptly upon receipt of Borrower's notice of each Increased Amount Date and, in respect thereof, the Series of New Term Loan Commitments.

The terms and provisions of the New Term Loans and New Term Loan Commitments of any Series shall be as set forth herein or in the Joinder Agreement and the terms and provisions of the Incremental Notes Issuances and Incremental Pari Note Commitments shall be set forth in the note purchase agreement or indenture or other definitive agreement for such Incremental Pari Notes (each, an **"Incremental Pari Note Agreement"**).  In any event (i) the weighted average life to maturity of all New Term Loans of any Series and of all Incremental Pari Notes issued pursuant to any Incremental Pari Note Commitment shall be no shorter than the remaining weighted average life to maturity of the Term B-1 Loans and the Term B-2 Loans (whichever is longest), (ii) the applicable Maturity Date of each Series of New Term Loans and the applicable maturity date of all Incremental Pari Notes issued pursuant to each Incremental Pari Note Commitment shall be no shorter than the Latest Maturity Date at the time the New Term Loan is made under such Series or at the time such Incremental Pari Notes are issued, (iii) the Weighted Average Yield applicable to the New Term Loans of each Series shall be determined by Borrower and the applicable New Term Loan Lenders and shall be set forth in each applicable Joinder Agreement and the Weighted Average Yield applicable to each Incremental Pari Note Issuance shall be determined by Borrower and the applicable Incremental Creditors and shall be set forth in each applicable Incremental Pari Note Agreement; provided, however, that the Weighted Average Yield applicable to the New Term Loans shall not be greater than the applicable Weighted Average Yield payable pursuant to the terms of this Agreement as amended through the date of such calculation with respect to Term B-2 Loans, plus 0.50% *per annum* unless the interest rate with respect to the Term B-2 Loan is increased so as to cause the then applicable Weighted Average Yield under this Agreement on the Term B-2 Loans to equal the Weighted Average Yield then applicable to the New Term Loans minus 0.50% *per annum*; provided, that if any increase in interest rate is required to achieve the foregoing due to interest rate floors, such increase shall be effected solely by the increase in the interest rate floors, and (iv) all other terms of the New Term Loans and New Term Loan Commitments, if not consistent with the terms of the Term B-2 Loans shall be as agreed by Borrower and the New Term Loan Lenders providing such New Term Loans and New Term Loan Commitments.  Each Joinder Agreement may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the opinion of Administrative Agent to effect the provision of this Section 2.24.

**2.25.   Extensions of Loans.**

(a)   Borrower may from time to time, pursuant to the provisions of this Section 2.25, agree with one or more Lenders holding Loans of any Class (**"Existing Class"**) to extend the Maturity Date and to provide for other terms consistent with this Section 2.25 (each such modification, an **"Extension"**) pursuant to one or more written offers (each an **"Extension Offer"**) made from time to time by Borrower to all Lenders under any Class that is proposed to be extended under this Section 2.25, in each case on a pro rata basis (based on the relative principal amounts of the outstanding Loans of each Lender in such Class) and on the same terms to each such Lender.  In connection with each Extension, Borrower will provide notification to Administrative Agent (for distribution to the Lenders of the applicable Class), no later than 30 days prior to the maturity of the applicable Class or Classes to be extended of the requested new maturity date for the extended Loans of each such Class (each an **"Extended Maturity Date"**) and the due date for Lender responses (or such later date acceptable to Administrative

Agent).  In connection with any Extension, each Lender of the applicable Class wishing to participate in such Extension shall, prior to such due date, provide Administrative Agent with a written notice thereof.  Any Lender that does not respond to an Extension Offer by the applicable due date shall be deemed to have rejected such Extension.  Any Extension shall be effected pursuant to such procedure, if any, as may be reasonably established by Administrative Agent and acceptable to the Borrower to accomplish the purposes of this Section 2.25.

(b)   After giving effect to any Extension, the Loans so extended shall cease to be a part of the Class that they were a part of immediately prior to the Extension and shall be a new Class hereunder; provided that at no time shall there be more than seven different Classes of Loans.

(c)   The consummation and effectiveness of each Extension shall be subject to the following:

(i)   no Default or Event of Default shall have occurred and be continuing at the time of the effectiveness of such Extension;

(ii)   the Loans of any Lender extended pursuant to any Extension (**"Extended Loans"**) shall have the same or less restrictive terms as the Class of Loans, subject to the related Extension Amendment (**"Existing Loans"**); except (A) the final maturity date of any Extended Loans of a Class to be extended pursuant to an Extension shall be later than the Latest Maturity Date at the time of such Extension, and the weighted average life to maturity of any Extended Loans of a Class to be extended pursuant to an Extension shall be no shorter than the weighted average life to maturity of the Class of Existing Loans subject to the Latest Maturity Date of the related Existing Loans at the time of such Extension; (B) the all-in pricing (including, without limitation, margins, fees and premiums) with respect to the Extended Loans may be higher or lower than the all-in pricing (including, without limitation, margins, fees and premiums) for the Existing Loans; (C) no repayment of any Extended Loans shall be permitted unless such repayment is accompanied by an at least pro rata repayment of the applicable Existing Loans; (D) any modification of the scheduled amortization applicable thereto, provided that the Weighted Average Life to Maturity of such Extended Loans shall be no shorter than the remaining Weighted Average Life to Maturity (determined at the time of such Extension Offer) of the Term Loans; (E) a modification of voluntary or mandatory prepayments applicable thereto, provided that voluntary and mandatory prepayments applicable to any other Loans shall not be affected by the terms thereof; (F) any addition to or change of call protection; (G) an increase in the fees payable to, or the inclusion of new fees to be payable to, the Extending Lenders in respect of such Extension Offer or their Extended Loans or Extended Commitments; and/or (H) the other terms and conditions applicable to Extended Loans may be terms more restrictive than those with respect to the Existing Loans, so long as such terms and conditions only apply after the Latest Maturity Date; provided further, each Extension Amendment may, without the consent of any Lender other than the applicable extending Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the opinion of Administrative Agent, to give effect to the provisions of

85

this Section 2.25, including any amendments necessary to treat the applicable Loans of the extending Lenders as a new "Class" of loans and/or commitments hereunder; provided however, no Extension Amendment may provide for any Class of Extended Loans to be secured by any Collateral or other assets of any Credit Party that does not also secure the Existing Loans;

(iii)    a minimum amount in respect of such Extension (to be determined in Borrower's discretion and specified in the relevant Extension Offer, but in no event less than $25,000,000, unless another amount is agreed to by Borrower) shall be satisfied; and

(iv)    no Extension shall become effective unless, on the proposed effective date of such Extension, (x) no Default or Event of Default shall exist on such date before or after giving effect to such Extension, (y) both before and after giving effect to such Extension, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of such date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof, and (z) Administrative Agent shall have received a certificate certifying as to the conditions set forth in the foregoing clauses (x) and (y) dated the applicable date of such Extension and executed by an Authorized Officer of Borrower.

(d)    For the avoidance of doubt, it is understood and agreed that the provisions of Section 2.17 and Section 10.5 will not apply to Extensions of Loans pursuant to Extension Offers made pursuant to and in accordance with the provisions of this Section 2.25, including to any payment of interest or fees in respect of any Extended Loans that have been extended pursuant to an Extension at a rate or rates different from those paid or payable in respect of Loans of any other Class, in each case as is set forth in the relevant Extension Offer.

(e)    The Lenders hereby irrevocably authorize Administrative Agent to enter into amendments (collectively, **"Extension Amendments"**) to this Agreement and the other Credit Documents as may be necessary in order to establish new Classes of Loans created pursuant to an Extension, in each case on terms consistent with this Section 2.25.    All such Extension Amendments entered into with Borrower by Administrative Agent hereunder shall be binding on the Lenders.

(f)    Promptly following the consummation and effectiveness of any Extension, the Administrative Agent shall notify each Lender as to the effectiveness of each Extension Amendment.

**2.26.    Incremental Revolving Commitments**.    Borrower may by written notice (it being understood and agreed that Borrower shall not deliver more than one such written notice) to Administrative Agent elect to request the establishment of revolving credit commitments (the

**"Incremental Revolving Commitments"** and the loans thereunder, when borrowed, the **"Incremental Revolving Loans"**) in an aggregate amount not to exceed $225,000,000; provided that Incremental Revolving Commitments may not be incurred if, at the time of such incurrence, any Indebtedness remains outstanding pursuant to Section 6.1(m).  Such notice shall specify (A) the date (the **"Incremental Revolver Date"**) on which Borrower proposes that the Incremental Revolving Commitments shall be effective, which shall be a date not less than 10 Business Days (or such shorter period as agreed by Administrative Agent) after the date on which such notice is delivered to Administrative Agent, (B) the amount of the Incremental Revolving Commitments, (C) the identity of each Lender or other Person that is an Eligible Assignee (each, an **"Incremental Revolving Lender"**) to whom Borrower proposes any portion of such Incremental Revolving Commitments be allocated and the amounts of such allocations; provided that Administrative Agent may elect or decline to arrange such Incremental Revolving Commitments in its sole discretion and any Lender approached to provide all or a portion of such Incremental Revolving Commitments may elect or decline, in its sole discretion, to provide an Incremental Revolving Commitments.  The Incremental Revolving Commitments shall become effective as of the Incremental Revolver Date; provided that (1) no Default or Event of Default shall exist on the Incremental Revolver Date after giving effect to the Incremental Revolving Commitments and the funding of the Incremental Revolving Loans thereunder; (2) both before and after giving effect to the Incremental Revolving Commitments and the funding any Incremental Revolving Loans thereunder, the representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects on and as of the Incremental Revolver Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; (3) the Incremental Revolving Commitments shall be effected pursuant to an Incremental Revolver Amendment executed and delivered by Borrower, the Incremental Revolving Lenders and Administrative Agent, which shall be recorded in the Register, and each Incremental Revolving Lender shall be subject to the requirements set forth in Section 2.20(d); (4)  Borrower shall make any payments required pursuant to Section 2.18(c) in connection with the Incremental Revolving Commitments; and (5) Borrower shall deliver or cause to be delivered within the time period requested by the Administrative Agent any legal opinions, mortgage modifications, amendments to Collateral Documents or other documents reasonably requested by Administrative Agent in connection with any such transaction. Borrower will use the proceeds of the Incremental Revolving Commitments for working capital and general corporate purposes, including capital expenditures and Permitted Acquisitions.

On the Incremental Revolver Date, subject to the satisfaction of the foregoing terms and conditions, (i) each Incremental Revolving Lender shall make an Incremental Revolving Commitment available to Borrower and (ii) each Incremental Revolving Lender shall become a Lender hereunder with respect to its Incremental Revolving Commitment and the Incremental Revolving Loan made pursuant thereto.

The terms, provisions and documentation of the Incremental Revolving Loans and Incremental Revolving Commitments shall be as agreed between Borrower and the Incremental Revolving Lenders providing such Incremental Revolving Commitment, and except as otherwise

set forth herein, to the extent not identical to the Term Loans existing as of the Incremental Revolver Date, shall be reasonably satisfactory to Administrative Agent.  In any event, the Incremental Revolving Commitments and Incremental Revolving Loans shall rank pari passu in right of payment and of security with the Term Loans, shall not be secured by any asset other than the Collateral and shall not be guaranteed by any Person other than the Guarantors.

The Incremental Revolving Commitments shall become Commitments under this Agreement pursuant to an amendment (an **"Incremental Revolver Amendment"**) to this Agreement and, as appropriate, the other Credit Documents, executed by Borrower, each Incremental Revolving Lender providing the Incremental Revolving Commitments and the Administrative Agent.  The Incremental Revolver Amendment may, without the consent of any other Credit Party, Agent or Lender, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the reasonable opinion of Administrative Agent, Borrower and the Incremental Revolving Lenders, to effect the provisions of this Section 2.26.  The Incremental Revolver Amendment may include, among other things, customary provisions regarding (i) letters of credit and reimbursement obligations with respect thereto, (ii) cash collateral obligations with respect to letters of credit, (iii) swing line loans and participations therein and (iv) Incremental Revolving Lenders that are Defaulting Lenders.

This Section 2.26 shall supersede any provisions in Section 2.17 or Section 10.5 to the contrary.

## SECTION 3.   CONDITIONS PRECEDENT

**3.1.  Closing Date**.  The obligation of each Lender to make a Credit Extension on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Closing Date:

(a)  <u>Credit Documents</u>.  Administrative Agent shall have received each Credit Document required to be delivered on the Closing Date, originally executed and delivered by each applicable Credit Party.

(b)  <u>Organizational Documents; Incumbency</u>.  Administrative Agent shall have received, in respect of each Credit Party, (i) the Organizational Documents of such Credit Party and, to the extent applicable; (ii) signature and incumbency certificates of the officers of such Credit Party; (iii) resolutions of the Board of Directors or similar governing body of such Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents and the Related Agreements to which it is a party as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; and (iv) a good standing certificate from the applicable Governmental Authority of such Credit Party's jurisdiction of incorporation, organization or formation, each dated the Closing Date or a recent date prior thereto (other than with respect to The Oklahoma Coal Company).

(c)  <u>Organizational and Capital Structure</u>.  The organizational structure and capital structure of Holdings and its Subsidiaries, after giving effect to transactions

contemplated by this Agreement and the Related Agreements, shall be as set forth on Schedule 4.1.

(d) <u>Consummation of Transactions Contemplated by Related Agreements</u>.

(i) The Transactions contemplated by the Related Agreements shall have become effective in accordance with the terms of the Related Agreement.

(ii) Administrative Agent shall have received a fully executed or conformed copy of each Related Agreement and any material agreements executed in connection therewith. Each Related Agreement shall be in full force and effect.

(e) <u>Existing Indebtedness</u>.

(i) On the Closing Date, Holdings and its Subsidiaries shall have (i) repaid in full all Indebtedness and other obligations outstanding evidenced by or related to the Existing Term Loan Agreement and (ii) delivered to Administrative Agent all documents or instruments necessary to confirm that the Liens granted to the Collateral Trustee no longer secure Indebtedness and other obligations outstanding under, evidenced by or related to the Existing Term Loan Agreement.

(ii) Pro forma for the Closing Date Acquisition, repayment of Indebtedness and other obligations under the Existing Term Loan Agreement referenced in clause (i) above and the transactions contemplated by the Related Agreements, Borrower and its Restricted Subsidiaries shall have no outstanding third party indebtedness for borrowed money other than (a) under this Agreement, the Revolving Credit Agreement and the Senior Secured Notes, (b) replacements, extensions and renewals of existing indebtedness that matures prior to the Closing Date, (c) ordinary course capital leases, (d) ordinary course letter of credit facilities, (e) ordinary course purchase money, mortgage and equipment financings, (f) indebtedness permitted under this Agreement and (g) other debt in amounts and on terms and conditions reasonably acceptable to the Administrative Agent.

(f) <u>Royalty Drop-Down Transaction</u>. The Royalty Drop-Down Transaction shall have been consummated.

(g) [Reserved.]

(h) <u>Real Estate Assets</u>. In order to create in favor of Collateral Trustee, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in certain Real Estate Assets, Collateral Trustee shall have received from Borrower and each applicable Guarantor:

(i) fully executed and notarized Mortgages, in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each Real Estate Asset listed in Schedule 3.1(h) (each, a **"Closing Date Mortgaged Property"**);

(ii)   an opinion of counsel (which counsel shall be reasonably satisfactory to Administrative Agent) in each state in which a Closing Date Mortgaged Property is located with respect to the enforceability of the form(s) of Mortgages to be recorded in such state and such other matters as Administrative Agent may reasonably request, in each case in form and substance reasonably satisfactory to Administrative Agent or Collateral Trustee; and

(iii)   (A)  a completed Flood Certificate with respect to each Closing Date Mortgaged Property, which Flood Certificate shall (x) be addressed to the Collateral Trustee and (y) otherwise comply with the Flood Program; (B)  if the Flood Certificate states that such Closing Date Mortgaged Property is located in a Flood Zone, Borrower's written acknowledgment of receipt of written notification from the Collateral Trustee (x) as to the existence of such Closing Date Mortgaged Property and (y) as to whether the community in which each Closing Date Mortgaged Property is located is participating in the Flood Program; and (C)  if such Closing Date Mortgaged Property is located in a Flood Zone and is located in a community that participates in the Flood Program, evidence that Borrower has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program.

(i)   Personal Property Collateral.  In order to create in favor of Collateral Trustee, for the benefit of Secured Parties, a valid, perfected First Priority security interest in the personal property Collateral (subject to the limitations set forth in the Collateral Documents), each Credit Party shall have delivered to Collateral Trustee:

(i)   evidence reasonably satisfactory to Administrative Agent of the compliance by each Credit Party of their obligations under the Pledge and Security Agreement and the other Collateral Documents (including their obligations to execute or authorize, as applicable, and deliver UCC financing statements, originals of securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts (other than Excluded Assets) as provided therein);

(ii)   a completed Collateral Questionnaire dated the Closing Date and executed by an Authorized Officer of each Credit Party, together with all attachments contemplated thereby;

(iii)   fully executed Intellectual Property Security Agreements, in proper form for filing or recording in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, memorializing and recording the encumbrance of the Intellectual Property Assets listed in Schedule 5.2 to the Pledge and Security Agreement; and

(iv)   evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument (including any intercompany notes evidencing Indebtedness permitted to be incurred pursuant to Section 6.1(b)) and made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by Administrative Agent.

CH\2051848.14

(j) <u>Financial Statements; Projections</u>.    Administrative Agent and Arranger shall have received from Borrower (i) the Historical Financial Statements, (ii) pro forma consolidated balance sheet and related pro forma consolidated statement of income of Borrower and its Subsidiaries on a consolidated basis as of and for the twelve-month period ending on the last day of the most recently completely four-fiscal quarter period for which financial statements were delivered under clause (i) of the definition of the term "Historical Financial Statements", reflecting the consummation of the transactions contemplated by Related Agreements, the related financings and the other transactions contemplated by the Credit Documents to occur on or prior to the Closing Date as if such transactions occurred as of such date, and (iii) the Projections.

(k) [Reserved.]

(l) <u>Opinions of Counsel to Credit Parties</u>.    Administrative Agent shall have received executed copies of the favorable written opinions of counsel for Credit Parties, as to such matters as Administrative Agent may reasonably request, dated as of the Closing Date and in form and substance reasonably satisfactory to Administrative Agent and Arranger (and each Credit Party hereby instructs such counsel to deliver such opinions to Administrative Agent).

(m) <u>Fees</u>.    Borrower shall have paid to each Agent the fees payable on or before the Closing Date referred to in Section 2.11 and all expenses payable pursuant to Section 10.2 which have accrued and invoiced to the Closing Date.

(n) <u>Solvency Certificate</u>.    On the Closing Date, Administrative Agent shall have received a solvency certificate from the chief financial officer of Holdings, dated the Closing Date and addressed to Administrative Agent, in form of Exhibit Q.

(o) <u>Closing Date Certificate</u>.    Borrower shall have delivered to Administrative Agent an originally executed Closing Date Certificate, together with all attachments thereto.

(p) [Reserved.]

(q) [Reserved.]

(r) <u>USA PATRIOT Act</u>. At least three (3) days prior to the Closing Date, the Lenders shall have received all documentation and other information with respect to the Credit Parties that shall have been reasonably requested by the Administrative Agents or the Arrangers in writing at least 10 business days prior to the Closing Date and that the Administrative Agents and the Arrangers reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) the **"PATRIOT Act"**).

(s) <u>Funding Notice</u>.    Administrative Agent shall have received a fully executed and delivered Funding Notice executed by an Authorized Officer no later than

one Business Day prior to the Closing Date or such shorter period of time acceptable to Administrative Agent.

(t)  No Default.  As of the Closing Date, no event shall have occurred and be continuing or would result from the consummation of the transactions contemplated by the Related Agreements that would constitute a Default or an Event of Default.

(u)  Accuracy of Representations.  As of the Closing Date, the representations and warranties set forth in Section 4 and in the other Credit Documents shall be true and correct in all material respects on and as of the Closing Date (both immediately prior to and after giving effect to the funding of the Term Loans) to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

(v)  [Reserved.]

(w)  Material Adverse Effect.  Since December 31, 2014, no event, change or circumstance shall have occurred that has caused or would reasonably be expected to cause, either individually or in the aggregate, a Material Adverse Effect.

Notwithstanding anything to the contrary in this Section 3.1, to the extent any security interest in any of the intended Collateral is not or cannot be provided and/or perfected on the Closing Date (other than any Collateral the security interest in which may be perfected by the filing of a UCC financing statement or the delivery of certificated stock certificates) after Credit Parties' use of commercially reasonable efforts to do so, then the provision and/or perfection of a security interest in such Collateral will not constitute a condition precedent to the obligation of each Lender to make a Credit Extension on the Closing Date but such security interest(s) will be perfected as required by Section 5.16.

## SECTION 4.   REPRESENTATIONS AND WARRANTIES

In order to induce Agents and Lenders to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to each Agent, on the Closing Date, that the following statements are true and correct (it being understood and agreed that the representations and warranties made on the Closing Date are deemed to be made concurrently with the consummation of the transactions contemplated by the Related Agreements contemplated to occur on the Closing Date):

**4.1.   Organization; Requisite Power and Authority; Qualification.** Each of Holdings and its Restricted Subsidiaries (a) is duly organized, validly existing and (except in the case of Immaterial Subsidiaries) in good standing under the laws of its jurisdiction of organization as identified in Schedule 4.1, (b) has all requisite power and authority to (i) own and operate its properties, to carry on its business as now conducted and as proposed to be conducted and (ii)

enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

**4.2.   Equity Interests and Ownership.**  The Equity Interests of each of Borrower and its Restricted Subsidiaries has been duly authorized and validly issued and is fully paid and to the extent applicable thereto, non-assessable.  Except as set forth on Schedule 4.2, as of the Closing Date, there is no existing option, warrant, call, right, commitment or other agreement to which Borrower or any of its Restricted Subsidiaries is a party requiring, and there is no membership interest or other Equity Interests of Borrower or any of its Restricted Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Borrower or any of its Restricted Subsidiaries of any additional membership interests or other Equity Interests of Borrower or any of its Restricted Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of Borrower or any of its Restricted Subsidiaries.  Schedule 4.2 correctly sets forth the ownership interest of Borrower and each of its Subsidiaries (including Unrestricted Subsidiaries) in their respective Subsidiaries (including Unrestricted Subsidiaries) as of the Closing Date after giving effect to transactions contemplated by this Agreement and the Related Agreements to occur on the Closing Date.

**4.3.   Due Authorization.**   The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary corporate, limited liability company or other action on the part of each Credit Party that is a party thereto.

**4.4.   No Conflict.**  The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to Holdings or any of its Restricted Subsidiaries, (ii) any of the Organizational Documents of Holdings or any of its Restricted Subsidiaries, or (iii) any order, judgment or decree of any court or other agency of government binding on Holdings or any of its Restricted Subsidiaries, except in the case of clauses (i) or (iii), such violations as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Holdings or any of its Restricted Subsidiaries except to the extent such conflict, breach or default could not reasonably be expected to have a Material Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Holdings or any of its Restricted Subsidiaries (other than any Liens created under any of the Credit Documents in favor of Collateral Trustee, for the benefit of the Secured Parties); or (d) require any approval of stockholders, members or partners or any approval or consent of any Person under any Contractual Obligation of Holdings or any of its Restricted Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and except for any such approvals or consents the failure of which to obtain will not have a Material Adverse Effect.

**4.5.  Governmental Consents.**  Except as would not be reasonably expected to result in a Material Adverse Effect, the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents to which they are a party do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except as otherwise set forth herein, and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Trustee for filing and/or recordation, as of the Closing Date.

**4.6.  Binding Obligation.**  Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by general equitable principles relating to enforceability (whether enforcement is sought by proceedings in equity or at law).

**4.7.  Historical Financial Statements.**  The Historical Financial Statements were prepared in conformity with GAAP (except as indicated in any notes thereto) and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments.

**4.8.  Security Interest in Collateral**.  The provisions of this Agreement and the other Credit Documents create legal and valid Liens on all the Collateral in favor of the Collateral Trustee, for the benefit of the Secured Parties, and so long as such filings and other actions required to be taken hereby or by the applicable Collateral Documents (including the filings of appropriate financing statements with the office of the Secretary of State of the state of organization of each Credit Party, the filing of the Intellectual Property Security Agreements with the U.S. Patent and Trademark Office and the U.S. Copyright Office, and the proper recordation of Mortgages and fixture filings with respect to Material Real Estate Assets, in each case in favor of the Collateral Trustee and the delivery to the Collateral Trustee (or to the Revolving Agent as bailee for the Collateral Trustee pursuant to the Intercreditor Agreement) of any Pledged Debt (as defined in the Pledge and Security Agreement) and any Pledged Equity Interest (as defined in the Pledge and Security Agreement) required to be delivered pursuant to the applicable Collateral Documents), such Liens constitute perfected and continuing Liens on the Collateral (to the extent that a Lien thereon can be perfected by the foregoing actions), securing the Secured Obligations (as defined in any applicable Collateral Document), enforceable (except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law)) against the applicable Credit Party and all third parties, and (a) in the case of Term Loan Priority Collateral, having priority over all other Liens on such Term Loan Priority Collateral subject to Permitted Liens and (b) in the case of Revolving Loan Priority Collateral, having Second Priority on such Revolving Loan Priority Collateral subject to Permitted Liens.

**4.9. No Material Adverse Effect.** Since the Closing Date, no event, circumstance or change has occurred that has caused a Material Adverse Effect.

**4.10. [Reserved].**

**4.11. Adverse Proceedings, Etc.** There are no Adverse Proceedings that could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Restricted Subsidiaries (a) is in violation of any applicable laws that could reasonably be expected to have a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that could reasonably be expected to have a Material Adverse Effect.

**4.12. Payment of Taxes.** Except as otherwise permitted under Section 5.3, all material tax returns and reports of Holdings and its Restricted Subsidiaries required to be filed by any of them have been timely filed, and all material Taxes shown on such returns to be due and payable and all other material assessments, fees and other governmental charges upon Holdings and its Restricted Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable except those which are being actively contested by Holdings or such Restricted Subsidiary in good faith by appropriate proceedings and for which reserves or other appropriate provisions, if any, required by GAAP shall have been made or provided therefor.

**4.13. Properties**.

    (a) Title. Each of Holdings and its Restricted Subsidiaries has (i) good and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), (iii) valid ownership of, valid licensed rights in or the valid right to use (in the case of interests in Intellectual Property) or (iv) good title to (in the case of all other personal property), all of their respective properties and assets; in each case of the foregoing except where failure to do so would not reasonably be expected to result in a Material Adverse Effect. Except as permitted by this Agreement, all such properties and assets are free and clear of Liens other than Permitted Liens.

    (b) Real Estate. As of the Closing Date, Schedule 4.13 contains a true, accurate and complete list of (i) all Real Estate Assets, and (ii) all leases, subleases or assignments of leases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Estate Asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease, sublease or assignment. Each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect, and each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization,

95

moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**4.14.  Environmental Matters.**  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, there are no pending or, to the knowledge of Holdings and any of its Restricted Subsidiaries threatened Environmental Claims against Holdings or any of its Restricted Subsidiaries. Neither Holdings nor any of its Restricted Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, notice, consent decree or settlement agreement with any Person relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials Activity that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  Holdings and each of its Restricted Subsidiaries have received all Governmental Authorizations required pursuant to Environmental Law for its business as currently conducted and are, and at all times have been, in compliance with all applicable Environmental Laws (including compliance with Environmental Laws with respect to any Real Estate Asset or governing its business and the requirements of any Governmental Authorizations issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Holdings or any of its Restricted Subsidiaries) except for such failure to receive or such non-compliance which would not reasonably be expected to have a Material Adverse Effect.  There are and, to each of Holdings' and its Restricted Subsidiaries' knowledge, have been, no conditions, occurrences, or Hazardous Materials Activities which would reasonably be expected to form the basis of an Environmental Claim against Holdings or any of its Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect. None of Holdings' or any of its Restricted Subsidiaries' operations involves the transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent, that, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.  To the knowledge of Holdings or any of its Restricted Subsidiaries, no event or condition has occurred or is occurring with respect to Holdings or any of its Restricted Subsidiaries or on any Real Estate Asset relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which event or condition individually or in the aggregate has had, or would reasonably be expected to have, a Material Adverse Effect.

**4.15.  Permits and Monitoring of the Environmental and Mining Laws.**

(a)  Holdings and its Restricted Subsidiaries possess, maintain in full force and effect, and are in compliance with all Governmental Authorizations required by the United States Environmental Protection Agency, the United States Army Corps of Engineers, the United States Department of Interior, the United States Office of Surface Mining Reclamation and Enforcement and corresponding state agencies, as are necessary under applicable law (including, without limitation, any Environmental and Mining Law) to own, lease or operate their current properties and conduct their current businesses, except to the extent that the failure to possess, maintain or be in compliance with any such Governmental Authorizations would not reasonably be expected to result in a Material Adverse Effect.  Each of Holdings and its Restricted Subsidiaries has fulfilled and performed all of its obligations with respect to the Governmental Authorizations, and no event has occurred that allows, or after notice or lapse of time would allow, revocation or termination thereof or results in any other impairment of the rights of the holder or any

such Governmental Authorizations, except to the extent that any such failure to fulfill or perform, revocation, termination or impairment would not reasonably be expected to result in a Material Adverse Effect.

(b)   Except as would not be reasonably expected to result in a Material Adverse Effect, Holdings and its Restricted Subsidiaries: (i) are conducting their businesses and operations in compliance with Environmental and Mining Laws; (ii) have not received any written notice from a governmental authority or any other third party alleging any violation of Environmental and Mining Law or liability thereunder (including, without limitation, liability as a "potentially responsible party" and/or for costs of investigating or remediating sites containing Hazardous Materials and/or reclamation or damages to natural resources and/or for fines or penalties and/or exposure to Hazardous Materials); (iii) do not have knowledge of any release of Hazardous Materials that, individually or in the aggregate, can reasonably be expected to require any material capital expenditures by Holdings or any of its Restricted Subsidiaries regarding the investigation, remediation or cleanup thereof; (iv) are not subject to any pending or, to the knowledge of Holdings or any of its Restricted Subsidiaries, threatened claim or other legal proceeding under any Environmental and Mining Laws against Holdings or any of its Restricted Subsidiaries; (v) possess and maintain in full force and effect all bonds, letters of credit, and other financial assurances required under Environmental and Mining Laws; (vi) have not agreed to assume, undertake or provide indemnification for any liability of any other Person under any Environmental and Mining Law, including any obligation of any other Person for reclamation, cleanup or remedial action, except as set forth on Schedule 4.15(b); and (vii) are not aware of any facts or issues with respect to Holdings or any of its Restricted Subsidiaries regarding compliance with Environmental and Mining Laws, pending legal proceedings or liabilities under the Environmental and Mining Laws or other obligations under Environmental and Mining Laws, including the release or threatened release of Hazardous Materials.

The representations and warranties in Sections 4.14, 4.15 and 4.20(b) are the sole representations and warranties with respect to Environmental Law, Environmental and Mining Laws, Mining Laws, Hazardous Materials, and Hazardous Materials Activities.

**4.16.   [Reserved].**

**4.17.   Governmental Regulation.**   Neither Holdings nor any of its Restricted Subsidiaries is subject to regulation under the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness such that it will render all or any portion of the Obligations unenforceable.  Neither Holdings nor any of its Restricted Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.18.   Federal Reserve Regulations; Exchange Act.**   Neither Holdings nor any of its Restricted Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any

such Margin Stock in violation of Regulation T, Regulation U or Regulation X of the Board of Governors or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, Regulation U or Regulation X of the Board of Governors.

**4.19.   [Reserved].**

**4.20.   Employee Benefit Plans and the Coal Industry Retiree Health Benefit Act and the Black Lung Benefits Act.**

(a)   Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, no ERISA Event has occurred or is reasonably expected to occur.   There has been no final determination (after completion or exhaustion of any dispute resolution procedure in accordance with Section 4221 of ERISA and any rules of the applicable Multiemployer Plan) that Holdings, any of its Restricted Subsidiaries or any of their ERISA Affiliates is in "default" (as defined in Section 4219(c)(5) of ERISA and any rules of the United Mine Workers of America 1974 Pension Plan (the "**1974 Plan**")) with respect to the 1974 Plan, which has resulted in or could reasonably be expected to result in immediate payment by Holdings, any of its Restricted Subsidiaries or any of their ERISA Affiliates of withdrawal liability with respect to the 1974 Plan which (together with accrued interest (as described in Section 4219(c)(5) of ERISA) and any liquidated damages (as described in the 1974 Plan)) is in an amount in excess of $900,000,000.

(b)   Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:  (i) each of Holdings and its Restricted Subsidiaries are in compliance with the Coal Industry Retiree Health Benefit Act (the "**Coal Act**") and the regulations promulgated thereunder, and none of Holdings or any of its Restricted Subsidiaries has incurred or reasonably expects to incur any liability under the Coal Act (including any liability due to non-compliance with the Coal Act by any of their respective "related persons" (within the meaning of Section 9701(c) of the Internal Revenue Code)), except with respect to premiums, benefit plans under Section 9711 and other payments required thereunder which have been paid when due; and (ii) each of Holdings and its Restricted Subsidiaries is in compliance with the Black Lung Act and the regulations promulgated thereunder.

**4.21.   Certain Fees.**  Except as set forth on Schedule 4.21, no broker's or finder's fee or commission will be payable with respect to the transactions contemplated by the Closing Date Acquisition Agreement, except as payable to Agents and Lenders.

**4.22.   Solvency.**   Immediately upon the consummation of the Transactions on the Closing Date, after taking into account rights of contribution, the Credit Parties, on a consolidated basis, are Solvent.

**4.23.   [Reserved].**

**4.24.   Compliance with Statutes, Etc.**  Each of Holdings and its Restricted Subsidiaries is in compliance with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property, except such non-compliance that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

**4.25.   Disclosure.**  The representations and warranties of any Credit Party contained in any Credit Document or in any other documents, certificates or written statements furnished to any Agent or Lender by or on behalf of Holdings or any of its Restricted Subsidiaries for use in connection with the transactions contemplated hereby (other than Projections, pro forma financial information, other forward-looking information and general economic or industry data or third party data), when taken as a whole, do not contain any untrue statement of a material fact or omits to state a material fact (known to Holdings or Borrower, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which the same were made. Any projections and pro forma financial information of the Credit Parties contained in such materials are based upon good faith estimates and assumptions believed by Holdings or Borrower to be reasonable at the time made, it being recognized by Agents and Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ materially from the projected results.

**4.26.   Foreign Corrupt Practices Act**.  Neither Holdings nor any of its Restricted Subsidiaries, nor, to the knowledge of Holdings and its Restricted Subsidiaries, any director, officer, agent, employee or other person associated with or acting on behalf of Holdings or any its Subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds, (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977 or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

**4.27.   PATRIOT Act.**  To the extent applicable, each Credit Party and each Subsidiary thereof is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the PATRIOT Act.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

## SECTION 5.   AFFIRMATIVE COVENANTS

Each of Borrower and each Guarantor Subsidiary covenants and agrees that, until payment in full of all Obligations (other than (i) contingent indemnification obligations for

which no claim has been asserted and (ii) obligations and liabilities in respect of any Hedge Agreement or Designated Coal Contract), each such Person shall perform, and shall cause each of its Restricted Subsidiaries to perform, all covenants in this Section 5.

**5.1. Financial Statements and Other Reports.** Borrower will deliver to Administrative Agent:

(a) [Reserved];

(b) Quarterly Financial Statements. Within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, commencing with the Fiscal Quarter ending March 31, 2015, the consolidated balance sheets of Borrower and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of Borrower and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and, commencing with the financial statements for the Fiscal Quarter ending March 31, 2016, (i) the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto and (ii) consolidated balance sheets of Borrower and its Subsidiaries and the related consolidated statements of income, stockholders' equity and cash flows of Borrower and its Subsidiaries covering the same periods reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries, if any, from such financial statements delivered under this clause (b);

(c) Annual Financial Statements. Within 90 days after the end of each Fiscal Year, commencing with the Fiscal Year in which the Closing Date occurs, (i) the consolidated balance sheets of Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of Borrower and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and, commencing with the financial statements for the Fiscal Year ending December 31, 2016, the corresponding figures from the Financial Plan for the Fiscal Year covered by such financial statements, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto; (ii) with respect to such consolidated financial statements a report thereon of Ernst & Young LLP or other independent certified public accountants of recognized national standing selected by Borrower (which report shall not be subject to any going concern or scope of audit qualification (except for qualifications relating to changes in accounting principles or practices reflecting changes in GAAP and required or approved by Borrower's independent certified public accountants or with respect to, or resulting from, an upcoming maturity date of any Indebtedness occurring within one year from the time such opinion is delivered), and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except

as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) and (iii) consolidated balance sheets of Borrower and its Subsidiaries and the related consolidated statements of income, stockholders' equity and cash flows of Borrower and its Subsidiaries covering the same periods reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries, if any, from such financial statements delivered under this clause (c);

(d)  Compliance Certificate.  Together with each delivery of financial statements of Borrower pursuant to Sections 5.1(b) and 5.1(c), commencing with the financial statements for the Fiscal Quarter ending September 30, 2015, a duly executed and completed Compliance Certificate.

(e)  Statements of Reconciliation after Change in Accounting Principles. If, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Borrower delivered pursuant to Section 5.1(b) or 5.1(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation reflecting such change;

(f)  Notice of Default.  Promptly upon any Authorized Officer of Borrower obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that written notice has been given by Administrative Agent or any Lender to Borrower with respect thereto; (ii) of any condition or event that constitutes a "Default" or an "Event of Default" under the Revolving Credit Agreement or any of the Second Lien Documents; (iii) that any Person has given any default notice to Borrower or any of its Restricted Subsidiaries, in each case, with respect to any event or condition set forth in Section 8.1(b); or (iv) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officer specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action Borrower has taken, is taking and proposes to take with respect thereto;

(g)  Notice of Litigation.  Promptly upon any Authorized Officer of Borrower obtaining knowledge of (i) the institution of, or non-frivolous threat of, any Adverse Proceeding not previously disclosed in writing by Borrower to Lenders, or (ii) any material development in any Adverse Proceeding that, in the case of either clause (i) or (ii) as to which there is a reasonable possibility of adverse determination and which, if adversely determined would be reasonably expected to have a Material Adverse Effect, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby, written notice thereof together with such other information as may be reasonably available to Borrower to enable Lenders and their counsel to evaluate such matters;

(h)  <u>ERISA</u>.  (i) Promptly upon any Authorized Officer of Borrower obtaining knowledge of the occurrence of or forthcoming occurrence of any ERISA Event that would result in a Material Adverse Effect, a written notice specifying the nature thereof, what action the Credit Parties or any of their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness after a request has been made by the Administrative Agent, copies of (1) all notices received by the Credit Parties or any of their respective ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (2) copies of such other documents or governmental reports or filings relating to any Pension Plan or any Multiemployer Plan as Administrative Agent shall reasonably request;

(i)  <u>Financial Plan</u>.  Commencing with the 2016 Fiscal Year, no later than 60 days after the beginning of each Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year (prepared on a monthly or quarterly basis) (a **"Financial Plan"**), including (i) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of Borrower and its Restricted Subsidiaries for such Fiscal Year and (ii) forecasted consolidated statements of income and cash flows of Borrower and its Restricted Subsidiaries for each month or each Fiscal Quarter, as applicable, of such Fiscal Year;

(j)  <u>Insurance Report</u>.  At Administrative Agent's reasonable request (but no more than once per year other than during the continuance of an Event of Default), a certificate from Borrower's insurance broker(s) in form and substance reasonably satisfactory to Administrative Agent outlining all material insurance coverage maintained as of the date of such certificate by Borrower and its Restricted Subsidiaries;

(k)  <u>Notice of Foresight Acquisition Option</u>.  Promptly upon the consummation thereof, Borrower will furnish to Administrative Agent notice of the exercise of the Foresight Acquisition Option.

(l)  <u>Information Regarding Collateral</u>.  Borrower will furnish to Administrative Agent and Collateral Trustee reasonable prior written notice of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's form of formation or incorporation, (iii) in any Credit Party's jurisdiction of organization or (iv) in any Credit Party's Federal Taxpayer Identification Number or state organizational identification number.  Borrower also agrees promptly to notify Administrative Agent and Collateral Trustee if any material portion of the Collateral is damaged or destroyed;

(m)  <u>Annual Collateral Verification</u>.  Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.1(c), Borrower shall deliver to Administrative Agent and Collateral Trustee a certificate of its Authorized Officer either confirming that there has been no change in the information required by Sections 2(b), 3, 4, 6, 7, 8, 11, 13, 14, 15 and 16 of the Collateral Questionnaire since the date of the Collateral Questionnaire delivered on the Closing

Date or the date of the most recent certificate delivered pursuant to this Section 5.1 and/or identifying such changes;

(n)  Other Information.  (A) Promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by Holdings to its security holders acting in such capacity or by any Restricted Subsidiary of Holdings to its security holders other than Holdings or another Subsidiary of Holdings, (ii) all regular and periodic reports and all registration statements and prospectuses, if any, filed by Borrower or any of its Restricted Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any other Governmental Authority, (iii) all press releases made available generally by Holdings or any of its Restricted Subsidiaries to the public concerning material developments in the business of Holdings or any of its Restricted Subsidiaries, and (B) such other information and data with respect to Holdings or any of its Restricted Subsidiaries as from time to time may be reasonably requested by Administrative Agent or any Lender (through the Administrative Agent) that is reasonably available without undue cost or burden; and

(o)  Public Information.   Holdings, Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to this Section 5.1 or otherwise are being distributed through IntraLinks/IntraAgency, SyndTrak or another relevant website or other information platform (the **"Platform"**), any document or notice that Holdings or Borrower has indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for such Public Lenders.  If Borrower has not indicated whether a document or notice delivered pursuant to this Section 5.1 contains Non-Public Information, Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material Non-Public Information with respect to Holdings, its Subsidiaries and their Securities.

Documents required to be delivered pursuant to Section 5.1(b) through (o) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are sent via e-mail to Administrative Agent for posting on Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, established on its behalf by Administrative Agent and to which each Lender and Administrative Agent have access or Borrower has posted on its own website to which each Lender and Administrative Agent have access. Each Lender shall be solely responsible for timely accessing posted documents.  If the delivery of any of the foregoing shall fall on a day that is not a Business Day, such deliverable shall be due on the next succeeding Business Day.

**5.2.  Existence.**  Except as otherwise permitted under Section 6.8, each Credit Party will, and will cause each of its Restricted Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights and franchises, licenses and permits material to its business; provided, no Credit Party (other than Borrower with respect to existence) or any of its Restricted Subsidiaries shall be required to preserve any such existence, right or franchise, licenses and permits if such Credit Party shall determine that the preservation thereof is no longer desirable in

the conduct of the business of such Person, and that the loss thereof would not reasonably be expect to result in a Material Adverse Effect.

**5.3.   Payment of Taxes.**   Except as would not reasonably be expected to have a Material Adverse Effect, each Credit Party will, and will cause each of its Restricted Subsidiaries to, file all material tax returns and pay all material taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon; provided, no such tax need be paid if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a tax which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such tax.  No Credit Party will, nor will it permit any of its Restricted Subsidiaries to, file or consent to the filing of any consolidated, combined or unitary income tax return with any Person (other than Holdings or any of its current or future Restricted Subsidiaries).

**5.4.   Maintenance of Properties.**   Each of Borrower and Guarantor Subsidiaries will, and will cause each of its Restricted Subsidiaries to, maintain or cause to be maintained in working order and condition, ordinary wear and tear, casualty and condemnation excepted, all material tangible properties used or useful in the business of Borrower and its Restricted Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof in its commercially reasonable business judgment, except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

**5.5.   Insurance.**   Borrower will maintain or cause to be maintained, with financially sound and reputable insurers (or pursuant to self-insurance to the extent commercially reasonable), such public liability insurance, third party property damage insurance, business interruption insurance and casualty insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Borrower and its Restricted Subsidiaries, in each case in such amounts (giving effect to self-insurance) and with such deductibles, covering such risks and otherwise, in each case, as are prudent in the good faith judgment of the officers of Borrower and its Restricted Subsidiaries (after giving effect to any reasonable and customary self-insurance).  Without limiting the generality of the foregoing, Borrower will maintain or cause to be maintained (a) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the Flood Program, in each case in compliance with any applicable regulations of the Board of Governors, and (b) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies (or pursuant to self-insurance to the extent commercially reasonable), in such amounts, with such deductibles, and covering such risks as are prudent in the good faith judgment of the officers of Borrower and its Subsidiaries.  Each such policy of insurance (other than directors and officers liability, workers compensation insurance, other employee benefits related insurance and business interruption insurance) shall (i) name Collateral Trustee, for the benefit of the Secured Parties as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, reasonably satisfactory in form and substance to Collateral Trustee, that names Collateral Trustee, for the benefit of the

Secured Parties, as the loss payee thereunder and Borrower will use commercially reasonable efforts to cause such policy to provide for at least 30 days' prior written notice to Collateral Trustee of any material modification or cancellation of such policy.

**5.6. Books and Records; Inspections.** Each Credit Party will, and will cause each of its Restricted Subsidiaries to, keep proper books of record and accounts in which complete, true and correct entries in conformity in all material respects with GAAP shall be made of all dealings and transactions in relation to its business and activities. Each Credit Party will, and will cause each of its Restricted Subsidiaries to, permit any authorized representatives designated by any Lender (coordinated through Administrative Agent), upon reasonable advance notice, to visit and inspect any of the properties of any Credit Party and any of its respective Restricted Subsidiaries, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and (so long as Borrower is afforded an opportunity to be present) independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested; provided, so long as no Event of Default is continuing, Borrower shall not be required to pay or reimburse the expenses (to the extent otherwise required to do so hereunder) of more than one such visit and inspection during any Fiscal Year.

**5.7. Lenders Calls.** Borrower will, upon the request of Administrative Agent or Requisite Lenders, participate in a telephonic conference call with Administrative Agent and Lenders once during each Fiscal Quarter (or more frequently during the continuance of an Event of Default) at such time as may be agreed to by Borrower and Administrative Agent.

**5.8. Compliance with Laws.** Borrower and each of its Restricted Subsidiaries will comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws), except for any noncompliance which would not reasonably be expected to have, in the aggregate, a Material Adverse Effect.

**5.9. Environmental**.

(a) Environmental Disclosure. Borrower will deliver to Administrative Agent:

(i) as soon as practicable following receipt thereof, copies of all material environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Borrower or any of its Restricted Subsidiaries or by independent consultants, Governmental Authorities or any other Persons, with respect to environmental matters at any Facility or with respect to any Environmental Claims that, in either case, would reasonably be expected to result in liability of Borrower or any of its Restricted Subsidiaries in excess of $10,000,000;

(ii) promptly upon the occurrence thereof, written notice describing in reasonable detail any of the following that would reasonably be expected to results in liabilities of Borrower or any of its Restricted Subsidiaries in excess of $10,000,000: (1) any Release of Hazardous Materials required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws, (2) any

105

remedial action taken by Borrower or any other Person in response to (A) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or more Environmental Claims, or (B) any Environmental Claims and (3) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that would reasonably be expected to cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)   as soon as practicable following the sending or receipt thereof by Holdings or any of its Restricted Subsidiaries, a copy of any and all material written communications with respect to any of the following that would reasonably be expected to result in liabilities of Holdings or any of its Restricted Subsidiaries in excess of $10,000,000 (1) any Environmental Claims, (2) any Release required to be reported to any Governmental Authority, and (3) any request for information from any Governmental Authority that suggests such Governmental Authority is investigating whether Holdings or any of its Restricted Subsidiaries may be potentially responsible for any liability (including penalties, fine or enforcement actions) arising from any Hazardous Materials Activity;

(iv)   reasonably prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Holdings or any of its Restricted Subsidiaries that would reasonably be expected to (A) expose Holdings or any of its Restricted Subsidiaries to, or result in, Environmental Claims that would reasonably be expected to result in liabilities of Holdings or any of its Restricted Subsidiaries in excess of $10,000,000 or (B) affect the ability of Holdings or any of its Restricted Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations that would reasonably be expected to result in liabilities of Holdings or any of its Restricted Subsidiaries in excess of $10,000,000 and (2) any proposed action to be taken by Holdings or any of its Restricted Subsidiaries to modify current operations in a manner that would reasonably be expected to subject Holdings or any of its Restricted Subsidiaries to any additional material obligations or requirements under any Environmental Laws resulting in liabilities of Holdings or any of its Restricted Subsidiaries in excess of $10,000,000; and

(v)   with reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent in relation to any matters disclosed pursuant to this Section 5.9(a).

(b)   Hazardous Materials Activities, Etc.   Each Credit Party shall promptly take, and shall cause each of its Restricted Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Restricted Subsidiaries that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Credit Party or any of its Restricted Subsidiaries and discharge any obligations it may have to any Person

thereunder, except where failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.10.  Subsidiaries.**

(a)  In the event that any Person becomes a wholly-owned subsidiary of Borrower  (other than an Excluded Subsidiary) or any Unrestricted Subsidiary is converted into a Restricted Subsidiary that is a wholly-owned subsidiary (other than an Excluded Subsidiary) after the Closing Date, Borrower shall (i) within 15 days (or such later date as Administrative Agent may agree) cause such subsidiary to become a Guarantor hereunder and a Grantor under the Pledge and Security Agreement by executing and delivering to Administrative Agent and Collateral Trustee a Counterpart Agreement and (ii) cause such Subsidiary within 15 days (or such later date as Administrative Agent may agree in its sole discretion), to take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates reasonably requested by Administrative Agent or Collateral Trustee, including those which are similar to those described in Sections 3.1(b), 3.1(h), 3.1(i) and 3.1(l). In the event that any Person becomes a Foreign Subsidiary (other than an Immaterial Subsidiary) of Borrower or any Unrestricted Subsidiary is converted into a Restricted Subsidiary that is a Foreign Subsidiary (other than an Immaterial Subsidiary) after the Closing Date, and the ownership interests of such Foreign Subsidiary are directly owned by Borrower or by any Guarantor Subsidiary thereof, Borrower shall, or shall cause such Guarantor Subsidiary to, deliver all such documents, instruments, agreements, and certificates as are similar to those described in Section 3.1(b), and Borrower shall take, or shall cause such Domestic Subsidiary to take, all of the actions referred to in Section 3.1(i)(i) necessary to grant and to perfect a First Priority Lien in favor of Collateral Trustee, for the benefit of Secured Parties, under the Pledge and Security Agreement in 65% of such ownership interests.  In the event that Borrower or any Guarantor Subsidiary acquires any Equity Interests of Foresight GP or Foresight LP after the Closing Date, Borrower shall take, or shall cause such Guarantor Subsidiary to take, all of the actions referred to in Section 3.1(i)(i) necessary to grant and to perfect a First Priority Lien in favor of Collateral Trustee, for the benefit of Secured Parties, under the Pledge and Security Agreement in 100% of such ownership interests.  With respect to each such Subsidiary, Borrower shall promptly send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary of Borrower or was converted into a Restricted Subsidiary, as applicable, and (ii) all of the data required to be set forth in Schedules 4.1 and 4.2 with respect to all Subsidiaries of Borrower; and such written notice shall be deemed to supplement Schedule 4.1 and 4.2 for all purposes hereof. Notwithstanding anything to the contrary herein or in the other Credit Documents, neither Holdings nor any of its Subsidiaries shall be required to grant a security interest in the Equity Interests of any Unrestricted Subsidiary (other than the Acquired Interests and any Equity Interests of Foresight GP or Foresight LP acquired by Borrower or the Guarantor Subsidiaries from time to time).

(b)  Notwithstanding anything in Section 5.10 or 5.11 or in any other Credit Document to the contrary, neither Holdings nor any of its Restricted Subsidiaries shall be required to take any actions in order to perfect the security interest in the Collateral granted to Collateral Trustee for the ratable benefit of the Secured Parties under the laws of any jurisdiction outside the United States.

**5.11.   Additional Material Real Estate Assets.**   In the event that any Credit Party acquires a Material Real Estate Asset or a Real Estate Asset owned or leased on the Closing Date becomes a Material Real Estate Asset or any Unrestricted Subsidiary that owns or leases a Material Real Estate Asset is converted into a Restricted Subsidiary after the Closing Date and such interest in such Material Real Estate Asset has not otherwise been made subject to the Lien of the Collateral Documents in favor of Collateral Trustee, for the benefit of Secured Parties, then such Credit Party shall (and with respect to any leased Material Real Estate Asset, shall use commercially reasonable efforts (without any requirement to make concessions or payments) to do the following) promptly take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions and certificates, including those which are similar to those described in Section 3.1(h) with respect to each such Material Real Estate Asset that Collateral Trustee or Administrative Agent shall reasonably request to create in favor of Collateral Trustee, for the benefit of Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected First Priority security interest in such Material Real Estate Assets.   In addition to the foregoing, Borrower shall, at the reasonable request of Administrative Agent or Collateral Trustee, deliver to Administrative Agent and Collateral Trustee such appraisals as are required by law or regulation of Real Estate Assets with respect to which Collateral Trustee has been granted a Lien.

**5.12.   [Reserved]**.

**5.13.   Further Assurances.**   At any time or from time to time upon the reasonable request of Administrative Agent, each Credit Party will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as Administrative Agent or Collateral Trustee may reasonably request in order to effect fully the purposes of the Credit Documents.   In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as Administrative Agent or Collateral Trustee may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of Holdings, and its Restricted Subsidiaries (except for the Excluded Subsidiaries and other than Excluded Assets) and all of the outstanding Equity Interests of Borrower and its Restricted Subsidiaries (other than Excluded Subsidiaries (other than the Acquired Interests and any Equity Interests of Foresight GP or Foresight LP acquired by Borrower or the Guarantor Subsidiaries from time to time)) subject to the limitation set forth herein and in the other Credit Documents and subject to the priorities in the Collateral Trust Agreement and the Intercreditor Agreement.

**5.14.   Maintenance of Ratings.**   Unless otherwise consented to by Administrative Agent or Requisite Lenders, at all times, Borrower shall use commercially reasonable efforts to maintain (i) a public corporate family rating issued by Moody's and a public corporate credit rating issued by S&P and (ii) a public credit rating from each of Moody's and S&P with respect to the Loans.

**5.15.   Designation of Subsidiaries.**   The Borrower may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (i) immediately before and after such designation, no Default or Event of Default shall have occurred and be continuing, (ii) no Subsidiary may be designated as an Unrestricted Subsidiary if it is a "Restricted Subsidiary" for the purpose of any

of the Second Lien Documents, the Revolving Credit Agreement, any Incremental Pari Note Issuance, any Additional Facility, any Refinancing Indebtedness or any Indebtedness subordinated in right of payment to the Obligations and (iii) Borrower shall deliver to Administrative Agent a certificate of an Authorized Officer of Borrower certifying compliance with the foregoing clauses (i) and (ii) of this Section 5.15. The designation of any subsidiary as an Unrestricted Subsidiary shall constitute an Investment by Borrower therein at the date of designation in an amount equal to the fair market value of Borrower's Investment therein; provided that upon a redesignation of such subsidiary as a Restricted Subsidiary, Borrower shall be deemed to continue to have a permanent Investment in an Unrestricted Subsidiary in an amount (if positive) equal to (i) the lesser of (A) the fair market value of Investments of Borrower and its Subsidiaries in such Unrestricted Subsidiary at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable) and (B) the fair market value of Investments of Borrower and its Subsidiaries made in connection with the designation of such Subsidiary as an Unrestricted Subsidiary minus (ii) the portion (proportionate to Borrower's and its Subsidiaries' Equity Interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation. The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time.

**5.16.   Post-Closing Covenants.**  Each of the Credit Parties shall satisfy the requirements set forth on Schedule 5.16 on or before the date specified for such requirement or such later date to be determined by Administrative Agent.

## SECTION 6.   NEGATIVE COVENANTS

Each of Borrower and each Guarantor Subsidiary (and with respect to Section 6.13 Holdings) covenants and agrees that, until payment in full of all Obligations under the Credit Documents (other than (i) contingent indemnity obligations for which no claim has been asserted and (ii) obligations and liabilities in respect of any Hedge Agreement or Designated Coal Contract), such Person shall perform, and shall cause each of its Restricted Subsidiaries to perform, all covenants in this Section 6.

**6.1.   Indebtedness.**  Neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect (collectively, "incur") to any Indebtedness, except:

(a)   the Obligations;

(b)   (A) Indebtedness of any Restricted Subsidiary to Borrower or to any other Subsidiary, or of Borrower to any Subsidiary and (B) Indebtedness of Holdings to Borrower or to any other Subsidiary; provided, (i) all such Indebtedness shall be evidenced by the Intercompany Note, and, if owed to a Credit Party, shall be subject to a First Priority Lien pursuant to the Pledge and Security Agreement, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in

full of the Obligations pursuant to the terms of the Intercompany Note and (iii) such Indebtedness is permitted as an Investment under Section 6.6;

(c) second lien or unsecured term loan or second lien or unsecured note facilities in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (c), not to exceed the Additional Facilities Amount (plus an amount equal to any accrued and unpaid interest, penalty or premium paid in connection with the refinancing or replacement of any Indebtedness incurred under this clause (c) plus any transaction fees and expenses relating to such refinancing or replacement) (the "**Additional Facilities**"; provided that (i) Administrative Agent shall have received a written notice thereof from Borrower no less than three Business Days prior to the establishment of each such Additional Facility, which notice shall specify whether such Additional Facility is an unsecured term loan or note facility (each, an "**Unsecured Additional Facility**") or a second lien secured term loan or note facility (each, a "**Second Lien Additional Facility**") and the amount thereof, together with a reasonably detailed description of the other material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, (ii) such Second Lien Additional Facility shall be secured by Liens on the Collateral on a *pari passu* basis with the Liens securing Second Lien Indebtedness but subordinated to the Lien securing Obligations pursuant to the Collateral Trust Agreement and such Liens shall be granted pursuant to security documents substantially similar to the security documents that are Second Lien Documents, (iii) such Second Lien Additional Facility shall not be secured by any property or assets of Holdings, Borrower or any Restricted Subsidiary other than the Collateral unless such property or assets become Collateral hereunder, (iv) such Additional Facility incurred by the Borrower or a Domestic Subsidiary shall not at any time be guaranteed by any Restricted Subsidiaries other than Restricted Subsidiaries that are Guarantors unless such Restricted Subsidiary shall become a Guarantor Subsidiary and the terms of such guarantee shall be no more favorable in any material respects to the secured parties in respect of such Indebtedness than the terms of the Guaranty, (v) the weighted average life to maturity of such Additional Facility shall be no shorter than the remaining weighted average life to maturity of the Term Loans, (vi) the maturity date of such Additional Facility shall be no shorter than the Latest Maturity Date at the time such Additional Facility is established, and (vii) both immediately prior and after giving effect to the incurrence thereof, no Event of Default shall exist or result therefrom;

(d) Indebtedness incurred by Borrower or any of its Restricted Subsidiaries arising from agreements providing for indemnification, holdbacks, working capital or other purchase price adjustments, earn-outs, non-compete agreements, deferred compensation or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of Borrower or any such Restricted Subsidiary pursuant to such agreements, in connection with acquisitions permitted pursuant to Section 6.6;

(e) the incurrence by Borrower or its Restricted Subsidiaries of Indebtedness in respect of Mining Financial Assurances, reclamation liabilities, water treatment, workers' compensation claims, payment obligations in connection with health

or social security benefits, unemployment or other insurance obligations, statutory obligations, bankers' acceptances, performance, letter of credit or completion or performance guarantees (including, without limitation, performance guarantees pursuant to coal supply agreements or equipment leases) and surety, performance, utility, bid, stay, statutory, appeal bonds or similar obligations in the ordinary course of business;

(f)  Indebtedness in respect of any customary cash management, cash pooling or netting or setting off arrangements in the ordinary course of business;

(g)  the incurrence by Borrower or any Restricted Subsidiary of Indebtedness arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, incurred in connection with the disposition of any business, assets or Restricted Subsidiary (other than Guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Restricted Subsidiary for the purpose of financing such acquisition), so long as the principal amount does not exceed the gross proceeds actually received by Borrower or any Restricted Subsidiary in connection with such disposition;

(h)  (i) the guarantee by Borrower or any Restricted Subsidiary of Indebtedness of Borrower or a Guarantor Subsidiary of Borrower and (ii) the guarantee by a Restricted Subsidiary that is not a Subsidiary Guarantor of Indebtedness of another Restricted Subsidiary that is not a Subsidiary Guarantor, in each case to the extent that the guaranteed Indebtedness was permitted to be incurred by another provision of this Section 6.1; provided that if the Indebtedness being guaranteed is subordinated to or pari passu with the Obligations, then the guarantee must be subordinated or pari passu, as applicable, to the same extent as the Indebtedness guaranteed;

(i)  the incurrence by Borrower and Borrower's Restricted Subsidiaries of Indebtedness described in Schedule 6.1;

(j)  the incurrence by Borrower or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than intercompany Indebtedness) that was permitted by this Agreement to be incurred pursuant to clauses (c), (i), (j), (k), (n) or (o) of this Section;

(k)  the incurrence by Borrower or any of its Restricted Subsidiaries of Indebtedness represented by Capital Lease Obligations, mortgage financings, Acquired Debt or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purchase price or cost of design, construction, installation or improvement of property, plant or equipment used in the business of Borrower or any of its Restricted Subsidiaries, in an aggregate principal amount, including Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (k), not to exceed $150,000,000 at any time outstanding.

(l)  [reserved];

111

(m)   solely in the event that the Incremental Revolving Commitments are not outstanding and subject to the Intercreditor Agreement, Indebtedness governed by and arising pursuant to the Revolving Credit Agreement in an aggregate principal amount not to exceed $225,000,000 (plus an amount equal to any accrued and unpaid interest, penalty or premium paid in connection with the refinancing or replacement of any Indebtedness incurred and outstanding under this clause (m), in each case in accordance with the terms of such Indebtedness, plus any transaction fees and expenses relating to such refinancing or replacement) at any one time outstanding;

(n)   Second Lien Indebtedness in an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (n), not to exceed $1,315,815,000 (plus an amount equal to any accrued and unpaid interest, penalty or premium paid in connection with any Permitted Refinancing Indebtedness, in each case, in accordance with the terms of the Second Lien Indebtedness being so refinanced, plus any transaction fees and expenses relating to such Permitted Refinancing Indebtedness) at any one time outstanding;

(o)   Indebtedness governed by and arising pursuant to the Incremental Pari Notes, including all Permitted Refinancing Indebtedness incurred to renew, refund, refinance, replace, defease or discharge any Indebtedness incurred pursuant to this clause (o);

(p)   the incurrence of royalties, the dedication of reserves under supply agreement or similar rights or interests granted, taken subject to, or otherwise imposed on properties consistent with the normal practices in the mining industry in an aggregate principal amount not to exceed the greater of (i) $50,000,000 and (ii) 2.5% of Total Assets at any one time outstanding (measured at the time of incurrence);

(q)   other Indebtedness of Borrower or its Guarantor Subsidiaries in an aggregate amount not to exceed at any time $100,000,000 plus an amount equal to any accrued and unpaid interest, penalty or premium paid in connection with the refinancing or replacement of any Indebtedness incurred in reliance on this clause; provided, that no more than $50,000,000 (plus an amount equal to any accrued and unpaid interest, penalty or premium, and fees and expenses paid in connection with any refinancing or replacement of any Indebtedness incurred in reliance on this clause (q) in an aggregate amount not to exceed $5,000,000) of such Indebtedness under this clause (q) may be secured unless at the time such Indebtedness is incurred the Secured Net Leverage Ratio (calculated on a pro forma basis giving effect to the incurrence of such Indebtedness and the use of proceeds thereof and all related transactions) does not exceed 3.00:1.00 as of the last day of the Fiscal Quarter most recently ended for which financial statements are available; provided, further that in no event shall the aggregate amount of such Indebtedness under this clause (q) that may be secured exceed $100,000,000 (plus an amount equal to any accrued and unpaid interest, penalty or premium, and fees and expenses paid in connection with any refinancing or replacement of any Indebtedness incurred in reliance on this clause (q) in an aggregate amount not to exceed $10,000,000);

(r)  other Indebtedness of Restricted Subsidiaries of Borrower that are not Guarantors in an aggregate amount not to exceed at any time $25,000,000; and

(s)  Refinancing Indebtedness incurred by Borrower pursuant to procedures reasonably specified by Administrative Agent and reasonably acceptable to Borrower to the extent that 100% of the cash proceeds therefrom (net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses) are, substantially concurrently with the receipt thereof, applied solely to the prepayment of Term Loans being so refinanced in accordance with Section 2.13 on a dollar-for-dollar basis (including all accrued interest, fees and premiums (if any)); provided that (A) no Default or Event of Default shall have occurred and be continuing or would result therefrom, and (B) with respect to Refinancing Indebtedness issued under the Credit Documents, Borrower shall deliver to Administrative Agent at least five Business Days prior to the incurrence of such Refinancing Indebtedness any customary legal opinions, board resolutions, officers' certificates and/or reaffirmation agreements reasonably requested by Administrative Agent;

(t)  Indebtedness supported by letters of credit in a principal amount outstanding not in excess of the stated amount of such letter of credit to finance insurance policy premiums in the ordinary course of business;

(u)  the incurrence by Borrower or any of its Restricted Subsidiaries of Hedging Obligations in the ordinary course of business and Hedging Obligations incurred to hedge any interest rate, commodity price, or currency rate, risk;

(v)  the incurrence by Borrower or its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Indebtedness is covered within five Business Days; and

(w)  the incurrence by Borrower or any of its Restricted Subsidiaries of Acquired Debt so long as immediately after giving effect to the incurrence thereof and related transactions, the Net Leverage Ratio (calculated on a pro forma basis giving effect to the incurrence thereof) does not exceed 3.50:1.00 as of the last day of the Fiscal Quarter most recently ended for which financial statements are available; provided, however, that on the date of such occurrence, if such Acquired Debt is incurred in connection with or in contemplation of the applicable transaction, such Acquired Debt is not incurred by a Restricted Subsidiary that is not a Guarantor Subsidiary.

For purposes of determining compliance with this Section 6.1 in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in clauses (a) through (w) above, Borrower will be permitted to classify such item of Indebtedness on the date of its incurrence, or later reclassify all or a portion of such item of Indebtedness, in any manner that complies with this Section 6.1.  Notwithstanding the foregoing, all Second Lien Indebtedness will be deemed to have been incurred in reliance on the exception provided by clause (n) above and all Indebtedness governed by the Revolving Credit Agreement

CH\2051848.14

will be deemed to have been incurred in reliance on the exception provided by clause (m) above. The accrual of interest or preferred stock dividends, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms, the reclassification of preferred stock as Indebtedness due to a change in accounting principles, and the payment of dividends on preferred stock or Disqualified Equity Interests in the form of additional shares of the same class of preferred stock or Disqualified Equity Interests will not be deemed to be an incurrence of Indebtedness or an issuance of preferred stock or Disqualified Equity Interests for purposes of this Section 6.1.  For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be utilized, calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred.  Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that Borrower or any Restricted Subsidiary may incur pursuant to this Section 6.1 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

The amount of any Indebtedness outstanding as of any date will be:

(1)    the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

(2)    the principal amount of the Indebtedness, in the case of any other Indebtedness; and

(3)    in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:

(a) the Fair Market Value of such assets at the date of determination; and

(b) the amount of the Indebtedness of the other Person.

**6.2.  Liens.**  Neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Borrower or any of its Restricted Subsidiaries, whether now owned or hereafter acquired (and including any license right), or any income or profits therefrom, except:

(a)  Liens in favor of Collateral Trustee for the benefit of Secured Parties granted pursuant to any Credit Document;

(b)  Liens for taxes, assessments or government charges or claims or unpaid utilities that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently concluded; provided that any reserve or other appropriate provision as is required in conformity with GAAP has been made therefor;

114

(c)   Liens imposed by law, such as carriers', warehousemen's, landlord's, mechanics' Liens, repairmen's and other like Liens, (other than any such Lien imposed on the assets of a Credit Party pursuant to Section 430(k) of the Internal Revenue Code or Section 303(k) ERISA with respect to a Pension Plan), in each case incurred in the ordinary course of business;

(d)   Liens to secure the performance of Mining Financial Assurances, statutory obligations, insurance, performance, trade contracts, utility services, government contracts, return of money bonds, surety or appeal bonds and other obligations of like nature (including surety bonds obtained as required in connection with federal coal leases), reclamation liabilities, workers compensation obligations, unemployment insurance and other types of social security and deposits securing liability to insurance carriers under insurance or self-insurance arrangements, performance bonds or other obligations of a like nature incurred in the ordinary course of business (including Liens to secure letters of credit issued to assure payment of such obligations);

(e)   survey exceptions, easements or reservations of, rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions or similar encumbrances as to the use of real property that were not incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of Borrower or any of its Restricted Subsidiaries;

(f)   any interest or title of a lessor, licensor, sublicensor or sublessor under any lease or license agreement entered into in the ordinary course of business, and rights of owners of interest in overlying, underlying or intervening strata and/or mineral interests not owned by Borrower or one of its Restricted Subsidiaries with respect to tracts of real property where Borrower or the applicable Restricted Subsidiary's ownership is only surface or severed mineral or is otherwise subject to mineral severances of one or more third parties; other defects and exceptions to title of real property where such defects or exceptions are not material to the value of such real property;

(g)   Liens arising from (i) protective filings of UCC financing statements regarding operating leases entered into by Borrower and its Restricted Subsidiaries in the ordinary course of business and (ii) filings of UCC financing statements as a precautionary measure in connection with operating leases;

(h)   Liens described in Schedule 6.2;

(i)   Liens securing Indebtedness permitted pursuant to Section 6.1(k); provided, in the case of such Liens other than Liens securing Acquired Debt, such Liens shall encumber only the asset acquired with the proceeds of such Indebtedness and, in the case of Liens securing Acquired Debt, such Liens shall encumber only those assets which secured such Indebtedness at the time such assets were acquired by Borrower or its Restricted Subsidiaries;

(j)   Liens securing Indebtedness permitted by Section 6.1(w), provided any such Lien shall encumber only those assets which secured such Indebtedness at the time such assets were acquired by Borrower or its Subsidiaries;

(k)   Liens on Borrower's or its Subsidiaries cash resulting from deposits or prepayments of royalties securing Indebtedness permitted by Section 6.1(p);

(l)   Liens securing (x) Indebtedness or other liabilities in an aggregate amount not to exceed $50,000,000 at any one time outstanding plus (y) additional Indebtedness or other liabilities so long as (in the case of this clause (y)), at the time such Indebtedness or liability is incurred, the Secured Net Leverage Ratio (calculated on a pro forma basis giving effect to the incurrence of such Indebtedness and the use of proceeds thereof and all related transactions) does not exceed 3.00:1.00 as of the last day of the Fiscal Quarter most recently ended for which financial statements are available; provided that in no event shall the aggregate amount of Indebtedness or other liabilities that may be secured by Liens under this clause (l) exceed $100,000,000 at any one time outstanding (plus an amount equal to any accrued and unpaid interest, penalty or premium, and fees and expenses paid in connection with any refinancing or replacement of any Indebtedness with Indebtedness secured in reliance on this clause (l) in an aggregate amount not to exceed $10,000,000);

(m)   solely in the event that the Incremental Revolving Commitments are not outstanding and subject to the Intercreditor Agreement, Liens in favor of the Revolving Agent securing (i) Indebtedness permitted pursuant to Section 6.1(m) and (ii) all "Bank Product Liability" (as defined in the Revolving Credit Agreement) and all "Hedging Liability" (as defined in the Revolving Credit Agreement) and guarantees thereof that are secured, or intended to be secured, under the Revolving Credit Documents;

(n)   Liens (subordinated to the Liens securing Obligations) in favor of Collateral Trustee for the benefit of holders of Second Lien Indebtedness and subject to the Collateral Trust Agreement securing Indebtedness permitted pursuant to Section 6.1(n);

(o)   subject to the Collateral Trust Agreement, Liens on the Collateral securing (i) Permitted First Lien Priority Refinancing Debt; (ii) Permitted Second Lien Priority Refinancing Debt; (iii) Incremental Pari Notes; and (iv) Second Lien Additional Facilities;

(p)   Liens on mineral rights and/or constructed coal mine assets, in each case securing installment notes issued to governmental authorities for the purchase of such mineral rights and/or rights to construct coal mines not in excess of the maximum principal amount of $10,000,000 in the aggregate at any time outstanding for all such notes);

(q)   Liens securing Cash Management Obligations with an aggregate principal amount that do not exceed $2,500,000 at any one time outstanding;

116

(r)  Liens securing judgments for the payment of money not constituting an Event of Default, so long as such Liens are adequately bonded and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(s)  Liens on insurance policies and proceeds thereof, or other deposits, to secure insurance premium financings;

(t)  Liens on specific items of inventory or other goods (and the proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances issued or created in the ordinary course of business for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(u)  Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(v)  Liens on Equity Interest of an Unrestricted Subsidiary (other than Foresight LP or Foresight GP) that secure Indebtedness of such Unrestricted Subsidiary;

(w)  Liens in favor of banking institutions arising as a matter of law or contract encumbering deposits (including the right of set off) which are within the general parameters customary in the banking industry;

(x)  Coal Liens;

(y)  Liens on property (other than Collateral) of a Restricted Subsidiary that is not a Guarantor Subsidiary securing Indebtedness and other liabilities of such Restricted Subsidiary;

(z)  Liens on property of a Person existing at the time such Person becomes a Restricted Subsidiary of Borrower or is merged with or into or consolidated with Borrower or any Restricted Subsidiary of Borrower; provided that such Liens were in existence prior to the contemplation of such Person becoming a Restricted Subsidiary of Borrower or such merger or consolidation and do not extend to any assets other than those of the Person that becomes a Restricted Subsidiary of Borrower or is merged with or into or consolidated with Borrower or any Restricted Subsidiary of Borrower; and

(aa)  Liens on property (including Capital Stock) existing at the time of acquisition of the property by Borrower or any Subsidiary of Borrower; provided that such Liens were in existence prior to such acquisition and not incurred in contemplation of such acquisition.

Notwithstanding any other provision of this covenant, the maximum amount of liabilities that may be secured by Liens pursuant to this Section 6.2 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.  In addition, (i) with respect to any Lien securing Indebtedness that was permitted to secure such Indebtedness or other obligation at the time of the Incurrence of such Indebtedness or obligation, such Lien shall also be permitted to secure any Increased Amount of such Indebtedness or other obligation; and (ii) in

117

the event that a Permitted Lien meets the criteria of more than one of the types of Permitted Liens (at the time of incurrence or at a later date), the Borrower in its sole discretion may divide, classify or from time to time reclassify all or any portion of such Permitted Lien in any manner that complies with this Section 6.2 and such Permitted Lien shall be treated as having been made pursuant only to the clause or clauses of this Section 6.2 to which such Permitted Lien has been classified or reclassified. The **"Increased Amount"** of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness with the same terms, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies or increases in the value of property securing Indebtedness.

**6.3. No Further Negative Pledges.**   Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale, (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be) (c) restrictions in any Refinancing Indebtedness, (d) restrictions in the Revolving Credit Agreement, (e) restrictions in the Second Lien Documents, (f) restrictions in Incremental Pari Agreements, (g) restrictions in the documentation governing Additional Facilities, (h) restrictions in the Credit Documents, (i) restrictions in any Permitted Refinancing Indebtedness of Indebtedness described in clauses (c) through (h) above, provided such restrictions are no less favorable to the Credit Parties and the Lenders than those in the debt so refinanced and (j) any restrictions permitted pursuant to Section 6.5, neither Borrower nor any Guarantor Subsidiary nor any of their Restricted Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired, to secure the Obligations.

**6.4. Restricted Junior Payments.**   Neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries through any manner or means or through any other Person to, directly or indirectly, declare, order, pay, make or set apart, or agree to declare, order, pay, make or set apart, any sum for any Restricted Junior Payment except that:

(a)   Any Restricted Subsidiary of Borrower may declare and pay dividends or make other distributions ratably to its equity holders;

(b)   Borrower may make regularly scheduled payments of principal and interest in respect of any of the Additional Facilities or any other Indebtedness in accordance with the terms of the documentation governing such Additional Facilities or such other Indebtedness (including, for the avoidance of doubt, any AHYDO prepayments required pursuant to the terms of such Indebtedness);

(c)   Borrower may make regularly scheduled payments of interest in respect of any of the Second Lien Indebtedness in accordance with the terms of the applicable Second Lien Documents;

CH\2051848.14

(d)   the payment of any dividend or the consummation of any irrevocable redemption within 60 days after the date of declaration of the dividend or giving of the redemption notice, as the case may be, if at the date of declaration or notice, the dividend or redemption payment would have complied with the provisions of this Agreement;

(e)   Permitted Payments to Holdings;

(f)   Borrower may (i) make Restricted Junior Payments to Holdings so that Holdings may make Restricted Junior Payments to its equity holders or the equity holders of any parent company of Holdings or (ii) make payments or prepayments of principal of, premium, if any, or interest on, or redeem, purchase, retire, defease (including in-substance or legal defeasance), or make similar payments (including on account of any sinking fund) with respect to, any Indebtedness in each case up to an amount not to exceed the Cumulative Amount as in effect immediately prior to the making of such Restricted Junior Payment; provided that (A) immediately prior to, and after giving effect thereto, (i) no Default or Event of Default shall have occurred and be continuing or would result therefrom and (ii) Borrower and its Restricted Subsidiaries shall be in compliance on a pro forma basis after giving effect to such Restricted Payment and all related transactions with a Net Leverage Ratio of 2.50:1.00 or less, in each case, as of the last day of the Fiscal Quarter most recently ended for which financial statements are available and (B) Borrower shall have delivered to Administrative Agent a Compliance Certificate, together with all relevant financial information reasonably requested by Administrative Agent, demonstrating in reasonable detail the calculation of the Cumulative Amount immediately prior to the making of such Restricted Junior Payment and the amount thereof elected to be so applied and evidencing compliance with the Net Leverage Ratio as required under clause (A)(ii) above;

(g)   after a Qualified IPO, Borrower may make Restricted Junior Payments to Holdings so that Holdings may make Restricted Junior Payments to its equity holders or the equity holders of any direct or indirect parent company of Holdings in an aggregate amount not exceeding 6.0% per annum of the Net Equity Proceeds received by Borrower from such Qualified IPO; provided that (i) the Cumulative Amount shall be reduced by a corresponding amount of any such Restricted Junior Payments (to the extent such Net Equity Proceeds are included therein) and (ii) immediately prior to, and after giving effect thereto, no Event of Default shall have occurred and be continuing or would result therefrom;

(h)   so long as no Default or Event of Default shall have occurred and be continuing or shall be caused thereby, Borrower may make Restricted Junior Payments to Holdings in an aggregate amount not to exceed $3,000,000 in any twelve-month period, less the amount of Investments made in any such twelve month period pursuant to Section 6.6(d)(B) in reliance on this clause (h), to the extent necessary to permit Holdings to repurchase, redeem or otherwise acquire or retire for value any Equity Interests in Holdings held by any current or former officer, director or employee of Borrower or any of its Subsidiaries pursuant to any equity subscription agreement, stock option agreement, shareholders' agreement or similar agreement; provided, that Borrower may carry over and make in subsequent twelve-month periods, in addition to the amounts permitted for

such twelve-month period, all of the unutilized capacity under this clause (h) attributable to the immediately preceding twelve-month period;

(i)   Borrower and its Restricted Subsidiaries may make payments to any Principal in connection with the contribution of American Equipment & Machine, Inc. in an amount not to exceed $1,000,000 since the Closing Date;

(j)   Borrower may make Restricted Junior Payment in exchange for, or out of or with the net cash proceeds of the sale of, Equity Interests in Borrower (other than Disqualified Equity Interest) to Holdings or from the contribution of common equity capital to Borrower; provided that the making of any such Restricted Junior Payment occurs within 20 days of the sale of Equity Interests or contribution of common equity capital;

(k)   so long as no Default or Event of Default has occurred and is continuing, any other Restricted Junior Payment in an aggregate amount not to exceed $15,000,000 since the Closing Date, less the amount of Investments made since the Closing Date pursuant to Section 6.6(d)(B) in reliance on this clause (k).

(l)   Borrower and its Restricted Subsidiaries may make cash advances or other Restricted Junior Payments to Holdings so that Holdings may repurchase Equity Interests deemed to occur upon the exercise of stock options to the extent such Equity Interests represent a portion of the exercise price of those stock options;

(m)   Borrower may make Restricted Junior Payments to Holdings so that Holdings may make payments of cash in lieu of the issuance of fractional shares upon (i) the exercise of options or warrants or (ii) the conversion or exchange of Equity Interest in Holdings;

(n)   the repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of Borrower or any Guarantor Subsidiary that is unsecured or contractually subordinated to the Obligations with the net cash proceeds from a substantially concurrent incurrence of Permitted Refinancing Indebtedness; and

(o)   prepayments in respect of deferred purchase arrangements consistent with past practices in an aggregate amount not to exceed the greater of (i) $20,000,000 or (ii) 1.75% of Total Assets outstanding at any one time.

For purposes of determining compliance with this Section 6.4, in the event that a Restricted Junior Payment meets criteria of more than one of the categories of Restricted Junior Payments described in clauses (a) through (o) above, Borrower will be entitled to classify such Restricted Junior Payment (or a portion thereof) on the date of its payment or later reclassify such Restricted Junior Payments (or a portion thereof) in any manner that complies with this Section 6.4.

The amount of all Restricted Junior Payments (other than cash) will be the Fair Market Value on the date of the Restricted Junior Payment of the asset(s) or securities proposed to be transferred or issued by Borrower or such Restricted Subsidiary, as the case may be,

120

pursuant to the Restricted Junior Payment. The Fair Market Value of any assets or securities that are required to be valued by this covenant will be determined by Borrower (subject to Board of Directors approval or an opinion as required by the definition of Fair Market Value).

**6.5. Restrictions on Subsidiary Distributions.** Except as provided herein, neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Restricted Subsidiary of Borrower to (a) pay dividends or make any other distributions on any of such Restricted Subsidiary's Equity Interests owned by Borrower or any other Restricted Subsidiary of Borrower, (b) repay or prepay any Indebtedness owed by such Restricted Subsidiary to Borrower or any other Restricted Subsidiary of Borrower, (c) make loans or advances to Borrower or any other Restricted Subsidiary of Borrower, or (d) transfer, lease or sell any of its property or assets to Borrower or any other Restricted Subsidiary of Borrower.

Notwithstanding the foregoing, the preceding restrictions will not apply to encumbrances or restrictions existing under or by reason of (i) agreements governing Indebtedness described on Schedule 6.1 as in effect on the Closing Date and the Credit Documents and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; provided that the amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in those agreements on the Closing Date; (ii) agreements evidencing Indebtedness permitted by (A) Sections 6.1(c), 6.1(m), 6.1(n), 6.1(o) and 6.1(w) and (B) Sections 6.1(l), 6.1(j) and 6.1(k) that impose restrictions on the property so acquired, and (C) Section 6.1(c) or (r) that impose restrictions only on Restricted Subsidiaries that are not Guarantors; (iii) any agreement or Equity Interest of a Person acquired by Borrower or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such agreement was entered into or Equity Interests were incurred in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired; provided that, in the case of Indebtedness, such Indebtedness was permitted by the terms of the agreement to be incurred; (iv) customary non-assignment provisions in contracts, leases, sub-leases and licenses entered into in the ordinary course of business; (v) purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations that impose restrictions on the property purchased or leased of the nature described in Section 6.2(k); (vi) any agreement for the sale or other disposition of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending its sale or other disposition; (vii) agreements evidencing Refinancing Indebtedness and Permitted Refinancing Indebtedness; provided that the restrictions contained in the agreements governing such Refinancing Indebtedness or Permitted Refinancing Indebtedness, as applicable, are not materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced; (viii) Liens, including real property mortgages, permitted to be incurred pursuant to Section 6.2 that limit the right of the debtor to dispose of the assets subject to such Liens; (ix) provisions limiting the disposition or distribution of assets or property in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements and other similar agreements, which limitation is applicable only to the assets that are the subject of such agreements; and (x) restrictions on cash

or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business.

**6.6. Investments.**   Neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including any Joint Venture, except:

(a)   Investments in Cash and assets that were Cash Equivalents when such Investments were made;

(b)   equity Investments owned as of the Closing Date in any Subsidiary (including Equity Interests of Foresight GP and Foresight LP);

(c)   Investments by and among the Borrower and its Restricted Subsidiaries made in the ordinary course of business;

(d)   (A) other Investments by and among Borrower and its Restricted Subsidiaries and Unrestricted Subsidiaries; provided that Investments by Credit Parties in non-Credit Parties and Investments by Borrower and its Restricted Subsidiaries in Unrestricted Subsidiaries shall not exceed $50,000,000 in the aggregate outstanding at any time, (B) intercompany loans by Borrower or a Restricted Subsidiary of Borrower to Holdings as long as had such intercompany loan been made as a Restricted Junior Payment to Holdings, it would have been permitted by clause (i), (ii) or (iii) of the definition of the term "Permitted Payment to Holdings", Section 6.4(f), 6.4(g), 6.4(h), 6.4(j), 6.4(k), 6.4(l), or 6.4(m) and (C) intercompany Loans and other Investments in any Subsidiary that is not a Guarantor for the purpose of making an Investment permitted under Section 6.6(j);

(e)   the exercise of the Foresight Acquisition Option in accordance with the terms thereof and the corresponding Equity Interests owned following the exercise of the Foresight Acquisition Option;

(f)   loans and advances to employees of Borrower and its Subsidiaries made in the ordinary course of business in an aggregate principal amount not to exceed $3,000,000 at any one time outstanding;

(g)   Permitted Acquisitions so long as (1) Borrower shall be in compliance with the financial covenant set forth in Section 6.7 (calculated on a pro forma basis after giving effect to such acquisition and reducing Consolidated Net Total Debt for the purposes of calculating the Net Leverage Ratio under this Section 6.6(g) by the aggregate amount of Unrestricted Cash acquired in such acquisition) as of the last day of the Fiscal Quarter most recently ended for which financial statements have been delivered hereunder (and Borrower shall deliver a Compliance Certificate evidencing compliance with Section 6.7 as required under this clause (1)) and (2) in respect of any acquisition of targets that will not become Guarantor Subsidiaries or assets that will not be acquired by Borrower or a Guarantor Subsidiary, the aggregate amount of Investments by Credit Parties in such Persons or assets shall not exceed $50,000,000 in the aggregate from the Closing Date to the date of determination;

CH\2051848.14

(h)  Investments described in Schedule 6.6 or made pursuant to binding Commitments existing on the Closing Date and any Investment consisting of an extension, modification or renewal of any Investment described in Schedule 6.6 or made pursuant to binding Commitments existing on the Closing Date; provided that the amount of any such Investment may be increased  (a) as required by the terms of such Investment as in existence on the Closing Date or (b) as otherwise permitted under this Agreement;

(i)  Secured Hedge Agreements and other Hedging Obligations and Designated Coal Contracts which constitute Investments;

(j)  Investments in Permitted Joint Ventures (A) existing on the Closing Date, and (B) after the Closing Date in an amount at any one time outstanding, together with all other Investments made pursuant to clause (B) of this clause (j) not to exceed the greater of  (i) $10,000,000 or (ii) 0.75% of Total Assets measured on the date such Investment was made and without giving effect to subsequent changes in value;

(k)  Borrower and its Subsidiaries may make Investments consisting of prepayments in respect of deferred purchase arrangements in an aggregate amount not to exceed the greater of (i) $20,000,000 and (ii) 1.75% of Total Assets  at any one time outstanding;

(l)  Investments made as a result of the receipt of non-cash consideration from any disposition of property or assets including an Asset Sale, in each case that was not made in violation of this Agreement (including Equity Interests of Foresight GP and Foresight LP);

(m)  Investments received in compromise or resolution of (A) obligations of trade creditors or customers that were incurred in the ordinary course of business of Borrower or any of its Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes;

(n)  any guaranty of Indebtedness and obligations permitted to be incurred pursuant to Section 6.1 or not prohibited by this Agreement;

(o)  Investments acquired after the Closing Date as a result of the acquisition by Borrower or any of its Subsidiaries of another Person, including by way of a merger, amalgamation or consolidation with or into Borrower or any of its Subsidiaries in a Permitted Acquisition or other Permitted Investment after the Closing Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(p)  Investments consisting of purchases and acquisitions of inventory or supplies or the licensing or contribution or intellectual property pursuant to joint marketing arrangements with other Persons, in each case in the ordinary course of business;

CH\2051848.14

(q)  Investments of a Subsidiary of Borrower acquired after the Closing Date in a transaction that is expressly permitted by Section 6.8 or of an entity merged into Borrower or merged into or consolidated with a Subsidiary of Borrower in a Permitted Acquisition or other Permitted Investment after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(r)  other Investments in any Person having an aggregate fair market value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (r) that are at the time outstanding not to exceed the greater of (i) $50,000,000 or (ii) 4% of Total Assets measured on the date such Investment was made and without giving effect to subsequent changes in value;

(s)  any acquisition of assets or Equity Interests solely in exchange for, or out of the net proceeds from, the issuance of Equity Interests (other than Disqualified Equity Interests) of Borrower, Holdings or any other direct or indirect parent company of Borrower;

(t)  other Investments in an aggregate amount not to exceed the Cumulative Amount as in effect immediately prior to the making of such Investment; provided that immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(u)  repurchases of any of the Second Lien Indebtedness and any other Restricted Junior Payments permitted pursuant to Section 6.4;

(v)  the granting of Liens pursuant to Section 6.2;

(w)  any Investment in the Capital Stock of Foresight GP, Foresight LP or any of their Subsidiaries after the Closing Date in an aggregate amount (when taken together with the aggregate principal amount of any Indebtedness then outstanding under Section 6.6(x)) not to exceed $75,000,000 outstanding at any one time;

(x)  Indebtedness of Foresight LP or any of its Subsidiaries owed to the Borrower or any of its Restricted Subsidiaries, in an aggregate principal amount (when taken together with the aggregate amount of Investments then outstanding under Section 6.6(w)) not to exceed $75,000,000 outstanding at any one time;

(y)  any Investments received in exchange for providing management and other related services;

(z)  Investments consummated pursuant to the Call and Put Option Agreement by and between Colt LLC and Borrower, dated as of April 16, 2015.

(aa)  other Investments in any Person so long as the Net Leverage Ratio (calculated on a pro forma basis after giving effect to such Investment) does not exceed

2.00:1.00 as of the last day of the Fiscal Quarter most recently ended for which financial statements are available.

In addition, in the event that a Permitted Investment meets the criteria of more than one of the types of Permitted Investment (at the time of incurrence or at a later date), Borrower in its sole discretion may divide, classify or from time to time reclassify all or any portion of such Permitted Investment in any manner that complies with this Section 6.6 and such Permitted Investment shall be treated as having been made pursuant only to the clause or clauses of this Section 6.6 to which such Permitted Investment has been classified or reclassified. Notwithstanding the foregoing, in no event shall Borrower or any Guarantor Subsidiary make any Investment which results in or facilitates in any manner any Restricted Junior Payment not otherwise permitted under the terms of Section 6.4.

**6.7.   Financial Covenant**.  Borrower shall not permit the First Lien Net Leverage Ratio as of the last day of any Fiscal Quarter, beginning with the Fiscal Quarter ending September 30, 2015, to exceed the correlative ratio indicated:

| Fiscal Quarter ending | First Lien Net Leverage Ratio |
|---|---|
| September 30, 2015 | 3.25:1.00 |
| December 31, 2015 | 3.00:1.00 |
| March 31, 2016 | 2.75:1.00 |
| June 30, 2016 | 2.75:1.00 |
| September 30, 2016 | 2.50:1.00 |
| December 31, 2016 | 2.50:1.00 |
| March 31, 2017 | 2.50:1.00 |
| June 30, 2017 | 2.50:1.00 |
| September 30, 2017 and each Fiscal Quarter end thereafter | 2.25:1.00 |

**6.8.   Fundamental Changes; Disposition of Assets.**   Neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries to, merge or consolidate, liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or consummate an Asset Sale, except:

(a) (A) any Subsidiary of Borrower may be merged with or into Borrower or any Restricted Subsidiary of Borrower, or be liquidated, wound up or

dissolved; provided, that (i) (x) in the case of such a merger, if Borrower is a party to such merger then Borrower shall be the continuing or surviving Person, (y) if Borrower is not a party but a Guarantor Subsidiary is a party to such merger, then a Guarantor Subsidiary shall be the continuing or surviving Person, and (z) if neither Borrower nor Guarantor Subsidiary is a party but a Restricted Subsidiary is a party to such merger, then a Restricted Subsidiary shall be the continuing or surviving person or (B) (x) in the case of a Restricted Subsidiary all or any part of such Restricted Subsidiary's business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to Borrower or any Guarantor Subsidiary of Borrower or (y) in the case of a Restricted Subsidiary that is not a Guarantor, all or any part of such Restricted Subsidiary's business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to a Restricted Subsidiary that is not a Guarantor; provided that any such conveyance, sale, lease, transfer or other disposition by a Guarantor Subsidiary to a Restricted Subsidiary that is not a Guarantor that does not comply with this Section 6.8 shall, to the extent of such non-compliance, be treated as an Investment in such Restricted Subsidiary (and permitted only if made in compliance with Section 6.6);

(b)   sales or other dispositions of assets that do not constitute Asset Sales;

(c)   (x) Asset Sales (other than Asset Sales to Foresight GP, Foresight LP or any of its Subsidiaries) where the book value of the assets subject thereto, when aggregated with the book value of all other assets subject to Asset Sales made within the same Fiscal Year are less than $100,000,000, plus (y) additional Asset Sales (other than Asset Sales to Foresight GP, Foresight LP or any of its Subsidiaries) at any time when the First Lien Net Leverage Ratio (calculated on a pro forma basis after giving effect to such Asset Sale and any related repayment of Indebtedness from the proceeds thereof) does not exceed 1.00:1.00 as of the last day of the Fiscal Quarter most recently ended for which financial statements are available; provided (1) the consideration received for such assets shall be in an amount at least equal to the Fair Market Value thereof, (2) no less than 75% thereof shall be paid in Cash, and (3) the Net Asset Sale Proceeds thereof shall be applied as required by Section 2.14(a)(i). For purposes of this Section 6.8(c), each of the following will be deemed to be cash:

(i) any liabilities, as shown on Borrower's most recent consolidated balance sheet, of Borrower or any Restricted Subsidiary of Borrower (other than contingent liabilities and liabilities that are by their terms subordinated to the Obligations) that are assumed by the transferee of any such assets pursuant to a customary novation or indemnity agreement that releases Borrower or such Restricted Subsidiary from or indemnifies against further liability;

(ii) (A) any securities, notes or other obligations received by Borrower or any such Restricted Subsidiary from such transferee that are, within 180 days of that Asset Sale, converted by Borrower or such Restricted Subsidiary into cash, and (B) any payments received with respect thereto within 180 days of that Asset Sale;

CH\2051848.14

(iii) any Capital Stock or assets of the kind in which Borrower is permitted to reinvest proceeds of Asset Sales pursuant to Section 2.14; and

(iv) any Designated Non-Cash Consideration received by Borrower or such Restricted Subsidiary having an aggregate Fair Market Value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (d), at any time outstanding, does not exceed the greater of (x) $25,000,000 and (y) 1% of Total Assets, with the Fair Market Value of each item of Designated Non-Cash Consideration being measured at the time received;

(d)  sales, licenses, abandonments, or other dispositions of Intellectual Property that is immaterial and no longer used in or necessary for the conduct of the business;

(e)  Drop-Down Transactions;

(f)  Investments made in accordance with Section 6.6 and, to the extent Investments pursuant to the Designated Coal Contracts under Section 6.6(i) involve sales of coal, sales of coal made pursuant thereto;

(g)  sales, transfers and other dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangement between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements (it being understood that Foresight GP, Foresight LP and its Subsidiaries shall not constitute joint ventures of the Borrower or any Restricted Subsidiary for purposes of this clause (g)); and

(h)  Borrower or any Subsidiary may merge with any other Person in order to effect a Permitted Acquisition or other Permitted Investment or the designation of a Restricted Subsidiary as an Unrestricted Subsidiary or an Unrestricted Subsidiary as a Restricted Subsidiary in accordance with Section 5.15.

**6.9.  [Reserved].**

**6.10.  Sales and Lease-Backs.**  Neither Borrower nor any Guarantor Subsidiary, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Person (a) has sold or transferred or is to sell or to transfer to any other Person (other than Holdings or any of its Subsidiaries), or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Person to any Person (other than Holdings or any of its Subsidiaries) in connection with such lease (such transaction, a "**Sale and Leaseback Transaction**"); provided that the foregoing shall not prohibit any such Sale and Leaseback Transaction in which such lease, to the extent constituting Indebtedness, is permitted to be incurred under Section 6.1 and in which the leased property is permitted to be sold or disposed of by Section 6.8.

**6.11.  Transactions with Affiliates.**  Neither Borrower nor any Guarantor Subsidiary, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Borrower or Holdings (each, an **"Affiliate Transaction"**) involving aggregate payments or consideration in excess of $5,000,000 unless the Affiliate Transaction is on terms, taken as a whole, that are no less favorable to Borrower or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by Borrower or such Restricted Subsidiary with an unrelated Person; <u>provided</u>, the foregoing restriction shall not apply to

(a)  any employment agreement, consulting agreement, severance agreement, employee benefit plan, officer or director indemnification agreement or any similar arrangement entered into by Borrower or any of its Restricted Subsidiaries in effect on the Closing Date or, if entered into after the Closing Date, in the ordinary course of business, and payments pursuant thereto;

(b)  transactions between or among Borrower and/or its Restricted Subsidiaries;

(c)  transactions with a Person (other than an Unrestricted Subsidiary of Borrower except as provided in clause (f) below) that is an Affiliate of Borrower solely because Borrower owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person;

(d)  payment of reasonable and customary fees and reimbursements of expenses (pursuant to indemnity arrangements or otherwise) of officers, directors, employees or consultants of Borrower or any of its Restricted Subsidiaries;

(e)  any issuance of Equity Interests (other than Disqualified Equity Interest) of Borrower or any capital contribution to Borrower or any of its Restricted Subsidiaries;

(f)  any transactions with Foresight GP, Foresight LP and any of their Subsidiaries;

(g)  Restricted Payments that do not violate Section 6.4;

(h)  loans or advances to employees in the ordinary course of business not to exceed $2.0 million in the aggregate at any one time outstanding;

(i)  Permitted Payments to Holdings;

(j)  payments and other agreements set forth in the lease agreement with Chagrin Executive Offices LLC, regarding Borrower's principal executive office located in Pepper Pike, Ohio, as in effect on the Closing Date, and as such lease agreement may be amended and renewed on an arms-length basis;

(k)  any transaction entered into by an Unrestricted Subsidiary with an Affiliate (other than Borrower or any of its Restricted Subsidiaries) prior to the redesignation of any such Unrestricted Subsidiary as a Restricted Subsidiary in accordance with Section 5.15; _provided_ that such transaction was not entered into in connection with or in contemplation of such redesignation; and

(l)  any (x) purchases of any class of Indebtedness from, or lending of any class of Indebtedness to, Borrower or any of its Restricted Subsidiaries so long as the amount of Indebtedness of such class loaned or purchased by such Affiliates does not exceed 25% of the applicable class of Indebtedness and the terms of the loan or purchase are the same as the terms with respect to investors or lenders that are not Affiliates and (y) repurchases, redemptions or other retirements for value by Borrower or any of its Restricted Subsidiaries of Indebtedness of any class held by any Affiliate of Holdings so long as such repurchase, redemption or other retirement for value is on the same terms as are made available to investors holding such class of Indebtedness generally and Affiliates hold no more than 25% of such class of Indebtedness.

**6.12.  Conduct of Business.**  From and after the Closing Date, neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries to, engage in any business other than Permitted Business, except to such extent as would not be material to Borrower and its Restricted Subsidiaries taken as a whole.

**6.13.  Permitted Activities of Holdings.**  Holdings shall not (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than the Indebtedness and obligations under this Agreement, the other Credit Documents, the Related Agreements and the Revolving Credit Agreement, Incremental Facilities, Refinancing Indebtedness, Additional Facilities and other Indebtedness that Holdings is expressly permitted to incur by the terms of this Agreement; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than (i) the Liens created under the Collateral Documents to which it is a party, (ii) Liens pursuant to the Second Lien Documents, the Revolving Credit Agreement, the Incremental Facilities, Refinancing Indebtedness, Additional Facilities or (iii) Liens permitted pursuant to Section 6.2 as if such Section is applicable to Holdings; (c) engage in any business or activity or own any assets other than (i) holding Cash, Cash Equivalents, and 100% of the Equity Interests of Borrower and activities incidental thereto, (ii) performing its obligations and activities under the Credit Documents, and to the extent not inconsistent therewith, the Related Agreements and the Revolving Credit Agreement, Incremental Facilities, Refinancing Indebtedness or Additional Facilities and other Indebtedness that Holdings is expressly permitted to incur by the terms of this Agreement; (iii) issuing its own Equity Interests subject to the terms hereof; (iv) filing tax reports and paying taxes in the ordinary course (and contesting any taxes); (v) preparing reports to Governmental Authorities and to its shareholders; (vi) holding directors and shareholders meetings, preparing corporate records and other corporate activities required to maintain its separate corporate structure or to comply with applicable Requirements of Law; (vii) effecting an Initial Public Offering and (viii) making Restricted Junior Payments; (d) consolidate with or merge with or into, or convey, transfer, lease or license all or substantially all its assets to, any Person; (e) sell or otherwise dispose of any Equity Interests of any of its Restricted Subsidiaries or (f) create or acquire any Subsidiary or make or own any Investment in any Person other than Borrower.

**6.14. Amendments or Waivers of Organizational Documents or Foresight Acquisition Option Agreement.** Neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries to, agree to any material amendment, restatement, supplement or other modification to, or waiver of, any of its Organizational Documents or the Foresight Acquisition Option Agreement after the Closing Date that is materially adverse to the Lenders without in each case obtaining the prior written consent of Administrative Agent to such amendment, restatement, supplement or other modification or waiver.

**6.15. Amendments or Waivers with Respect to Certain Indebtedness.** Neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries to, amend or otherwise change the terms of any of the Second Lien Indebtedness or the applicable Second Lien Documents or any of the Additional Facilities (it being understood that this Section 6.15 shall not apply to any refinancing or replacement of the Second Lien Indebtedness or any Additional Facility otherwise permitted hereunder), if the effect of such amendment or change is to:

(a)   increase the interest rate on the Second Lien Indebtedness or any such Additional Facility in any amount in excess of 400 basis points (which such increase shall not include the imposition of default interest),

(b)   change (to earlier dates) any scheduled dates upon which payments of principal or interest are due thereon,

(c)   make more restrictive any event of default or condition to an event of default with respect thereto (other than to waive or eliminate any such event of default or increase any grace period related thereto) if as a result of such change, the events of default, taken as a whole, would be more restrictive than the Events of Default in Section 8.1,

(d)   change the redemption, prepayment or defeasance provisions thereof in any manner adverse to Borrower,

(e)   together with all other amendments or changes made, increase materially the obligations of the obligor thereunder or to confer any material additional rights on the holders of the Second Lien Indebtedness or any such Additional Facility (or a trustee or other representative on their behalf) which would be adverse to Borrower, any Guarantor Subsidiary or Lenders;

(f)   change any scheduled dates upon which payments of principal are due pursuant to any such Additional Facility so that the weighted average life to maturity of such Additional Facility is shorter than the weighted average life to maturity of the Term Loans,

(g)   change the applicable maturity date of any such Additional Facility to a date that is earlier than the Latest Maturity Date at the time such Additional Facility was established,

(h)   render any such Additional Facility secured by any property or assets of Holdings, Borrower or any Subsidiary other than the Collateral unless such property or asset becomes Collateral hereunder), or

(i)   add any Subsidiaries as a guarantor of the Second Lien Indebtedness or of any such Additional Facility of a Domestic Subsidiary and that is not a Guarantor hereunder unless such Subsidiary becomes a Guarantor Subsidiary.

**6.16.   Fiscal Year.**   Neither Borrower nor any Guarantor Subsidiary shall, nor shall it permit any of its Restricted Subsidiaries to change its Fiscal Year-end from December 31.

## SECTION 7.   GUARANTY

**7.1.   Guaranty of the Obligations.**   Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent, for the ratable benefit of the Beneficiaries, the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the **"Guaranteed Obligations"**).

**7.2.   Contribution by Guarantors.**   All Guarantors desire to allocate among themselves (collectively, the **"Contributing Guarantors"**), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a **"Funding Guarantor"**) under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. **"Fair Share"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the Guaranteed Obligations. **"Fair Share Contribution Amount"** means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the **"Fair Share Contribution Amount"** with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. **"Aggregate Payments"** means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including, without limitation, in respect of

131

this Section 7.2), <u>minus</u> (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

**7.3.  Payment by Guarantors.**  Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4.  Liability of Guarantors Absolute.**  Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)  this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)  Administrative Agent may enforce this Guaranty upon the occurrence, but only during the continuance, of an Event of Default notwithstanding the existence of any dispute between Borrower and any Beneficiary with respect to the existence of such Event of Default;

(c)  the obligations of each Guarantor hereunder are independent of the obligations of Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrower or any of such other guarantors and whether or not Borrower is joined in any such action or actions;

132

(d)   payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)   any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or the applicable Hedge Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Credit Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents, any Secured Hedge Agreements or any Designated Coal Contract; and

(f)   this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations (other than contingent indemnity obligations not then due and payable), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand

133

or any right, power or remedy (whether arising under the Credit Documents, any Secured Hedge Agreements or any Designated Coal Contracts, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, any of the Secured Hedge Agreements, any of the Designated Coal Contracts, or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document, such Secured Hedge Agreement, such Designated Coal Contract or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents, any of the Secured Hedge Agreements, any of the Designated Coal Contracts or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Holdings or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations (subject to the limitations set forth in the Collateral Documents); (vii) any defenses, set-offs or counterclaims which Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7.5.  Waivers by Guarantors.**  Each Guarantor hereby waives, to the extent permitted by applicable law, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of any Credit Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any

defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, the Secured Hedge Agreements, the Designated Coal Contracts or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrower and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**7.6.   Guarantors' Rights of Subrogation, Contribution, Etc.**   Until the Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending) shall have been paid in full, each Guarantor hereby waives, to the extent permitted by law, any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary.  In addition, until the Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending) shall have been paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 7.2. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.  If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending) shall not have been finally and paid in full, such amount shall, to the extent possible under applicable law, be held in trust for Administrative Agent on behalf of

Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**7.7.    Subordination of Other Obligations.**    Any Indebtedness of Borrower or any Guarantor now or hereafter held by any Guarantor (the **"Obligee Guarantor"**) is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall, to the extent permitted by applicable law, be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**7.8.    Continuing Guaranty.**    This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations (other than contingent obligations under general indemnification provisions as to which no claim is pending) shall have been paid in full.  Each Guarantor hereby irrevocably waives, to the extent permitted by applicable law, any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9.    Authority of Guarantors or Borrower.**    It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7.10.    Financial Condition of Borrower.**    Any Credit Extension may be made to Borrower or continued from time to time, and any Secured Hedge Agreements and Designated Coal Contracts may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrower at the time of any such grant or continuation or at the time such Secured Hedge Agreement or Designated Coal Contract is entered into, as the case may be.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrower.  Each Guarantor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of Borrower and its ability to perform its obligations under the Credit Documents, the Secured Hedge Agreements and the Designated Coal Contracts, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives, to the extent permitted by applicable law, and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by any Beneficiary.

**7.11.    Bankruptcy, Etc.**    (a) So long as any Guaranteed Obligations remain outstanding (other than contingent obligations under general indemnification provisions as to which no claim is pending or reasonably foreseeable), no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against Borrower or any other Guarantor.  The obligations of

Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any other Guarantor or by any defense which Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Borrower of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**7.12.    Discharge of Guaranty Upon Sale of Guarantor.**    If (A) all of the Equity Interests of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof or (B) if a Guarantor is designated as an Unrestricted Subsidiary in accordance with Section 5.15, then in the case of each of clauses (A) and (B), the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

**7.13.    Keepwell.**    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its obligations under this Guaranty or the Pledge and Security Agreement in respect of Swap Obligations under any Secured Hedge Agreement (provided, however, that each Qualified ECP Guarantor shall only be liable under this Guaranty for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 7.13, or otherwise under this Guaranty or the Pledge and Security Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP

Guarantor under this Section 7.13 shall remain in full force and effect until the guarantees in respect of Swap Obligations under each Secured Hedge Agreement have been discharged, or otherwise released or terminated in accordance with the terms of this Agreement (other than contingent obligations under general indemnification provisions as to which no claim is pending).  Each Qualified ECP Guarantor intends that this Section 7.13 constitute, and this Section 7.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

## SECTION 8.   EVENTS OF DEFAULT

**8.1.   Events of Default.**  If any one or more of the following conditions or events shall occur:

(a)  <u>Failure to Make Payments When Due</u>.  Failure by Borrower to pay (i) when due any amount of principal of any Loan, whether at stated maturity, by acceleration, by mandatory prepayment or otherwise; or (ii) any interest on any Loan or any fee or any other amount due hereunder and such payment is not made within five Business Days after the date due; or

(b)  <u>Default in Other Agreements</u>.  (i) Failure of any Credit Party or any of their respective Restricted Subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) with an aggregate principal amount (or Net Mark-to-Market Exposure) of $30,000,000 or more, in each case beyond the grace period, if any, provided therefor; (ii) breach or default by any Credit Party with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts (or Net Mark-to-Market Exposure) referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), to cause, that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; <u>provided</u>, that any breach or default or event of default under the Revolving Credit Agreement as a result of a breach of a financial covenant set forth in Section 7.17 of the Revolving Credit Agreement shall not constitute an Event of Default under clause (ii) until the acceleration of the Indebtedness under the Revolving Credit Agreement; or (iii) any termination of a Designated Coal Contract resulting in a Termination Amount payable by the applicable Credit Parties, together with the aggregate Termination Amount payable by applicable Credit Parties with respect to all other Designated Coal Contracts, in an aggregate amount of $30,000,000 or more; <u>provided</u> <u>further</u> that this clause (b) shall not apply to (i) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and (ii) any Indebtedness if the sole remedy of the holder thereof in the event of the non-

payment of such Indebtedness or the non-payment or non-performance of obligations related thereto is to convert such Indebtedness into Equity Interests (other than Disqualified Equity Interests) and cash in lieu of fractional shares; provided, further, that such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to this Section 8.1; or

(c) Breach of Certain Covenants. Failure of any Credit Party to perform or comply with any term or condition contained in (a) Section 2.6, Section 5.1(f)(i), Section 5.2 (with respect to Borrower) or Section 6 or (b) Section 5.16 and such failure under this clause (b) shall continue for 15 days; or

(d) Breach of Representations, Etc. Any representation, warranty, certification or other statement of fact made or deemed made by any Credit Party in any Credit Document shall be false in any material respect as of the date made or deemed made; or

(e) Other Defaults Under Credit Documents. Any Credit Party shall default in the performance of or compliance with any term contained herein or any of the other Credit Documents, other than any such term referred to in any other paragraph of this Section 8.1, such default shall not have been remedied or waived within thirty days after receipt by Borrower of notice from Administrative Agent or the Required Lenders of such default; or

(f) Involuntary Bankruptcy; Appointment of Receiver, Etc. (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) in an involuntary case under any Debtor Relief Laws now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (ii) an involuntary case shall be commenced against Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) under any Debtor Relief Laws now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary), or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary), and any such event described in this clause (ii) shall continue for sixty days without having been dismissed, bonded or discharged; or

(g) Voluntary Bankruptcy; Appointment of Receiver, Etc. (i) Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) shall have an order for relief entered with respect to it or shall commence a voluntary case under any

Debtor Relief Laws now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) shall make any assignment for the benefit of creditors; or (ii) Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) shall be unable, or shall fail generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f); or

(h) <u>Judgments and Attachments</u>.  Any judgment, order or decree for the payment of money involving in the aggregate at any time an amount in excess of $30,000,000 (to the extent not covered by independent, third party insurance that has not denied coverage in writing) shall be entered or filed against Holdings or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty days; or

(i) <u>Dissolution</u>.  Any order, judgment or decree shall be entered against any Credit Party decreeing the dissolution or split up of such Credit Party and such order shall remain undischarged or unstayed for a period in excess of thirty days; or

(j) <u>Employee Benefit Plans</u>.  There shall occur (i) one or more ERISA Events which individually or in the aggregate results in or would reasonably be expected to result in a Material Adverse Effect or (ii) a final determination (after completion or exhaustion of any dispute resolution procedure in accordance with Section 4221 of ERISA and any rules of the applicable Multiemployer Plan) that Holdings, any of its Restricted Subsidiaries and any of their ERISA Affiliates is in "default" (as defined in Section 4219(c)(5) of ERISA and any rules of the 1974 Plan) with respect to the 1974 Plan, which results in or could reasonably be expected to result in immediate payment by Holdings, any of its Restricted Subsidiaries or any of their ERISA Affiliates of withdrawal liability with respect to the 1974 Plan which (together with accrued interest (as described in Section 4219(c)(5) of ERISA) and any liquidated damages (as described in the 1974 Plan)) is in an amount in excess of $900,000,000; or

(k) <u>Change of Control</u>.  A Change of Control shall occur; or

(l) <u>Guaranties, Collateral Documents and other Credit Documents</u>.  At any time after the execution and delivery thereof, (i) any material portion of the Guaranty for any reason, other than the satisfaction in full of all Obligations (other than contingent indemnity obligations), shall cease to be in full force and effect (other than in accordance with its terms or in connection with a transaction permitted by Section 6.8) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) any portion of this Agreement or any material Collateral Document ceases to be in

full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations (other than contingent indemnity obligations) or in connection with a transaction permitted by Section 6.8) or shall be declared null and void, or Collateral Trustee shall not have or shall cease to have a valid and perfected First Priority Lien (to the extent required by the Pledge and Security Agreement), subject to Permitted Liens, in any material portion of the Collateral in which the Secured Parties are meant to have a First Priority Lien pursuant to the Collateral Trust Agreement and the Intercreditor Agreement purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Trustee or any Secured Party to take any action within its control, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or repudiate or rescind (or purport to repudiate or rescind) or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any provision of any Credit Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents;

**THEN**, (1) upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), automatically, and (2) upon the occurrence and during the continuance of any other Event of Default, at the request of (or with the consent of) Requisite Lenders, upon notice to Borrower by Administrative Agent, (A) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (I) the unpaid principal amount of and accrued interest and premium on the Loans, and (II) all other Obligations under the Credit Documents; and (B) Administrative Agent may cause Collateral Trustee to enforce any and all Liens and security interests created pursuant to Collateral Documents.

## SECTION 9.   AGENTS

**9.1.   Appointment of Agents.**  Goldman Sachs is hereby appointed Syndication Agent hereunder, and each Lender hereby authorizes Goldman Sachs to act as Syndication Agent in accordance with the terms hereof and the other Credit Documents.  DBNY is hereby appointed Administrative Agent hereunder and under the other Credit Documents and each Lender hereby authorizes DBNY to act as Administrative Agent in accordance with the terms hereof and the other Credit Documents.  Each such Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents, as applicable.   The provisions of this Section 9 are solely for the benefit of Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.   In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Holdings or any of its Subsidiaries.   The Syndication Agent, upon written notice to Borrower and Administrative Agent, may assign any and all of its rights or obligations hereunder to any of its Affiliates.   As of the Closing Date, Goldman Sachs, in its capacity as Syndication Agent, shall not have any obligations but shall be entitled to all benefits of this Section 9.   Each of Syndication Agent and any Agent described in clause (iv) of the

definition thereof may resign from such role at any time, with immediate effect, by giving prior written notice thereof to Administrative Agent and Borrower.

**9.2.   Powers and Duties.**   Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.   Each Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.   Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.   No Agent shall have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

Each Secured Party irrevocably authorizes the Collateral Trustee to execute and deliver the Pledge and Security Agreement, the Intercreditor Agreement and the Collateral Trust Agreement (including any joinders thereto) and each other Collateral Document and to take such action, and to exercise the powers, rights and remedies granted to the Collateral Trustee thereunder and with respect thereto.

Each Secured Party authorizes and directs Administrative Agent to execute and deliver the Intercreditor Agreement for the benefit of such Secured Party and any amendment to or restatement of the Intercreditor Agreement necessary to reflect any Indebtedness permitted hereunder.   Each Secured Party authorizes and directs Administrative Agent to execute and deliver the Collateral Trust Agreement (including any joinders thereto) for the benefit of each Secured Party and any amendment to or restatement of the Collateral Trust Agreement necessary to reflect any Indebtedness permitted hereunder and to evidence that each Secured Party is bound by the terms and provisions of the Collateral Trust Agreement, including the provisions relating to the ranking of Priority Liens (as defined in the Collateral Trust Agreement) and the order of application of proceeds from enforcement of such Priority Liens (as defined in the Collateral Trust Agreement) and hereby appoints Administrative Agent as a representative of the Priority Lien Debt (as defined in the Collateral Trust Agreement) for purposes related to the administration of the security documents.

Each Secured Party agrees (a) to be bound by, and consents to, the terms and provisions of the Pledge and Security Agreement, the Collateral Trust Agreement and the Intercreditor Agreement and (b) that it will take no actions contrary to the provisions of the Pledge and Security Agreement, the Intercreditor Agreement and the Collateral Trust Agreement.

**9.3.   General Immunity**.

(a)   <u>No Responsibility for Certain Matters</u>.   Neither any Agent nor any Arranger shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or

made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent or any Arranger to Lenders or by or on behalf of any Credit Party to any Agent, any Arranger or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent or any Arranger be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing.  Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof.

(b)  Exculpatory Provisions.  None of any Agent, any Arranger or any of their respective officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent or any Arranger under or in connection with any of the Credit Documents except to the extent caused by such Agent's or such Arranger's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  Each Agent and each Arranger shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent or such Arranger shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), such Agent or such Arranger shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions, including for the avoidance of doubt refraining from any action that, in its opinion or the opinion of its counsel, may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law.  Without prejudice to the generality of the foregoing, (i) each Agent and each Arranger shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Holdings and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent or any Arranger as a result of such Agent or such Arranger acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5).

(c)  Delegation of Duties. Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by Administrative

Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of this Section 9.3 and of Section 9.6 and Section 10.2 shall apply to any the Affiliates of Administrative Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 9.3 and of Section 9.6 and Section 10.2 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein.  Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to Administrative Agent and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

**9.4.   Agents Entitled to Act as Lender.**   The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder.  With respect to its participation in the Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity.  Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Holdings or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Borrower for services in connection herewith and otherwise without having to account for the same to Lenders.

**9.5.   Lenders' Representations, Warranties and Acknowledgment.**

(a)  Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries.  No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time

or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)   Each Lender, by delivering its signature page to this Agreement, an Assignment Agreement or a Joinder Agreement and funding its Term Loan on the Closing Date or by the funding of any New Term Loans, as the case may be, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on the Closing Date or as of the date of funding of such New Term Loans.

**9.6.   Right to Indemnity.**   Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent and each Arranger, to the extent that such Agent or such Arranger shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent or such Arranger in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent or such arranger in any way relating to or arising out of this Agreement or the other Credit Documents; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's or such Arranger's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction.  If any indemnity furnished to any Agent or any Arranger for any purpose shall, in the opinion of such Agent or such Arranger, be insufficient or become impaired, such Agent or such Arranger may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Agent or any Arranger gainst any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent or any Arranger against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7.   Successor Administrative Agent.**   Administrative Agent shall have the right to resign at any time by giving 30 days' prior written notice thereof to Lenders and Borrower and Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to Borrower and Administrative Agent and signed by Requisite Lenders.  Upon any such notice of resignation or any such removal, Requisite Lenders shall have the right, with the Borrower's consent (not to be unreasonably withheld or delayed; provided that Borrower consent shall not be required if an Event of Default pursuant to Section 8.1(a), (f) or (g) has occurred and is continuing), to appoint a successor Administrative Agent.  If no successor shall have been so appointed by the Requisite Lenders (and consented to by Borrower, if applicable) and shall have accepted such appointment within 15 days after the retiring Administrative Agent gives notice of its intent to resign, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor (subject to the same Borrower consent right set forth above).  Upon the acceptance of any appointment as Administrative Agent

hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall promptly transfer to such successor Administrative Agent all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Credit Documents, whereupon such retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder. Notwithstanding the foregoing, in the event no successor shall have been so appointed and shall have accepted such appointment within 15 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and Borrower, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents and (b) the Requisite Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, provided that all payments required to be made hereunder or under any other Credit Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person. After any retiring or removed Administrative Agent's resignation or removal hereunder as Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.

**9.8. Collateral Documents and Guaranty**.

(a) Collateral Trustee and Agents under Collateral Documents and Guaranty. Each Secured Party hereby further authorizes Administrative Agent to appoint the Collateral Trustee under the Collateral Trust Agreement to act on behalf of the Secured Parties. Each Secured Party hereby further authorizes Administrative Agent or Collateral Trustee, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of Secured Parties with respect to the Guaranty, the Collateral and the Collateral Documents; provided that, without limiting the express obligations of Administrative Agent or Collateral Trustee under any Collateral Document to holders of Obligations under any Designated Coal Contract, neither Administrative Agent nor Collateral Trustee shall owe any fiduciary duty, duty of loyalty, duty of care, duty of disclosure or any other obligation whatsoever to any holder of Obligations with respect to any Secured Hedge Agreement or Designated Coal Contract. Subject to Section 10.5, without further written consent or authorization from any Secured Party, Administrative Agent or Collateral Trustee, as applicable, may execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement or designation of a Guarantor as an Unrestricted Subsidiary in accordance with Section 5.15, release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented, (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented or (iii) subordinate any Lien encumbering Collateral to any Permitted Lien thereon that may be prior to such Lien in accordance with the terms of this Agreement (subject to the discretion of Collateral

CH\2051848.14

Trustee as to whether such Permitted Lien is intended to be prior to the Liens securing the Secured Obligations (as defined in any applicable Collateral Document)), it being agreed that the Lien of the Collateral Trustee encumbering any item of Collateral may be subordinated to any Lien permitted under Section 6.2(e), (h) (solely with respect to item 1 described on Schedule 6.2), (i), (j) and (p). Subject to Section 10.5 to the extent applicable, without further written consent or authorization from any Secured Party, Administrative Agent or Collateral Trustee, as applicable, may execute any documents or instruments necessary to enter into any intercreditor or subordination arrangement in connection with any Indebtedness permitted to be incurred under this Agreement including any Refinancing Indebtedness, Incremental Pari Notes, Additional Facilities and Indebtedness under the Revolving Credit Agreement.

(b)   Right to Realize on Collateral and Enforce Guaranty.   Anything contained in any of the Credit Documents to the contrary notwithstanding, Borrower, Administrative Agent, Collateral Trustee and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of the other Credit Documents (other than Collateral Documents) may be exercised solely by Administrative Agent, for the benefit of Secured Parties in accordance with the terms hereof or thereof, and all powers, rights and remedies under the Collateral Documents may be exercised solely by Collateral Trustee for the benefit of the Secured Parties in accordance with the terms thereof, and (ii) in the event of a foreclosure or similar enforcement action by Collateral Trustee on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), Collateral Trustee (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code,) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and Collateral Trustee, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from Requisite Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Trustee at such sale or other disposition.

(c)   Rights under Hedge Agreements, Secured Commodities Agreements and Designated Coal Contracts.   No Hedge Agreement will create (or be deemed to create) in favor of any Lender Counterparty that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Credit Documents except as expressly provided in Sections 10.5(c)(iv) and 10.5(c)(v) of this Agreement and Section 9.2 of the Pledge and Security Agreement.   By accepting the benefits of the Collateral, such Lender Counterparty shall be deemed to have appointed Collateral Trustee as its agent and agreed to be bound by the Credit Documents as a Secured Party, subject to the limitations set forth in this clause (c).   No Secured Commodities Agreement will create (or be deemed to create) in favor of any Commodities Hedge Provider that is a party thereto any rights in connection with the

147

management or release of any Collateral or of the obligations of any Guarantor under the Credit Documents except as expressly provided in Sections 10.5(c)(iv) and 10.5(c)(v) of this Agreement and Section 9.2 of the Pledge and Security Agreement.  By accepting the benefits of the Collateral, such Commodities Hedge Provider shall be deemed to have appointed Collateral Trustee as its agent and agreed to be bound by the Credit Documents as a Secured Party, subject to the limitations set forth in this clause (c).  No Designated Coal Contract will create (or be deemed to create) in favor of any Designated Coal Contract Counterparty that is a party thereto any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Credit Documents except as expressly provided in Sections 10.5(c)(iv) and 10.5(c)(v) of this Agreement and Section 9.2 of the Pledge and Security Agreement.  By accepting the benefits of the Collateral, such Designated Coal Contract Counterparty shall be deemed to have appointed Collateral Trustee as its agent and agreed to be bound by the Credit Documents as a Secured Party, subject to the limitations set forth in this clause (c).

(d)  <u>Release of Guarantees, Termination of this Agreement</u>.  Notwithstanding anything to the contrary contained herein or any other Credit Document, when all Obligations (other than (i) contingent indemnity obligations that are not due and payable and (ii) obligations and liabilities in respect of any Secured Hedge Agreement or Designated Coal Contract) have been paid in full, and all Commitments have terminated or expired, the guarantees made herein shall automatically terminate and, upon request of Borrower, Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any Affiliate of any Lender that is a party to any Hedge Agreement, any Commodities Hedge Provider that is a party to any Secured Commodities Agreement or any Designated Coal Contract Counterparty that is a party to a Designated Coal Contract) take such actions as shall be required to terminate this Agreement and to release all guarantee obligations provided for in any Credit Document, whether or not on the date of such release there may be outstanding Obligations in respect of Hedge Agreements, Secured Commodities Agreements or Designated Coal Contracts.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(e)  The Collateral Trustee shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Trustee's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall the Collateral Trustee be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

**9.9.  Withholding Taxes.**  To the extent required by any applicable law, Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable

withholding Tax.  If the Internal Revenue Service or any other Governmental Authority asserts a claim that Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

**9.10.    Administrative Agent May File Bankruptcy Disclosure and Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Laws relative to any Credit Party, Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

      (a)    to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

      (b)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its respective agents and counsel and all other amounts due Administrative Agent under Sections 2.11, 10.2 and 10.3 allowed in such judicial proceeding; and

      (c)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Sections 2.11, 10.2 and 10.3.  To the extent that the payment of any such compensation, expenses, disbursements and advances of Administrative Agent, its agents and counsel, and any other amounts due Administrative Agent under Sections 2.11, 10.2 and 10.3 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

### SECTION 10.   MISCELLANEOUS

**10.1.   Notices.**

(a)   Notices Generally.   Any notice or other communication herein required or permitted to be given to a Credit Party, Syndication Agents or Administrative Agent, shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing.   Except as otherwise set forth in paragraph (b) below, each notice hereunder shall be in writing and may be personally served or sent by telefacsimile (except for any notices sent to Administrative Agent), email or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed; provided, no notice to any Agent or Borrower shall be effective until received by such Person; provided further, any such notice or other communication shall at the request of Administrative Agent be provided to any sub-agent appointed pursuant to Section 9.3(c) as designated by Administrative Agent from time to time.

(b)   Electronic Communications.

(i)   Notices and other communications to any Agent and Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, including the Platform) pursuant to procedures approved by Administrative Agent, provided that the foregoing shall not apply to notices to any Agent or any Lender pursuant to Section 2 if such Person has notified Borrower and Administrative Agent that it is incapable of receiving notices under such Section by electronic communication.   Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.   Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed

receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(ii) Each Credit Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(iii) The Platform and any Approved Electronic Communications are provided "as is" and "as available". None of the Agents or any of their respective officers, directors, employees, agents, advisors or representatives (the **"Agent Affiliates"**) warrant the accuracy, adequacy, or completeness of the Approved Electronic Communications or the Platform and each expressly disclaims liability for errors or omissions in the Platform and the Approved Electronic Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects is made by the Agent Affiliates in connection with the Platform or the Approved Electronic Communications.

(iv) Each Credit Party, each Lender and each Agent agrees that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

(v) Any notice of Default or Event of Default may be provided by telephone if confirmed promptly thereafter by delivery of written notice thereof.

(c) Private Side Information Contacts. Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal and state securities laws, to make reference to information that is not made available through the "Public Side Information" portion of the Platform and that may contain Non-Public Information with respect to Holdings, its Subsidiaries or their securities for purposes of United States federal or state securities laws. In the event that any Public Lender has determined for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other Lenders may have availed themselves of such information and (ii) neither Borrower nor Administrative Agent has any responsibility for such Public Lender's decision to limit the scope of the information it has obtained in connection with this Agreement and the other Credit Documents.

**10.2.   Expenses.**

Borrower agrees to pay, within 30 days of written request (or on the Closing Date, in the case of amounts required to be paid in order to satisfy the condition in Section 3.1(m)) (a) all the actual, reasonable and documented out-of-pocket costs and expenses of the Administrative Agent incurred in connection with the negotiation, preparation and execution of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for Borrower and the other Credit Parties; (c) the reasonable, actual and documented out-of-pocket fees, expenses and disbursements of counsel to the Administrative Agent in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrower (limited, in the case of counsel, to one firm of primary outside counsel for the Administrative Agent, one firm of outside local counsel for the Administrative Agent in any applicable jurisdiction as to which Administrative Agent reasonably determined local counsel is appropriate, and one specialty counsel for the Administrative Agent with respect to each subject matter as to which Administrative Agent reasonably determines specialty counsel is appropriate; provided, that if any Agent has been advised by counsel that there is an actual or reasonable likelihood of a conflict of interest, such affected Agent may retain its own counsel); (d) all the actual costs and reasonable and documented out-of-pocket expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of Collateral Trustee, for the benefit of Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums (limited, in the case of counsel, to one firm of primary outside counsel for the Administrative Agent and one firm of outside local counsel for the Administrative Agent in any applicable jurisdiction as to which Administrative Agent reasonably determines local counsel is appropriate; provided, that if any Agent has been advised by counsel that there is an actual or reasonable likelihood of a conflict of interest, such affected Agent may retain its own counsel); (e) all the actual and reasonable and documented out-of-pocket costs, fees, expenses and disbursements of any auditors, accountants, consultants or appraisers, in each case hired with the consent of Borrower; (f) all the actual and reasonable and documented out-of-pocket costs and reasonable expenses of the Administrative Agent (including the reasonable and documented out-of-pocket fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Administrative Agent or Collateral Trustee and its counsel with the consent of Borrower) in connection with the custody or preservation of any of the Collateral (limited, in the case of counsel, to one firm of primary outside counsel for the Administrative Agent and one firm of outside local counsel for the Administrative Agent in any applicable jurisdiction as to which Administrative Agent reasonably determines local counsel is appropriate; provided, that if any Agent or Collateral Trustee has been advised by counsel that there is an actual or reasonable likelihood of a conflict of interest, such affected Agent or Collateral Trustee may retain its own counsel); (g) all other actual out-of-pocket, reasonable and documented costs and expenses incurred by each Agent in connection with the primary syndication of the Loans and Commitments; and (h) after the occurrence and during the continuance of an Event of Default, all documented out-of-pocket costs and expenses, including reasonable and documented out-of-pocket attorneys' fees and costs of settlement, incurred by any Agent and Lenders in preserving or enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in

connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings (limited, in the case of counsel, to one firm of primary outside counsel for the Administrative Agent and Lenders and one firm of outside local counsel for the Administrative Agent and Lenders in any applicable jurisdiction as to which Administrative Agent reasonably determines local counsel is appropriate; provided, that if any Agent or any Lender has been advised by counsel that there is an actual or reasonable likelihood of a conflict of interest, such affected Agent or affected Lender, as applicable, may retain its own counsel). This Section 10.2 shall not apply to Taxes, which are the subject to of Section 2.20.

**10.3.   Indemnity**.

(a)   In addition to the payment of expenses pursuant to Section 10.2, each Credit Party agrees to indemnify, pay and hold harmless, each Agent, Arranger and Lender and each of their respective officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents, Affiliates and controlling persons (each, an **"Indemnitee"**), from and against any and all Indemnified Liabilities; provided, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities (i) to the extent such Indemnified Liabilities resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, (ii) arises out of or is in connection with any claim, litigation, loss or proceeding not involving an act or omission of any Credit Party or any of Credit Party's related parties and that is brought by an Indemnitee against another Indemnitee (other than against the applicable Indemnitee) or (iii) resulted from material breach by such Indemnitee of the terms of this Agreement or any other Credit Documents, in each case of clauses (i) - (iii), as determined by a final, non-appealable judgment of a court of competent jurisdiction (collectively, the **"Excluded Damages"**).   To the extent that the undertakings to indemnify, pay and hold harmless set forth in this Section 10.3 (other than any Excluded Damage) may be unenforceable in whole or in part because they are violative of any law or public policy or are otherwise unavailable to any Indemnitee or are insufficient to hold such Indemnitee harmless, the applicable Credit Party shall contribute to the amount paid or payable by such Indemnitee as a result of such Indemnified Liabilities in such proportion as is appropriate to reflect the relative economic interests of (a) such Credit Party and its affiliates, shareholders, partners, members or other equity holders on the one hand and (b) such Indemnitee on the other hand in the matters contemplated by this Agreement as well as the relative fault of (1) such Credit Party and its affiliates, shareholders, partners, members or other equity holders and (2) such Indemnitee with respect to such Indemnified Liabilities and any other relevant equitable considerations. Promptly after receipt by any Indemnitee of notice of its involvement in any action, proceeding or investigation, such Indemnitee shall, if a claim for indemnification in respect thereof is to be made against the Credit Parties under this Section 10.3, notify Borrower of such involvement.   Failure by such Indemnitee to so notify Borrower shall not relieve any Credit Party from its obligation to indemnify such Indemnitee under this Section 10.3 except to the extent that such Credit Party suffers actual prejudice as a result of such failure, and shall not relieve any Credit Party from its obligation to provide reimbursement and contribution to such Indemnitee.   With respect to an Indemnitee hereunder in the event of any action or proceeding brought by a third party, Borrower

shall be entitled, but not required, to assume the defense of any such action or proceeding with counsel reasonably satisfactory to the Indemnitee. Upon assumption by Borrower of the defense of any such action or proceeding, the Indemnitee shall have the right to participate in such action or proceeding and to retain its own counsel but Borrower shall not be liable for any legal expenses of other counsel subsequently incurred by the Indemnitee in connection with the defense thereof unless (x) Borrower has agreed to pay such fees and expenses, (y) Borrower has failed to employ counsel reasonably satisfactory to the Indemnitee in a timely manner and Borrower has been advised in writing of such circumstance by the Indemnitee, or (z) the Indemnitee advises Borrower in writing that the Indemnitee has been advised by counsel that there are actual or potential conflicting interests between Borrower and the Indemnitee, including situations in which there are one or more legal defenses available to the Indemnitee that are different from or additional to those available to Borrower; provided, however, that Borrower shall not, in connection with any one such action or proceeding or separate but substantially similar actions or proceedings arising out of the same general allegations, be liable for the fees and expenses of more than one separate firm of attorneys at any time for all Indemnitees, except to the extent that local counsel, in addition  to its regular counsel, is required in order to effectively defend against such action or proceeding. Borrower shall not consent to the terms of any compromise or settlement of any action or proceeding defended by Borrower in accordance with the foregoing without the prior written consent of the Indemnitee unless such compromise or settlement (A) includes an unconditional release of the Indemnitee from all liability arising out of such action and (B) does not include a statement as to or an admission of fault, culpability or a failure to act, by or on behalf of any Indemnitee. No Credit Party shall be required to indemnify any Indemnitee for any amount paid or payable by the Indemnitee in the settlement of any action, proceeding or investigation without the written consent of Borrower, which consent shall not be unreasonably withheld, conditioned or delayed; provided that the foregoing indemnity will apply to any such settlement in the event that Borrower was expressly offered the ability to assume the defense of the action that was the subject matter of such settlement and elected not to so assume.  The reimbursement, indemnity and contribution obligations of the Credit Parties under this paragraph will be in addition to any liability which the Credit Parties may otherwise have, and will be binding upon and inure to the benefit of any successors, and assigns of the Credit Parties and the Indemnitees.  Notwithstanding anything in this Agreement or any other Credit Document to the contrary, the Credit Parties shall not be required to indemnify any Agent, Lender or other Indemnitee hereunder for any matter, claim, fees, costs or expenses arising in such Agent's, Lender's or Indemnitees', as applicable, capacity as either (A) Trading Counterparty, (B) in any role in connection with the Second Lien Documents or the Revolving Credit Agreement or (C) in any role in connection any Acquisition (other than as Agents, Arrangers and/or Lenders hereunder).

(b)   To the extent permitted by applicable law, no party hereto shall assert, and each party hereto hereby waives, any claim against each other party hereto and their respective Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a

result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each party hereto hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; provided that nothing contained in this Section 10.3(b) shall limit any Credit Party's indemnification obligations set forth in Section 10.3 to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnitee is entitled to indemnification hereunder.

(c)   Each Credit Party also agrees that no Lender, Agent, Arranger nor their respective Affiliates, directors, employees, attorneys, agents or sub-agents will have any liability based on its exclusive or contributory negligence or otherwise to any Credit Party or any person asserting claims on behalf of or in right of any Credit Party or any other person in connection with or as a result of this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, in each case, except in the case of any Credit Party to the extent that any losses, claims, damages, liabilities or expenses incurred by such Credit Party or its affiliates, shareholders, partners or other equity holders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Lender, Agent, Arranger or their respective Affiliates, directors, employees, attorneys, agents or sub-agents in performing the services or its express obligations under this Agreement or any Credit Document or any material breach by such Lender, Agent or Arranger of the terms hereof or thereof; provided, however, that in no event will such Lender, Agent, Arranger or their respective Affiliates, directors, employees, attorneys, agents or sub-agents have any liability for any indirect, consequential, special or punitive damages in connection with or as a result of such Lender's, Agent's, Arranger's or their respective Affiliates', directors', employees', attorneys', agents' or sub-agents' activities related to this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein.

(d)   [Reserved].

(e)   Each Credit Party also agrees that neither any Agent nor Arranger shall have any liability to any Credit Party or any person asserting claims on behalf of or in right of any Credit Party or any other person for failure to monitor compliance with any provisions of this Agreement with respect to Disqualified Lenders.

**10.4.   Set-Off.**   In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default each Lender is hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person

(other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party against and on account of the obligations and liabilities of any Credit Party to such Lender hereunder, and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, or with any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to Administrative Agent for further application in accordance with the provisions of Sections 2.17 and 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and their respective Affiliates under this Section 10.4 are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.

**10.5.  Amendments and Waivers.**

(a)  Requisite Lenders' Consent.  Subject to the additional requirements of Sections 10.5(b) and 10.5(c), no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of Requisite Lenders and Borrower; provided that Administrative Agent may, with the consent of Borrower only, amend, modify or supplement this Agreement or any other Credit Document to cure any ambiguity, omission, defect or inconsistency (as reasonably determined by Administrative Agent), so long as such amendment, modification or supplement to cure any such ambiguity, omission, defect or inconsistency does not adversely affect the rights of any Lender or the Lenders shall have received at least five Business Days' prior written notice thereof and Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Requisite Lenders stating that the Requisite Lenders object to such amendment.

(b)  Affected Lenders' Consent. Without the written consent of each Lender (other than a Defaulting Lender) that would be directly adversely affected thereby and in addition, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)  extend the scheduled final maturity of any Loan or Note of such Lender (it being understood that a waiver of any condition precedent set forth in Section 3.1 or the waiver of any Default, Event of Default or mandatory prepayment shall not constitute such an extension);

(ii)   waive, reduce or postpone any scheduled repayment owing to such Lender (but not prepayment);

(iii)   [reserved];

(iv)   reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.10 and provided that no waiver of any Default or Event of Default shall constitute a reduction in the rate of interest) or any fee or any premium payable hereunder to such Lender;

(v)   extend the time for payment of any such interest, fees or premium;

(vi)   reduce the principal amount of any Loan;

(vii)   amend, modify, terminate or waive any provision of this Section 10.5(b), Section 10.5(c) or any other provision of this Agreement that expressly provides that the consent of all Lenders is required (it being understood that this clause (vii) shall not prohibit amendments pursuant to Joinder Agreements entered into as provided in Section 2.24 and Extension Amendment as contemplated by Section 2.25(e) and amendments in connection with any Refinancing Indebtedness);

(viii)   amend the definition of "Requisite Lenders" or "Pro Rata Share"; provided, (A) with the consent of Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of "Requisite Lenders" or "Pro Rata Share" on substantially the same basis as the Term Loan Commitments and the Term Loans are included on the Closing Date, (B) such definitions may be amended pursuant to Joinder Agreements entered into as provided in Section 2.24 and (C) the definition of "**Pro Rata Share**" may be amended pursuant to an Extension Amendment as contemplated by Section 2.25(e) or in connection with any Refinancing Indebtedness;

(ix)   release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents or the Collateral Trust Agreement and except in connection with a "credit bid" undertaken by the Collateral Trustee at the direction of the Requisite Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code or other sale or disposition of assets in connection with an enforcement action with respect to the Collateral permitted pursuant to the Credit Documents (in which case only the consent of the Requisite Lenders will be needed for such release);

(x)   consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document (other than in connection with a transaction permitted under this Agreement); or

(xi)   reduce the principal amount of any reimbursement obligation in respect of letters of credit issued under the Incremental Revolving Commitments;

provided that for the avoidance of doubt, all Lenders shall be deemed directly affected thereby with respect to any amendment described in clauses (vii), (viii), (ix) and (x).

157

(c)  Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)  [reserved];

(ii)  [reserved];

(iii)  alter the required application of any repayments or prepayments as between Classes pursuant to Section 2.15 without the consent of Lenders holding more than 50% of the aggregate Term B-1 Loan Exposure of all Lenders, Term B-2 Loan Exposure of all Lenders, New Term Loan Exposure of all Lenders or Incremental Revolving Exposure of all Lenders, as applicable, of each Class which is being allocated a lesser repayment or prepayment as a result thereof; provided, Requisite Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered;

(iv)  release all or substantially all of the Collateral (or amend or modify the definition of the term "Collateral" that would have the effect of a release of all or substantially all of the Collateral) or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents or the Collateral Trust Agreement and except in connection with a "credit bid" undertaken by the Collateral Trustee on behalf of the Secured Parties at the direction of the Requisite Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code or other sale or disposition of assets in connection with an enforcement action with respect to the Collateral permitted pursuant to the Credit Documents (in which case only the consent of the Requisite Lenders will be needed for such release and which release will be only on the assets subject to such "credit bid" or that are so sold or disposed) without the written consent of the Existing Designated Coal Contract Counterparty;

(v)  amend, modify or waive this Agreement or the Pledge and Security Agreement so as to alter the ratable treatment of Obligations arising under the Credit Documents and Obligations arising under Hedge Agreements, Secured Commodities Agreements  or Designated Coal Contracts or the definition of "Designated Coal Contract Counterparty", "Designated Coal Contract", "Existing Designated Coal Contract Counterparty", "Existing Designated Coal Contract Counterparty," "Lender Counterparty," "Commodities Hedge Provider," "Hedge Agreement," "Secured Commodities Agreement," "Obligations," or "Secured Obligations" (as defined in any applicable Collateral Document) in each case in a manner adverse to any Lender Counterparty, Commodities Hedge Provider or Designated Coal Contract Counterparty with Obligations then outstanding without the written consent of any such Lender Counterparty, Commodities Hedge Provider and or Designated Coal Contract Counterparty, as applicable;

(vi)   amend, modify, terminate or waive any provision of the Credit Documents as the same applies to any Agent or Arranger, or any other provision hereof as the same applies to the rights or obligations of any Agent or Arranger, in each case without the consent of such Agent or Arranger, as applicable; or

(vii)   increase the Incremental Revolving Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Incremental Revolving Commitment of any Lender;

(viii)   amend, modify, terminate or waive any provision hereof relating to the swingline subfacility provided under the Incremental Revolving Commitment (if any) that directly and adversely affects the rights or duties of the swingline lender thereunder without the consent of the applicable swingline lender; or

(ix)   amend, modify, terminate or waive any obligation of Lenders relating to the purchase of participations in letters of credit issued under the Incremental Revolving Commitment without the written consent of Administrative Agent and the applicable issuing bank.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of Administrative Agent, Borrower and the Lenders providing the relevant Replacement Term Loans (as defined below) to permit the refinancing of all outstanding Term Loans ("**Refinanced Term Loans**"), with a replacement term loan tranche denominated in Dollars ("**Replacement Term Loans**"); provided that (a) the aggregate principal amount of such Replacement Term Loans shall not exceed the aggregate principal amount of such Refinanced Term Loans, (b) the Weighted Average Yield for such Replacement Term Loans shall not be higher than the Weighted Average Yield for such Refinanced Term Loans, (c) the Weighted Average Life to Maturity of such Replacement Term Loans shall not be shorter than the Weighted Average Life to Maturity of such Refinanced Term Loans at the time of such refinancing (except to the extent of nominal amortization for periods where amortization has been eliminated as a result of prepayment of the applicable Term Loans), (d) all other terms applicable to such Replacement Term Loans shall be substantially identical to, or less favorable to the Lenders providing such Replacement Term Loans than those applicable to such Refinanced Term Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the latest final maturity of the Term Loans in effect immediately prior to such refinancing.

In addition, notwithstanding the foregoing, in connection with an amendment that addresses solely a re-pricing transaction and any related amendments (including any amendments to Section 2.13(b) and related provisions) in which all or any portion of Class of Term Loans is refinanced with a replacement Class of term loans bearing (or is modified in such a manner such that the resulting term loans bear) a lower Weighted Average Yield (a "**Permitted Repricing Amendment**"), only the consent of the Lenders holding Term Loans subject to such permitted repricing transaction that will continue as a Lender in respect of the repriced tranche of

Term Loans or modified Term Loans shall be required for such Permitted Repricing Amendment.

(d)    <u>Certain Authorizations</u>.    Notwithstanding anything herein to the contrary, Administrative Agent and Collateral Trustee may, without the consent of any Secured Party, waive, amend or modify any provision in any Collateral Document, or consent to a departure by any Credit Party therefrom, to the extent Administrative Agent or Collateral Trustee determines that such waiver, amendment, modification or consent is necessary in order to eliminate any conflict between such provision and the terms of this Agreement.  Collateral Trustee also may amend, supplement or modify the Intercreditor Agreement or the Collateral Trust Agreement as provided in Section 9.8(a).

(e)    <u>Execution of Amendments, Etc.</u>    Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

Notwithstanding the foregoing, no Secured Party consent is required to effect any amendment, modification or supplement to any Intercreditor Agreement, Collateral Trust Agreement or other intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral, including any Incremental Commitment, any Additional Facilities, or any Permitted First Lien Priority Refinancing Debt or any Permitted Second Lien Priority Refinancing Debt, for the purpose of adding the holders of such Indebtedness (or their Representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case as contemplated by the terms of such Intercreditor Agreement, Collateral Trust Agreement or such other intercreditor agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and *provided* that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Secured Parties); *provided*, *further*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Credit Document without the prior written consent of the Administrative Agent.

Notwithstanding anything to the contrary contained in this <u>Section 10.5</u>, guarantees, collateral security documents and related documents executed by the Credit Parties or the Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel or (ii) to cause such guarantee, collateral security document

or other document to be consistent with this Agreement and the other Credit Documents.

**10.6.  Successors and Assigns; Participations**.

(a)  <u>Generally</u>.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders (except in the case of any such assignment or delegation as a result of any merger or consolidation or liquidation or amalgamation or otherwise permitted by Section 6.8).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of the Agents and Lenders and other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  <u>Register</u>.  Borrower, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of a fully executed Assignment Agreement effecting the assignment or transfer thereof, together with the required forms and certificates regarding tax matters and any fees payable in connection with such assignment, in each case, as provided in Section 10.6(d).  Each assignment shall be recorded in the Register promptly following receipt by Administrative Agent of the fully executed Assignment Agreement and all other necessary documents and approvals, prompt notice thereof shall be provided to Borrower and a copy of such Assignment Agreement shall be maintained, as applicable.  The date of such recordation of a transfer shall be referred to herein as the **"Assignment Effective Date."**  Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)  <u>Right to Assign</u>.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations (<u>provided</u>, <u>however</u>, that pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments):

(i)  to any Person meeting the criteria of clause (i) of the definition of the term "Eligible Assignee" upon the giving of notice to Borrower and Administrative Agent; and

(ii)  to any Person meeting the criteria of clause (ii) of the definition of the term "Eligible Assignee" upon giving of notice to Borrower and Administrative

CH\2051848.14

Agent and to any such Person (except in the case of assignments made by or to DBNY), consented to by each of Borrower and Administrative Agent (such consent not to be (x) unreasonably withheld or delayed or, (y) in the case of Borrower, required at any time an Event of Default under Section 8.1(a), (f) or (g) shall have occurred and then be continuing); provided further that (A) Borrower shall be deemed to have consented to any such assignment (i) during the initial primary syndication of the Term Loans (as determined by Administrative Agent) and (ii) unless it shall object thereto by written notice to Administrative Agent within 10 Business Days after having received written notice thereof and (B) each such assignment pursuant to this Section 10.6(c)(ii) shall be in an aggregate amount of not less than (w) $1,000,000, (x) such lesser amount as agreed to by Borrower and Administrative Agent, (y) the aggregate amount of the Loans of the assigning Lender with respect to the Class being assigned or (z) the amount assigned by an assigning Lender to an Affiliate or Related Fund of such Lender.

(d)  Mechanics.

(i)  Subject to the other requirements of this Section 10.6, assignments and assumptions of Loans and Commitments by Lenders shall be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement. Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date.  In connection with all assignments there shall be delivered to Administrative Agent such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.20(c), together with payment to Administrative Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable (y) in connection with an assignment by or to DBNY or any Affiliate thereof or (z) in the case of an assignee which is already a Lender or is an affiliate or Related Fund of a Lender or a Person under common management with a Lender).

(ii)  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of Borrower and Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to Administrative Agent, and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

CH\2051848.14

(e)   Representations and Warranties of Assignee.   Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(f)   Effect of Assignment.   Subject to the terms and conditions of this Section 10.6, as of the Assignment Effective Date (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; provided that an assignee shall not be entitled to receive any greater payment under Section 2.18, 2.19 or 2.20 (due to the condition giving rise to such payment being in existence on the date of such assignment) than the applicable assigning Lender would have been entitled to receive has the assignment not occurred, unless the assignment to such participant is made with Borrower's prior written consent; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; provided, anything contained in any of the Credit Documents to the contrary notwithstanding, and (y) such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect any Commitment of such assignee; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new outstanding Loans of the assignee and/or the assigning Lender.

(g)   Participations.

(i)   Each Lender shall have the right at any time to sell one or more participations to any Person (other than to (x) any Disqualified Lender or (y) Holdings, any of its Subsidiaries or (except as provided in Section 10.6(i)) any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation. Each Lender that sells a participation pursuant to this Section 10.6(g) shall, acting solely for U.S. federal income tax purposes as an agent of Borrower, maintain a register on which it records the

163

name and address of each participant and the principal amounts of each participant's participation interest with respect to the Term Loan (each, a **"Participant Register"**); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. Unless otherwise required by the Internal Revenue Service, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the Internal Revenue Service.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of a participation with respect to the Term Loan for all purposes under this Agreement, notwithstanding any notice to the contrary.

(ii)    The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (A) extend the final scheduled maturity of any Loan, Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (B) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (C) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.

(iii)    Borrower agrees that each participant shall be entitled to the benefits of Sections 2.18(c), 2.19 and 2.20 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section; provided, (x) a participant shall not be entitled to receive any greater payment under Section 2.19 or 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with Borrower's prior written consent (not to be unreasonably withheld or delayed) and (y) a participant that would be a Non-US Lender if it were a Lender shall not be entitled to the benefits of Section 2.20 unless Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of Borrower, to comply with Section 2.20 as though it were a Lender; provided further that, except as specifically set forth in clauses (x) and (y) of this sentence, nothing herein shall require any notice to Borrower or any other Person in connection with the sale of any

164

participation.  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender, <u>provided</u> such participant agrees to be subject to Section 2.17 as though it were a Lender.

(h)    <u>Certain Other Assignments and Participations</u>.  In addition to any other assignment or participation permitted pursuant to this Section 10.6 any Lender may assign, pledge and/or grant a security interest in all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; <u>provided</u>, that no Lender, as between Borrower and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and <u>provided</u> <u>further</u>, that in no event shall the applicable Federal Reserve Bank, pledgee or trustee, be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

(i)    <u>Assignments to Borrower</u>.  Notwithstanding anything to the contrary contained in this Section 10.6 or any other provision of this Agreement, so long as no Default or Event of Default has occurred and is continuing or would result therefrom, each Lender shall have the right at any time to sell, assign or transfer all or a portion of its Term Loan Commitment or Term Loans owing to it to Borrower on a non-pro rata basis (<u>provided</u>, <u>however</u>, that each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Term Loan and any related Term Loan Commitments) through (A) one or more modified Dutch auctions conducted by Borrower (each, an **"Auction"**) to repurchase all or any portion of the Term Loans, <u>provided</u> that, (i) notice of the Auction shall be made to all Term Loan Lenders and (ii) the Auction shall be conducted pursuant to such procedures as the Auction Manager may establish which are consistent with this Section 10.6(i) and the Auction Procedures set forth on Exhibit M and are otherwise reasonably acceptable to Borrower, the Auction Manager, and Administrative Agent or such other procedures as are acceptable to Borrower and Administrative Agent or (B) open market purchases, in each case subject to the following limitations:

(i)    With respect to all repurchases made by Borrower pursuant to this Section 10.6(i), (A) Borrower shall deliver a certificate of an Authorized Officer to the Auction Manager, in the case of an Auction, or the assigning Lender, in the case of an open market purchase, stating that (1) no Default or Event of Default has occurred and is continuing or would result from such repurchase and (2) in the case of an Auction, as of the launch date of the related Auction and the effective date of any Affiliate Assignment Agreement and in the case of an open market purchase, as of the date of any such purchase and the effective date of any Affiliate Assignment Agreement, it is not making any representation that it is not in possession of any information regarding Borrower, its Subsidiaries or its Affiliates, or their assets, Borrower's ability to perform its Obligations or any other matter that may be material to a decision by any Lender to participate in any Auction or enter into any Affiliate Assignment Agreement or any of the transactions contemplated thereby, (B) Borrower shall not use the proceeds of any loans under the Revolving Credit Agreement to acquire such Term Loans and (C) the assigning Lender

and Borrower shall execute and deliver to the Auction Manager or Administrative Agent, as applicable, an Affiliate Assignment Agreement; and

(ii)    Following repurchase by Borrower pursuant to this Section 10.6(i), the Term Loans so repurchased shall, without further action by any Person, be deemed cancelled for all purposes and no longer outstanding (and may not be resold by Borrower), for all purposes of this Agreement and all other Credit Documents, including, but not limited to (A) the making of, or the application of, any payments to the Lenders under this Agreement or any other Credit Document, (B) the making of any request, demand, authorization, direction, notice, consent or waiver under this Agreement or any other Credit Document or (C) the determination of Requisite Lenders, or for any similar or related purpose, under this Agreement or any other Credit Document.  In connection with any Term Loans repurchased and cancelled pursuant to this Section 10.6(i), Administrative Agent is authorized to make appropriate entries in the Register to reflect any such cancellation.

(j)    <u>Assignments to Affiliated Lenders</u>.

(i)    Notwithstanding anything to the contrary contained in this Agreement, any Lender may assign all or a portion of its Term Loans to an Affiliated Lender (other than any natural person) (without the consent of any Person but subject to acknowledgment by Administrative Agent and Borrower); provided that (A) such Affiliated Lender (whether as a direct purchaser of the Term Loans or as the ultimate purchaser of the Term Loans through a broker or other intermediary) shall ensure that its identity as an Affiliated Lender is known to the assigning Lender; (B) the assigning Lender and such Affiliated Lender shall execute and deliver to the Administrative Agent an Assignment Agreement that contains a Big Boy Representation; (C) for the avoidance of doubt, Lenders shall not be permitted to assign Incremental Revolving Commitments or Incremental Revolving Loans to an Affiliated Lender and any purported assignment of Incremental Revolving Commitments or Incremental Revolving Loans to an Affiliated Lender shall be null and void; (D) at the time of such assignment and after giving effect thereto, no Event of Default shall have occurred and be continuing and (E) at the time of such assignment, after giving effect to such assignment, the aggregate principal amount of all Term Loans held by all Affiliated Lenders shall not exceed 20% of the aggregate principal amount of all Term Loans outstanding under this Agreement at the time of such purchase.

(ii)    Each Affiliated Lender, in connection with any (i) consent to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Credit Document or (ii) direction to Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Credit Document, agrees that, except with respect to any amendment, modification, waiver, consent or any action described in Section 10.5(b) or that adversely affects such Affiliated Lender in a disproportionate manner as compared to other Lenders, such Affiliated Lender shall be deemed to have voted its interest as a Lender without discretion in such proportion as the allocation of voting with respect to such matter by Lenders who are not Affiliated Lenders.

166

(iii)  Each Affiliated Lender, solely in its capacity as a Lender, hereby further agrees that if any Credit Party shall be subject to any voluntary or involuntary proceeding commenced under any Debtor Relief Law, such Affiliated Lender shall be deemed to have voted in such proceedings in the same proportion as the allocation of voting with respect to such matter by those Lenders who are not Affiliated Lenders, except to the extent that any plan under the Debtor Relief Laws proposes to treat the Obligations of the Credit Parties under the Credit Documents held by such Affiliated Lender in a manner that is disproportionately less favorable to such Affiliated Lender than the proposed treatment of similar Obligations of the Credit Parties under the Credit Documents held by other Lenders.  Each Affiliated Lender agrees and acknowledges that the foregoing constitutes an irrevocable proxy in favor of Administrative Agent to vote or consent on behalf of such Affiliated Lender in any proceeding in the manner set forth above.

(iv)  Notwithstanding anything to the contrary in this Agreement, no Affiliated Lender shall have any right to (A) attend (including by telephone or electronic means) any meeting or discussions (or portion thereof) intended to be solely among Administrative Agent and Lenders other than the Affiliated Lenders, or (B) receive any information or material prepared by Administrative Agent intended to be disseminated solely to Lenders other than the Affiliated Lenders.

**10.7.  Independence of Covenants.**    All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.8.  Survival of Representations, Warranties and Agreements.**  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.18(c), 2.19, 2.20, 10.2, 10.3 and 10.4 and the agreements of Lenders set forth in Sections 2.17, 9.3(b) and 9.6 shall survive the payment of the Loans and the termination hereof.

**10.9.  No Waiver; Remedies Cumulative.**  No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents, any of the Secured Hedge Agreements or any of the Designated Coal Contracts.  Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.10.  Termination; Collateral Trust Agreement.**

(a)  A Guarantor Subsidiary shall automatically be released from its obligations under the Credit Documents upon the consummation of any transaction permitted by this Agreement as a result of which (i) such Guarantor Subsidiary is not a Subsidiary of Holdings or (ii) such Guarantor Subsidiary becomes an Excluded Subsidiary; provided that, if so required by this Agreement, the Requisite Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.

(b)  The Collateral Trust Agreement shall govern the release of security interests in Collateral as security for Obligations (A) when all the Obligations (other than (i) contingent indemnification obligations for which no claim has been asserted and (ii) obligations and liabilities in respect of any Hedge Agreement or Designated Coal Contract) shall have been paid in full and the Commitments of the Lenders shall have been terminated and (B) upon any sale or other transfer by any Credit Party of any Collateral that is permitted under this Agreement (other than a sale or other transfer to a Credit Party) or upon effectiveness of any written direction by the consent to the release of the security interest created under any Collateral Document in any Collateral pursuant to Section 10.5.

(c)  Notwithstanding anything to the contrary contained herein or in any other Credit Document, in connection with any termination or release pursuant to this Section 10.10, the Administrative Agent and/or Collateral Trustee are hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender) to execute and deliver, and shall promptly execute and deliver to any the applicable Credit Party, at such Credit Party's expense, all documents that such Credit Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section 10.10 shall be without recourse to or warranty by the Administrative Agent or the Collateral Trustee.

**10.11.  Marshalling; Payments Set Aside.**  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Credit Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of Lenders), or any Agent or Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.12.  Severability.**  In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity,

legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.13.  Obligations Several; Independent Nature of Lenders' Rights.**  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a Joint Venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.14.  Headings.**  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.15.  APPLICABLE LAW**.  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.**

**10.16.  CONSENT TO JURISDICTION**.  **SUBJECT TO CLAUSE (E) OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENTS, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN ANY FEDERAL COURT OF THE UNITED STATES SITTING IN THE BOROUGH OF MANHATTAN OR, IF THAT COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, IN ANY STATE COURT LOCATED IN THE CITY AND COUNTY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS (OTHER THAN WITH RESPECT TO ACTIONS BY ANY AGENT IN RESPECT OF RIGHTS UNDER ANY SECURITY AGREEMENT GOVERNED BY LAWS OTHER THAN THE LAWS OF THE STATE OF NEW YORK OR WITH RESPECT TO ANY COLLATERAL SUBJECT THERETO); (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL**

**JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY SECURITY DOCUMENT OR THE ENFORCEMENT OF ANY JUDGMENT.**

**10.17. WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.   THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.   EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.17 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**10.18. Confidentiality.**  Each Agent and each Lender shall hold confidential all non-public information regarding Holdings, Borrower and their respective Subsidiaries, Affiliates and their businesses obtained by such Agent or such Lender pursuant to the requirements hereof in accordance with such Agent's and such Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by Borrower that, in any event, Administrative Agent may disclose such information to the Lenders and each Agent and each Lender and each Agent may make (i) disclosures of such information to Affiliates of such Lender or Agent and to their respective officers, directors, partners, members, employees, legal counsel, independent auditors and other advisors, experts or agents who need to

CH\2051848.14

know such information and on a confidential basis (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.18) (it being understood and agreed that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and who have agreed to treat such information confidentially), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) to any swap or derivative transaction relating to Borrower and its obligations or by any Designated Coal Contract Counterparty (provided, such assignees, transferees, participants, counterparties and advisors are advised of and agree to be bound by either the provisions of this Section 10.18 or other provisions at least as restrictive as this Section 10.18), (iii) disclosure to any rating agency when required by it, provided that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to Credit Parties received by it from any Agent or any Lender, (iv) disclosure on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (v) disclosures in connection with the exercise of any remedies hereunder or under any other Credit Document, (vi) disclosures made pursuant to the order of any court or administrative agency or a judicial, administrative or legislative body or committee or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Person agrees to inform Borrower promptly thereof to the extent not prohibited by law), (vii) disclosures made upon the request or demand of any regulatory or quasi-regulatory authority purporting to have jurisdiction over such Person or any of its Affiliates (in which case such Person agrees to inform the Borrower promptly thereof to the extent not prohibited by law), (viii) disclosures of information received by such Person on a non-confidential basis from a source (other than Borrower or any of Borrower's affiliates, advisors, members, directors, employees, accountants, attorneys, agents or other representatives) not known by such Person to be prohibited from disclosing such information to such Person by a legal, contractual or fiduciary obligation, (ix) disclosures of such information to the extent that such information is publicly available or becomes publicly available other than by reason of improper disclosure in violation of this Section 10.18, (x) disclosures to the extent that such information was already in such Person's possession (and disclosure by such Person is not otherwise prohibited by a contractual obligation) or is independently developed by such Person (from information not otherwise prohibited from being disclosed pursuant to a separate contractual obligation), and (xi) disclosures for purposes of establishing a "due diligence" defense.  In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement and the other Credit Documents.

**10.19. Usury Savings Clause.**    Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the

outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrower.

**10.20.  Effectiveness; Counterparts.**  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Borrower and Administrative Agent of written notification of such execution and authorization of delivery thereof.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.21.  PATRIOT Act.**  Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Credit Party that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender or Administrative Agent, as applicable, to identify such Credit Party in accordance with the PATRIOT Act.

**10.22.  Electronic Execution of Assignments.**  The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.23.  No Fiduciary Duty; Trading Counterparty**.  Each Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the **"Lenders"**), may have economic interests that conflict with those of the Credit Parties, their stockholders and/or their affiliates.  Each Credit Party agrees that nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Credit Party, its stockholders or its affiliates, on

172

the other.  The Credit Parties acknowledge and agree that (i) the transactions contemplated by the Credit Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Credit Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Credit Party, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Credit Party, its stockholders or its Affiliates on other matters) or any other obligation to any Credit Party except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Credit Party, its management, stockholders, creditors or any other Person.  Each Credit Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  Each Credit Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Credit Party, in connection with such transaction or the process leading thereto.

Each Agent or their respective affiliates are, or may at any time be, (a) a counterparty (in such capacities, the **"Trading Counterparties"**) to Borrower and/or any of its subsidiaries with respect to one or more agreements with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction (including, without limitation, transactions involving the purchase or sale of physical commodities) or any combination of these transactions, in each case, entered into by Borrower or any of its affiliates (collectively, the **"Trading Transactions"**), (b) a holder or lender, as applicable, of any Second Lien Indebtedness and/or Revolving Credit Agreement (in such capacity, the **"Existing Lender"**) or (c) an agent under the Second Lien Indebtedness and/or the Revolving Credit Agreement (in such capacity, the **"Existing Agent"**).  Each Credit Party acknowledges and agrees for itself and its affiliates that each Trading Counterparty, solely in such capacity, (a) will be acting for its own account as principal in connection with the Trading Transactions, (b) will be under no obligation or duty as a result of DBNY's or DBSI's (together with their affiliates, "**Deutsche**") role, as provided for in this Agreement or other Credit Documents, as applicable, in connection with the transactions contemplated by this Agreement or other Credit Documents or otherwise to take any action or refrain from taking any action, or exercising any rights or remedies, that such Trading Counterparty may be entitled to take or exercise in respect of the applicable Trading Transaction and (c) may manage its exposure under the Trading Transactions without regard to Deutsche's role hereunder.  Each Credit Party further acknowledges and agrees for itself and its subsidiaries that the Existing Lender and the Existing Agent (a) will be acting for its own account as principal in connection with any Second Lien Indebtedness and/or the Revolving Credit Agreement, (b) will be under no obligation or duty as a result of Deutsche's role in connection with the transactions contemplated by this Agreement or other Credit Documents or otherwise to take any action or refrain from taking any action (including with respect to voting for or against any requested amendments), or exercising any rights or remedies, that the Existing Lender or the Existing Agent may be entitled to take or exercise in respect of any Second Lien Indebtedness and/or the Revolving Credit Agreement and

(c) may manage its exposure to any Second Lien Indebtedness and/or the Revolving Credit Agreement without regard to Deutsche's role hereunder.

**10.24. Designated Coal Contracts**.  Notwithstanding anything to the contrary in this Agreement, the Credit Parties shall be entitled to enter into Designated Coal Contracts.

[Remainder of page intentionally left blank]

CH\2051848.14

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

MURRAY ENERGY CORPORATION

By: _____

Name: Robert D. Moore

Title:  Executive Vice President, Chief Operating
Officer and Chief Financial Officer

MURRAY ENERGY HOLDINGS CO.

By: _____

Name: Robert D. Moore

Title:  Chief Financial Officer

[Signature Page to Credit and Guaranty Agreement]

**AMCA COAL LEASING, INC.**
**AMCOAL HOLDINGS, INC.**
**AMERICAN COMPLIANCE COAL, INC.**
**AMERICAN EQUIPMENT & MACHINE, INC.**
**AMERICAN MINE SERVICES, INC.**
**AMERICANMOUNTAINEER PROPERTIES,
INC.**
**AMERICAN NATURAL GAS, INC.**
**ANDALEX RESOURCES, INC.**
**ANDALEX RESOURCES MANAGEMENT,
INC.**
**AVONMORE RAIL LOADING, INC.**
**CANTERBURY COAL COMPANY**
**CCC LAND RESOURCES LLC**
**CCC RCPC LLC**
**CENTRAL OHIO COAL COMPANY**
**COAL RESOURCES, INC.**
**CONSOLIDATED LAND COMPANY**
**CONSOLIDATION COAL COMPANY**
**EIGHTY-FOUR MINING COMPANY**
**KANAWHA TRANSPORTATION CENTER, INC.**
**KEYSTONE COAL MINING CORPORATION**
**MCELROY COAL COMPANY**
**MON RIVER TOWING, INC.**
**MURRAY AMERICAN COAL, INC.**
**MURRAY AMERICAN ENERGY, INC.**
**MURRAY AMERICAN RESOURCES, INC.**
**MURRAY AMERICAN RIVER TOWING,
INC.**
**MURRAY AMERICAN TRANSPORTATION,
INC.**
**MURRAY EQUIPMENT & MACHINE, INC.**
**MURRAY KEYSTONE PROCESSING, INC.**
**MURRAY SOUTH AMERICA, INC.**
**OHIOAMERICAN ENERGY,
INCORPORATED**
**OHIO ENERGY TRANSPORTATION, INC.**
**OHIO VALLEY RESOURCES, INC.**
**ONEIDA COAL COMPANY, INC.**
**PENNAMERICAN COAL, INC.**
**PENNAMERICAN COAL L.P.**
**PINSKI CORP.**
**PLEASANT FARMS, INC.**
**PREMIUM COAL, INC.**
**SOUTHERN OHIO COAL COMPANY**
**SPRING CHURCH COAL COMPANY**

[Signature Page to Credit and Guaranty Agreement]

THE AMERICAN COAL COMPANY
THE FRANKLIN COUNTY COAL COMPANY
THE HARRISON COUNTY COAL COMPANY
THE MARION COUNTY COAL COMPANY
THE MARSHALL COUNTY COAL
COMPANY
THE MCLEAN COUNTY COAL COMPANY
THE MEIGS COUNTY COAL COMPANY
THE MONONGALIA COUNTY COAL
COMPANY
THE MUSKINGUM COUNTY COAL
COMPANY
THE OHIO COUNTY COAL COMPANY
THE WASHINGTON COUNTY COAL
COMPANY
TWIN RIVERS TOWING COMPANY

By: _____
Name: Robert D. Moore
Title:  Authorized Officer

[Signature Page to Credit and Guaranty Agreement]

THE AMERICAN COAL SALES COMPANY
AMERICAN ENERGY CORPORATION
ANCHOR LONGWALL AND REBUILD, INC.
COAL RESOURCES HOLDINGS CO.
CORPORATE AVIATION SERVICES, INC.
EMPIRE DOCK, INC.
ENERGY RESOURCES, INC.
ENERGY TRANSPORTATION, INC.
GENWAL RESOURCES, INC.
KENAMERICAN RESOURCES, INC.
MILL CREEK MINING COMPANY
PENNSYLVANIA TRANSLOADING, INC.
T D K COAL SALES, INCORPORATED
THE OKLAHOMA COAL COMPANY
UTAHAMERICAN ENERGY, INC.
WEST RIDGE RESOURCES, INC.

By: _____
Name:  Michael O. McKown
Title:   Authorized Officer

[Signature Page to Credit and Guaranty Agreement]

AMERICANHOCKING ENERGY, INC.
MAPLE CREEK MINING, INC.
MAPLE CREEK PROCESSING, INC.
THE OHIO VALLEY COAL COMPANY
THE OHIO VALLEY TRANSLOADING
COMPANY
SUNBURST RESOURCES, INC.
UMCO ENERGY, INC.

By _____
Name: Ronnie D. Dietz
Title:   Authorized Officer

**AMERICANMOUNTAINEER ENERGY, INC.**
**BELMONT COAL, INC.**
**MONVALLEY TRANSPORTATION CENTER,**
**INC.**
**MURRAY AMERICAN KENTUCKY**
**TOWING, INC.**


By: _____
Name: Anthony C. Vcelka, II
Title:   Authorized Officer

[Signature Page to Credit and Guaranty Agreement]

**WEST VIRGINIA RESOURCES, INC.**

By:

Name: Robert L. Putsock
Title: Authorized Officer

**GOLDMAN SACHS BANK USA,**
as Joint Lead Arranger, Joint Bookrunner and Sole
Syndication Agent

By:
Name:        Robert Ehudin
Title:        Authorized Signatory

[Signature Page to Credit and Guaranty Agreement]

**DEUTSCHE BANK AG NEW YORK
BRANCH,**
as Administrative Agent and a Lender

By:
Name:     **Sandeep Desai**
Title:      Managing Director

By:
Name:     Aaron Parren
Title:      Director

**DEUTSCHE BANK SECURITIES INC.,**
as Joint Lead Arranger and Joint Bookrunner

By: _____

Name: Ralph Totonchic

Title: Director

By: _____

Name: Massin Parker

Title: DIRECTOR

**APPENDIX A-1**
**TO CREDIT AND GUARANTY AGREEMENT**

**Term B-1 Loan Commitments**

| Lender | Term B-1 Loan Commitment | Pro Rata Share |
|---|---|---|
| Deutsche Bank AG New York Branch | $300,000,000.00 | 100% |
| **Total** | **$300,000,000.00** | **---** |

**APPENDIX A-2**
**TO CREDIT AND GUARANTY AGREEMENT**

**Term B-2 Loan Commitments**

| Lender | Term B-2 Loan Commitment | Pro Rata Share |
|---|---|---|
| Deutsche Bank AG New York Branch | $1,700,000,000.00 | 100% |
| **Total** | **$1,700,000,000.00** | **---** |

**APPENDIX B**
**TO CREDIT AND GUARANTY AGREEMENT**

**Notice Addresses**

MURRAY ENERGY CORPORATION
MURRAY ENERGY HOLDINGS CO. and
CERTAIN SUBSIDIARIES OF BORROWER, as Guarantors
46226 National Road
St. Clairsville, Ohio  43950
Attention:  Robert D. Moore,
          Executive Vice President, Chief Operating Officer & Chief Financial Officer
Telephone: 740.338.3100
Fax:        740.338.3405
Email: rmoore@coalsource.com

with copies to:

MURRAY ENERGY CORPORATION
46226 National Road
St. Clairsville, Ohio  43950
Attention:   Mr. Robert E. Murray,
            Chairman, President and Chief Executive Officer
Telephone:  740.338.3100
Fax:        740.338.3405
Email: bobmurray@coalsource.com

and

MURRAY ENERGY CORPORATION
46226 National Road
St. Clairsville, Ohio  43950
Attention:  Mr. Michael O. McKown,
          Senior Vice President - Law & Administration
Telephone:  740.338.3100
Fax:        740.338.3405
Email: mmckown@coalsource.com

DEUTSCHE BANK AG NEW YORK BRANCH,
as Administrative Agent
          Deutsche Bank AG New York Branch
          60 Wall Street
          New York, New York 10005

DEUTSCHE BANK SECURITIES INC.,
as Joint Lead Arranger and Joint Bookrunner
       Deutsche Bank Securities Inc.
       60 Wall Street
       New York, New York 10005

GOLDMAN SACHS BANK USA,
as Joint Lead Arranger, Joint Bookrunner and Sole Syndication Agent:

       Goldman Sachs Bank USA
       6011 Connection Drive
       Irving , TX 75039
       EFax: 646-769-7829
       Group Email: gsmmg-operations@gs.com

       with a copy to:

       Goldman Sachs Bank USA
       200 West Street
       New York, New York  10282-2198
       Attention: Douglas Tansey
                  Dana Horan
       Emails: douglas.tansey@gs.com
           dana.horan@gs.com

## **SCHEDULE 1.1**

**Certain Excluded Subsidiaries**

None.

## SCHEDULE 3.1(h)

### Closing Date Mortgaged Properties

| Grantor | County |
|---|---|
| **The American Coal Company** | Scott County, AR |
| | Hamilton County, IL |
| | Saline County, IL |
| | Meigs County, OH |
| | Mason County, WV |
| | LeFlore County, OK |
| | Haskell County, OK |
| | LaSalle County, IL |
| | Putnam County, IL |
| | Bureau County, IL |
| **The American Coal Sales Company** | Belmont County, OH |
| **American Energy Corporation** | Belmont County, OH |
| | Monroe County, OH |
| **American Equipment & Machine, Inc.** | Saline County, IL |
| **Belmont Coal, Inc.** | Belmont County, OH |
| | Jefferson County, OH |
| **Canterbury Coal Company** | Armstrong County, PA |
| **CCC Land Resources LLC** | Marion County, WV |
| | Marshall County, WV |
| | Wetzel County, WV |
| **CCC RCPC LLC** | Doddridge County,WV |
| | Greene County, PA |
| | Harrison County, WV |
| | Marion County, WV |
| | Marshall County, WV |
| | Monongalia County, WV |
| | Washington County, PA |
| | Wetzel County, WV |
| **Consolidated Land Company** | Belmont County, OH |
| | Monroe County, OH |
| **Consolidation Coal Company** | Doddridge County, WV |

|  |  |
|---|---|
|  | Greene County, PA |
|  | Harrison County, WV |
|  | Marion County, WV |
|  | Marshall County, WV |
|  | Monongalia County, WV |
|  | Ohio County, WV |
|  | Washington County, PA |
|  | Wetzel County, WV |
| **Corporate Aviation Services, Inc.** | Brooke County, WV |
| **Eighty-Four Mining Company** | Washington County, PA |
| **AmericanHocking Energy, Inc.** | Athens County, OH |
|  | Morgan County, OH |
| **KenAmerican Resources, Inc.** | Hopkins County, KY |
|  | Muhlenberg County, KY |
| **Keystone Coal Mining Corporation** | Armstrong County, PA |
| **Maple Creek Mining, Inc.** | Washington County, PA |
| **McElroy Coal Company** | Marshall County, WV |
| **The Ohio Valley Coal Company** | Belmont County, OH |
| **The Oklahoma Coal Company** | Belmont County, OH |
| **Pleasant Farms, Inc.** | Belmont County, OH |
| **UMCO Energy, Inc.** | Washington County, PA |
| **UtahAmerican Energy, Inc.** | Emery County, UT |
| **West Virginia Resources, Inc.** | Ohio County, WV |
| **West Ridge Resources, Inc.** | Carbon County, UT |
| **Genwal Resources, Inc.** | Emery County, UT |
| **AmericanMountaineer Energy, Inc.** | Harrison County, WV |
| **Murray Energy Corporation** | Saline, IL |
| **American Mine Services, Inc.** | Monroe, OH |
| **Empire Dock, Inc.** | Hardin, IL |

## SCHEDULE 4.1

### Jurisdictions of Organization and Qualification

| COMPANY | Jurisdiction of Organization |
|---|---|
| AMCA COAL LEASING, INC. | DE |
| AMCOAL HOLDINGS, INC. | OH |
| AMERICANHOCKING ENERGY, INC. | OH |
| AMERICANMOUNTAINEER ENERGY, INC. | OH |
| AMERICANMOUNTAINEER PROPERTIES, INC. | WV |
| AMERICAN MINE SERVICES, INC. | OH |
| AMERICAN NATURAL GAS, INC. | DE |
| THE AMERICAN COAL COMPANY | DE |
| THE AMERICAN COAL SALES COMPANY | OH |
| AMERICAN COMPLIANCE COAL, INC. | CO |
| AMERICAN ENERGY CORPORATION | OH |
| AMERICAN EQUIPMENT & MACHINE, INC. | WV |
| ANCHOR LONGWALL AND REBUILD, INC. | WV |
| ANDALEX RESOURCES, INC. | DE |
| ANDALEX RESOURCES MANAGEMENT, INC. | DE |
| AVONMORE RAIL LOADING, INC. | DE |
| BELMONT COAL, INC. | OH |
| CANTERBURY COAL COMPANY | PA |
| COAL RESOURCES HOLDINGS CO. | DE |
| COAL RESOURCES, INC. | OH |
| CONSOLIDATED LAND COMPANY | OH |
| CORPORATE AVIATION SERVICES, INC. | OH |
| EMPIRE DOCK, INC. | PA |
| ENERGY RESOURCES, INC. | PA |
| ENERGY TRANSPORTATION, INC. | PA |
| GENWAL RESOURCES, INC. | UT |
| KANAWHA TRANSPORTATION CENTER, INC. | WV |
| KENAMERICAN RESOURCES, INC. | KY |
| MAPLE CREEK MINING, INC. | PA |
| MAPLE CREEK PROCESSING, INC. | PA |
| MILL CREEK MINING COMPANY | PA |
| MONVALLEY TRANSPORTATION CENTER, INC. | PA |
| MURRAY ENERGY CORPORATION | OH |
| MURRAY ENERGY HOLDINGS CO. | DE |
| MURRAY AMERICAN COAL, INC. | DE |
| MURRAY AMERICAN KENTUCKY TOWING, INC. | DE |
| MURRAY AMERICAN RIVER TOWING, INC. | PA |
| MURRAY AMERICAN TRANSPORTATION, INC. | DE |
| MURRAY AMERICAN RESOURCES, INC. | WY |
| MURRAY AMERICAN ENERGY, INC. | DE |
| MURRAY EQUIPMENT & MACHINE, INC. | OH |
| MURRAY KEYSTONE PROCESSING, INC. | DE |
| MURRAY SOUTH AMERICA, INC. | DE |
| OHIOAMERICAN ENERGY, INCORPORATED | OH |
| OHIO ENERGY TRANSPORTATION, INC. | OH |
| OHIO VALLEY RESOURCES, INC. | OH |
| THE HARRISON COUNTY COAL COMPANY | DE |
| THE FRANKLIN COUNTY COAL COMPANY | IL |

| COMPANY | Jurisdiction of Organization |
|---|---|
| THE MCLEAN COUNTY COAL COMPANY | KY |
| THE MARION COUNTY COAL COMPANY | DE |
| THE MARSHALL COUNTY COAL COMPANY | DE |
| ONEIDA COAL COMPANY, INC. | WV |
| THE MEIGS COUNTY COAL COMPANY | WV |
| THE MONONGALIA COUNTY COAL COMPANY | DE |
| THE OHIO COUNTY COAL COMPANY | OH |
| THE MUSKINGUM COUNTY COAL COMPANY | OH |
| THE OHIO VALLEY COAL COMPANY | OH |
| THE OHIO VALLEY TRANSLOADING COMPANY | OH |
| THE OKLAHOMA COAL COMPANY | OK |
| PENNAMERICAN COAL, INC. | PA |
| PENNAMERICAN COAL L.P. | PA |
| PENNSYLVANIA TRANSLOADING, INC. | OH |
| PINSKI CORP. | PA |
| PLEASANT FARMS, INC. | OH |
| PREMIUM COAL, INC. | PA |
| SPRING CHURCH COAL COMPANY | PA |
| SUNBURST RESOURCES, INC. | PA |
| T D K COAL SALES, INCORPORATED | PA |
| UMCO ENERGY, INC. | PA |
| UTAHAMERICAN ENERGY, INC. | UT |
| WEST RIDGE RESOURCES, INC. | UT |
| THE WASHINGTON COUNTY COAL COMPANY | PA |
| WEST VIRGINIA RESOURCES, INC. | WV |
| CONSOLIDATION COAL COMPANY | DE |
| EIGHTY-FOUR MINING COMPANY | PA |
| MCELROY COAL COMPANY | DE |
| SOUTHERN OHIO COAL COMPANY | WV |
| CENTRAL OHIO COAL COMPANY | OH |
| KEYSTONE COAL MINING CORPORATION | PA |
| MON RIVER TOWING, INC. | PA |
| TWIN RIVERS TOWING COMPANY | DE |
| CCC RCPC LLC | DE |
| CCC LAND RESOURCES LLC | DE |

## Organizational and Capital Structure

See attached.

## SCHEDULE 4.2

## Equity Interests and Ownership

**Equity Interests:** Set forth below is a list of the ownership interest of Borrower and each of its Subsidiaries (including Unrestricted Subsidiaries) in their respective Subsidiaries (including Unrestricted Subsdiaries) together with the type of organization which issued such equity interests (e.g. corporation, limited liability company, partnership or trust):

**Stock:**

| Name Of Holder | Issuer | Type of Organization | # of Shares Owned | Total Shares Outstanding | % of Interest Pledged | Certificate No. (if uncertificated, please indicate so) | Par Value |
|---|---|---|---|---|---|---|---|
| Amcoal Holdings, Inc. | The American Coal Company | Corporation | 100,000 | 100,000 | 100% | 3 | $.01 |
| The American Coal Sales Company | Corporate Aviation Services, Inc. | Corporation | 100 | 100 | 100% | 2 | No par value |
| | The Oklahoma Coal Company | Corporation | 1,000 | 1,000 | 100% | 2 | No par value |
| | Pleasant Farms, Inc. | Corporation | 100 | 100 | 100% | 2 | No par value |
| AmericanMountaineer Energy, Inc. | AmericanMountaineer Properties, Inc. | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
| Murray Energy Corporation | American Equipment & Machine, Inc. | Corporation | 100 | 100 | 100% | 1 | No par value |
| Coal Resources Holdings Co. | Coal Resources, Inc. | Corporation | 10,000 | 10,000 | 100% | 3 | No par value |
| Coal Resources, Inc. | The American Coal Sales Company | Corporation | 130 | 130 | 100% | 3 | No par value |
| | Anchor Longwall and Rebuild, Inc. | Corporation | 100 | 100 | 100% | R-4 | $1.00 |
| | Mill Creek Mining Company | Corporation | 1,000 | 1,000 | 100% | R-3 | No par value |
| | Premium Coal, Inc. | Corporation | 100 | 100 | 100% | 001 | No par value |
| | The Hocking Valley Resources Company n/k/a AmericanHocking Energy, Inc. | Corporation | 100 | 100 | 100% | 3 | No par value |
| Energy Resources, Inc. | T D K Coal Sales, Incorporated | Corporation | 10,000 | 10,000 | 100% | R-11 | No par value |
| Maple Creek Mining, Inc. | UMCO Energy, Inc. | Corporation | 490 | 500[1] | 100% | 7 | $10.00 |
| Mill Creek Mining Company | Avonmore Rail Loading, Inc. | Corporation | 1,000 | 1,000 | 100% | R-6 | $1.00 |
| | Canterbury Coal Company | Corporation | 100 | 100 | 100% | R-21 | $100 |
| | Energy Resources, Inc. | Corporation | 1,000 | 1,000 | 100% | 2 | No par value |

---

[1]   Certificate No. 4 issued to Toni J. Southern for 10 shares.

| | Energy Transportation, Inc. | Corporation | 1,000 | 1,000 | 100% | 2 | No par value |
|---|---|---|---|---|---|---|---|
| | KenAmerican Resources, Inc. | Corporation | 1,000 | 1,000 | 100% | 001 | No par value |
| | PennAmerican Coal, Inc. | Corporation | 100 | 100 | 100% | 001 | No par value |
| | Spring Church Coal Company | Corporation | 10 | 10 | 100% | R-5 | $100 |
| | West Virginia Resources, Inc. | Corporation | 100 | 100 | 100% | 3 | $1.00 |
| Murray Energy Holdings Co. | Murray Energy Corporation | Corporation | 10,000 | 10,000 | 100% | 1 | No par value |
| Murray Energy Corporation | Amcoal Holdings, Inc. | Corporation | 100 | 100 | 100% | 002 | No par value |
| | American Compliance Coal, Inc. | Corporation | 100 | 100 | 100% | 3 | No par value |
| | American Energy Corporation | Corporation | 100 | 100 | 100% | 004 | No par value |
| | Belmont Coal, Inc. | Corporation | 100 | 100 | 100% | 002 | No par value |
| | Consolidated Land Company | Corporation | 100 | 100 | 100% | 004 | No par value |
| | Kanawha Transportation Center, Inc. | Corporation | 100 | 100 | 100% | 2 | No par value |
| | MonValley Transloading, Inc. n/k/a Empire Dock, Inc. | Corporation | 100 | 100 | 100% | 003 | No par value |
| | Ohio Valley Resources, Inc. | Corporation | Class A 100 | Class A 100 | 100% | A-2 | No par value |
| | Ohio Valley Resources, Inc. | Corporation | Class B 9,900 | Class B 9,900 | 100% | B-8, B-9, B-10, B-11 & B-12 | No par value |
| | UtahAmerican Energy, Inc. | Corporation | 100 | 100 | 100% | 004 | No par value |
| | OhioAmerican Energy, Incorporated | Corporation | 100 | 100 | 100% | 1 | No par value |
| | Ohio Energy Transportation, Inc. | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
| | AmericanMountaineer Energy, Inc. | Corporation | 100 | 100 | 100% | 001 | No par value |
| | Murray American Resources, Inc. | Corporation | 100,000 | 100,000 | 100% | 4 | No par value |
| | Murray South America, Inc. | Corporation | 1,000 | 1,000 | 100% | A-1 | No par value |
| | American Natural Gas, Inc. | Corporation | 1000 | 1000 | 100% | 1 | $.001 |
| | American Mine Services, Inc. | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
| | Murray American River Towing, Inc. | Corporation | 1,000 | 1,000 | 100% | A-1 | No par value |
| | Murray Equipment & Machine, Inc. | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |

|  | Murray American Coal, Inc. | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
| Murray American River Towing, Inc. | Murray American Kentucky Towing, Inc. | Corporation | 100 | 100 | 100% | 1 | No par value |
| Ohio Valley Resources, Inc. | Consolidation Coal Company | Corporation | 75,000 | 75,000 | 100% | 8 | $1,000 |
|  | The Ohio Valley Coal Company | Corporation | 700 | 700 | 100% | 1 | No par value |
|  | The Ohio Valley Transloading Company | Corporation | 100 | 100 | 100% | 1 | No par value |
|  | Sunburst Resources, Inc. | Corporation | 100 | 100 | 100% | 006 | No par value |
|  | Murray American Energy, Inc. | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
|  | The McLean County Coal Company | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
| PennAmerican Coal, Inc. | PennAmerican Coal L.P. | Limited Partnership | N/A | N/A | 100% | N/A | N/A |
|  | Pinski Corp. | Corporation | 300 | 300 | 100% | R-5 | No par value |
| Pennsylvania Transloading, Inc. | MonValley Transportation Center, Inc. | Corporation | 14,848 | 14,848 | 100% | R-1 | $1.00 |
| Pinski Corp. | PennAmerican Coal, L.P. | Limited Partnership | N/A | N/A | 100% | N/A | N/A |
| Sunburst Resources, Inc. | Maple Creek Mining, Inc. | Corporation | 100 | 100 | 100% | 002 | No par value |
|  | Maple Creek Processing, Inc. | Corporation | 100 | 100 | 100% | 001 | No par value |
|  | Pennsylvania Transloading, Inc. | Corporation | 100 | 100 | 100% | 3 | No par value |
| UtahAmerican Energy, Inc. | ANDALEX Resources, Inc. | Corporation | 9,000 | 9,000 | 100% | 0001 | No par value |
| ANDALEX Resources, Inc. | Andalex Resources Management, Inc. | Corporation | 200 | 200 | 100% | 1 | No par value |
|  | AMCA Coal Leasing, Inc. | Corporation | 2000 | 2000 | 100% | 1 | No par value |
|  | GENWAL Resources, Inc. | Corporation | 100 | 100 | 100% | 2 | No par value |
|  | West Ridge Resources, Inc. | Corporation | 100 | 100 | 100% | 2 | No par value |
| West Virginia Resources, Inc. | Oneida Coal Company, Inc. | Corporation | 1,000 | 1,000 | 100% | R-5 | $1.00 |
| Murray American Resources, Inc. | Coal Resources Holdings Co. | Corporation | Class A 100 Class B 9,900 | Class A 100 Class B 9,900 | 100% | Class A: A-4 Class B: B-9 | No par value |
| Murray American Energy, Inc. | The Ohio County Coal Company | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
|  | The Marshall County Coal Company | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |

| | The Marion County Coal Company | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
|---|---|---|---|---|---|---|---|
| | The Monongalia Coal Company | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
| | The Harrison County Coal Company | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
| | Murray American Transportation, Inc. | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
| | Murray Keystone Processing, Inc. | Corporation | 1,000 | 1,000 | 100% | 1 | No par value |
| | The Meigs County Coal Company | Corporation | 1,000 | 1,000 | 100% | A-1 | No par value |
| | The Muskingum County Coal Company | Corporation | 1,000 | 1,000 | 100% | A-1 | No par value |
| | The Washington County Coal Company | Corporation | 1,000 | 1,000 | 100% | A-1 | No par value |
| | The Franklin County Coal Company | Corporation | 1,000 | 1,000 | 100% | A-1 | No par value |
| Consolidation Coal Company | Eighty-Four Mining Company | Corporation | 10 | 10 | 100% | 2 | $500.00 |
| | McElroy Coal Company | Corporation | 1,000 | 1,000 | 100% | 1 | $1.00 |
| | Southern Ohio Coal Company | Corporation | 5,000 | 5,000 | 100% | 10 | $1.00 |
| | Central Ohio Coal Company | Corporation | 75,000 | 75,000 | 100% | 25 | $0.10 |
| | Keystone Coal Mining Corporation | Corporation | 100 | 100 | 100% | 3 | None |
| | Mon River Towing, Inc. | Corporation | 1,000 | 1,000 | 100% | 19 | $100 |
| | Twin Rivers Towing Company | Corporation | 1,000 | 1,000 | 100% | 7 | $1 |

## Partnership Interests:

| Name of Holder | Partnership | Type of Partnership Interests (e.g., general or limited) | Certificated (Y/N) | Certificate No. (if any) | Percentage of Outstanding Partnership Interests of the Partnership |
|---|---|---|---|---|---|
| PennAmerican Coal, Inc. | PennAmerican Coal L.P. | Limited Partnership (Limited Partner) | Y | 1 | 99% |
| Pinski Corp. | PennAmerican Coal L.P. | Limited Partnership (General Partner) | Y | 2 | 1% |
| Murray Energy Corporation | Foresight Energy LP | Limited Partnership Subordinated Units | N | None | 64,954,691 Subordinated Units |

**Membership Interests:**

| Name of Holder | Limited Liability Company | Type of Membership Interests (e.g., general or limited) | Certificated (Y/N) | Certificate No. (if any) | Percentage of Outstanding Membership Interests of the Membership |
|---|---|---|---|---|---|
| Consolidation Coal Company | CCC RCPC LLC | Limited Liability Company | Y | 1 | 100% |
| Consolidation Coal Company | CCC Land Resources LLC | Limited Liability Company | Y | 1 | 100% |
| Murray Energy Corporation | Foresight Energy GP LLC | Limited Liability Company Voting Units | N | None | 340,000 Voting Units |
| Murray Energy Corporation | Foresight Energy GP LLC | Limited Liability Company IDR Units | N | None | 775,000 IDR Units |

## SCHEDULE 4.13

### Real Estate

**Murray Entities:**

| | Owner/Tenant | County | State | Leased/Owned | Notes |
|---|---|---|---|---|---|
| 1. | The American Coal Company, a Delaware corporation | Scott | Arkansas | Owned | |
| 2. | Compliance Coals, Inc., (n/k/a American Equipment & Machine, Inc.), a West Virginia corporation | Saline | Illinois | Owned | |
| 3. | Empire Dock, Inc., a Pennsylvania corporation | Hardin | Illinois | Leased | |
| 4. | The American Coal Company, a Delaware corporation | Bureau | Illinois | Owned | |
| 5. | The American Coal Company, a Delaware corporation | Hamilton | Illinois | Owned and Leased | |
| 6. | The American Coal Company, a Delaware corporation | LaSalle | Illinois | Owned | |
| 7. | The American Coal Company, a Delaware corporation | Putnam | Illinois | Owned | |
| 8. | The American Coal Company, a Delaware corporation | Saline | Illinois | Owned and Leased | |
| 9. | American Natural Gas, Inc., a Delaware corporation | Elliot | Kentucky | Owned and Leased | |
| 10. | American Natural Gas, Inc., a Delaware corporation | Lee | Kentucky | Owned and Leased | |
| 11. | American Natural Gas, Inc., a Delaware corporation | Morgan | Kentucky | Owned and Leased | |

| | __Owner/Tenant__ | __County__ | __State__ | __Leased/Owned__ | __Notes__ |
|---|---|---|---|---|---|
| 12. | American Natural Gas, Inc., a Delaware corporation | Gallia | Ohio | Owned and Leased | |
| 13. | American Natural Gas, Inc., a Delaware corporation | Meigs | Ohio | Owned and Leased | |
| 14. | KenAmerican Resources, Inc., a Kentucky corporation | Muhlenberg | Kentucky | Owned and Leased | |
| 15. | KenAmerican Resources, Inc., a Kentucky corporation | Hopkins | Kentucky | Leased | |
| 16. | American Energy Corporation, an Ohio corporation | Monroe | Ohio | Owned and Leased | |
| 17. | Belmont Coal, Inc., an Ohio corporation | Belmont | Ohio | Owned | |
| 18. | Belmont Coal, Inc., an Ohio corporation | Jefferson | Ohio | Owned | |
| 19. | Consolidated Land Company, an Ohio corporation | Monroe | Ohio | Owned | |
| 20. | Consolidated Land Company, an Ohio corporation | Belmont | Ohio | Owned | |
| 21. | OhioAmerican Energy, Incorporated, an Ohio corporation | Jefferson | Ohio | Owned and Leased | |
| 22. | OhioAmerican Energy, Incorporated, an Ohio corporation | Belmont | Ohio | Leased | |
| 23. | Pleasant Farms, Inc., an Ohio corporation | Belmont | Ohio | Owned | |
| 24. | The American Coal Sales Company, an Ohio corporation | Belmont | Ohio | Owned | |
| 25. | The American Coal Company, a Delaware corporation | Meigs | Ohio | Owned | |
| 26. | AmericanHocking Energy, Inc., an Ohio corporation | Athens | Ohio | Leased | |
| 27. | AmericanHocking Energy, Inc., an Ohio corporation | Morgan | Ohio | Owned and Leased | |

|  | **Owner/Tenant** | **County** | **State** | **Leased/Owned** | **Notes** |
|---|---|---|---|---|---|
| 28. | The Ohio Valley Coal Company, an Ohio corporation | Belmont | Ohio | Owned | |
| 29. | The Oklahoma Coal Company, an Oklahoma corporation | Belmont | Ohio | Owned | |
| 30. | The American Coal Company, a Delaware corporation | Haskell | Oklahoma | Owned | |
| 31. | The American Coal Company, a Delaware corporation | Leflore | Oklahoma | Owned | |
| 32. | American Compliance Coal, Inc., a Colorado corporation | Clearfield | Pennsylvania | Owned | |
| 33. | Avonmore Rail Loading, Inc., a Delaware corporation | Armstrong | Pennsylvania | Owned | |
| 34. | Avonmore Rail Loading, Inc., a Delaware corporation | Indiana | Pennsylvania | Owned | |
| 35. | Canterbury Coal Company, a Pennsylvania corporation | Armstrong | Pennsylvania | Owned | |
| 36. | Canterbury Coal Company, a Pennsylvania corporation | Armstrong | Pennsylvania | Owned | |
| 37. | Energy Resources, Inc., a Pennsylvania corporation | Elk | Pennsylvania | Owned | |
| 38. | Energy Resources, Inc., a Pennsylvania corporation | Clearfield | Pennsylvania | Owned | |
| 39. | Energy Resources, Inc., a Pennsylvania corporation | Jefferson | Pennsylvania | Owned | |
| 40. | Maple Creek Mining, Inc., a Pennsylvania corporation | Washington | Pennsylvania | Owned and Leased | |
| 41. | PennAmerican Coal L.P., a Pennsylvania limited partnership | Indiana | Pennsylvania | Owned | |
| 42. | T D K Coal Sales, Incorporated, a Pennsylvania corporation | Armstrong | Pennsylvania | Owned | |
| 43. | T D K Coal Sales, Incorporated, a Pennsylvania corporation | Clarion | Pennsylvania | Owned | |

| | **Owner/Tenant** | **County** | **State** | **Leased/Owned** | **Notes** |
|---|---|---|---|---|---|
| 44. | T D K Coal Sales, Incorporated, a Pennsylvania corporation | Clearfield | Pennsylvania | Owned | |
| 45. | T D K Coal Sales, Incorporated, a Pennsylvania corporation | Elk | Pennsylvania | Owned | |
| 46. | T D K Coal Sales, Incorporated, a Pennsylvania corporation | Jefferson | Pennsylvania | Owned | |
| 47. | UMCO Energy, Inc., a Pennsylvania corporation | Washington | Pennsylvania | Owned | |
| 48. | AMCA Coal Leasing, Inc., a Delaware corporation | Carbon | Utah | Owned | |
| 49. | Andalex Resources, Inc., a Delaware corporation | Carbon | Utah | Owned and Leased | |
| 50. | UtahAmerican Energy, Inc., a Utah corporation | Emery | Utah | Owned and Leased | |
| 51. | UtahAmerican Energy, Inc., a Utah corporation | Carbon | Utah | Leased | |
| 52. | AmericanMountaineer Energy, Inc., an Ohio corporation | Harrison | West Virginia | Leased | |
| 53. | Corporate Aviation Services, Inc., an Ohio corporation | Brooke | West Virginia | Owned | |
| 54. | OhioAmerican Energy, Incorporated, an Ohio corporation | Brooke | West Virginia | Leased | |
| 55. | The American Coal Company, a Delaware corporation | Mason | West Virginia | Owned | |
| 56. | West Virginia Resources, Inc., a West Virginia corporation | Ohio | West Virginia | Owned | |
| 57. | American Mine Services, Inc., an Ohio corporation | Monroe | Ohio | Owned | |
| 58. | American Energy Corporation, an Ohio corporation | Belmont | Ohio | Owned and Leased | |
| 59. | GENWAL Resources, Inc., a Utah corporation | Emery | Utah | Leased | |

|  | **Owner/Tenant** | **County** | **State** | **Leased/Owned** | **Notes** |
|---|---|---|---|---|---|
| 60. | West Ridge Resources, Inc., a Utah corporation | Carbon | Utah | Leased | |
| 61. | Murray Energy Corporation, an Ohio corporation | Saline | Illinois | Leased | |
| 62. | Murray Equipment & Machine, Inc., an Ohio corporation | Bourbon | Kentucky | Owned | |

**Consol Entities:**[2]

*Owned Real Property - Mining Transferred Business*

The "Mining Transferred Business" is limited to the following, provided, however, in no event shall Mining Transferred Business include oil and gas and coalbed methane (whether within or outside of a coal seam):

1.      The "**Blacksville Mine**" means and is limited all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities: (i) in and to the Pittsburgh seam of coal within the area shown on Exhibit "A3" under "Blacksville Mine (Pittsburgh Coal Only)" and associated mining rights for the Pittsburgh seam within such area; and (ii) in and to the surface only of property that is located entirely on or within the highlighted areas shown Exhibit "A4".

2.      The "**Loveridge Mine**" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities: (i) in and to the Pittsburgh seam of coal within the area shown on Exhibit "A3" under "Loveridge Mine (Pittsburgh Coal Only)" and associated mining rights for the Pittsburgh seam within such area; and (ii) in and to the surface only of property that is located entirely on or within the highlighted areas shown Exhibit "A5".

3.      The "**McElroy Mine**" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities: (i) in and to the Pittsburgh seam of coal within the area shown on Exhibit "A3" under "McElroy Mine (Pittsburgh Coal Only)" and associated mining rights for the Pittsburgh seam within such area; and (ii) in and to the surface only of property that is located entirely on or within the highlighted areas shown Exhibit "A6".

4.      "**Mine 84**" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities: (i) in and to the Pittsburgh seam of coal within the area shown on Exhibit "A3" under "Mine 84 (Pittsburgh Coal Only)" and associated mining rights for the Pittsburgh seam within such area; and (ii) in and to the surface only of property that is located entirely on or within the highlighted areas shown Exhibit "A7".

5.      The "**Robinson Run Mine**" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities: (i) in and to the Pittsburgh seam of coal within the area shown on Exhibit "A3" under "Robinson Run Mine (Pittsburgh Coal Only)" and associated mining rights for the Pittsburgh seam within such area; and (ii) in and to the surface only of property that is located entirely on or within the highlighted areas shown Exhibit "A8".

6.      The "**Shoemaker Mine**" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities: (i) in and to the Pittsburgh seam of coal within the area shown on Exhibit "A3" under "Shoemaker Mine (Pittsburgh Coal Only)" and associated mining rights for the Pittsburgh seam within such area; and (ii) in and to the surface only of property that is located entirely on or within the highlighted areas shown Exhibit "A9".

---

[2] Exhibits and Schedules referenced are those in that certain Stock Purchase Agreement, dated as of October 25, 2013, among CONSOL Energy Inc., a Delaware corporation, CCC Purchaser, CCC Company, and solely for purposes of Section 5.14, Section 6.03 and Section 11.16 thereof, Borrower, as amended, which correspond to legal descriptions and maps delineating mine areas.  Such maps and schedules are attached hereto.

7.      The "***Rend Lake Mine***" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities: (i) in and to all seams of coal within the area shown on Exhibit "A10" and associated mining rights for such seams; and (ii) in and to the surface only of property that is located entirely on or within the highlighted areas shown Exhibit "A10".

8.      The "***Keystone Coal Mining Company Mines***" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities in and to the surface only within the area shown on Exhibit "A11" and associated surface access rights for operation of the preparation plant;

9.      The "***Tetrick South Reserves***" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities in and to any the Pittsburgh seam of coal within the highlighted area shown on Exhibit "A12" and associated mining rights for the Pittsburgh seam within such area, excluding however, any overriding royalties that will be granted to Reserve Coal Properties Company at Closing.

10.     The "***Legacy Areas and AMD Sites***" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities: (i) in and to certain unmined and mined out areas of the Pittsburgh seam only within the highlighted areas shown on Exhibit "A13(i)" ("*Legacy Areas*"), and (ii) associated mining rights for such seam within the Legacy Areas, including, but not limited to, the operation of permitted facilities within the Legacy Areas and the right to remove water from the unmined and mined out areas of the Pittsburgh seam and the right to inject water, slurry and sludge into the unmined and mined out areas of the Pittsburgh seam through acid mine drainage sites located within such Legacy Areas (collectively permitted facilities, acid mine drainage sites and facilities related thereto shall be referred to herein as "*AMD Sites*"), such AMD sites listed on Exhibit "A13(ii)."

### *Related Transferred Businesses*

1.      The "***Reverse Osmosis Facilities and Plant Complex***" means and is limited all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities: (i) in and to the surface only of property with respect to the Plant Complex as shown on Exhibit "A14" under "Refuse Area" and "RO Plant Site"; and (ii) in and to the rights of way with respect to the Facilities as shown on such Exhibit "A14" under "RO Pipeline Alignment."

2.      The "***River Division***" means and is limited to all right, title and interest owned or controlled by Company, the Subsidiaries and Transferring Entities in and to the surface only of property associated with the Alicia Dock river facility as shown on  Exhibit "A15"; provided, however, for the landings identified as having a Surface Use Agreement as shown on Exhibit "A15" the surface will be owned by a Transferring Entity after  Closing and such surface will be excluded property that is part of the Excluded Business, and a Surface Use Agreement will address use of such landings by Company after Closing.

3.      The "***Monongah Office***" means the office building owned by Company that is located in Grant District, Marion County, West Virginia on Tax Map Parcel 02-15/157 and the surface only of property associated therewith as shown on Exhibit "A16(i)", being part of the property conveyed in Deed Book 322, Page 305 recorded in the office of the Clerk of the County Commission of Marion County, West Virginia.

4.      The "***Ohio Valley Operations Office***" means the office building owned by the Company that is located in Clay District, Marshall County, West Virginia on Tax Map 14, Parcel 2 and the surface only of property associated therewith as shown on Exhibit "A16(ii)", being part of the property conveyed in Deed

Book 500, Page 241 recorded in the office of the Clerk of the County Commission of Marshall County, West Virginia.

### *Leased Real Property*

"Leased Real Property" means all right, title and interest leased by Company, the Subsidiaries and the Transferring Entities in and to the following:

1.      For the Blacksville Mine, (A) the Real Property leases set forth on Exhibit 1.01(d)(i)(A) insofar and only insofar as the leases cover the Pittsburgh seam of coal and associated mining rights within the area shown on Exhibit "A3" under "Blacksville Mine (Pittsburgh Coal Only)"; and (B) the Real Property leases set forth on Exhibit 1.01(d)(i)(B) insofar and only insofar as the leases cover the surface only of property that is located entirely on or within the highlighted areas shown on Exhibit "A4";

2.      For the Loveridge Mine, (A) the Real Property leases set forth on Exhibit 1.01(d)(ii)(A) insofar and only insofar as the leases cover the Pittsburgh seam of coal and associated mining rights within the area shown on Exhibit "A3" under "Loveridge Mine (Pittsburgh Coal Only)"; and (B) the Real Property leases set forth on Exhibit 1.01(d)(ii)(B) insofar and only insofar as the leases cover the surface only of property that is located entirely on or within the highlighted areas shown on Exhibit "A5";

3.      For the McElroy Mine, the Real Property leases set forth on Exhibit 1.01(d)(iii)(A) insofar and only insofar as the leases cover the Pittsburgh seam of coal and associated mining rights within the area shown on Exhibit "A3" under "McElroy Mine (Pittsburgh Coal Only)"; and (B) the Real Property leases set forth on Exhibit 1.01(d)(iii)(B) insofar and only insofar as the leases cover the surface only of property that is located entirely on or within the highlighted areas shown on Exhibit "A6";

4.      For Mine 84, the Real Property leases set forth on Exhibit 1.01(d)(iv)(A) insofar and only insofar as the leases cover the Pittsburgh seam of coal and associated mining rights within the area shown on Exhibit "A3" under "Mine 84 (Pittsburgh Coal Only)"; and (B) the Real Property leases set forth on Exhibit 1.01(d)(iv)(B) insofar and only insofar as the leases cover the surface only of property that is located entirely on or within the highlighted areas shown on Exhibit "A7";

5.      For the Robinson Run Mine, the Real Property leases set forth on Exhibit 1.01(d)(v)(A) insofar and only insofar as the leases cover the Pittsburgh seam of coal and associated mining rights within the area shown on Exhibit "A3" under "Robinson Run Mine (Pittsburgh Coal Only)"; and (B) the Real Property leases set forth on Exhibit 1.01(d)(v)(B) insofar and only insofar as the leases cover the surface only of property that is located on or within the highlighted areas shown on Exhibit "A8";

6.      For the Shoemaker Mine, the Real Property leases set forth on Exhibit 1.01(d)(vi)(A) insofar and only insofar as the leases cover the Pittsburgh seam of coal and associated mining rights within the area shown on Exhibit "A3" under "Shoemaker Mine (Pittsburgh Coal Only)"; and (B) the Real Property leases set forth on Exhibit 1.01(d)(vi)(B) insofar and only insofar as the leases cover the surface only of property that is located entirely on or within the highlighted areas shown on Exhibit "A9";

7.      For the Rend Lake Mine, (A) the Real Property leases and leased or licensed rights of way set forth on Exhibit 1.01(d)(vii) insofar and only insofar as the leases cover any coal seams and associated mining rights within the area shown on Exhibit "A10" for the Rend Lake Mine; and (B) the Real Property leases and leased or licensed rights of way set forth on Exhibit 1.01(d)(vii) insofar and only insofar as the leases cover the surface only of property that is located entirely on or within the highlighted areas shown on Exhibit "A10";

8.      For the Keystone Coal Mining Company Mines, the Real Property leases and leased or licensed rights of ways set forth on Exhibit 1.01(d)(viii) insofar and only insofar as the leases cover the surface only and associated surface access rights for operation of the preparation plant within the highlighted areas shown on Exhibit "A11" for the Keystone Coal Mining Company Mines;

9.      For the Tetrick South Reserves, the Real Property leases set forth on Exhibit 1.01(d)(ix) insofar and only insofar as the leases cover the Pittsburgh seam of coal and associated mining rights within the area shown on Exhibit "A12" for the Tetrick South Reserves (the "Tetrick Lease"), excluding, however, any overriding royalties that will be granted to Reserve Coal Properties Company at Closing;

10.     For the Legacy Areas and AMD Sites, (A) the Real Property leases and leased or licensed rights of ways set forth on Exhibit 1.01(d)(x)(A) insofar and only insofar as the leases or licenses cover the unmined and mined out areas of the Pittsburgh seam of coal only and associated mining rights within the highlighted areas shown on Exhibit "A13(i)" under "Legacy Areas"; and (B) the Real Property leases and leased or licensed rights of ways set forth on Exhibit 1.01(d)(x)(B) insofar and only insofar as the leases or licenses cover the surface only associated with twenty-one (21) AMD Sites as shown on the highlighted areas of Exhibit "A13(i)," the coordinates of which are more particularly described on Exhibit "A13(ii)", together with all necessary and required access rights to the Pittsburgh seam for operation of the AMD Sites, including, but not limited to, the right to remove water from the unmined and mined out areas of the Pittsburgh seam and the right to inject water, slurry and sludge into the unmined and mined out areas of the Pittsburgh seam;

11.     For the Reverse Osmosis Facilities and Plant Complex, the Real Property leases set forth on Exhibit 1.01(d)(xi) insofar and only insofar as the leases cover (A) any surface property only with respect to the Plant Complex within the highlighted areas as shown on Exhibit "A14" under "Refuse Area" and "RO Plant Site" and (B) any rights of way with respect to the Facilities as shown on such Exhibit "A14" under "RO Pipeline Alignment";

12.     For the River Division Areas, the Real Property leases set forth on Exhibit 1.01(d)(xii) associated with the river facilities as shown on Exhibit "A15" for the River Division Areas; provided, however, for the landings identified as having a Surface Use Agreement as shown on Exhibit "A15" the surface will be owned by a Transferring Entity after Closing and such surface will be excluded property that is part of the Excluded Business, and a Surface Use Agreement will address use of such landings by Company after Closing;

13.     All Real Property leases set forth on Exhibit 1.01(d)(xiii) insofar and only insofar as the leases cover the surface only of property associated with the Monongah Office within the area shown on Exhibit "A16(i)" and with the Ohio Valley Operations Office within the area shown on Exhibit "A16(ii)" together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of the Company, the Subsidiaries or the Transferring Entities (to the extent primarily used in the Related Transferred Business) attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing;

14.     Buildings and other structures, facilities or improvements leased by the Company, the Subsidiaries or the Transferring Entities located on or within the Limited Surface Area (to the extent primarily used in Mining Transferred Business) attached or appurtenant thereto;

15.     All fixtures, systems, equipment and items of personal property leased by the Company, the Subsidiaries or the Transferring Entities located on or within the Limited Surface Area (to the extent primarily used in Mining Transferred Business) attached or appurtenant thereto; and

16.      Subject to any existing shared usage by other Persons and whether such usage is recorded or unrecorded, all leased or licensed easements, licenses, rights and appurtenances of the Company, the Subsidiaries or the Transferring Entities relating to or within the Mining Transferred Business.

For the avoidance of doubt:

1.      To the extent all or any part of any Real Property leases of the Company, the Subsidiaries and the Transferring Entities are located, in whole or in part, outside the areas designated on the above-referenced Exhibit maps:  (1) all surface lying outside of the surface areas designated on Exhibits A4, A5, A6, A7, A8, A9, A10, A11, A13(i), A14, A15, A16(i) and A16(ii) is excluded property and part of the Excluded Business; and (2) all coal lying outside of the coal areas designated on Exhibits A3, A10, A12, and A13(i) is excluded property and part of the Excluded Business;

2.      Within the coal areas designated on Exhibits A3, A12 and A13(i), all coal, except for the Pittsburgh seam, is excluded property and part of the Excluded Business; and

3.      All oil, gas, coalbed methane, coal (except for the coal  interests specifically described above), and other minerals are excluded property and part of the Excluded Business.

[MAPS & SCHEDULES]

## SCHEDULE 4.15(b)

### Certain Environmental and Mining Obligations

1. <u>Obligations Under 2011 Consent Decree Applicable to Acquired Mines</u>. In 2011, Consol Energy Inc. ("Consol") entered into a Consent Decree with the United States and the State of West Virginia titled "Consent Decree: *United States, et al v. Consol Energy Inc. et al,* Civil Action No. 1:11-CV-28, U.S. District Court, Northern District of West Virginia." The Consent Decree settled allegations that Consol was in violation of the Federal Water Pollution Control Act, the West Virginia Water Pollution Control Act and the West Virginia Surface Coal Mining and Reclamation Act. The Consent Order required Consol to pay a civil penalty; to design, construct, and operate a wastewater treatment plant, landfill, and pipeline collection system for treatment of the Monongahela Basin Discharges; and to comply with certain interim treatment measures, monitoring requirements, and certain instream levels. As part of CCC Purchaser's acquisition of the Acquired Business, CCC Purchaser will acquire the McElroy, Robinson Run, Shoemaker, Blacksville, and Loveridge Mines, and the Monongahela Basin Discharges Treatment System as defined in Paragraph 9.j. of the Consent Decree, and the Shoemaker Mine pipeline to the Ohio River and diffuser that was constructed pursuant to Paragraphs 39 and 40 of the Consent Decree. CCC Purchaser expects to assume the responsibility to comply with the Consent Decree with respect to the aforementioned mines and facilities. CCC Purchaser will not acquire, and does not anticipate responsibility under the Consent Decree for, the original Windsor Mine NPDES Permit WV1011456 Outlet 001 and the new WVDEP NPDES Outlet 008 for the Windsor Mine pipeline discharge at the Ohio River. Consol notified the United States and the State of West Virginia that Consol desires to have the Consent Decree modified so that Consol and Windsor Coal Company are relieved of their obligations relating to all the facilities with waste streams covered by the Consent Decree, except for the Windsor Mine NPDES Permit WV1011456 Outlet 001 and the new WVDEP NPDES Outlet 008 for the discharge at the Ohio River. That request is pending.

2. <u>Assumption of Environmental Liabilities of the Acquired Business</u>. In connection with CCC Purchaser's acquisition of Consolidation Coal Company, a Delaware corporation, Eighty-Four Mining Company, a Pennsylvania corporation, McElroy Coal Company, a Delaware corporation, Southern Ohio Coal Company, a West Virginia corporation, Central Ohio Coal Company, an Ohio corporation, Keystone Coal Mining Corporation, a Pennsylvania corporation, Mon River Towing, Inc., a Pennsylvania corporation, Twin Rivers Towing Company, a Delaware corporation, CCC RCPC LLC, a Delaware limited liability company, CCC Land Resources LLC, a Delaware limited liability company, pursuant to that certain Stock Purchase Agreement, dated as of October 25, 2013, among CONSOL Energy Inc., a Delaware corporation, CCC Purchaser, CCC Company, and solely for purposes of <u>Section 5.14</u>, <u>Section 6.03</u> and <u>Section 11.16</u> thereof, Borrower, as amended), CCC Purchaser has assumed approximately $149 million in environmental liabilities of the acquired business. These liabilities are principally mine closure and reclamation obligations and water treatment obligations.

## <u>SCHEDULE 4.21</u>

**Broker's or Finder's Fees or Commissions**

None.

## SCHEDULE 5.16

### Post-Closing Covenants

1. Within ninety (90) days following the Closing Date (as such period may be extended by Administrative Agent in its sole discretion), Administrative Agent and Collateral Trustee shall have received from Borrower and each applicable Guarantor:

    a. fully executed and notarized amendments to the Mortgages encumbering the Closing Date Mortgaged Properties previously delivered by Borrower and each applicable Guarantor in favor of Collateral Trustee (the "**Mortgage Amendments**");

    b. an opinion of counsel (which counsel shall be reasonably satisfactory to Administrative Agent) in each state in which the applicable mortgagor is organized (covering the due authorization, execution and delivery of the Mortgage Amendments) and in which the real property subject thereto is located (with respect to the enforceability of the form(s) of Mortgage Amendments to be recorded in such state and such other matters as Administrative Agent may reasonably request), in each case in form and substance reasonably satisfactory to Administrative Agent and Collateral Trustee; and

    c. (i) a completed Flood Certificate with respect to the real property subject to the Mortgage Amendments, which Flood Certificate shall (x) be addressed to Collateral Trustee and (y) otherwise comply with the Flood Program; (ii) if the Flood Certificate states that such real property is located in a Flood Zone, Borrower's written acknowledgment of receipt of written notification from Collateral Trustee (x) as to the existence of such real property and (y) as to whether the community in which each such real property is located is participating in the Flood Program; and (iii) if such real property is located in a Flood Zone and is located in a community that participates in the Flood Program, evidence that Borrower has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program.

2. Within thirty (30) days following the Closing Date (as such period may be extended by Administrative Agent in its sole discretion), Borrower shall deliver, or cause to be delivered, to Administrative Agent and Collateral Trustee insurance certificates and endorsements for each property and liability policy (including, without limitation, general, umbrella, automobile and environmental site liability) maintained by Borrower and its Restricted Subsidiaries, in each case in form and substance substantially consistent with the certificates and endorsements delivered to Collateral Trustee in connection with the financing transactions closed December 5, 2013.

3. Within five (5) days following the Closing Date (as such period may be extended by Administrative Agent in its sole discretion), Borrower shall deliver, or cause to be delivered, to Collateral Trustee original stock powers with respect to 100% of the Equity Interests of each of The Ohio County Coal Company, The Marshall County Coal

Company, The Monongalia County Coal Company, The Marion County Coal Company, The Harrison County Coal Company, Murray American Coal, Inc., The McLean County Coal Company, Murray Equipment & Machine, Inc. and Murray American Kentucky Towing, Inc.

4. Within ten (10) Business Days following the Closing Date (as such period may be extended by Administrative Agent in its sole discretion), Borrower shall deliver, or cause to be delivered, to Collateral Trustee the original promissory note and note power representing the Fixed Rate Term Note, dated as of October 13, 2000, issued by CEO, LLC in favor of The Ohio Valley Coal Company in the original principal amount of $3,800,000.

5. Within ten (10) Business Days following the Closing Date (as such period may be extended by Administrative Agent in its sole discretion), Borrower shall properly record, or cause to be properly recorded, in favor of Collateral Agent, UCC-1 as-extracted collateral financing statements with respect to properties located in Washington County, Pennsylvania.

6. Within ten (10) Business Days following the Closing Date (as such period may be extended by the Administrative Agent in its sole discretion), Borrower shall deliver, or cause to be delivered, to the Administrative Agent a good standing certificate from the applicable Governmental Authority of the State of Oklahoma, dated as of the date of the delivery thereof or a recent date prior thereto, with respect to the The Oklahoma Coal Company.

## **SCHEDULE 6.1**

### **Certain Indebtedness**

1. Capital Lease Obligations in existence as of the Closing Date with respect to leased vehicles, in an aggregate amount not exceeding $500,000.

## SCHEDULE 6.2

### Certain Liens

Liens securing Indebtedness permitted under item 1 of Schedule 6.1

## SCHEDULE 6.6

**Certain Investments**

1. Schedule 4.2 is hereby incorporated by reference as if fully set forth herein.

2. At December 31, 2014 and 2013, the Company has outstanding notes receivable due from various employees.  The notes receivable mature at various dates through December 31, 2040, and earn fixed rate interest ranging from 0.25% to 5.0%.

EXHIBIT A-1 TO
CREDIT AND GUARANTY AGREEMENT

## FUNDING NOTICE

Reference is made to the Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MURRAY ENERGY CORPORATION**, an Ohio corporation, **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent.

Pursuant to Section 2.1 of the Credit Agreement, Borrower desires that Lenders make the following Loans to Borrower in accordance with the applicable terms and conditions of the Credit Agreement on April 16, 2015 (the "**Credit Date**"):

Term B-1 Loans

☐   Base Rate Loans:                                                   $[___,___,___]

☐   Eurodollar Rate Loans, with an initial Interest Period
     of _____ [1][2][3][6][12] [month(s)] [2 weeks][1]:     $[___,___,___]

Term B-2 Loans

☐   Base Rate Loans:                                                   $[___,___,___]

☐   Eurodollar Rate Loans, with an initial Interest Period
     of _____ [1][2][3][6][12] [month(s)] [2 weeks][2]:     $[___,___,___]

---

[1]   2 weeks and 12 months options only if available to and not prohibited by customary lending policies applicable to similar credits of all Lenders.  Interest Period shall be no longer than one month until the earlier of (a) the date on which Syndication Agent notifies Borrower that the primary syndication has been completed and (b) 90 days after the Closing Date.

[2]   2 weeks and 12 months options only if available to and not prohibited by customary lending policies applicable to similar credits of all Lenders.  Interest Period shall be no longer than one month until the earlier of (a) the date on which Syndication Agent notifies Borrower that the primary syndication has been completed and (b) 90 days after the Closing Date.

EXHIBIT A-1-1

Date:  April [__], 2015

**MURRAY ENERGY CORPORATION**

By: _____
Name:
Title:

EXHIBIT A-1-2

EXHIBIT A-2 TO
CREDIT AND GUARANTY AGREEMENT

**CONVERSION/CONTINUATION NOTICE**

Reference is made to the Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MURRAY ENERGY CORPORATION**, an Ohio corporation, **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent.

Pursuant to Section 2.9 of the Credit Agreement, Borrower desires to convert or to continue the following Loans, such conversion and/or continuation to be effective as of [_____ __], 20[__]:

1.  Term B-1 Loans:

$[___,___,___]    Eurodollar Rate Loans to be continued with Interest Period of [1][2][3][6][12] [month(s)] [2 weeks][3]

$[___,___,___]    Base Rate Loans to be converted to Eurodollar Rate Loans with Interest Period of [1][2][3][6][12] [month(s)] [2 weeks][4]

$[___,___,___]    Eurodollar Rate Loans to be converted to Base Rate Loans

2.  Term B-2 Loans:

$[___,___,___]    Eurodollar Rate Loans to be continued with Interest Period of [1][2][3][6][12] [month(s)] [2 weeks][5]

---

[3]    2 weeks and 12 months options only if available to and not prohibited by customary lending policies applicable to similar credits of all Lenders.  Interest Period shall be no longer than one month until the earlier of (a) the date on which Syndication Agent notifies Borrower that the primary syndication has been completed and (b) 90 days after the Closing Date.

[4]    2 weeks and 12 months options only if available to and not prohibited by customary lending policies applicable to similar credits of all Lenders.  Interest Period shall be no longer than one month until the earlier of (a) the date on which Syndication Agent notifies Borrower that the primary syndication has been completed and (b) 90 days after the Closing Date.

EXHIBIT A-2-1

$[___,___,___]     Base Rate Loans to be converted to Eurodollar Rate Loans with Interest Period of [1][2][3][6][12] [month(s)] [2 weeks][6]

$[___,___,___]     Eurodollar Rate Loans to be converted to Base Rate Loans

Date:  [_____ __], 20[__]          **MURRAY ENERGY CORPORATION**

By: _____
Name:
Title:

---

[5]    2 weeks and 12 months options only if available to and not prohibited by customary lending policies applicable to similar credits of all Lenders.  Interest Period shall be no longer than one month until the earlier of (a) the date on which Syndication Agent notifies Borrower that the primary syndication has been completed and (b) 90 days after the Closing Date.

[6]    2 weeks and 12 months options only if available to and not prohibited by customary lending policies applicable to similar credits of all Lenders.  Interest Period shall be no longer than one month until the earlier of (a) the date on which Syndication Agent notifies Borrower that the primary syndication has been completed and (b) 90 days after the Closing Date.

EXHIBIT A-2-2

EXHIBIT B-1 TO
CREDIT AND GUARANTY AGREEMENT

## TERM B-1 LOAN NOTE

$[_____]

[_____ __], 2015                                                                    New York, New York

**FOR VALUE RECEIVED**, **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**"), promises to pay **[NAME OF LENDER]** ("**Payee**") or its registered assigns the principal amount of [_____] DOLLARS ($[_____]) in the installments referred to below.

Borrower also promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the rates and at the times which shall be determined in accordance with the provisions of that certain Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Borrower, **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent.

Borrower shall make scheduled principal payments on this Note as set forth in Section 2.12 of the Credit Agreement.

This Note is one of the "Term B-1 Loan Notes" and is issued pursuant to and entitled to the benefits of the Credit Agreement, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loan evidenced hereby was made and is to be repaid.

All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds at the Principal Office of Administrative Agent or at such other place as shall be designated in writing for such purpose in accordance with the terms of the Credit Agreement. Unless and until an Assignment Agreement effecting the assignment or transfer of the obligations evidenced hereby shall have been accepted by Administrative Agent and recorded in the Register, Borrower, each Agent and Lenders shall be entitled to deem and treat Payee as the owner and holder of this Note and the obligations evidenced hereby. Payee hereby agrees, by its acceptance hereof, that before disposing of this Note or any part hereof it will make a notation hereon of all principal payments previously made hereunder and of the date on which interest hereon has been paid; provided, the failure to make a notation of any payment made on this Note shall not limit or otherwise affect the obligations of Borrower hereunder with respect to payments of principal of or interest on this Note.

This Note is subject to mandatory prepayment and to prepayment at the option of Borrower, each as provided in the Credit Agreement.

THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

The terms of this Note are subject to amendment only in the manner provided in the Credit Agreement.

No reference herein to the Credit Agreement and no provision of this Note or the Credit Agreement shall alter or impair the obligations of Borrower, which are absolute and unconditional, to pay the principal of and interest on this Note at the place, at the respective times, and in the currency herein prescribed.

Borrower promises to pay all costs and expenses, including reasonable and documented out-of-pocket attorneys' fees, all as provided in the Credit Agreement, incurred in the collection and enforcement of this Note.  Borrower and any endorsers of this Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand notice of every kind and, to the extent permitted by applicable law, the right to plead any statute of limitations as a defense to any demand hereunder.

[Remainder of page intentionally left blank]

CH\2055450.10

**IN WITNESS WHEREOF**, Borrower has caused this Note to be duly executed and delivered by its officer thereunto duly authorized as of the date and at the place first written above.

**MURRAY ENERGY CORPORATION**

By: _____

Name:

Title:

EXHIBIT B-1-3

EXHIBIT B-2 TO
CREDIT AND GUARANTY AGREEMENT

## TERM B-2 LOAN NOTE

$[_____]

[_____ __], 2015                                                    New York, New York

**FOR VALUE RECEIVED**, **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**"), promises to pay **[NAME OF LENDER]** ("**Payee**") or its registered assigns the principal amount of [_____] DOLLARS ($[_____]) in the installments referred to below.

Borrower also promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the rates and at the times which shall be determined in accordance with the provisions of that certain Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Borrower, **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent.

Borrower shall make scheduled principal payments on this Note as set forth in Section 2.12 of the Credit Agreement.

This Note is one of the "Term B-2 Loan Notes" and is issued pursuant to and entitled to the benefits of the Credit Agreement, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loan evidenced hereby was made and is to be repaid.

All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds at the Principal Office of Administrative Agent or at such other place as shall be designated in writing for such purpose in accordance with the terms of the Credit Agreement.  Unless and until an Assignment Agreement effecting the assignment or transfer of the obligations evidenced hereby shall have been accepted by Administrative Agent and recorded in the Register, Borrower, each Agent and Lenders shall be entitled to deem and treat Payee as the owner and holder of this Note and the obligations evidenced hereby.  Payee hereby agrees, by its acceptance hereof, that before disposing of this Note or any part hereof it will make a notation hereon of all principal payments previously made hereunder and of the date on which interest hereon has been paid; provided, the failure to make a notation of any payment made on this Note shall not limit or otherwise affect the obligations of Borrower hereunder with respect to payments of principal of or interest on this Note.

This Note is subject to mandatory prepayment and to prepayment at the option of Borrower, each as provided in the Credit Agreement.

EXHIBIT B-2-1

THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

The terms of this Note are subject to amendment only in the manner provided in the Credit Agreement.

No reference herein to the Credit Agreement and no provision of this Note or the Credit Agreement shall alter or impair the obligations of Borrower, which are absolute and unconditional, to pay the principal of and interest on this Note at the place, at the respective times, and in the currency herein prescribed.

Borrower promises to pay all costs and expenses, including reasonable and documented out-of-pocket attorneys' fees, all as provided in the Credit Agreement, incurred in the collection and enforcement of this Note.  Borrower and any endorsers of this Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand notice of every kind and, to the extent permitted by applicable law, the right to plead any statute of limitations as a defense to any demand hereunder.

[Remainder of page intentionally left blank]

EXHIBIT B-2-2

**IN WITNESS WHEREOF**, Borrower has caused this Note to be duly executed and delivered by its officer thereunto duly authorized as of the date and at the place first written above.

**MURRAY ENERGY CORPORATION**

By: _____
Name:
Title:

EXHIBIT B-2-3

EXHIBIT D TO
CREDIT AND GUARANTY AGREEMENT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "**Assignment**") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including without limitation any guarantees included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment, without representation or warranty by the Assignor.

1.    Assignor:    _____

2.    Assignee:[1]    _____ [and is an Affiliate/Related Fund [2] of [*identify Lender*]] [Assignor is not a Defaulting Lender]

    Markit Entity Identifier (if any):  _____

3.    Borrower:    Murray Energy Corporation, an Ohio corporation

4.    Administrative Agent:    DEUTSCHE BANK AG NEW YORK BANK, as the administrative agent under the Credit Agreement

5.    Credit Agreement:    The $2,000,000,000 Credit and Guaranty Agreement dated as of April 16, 2015 among Murray Energy Corporation, as Borrower, Murray Energy Holdings Co., the Lenders parties thereto, DEUTSCHE BANK AG NEW YORK BRANCH, as Administrative Agent, and the other agents parties thereto

---

[1]    Note: Assignments to Borrower or any Affiliated Lender should be documented using an Affiliate Assignment Agreement.

[2]    Select as applicable.

EXHIBIT D-1

6.        Assigned Interest[s]:

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[3] |
|---|---|---|---|
| _____[4] | $_____ | $_____ | _____% |
| _____ | $_____ | $_____ | _____% |
| _____ | $_____ | $_____ | _____% |

Effective Date: _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

7.    Notice and Wire Instructions:

**[NAME OF ASSIGNOR]**                    **[NAME OF ASSIGNEE]**

Notices:                                    Notices:

        _____        _____
        _____        _____
        _____        _____
        Attention:                          Attention:
        Telecopier:                       Telecopier:

with a copy to:                          with a copy to:

        _____        _____
        _____        _____
        _____        _____
        Attention:                          Attention:
        Telecopier:                       Telecopier:

Wire Instructions:                    Wire Instructions:

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR
**[NAME OF ASSIGNOR]**

By:_____
Title:

---

[3]    Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[4]    Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Term Loan Commitment", "Term Loan", "New Term Loan", etc.). For any New Term Loan, include the Series.

EXHIBIT D-2

ASSIGNEE
**[NAME OF ASSIGNEE]**

By:_____
Title:

[Consented to and][5] Accepted:

**DEUTSCHE BANK AG NEW YORK BRANCH**, as
    Administrative Agent

By:_____
Title:

[Consented to:][6]

**MURRAY ENERGY CORPORATION**

By:_____
Title:

---

[5]    To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

[6]    To be added only if the consent of Borrower is required by the terms of the Credit Agreement.

**EXHIBIT D-3**

ANNEX 1

## STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
## AND ASSUMPTION AGREEMENT

1. <u>Representations and Warranties</u>.

   1.1 <u>Assignor</u>. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and (iv) it is not a Defaulting Lender; and (b) except as provided in clause (a), assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "**Credit Documents**"), or any collateral thereunder, (iii) the financial condition of Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

   1.2 <u>Assignee</u>. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.1 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest, (vi) it has, independently and without reliance upon Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest, and (vii) if it is a Non-US Lender, attached to this Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2. <u>Payments</u>. All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

   2.1 From and after the Effective Date, Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. Notwithstanding the foregoing, Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to the Assignee.

EXHIBIT D-4

3.    <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York without regard to conflict of laws principles thereof that would result in the application of any law other than the law of the State of New York.

[Remainder of page intentionally left blank]

EXHIBIT D-5

EXHIBIT E TO
CREDIT AND GUARANTY AGREEMENT

### CERTIFICATE RE NON BANK STATUS

Reference is made to the Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by among **MURRAY ENERGY CORPORATION**, an Ohio corporation, **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent.  Pursuant to Section 2.20(d) of the Credit Agreement, the undersigned hereby certifies that it is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code of 1986, as amended.

**[NAME OF LENDER]**

By: _____

Name:

Title:

EXHIBIT E-1

EXHIBIT F TO
CREDIT AND GUARANTY AGREEMENT

## CLOSING DATE CERTIFICATE

April 16, 2015

**THE UNDERSIGNED HEREBY CERTIFY AS FOLLOWS:**

1.      We are, respectively, the chief executive officer and the chief financial officer of **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation ("**Holdings**"), and **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**").

2.      We have reviewed the terms of Section 3 of the Credit and Guaranty Agreement, dated as of the date hereof (as it may be amended, restated, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Borrower, Holdings, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent, and the definitions and provisions contained in the Credit Agreement relating thereto, and, in each case, in our opinion we have made, or have caused to be made under our supervision, such examination or investigation as is necessary to enable us to express an informed opinion as to the matters referred to herein.

3.      Based upon our review and examination described in paragraph 2 above, we, each acting as an officer of the Borrower but not in any personal capacity, certify, on behalf of Borrower, that as of the date hereof:

(i)      the Transactions contemplated by the Related Agreements have become effective in accordance with the terms of the Related Agreements;

(ii)      since December 31, 2014, no event, change or circumstance has occurred that has caused or would reasonably be expected to cause, either individually or in the aggregate, a Material Adverse Effect;

(iii)      pro forma for the Closing Date Acquisition, repayment of Indebtedness and other obligations under the Existing Term Loan Agreement and the transactions contemplated by the Related Agreements, Borrower and its Restricted Subsidiaries have no outstanding third party indebtedness for borrowed money other than (a) under the Credit Agreement, the Revolving Credit Agreement and the Senior Secured Notes, (b) replacements, extensions and renewals of existing indebtedness that matures prior to the Closing Date, (c) ordinary course capital leases, (d) ordinary course letter of credit facilities, (e) ordinary course purchase money, mortgage and equipment financings, (f) indebtedness permitted under the Credit Agreement and (g) other debt in amounts and on terms and conditions reasonably acceptable to the Administrative Agent;

EXHIBIT F-1

(iv)     the Royalty Drop-Down Transaction has been consummated;

(v)      no event has occurred and is continuing or will result from the consummation of the transactions contemplated by the Related Agreements that would constitute a Default or an Event of Default; and

(vi)     the representations and warranties set forth in Section 4 of the Credit Agreement and in the other Credit Documents are true and correct in all material respects on and as of the Closing Date (both immediately prior to and after giving effect to the funding of the Term Loans) to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties were true and correct in all material respects on and as of such earlier date; <u>provided</u> that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

4.       Attached as Annex A hereto are true and complete (and, where applicable, executed) copies of each of the Related Agreements and the material agreements executed in connection therewith, the Foresight Acquisition Option Agreement, the Purchase and Sale Agreement dated as of April 16, 2015, between American Century Transport LLC and American Energy Corporation (including the exhibits and schedules thereto), the Lease Agreement dated as of April 16, 2015, among American Century Transport LLC, American Energy Corporation and the other parties thereto (including the exhibits and schedules thereto), the Overriding Royalty Agreement dated as of April 16, 2015, between American Energy Corporation and American Century Minerals LLC (including the exhibits and schedules thereto), and the Call and Put Option Agreement dated as of April 16, 2015, between Colt LLC and the Borrower, each of which is in full force and effect.  We have reviewed the terms of each of such documents and in our opinion we have made, or have caused to be made under our supervision, such examination or investigation as is necessary to enable us to express an informed opinion as to the matters referred to in paragraph 3.

EXHIBIT F-2

The foregoing certifications are made and delivered as of the date first written above.

**MURRAY ENERGY HOLDINGS CO.**

_____

Name:
Title:  Chief Executive Officer

**MURRAY ENERGY CORPORATION**

_____

Name:
Title:  Chief Financial Officer

EXHIBIT F-3

EXHIBIT G TO
CREDIT AND GUARANTY AGREEMENT

## COUNTERPART AGREEMENT

This **COUNTERPART AGREEMENT**, dated [_____ __], 20[__] (this "**Counterpart Agreement**") is delivered pursuant to that certain Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MURRAY ENERGY CORPORATION**, an Ohio corporation, **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent.

**Section 1.**     Pursuant to Section 5.10 of the Credit Agreement, the undersigned hereby:

(a)     agrees that this Counterpart Agreement may be attached to the Credit Agreement and that by the execution and delivery hereof, the undersigned becomes a Guarantor under the Credit Agreement and agrees to be bound by all of the terms thereof;

(b)     represents and warrants that each of the representations and warranties set forth in the Credit Agreement and each other Credit Document and applicable to the undersigned is true and correct both before and after giving effect to this Counterpart Agreement, except to the extent that any such representation and warranty relates solely to any earlier date, in which case such representation and warranty is true and correct as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof;

(c)     states that no event has occurred or is continuing as of the date hereof, or will result from the transactions contemplated hereby on the date hereof, that would constitute an Event of Default or a Default;

(d)     agrees to irrevocably and unconditionally guaranty the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) and in accordance with Section 7 of the Credit Agreement; and

(e)     (i) agrees that this counterpart may be attached to the Pledge and Security Agreement, (ii) agrees that the undersigned will comply with all the terms and conditions of the Pledge and Security Agreement as if it were an original signatory thereto, (iii) grants to Priority Lien Collateral Trustee (as defined in the Pledge and Security Agreement) a security interest in all of the undersigned's right, title and interest in and to

EXHIBIT G-1

all "Collateral" (as such term is defined in the Pledge and Security Agreement) of the undersigned, in each case whether now or hereafter existing or in which the undersigned now has or hereafter acquires an interest and wherever the same may be located and (iv) delivers to Collateral Trustee supplements to all schedules attached to the Pledge and Security Agreement.  All such Collateral shall be deemed to be part of the "Collateral" and hereafter subject to each of the terms and conditions of the Pledge and Security Agreement.

**Section 2**.       The undersigned agrees from time to time, upon reasonable request of Administrative Agent, to take such additional actions and to execute and deliver such additional documents and instruments as Administrative Agent or Collateral Trustee may reasonably request to effect the transactions contemplated by, and to carry out the intent of, this Counterpart Agreement.  Neither this Counterpart Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Counterpart Agreement) against whom enforcement of such change, waiver, discharge or termination is sought.  Any notice or other communication herein required or permitted to be given shall be given pursuant to Section 10.1 of the Credit Agreement, and all for purposes thereof, the notice address of the undersigned shall be the address as set forth on the signature page hereof.  In case any provision in or obligation under this Counterpart Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

THIS COUNTERPART AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

[Remainder of page intentionally left blank]

CH\2055450.10

**IN WITNESS WHEREOF**, the undersigned has caused this Counterpart Agreement to be duly executed and delivered by its duly authorized officer as of the date above first written.

**[NAME OF SUBSIDIARY]**

By:_____

Name:

Title:

Address for Notices:

_____

_____

_____

Attention:

Telecopier

with a copy to:

_____

_____

_____

Attention:

Telecopier

ACKNOWLEDGED AND ACCEPTED,

as of the date above first written:

DEUTSCHE BANK AG NEW YORK BRANCH,

as Administrative Agent

By:_____

Name:

Title:

U.S. BANK NATIONAL ASSOCIATION,

as Collateral Trustee

By:_____

Name:

Title:

EXHIBIT H TO
CREDIT AND GUARANTY AGREEMENT

## PLEDGE AND SECURITY AGREEMENT

**[See attached]**

CH\2055450.10

EXECUTION VERSION

**SECOND AMENDED AND RESTATED PRIORITY LIEN DEBT
PLEDGE AND SECURITY AGREEMENT**

**dated as of April 16, 2015**

**between**

**EACH OF THE GRANTORS PARTY HERETO**

**and**

**U.S. BANK NATIONAL ASSOCIATION, AS PRIORITY LIEN COLLATERAL TRUSTEE**

# TABLE OF CONTENTS

PAGE

SECTION 1.        DEFINITIONS; GRANT OF SECURITY. ...................................................... 2
   1.1    General Definitions .............................................................................. 2
   1.2    Definitions; Interpretation .................................................................... 7

SECTION 2.        GRANT OF SECURITY. ......................................................................... 8
   2.1    Grant of Security ................................................................................. 8
   2.2    Certain Limited Exclusions .................................................................. 9
   2.3    Intercreditor Agreement ...................................................................... 10

SECTION 3.        SECURITY FOR PRIORITY LIEN OBLIGATIONS; GRANTORS REMAIN
                LIABLE. ............................................................................................. 10
   3.1    Security for Priority Lien Obligations .................................................. 10
   3.2    Continuing Liability Under Collateral ................................................... 11

SECTION 4.        CERTAIN PERFECTION REQUIREMENTS ............................................. 11
   4.1    Delivery Requirements ......................................................................... 11
   4.2    Control Requirements .......................................................................... 11
   4.3    Intellectual Property Recording Requirements ....................................... 13
   4.4    [Reserved ............................................................................................ 13
   4.5    Timing and Notice .............................................................................. 13

SECTION 5.        REPRESENTATIONS AND WARRANTIES. ............................................. 13
   5.1    Grantor Information and Status ............................................................. 13
   5.2    Collateral Identification, Special Collateral ............................................ 14
   5.3    Ownership of Collateral and Absence of Other Liens .............................. 14
   5.4    Status of Security Interest .................................................................... 15
   5.5    Goods and Receivables ........................................................................ 16
   5.6    Pledged Equity Interests, Investment Related Property ........................... 16
   5.7    Intellectual Property ............................................................................ 17

SECTION 6.        COVENANTS AND AGREEMENTS. ...................................................... 18
   6.1    Reserved. ........................................................................................... 18
   6.2    Collateral Identification; Special Collateral ........................................... 18
   6.3    Ownership of Collateral and Absence of Other Liens .............................. 19
   6.4    Status of Security Interest .................................................................... 19
   6.5    Goods and Receivables ........................................................................ 19
   6.6    Pledged Equity Interests, Investment Related Property ........................... 20
   6.7    Intellectual Property ............................................................................ 21

SECTION 7.        FURTHER ASSURANCES; ADDITIONAL GRANTORS. ........................... 23
   7.1    Further Assurances .............................................................................. 23
   7.2    Additional Grantors ............................................................................ 24

SECTION 8.        PRIORITY LIEN COLLATERAL TRUSTEE APPOINTED ATTORNEY-IN-
                FACT. ................................................................................................ 24
   8.1    Power of Attorney .............................................................................. 24
   8.2    No Duty on the Part of Priority Lien Collateral Trustee or Secured Parties ................ 25

i

8.3     Appointment Pursuant to Credit Agreement ................................................ 25

SECTION 9.     REMEDIES ...................................................................................... 25
9.1     Generally ................................................................................................ 26
9.2     Application of Proceeds ......................................................................... 27
9.3     Sales on Credit ....................................................................................... 27
9.4     Investment Related Property .................................................................. 27
9.5     Grant of Intellectual Property License ................................................... 28
9.6     Intellectual Property .............................................................................. 28
9.7     Cash Proceeds; Deposit Accounts ......................................................... 30

SECTION 10.     PRIORITY LIEN COLLATERAL TRUSTEE. ............................. 30

SECTION 11.     CONTINUING SECURITY INTEREST; TRANSFER OF LOANS. ............ 31

SECTION 12.     STANDARD OF CARE; PRIORITY LIEN COLLATERAL TRUSTEE MAY
PERFORM. ............................................................................................... 31

SECTION 13.     MISCELLANEOUS. ........................................................................ 32

SECTION 14.     EFFECT OF RESTATEMENT. ......................................................... 33

SCHEDULE 5.1 — GENERAL INFORMATION

SCHEDULE 5.2 — COLLATERAL IDENTIFICATION

SCHEDULE 5.4 — FINANCING STATEMENTS

SCHEDULE 5.5 — CERTAIN RECEIVABLES; LOCATION OF EQUIPMENT AND
INVENTORY

EXHIBIT A — PLEDGE SUPPLEMENT

EXHIBIT B — UNCERTIFICATED SECURITIES CONTROL AGREEMENT

EXHIBIT C — TRADEMARK SECURITY AGREEMENT

EXHIBIT D — PATENT SECURITY AGREEMENT

EXHIBIT E — COPYRIGHT SECURITY AGREEMENT

EXECUTION VERSION

This **SECOND AMENDED AND RESTATED PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT**, dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified from time to time, this **"Agreement"**), between Murray Energy Holdings Co., a Delaware corporation (**"Holdings"**), Murray Energy Corporation, an Ohio corporation (the **"Borrower"**) and each of the subsidiaries of the Borrower party hereto from time to time, whether as an original signatory hereto or as an Additional Grantor (as herein defined) (each, a **"Grantor"**), and U.S. Bank National Association, as collateral trustee for the Secured Parties (as herein defined) (in such capacity as collateral trustee, together with its successors and permitted assigns, the **"Priority Lien Collateral Trustee"**).

<strong>RECITALS:</strong>

**WHEREAS**, reference is made to that certain Credit and Guaranty Agreement, dated as of the date hereof (as it may be amended, restated, supplemented or otherwise modified from time to time, including any replacement thereof if such replacement credit agreement has been designated as **"Priority Lien Debt"** in accordance with Section 3.8 of the Collateral Trust Agreement, the **"Credit Agreement"**), by and among Borrower, Holdings, certain subsidiaries of the Borrower, as Guarantors, the Lenders party thereto from time to time, Deutsche Bank AG New York Branch, as Administrative Agent (in such capacity, together with its successors and permitted assigns, the "**Administrative Agent**"), and the other financial institutions party thereto;

**WHEREAS**, subject to the terms and conditions of the Credit Agreement, certain Grantors have entered into and/or may enter into one or more Hedge Agreements with one or more Lender Counterparties;

**WHEREAS**, subject to the terms and conditions of the Credit Agreement, certain Grantors have entered into and/or may enter into one or more Secured Commodities Agreements with one or more Commodities Hedge Providers;

**WHEREAS**, subject to the terms and conditions of the Credit Agreement, certain Grantors have entered into and/or may enter into one or more Designated Coal Contracts with one or more Designated Coal Contract Counterparties;

**WHEREAS**, in consideration of the extensions of credit and other accommodations of Lenders, Lender Counterparties, Commodities Hedge Providers and Designated Coal Contract Counterparties as set forth in the Credit Agreement, the Hedge Agreements, the Secured Commodities Agreements and the Designated Coal Contracts, respectively, each Grantor has agreed to secure (and, as applicable, continue to secure) such Grantor's obligations under the Credit Documents, the Hedge Agreements, the Secured Commodities Agreements and the Designated Coal Contracts (other than, in each case, Excluded Hedge Obligations) as set forth herein;

**WHEREAS**, reference is made to that certain Amended and Restated Collateral Trust Agreement (as amended, restated, supplemented or otherwise modified from time to time, the **"Collateral Trust Agreement"**), dated as of December 5, 2013, by and among the Borrower, the other Grantors from time to time party thereto, the Administrative Agent, The Bank of New York Mellon Trust Company, N.A., as trustee for the noteholders under the Senior Secured Notes Indenture, Goldman Sachs Bank USA, as Bridge Loan Administrative Agent (as defined therein), U.S. Bank National Association, as collateral trustee for the benefit of all Priority Lien Secured Parties and Parity Lien Secured Parties (as defined therein) (in such capacity, together with its

successors and permitted assigns, the **"Collateral Trustee"**), and the other parties from time to time party thereto;

**WHEREAS**, reference is made to that certain Amended and Restated Intercreditor Agreement (as amended, restated, supplemented or otherwise modified from time to time, the **"Intercreditor Agreement"**), dated as of the date hereof, by and between Goldman Sachs Banks USA, as Revolving Agent, and the Collateral Trustee, and acknowledged by Borrower and the other Grantors from time to time party thereto;

**WHEREAS**, in addition to the obligations under the Credit Agreement, the Hedge Agreements, the Secured Commodities Agreements and the Designated Coal Contracts referred to above, the Grantors may incur additional "Priority Lien Obligations" (as defined in the Collateral Trust Agreement) and each Grantor has agreed to secure (and, as applicable, continue to secure) such Grantor's Priority Lien Obligations as set forth herein; and

**WHEREAS**, this Agreement amends and restates that certain Amended and Restated Priority Lien Debt Pledge and Security Agreement dated as of December 5, 2013 (the **"Existing Pledge and Security Agreement"**) between Holdings, Borrower, each of the subsidiaries of the Borrower party thereto from time to time as a **"Grantor"** and U.S. Bank National Association, as collateral trustee for the Secured Parties (as defined therein).

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, each Grantor and the Priority Lien Collateral Trustee agree to amend and restate the Existing Pledge and Security Agreement as follows:

## SECTION 1.    DEFINITIONS; GRANT OF SECURITY.

**1.1    General Definitions**.  In this Agreement, the following terms shall have the following meanings:

**"ABL Collateral"** shall have the meaning set forth in the Intercreditor Agreement.

**"Additional Grantors"** shall have the meaning assigned in Section 7.2.

**"Act of Required Debtholders"** shall have the meaning set forth in the Collateral Trust Agreement.

**"Agreement"** shall have the meaning set forth in the preamble.

**"Borrower"** shall have the meaning set forth in the preamble.

**"Cash Proceeds"** shall have the meaning assigned in Section 9.7.

**"Collateral"** shall have the meaning assigned in Section 2.1.

**"Collateral Records"** shall mean books, records, ledger cards, files, correspondence, customer lists, supplier lists, blueprints, technical specifications, manuals, computer software and related documentation, computer printouts, tapes, disks and other electronic storage media and related data processing software and similar items that at any time

2

evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"**Collateral Support**" shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"**Collateral Trust Agreement**" shall have the meaning set forth in the recitals.

"**Collateral Trustee**" shall have the meaning set forth in the recitals.

"**Control**" shall mean: (1) with respect to any Deposit Accounts, control within the meaning of Section 9-104 of the UCC, (2) with respect to any Securities Accounts, Security Entitlements, Commodity Contract or Commodity Account, control within the meaning of Section 9-106 of the UCC, (3) with respect to any Uncertificated Securities, control within the meaning of Section 8-106(c) of the UCC, (4) with respect to any Certificated Security, control within the meaning of Section 8-106(a) or (b) of the UCC, (5) with respect to any Electronic Chattel Paper, control within the meaning of Section 9-105 of the UCC, (6) with respect to Letter of Credit Rights, control within the meaning of Section 9-107 of the UCC and (7) with respect to any "transferable record"(as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), control within the meaning of Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in the jurisdiction relevant to such transferable record.

"**Controlled Foreign Corporation**" shall mean "controlled foreign corporation" as defined in the Internal Revenue Code.

"**Copyright Licenses**" shall mean any and all agreements and licenses providing for the granting of any right in or to any Copyright (whether such Grantor is licensee or licensor thereunder).

"**Copyrights**" shall mean all United States copyrights (including Community designs), including but not limited to copyrights in software and databases, and all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor including, without limitation, the registrations and applications referred to in Schedule 5.2(II) under the heading "Copyrights" (as such schedule may be amended or supplemented from time to time), (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto, (iv) all rights to sue for past, present and future infringements thereof, and (v) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages and proceeds of suit.

"**Credit Agreement**" shall have the meaning set forth in the recitals.

"**Discharge of Priority Lien Obligations**" shall have the meaning set forth in the Collateral Trust Agreement.

"**Excluded Accounts**" shall mean (1) local petty cash accounts up to a maximum aggregate cash deposit amount of $500,000, (2) payroll accounts, (3) benefits accounts, (4) tax accounts, (5) escrow accounts, (6) trust accounts, (7) any accounts held solely for the benefit of

3

customers, (8) restricted investment accounts, (9) any accounts holding deposits in connection with Permitted Liens (other than the Liens in favor of the Collateral Trustee or the Revolving Agent) and (10) any accounts used for customs or other fiduciary purposes.

"**Excluded Asset**" shall mean any asset of any Grantor excluded from the security interest hereunder by virtue of Section 2.2 hereof but only to the extent, and for so long as, so excluded thereunder.

"**Foresight GP**" shall mean Foresight Energy GP LLC, a Delaware limited liability company.

"**Foresight GP Voting Units**" shall have the meaning assigned in Section 2.2.

"**Foresight LP**" shall mean Foresight Energy LP, a Delaware limited partnership.

"**Grantors**" shall have the meaning set forth in the preamble.

"**Holdings**" shall have the meaning set forth in the preamble.

"**Insurance**" shall mean all insurance policies covering any or all of the Collateral (regardless of whether the Priority Lien Collateral Trustee is the loss payee thereof).

"**Intellectual Property**" shall mean, the collective reference to all rights, title and interest in intellectual property arising under the laws of the United States, including without limitation, Copyrights, Patents, Trademarks and Trade Secrets.

"**Intellectual Property Security Agreement**" shall mean each intellectual property security agreement executed and delivered by the applicable Grantors, substantially in the form set forth in Exhibit C, Exhibit D and Exhibit E, as applicable.

"**Investment Accounts**" shall mean the Term Loan Asset Proceeds Account, Securities Accounts, Commodity Accounts and Deposit Accounts.

"**Investment Related Property**" shall mean:  (i) all "investment property" (as such term is defined in Article 9 of the UCC) and (ii) all of the following (regardless of whether classified as investment property under the UCC): all Pledged Equity Interests, Pledged Debt, the Investment Accounts and certificates of deposit; in each case of the foregoing, excluding any Excluded Asset.

"**Material Intellectual Property**" shall mean any Intellectual Property included in the Collateral that is material to the business of any Grantor.

"**Patent Licenses**" shall mean all agreements and licenses providing for the granting of any right in or to any Patent (whether such Grantor is licensee or licensor thereunder).

"**Patents**" shall mean all United States patents and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including, but not limited to: (i) each patent and patent application referred to in Schedule 5.2(II) hereto under the heading "Patents" (as such schedule may be amended or supplemented from time to time), (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations

thereof, (iii) all rights corresponding thereto, (iv) all inventions and improvements described therein, (v) all rights to sue for past, present and future infringements thereof, (vi) all claims, damages, and proceeds of suit arising therefrom, and (vii) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages, and proceeds of suit.

"**Pledge Supplement**" shall mean any supplement to this Agreement in substantially the form of Exhibit A.

"**Pledged Debt**" shall mean all indebtedness for borrowed money owed to such Grantor, whether or not evidenced by any Instrument, including, without limitation, all indebtedness described on Schedule 5.2(I) under the heading "Pledged Debt" (as such schedule may be amended or supplemented from time to time), issued by the obligors named therein, the instruments, if any, evidencing any of the foregoing, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing.

"**Pledged Equity Interests**" shall mean all Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and any other participation or interests in any equity or profits of any business entity including, without limitation, any trust and all management rights relating to any entity whose equity interests are included as Pledged Equity Interests, excluding, in each case, such interests that constitute Excluded Assets.

"**Pledged LLC Interests**" shall mean all interests in any limited liability company and each series thereof including, without limitation, all limited liability company interests listed on Schedule 5.2(I) under the heading "Pledged LLC Interests" (as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such limited liability company interests and any interest of such Grantor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests and all rights as a member of the related limited liability company, excluding, in each case, such interests that constitute Excluded Assets.

"**Pledged Partnership Interests**" shall mean all interests in any general partnership, limited partnership, limited liability partnership or other partnership including, without limitation, all partnership interests listed on Schedule 5.2(I) under the heading "Pledged Partnership Interests" (as such schedule may be amended or supplemented from time to time) and the certificates, if any, representing such partnership interests and any interest of such Grantor on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests and all rights as a partner of the related partnership, excluding, in each case, such interests that constitute Excluded Assets.

"**Pledged Stock**" shall mean all shares of capital stock owned by such Grantor, including, without limitation, all shares of capital stock described on Schedule 5.2(I) under the heading "Pledged Stock" (as such schedule may be amended or supplemented from time to time), and the certificates, if any, representing such shares and any interest of such Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining

5

to such shares, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares, excluding, in each case, such interests that constitute Excluded Assets.

"**Priority Lien Collateral Trustee**" shall have the meaning set forth in the preamble.

"**Priority Lien Obligations**" shall mean, without duplication, (i) all Priority Lien Obligations (as defined in the Collateral Trust Agreement) and (ii) all Obligations (as defined in the Credit Agreement).

"**Priority Lien Representative**" shall have the meaning set forth in the Collateral Trust Agreement.

"**Priority Lien Secured Parties**" shall have the meaning set forth in the Collateral Trust Agreement.

"**Receivables**" shall mean all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including, without limitation all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Related Property, together with all of Grantor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

"**Receivables Records**" shall mean (i) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of Grantor or any computer bureau or agent from time to time acting for Grantor or otherwise, (iii) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors, secured parties or agents thereof, and certificates, acknowledgments, or other writings, including, without limitation, lien search reports, from filing or other registration officers, (iv) all credit information, reports and memoranda relating thereto and (v) all other written or non-written forms of information related in any way to the foregoing or any Receivable, in each case of clauses (i) - (v), to the extent not prohibited to be pledged pursuant to any written agreement with any applicable Account Debtor.

"**Secured Obligations**" shall have the meaning assigned in Section 3.1.

"**Secured Parties**" shall mean each holder of a Priority Lien Obligation, including, without limitation, the Agents, Lenders, Lender Counterparties, Commodities Hedge Providers, Designated Coal Contract Counterparties and each other Priority Lien Secured Party, and shall include, without limitation, all former Agents, Lenders, Lender Counterparties, Commodities Hedge Providers and Designated Coal Contract Counterparties to the extent that any Priority Lien Obligations owing to such Persons were incurred while such Persons were

6

Agents, Lenders, Lender Counterparties, Commodities Hedge Providers or Designated Coal Contract Counterparties, and such Priority Lien Obligations have not been paid or satisfied in full.

**"Trademark Licenses"** shall mean any and all agreements and licenses providing for the granting of any right in or to Trademarks (whether such Grantor is licensee or licensor thereunder).

**"Trademarks"** shall mean all United States trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing including, but not limited to: (i) the registrations and applications referred to in Schedule 5.2(II) under the heading "Trademarks" (as such schedule may be amended or supplemented from time to time), (ii) all extensions or renewals of any of the foregoing, (iii) all of the goodwill of the business connected with the use of and symbolized by the foregoing, (iv) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill, and (v) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages, and proceeds of suit.

**"Trade Secret Licenses"** shall mean any and all agreements providing for the granting of any right in or to Trade Secrets (whether such Grantor is licensee or licensor thereunder).

**"Trade Secrets"** shall mean all trade secrets and all other confidential or proprietary information and know-how whether or not such Trade Secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such Trade Secret, including but not limited to: (i) the right to sue for past, present and future misappropriation or other violation of any Trade Secret, and (ii) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages, and proceeds of suit.

**"UCC"** shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority or remedies.

**"United States"** shall mean the United States of America.

**1.2    Definitions; Interpretation**.

(a)    In this Agreement, the following capitalized terms shall have the meaning given to them in the UCC (and, if defined in more than one Article of the UCC, shall have the meaning given in Article 9 thereof): Account, Account Debtor, As-Extracted Collateral, Bank, Certificate of Title, Certificated Security, Chattel Paper, Commercial Tort Claims, Commodity Account, Commodity Contract, Commodity Intermediary, Consignee, Consignment, Consignor, Deposit Account, Document, Entitlement Order, Electronic Chattel Paper, Equipment, Farm Products, General Intangibles, Goods, Health-Care-Insurance Receivable, Instrument, Inventory, Letter of Credit Right, Manufactured Home, Money, Payment Intangible, Proceeds,

7

Record, Securities Account, Securities Intermediary, Security Certificate, Security Entitlement, Supporting Obligations, Tangible Chattel Paper and Uncertificated Security.

(b)     All other capitalized terms used herein (including the preamble and recitals hereto) and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement.  The incorporation by reference of terms defined in the Credit Agreement shall survive any termination of the Credit Agreement until this Agreement is terminated as provided in Section 11 hereof.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  The terms lease and license shall include sub-lease and sub-license, as applicable.  If any conflict or inconsistency exists between this Agreement and the Credit Agreement, the Credit Agreement shall govern.  All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

## SECTION 2.   GRANT OF SECURITY.

**2.1     Grant of Security**.  Each Grantor hereby grants (and, as applicable, reaffirms its prior grant) to the Priority Lien Collateral Trustee, for its benefit and for the benefit of the Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all personal property of such Grantor (subject to the limitations set forth in Section 2.2) including, but not limited to the following, in each case whether now or hereafter existing or in which any Grantor now has or hereafter acquires an interest and wherever the same may be located (all of which being hereinafter collectively referred to as the **"Collateral"**):

(a)     Accounts;

(b)     As-Extracted Collateral;

(c)     Chattel Paper;

(d)     Documents;

(e)     General Intangibles;

(f)     Goods (including, without limitation, Inventory and Equipment);

(g)     Instruments;

(h)     Insurance;

(i)     Intellectual Property, Copyright Licenses, Patent Licenses, Trademark Licenses and Trade Secret Licenses;

8

(j)     Investment Related Property (including, without limitation, Deposit Accounts);

(k)     Letter of Credit Rights;

(l)     Money;

(m)     Receivables and Receivable Records;

(n)     Commercial Tort Claims now or hereafter described on Schedule 5.2

(o)     to the extent not otherwise included above, all other personal property of any kind and all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

(p)     to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

**2.2     Certain Limited Exclusions**.  Notwithstanding anything contained in this Agreement to the contrary, in no event shall the Collateral include or the security interest granted under Section 2.1 hereof attach to (a) any Real Estate Asset other than (x) Closing Date Mortgaged Properties and (y) Material Real Estate Assets; (b) Letter of Credit Rights and Commercial Tort Claims below $2,500,000 in the aggregate for all Letter of Credit Rights and Commercial Tort Claims; (c) pledges and security interests prohibited or restricted by applicable law (including the requirement to obtain the consent of any Governmental Authority or third party); (d) margin stock and interests in any Person other than wholly-owned subsidiaries to the extent not permitted by the terms of such Person's organizational or joint venture documents or could not be pledged without the consent of third parties (provided that any Equity Interests in Foresight GP and Foresight LP owned by a Grantor shall not be excluded); (e) any assets to the extent a security interest in such assets could reasonably be expected to result in adverse tax consequences or adverse regulatory consequences, in each case, as reasonably determined by the Borrower; (f) any intent-to-use United States Trademark applications for which an amendment to allege use or statement of use has not been filed under federal law or, if filed, has not been deemed in conformance with federal law; (g) any lease (other than real property leases not excluded in item (a) above), license, permit or other agreement, or any property subject to a purchase money security interest, capital lease obligation or similar arrangement to the extent that a grant of a security interest therein would require consent thereunder, or would violate or invalidate such lease, license, permit, or agreement, purchase money arrangement, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than a Grantor), after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law (provided, however, that the Collateral shall include and such security interest shall attach at such time as the contractual or legal prohibition shall no longer be applicable and to the extent severable, shall attach immediately to any portion of such lease, license, permit or agreement not subject to the prohibitions specified in this clause (g)); (h) any governmental license or state or local franchises, charters and authorizations to the extent a security interest therein is prohibited or restricted by applicable law; (i) motor vehicles, airplanes and other assets subject to Certificate of Title; (j) any Equity Interests in Excluded Subsidiaries (except for the Equity Interests in Foresight GP and Foresight LP owned by a Grantor and 65% of the Equity Interests in any first-tier Foreign Subsidiaries); (k) any assets where the cost of obtaining a security interest therein exceeds the practical benefit to the Secured Parties afforded thereby as agreed by the Borrower and the Administrative Agent; (l) mineral rights and/or constructed coal

9

mine assets, in each case securing installment notes issued to Governmental Authorities for the purchase of such mineral rights and/or rights to construct coal mines not in excess of the maximum principal amount of $10,000,000 in the aggregate at any time outstanding for all such notes); (m) (x) cash posted as margin by the Existing Designated Coal Contract Counterparty (as defined in the Credit Agreement) pursuant to the Existing Designated Coal Contract and (y) cash, cash equivalents and investments deposited in Excluded Accounts; (n) following the ABL Termination Date, all cash, cash equivalents and Deposit Accounts; and (o) any assets located outside the United States of America or assets that require action under the law of any foreign jurisdiction to create or perfect a security interest in such assets under such foreign jurisdiction, including any Intellectual Property registered in any foreign jurisdiction; provided that the exclusions referred to in clauses (a) through (o) of this Section 2.2 shall not include any Proceeds of any such assets unless such Proceeds would otherwise be excluded by virtue of being the type of asset described in clauses (a) through (o) of this Section 2.2. Notwithstanding anything contained in this Agreement to the contrary, the Grantors shall not be required to take any action intended to cause "Excluded Assets" to constitute Collateral. Nothing herein or in any of the ABL Loan Documents (as defined in the Intercreditor Agreement), the Term Debt Documents (as defined in the Intercreditor Agreement) or the Secured Debt Documents (as defined in the Collateral Trust Agreement) shall be deemed or construed to affect the right of the Existing Designated Coal Contract Counterparty (as defined in the Credit Agreement), following a default under the Existing Designated Coal Contract (as defined in the Credit Agreement), to offset the obligations owing by The American Coal Company to the Existing Designated Coal Contract Counterparty against the receivables arising from the sale of coal or other obligations owing by the Existing Designated Coal Contract Counterparty to The American Coal Company under the Existing Designated Coal Contract, and any amounts so offset shall not be subject to claims by any Secured Party. Notwithstanding anything in this Agreement or the Collateral Trust Agreement to the contrary, following the allocation of any voting units of Foresight GP (the "**Foresight GP Voting Units**") owned by a Grantor to Foresight Reserves, LP pursuant to and in accordance with Section 10.4(d)(ii) of that certain Second Amended and Restated Limited Liability Company Agreement of Foresight GP (as amended, amended and restated, supplemented or modified from time to time), the liens on the Foresight GP Voting Units granted pursuant to this Agreement shall be immediately and automatically released without any further action on the part of the parties hereto (or party to the Collateral Trust Agreement).

**2.3    Intercreditor Agreement**. Notwithstanding anything herein to the contrary, the lien and security interest granted to the Priority Lien Collateral Trustee pursuant to this Agreement and the exercise of any right or remedy by the Priority Lien Collateral Trustee hereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

## SECTION 3.    SECURITY FOR PRIORITY LIEN OBLIGATIONS; GRANTORS REMAIN LIABLE.

**3.1    Security for Priority Lien Obligations**. This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a) (and any successor provision thereof)), of all Priority Lien Obligations (the **"Secured Obligations"**).

**3.2     Continuing Liability Under Collateral**.  Notwithstanding anything herein to the contrary, (i) each Grantor shall remain liable for all obligations under the Collateral and nothing contained herein is intended or shall be a delegation of duties to the Priority Lien Collateral Trustee or any other Secured Party, (ii) each Grantor shall remain liable under each of the agreements included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, to perform all of the obligations undertaken by it thereunder all in accordance with and pursuant to the terms and provisions thereof and neither the Priority Lien Collateral Trustee nor any Secured Party shall have any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related thereto nor shall the Priority Lien Collateral Trustee nor any Secured Party have any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, and (iii) the exercise by the Priority Lien Collateral Trustee of any of its rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral.

## SECTION 4.     CERTAIN PERFECTION REQUIREMENTS

**4.1     Delivery Requirements**.

(a)     With respect to any Certificated Securities included in the Collateral, each Grantor shall deliver to the Priority Lien Collateral Trustee the Security Certificates evidencing such Certificated Securities duly indorsed by an effective indorsement (within the meaning of Section 8-107 of the UCC), or accompanied by share transfer powers or other instruments of transfer duly endorsed by such an effective endorsement, in each case, to the Priority Lien Collateral Trustee or in blank.  In addition, each Grantor shall cause any certificates evidencing any Pledged Equity Interests, including, without limitation, any Pledged Partnership Interests or Pledged LLC Interests, to be similarly delivered to the Priority Lien Collateral Trustee regardless of whether such Pledged Equity Interests constitute Certificated Securities.

(b)     With respect to any Instruments or Tangible Chattel Paper included in the Collateral, each Grantor shall deliver to the Priority Lien Collateral Trustee (or, with respect to any ABL Collateral, the Revolving Agent as bailee of the Priority Lien Collateral Trustee for purposes of perfection in accordance with the Intercreditor Agreement) all such Instruments or Tangible Chattel Paper duly indorsed in blank; provided, however, that such delivery requirement shall not apply to any Instruments or Tangible Chattel Paper (other than the Intercompany Note) having a face amount of less than $2,000,000 in the aggregate.

**4.2     Control Requirements**.

(a)     Subject to Section 5.16 of the Credit Agreement (to the extent applicable), with respect to any Deposit Account (including the Term Loan Asset Proceeds Account), Securities Account, Security Entitlement, Commodity Account or Commodity Contract included in the Collateral, each Grantor shall ensure that the Priority Lien Collateral Trustee (or, with respect to any ABL Collateral, the Revolving Agent as bailee of the Priority Lien Collateral Trustee for purposes of perfection in accordance with the Intercreditor Agreement) has Control thereof; provided, however, that such Control requirement shall not apply to (x) any Excluded Account or (y) with respect to any Deposit Account, at any time the Revolving Credit Agreement has been terminated and no asset-based revolving credit facility of the Borrower is in effect (such date being the "**ABL Termination Date**").  With respect to any Securities Accounts or Securities

Entitlements, such Control shall be accomplished by the Grantor causing the Securities Intermediary maintaining such Securities Account or Security Entitlement to enter into an agreement in form and substance reasonably satisfactory to the Priority Lien Collateral Trustee pursuant to which the Securities Intermediary shall agree to comply with the Priority Lien Collateral Trustee's (or, with respect to ABL Collateral and subject to the terms of the Intercreditor Agreement, the Revolving Agent's) Entitlement Orders without further consent by such Grantor.  With respect to any Deposit Account, each Grantor shall cause the depositary institution maintaining such account to enter into an agreement in form and substance reasonably satisfactory to the Priority Lien Collateral Trustee, pursuant to which the Bank shall agree to comply with the Priority Lien Collateral Trustee's (or, with respect to ABL Collateral and subject to the terms of the Intercreditor Agreement, the Revolving Agent's) instructions with respect to disposition of funds in the Deposit Account without further consent by such Grantor.  With respect to any Commodity Accounts or Commodity Contracts, each Grantor shall cause Control in favor of the Priority Lien Collateral Trustee  (or, with respect to any ABL Collateral, the Revolving Agent as bailee of the Priority Lien Collateral Trustee for purposes of perfection in accordance with the Intercreditor Agreement) in a manner reasonably acceptable to the Priority Lien Collateral Trustee.  With respect to any Uncertificated Security included in the Collateral (other than any Uncertificated Securities credited to a Securities Account), the applicable Grantor shall promptly notify the Priority Lien Collateral Trustee of the acquisition thereof and thereafter at the written request of the Priority Lien Collateral Trustee (except that the no such written request shall be required with respect to any Uncertificated Security issued by Foresight LP), each Grantor shall cause (or, with respect to an issuer that is not a Subsidiary or a controlled Affiliate of a Grantor, use commercially reasonable efforts to cause), the issuer of such Uncertificated Security to either (i) register the Priority Lien Collateral Trustee as the registered owner thereof on the books and records of the issuer or (ii) execute an agreement substantially in the form of Exhibit B hereto (or such other agreement in form and substance reasonably satisfactory to the Priority Lien Collateral Trustee), pursuant to which such issuer agrees to comply with the Priority Lien Collateral Trustee's instructions with respect to such Uncertificated Security without further consent by such Grantor; provided that, with respect to an issuer that is not a Subsidiary or a controlled Affiliate of a Grantor, if after the use of commercially reasonable efforts such Grantor cannot satisfy such requirement with respect to such Uncertificated Security then such Grantor shall not be required to take any further action with respect to such Uncertificated Security to ensure that the Priority Lien Collateral Trustee has Control of such Uncertificated Security.  Notwithstanding the foregoing, for purposes of the preceding sentence only, each of Foresight GP and Foresight LP shall be deemed to be a Subsidiary of Borrower to the extent and so long as such entity would be a Subsidiary of Borrower following Borrower's exercise of the Foresight Acquisition Option and the acquisition of the Voting Stock subject thereto.

(b)     With respect to any Letter of Credit Rights included in the Collateral (other than any Letter of Credit Rights constituting a Supporting Obligation for a Receivable in which the Priority Lien Collateral Trustee has a valid and perfected security interest), Grantor shall ensure that Priority Lien Collateral Trustee (or, with respect to any ABL Collateral, the Revolving Agent as bailee of the Priority Lien Collateral Trustee for purposes of perfection in accordance with the Intercreditor Agreement) has Control thereof by obtaining the written consent of each issuer of each related letter of credit to the assignment of the proceeds of such letter of credit to the Priority Lien Collateral Trustee (or the Revolving Agent, as applicable).

(c)     With respect to any Electronic Chattel Paper or "transferable record" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any

relevant jurisdiction) included in the Collateral, Grantor shall ensure that the Priority Lien Collateral Trustee (or, with respect to any ABL Collateral, the Revolving Agent as bailee of the Priority Lien Collateral Trustee for purposes of perfection in accordance with the Intercreditor Agreement) has Control thereof; provided, however, that such Control requirement shall not apply to any Electronic Chattel Paper or transferable record having a face amount of less than $2,000,000 in the aggregate.

**4.3     Intellectual Property Recording Requirements**.

(a)     In the case of any Collateral (whether now owned or hereafter acquired) consisting of U.S. federal issued Patents and applications therefor, each Grantor shall execute and deliver to the Priority Lien Collateral Trustee a Patent Security Agreement (Priority Lien) in substantially the form of Exhibit D hereto (or a supplement thereto) covering all such Patents for recordation with the U.S. Patent and Trademark Office with respect to the security interest of the Priority Lien Collateral Trustee.

(b)     In the case of any Collateral (whether now owned or hereafter acquired) consisting of U.S. federal registered Trademarks and applications therefor, each Grantor shall execute and deliver to the Priority Lien Collateral Trustee a Trademark Security Agreement (Priority Lien) in substantially the form of Exhibit C hereto (or a supplement thereto) covering all such Trademarks for recordation with the U.S. Patent and Trademark Office with respect to the security interest of the Priority Lien Collateral Trustee.

(c)     In the case of any Collateral (whether now owned or hereafter acquired) consisting of U.S. federal registered Copyrights, each Grantor shall execute and deliver to the Priority Lien Collateral Trustee a Copyright Security Agreement (Priority Lien) in substantially the form of Exhibit E hereto (or a supplement thereto) covering all such Copyrights for recordation with the U.S. Copyright Office with respect to the security interest of the Priority Lien Collateral Trustee.

**4.4     [Reserved.]**

**4.5     Timing and Notice**.  With respect to any Collateral in existence on the Closing Date, except as otherwise expressly stated above, each Grantor shall comply with the requirements of Section 4 on the date hereof and, with respect to any Collateral hereafter owned or acquired, such Grantor shall comply with such requirements within 30 (thirty) days (or such longer period as the Priority Lien Collateral Trustee as directed by an Act of Required Debtholders may agree to) of Grantor acquiring rights therein.  Each Grantor shall promptly inform the Priority Lien Collateral Trustee in writing of its acquisition of any Collateral for which any action is required by Section 4 hereof (including, for the avoidance of doubt, the filing of any U.S. federal applications for, or the issuance or registration of, any Patents, Copyrights or Trademarks).

**SECTION 5.     REPRESENTATIONS AND WARRANTIES.**

Each Grantor hereby represents and warrants, on the Closing Date and on each Credit Date, that:

**5.1     Grantor Information and Status**.

(a)     as of the Closing Date, Schedule 5.1(A) sets forth under the appropriate headings: (1) the full legal name of such Grantor, (2) all trade names or other names under which

13

such Grantor currently conducts business, (3) the type of organization of such Grantor, (4) the jurisdiction of organization of such Grantor, (5) its organizational identification number, if any, and (6) the jurisdiction where the chief executive office or its sole place of business (or the principal residence if such Grantor is a natural person) is located;

(b)        [reserved;]

(c)        as of the Closing Date, except as provided on Schedule 5.1(C), it has not changed its name, jurisdiction of organization, chief executive office or sole place of business (or principal residence if such Grantor is a natural person) or its corporate structure in any way (e.g., by merger, consolidation, change in corporate form or otherwise) and has not done business under any other name, in each case, within the past five (5) years;

(d)        as of the Closing Date, such Grantor has been duly organized and is validly existing as an entity of the type as set forth opposite such Grantor's name on Schedule 5.1(A) solely under the laws of the jurisdiction as set forth opposite such Grantor's name on Schedule 5.1(A) and remains duly existing as such.  Such Grantor has not filed any certificates of dissolution or liquidation, any certificates of domestication, transfer or continuance in any other jurisdiction; and

(e)        as of the Closing Date and (unless otherwise specified to the Priority Lien Collateral Trustee in writing prior to such time) as of each Credit Date, no Grantor is a "transmitting utility" (as defined in Section 9-102(a)(80) of the UCC).

**5.2        Collateral Identification, Special Collateral**.

(a)        as of the Closing Date, Schedule 5.2 sets forth under the appropriate headings all of such Grantor's: (1) Pledged Equity Interests, (2) Pledged Debt, (3) Securities Accounts, (4) Deposit Accounts, (5) Commodity Contracts and Commodity Accounts, (6) United States federal registrations and issuances of and applications for Patents, Trademarks (other than Internet domain names), and Copyrights owned by each Grantor, (7) Commercial Tort Claims other than any Commercial Tort Claims having a value of less than $5,000,000 in the aggregate, (8) Letter of Credit Rights for letters of credit other than any Letters of Credit Rights worth less than $5,000,000 in the aggregate, and (9) the name and address of any warehouseman, bailee or other third party in possession of any Inventory, Equipment and other tangible personal property other than any Inventory, Equipment or other tangible person property having a value less than $3,000,000 individually or $5,000,000 in the aggregate; and

(b)        as of the Closing Date and (unless otherwise specified to the Priority Lien Collateral Trustee in writing prior to such time) as of each Credit Date, none of the material Collateral constitutes, or is the Proceeds of, (1) Farm Products, (2) Manufactured Homes, (3) Health-Care-Insurance Receivables, (4) timber to be cut, or (5) aircraft, aircraft engines, satellites, ships or railroad rolling stock.

**5.3        Ownership of Collateral and Absence of Other Liens**.

(a)        (x) it owns the Collateral purported to be owned by it or otherwise has the rights it purports to have in each item of Collateral and, as to all Collateral whether now existing or hereafter acquired, developed or created (including by way of lease or license), will continue to own or have such rights in each item of the Collateral except where failure to do so would not reasonably be expected to result in a Material Adverse Effect, and (y) the Collateral is

14

free and clear of any and all Liens other than, in the case of priority only, any Permitted Liens; and

(b)     other than any financing statements filed in favor of the Priority Lien Collateral Trustee, no Grantor has filed or consented to the filing of any effective financing statement, fixture filing or other instrument similar in effect under any applicable law covering all or any part of the Collateral which is on file in any filing or recording office, in each case to the extent such filing effectuates a Lien other than a Permitted Lien, except for (w) any filings, notices or recordations with respect to which the underlying Indebtedness has been paid off or otherwise satisfied, (x) financing statements for which duly authorized proper termination statements have been delivered to the Priority Lien Collateral Trustee for filing and (y) financing statements filed in connection with Permitted Liens.   Other than the Priority Lien Collateral Trustee, the Revolving Agent (subject to the terms of the Intercreditor Agreement), the Collateral Trustee for the benefit of the Parity Lien Secured Parties (as defined in the Collateral Trust Agreement) in accordance with the Collateral Trust Agreement and any automatic control in favor of a Bank, Securities Intermediary or Commodity Intermediary maintaining a Deposit Account, Securities Account or Commodity Contract, no Person is in Control of any Collateral.

### 5.4     Status of Security Interest.

(a)     upon the filing of financing statements naming each Grantor as "debtor" and the Priority Lien Collateral Trustee as "secured party" and describing the Collateral in the filing offices set forth opposite such Grantor's name on Schedule 5.4 hereof provided as of the Closing Date, the security interest of the Priority Lien Collateral Trustee in all Collateral that can be perfected by the filing of a financing statement under the Uniform Commercial Code as in effect in any jurisdiction will constitute valid, perfected, first priority Liens (if and to the extent perfection can be achieved through the actions described in this Section 5.4(a)) subject in the case of priority only, to any Permitted Liens with respect to Collateral.   Each agreement purporting to give the Priority Lien Collateral Trustee (or the Revolving Agent, as the case may be with respect to ABL Collateral) Control over any Collateral is effective to establish the Priority Lien Collateral Trustee's (or the Revolving Agent's, as the case may be with respect to ABL Collateral) Control of the Collateral subject thereto;

(b)     to the extent perfection or priority of the security interest therein is not subject to Article 9 of the UCC, upon recordation of the security interests granted hereunder in Patents, Trademarks and Copyrights the United States Patent and Trademark Office and the United States Copyright Office, the security interests granted to the Priority Lien Collateral Trustee hereunder shall constitute valid, perfected, first priority Liens in the United States (subject, in the case of priority only, to Permitted Liens).   Notwithstanding the foregoing, nothing in this Agreement or any other Loan Documents shall require any Grantor to make any filings or take any other actions to record or perfect the Priority Lien Collateral Trustee's Lien on and security interest in any Intellectual Property outside the United States or to reimburse the Priority Lien Collateral Trustee for any costs or expenses incurred in connection with making such filings or taking any other such action; and

(c)     no authorization, consent, approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body or any other Person is required for either (i) the pledge or grant by any Grantor of the Liens purported to be created in favor of the Priority Lien Collateral Trustee hereunder or (ii) the exercise by Priority Lien Collateral Trustee of any rights or remedies in accordance with the UCC in respect of any Collateral (whether specifically granted or created hereunder or created or provided for by applicable law), except (A)

15

for the filings contemplated by clause (a) above and (B) as may be required, in connection with the disposition of any Investment Related Property, by laws generally affecting the offering and sale of Securities.

### 5.5    Goods and Receivables.

(a)    [reserved];

(b)    except as set forth on Schedule 5.5(B) (as may be supplemented from time to time), none of the Account Debtors in respect of any Receivable in excess of $1,000,000 individually or $2,500,000 in the aggregate is the government of the United States, any agency or instrumentality thereof, any state or municipality or any foreign sovereign.  Except as set forth on Schedule 5.5(B) (as may be supplemented from time to time), no Receivable in excess of $1,000,000 individually or $2,500,000 in the aggregate requires the consent of the Account Debtor in respect thereof in connection with the security interest hereunder, except any consent which has been obtained;

(c)    no material portion of Goods now or hereafter produced by any Grantor and included in the Collateral have been or will be produced in material violation of the requirements of the Fair Labor Standards Act, as amended, or the rules and regulations promulgated thereunder; and

(d)    other than any Inventory or Equipment in transit, undergoing repairs, replacements loaned to employees, or kept on the premises of customers, as of the Closing Date, all of the material Equipment and Inventory included in the Collateral is located only at the locations specified in Schedule 5.5(D).

### 5.6    Pledged Equity Interests, Investment Related Property.

(a)    it is the record and beneficial owner of the Pledged Equity Interests free of all Liens, rights or claims of other Persons (other than the Revolving Agent) and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Pledged Equity Interests;

(b)    no consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary in connection with the creation, perfection or first priority status of the security interest of the Priority Lien Collateral Trustee in any Pledged Equity Interests or, to the extent the Pledged Equity Interests are issued by a wholly-owned Subsidiary of a Grantor, the exercise by the Priority Lien Collateral Trustee of the voting or other rights provided for in this Agreement or the exercise of remedies in respect thereof except as contemplated by the Intercreditor Agreement or as have been obtained or waived;

(c)    (i) all of the Pledged LLC Interests (other than Pledged LLC Interests in Foresight GP) and Pledged Partnership Interests (other than subordinated units in Foresight LP) are or represent interests that by their terms provide that they are securities governed by the Uniform Commercial Code of an applicable jurisdiction; and (ii) the Pledged LLC Interests in Foresight GP and the Pledged Partnership Interests that are subordinated units in Foresight LP are not securities for purposes of the Uniform Commercial Code of any jurisdiction; and

16

(d)      Grantor has caused each partnership or limited liability company that is the issuer of Pledged Equity Interests, other than Foresight LP, to amend their partnership agreement or limited liability company agreement to include the following provision: "Notwithstanding any other provision in this [Limited Partnership Agreement] [Operating Agreement] or otherwise to the contrary, each [Partner] [Member] consents to and agrees that (i) any [Partner] [Member] may pledge its [partnership interests (including any Units and any interests in such Units, collectively the "Partnership Interests")] [membership interests ("Membership Interests")] to secure obligations arising pursuant to loans or other financial accommodations made to a Partner [Member], the [Partnership] [LLC] and/or one or more of their respective affiliates from time to time, (ii) a pledge of Partnership Interests, or such pledgee's permitted successors or assigns, may, in connection with the valid exercise of such pledgee's or such permitted successor's or assign's rights, sell, transfer or otherwise dispose of all or part of the [Partnership] [Membership] Interests (including a sale, transfer or disposition in connection with any foreclosure) without any further consent of any [Partner] [Member] and without having to comply with any restrictions of the sale, transfer of other disposition of the [Partnership] [Membership] Interests set forth in this [Limited Partnership Agreement] [Operating Agreement] or otherwise and (iii) a pledge of [Partnership] [Membership] Interests, or such pledgee's permitted successors or assigns, in connection with the valid exercise of such pledgee's or such permitted successor's or assign's rights, or any purchaser of the [Partnership] [Membership] Interests acquired the [Partnership] [Membership] Interests in connection with the valid exercise of such rights (including in connection with any foreclosure), may acquire the [Partnership] [Membership] Interests and become a [Partner] [Member] or be substituted for a [Partner] [Member] under this [Limited Partnership Agreement] [Operating Agreement] without the consent of any [Partner] [Member] and without having to comply with any of the restrictions on the sale, transfer or other disposition of the interests set forth in this [Limited Partnership Agreement] [Operating Agreement] or otherwise.  So long as any pledge of any [Partner's Partnership Interests] [Member's Membership Interests] is in effect, this Section [__] shall inure to the benefit of any such pledgee and its successors and assigns, as an intended third party beneficiary and no amendment, modification or waiver of, or consent with respect to this Section [__] shall in any event be effective without the prior written consent of any such pledgee."

**5.7      Intellectual Property**.

(a)      it is the sole and exclusive owner of the entire right, title, and interest in and to all Intellectual Property listed on Schedule 5.2(II) (as such schedule may be amended or supplemented from time to time), and owns or has a license or other right to use all other Material Intellectual Property, free and clear of all Liens (except for Permitted Liens) and all claims (except such claims as would not reasonably be expected to have a Material Adverse Effect);

(b)      as of the Closing Date, all Material Intellectual Property owned by such Grantor is subsisting and has not been adjudged invalid or unenforceable, in whole or in part, and each Grantor has performed all acts and has paid, when due, all material renewal, maintenance, and other fees and taxes required to maintain each and every material registration and application of Copyrights, Patents and Trademarks owned by such Grantor in full force and effect, except to the extent being actively contested by such Grantor in good faith and by appropriate proceedings;

(c)      to such Grantor's knowledge, no holding, decision, or judgment has been rendered in any action or proceeding before any court or administrative authority challenging the validity of such Grantor's right to register, or such Grantor's rights to own or use, any Material Intellectual Property (other than office actions issued in the ordinary course of prosecution) and no such action or proceeding is pending or, to the best of such Grantor's knowledge, threatened;

17

(d)        all registrations and applications for Copyrights, Patents and Trademarks owned by such Grantor and included in the Material Intellectual Property are standing in the name of such Grantor;

(e)        such Grantor has not made a previous assignment, sale, transfer, exclusive license, or similar arrangement constituting a present or future assignment, sale, transfer, exclusive license or similar arrangement of any Material Intellectual Property that has not been terminated or released;

(f)        such Grantor has been using appropriate statutory notice of registration in connection with its use of registered Trademarks owned by such Grantor, proper marking practices in connection with its use of Patents owned by such Grantor, and appropriate notice of copyright in connection with the publication of Copyrights owned by such Grantor, in each case, to the extent constituting Material Intellectual Property and necessary to maintain such items;

(g)        such Grantor has taken commercially reasonable steps to protect the confidentiality of its Trade Secrets in accordance with industry standards except as would not reasonably be expected to have a Material Adverse Effect;

(h)        such Grantor uses adequate standards of quality, as determined by such Grantor in its reasonable business judgment, in the manufacture, distribution, and sale of all products sold and all services rendered under or in connection with all Trademarks owned by such Grantor and has taken all commercially reasonable actions necessary to insure that all licensees of the Trademarks owned by such Grantor use such adequate standards of quality, in each case, to the extent constituting Material Intellectual Property;

(i)        to such Grantor's knowledge, the conduct of such Grantor's business does not materially infringe upon or otherwise violate any trademark, patent, copyright, trade secret or other intellectual property right owned or controlled by a third party; no written claim has been made against such Grantor that the use of any Material Intellectual Property owned or used by such Grantor (or any of its respective licensees) violates the asserted rights of any third party, nor, to such Grantor's knowledge, has any such claim been threatened;

(j)        to the best of such Grantor's knowledge, no Person is infringing or otherwise violating any rights in any Material Intellectual Property owned by such Grantor; and

(k)        no settlement or consents, covenants not to sue, non-assertion assurances, or releases have been entered into by such Grantor or bind such Grantor in a manner that could adversely affect such Grantor's rights to own or use any Material Intellectual Property.

## SECTION 6.    COVENANTS AND AGREEMENTS.

**Each Grantor hereby covenants and agrees that:**

**6.1        Reserved.**

**6.2        Collateral Identification; Special Collateral**.

(a)        in the event that it hereafter acquires any Collateral of a type described in Section 5.2(b) hereof, it shall promptly notify the Priority Lien Collateral Trustee thereof in writing and take such actions and execute such documents and make such filings all at Grantor's

18

expense as may be required or as the Priority Lien Collateral Trustee may reasonably request in order to ensure that the Priority Lien Collateral Trustee has a valid, perfected, first priority security interest in such Collateral, subject in the case of priority only, to any Permitted Liens. Notwithstanding the foregoing, no Grantor shall be required to notify the Priority Lien Collateral Trustee or take any such action unless such Collateral is of a material value or is material to such Grantor's business as determined in good faith by such Grantor.

(b)        in the event that it hereafter acquires or has any Commercial Tort Claim in excess of $5,000,000 in the aggregate it shall deliver to the Priority Lien Collateral Trustee a completed Pledge Supplement together with all Supplements to Schedules thereto, identifying such new Commercial Tort Claims.

**6.3        Ownership of Collateral and Absence of Other Liens**.  Except for the security interest created by this Agreement, it shall not create or suffer to exist any Lien upon or with respect to any of the Collateral, except Permitted Liens, and such Grantor shall use its commercially reasonable efforts in its business judgment to defend the Collateral against all Persons at any time claiming any security interest therein.

**6.4        Status of Security Interest**.

(a)        Subject to the limitations set forth in subsection (b) of this Section 6.4, each Grantor shall maintain the security interest of the Priority Lien Collateral Trustee hereunder in all Collateral as valid, perfected, first priority Liens (subject, in the case of priority only, to Permitted Liens).

(b)        Notwithstanding the foregoing, no Grantor shall be required to take any action to perfect any Collateral that can only be perfected by Control except as and to the extent specified in Section 4 hereof.

**6.5        Goods and Receivables**.

(a)        other than as permitted pursuant to any Permitted Lien, it shall not deliver any Document evidencing any Equipment and Inventory to any Person other than the issuer of such Document to claim the Goods evidenced therefor or the Priority Lien Collateral Trustee; and

(b)        subject to the terms of the Intercreditor Agreement, during the continuance of an Event of Default, the Priority Lien Collateral Trustee shall have the right after notice to the applicable Grantor to notify, or require any Grantor to notify, any Account Debtor of the Priority Lien Collateral Trustee's security interest in the Receivables and any Supporting Obligation and, in addition, at any time following the occurrence and during the continuation of an Event of Default, the Priority Lien Collateral Trustee may:  (i) direct the Account Debtors under any Receivables to make payment of all amounts due or to become due to such Grantor thereunder directly to the Priority Lien Collateral Trustee; (ii) notify, or require any Grantor to notify, each Person maintaining a lockbox or similar arrangement to which Account Debtors under any Receivables have been directed to make payment to remit all amounts representing collections on checks and other payment items from time to time sent to or deposited in such lockbox or other arrangement directly to the Priority Lien Collateral Trustee; (iii) direct the Account Debtors under any Receivables subject to the Assignment of Claims Act of 1940, as amended 31 U.S.C. Section 3727 and 41 U.S.C. Section 15, to execute and deliver all documents necessary or appropriate to make payment of all amounts due or to become due to such Grantor

19

thereunder directly to the Priority Lien Collateral Trustee; and (iv) enforce, at the expense of such Grantor, collection of any such Receivables and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done; provided, in each case, that notwithstanding anything to the contrary herein, to the extent any credit information, reports or memoranda constituting Receivables Records is prohibited to be disclosed in accordance with any confidentiality restriction in any agreement with any applicable Account Debtor, such credit information, reports or memoranda shall not be required to be provided to the Priority Lien Collateral Trustee.  If the Priority Lien Collateral Trustee notifies any Grantor that it has elected to collect the Receivables in accordance with the preceding sentence, any payments of Receivables received by such Grantor shall be forthwith (and in any event within two (2) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Priority Lien Collateral Trustee if required, in a Deposit Account maintained under the sole dominion and control of the Priority Lien Collateral Trustee, and until so turned over, all amounts and proceeds (including checks and other instruments) received by such Grantor in respect of the Receivables, any Supporting Obligation or Collateral Support shall be received in trust for the benefit of the Priority Lien Collateral Trustee hereunder and shall be segregated from other funds of such Grantor and such Grantor shall not adjust, settle or compromise the amount or payment of any Receivable, or release wholly or partly any Account Debtor or obligor thereof, or allow any credit or discount thereon.

### 6.6 **Pledged Equity Interests, Investment Related Property**.

(a)     Except as provided in the next sentence, in the event such Grantor receives any dividends, interest or distributions on any Pledged Equity Interest or other Investment Related Property, upon the merger, consolidation, liquidation or dissolution of any issuer of any Pledged Equity Interest or Investment Related Property, then (a) such dividends, interest or distributions and securities or other property shall be included in the definition of Collateral without further action and (b) such Grantor shall promptly take all steps, if any, to the extent required hereunder with respect to such Collateral, to ensure the validity, perfection, priority and, if applicable, Control, subject to the priorities set forth in the Intercreditor Agreement, of the Priority Lien Collateral Trustee over such Investment Related Property (including, without limitation, delivery thereof to the Priority Lien Collateral Trustee) and, pending any such action, to the extent an Event of Default is occurring or continuing, such Grantor shall be deemed to hold such dividends, interest, distributions, securities or other property in trust for the benefit of the Priority Lien Collateral Trustee and shall segregate such dividends, distributions, Securities or other property from all other property of such Grantor. Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the Priority Lien Collateral Trustee authorizes each Grantor to retain all cash dividends and distributions paid and all payments of interest;

(b)     <u>Voting</u>

(i)     So long as no Event of Default shall have occurred and be continuing, except as otherwise provided under the covenants and agreements relating to Investment Related Property in this Agreement or elsewhere herein or in the Credit Agreement, each Grantor shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Investment Related Property or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Credit Agreement; and

20

CH\2055871.9

        (ii)      Upon the occurrence and during the continuation of an Event of Default:

    (1)     all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease and all such rights shall thereupon become vested in the Priority Lien Collateral Trustee who shall thereupon have the sole right to exercise such voting and other consensual rights; and

    (2)     in order to permit the Priority Lien Collateral Trustee to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder: (1) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Priority Lien Collateral Trustee all proxies, dividend payment orders and other instruments as the Priority Lien Collateral Trustee may from time to time reasonably request and (2) each Grantor acknowledges that the Priority Lien Collateral Trustee may utilize the power of attorney set forth in Section 8.1;

    (c)     If any issuer of any Pledged Partnership Interests or Pledged LLC Interests owned by a Grantor which are not securities (for purposes of the UCC) elects or otherwise takes any action to cause such Pledged Partnership Interests or Pledged LLC Interests to be treated as securities for purposes of the UCC, such Grantor shall promptly notify the Priority Lien Collateral Trustee in writing of any such election or action and, in such event, shall, to the extent required hereunder, take all steps necessary or advisable to establish the Priority Lien Collateral Trustee's Control thereof;

    (d)     Each Grantor consents to the grant by each other Grantor of a Lien in all Investment Related Property to the Priority Lien Collateral Trustee and without limiting the generality of the foregoing consents to the transfer of any Pledged Partnership Interest and any Pledged LLC Interest to the Priority Lien Collateral Trustee or its designee following an Event of Default and to the substitution of the Priority Lien Collateral Trustee or its designee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto; and

    (e)     Without the prior written consent of the Priority Lien Collateral Trustee, no Grantor will consent or otherwise agree to (i) any election by Foresight LP or Foresight GP to treat the Pledged Partnership Interests that are subordinated units in Foresight LP or the Pledged LLC Interests in Foresight GP, as applicable, as securities governed by the Uniform Commercial Code of any jurisdiction (including any amendments to Foresight LP's partnership agreement or Foresight GP's membership agreement to expressly provide that such Pledged Partnership Interests or Pledged LLC Interests, as applicable, constitute securities governed by Article 8 of the UCC) or (ii) certificate such Pledged Partnership Interests or Pledged LLC Interests such that they constitute "certificated securities" within the meaning of Section 8-102(4) of the UCC.

    **6.7**    **Intellectual Property**.

    (a)     it shall not do any act or knowingly omit to do any act whereby any of the Material Intellectual Property owned by such Grantor may lapse, or become abandoned, dedicated to the public, or unenforceable, or which would materially adversely affect the validity, grant, or enforceability of the security interest granted therein;

21

(b)    it shall not, with respect to any Trademarks owned by such Grantor constituting Material Intellectual Property, cease the use of any of such Trademarks for a period of greater than one year or fail to maintain the level of the quality of products sold and services rendered under any of such Trademarks at a level at least substantially consistent (or higher) with the quality of such products and services as of the date hereof, and such Grantor shall take all commercially reasonable steps necessary to insure that licensees of such Trademarks use such consistent standards of quality;

(c)    [Intentionally Omitted]

(d)    it shall promptly notify the Priority Lien Collateral Trustee if it knows that any item of Material Intellectual Property would reasonably be expected to become (i) abandoned or dedicated to the public or placed in the public domain (other than the expiration of patents at the end of their statutory term), (ii) invalid or unenforceable, or (iii) subject to any materially adverse determination or development (including the institution of proceedings) in any action or proceeding in the United States Patent and Trademark Office, the United States Copyright Office, any state registry or any court, other than office actions issued in the ordinary course of prosecution of any pending applications for patents or applications for registration of other Intellectual Property);

(e)    it shall take all commercially reasonable steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any state registry to pursue any application and maintain any registration or issuance of each Trademark, Patent, and Copyright owned by any Grantor and constituting Material Intellectual Property, including, but not limited to, those items on Schedule 5.2(II) (as such schedule may be amended or supplemented from time to time);

(f)    it shall use commercially reasonable efforts so as not to permit the inclusion in any contract to which it hereafter becomes a party of any provision that could materially impair or prevent the creation of a security interest in, or the assignment of, such Grantor's rights and interests in any property included within the definitions of any Material Intellectual Property acquired under such contracts;

(g)    in the event that any Material Intellectual Property owned by or exclusively licensed to any Grantor is infringed, misappropriated, diluted or otherwise violated by a third party, such Grantor shall promptly take all reasonable actions to stop such infringement, misappropriation, dilution or other violation and protect its rights in such Material Intellectual Property (with respect to exclusively licensed Materially Intellectual Property, if and to the extent permitted by the terms of any applicable agreements);

(h)    it shall take commercially reasonable steps to protect the secrecy of all Trade Secrets owned by such Grantor and included in the Material Intellectual Property;

(i)    it shall use proper statutory notice in connection with its use of any of the Material Intellectual Property owned by such Grantor to the extent necessary to protect such Material Intellectual Property; and

(j)    it shall continue to collect, at its own expense, all amounts due or to become due to such Grantor in respect of the Material Intellectual Property or any portion thereof. In connection with such collections, such Grantor may take (and, at the Priority Lien Collateral

22

Trustee's reasonable direction, shall take) such action as such Grantor or the Priority Lien Collateral Trustee may deem reasonably necessary or advisable to enforce collection of such amounts. Notwithstanding the foregoing, the Priority Lien Collateral Trustee shall have the right at any time, to notify, or require any Grantor to notify, any obligors with respect to any such amounts of the existence of the security interest created hereby.

## SECTION 7.    FURTHER ASSURANCES; ADDITIONAL GRANTORS.

**7.1    Further Assurances**.

(a)    Each Grantor agrees that from time to time, at the expense of such Grantor, that it shall promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary, or that the Priority Lien Collateral Trustee may reasonably request, in order to create and/or maintain the validity, perfection or priority of (subject to Permitted Liens) and protect any security interest granted or purported to be granted hereby (subject to the limitations set forth in Section 2.2) or to enable the Priority Lien Collateral Trustee to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, each Grantor shall:

(i)    file such financing or continuation statements, or amendments thereto, record security interests in Intellectual Property and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices, as may be necessary or advisable, or as the Priority Lien Collateral Trustee may reasonably request, in order to perfect and preserve the security interests granted or purported to be granted hereby;

(ii)    take all actions necessary to ensure the recordation of appropriate evidence of the liens and security interest granted hereunder in any Intellectual Property registered or issued or in which an application for registration or issuance is pending with the United States Patent and Trademark Office or the United States Copyright Office;

(iii)    upon reasonable notice and at such reasonable times during normal business hours as reasonably requested by the Priority Lien Collateral Trustee, assemble the Collateral and allow inspection of the Collateral by the Priority Lien Collateral Trustee, or persons designated by the Priority Lien Collateral Trustee;

(iv)    at the Priority Lien Collateral Trustee's reasonable request, appear in and defend any action or proceeding that may affect such Grantor's title to or the Priority Lien Collateral Trustee's security interest in all or any material part of the Collateral; and

(v)    furnish the Priority Lien Collateral Trustee with such information regarding the Collateral, including, without limitation, the location thereof, as the Priority Lien Collateral Trustee may reasonably request from time to time.

(b)    Each Grantor hereby authorizes the Priority Lien Collateral Trustee (without implying that the Collateral Trustee shall have any obligations to file) to file a Record or Records, including, without limitation, financing or continuation statements, Intellectual Property Security Agreements and amendments and supplements to any of the foregoing, in the United States and with any filing offices in the United States as the Priority Lien Collateral Trustee may

23

determine, as directed by an Act of Required Debtholders, are necessary or advisable to perfect or otherwise protect the security interest granted to the Priority Lien Collateral Trustee herein.  Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as the Priority Lien Collateral Trustee may determine, as directed by an Act of Required Debtholders, to ensure the perfection of the security interest in the Collateral granted to the Priority Lien Collateral Trustee herein, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired", "all personal property, whether now owned or hereafter acquired" or words of similar effect.  Each Grantor shall furnish to the Priority Lien Collateral Trustee from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Priority Lien Collateral Trustee may reasonably request, all in reasonable detail.

(c)     Each Grantor hereby authorizes the Priority Lien Collateral Trustee to modify this Agreement after obtaining such Grantor's approval of or signature to such modification by amending Schedule 5.2 (as such schedule may be amended or supplemented from time to time) to include reference to any right, title or interest in any existing Intellectual Property or any Intellectual Property acquired or developed by any Grantor after the execution hereof or to delete any reference to any right, title or interest in any Intellectual Property in which any Grantor no longer has or claims any right, title or interest.

**7.2     Additional Grantors**.  From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional Grantors (each, an **"Additional Grantor"**), by executing a Pledge Supplement.  Upon delivery of any such Pledge Supplement to the Priority Lien Collateral Trustee, notice of which is hereby waived by the other Grantors, each Additional Grantor shall be a Grantor and shall be as fully a party hereto as if such Additional Grantor were an original signatory hereto.  Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantor hereunder, nor by any election of Priority Lien Collateral Trustee not to cause any Subsidiary of Borrower to become an Additional Grantor hereunder.  This Agreement shall be fully effective as to any Grantor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor hereunder.

**SECTION 8.   PRIORITY LIEN COLLATERAL TRUSTEE APPOINTED ATTORNEY-IN-FACT.**

**8.1     Power of Attorney**.  Each Grantor hereby appoints the Priority Lien Collateral Trustee (such appointment being coupled with an interest) as such Grantor's attorney-in-fact (such appointment to cease upon Discharge of Priority Lien Obligations), with full authority in the place and stead of such Grantor and in the name of such Grantor, the Priority Lien Collateral Trustee to take any action and to execute any instrument that the Priority Lien Collateral Trustee may deem reasonably necessary or advisable as directed by an Act of Required Debtholders to accomplish the purposes of this Agreement, including, without limitation, the following:

(a)     upon the occurrence and during the continuance of any Event of Default, to obtain and adjust insurance required to be maintained by such Grantor or paid to the Priority Lien Collateral Trustee pursuant to the Credit Agreement;

(b)     upon the occurrence and during the continuance of any Event of Default, to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(c)      upon the occurrence and during the continuance of any Event of Default, to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (b) above;

(d)      upon the occurrence and during the continuance of any Event of Default, to file any claims or take any action or institute any proceedings that the Priority Lien Collateral Trustee may deem necessary or advisable for the collection of any of the Collateral or otherwise to enforce the rights of the Priority Lien Collateral Trustee with respect to any of the Collateral;

(e)      to prepare and file any UCC financing statements against such Grantor as debtor;

(f)      to prepare, sign, and file for recordation in any United States federal intellectual property registry, appropriate evidence of the lien and security interest granted herein in the Intellectual Property in the name of such Grantor as debtor;

(g)      to take or cause to be taken all actions necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including, without limitation, access to pay or discharge taxes or Liens (other than Permitted Liens) levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same, any such payments made by the Priority Lien Collateral Trustee to become obligations of such Grantor to the Priority Lien Collateral Trustee, due and payable immediately without demand; and

(h)      upon the occurrence and during the continuation of an Event of Default, generally to sell, transfer, lease, license, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Priority Lien Collateral Trustee were the absolute owner thereof for all purposes, and to do, at the Priority Lien Collateral Trustee's option as directed by an Act of Required Debtholders and such Grantor's expense, at any time or from time to time, all acts and things that the Priority Lien Collateral Trustee deems reasonably necessary as directed by an Act of Required Debtholders to protect, preserve or realize upon the Collateral and the Priority Lien Collateral Trustee's security interest therein in order to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

**8.2      No Duty on the Part of Priority Lien Collateral Trustee or Secured Parties**. The powers conferred on the Priority Lien Collateral Trustee hereunder are solely to protect the interests of the Secured Parties in the Collateral and shall not impose any duty upon the Priority Lien Collateral Trustee or any other Secured Party to exercise any such powers.  The Priority Lien Collateral Trustee and the other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence, bad faith or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction.

**8.3      Appointment Pursuant to Credit Agreement**.  The Priority Lien Collateral Trustee has been appointed as Collateral Trustee pursuant to the Credit Agreement and the Collateral Trust Agreement.  The rights, duties, privileges, immunities and indemnities of the Priority Lien Collateral Trustee hereunder are subject to the provisions of the Credit Agreement and the Collateral Trust Agreement.

**SECTION 9.    REMEDIES.**

CH\2055871.9

**9.1**    **Generally**.

(a)    If any Event of Default shall have occurred and be continuing, the Priority Lien Collateral Trustee may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies of the Priority Lien Collateral Trustee on default under the UCC (whether or not the UCC applies to the affected Collateral) to collect, enforce or satisfy any Secured Obligations then owing, whether by acceleration or otherwise, and also may pursue any of the following separately, successively or simultaneously:

(i)    require any Grantor to, and each Grantor hereby agrees that it shall at its expense and promptly upon request of the Priority Lien Collateral Trustee forthwith, assemble all or part of the Collateral as directed by the Priority Lien Collateral Trustee and make it available to the Priority Lien Collateral Trustee at a place to be designated by the Priority Lien Collateral Trustee that is reasonably convenient to both parties;

(ii)    enter onto the property during normal business hours where any Collateral is located and take possession thereof with or without judicial process;

(iii)    prior to the disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for disposition in any manner to the extent the Priority Lien Collateral Trustee deems appropriate;

(iv)    without notice except as specified below or under the UCC, sell, assign, lease, license (on an exclusive or nonexclusive basis) or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Priority Lien Collateral Trustee's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as the Priority Lien Collateral Trustee may deem commercially reasonable; and

(v)    visit and inspect any of the properties of any Grantor or subsidiary of any Grantor, to inspect, copy and take extracts from such Grantor's financial and accounting records relating to the Collateral, including the Accounts, at such times and during normal business hours as the Priority Lien Collateral Trustee may reasonably request.

(b)    The Priority Lien Collateral Trustee or any other Secured Party may be the purchaser of any or all of the Collateral at any public or private (to the extent the portion of the Collateral being privately sold is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations) sale in accordance with the UCC and the Priority Lien Collateral Trustee, as collateral trustee for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale made in accordance with the UCC, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by the Priority Lien Collateral Trustee at such sale. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days'

26

notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  The Priority Lien Collateral Trustee shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  The Priority Lien Collateral Trustee may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.  Each Grantor agrees that it would not be commercially unreasonable for the Priority Lien Collateral Trustee to dispose of the Collateral or any portion thereof by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets.  Each Grantor hereby waives any claims against the Priority Lien Collateral Trustee arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if the Priority Lien Collateral Trustee accepts the first offer received and does not offer such Collateral to more than one offeree.  If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, Grantors shall be liable for the deficiency and the reasonable fees of any attorneys employed by the Priority Lien Collateral Trustee to collect such deficiency.  Each Grantor further agrees that a breach of any of the covenants contained in this Section will cause irreparable injury to the Priority Lien Collateral Trustee, that the Priority Lien Collateral Trustee has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section shall be specifically enforceable against such Grantor, and such Grantor hereby waives to the extent permitted by applicable law and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no default has occurred giving rise to the Secured Obligations becoming due and payable prior to their stated maturities.  Nothing in this Section shall in any way alter the rights of the Priority Lien Collateral Trustee hereunder.

(c)     The Priority Lien Collateral Trustee may sell the Collateral without giving any warranties as to the Collateral.  The Priority Lien Collateral Trustee may specifically disclaim or modify any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(d)     The Priority Lien Collateral Trustee shall have no obligation to marshal any of the Collateral.

(e)     Any exercise of remedies provided in this Section 9 shall be subject to the Intercreditor Agreement.

**9.2     Application of Proceeds**.  All proceeds received by the Priority Lien Collateral Trustee in respect of any sale of, any collection from, or other realization upon all or any part of the Collateral shall be applied by the Priority Lien Collateral Trustee as provided in the Collateral Trust Agreement.

**9.3     Sales on Credit**.  If Priority Lien Collateral Trustee sells any of the Collateral upon credit, Grantor will be credited only with payments actually made by purchaser and received by Priority Lien Collateral Trustee and applied to indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral, Priority Lien Collateral Trustee may resell the Collateral and Grantor shall be credited with proceeds of the sale.

**9.4     Investment Related Property**.  Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, the Priority Lien Collateral Trustee may be compelled, with respect to any sale of all or any part of

27

the Investment Related Property conducted without prior registration or qualification of such Investment Related Property under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Investment Related Property for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act) and, notwithstanding such circumstances, each Grantor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Priority Lien Collateral Trustee shall have no obligation to engage in public sales and no obligation to delay the sale of any Investment Related Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.  If the Priority Lien Collateral Trustee determines to exercise its right to sell any or all of the Investment Related Property, upon written request, each Grantor shall and shall cause each issuer of any Pledged Stock to be sold hereunder, each partnership and each limited liability company from time to time to furnish to the Priority Lien Collateral Trustee all such information as the Priority Lien Collateral Trustee may request in order to determine the number and nature of interest, shares or other instruments included in the Investment Related Property which may be sold by the Priority Lien Collateral Trustee in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

**9.5     Grant of Intellectual Property License**.  For the purpose of enabling the Priority Lien Collateral Trustee, during the continuance of an Event of Default, to exercise rights and remedies under Section 9 hereof at such time as the Priority Lien Collateral Trustee shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby grants to the Priority Lien Collateral Trustee, to the extent assignable, a non-exclusive license (exercisable without payment of royalty or other compensation to such Grantor), subject, in the case of Trademarks, to sufficient rights to quality control and inspection in favor of such Grantor to avoid the risk of invalidation of such Trademarks, to use, assign, license or sublicense any of the Intellectual Property now owned or hereafter acquired, developed or created by such Grantor, wherever the same may be located.  Such license shall include access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

**9.6     Intellectual Property**.

(a)     Anything contained herein to the contrary notwithstanding, in addition to the other rights and remedies provided herein, upon the occurrence and during the continuation of an Event of Default:

(i)     the Priority Lien Collateral Trustee shall have the right (but not the obligation) to bring suit or otherwise commence any action or proceeding in the name of any Grantor, the Priority Lien Collateral Trustee or otherwise, to enforce any Intellectual Property rights of such Grantor, in which event such Grantor shall, at the request of the Priority Lien Collateral Trustee, do any and all lawful acts and execute any and all documents required by the Priority Lien Collateral Trustee in aid of such enforcement, and such Grantor shall promptly, upon demand, reimburse and indemnify the Priority Lien Collateral Trustee as provided in Section 12 hereof in connection with the exercise of its rights under this Section 9.6, and, to the extent that the Priority Lien

28

Collateral Trustee shall elect not to bring suit to enforce any Intellectual Property rights as provided in this Section 9.6, each Grantor agrees to use all reasonable measures, whether by action, suit, proceeding or otherwise, to prevent the infringement, misappropriation, dilution or other violation of any of such Grantor's rights in the Intellectual Property by others and for that purpose agrees to diligently maintain any action, suit or proceeding against any Person so infringing, misappropriating, diluting or otherwise violating as shall be necessary to prevent such infringement, misappropriation, dilution or other violation;

(ii)    upon written demand from the Priority Lien Collateral Trustee, each Grantor shall grant, assign, convey or otherwise transfer to the Priority Lien Collateral Trustee or such Priority Lien Collateral Trustee's designee all of such Grantor's right, title and interest in and to any Intellectual Property and shall execute and deliver to the Priority Lien Collateral Trustee such documents as are necessary or appropriate to carry out the intent and purposes of this Agreement;

(iii)    each Grantor agrees that such an assignment and/or recording shall be applied to reduce the Secured Obligations outstanding only to the extent that the Priority Lien Collateral Trustee (or any other Secured Party) receives cash proceeds in respect of the sale of, or other realization upon, any such Intellectual Property;

(iv)    within five (5) Business Days after written notice from the Priority Lien Collateral Trustee, each Grantor shall make available to the Priority Lien Collateral Trustee, to the extent within such Grantor's power and authority, such personnel in such Grantor's employ on the date of such Event of Default as the Priority Lien Collateral Trustee may reasonably designate, by name, title or job responsibility, to permit such Grantor to continue, directly or indirectly, to produce, advertise and sell the products and services sold or delivered by such Grantor under or in connection with any Trademarks or Trademark Licenses, such persons to be available to perform their prior functions on the Priority Lien Collateral Trustee's behalf and to be compensated by the Priority Lien Collateral Trustee at such Grantor's expense on a per diem, pro-rata basis consistent with the salary and benefit structure applicable to each as of the date of such Event of Default; and

(v)    the Priority Lien Collateral Trustee shall have the right to notify, or require each Grantor to notify, any obligors with respect to amounts due or to become due to such Grantor in respect of any Intellectual Property of such Grantor, of the existence of the security interest created herein, to direct such obligors to make payment of all such amounts directly to the Priority Lien Collateral Trustee, and, upon such notification and at the expense of such Grantor, to enforce collection of any such amounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done;

(1)    all amounts and proceeds (including checks and other instruments) received by Grantor in respect of amounts due to such Grantor in respect of the Collateral or any portion thereof shall be received in trust for the benefit of the Priority Lien Collateral Trustee hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over or delivered to the Priority Lien Collateral Trustee in the same form as so received (with any necessary endorsement) to be held as cash Collateral and applied as provided by Section 9.7 hereof; and

29

(2)    Grantor shall not adjust, settle or compromise the amount or payment of any such amount or release wholly or partly any obligor with respect thereto or allow any credit or discount thereon.

(b)    If (i) an Event of Default shall have occurred and, by reason of cure, waiver, modification, amendment or otherwise, no longer be continuing, (ii) no other Event of Default shall have occurred and be continuing, (iii) an assignment or other transfer to the Priority Lien Collateral Trustee of any rights, title and interests in and to any Intellectual Property of such Grantor shall have been previously made and shall have become absolute and effective, and (iv) the Secured Obligations shall not have become immediately due and payable, upon the written request of any Grantor, the Priority Lien Collateral Trustee shall promptly execute and deliver to such Grantor, at such Grantor's sole cost and expense, such assignments or other transfer as may be necessary to reassign to such Grantor any such rights, title and interests as may have been assigned to the Priority Lien Collateral Trustee as aforesaid, subject to any disposition thereof that may have been made by the Priority Lien Collateral Trustee; provided, after giving effect to such reassignment, the Priority Lien Collateral Trustee's security interest granted pursuant hereto, as well as all other rights and remedies of the Priority Lien Collateral Trustee granted hereunder, shall continue to be in full force and effect; and provided further, the rights, title and interests so reassigned shall be free and clear of any other Liens granted by or on behalf of the Priority Lien Collateral Trustee and the Secured Parties.

**9.7    Cash Proceeds; Deposit Accounts**.    (a)  If any Event of Default shall have occurred and be continuing, in addition to the rights of the Priority Lien Collateral Trustee specified in Section 6.5 with respect to payments of Receivables, all proceeds of any Collateral received by any Grantor consisting of cash, checks and other near-cash items (collectively, **"Cash Proceeds"**) shall, subject to the terms of and the priorities set forth in the Intercreditor Agreement, be held by such Grantor in trust for the Priority Lien Collateral Trustee, segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, be turned over to the Priority Lien Collateral Trustee in the exact form received by such Grantor (duly indorsed by such Grantor to the Priority Lien Collateral Trustee, if required) and, until the ABL Termination Date shall have occurred, held by the Priority Lien Collateral Trustee in a Deposit Account maintained under the dominion and control of the Collateral Trustee.    Any Cash Proceeds received by the Priority Lien Collateral Trustee (whether from a Grantor or otherwise) may, subject to the terms of and the priorities set forth in the Intercreditor Agreement, (i) be held by the Priority Lien Collateral Trustee for the ratable benefit of the Secured Parties, as collateral security for the Secured Obligations (whether matured or unmatured) and/or (ii) then or at any time thereafter may be applied by the Priority Lien Collateral Trustee against the Secured Obligations then due and owing in accordance with Section 9.2 hereof.

(b)    Until the ABL Termination Date shall have occurred, if any Event of Default shall have occurred and be continuing, the Priority Lien Collateral Trustee may, subject to the terms of and the priorities set forth in the Intercreditor Agreement, apply the balance from any Deposit Account or instruct the bank at which any Deposit Account is maintained to pay the balance of any Deposit Account to or for the benefit of the Priority Lien Collateral Trustee.

## SECTION 10.  PRIORITY LIEN COLLATERAL TRUSTEE.

The Priority Lien Collateral Trustee has been appointed to act as Priority Lien Collateral Trustee hereunder by each Priority Lien Representative and, by their acceptance of the benefits hereof, the other Secured Parties. The Priority Lien Collateral Trustee shall be obligated, and shall have the right hereunder, to make demands, to give notices, to exercise or refrain from

exercising any rights, and to take or refrain from taking any action (including, without limitation, the release or substitution of Collateral), solely in accordance with this Agreement and the Collateral Trust Agreement; provided, the Priority Lien Collateral Trustee shall exercise, or refrain from exercising, any remedies provided for herein in accordance with the terms of the Collateral Trust Agreement and the Intercreditor Agreement. In furtherance of the foregoing provisions of this Section, each Secured Party, by its acceptance of the benefits hereof, agrees that it shall have no right individually to realize upon any of the Collateral hereunder, it being understood and agreed by such Secured Party that all rights and remedies hereunder may be exercised solely by the Priority Lien Collateral Trustee for the benefit of Secured Parties in accordance with the terms of this Section. The rights, privileges, protections and immunities in the Collateral Trust Agreement for the benefit of the Collateral Trustee and the other provisions of the Collateral Trust Agreement relating to the Collateral Trustee are hereby incorporated herein with respect to the Priority Lien Collateral Trustee.

**SECTION 11.  CONTINUING SECURITY INTEREST; TRANSFER OF LOANS.**

This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until the Discharge of Priority Lien Obligations and shall be binding upon each Grantor, its successors and permitted assigns, and inure, together with the rights and remedies of the Priority Lien Collateral Trustee hereunder, to the benefit of the Priority Lien Collateral Trustee and its successors, transferees and permitted assigns. Without limiting the generality of the foregoing, but subject to the terms of the Credit Agreement, any Lender may assign or otherwise transfer any Loans held by it to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to Lenders herein or otherwise. Upon the Discharge of Priority Lien Obligations, the security interest granted hereby shall automatically terminate hereunder and of record and all rights to the Collateral shall revert to Grantors or to whomsoever may be lawfully entitled to receive the same (in accordance with the Collateral Trust Agreement, the Intercreditor Agreement or otherwise). Upon any such termination the Priority Lien Collateral Trustee shall, at Grantors' expense, execute and deliver to Grantors or otherwise authorize the filing of such documents as Grantors shall reasonably request, including financing statement amendments or terminations, account control termination letters, and any other such documents to evidence such termination.  All other releases of Collateral shall be made in accordance with the terms of the Collateral Trust Agreement and the Intercreditor Agreement.

**SECTION 12.  STANDARD OF CARE; PRIORITY LIEN COLLATERAL TRUSTEE MAY PERFORM.**

The powers conferred on the Priority Lien Collateral Trustee hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Priority Lien Collateral Trustee shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. The Priority Lien Collateral Trustee shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Priority Lien Collateral Trustee accords its own property. Neither the Priority Lien Collateral Trustee nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or otherwise. If any Grantor fails to perform any

31

agreement contained herein, the Priority Lien Collateral Trustee may, but shall not be required to, itself perform, or cause performance of, such agreement, and the expenses of the Priority Lien Collateral Trustee incurred in connection therewith shall be payable by each Grantor under the Collateral Trust Agreement.

## SECTION 13.  MISCELLANEOUS.

Any notice, request or demand required or permitted to be given under this Agreement shall be given in accordance with the Collateral Trust Agreement.  No failure or delay on the part of the Priority Lien Collateral Trustee in the exercise of any power, right or privilege hereunder or under the Collateral Trust Agreement shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  All rights and remedies existing under this Agreement and the Collateral Trust Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.  In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.  This Agreement shall be binding upon and inure to the benefit of the Priority Lien Collateral Trustee and Grantors and their respective successors and permitted assigns.  No Grantor shall, without the prior written consent of the Priority Lien Collateral Trustee given in accordance with the Collateral Trust Agreement, assign any right, duty or obligation hereunder.  This Agreement and the Collateral Trust Agreement embody the entire agreement and understanding between Grantors and the Priority Lien Collateral Trustee and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof.  Accordingly, the Collateral Trust Agreement may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.  This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission (including .pdf or .tif format) shall be effective as delivery of a manually executed counterpart of this Agreement.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OF THE SECURITY INTEREST).**

CH\2055871.9

**THE PROVISIONS OF THE COLLATERAL TRUST AGREEMENT UNDER THE HEADINGS "CONSENT TO JURISDICTION" AND "WAIVER OF JURY TRIAL" ARE INCORPORATED HEREIN BY THIS REFERENCE AND SUCH INCORPORATION SHALL SURVIVE ANY TERMINATION OF THE COLLATERAL TRUST AGREEMENT.**

**SECTION 14.  EFFECT OF RESTATEMENT.**

This Agreement amends and restates the Existing Pledge and Security Agreement in its entirety, and nothing in this Agreement shall be deemed to constitute a novation of the Existing Pledge and Security Agreement.  This Agreement does not evidence a termination and re-granting of the security interests and Liens granted under the Existing Pledge and Security Agreement and such security interests and Liens shall be continuing in all respects.

CH\2055871.9

IN WITNESS WHEREOF, each Grantor and the Priority Lien Collateral Trustee have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

MURRAY ENERGY CORPORATION


By:_____
  Name: Robert D. Moore
  Title:   Executive Vice President, Chief
          Operating Officer and Chief Financial
          Officer


MURRAY ENERGY HOLDINGS CO.


By:_____
  Name: Robert D. Moore
  Title:   Chief Financial Officer

AMCA COAL LEASING, INC.
AMCOAL HOLDINGS, INC.
AMERICAN COMPLIANCE COAL, INC.
AMERICAN EQUIPMENT & MACHINE, INC.
AMERICAN MINE SERVICES, INC.
AMERICANMOUNTAINEER PROPERTIES,
INC.
AMERICAN NATURAL GAS, INC.
ANDALEX RESOURCES MANAGEMENT, INC.
ANDALEX RESOURCES, INC.
AVONMORE RAIL LOADING, INC.
BELMONT COAL, INC.
CANTERBURY COAL COMPANY
CCC LAND RESOURCES LLC
CCC RCPC LLC
CENTRAL OHIO COAL COMPANY
COAL RESOURCES, INC.
COAL RESOURCES HOLDINGS CO.
CONSOLIDATED LAND COMPANY
CONSOLIDATION COAL COMPANY
EIGHTY-FOUR MINING COMPANY
GENWAL RESOURCES, INC.
KANAWHA TRANSPORTATION CENTER, INC.
KENAMERICAN RESOURCES, INC.
KEYSTONE COAL MINING CORPORATION
MCELROY COAL COMPANY
MILL CREEK MINING COMPANY
MON RIVER TOWING, INC.
MURRAY AMERICAN ENERGY, INC.
MURRAY AMERICAN RESOURCES, INC.
MURRAY AMERICAN TRANSPORTATION,
INC.
MURRAY KEYSTONE PROCESSING, INC.
MURRAY SOUTH AMERICA, INC.
OHIOAMERICAN ENERGY, INCORPORATED
OHIO ENERGY TRANSPORTATION, INC.
ONEIDA COAL COMPANY, INC.
PENNAMERICAN COAL, INC.
PINSKI CORP.
PLEASANT FARMS, INC.
PREMIUM COAL, INC.
SOUTHERN OHIO COAL COMPANY
SPRING CHURCH COAL COMPANY
THE AMERICAN COAL COMPANY
THE HARRISON COUNTY COAL COMPANY
THE MARION COUNTY COAL COMPANY
THE MARSHALL COUNTY COAL COMPANY
THE MONONGALIA COUNTY COAL
COMPANY
THE OHIO COUNTY COAL COMPANY
TWIN RIVERS TOWING COMPANY

[Signature Page to Second Amended and Restated Priority Lien Debt Pledge and Security Agreement]

UTAHAMERICAN ENERGY, INC.
WEST RIDGE RESOURCES, INC.


By:_____
  Name: Robert D. Moore
  Title:   Authorized Signatory

[Signature Page to Second Amended and Restated Priority Lien Debt Pledge and Security Agreement]

AMERICANHOCKING ENERGY, INC.
MAPLE CREEK MINING, INC.
MAPLE CREEK PROCESSING, INC.
OHIO VALLEY RESOURCES, INC.
SUNBURST RESOURCES, INC.
THE OHIO VALLEY COAL COMPANY
THE OHIO VALLEY TRANSLOADING
COMPANY
UMCO ENERGY, INC.


By:_____
  Name: Ronnie D. Dietz
  Title:  Authorized Signatory

[Signature Page to Second Amended and Restated Priority Lien Debt Pledge and Security Agreement]

MONVALLEY TRANSPORTATION CENTER, INC.
THE OKLAHOMA COAL COMPANY


By:_____
 Name: Paul B. Piccolini
 Title:  President

[Signature Page to Second Amended and Restated Priority Lien Debt Pledge and Security Agreement]

WEST VIRGINIA RESOURCES, INC.

By:_____
 Name: Robert L. Putsock
 Title:    Secretary and Treasurer

[Signature Page to Second Amended and Restated Priority Lien Debt Pledge and Security Agreement]

PENNAMERICAN COAL, L.P.

By: PINSKI CORP.
Its: General Partner


By:_____
  Name: Robert D. Moore
  Title:    Treasurer and Secretary

[Signature Page to Second Amended and Restated Priority Lien Debt Pledge and Security Agreement]

AMERICAN ENERGY CORPORATION
AMERICANMOUNTAINEER ENERGY, INC.
ANCHOR LONGWALL AND REBUILD, INC.
CORPORATE AVIATION SERVICES, INC.
EMPIRE DOCK, INC.
ENERGY RESOURCES, INC.
ENERGY TRANSPORTATION, INC.
PENNSYLVANIA TRANSLOADING, INC.
T D K COAL SALES, INCORPORATED
THE AMERICAN COAL SALES COMPANY


By:_____
 Name: Michael O. McKown
 Title:    Authorized Signatory

[Signature Page to Second Amended and Restated Priority Lien Debt Pledge and Security Agreement]

MURRAY AMERICAN RIVER TOWING, INC.
THE FRANKLIN COUNTY COAL COMPANY
THE MEIGS COUNTY COAL COMPANY
THE MUSKINGUM COUNTY COAL COMPANY
THE WASHINGTON COUNTY COAL COMPANY


By: _____
    Name:
    Title:

MURRAY AMERICAN KENTUCKY TOWING, INC.

By: _____
   Name:
   Title:

MURRAY EQUIPMENT & MACHINE, INC.


By: _____
  Name:
  Title:

THE MCLEAN COUNTY COAL COMPANY


By: _____
  Name:
  Title:

MURRAY AMERICAN COAL, INC.

By: _____
    Name:
    Title:

**U.S. BANK NATIONAL ASSOCIATION**,
as Priority Lien Collateral Trustee


By:_____
              Authorized Signatory

[Signature Page to Second Amended and Restated Priority Lien Debt Pledge and Security Agreement]

SCHEDULE 5.1
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

**GENERAL INFORMATION**

(A)   Full Legal Name, Other Names (including any Trade Name or Fictitious Business Name) , Type of Organization, Jurisdiction of Organization, Chief Executive Office/Sole Place of Business (or Residence if Grantor is a Natural Person) and Organizational Identification Number of each Grantor:

| Full Legal Name | Trade Name or Fictitious Business Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office/Sole Place of Business (or Residence if Grantor is a Natural Person) | Organization I.D.# |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

(C)   Changes in Name, Jurisdiction of Organization, Chief Executive Office or Sole Place of Business (or Principal Residence if Grantor is a Natural Person) and Corporate Structure within past five (5) years:

| Grantor | Date of Change | Description of Change |
|---|---|---|
|  |  |  |

SCHEDULE 5.2-1

SCHEDULE 5.2
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

## COLLATERAL IDENTIFICATION

### I.  INVESTMENT RELATED PROPERTY

(A)    Pledged Stock:

| Grantor | Stock Issuer | Class of Stock | Certificated (Y/N) | Stock Certificate No. | Par Value | No. of Pledged Stock | Percentage of Outstanding Stock of the Stock Issuer |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

Pledged LLC Interests:

| Grantor | Limited Liability Company | Certificated (Y/N) | Certificate No. (if any) | No. of Pledged Units | Percentage of Outstanding LLC Interests of the Limited Liability Company |
|---|---|---|---|---|---|
| | | | | | |

Pledged Partnership Interests:

| Grantor | Partnership | Type of Partnership Interests (e.g., general or limited) | Certificated (Y/N) | Certificate No. (if any) | Percentage of Outstanding Partnership Interests of the Partnership |
|---|---|---|---|---|---|
| | | | | | |

Trust Interests or other Equity Interests not listed above:

| Grantor | Trust | Class of Trust Interests | Certificated (Y/N) | Certificate No. (if any) | Percentage of Outstanding Trust Interests of the Trust |
|---|---|---|---|---|---|
| | | | | | |

SCHEDULE 5.2-2

Pledged Debt:

| Grantor | Issuer | Original Principal Amount | Outstanding Principal Balance | Issue Date | Maturity Date |
|---------|--------|---------------------------|-------------------------------|------------|---------------|
|         |        |                           |                               |            |               |

Securities Account:

| Grantor | Share of Securities Intermediary | Account Number | Account Name |
|---------|----------------------------------|----------------|--------------|
|         |                                  |                |              |

Deposit Accounts:

| Grantor | Name of Depositary Bank | Account Number | Account Name |
|---------|-------------------------|----------------|--------------|
|         |                         |                |              |

Commodity Contracts and Commodity Accounts:

| Grantor | Name of Commodity Intermediary | Account Number | Account Name |
|---------|-------------------------------|----------------|--------------|
|         |                               |                |              |

## II.  INTELLECTUAL PROPERTY

(A)    Copyrights

| Grantor | Title of Work | Registration Number (if any) | Registration Date (if any) |
|---------|---------------|------------------------------|-----------------------------|
|         |               |                              |                             |

(B)    Patents

| Grantor | Title of Patent | Patent Number/(Application Number) | Issue Date/(Filing Date) |
|---------|-----------------|-------------------------------------|---------------------------|
|         |                 |                                     |                           |

SCHEDULE 5.2-3

(C)     Trademarks

| Grantor | Trademark | Registration Number/(Serial Number) | Registration Date/(Filing Date) |
|---------|-----------|-------------------------------------|----------------------------------|
|         |           |                                     |                                  |

## III. COMMERCIAL TORT CLAIMS

Grantor                                    Commercial Tort Claims

## IV. LETTER OF CREDIT RIGHTS

Grantor                          Description of Letters of Credit

## V.  WAREHOUSEMAN, BAILEES AND OTHER THIRD PARTIES IN POSSESSION OF COLLATERAL

Grantor                 Description of Property        Name and Address of Third Party

SCHEDULE 5.2-4

SCHEDULE 5.4
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

FINANCING STATEMENTS:

<u>Grantor</u>                                   <u>Filing Jurisdiction(s)</u>

SCHEDULE 5.4-1

SCHEDULE 5.5
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

(B)

    (1)    Any Account Debtor in respect of any Receivable in excess of $1,000,000 individually or $2,500,000 in the aggregate that is the government of the United States, any agency or instrumentality thereof, any state or municipality or any foreign sovereign:

Account Debtors

    (2)    Any Receivable in excess of $1,000,000 individually or $2,500,000 in the aggregate that requires the consent of the Account Debtor in respect thereof in connection with the security interest hereunder, except any consent which has been obtained:

Receivables Requiring Consent

(D)    Locations of material Equipment and Inventory, other than any Inventory or Equipment in transit, undergoing repairs, replacements loaned to employees, or kept on the premises of customers:

Grantor                            Location of Equipment and Inventory

EXHIBIT A
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

**PLEDGE SUPPLEMENT**

This **PLEDGE SUPPLEMENT**, dated [mm/dd/yy], is delivered by **[NAME OF GRANTOR]** a **[NAME OF STATE OF INCORPORATION]** [Corporation] (the **"Grantor"**) pursuant to the Second Amended and Restated Priority Lien Debt Pledge and Security Agreement, dated as of April 16, 2015 (as it may be from time to time amended, restated, modified or supplemented, the **"Security Agreement"**), among **MURRAY ENERGY CORPORATION**, the other Grantors named therein, and **U.S. BANK NATIONAL ASSOCIATION**, as the Priority Lien Collateral Trustee.  Capitalized terms used herein not otherwise defined herein shall have the meanings ascribed thereto in the Security Agreement.

Grantor hereby confirms the grant to the Priority Lien Collateral Trustee set forth in the Security Agreement of, and does hereby grant to the Priority Lien Collateral Trustee, a security interest in all of Grantor's right, title and interest in, to and under all Collateral to secure the Secured Obligations, in each case whether now or hereafter existing or in which Grantor now has or hereafter acquires an interest and wherever the same may be located.  Grantor represents and warrants that the attached Supplements to Schedules accurately and completely set forth all additional information required to be provided pursuant to the Security Agreement and hereby agrees that such Supplements to Schedules shall constitute part of the Schedules to the Security Agreement.

Notwithstanding anything herein to the contrary, the lien and security interest granted to the Priority Lien Collateral Trustee pursuant to the Security Agreement or this Agreement and the exercise of any right or remedy by the Priority Lien Collateral Trustee under the Security Agreement are subject to the provisions of the Intercreditor Agreement.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control.

**THIS PLEDGE SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK (OTHER THAN ANY MANDATORY PROVISIONS OF THE UCC RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OF THE SECURITY INTEREST).**

**IN WITNESS WHEREOF**, Grantor has caused this Pledge Supplement to be duly executed and delivered by its duly authorized officer as of **[mm/dd/yy]**.

EXHIBIT B-1

**[NAME OF GRANTOR]**

By:_____
Name:
Title:

EXHIBIT B-2

SUPPLEMENT TO SCHEDULE 5.1
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

Additional Information:

## GENERAL INFORMATION

(A)     Full Legal Name, Other Names (including any Trade Name or Fictitious Business Name) , Type of Organization, Jurisdiction of Organization, Chief Executive Office/Sole Place of Business (or Residence if Grantor is a Natural Person) and Organizational Identification Number of each Grantor:

| Full Legal Name | Trade Name or Fictitious Business Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office/Sole Place of Business (or Residence if Grantor is a Natural Person) | Organization I.D.# |
|---|---|---|---|---|---|
| | | | | | |

(C)     Changes in Name, Jurisdiction of Organization, Chief Executive Office or Sole Place of Business (or Principal Residence if Grantor is a Natural Person) and Corporate Structure within past five (5) years:

| Grantor | Date of Change | Description of Change |
|---|---|---|
| | | |

EXHIBIT B-3

SUPPLEMENT TO SCHEDULE 5.2
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

## COLLATERAL IDENTIFICATION

### I.  INVESTMENT RELATED PROPERTY

(A)    Pledged Stock:

| Grantor | Stock Issuer | Class of Stock | Certificated (Y/N) | Stock Certificate No. | Par Value | No. of Pledged Stock | Percentage of Outstanding Stock of the Stock Issuer |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

Pledged LLC Interests:

| Grantor | Limited Liability Company | Certificated (Y/N) | Certificate No. (if any) | No. of Pledged Units | Percentage of Outstanding LLC Interests of the Limited Liability Company |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

Pledged Partnership Interests:

| Grantor | Partnership | Type of Partnership Interests (e.g., general or limited) | Certificated (Y/N) | Certificate No. (if any) | Percentage of Outstanding Partnership Interests of the Partnership |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

Pledged Trust Interests:

| Grantor | Trust | Class of Trust Interests | Certificated (Y/N) | Certificate No. (if any) | Percentage of Outstanding Trust Interests of the Trust |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

EXHIBIT B-4

Pledged Debt:

| Grantor | Issuer | Original Principal Amount | Outstanding Principal Balance | Issue Date | Maturity Date |
|---------|--------|---------------------------|-------------------------------|------------|---------------|
|         |        |                           |                               |            |               |

Securities Account:

| Grantor | Share of Securities Intermediary | Account Number | Account Name |
|---------|----------------------------------|----------------|--------------|
|         |                                  |                |              |

Deposit Accounts:

| Grantor | Name of Depositary Bank | Account Number | Account Name |
|---------|-------------------------|----------------|--------------|
|         |                         |                |              |

Commodities Accounts:

| Grantor | Name of Commodities Intermediary | Account Number | Account Name |
|---------|----------------------------------|----------------|--------------|
|         |                                  |                |              |

(B)

| Grantor | Date of Acquisition | Description of Acquisition |
|---------|---------------------|---------------------------|
|         |                     |                           |

## II.  INTELLECTUAL PROPERTY

(A)    Copyrights

| Grantor | Title of Work | Registration Number (if any) | Registration Date (if any) |
|---------|---------------|------------------------------|----------------------------|
|         |               |                              |                            |

(B)    Patents

| Grantor | Title of Patent | Patent Number/(Application Number) | Issue Date/(Filing Date) |
|---------|-----------------|------------------------------------|--------------------------|

EXHIBIT B-5

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

(C)     Trademarks

| Grantor | Trademark | Registration Number/(Serial Number) | Registration Date/(Filing Date) |
|---|---|---|---|
|  |  |  |  |

## III. COMMERCIAL TORT CLAIMS

<u>Grantor</u>                                                      <u>Commercial Tort Claims</u>

## IV. LETTER OF CREDIT RIGHTS

<u>Grantor</u>                                          <u>Description of Letters of Credit</u>

## V.  WAREHOUSEMAN, BAILEES AND OTHER THIRD PARTIES IN POSSESSION OF COLLATERAL

<u>Grantor</u>                        <u>Description of Property</u>           <u>Name and Address of Third Party</u>

EXHIBIT B-6

SUPPLEMENT TO SCHEDULE 5.4
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

Financing Statements:

Grantor                                    Filing Jurisdiction(s)

EXHIBIT B-7

SUPPLEMENT TO SCHEDULE 5.5
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

(B)

     (1)     Any Account Debtor in respect of any Receivable in excess of $1,000,000 individually or $2,500,000 in the aggregate that is the government of the United States, any agency or instrumentality thereof, any state or municipality or any foreign sovereign:

Account Debtors

     (2)     Any Receivable in excess of $1,000,000 individually or $2,500,000 in the aggregate that requires the consent of the Account Debtor in respect thereof in connection with the security interest hereunder, except any consent which has been obtained:

Receivables Requiring Consent

(D)     Locations of material Equipment and Inventory, other than any Inventory or Equipment in transit, undergoing repairs, replacements loaned to employees, or kept on the premises of customers:

Grantor                       Location of Equipment and Inventory

EXHIBIT B-8

EXHIBIT B
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

## UNCERTIFICATED SECURITIES CONTROL AGREEMENT

This Uncertificated Securities Control Agreement (this **"Agreement"**) dated as of [_____], 20[__] among [_____] (the **"Pledgor"**), **U.S. BANK NATIONAL ASSOCIATION**, as Priority Lien Collateral Trustee for the Secured Parties, (the **"Priority Lien Collateral Trustee"**) and [_____], a [_____] [corporation] (the **"Issuer"**). Capitalized terms used but not defined herein shall have the meaning assigned in the Second Amended and Restated Priority Lien Debt Pledge and Security Agreement dated as of April 16, 2015, among the Pledgor, the other Grantors party thereto and the Priority Lien Collateral Trustee (as it may be amended, restated, supplemented or otherwise modified from time to time, the **"Security Agreement"**).    All references herein to the **"UCC"** shall mean the Uniform Commercial Code as in effect in the State of New York.

**Section 1.    Registered Ownership of Shares**.  The Issuer hereby confirms and agrees that as of the date hereof the Pledgor is the registered owner of [_____] shares of the Issuer's [common] stock (the **"Pledged Shares"**) and the Issuer shall not change the registered owner of the Pledged Shares without the prior written consent of the Priority Lien Collateral Trustee.

**Section 2.    Instructions**.  If at any time the Issuer shall receive instructions originated by the Priority Lien Collateral Trustee relating to the Pledged Shares, the Issuer shall comply with such instructions without further consent by the Pledgor or any other person.

**Section 3.    Additional Representations and Warranties of the Issuer**.  The Issuer hereby represents and warrants to the Priority Lien Collateral Trustee:

(a)  It has not entered into, and until the termination of this agreement will not enter into, any agreement with any other person relating the Pledged Shares pursuant to which it has agreed to comply with instructions issued by such other person; and

(b)  It has not entered into, and until the termination of this agreement will not enter into, any agreement with the Pledgor or the Priority Lien Collateral Trustee purporting to limit or condition the obligation of the Issuer to comply with Instructions as set forth in Section 2 hereof.

(c)  Except for Permitted Liens (as defined in the Credit Agreement) and the claims and interest of the Priority Lien Collateral Trustee and of the Pledgor in the Pledged Shares, the Issuer does not know of any claim to, or interest in, the Pledged Shares.  If any person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Pledged Shares, the Issuer will promptly notify the Priority Lien Collateral Trustee and the Pledgor thereof.

(d)  This Uncertificated Securities Control Agreement is the valid and legally binding obligation of the Issuer.

**Section 4.    Choice of Law**.    THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING

OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

**Section 5.   Conflict with Other Agreements**.  In the event of any conflict between this Agreement (or any portion thereof) and any other agreement now existing or hereafter entered into, the terms of this Agreement shall prevail.  No amendment or modification of this Agreement or waiver of any right hereunder shall be binding on any party hereto unless it is in writing and is signed by all of the parties hereto.

**Section 6.   Voting Rights**.  Until such time as the Priority Lien Collateral Trustee shall otherwise instruct the Issuer in writing, the Pledgor shall have the right to vote the Pledged Shares.

**Section 7.   Successors; Assignment**.  The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives who obtain such rights solely by operation of law.  The Priority Lien Collateral Trustee may assign its rights hereunder only with the express written consent of the Issuer and by sending written notice of such assignment to the Pledgor.

**Section 8.   Indemnification of Issuer**.  The Pledgor and the Priority Lien Collateral Trustee hereby agree that (a) the Issuer is released from any and all liabilities to the Pledgor and the Priority Lien Collateral Trustee arising from the terms of this Agreement and the compliance of the Issuer with the terms hereof, except to the extent that such liabilities arise from the Issuer's negligence and (b) the Pledgor, its successors and assigns shall at all times indemnify and save harmless the Issuer from and against any and all claims, actions and suits of others arising out of the terms of this Agreement or the compliance of the Issuer with the terms hereof, except to the extent that such arises from the Issuer's negligence, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character arising by reason of the same, until the termination of this Agreement.

**Section 9.   Notices**.  Any notice, request or other communication required or permitted to be given under this Agreement shall be in writing and deemed to have been properly given when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received or two (2) days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth below.

Pledgor:                    **[Name and Address of Pledgor]**
                            Attention: **[_____]**
                            Telecopier: **[_____]**

Priority Lien Collateral Trustee: **[Name and Address of Priority Lien Collateral Trustee]**
                            Attention: **[_____]**
                            Telecopier: **[_____]**

Issuer:                     **[Insert Name and Address of Issuer]**
                            Attention: **[_____]**
                            Telecopier: **[_____]**

EXHIBIT B-10

Any party may change its address for notices in the manner set forth above.

**Section 10.   Termination**.  The obligations of the Issuer to the Priority Lien Collateral Trustee pursuant to this Control Agreement shall continue in effect until the security interests of the Priority Lien Collateral Trustee in the Pledged Shares have been terminated pursuant to the terms of the Security Agreement and the Priority Lien Collateral Trustee has notified the Issuer of such termination in writing.  The Priority Lien Collateral Trustee agrees to provide Notice of Termination in substantially the form of Exhibit A hereto to the Issuer upon the request of the Pledgor on or after the termination of the Priority Lien Collateral Trustee's security interest in the Pledged Shares pursuant to the terms of the Security Agreement.  The termination of this Control Agreement shall not terminate the Pledged Shares or alter the obligations of the Issuer to the Pledgor pursuant to any other agreement with respect to the Pledged Shares.

**Section 11.   Counterparts**.  This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party hereto may execute this Agreement by signing and delivering one or more counterparts.

[NAME OF PLEDGOR],
as Pledgor


By: _____
Name:
Title:


U.S. BANK NATIONAL ASSOCIATION,
as Priority Lien Collateral Trustee


By: _____
     Authorized Signatory


[NAME OF ISSUER],
as Issuer


By: _____
Name:
Title:

EXHIBIT B-11

<u>Exhibit A</u>

[Letterhead of Priority Lien Collateral Trustee]

[Date]

[Name and Address of Issuer]
Attention: [_____]

Re:  <u>Termination of Control Agreement</u>

You are hereby notified that the Uncertificated Securities Control Agreement between you, [Name of Pledgor] (the **"Pledgor"**) and the undersigned (a copy of which is attached) is terminated and you have no further obligations to the undersigned pursuant to such Agreement. Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to Pledged Shares (as defined in the Uncertificated Control Agreement) from the Pledgor.  This notice terminates any obligations you may have to the undersigned with respect to the Pledged Shares, however nothing contained in this notice shall alter any obligations which you may otherwise owe to the Pledgor pursuant to any other agreement.

You are instructed to deliver a copy of this notice by facsimile transmission to the Pledgor.

Very truly yours,
U.S. BANK NATIONAL ASSOCIATION,
as Priority Lien Collateral Trustee

By: _____
      Authorized Signatory

EXHIBIT B-12

CH\2055871.9

EXHIBIT C
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

**FORM OF TRADEMARK SECURITY AGREEMENT (PRIORITY LIEN)**

This **TRADEMARK SECURITY AGREEMENT**, dated as of [_____], 20[__] (as it may be amended, restated, supplemented or otherwise modified from time to time, this **"Agreement"**), is made by the entities identified as grantors on the signature pages hereto (collectively, the **"Grantors"**) in favor of **U.S. BANK NATIONAL ASSOCIATION**, as Priority Lien Collateral Trustee for the Secured Parties (in such capacity, together with its successors and permitted assigns, the **"Priority Lien Collateral Trustee"**).

**WHEREAS**, the Grantors are party to that certain Second Amended and Restated Priority Lien Debt Pledge and Security Agreement dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified from time to time, the **"Pledge and Security Agreement"**) between each of the Grantors and the other grantors party thereto and the Priority Lien Collateral Trustee pursuant to which the Grantors granted a security interest to the Priority Lien Collateral Trustee in the Trademark Collateral (as defined below) and are required to execute and deliver this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Grantors hereby agree with the Priority Lien Collateral Trustee as follows:

**SECTION 1.   Defined Terms**

Unless otherwise defined herein, terms defined in the Pledge and Security Agreement and used herein have the meaning given to them in the Pledge and Security Agreement.

**SECTION 2.   Grant of Security Interest in Trademark Collateral**

**SECTION 2.1  Grant of Security**.  Each Grantor hereby grants to the Priority Lien Collateral Trustee, for the benefit of the Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following, in each case whether now owned or existing or hereafter acquired, developed, created or arising and wherever located (collectively, the **"Trademark Collateral"**):

All of its United States trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing including, but not limited to: (i) the registrations and applications listed in Schedule A attached hereto, (ii) all extensions or renewals of any of the foregoing, (iii) all of the goodwill of the business connected with the use of and symbolized by any of the foregoing, (iv) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill, and (v) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages, and proceeds of suit.

EXHIBIT C-1

CH\2055871.9

**SECTION 2.2  Certain Limited Exclusions**.  Notwithstanding anything herein to the contrary, in no event shall the Trademark Collateral include or the security interest granted under Section 2.1 hereof attach to any intent-to-use United States Trademark applications for which an amendment to allege use or statement of use has not been filed under federal law or, if filed, has not been deemed in conformance with federal law.

## SECTION 3.   Security Agreement

The security interest granted pursuant to this Agreement is granted in conjunction with the security interest granted to the Priority Lien Collateral Trustee for the Secured Parties pursuant to the Pledge and Security Agreement, and the Grantors hereby acknowledge and affirm that the rights and remedies of the Priority Lien Collateral Trustee with respect to the security interest in the Trademark Collateral made and granted hereby are more fully set forth in the Pledge and Security Agreement.  In the event that any provision of this Agreement is deemed to conflict with the Pledge and Security Agreement, the provisions of the Pledge and Security Agreement shall control.

## SECTION 4.   Governing Law

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK (OTHER THAN ANY MANDATORY PROVISIONS OF LAW RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OF THE SECURITY INTEREST).

## SECTION 5.   Counterparts

This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

[Remainder of page intentionally left blank]

EXHIBIT C-2

CH\2055871.9

**IN WITNESS WHEREOF,** each Grantor has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**[NAME OF GRANTOR]**

By: _____

Name:

Title:

**[NAME OF GRANTOR]**

By: _____

Name:

Title:

EXHIBIT C-3

Accepted and Agreed:

**U.S. BANK NATIONAL ASSOCIATION,**
as Priority Lien Collateral Trustee


By: _____
      Authorized Signatory

EXHIBIT C-4

**SCHEDULE A**
**to**
**TRADEMARK SECURITY AGREEMENT (PRIORITY LIEN)**


**TRADEMARK REGISTRATIONS AND APPLICATIONS**

| Mark | Serial No. | Filing Date | Registration No. | Registration Date |
|------|-----------|-------------|------------------|-------------------|
|      |           |             |                  |                   |
|      |           |             |                  |                   |
|      |           |             |                  |                   |
|      |           |             |                  |                   |
|      |           |             |                  |                   |

EXHIBIT C-5

EXHIBIT D
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

## FORM OF PATENT SECURITY AGREEMENT (PRIORITY LIEN)

This **PATENT SECURITY AGREEMENT**, dated as of [_____], 20[__] (as it may be amended, restated, supplemented or otherwise modified from time to time, this **"Agreement"**), is made by the entities identified as grantors on the signature pages hereto (collectively, the **"Grantors"**) in favor of **U.S. BANK NATIONAL ASSOCIATION**, as Priority Lien Collateral Trustee for the Secured Parties (in such capacity, together with its successors and permitted assigns, the **"Priority Lien Collateral Trustee"**).

**WHEREAS**, the Grantors are party to that certain Second Amended and Restated Priority Lien Debt Pledge and Security Agreement dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified from time to time, the **"Pledge and Security Agreement"**) between each of the Grantors and the other grantors party thereto and the Priority Lien Collateral Trustee pursuant to which the Grantors granted a security interest to the Priority Lien Collateral Trustee in the Patent Collateral (as defined below) and are required to execute and deliver this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Grantors hereby agree with the Priority Lien Collateral Trustee as follows:

**SECTION. 1.   Defined Terms**

Unless otherwise defined herein, terms defined in the Pledge and Security Agreement and used herein have the meaning given to them in the Pledge and Security Agreement.

**SECTION 2.   Grant of Security Interest**

Each Grantor hereby grants to the Priority Lien Collateral Trustee, for the benefit of the Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following, in each case whether now owned or existing or hereafter acquired, developed, created or arising and wherever located (collectively, the **"Patent Collateral"**):

All of its United States patents and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including, but not limited to: (i) each patent and patent application listed in Schedule A attached hereto (as such schedule may be amended or supplemented from time to time), (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (iii) all rights corresponding thereto, (iv) all inventions and improvements described therein, (v) all rights to sue for past, present and future infringements thereof, (vi) all claims, damages, and proceeds of suit arising therefrom, and (vii) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages, and proceeds of suit.

**SECTION 3.   Security Agreement**

EXHIBIT D-1

The security interest granted pursuant to this Agreement is granted in conjunction with the security interest granted to the Priority Lien Collateral Trustee for the Secured Parties pursuant to the Pledge and Security Agreement, and the Grantors hereby acknowledge and affirm that the rights and remedies of the Priority Lien Collateral Trustee with respect to the security interest in the Patent Collateral made and granted hereby are more fully set forth in the Pledge and Security Agreement.  In the event that any provision of this Agreement is deemed to conflict with the Pledge and Security Agreement, the provisions of the Pledge and Security Agreement shall control.

**SECTION 4.   Governing Law**

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK (OTHER THAN ANY MANDATORY PROVISIONS OF LAW RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OF THE SECURITY INTEREST).

**SECTION 5.   Counterparts**

This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

[Remainder of page intentionally left blank]

EXHIBIT D-2

**IN WITNESS WHEREOF,** each Grantor has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**[NAME OF GRANTOR]**

By: _____
     Name:
     Title:

**[NAME OF GRANTOR]**

By: _____
     Name:
     Title:

EXHIBIT D-3

Accepted and Agreed:

**U.S. BANK NATIONAL ASSOCIATION,**
as Priority Lien Collateral Trustee


By: _____
 Authorized Signatory

EXHIBIT D-4

**SCHEDULE A**
**to**
**PATENT SECURITY AGREEMENT (PRIORITY LIEN)**

**PATENTS AND PATENT APPLICATIONS**

| Title | Application No. | Filing Date | Patent No. | Issue Date |
|-------|----------------|-------------|------------|------------|
|       |                |             |            |            |
|       |                |             |            |            |
|       |                |             |            |            |
|       |                |             |            |            |
|       |                |             |            |            |

EXHIBIT D-5

EXHIBIT E
TO SECOND AMENDED AND RESTATED
PRIORITY LIEN DEBT PLEDGE AND SECURITY AGREEMENT

**FORM OF COPYRIGHT SECURITY AGREEMENT (PRIORITY LIEN)**

This **COPYRIGHT SECURITY AGREEMENT**, dated as of [_____], 20[__] (as it may be amended, restated, supplemented or otherwise modified from time to time, this **"Agreement"**), is made by the entities identified as grantors on the signature pages hereto (collectively, the **"Grantors"**) in favor of **U.S. BANK NATIONAL ASSOCIATION**, as Priority Lien Collateral Trustee for the Secured Parties (in such capacity, together with its successors and permitted assigns, the **"Priority Lien Collateral Trustee"**).

**WHEREAS**, the Grantors are party to that certain Second Amended and Restated Priority Lien Debt Pledge and Security Agreement dated as of April 16, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the **"Pledge and Security Agreement"**) between each of the Grantors and the other grantors party thereto and the Priority Lien Collateral Trustee pursuant to which the Grantors granted a security interest to the Priority Lien Collateral Trustee in the Copyright Collateral (as defined below) and are required to execute and deliver this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Grantors hereby agree with the Priority Lien Collateral Trustee as follows:

**SECTION 1.   Defined Terms**

Unless otherwise defined herein, terms defined in the Pledge and Security Agreement and used herein have the meaning given to them in the Pledge and Security Agreement.

**SECTION 2.   Grant of Security Interest**

Each Grantor hereby grants to the Priority Lien Collateral Trustee, for the benefit of the Secured Parties, a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under the following, in each case whether now owned or existing or hereafter acquired, developed, created or arising and wherever located (collectively, the **"Copyright Collateral"**):

All of its United States copyrights (including Community designs), including but not limited to copyrights in software and databases, and all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor including, without limitation, the registrations and applications listed in Schedule A attached hereto, (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto, (iv) all rights to sue for past, present and future infringements thereof, and (v) all Proceeds of the foregoing, including, without limitation, royalties, income, payments, claims, damages and proceeds of suit.

**SECTION 3.   Security Agreement**

CH\2055871.9

The security interest granted pursuant to this Agreement is granted in conjunction with the security interest granted to the Priority Lien Collateral Trustee for the Secured Parties pursuant to the Pledge and Security Agreement, and the Grantors hereby acknowledge and affirm that the rights and remedies of the Priority Lien Collateral Trustee with respect to the security interest in the Copyright Collateral made and granted hereby are more fully set forth in the Pledge and Security Agreement.  In the event that any provision of this Agreement is deemed to conflict with the Pledge and Security Agreement, the provisions of the Pledge and Security Agreement shall control.

**SECTION 4.   Governing Law**

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK (OTHER THAN ANY MANDATORY PROVISIONS OF LAW RELATING TO THE LAW GOVERNING PERFECTION AND THE EFFECT OF PERFECTION OF THE SECURITY INTEREST).

**SECTION 5.   Counterparts**

This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

[Remainder of page intentionally left blank]

EXHIBIT E-2

**IN WITNESS WHEREOF,** each Grantor has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**[NAME OF GRANTOR]**

By: _____
    Name:
    Title:

**[NAME OF GRANTOR]**

By: _____
    Name:
    Title:

EXHIBIT E-3

Accepted and Agreed:

**U.S. BANK NATIONAL ASSOCIATION,**
as Priority Lien Collateral Trustee


By: _____
       Authorized Signatory

EXHIBIT E-4

**SCHEDULE A**
**to**
**COPYRIGHT SECURITY AGREEMENT (PRIORITY LIEN)**

**COPYRIGHT REGISTRATIONS AND APPLICATIONS**

| Title | Application No. | Filing Date | Registration No. | Registration Date |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

EXHIBIT E-5

EXHIBIT K TO
CREDIT AND GUARANTY AGREEMENT

**INTERCOMPANY NOTE**

Note Number: _____                Dated:_____, 20[\_\_]

FOR VALUE RECEIVED, **MURRAY ENERGY CORPORATION**, an Ohio corporation (**"Borrower"**), **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation (**"Holdings"**), and certain Subsidiaries of Borrower (collectively, the **"Group Members"** and each, a **"Group Member"**) which are party to this subordinated intercompany note (this **"Promissory Note"**) promise to pay to the order of such other Group Member as it makes loans to such Group Member (each Group Member which borrows money pursuant to this Promissory Note is referred to herein as a "**Payor**" and each Group Member which makes loans and advances pursuant to this Promissory Note is referred to herein as a **"Payee"**), on demand, in lawful money as may be agreed upon from time to time by the relevant Payor and Payee, in immediately available funds and at the appropriate office of the Payee, the aggregate unpaid principal amount of all loans and advances heretofore and hereafter made by such Payee to such Payor and any other indebtedness now or hereafter owing by such Payor to such Payee as shown either on Schedule A attached hereto (and any continuation thereof) or in the books and records of such Payee.  The failure to show any such indebtedness or any error in showing such indebtedness shall not affect the obligations of any Payor hereunder.  Capitalized terms used herein but not otherwise defined herein shall have the meanings given such terms in the Amended and Restated Collateral Trust Agreement dated as of December 5, 2013 (as it may be amended, restated, supplemented or otherwise modified, the "**Agreement**"), by and among Borrower, the other Guarantors party thereto from time to time, **DEUTSCHE BANK AG NEW YORK BRANCH**, as Priority Lien Administrative Agent, the additional Priority Lien Representatives party thereto from time to time, **THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**, as Trustee under the Indenture, the additional Parity Lien Representatives party thereto from time to time, and **U.S. BANK NATIONAL ASSOCIATION**, as Collateral Trustee.

The unpaid principal amount hereof from time to time outstanding shall bear interest at a rate equal to the rate as may be agreed upon in writing from time to time by the relevant Payor and Payee.  Interest shall be due and payable at such times as may be agreed upon from time to time by the relevant Payor and Payee.  Upon demand for payment of any principal amount hereof, accrued but unpaid interest on such principal amount shall also be due and payable.  Interest shall be paid in any lawful currency as may be agreed upon by the relevant Payor and Payee and in immediately available funds.  Interest shall be computed for the actual number of days elapsed on the basis of a year consisting of 365 days.

Each Payor and any endorser of this Promissory Note hereby waives (to the extent permitted by applicable law) presentment, demand, protest and notice of any kind.  No failure to exercise, and no delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of such rights.

This Promissory Note has been pledged to the Collateral Trustee, for the benefit of the Secured Parties, by each Payee that is the Borrower or a Guarantor (a "**Credit Party**"), as security for such Payee's obligations, if any, under the Secured Debt Documents to which such Payee is a party. Each Payor acknowledges and agrees that after the occurrence of and during the continuation of any event that constitutes a default under any Secured Debt Document entitling the Collateral Trustee to foreclose upon, collect or otherwise enforce its Liens under the Security Documents (an "**Event of Default**"), the Collateral Trustee may exercise all the rights of each Payee that is a Credit Party under this Promissory Note and will not be subject to any abatement, reduction, recoupment, defense (other than payment in full), setoff or counterclaim available to such Payor.

Each Payee agrees that any and all claims of such Payee against any Payor that is a Credit Party or any endorser of this Promissory Note, or against any of their respective properties, shall be subordinate and subject in right of payment to the Secured Obligations until all of the Secured Obligations have been performed and paid in full (other than contingent indemnification obligations not due and payable) and all commitments to extend credit under any Secured Debt Document have been terminated; provided, that each Payor that is a Credit Party may make payments to the applicable Payee so long as no Event of Default shall have occurred and be continuing; and provided, further, that upon the waiver, remedy or cure of such Event of Default, such payments shall be permitted; and provided, further, that all loans and advances made by a Payee pursuant to this Promissory Note shall be received by the applicable Payor subject to the provisions of the Secured Debt Documents. Notwithstanding any right of any Payee to ask, demand, sue for, take or receive any payment from any Payor, all rights, Liens and security interests of such Payee, whether now or hereafter arising and howsoever existing, in any assets of any Payor (whether constituting part of the security or collateral given to any Secured Party to secure payment of all or any part of the Secured Obligations or otherwise) shall be and hereby are subordinated to the rights of the Secured Parties in such assets. Except as expressly permitted by the Secured Debt Documents, the Payees shall have no right to possession of any such asset or to foreclose upon, or exercise any other remedy in respect of, any such asset, whether by judicial action or otherwise, unless and until all of the Secured Obligations shall have been performed and paid in full (other than contingent indemnification obligations not due and payable) and all commitments have been expired or terminated.

After the occurrence of and during the continuation of an Event of Default, if all or any part of the assets of any Payor, or the proceeds thereof, are subject to any distribution, division or application to the creditors of any Payor, whether partial or complete, voluntary or involuntary, and whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding, or if the business of any Payor is dissolved or if (except as expressly permitted by the Secured Debt Documents) all or substantially all of the assets of any Payor are sold, then, and in any such event, any payment or distribution of any kind or character, whether in cash, securities or other investment property, or otherwise, which shall be payable or deliverable upon or with respect to any indebtedness of such Payor to any Payee ("**Payor Indebtedness**") shall be paid or delivered directly to the Collateral Trustee for application to any of the Secured Obligations, due or to become due, until all of the Secured Obligations have been performed and paid in full (other than contingent indemnification obligations not due and payable) and all commitments to extend credit under any Secured Debt Document have been terminated. After the occurrence of and during the continuation of an

EXHIBIT K-2

Event of Default, each Payee that is a Credit Party irrevocably authorizes, empowers and appoints the Collateral Trustee as such Payee's attorney-in-fact (which appointment is coupled with an interest and is irrevocable) to demand, sue for, collect and receive every such payment or distribution and give acquittance therefor and to make and present for and on behalf of such Payee such proofs of claim and take such other action, in the Collateral Trustee's own names or in the name of such Payee or otherwise, as the Collateral Trustee may deem necessary or advisable for the enforcement of this Promissory Note.  After the occurrence of and during the continuation of an Event of Default, each Payee that is a Credit Party also agrees to execute, verify, deliver and file any such proofs of claim in respect of the Payor Indebtedness requested by the Collateral Trustee.  After the occurrence of and during the continuation of an Event of Default, the Collateral Trustee may vote such proofs of claim in any such proceeding (and the applicable Payee shall not be entitled to withdraw such vote), receive and collect any and all dividends or other payments or disbursements made on Payor Indebtedness in whatever form the same may be paid or issued and apply the same on account of any of the Secured Obligations in accordance with the Agreement.  Upon the occurrence and during the continuation of any Event of Default, should any payment, distribution, security or other investment property or instrument or any proceeds thereof be received by any Payee that is a Credit Party upon or with respect to Payor Indebtedness owing to such Payee prior to such time as the Secured Obligations have been performed and paid in full (other than contingent indemnification obligations not due and payable) and all commitments to extend credit under any Secured Debt Document have expired or been terminated, such Payee that is a Credit Party shall receive and hold the same for the benefit of the Secured Parties, and shall forthwith deliver the same to the Collateral Trustee, for the benefit of the Secured Parties, in precisely the form received (except for the endorsement or assignment of such Payee where necessary or advisable in the Collateral Trustee's judgment), for application to any of the Secured Obligations in accordance with the Agreement, due or not due, and, until so delivered, the same shall be segregated from the other assets of such Payee for the benefit of the Secured Parties.  Upon the occurrence and during the continuance of an Event of Default, if such Payee fails to make any such endorsement or assignment to the Collateral Trustee, the Collateral Trustee or any of its officers, employees or representatives are hereby irrevocably authorized to make the same.  Each Payee that is a Credit Party agrees that until the Secured Obligations have been performed and paid in full (other than contingent indemnification obligations not due and payable) and all commitments to extend credit under any Secured Debt Document have expired or been terminated, such Payee will not (i) assign or transfer, or agree to assign or transfer, to any Person (other than in favor of the Collateral Trustee for the benefit of the Secured Parties pursuant to the Pledge and Security Agreement or otherwise) any claim such Payee has or may have against any Payor, (ii) upon the occurrence and during the continuance of an Event of Default, discount or extend the time for payment of any Payor Indebtedness, or (iii) otherwise amend, modify, supplement, waive or fails to enforce any provision of this Promissory Note.

The Secured Parties shall be third party beneficiaries hereof and shall be entitled to enforce the subordination and other provisions hereof.

Notwithstanding anything to the contrary contained herein, in any other Secured Debt Document or in any such promissory note or other instrument, this Promissory Note shall not be deemed replaced, superseded or in any way modified by any promissory note or other instrument

EXHIBIT K-3

entered into on or after the date hereof which purports to create or evidence any loan or advance by any Group Member to any other Group Member.

THIS PROMISSORY NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

From time to time after the date hereof, additional Subsidiaries of the Group Members may become parties hereto by executing a counterpart signature page to this Promissory Note (each additional Subsidiary, an **"Additional Payor"**).   Upon delivery of such counterpart signature page to the Payees, notice of which is hereby waived by the other Payors, each Additional Payor shall be a Payor and shall be as fully a party hereto as if such Additional Payor were an original signatory hereof.   Each Payor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Payor hereunder.   This Promissory Note shall be fully effective as to any Payor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Payor hereunder.

This Promissory Note may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

[Remainder of page intentionally left blank]

EXHIBIT K-4

CH\2055450.10

IN WITNESS WHEREOF, each Payor has caused this Promissory Note to be executed and delivered by its proper and duly authorized officer as of the date set forth above.

MURRAY ENERGY CORPORATION


By:_____
  Name: [Robert D. Moore]
  Title:   [Executive Vice President, Chief Operating
           Officer and Chief Financial Officer]


MURRAY ENERGY HOLDINGS CO.


By:_____
  Name: [Robert D. Moore]
  Title:  [Chief Financial Officer]

EXHIBIT K-5

AMCA COAL LEASING, INC.
AMCOAL HOLDINGS, INC.
AMERICAN COMPLIANCE COAL, INC.
AMERICAN EQUIPMENT & MACHINE, INC.
AMERICAN NATURAL GAS, INC.
ANDALEX RESOURCES MANAGEMENT, INC.
ANDALEX RESOURCES, INC.
AVONMORE RAIL LOADING, INC.
BELMONT COAL, INC.
CANTERBURY COAL COMPANY
COAL RESOURCES, INC.
COAL RESOURCES HOLDINGS CO.
CONSOLIDATED LAND COMPANY
GENWAL RESOURCES, INC.
KANAWHA TRANSPORTATION CENTER, INC.
KENAMERICAN RESOURCES, INC.
MILL CREEK MINING COMPANY
MURRAY AMERICAN RESOURCES, INC.
MURRAY SOUTH AMERICA, INC.
OHIOAMERICAN ENERGY, INCORPORATED
OHIO ENERGY TRANSPORTATION, INC.
ONEIDA COAL COMPANY, INC.
PENNAMERICAN COAL, INC.
PINSKI CORP.
PLEASANT FARMS, INC.
PREMIUM COAL, INC.
SPRING CHURCH COAL COMPANY
THE AMERICAN COAL COMPANY
UTAHAMERICAN ENERGY, INC.
WEST RIDGE RESOURCES, INC.


By:_____
 Name: [Robert D. Moore]
 Title:  [Authorized Signatory]



EXHIBIT K-6

AMERICANHOCKING ENERGY, INC.

By:_____
  Name: [Michael D. Loiacono]
  Title:   [Secretary and Treasurer]

EXHIBIT K-7

MAPLE CREEK MINING, INC.
MAPLE CREEK PROCESSING, INC.
OHIO VALLEY RESOURCES, INC.
SUNBURST RESOURCES, INC.
THE OHIO VALLEY COAL COMPANY
THE OHIO VALLEY TRANSLOADING
COMPANY
UMCO ENERGY, INC.


By:_____
  Name: [Ronnie D. Dietz]
  Title:   [Treasurer]


EXHIBIT K-8

MONVALLEY TRANSPORTATION CENTER, INC.
THE OKLAHOMA COAL COMPANY


By:_____
  Name: [James R. Turner]
  Title:   [Treasurer]

EXHIBIT K-9

WEST VIRGINIA RESOURCES, INC.


By:_____
   Name: [Robert L. Putsock]
   Title:   [Secretary and Treasurer]

EXHIBIT K-10

PENNAMERICAN COAL L.P.

By: PINSKI CORP.
Its: Managing Partner


By:_____
   Name: [Robert D. Moore]
   Title:   [Treasurer and Secretary]

EXHIBIT K-11

AMERICAN ENERGY CORPORATION
AMERICANMOUNTAINEER ENERGY, INC.
ANCHOR LONGWALL AND REBUILD,
INC.
CORPORATE AVIATION SERVICES, INC.
EMPIRE DOCK, INC.
ENERGY RESOURCES, INC.
ENERGY TRANSPORTATION, INC.
PENNSYLVANIA TRANSLOADING, INC.
T D K COAL SALES, INCORPORATED
THE AMERICAN COAL SALES COMPANY


By:_____
  Name: [Michael O. McKown]
  Title:    [Authorized Signatory]


EXHIBIT K-12

CONSOLIDATION COAL COMPANY


By:_____
    Name:
    Title:

EXHIBIT K-13

EIGHTY-FOUR MINING COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-14

MCELROY COAL COMPANY

By:_____
   Name:
   Title:

EXHIBIT K-15

SOUTHERN OHIO COAL COMPANY

By:_____
   Name:
   Title:

EXHIBIT K-16

CENTRAL OHIO COAL COMPANY

By:_____
   Name:
   Title:

EXHIBIT K-17

KEYSTONE COAL MINING CORP.


By:_____
    Name:
    Title:

EXHIBIT K-18

MON RIVER TOWING INC.

By:_____
        Name:
        Title:

EXHIBIT K-19

TWIN RIVERS TOWING COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-20

CCC RCPC LLC

By:_____
    Name:
    Title:

EXHIBIT K-21

CCC LAND RESOURCES LLC

By:_____
    Name:
    Title:

EXHIBIT K-22

AMERICAN MINE SERVICES, INC.

By:_____
   Name:
   Title:

EXHIBIT K-24

AMERICANMOUNTAINEER PROPERTIES, INC.

By:_____
    Name:
    Title:

EXHIBIT K-25

MURRAY AMERICAN ENERGY, INC.

By:_____
    Name:
    Title:

EXHIBIT K-26

THE OHIO COUNTY COAL COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-27

THE MARSHALL COUNTY COAL COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-28

THE MONONGALIA COUNTY COAL
COMPANY


By:_____
   Name:
   Title:

EXHIBIT K-29

THE MARION COUNTY COAL COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-30

THE HARRISON COUNTY COAL COMPANY

By:_____

    Name:
    Title:

EXHIBIT K-31

MURRAY AMERICAN TRANSPORTATION, INC.

By:_____
    Name:
    Title:

EXHIBIT K-32

MURRAY KEYSTONE PROCESSING, INC.

By:_____
   Name:
   Title:

EXHIBIT K-33

MURRAY AMERICAN RIVER TOWING, INC.
THE FRANKLIN COUNTY COAL COMPANY
THE MEIGS COUNTY COAL COMPANY
THE MUSKINGUM COUNTY COAL COMPANY
THE WASHINGTON COUNTY COAL COMPANY


By: _____
    Name:
    Title:

EXHIBIT K-34

MURRAY AMERICAN KENTUCKY TOWING, INC.

By: _____
  Name:
  Title:

EXHIBIT K-35

MURRAY EQUIPMENT & MACHINE, INC.

By: _____
   Name:
   Title:

EXHIBIT K-36

THE MCLEAN COUNTY COAL COMPANY

By: _____
   Name:
   Title:

EXHIBIT K-37

MURRAY AMERICAN COAL, INC.

By: _____
   Name:
   Title:

EXHIBIT K-38

**[NAME OF EACH OTHER SUBSIDIARY OF BORROWER]**


By: _____
Name:
Title:

EXHIBIT K-39

Schedule A

TRANSACTIONS UNDER PROMISSORY NOTE

| Date | Name of Payor | Name of Payee | Amount of Advance This Date | Amount of Principal Paid This Date | Outstanding Principal Balance from Payor to Payee This Date | Notation Made By |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

EXHIBIT K-A-1

ENDORSEMENT

FOR VALUE RECEIVED, each of the undersigned does hereby sell, assign and transfer to _____ all of its right, title and interest in and to the Intercompany Note, dated April [__], 2015 (as amended, restated, supplemented or otherwise modified from time to time, the **"Promissory Note"**; capitalized terms used herein without definition have the definitions given to such terms in the Promissory Note), made by **MURRAY ENERGY CORPORATION**, an Ohio corporation, **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, and certain subsidiaries of the Borrower or any other Person that is or becomes a party thereto, and payable to the undersigned.  This endorsement is intended to be attached to the Promissory Note and, when so attached, shall constitute an endorsement thereof.

The initial undersigned shall be the Group Members (as defined in the Promissory Note) party to the Secured Debt Documents on the date of the Promissory Note.  From time to time after the date thereof, additional subsidiaries of the Group Members shall become parties to the Promissory Note (each, an **"Additional Payee"**) and a signatory to this endorsement by executing a counterpart signature page to the Promissory Note and to this endorsement.  Upon delivery of such counterpart signature page to the Payors, notice of which is hereby waived by the other Payees, each Additional Payee shall be a Payee and shall be as fully a Payee under the Promissory Note and a signatory to this endorsement as if such Additional Payee were an original Payee under the Promissory Note and an original signatory hereof.  Each Payee expressly agrees that its obligations arising under the Promissory Note and hereunder shall not be affected or diminished by the addition or release of any other Payee under the Promissory Note or hereunder.  This endorsement shall be fully effective as to any Payee that is or becomes a signatory hereto regardless of whether any other Person becomes or fails to become or ceases to be a Payee to the Promissory Note or hereunder.

Dated: _____

MURRAY ENERGY CORPORATION


By:_____
  Name: [Robert D. Moore]
  Title:   [Executive Vice President, Chief Operating
          Officer and Chief Financial Officer]


MURRAY ENERGY HOLDINGS CO.


By:_____
  Name: [Robert D. Moore]
  Title:   [Chief Financial Officer]


EXHIBIT K-A-2

AMCA COAL LEASING, INC.
AMCOAL HOLDINGS, INC.
AMERICAN COMPLIANCE COAL, INC.
AMERICAN EQUIPMENT & MACHINE, INC.
AMERICAN NATURAL GAS, INC.
ANDALEX RESOURCES MANAGEMENT, INC.
ANDALEX RESOURCES, INC.
AVONMORE RAIL LOADING, INC.
BELMONT COAL, INC.
CANTERBURY COAL COMPANY
COAL RESOURCES, INC.
COAL RESOURCES HOLDINGS CO.
CONSOLIDATED LAND COMPANY
GENWAL RESOURCES, INC.
KANAWHA TRANSPORTATION CENTER, INC.
KENAMERICAN RESOURCES, INC.
MILL CREEK MINING COMPANY
MURRAY AMERICAN RESOURCES, INC.
MURRAY SOUTH AMERICA, INC.
OHIOAMERICAN ENERGY, INCORPORATED
OHIO ENERGY TRANSPORTATION, INC.
ONEIDA COAL COMPANY, INC.
PENNAMERICAN COAL, INC.
PINSKI CORP.
PLEASANT FARMS, INC.
PREMIUM COAL, INC.
SPRING CHURCH COAL COMPANY
THE AMERICAN COAL COMPANY
UTAHAMERICAN ENERGY, INC.
WEST RIDGE RESOURCES, INC.


By:_____
  Name: [Robert D. Moore]
  Title:   [Authorized Signatory]


EXHIBIT K-A-3

AMERICANHOCKING ENERGY, INC.


By:_____
  Name: [Michael D. Loiacono]
  Title:   [Secretary and Treasurer]

EXHIBIT K-A-4

MAPLE CREEK MINING, INC.
MAPLE CREEK PROCESSING, INC.
OHIO VALLEY RESOURCES, INC.
SUNBURST RESOURCES, INC.
THE OHIO VALLEY COAL COMPANY
THE OHIO VALLEY TRANSLOADING
COMPANY
UMCO ENERGY, INC.


By:_____
  Name: [Ronnie D. Dietz]
  Title:   [Treasurer]

EXHIBIT K-A-5

MONVALLEY TRANSPORTATION CENTER,
INC.
THE OKLAHOMA COAL COMPANY


By:_____
  Name: [James R. Turner]
  Title:   [Treasurer]

EXHIBIT K-A-6

WEST VIRGINIA RESOURCES, INC.

By:_____
  Name: [Robert L. Putsock]
  Title:   [Secretary and Treasurer]

EXHIBIT K-A-7

PENNAMERICAN COAL L.P.

By: PINSKI CORP.
Its: Managing Partner


By:_____
  Name: [Robert D. Moore]
  Title:    [Treasurer and Secretary]

EXHIBIT K-A-8

AMERICAN ENERGY CORPORATION
AMERICANMOUNTAINEER ENERGY, INC.
ANCHOR LONGWALL AND REBUILD, INC.
CORPORATE AVIATION SERVICES, INC.
EMPIRE DOCK, INC.
ENERGY RESOURCES, INC.
ENERGY TRANSPORTATION, INC.
PENNSYLVANIA TRANSLOADING, INC.
T D K COAL SALES, INCORPORATED
THE AMERICAN COAL SALES COMPANY


By:_____
  Name: [Michael O. McKown]
  Title:   [Authorized Signatory]

EXHIBIT K-A-9

CONSOLIDATION COAL COMPANY


By:_____
    Name:
    Title:

EXHIBIT K-A-10

EIGHTY-FOUR MINING COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-A-11

MCELROY COAL COMPANY


By:_____
   Name:
   Title:

EXHIBIT K-A-12

SOUTHERN OHIO COAL COMPANY

By:_____
   Name:
   Title:

EXHIBIT K-A-13

CENTRAL OHIO COAL COMPANY


By:_____
    Name:
    Title:

EXHIBIT K-A-14

KEYSTONE COAL MINING CORP.


By:_____
    Name:
    Title:

EXHIBIT K-A-15

MON RIVER TOWING INC.

By:_____
    Name:
    Title:

EXHIBIT K-A-16

TWIN RIVERS TOWING COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-A-17

CCC RCPC LLC

By:_____
    Name:
    Title:

EXHIBIT K-A-18

CCC LAND RESOURCES LLC

By:_____
   Name:
   Title:

EXHIBIT K-A-19

AMERICAN MINE SERVICES, INC.

By:_____
    Name:
    Title:

EXHIBIT K-A-20

AMERICANMOUNTAINEER PROPERTIES, INC.


By:_____
    Name:
    Title:

EXHIBIT K-A-21

MURRAY AMERICAN ENERGY, INC.

By:_____
   Name:
   Title:

EXHIBIT K-A-22

THE OHIO COUNTY COAL COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-A-23

THE MARSHALL COUNTY COAL COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-A-24

THE MONONGALIA COUNTY COAL
COMPANY


By:_____
   Name:
   Title:

EXHIBIT K-A-25

THE MARION COUNTY COAL COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-A-26

THE HARRISON COUNTY COAL COMPANY

By:_____
    Name:
    Title:

EXHIBIT K-A-27

MURRAY AMERICAN TRANSPORTATION, INC.

By:_____
    Name:
    Title:

EXHIBIT K-A-28

MURRAY KEYSTONE PROCESSING, INC.

By:_____
    Name:
    Title:

EXHIBIT K-A-29

MURRAY AMERICAN RIVER TOWING, INC.
THE FRANKLIN COUNTY COAL COMPANY
THE MEIGS COUNTY COAL COMPANY
THE MUSKINGUM COUNTY COAL COMPANY
THE WASHINGTON COUNTY COAL COMPANY


By: _____
    Name:
    Title:

EXHIBIT K-A-30

CH\2055450.10

MURRAY AMERICAN KENTUCKY TOWING, INC.

By: _____
  Name:
  Title:

EXHIBIT K-A-31

MURRAY EQUIPMENT & MACHINE, INC.

By: _____
   Name:
   Title:

EXHIBIT K-A-32

THE MCLEAN COUNTY COAL COMPANY

By: _____
   Name:
   Title:

EXHIBIT K-A-33

MURRAY AMERICAN COAL, INC.

By: _____
   Name:
   Title:

EXHIBIT K-A-34

EXHIBIT L TO
CREDIT AND GUARANTY AGREEMENT

## JOINDER AGREEMENT

**THIS JOINDER AGREEMENT**, dated as of [_____ __], 20[__] (this "**Agreement**"), by and among **[NEW LENDERS]** (each a "**Lender**" and collectively the "**Lenders**"), **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**"), and **DEUTSCHE BANK AG NEW YORK BRANCH** ("**DB**"), as Administrative Agent.

## RECITALS:

**WHEREAS,** reference is hereby made to the Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **Borrower**, **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DB**, as Administrative Agent; and

**WHEREAS,** subject to the terms and conditions of the Credit Agreement, Borrower may obtain New Term Loan Commitments by entering into one or more Joinder Agreements with the New Term Loan Lenders.

**NOW, THEREFORE,** in consideration of the premises and agreements, provisions and covenants herein contained, the parties hereto agree as follows:

Each Lender party hereto hereby agrees to commit to provide its respective Commitment as set forth on Schedule A annexed hereto, on the terms and subject to the conditions set forth below:

Each Lender (i) confirms that it has received a copy of the Credit Agreement and the other Credit Documents, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Joinder Agreement (this "**Agreement**") and it is sophisticated with respect to decisions to make loans similar to those contemplated to be made hereunder and it is experienced in making loans of such type; (ii) agrees that it will, independently and without reliance upon Administrative Agent or any other Lender or Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iii) appoints and authorizes Administrative Agent and Syndication Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Credit Documents as are delegated to Administrative Agent and Syndication Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto and (iv)

EXHIBIT L-1

agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender.

Each Lender hereby agrees to make its Commitment on the following terms and conditions[1]:

1.    **Applicable Margin.**  The Applicable Margin for each Series [__] New Term Loan shall mean, as of any date of determination, [___]% per annum

2.    **Principal Payments.**  Borrower shall make principal payments on the Series [__] New Term Loans in installments on the dates and in the amounts set forth below:

| (A)<br>Payment<br>Date | (B)<br>Scheduled<br>Repayment of<br>Series [__] New Term Loans |
|---|---|
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
|  | $_____ |
| **TOTAL** | $_____ |

3.    **Voluntary and Mandatory Prepayments.**  Scheduled installments of principal of the Series [__] New Term Loans set forth above shall be reduced in connection with any

---

[1]    Insert completed items 1-7 as applicable, with respect to New Term Loans with such modifications as may be agreed to by the parties hereto to the extent consistent with Section 2.24 of the Credit Agreement.

EXHIBIT L-2

voluntary or mandatory prepayments of the Series [__] New Term Loans in accordance with Sections 2.12, 2.13 and 2.14 of the Credit Agreement, respectively.

4.    **Prepayment Fees.**  Borrower agrees to pay to each New Term Loan Lender the following prepayment fees, if any:  [_____].

**[Insert other additional prepayment provisions with respect to New Term Loans]**

5.    **Other Fees**.  Borrower agrees to pay each New Term Loan Lender its Pro Rata Share of an aggregate fee equal to [_____ __, ____] on [_____ __, ____].

6.    **Proposed Borrowing**.  This Agreement represents Borrower's request to borrow Series [__] New Term Loans from New Term Loan Lender as follows (the "**Proposed Borrowing**"):

   a.    Business Day of Proposed Borrowing:  _____, ____

   b.    Amount of Proposed Borrowing:  $_____

   c.    Interest rate option:    ☐   a. Base Rate Loan(s)
                                  ☐   b. Eurodollar Rate Loans
                                         with an initial Interest
                                         Period of ____ month(s)

7.    **[New Lenders**.  Each New Term Loan Lender acknowledges and agrees that upon its execution of this Agreement and the making of Series [___] New Term Loans that such New Term Loan Lender shall become a "Lender" under, and for all purposes of, the Credit Agreement and the other Credit Documents, and shall be subject to and bound by the terms thereof, and shall perform all the obligations of and shall have all rights of a Lender thereunder.][2]

8.    **Credit Agreement Governs.**  Except as set forth in this Agreement, Series [__] New Term Loans shall otherwise be subject to the provisions of the Credit Agreement and the other Credit Documents.

9.    **Borrower's Certifications**.[3]  By its execution of this Agreement, the undersigned officer of the Borrower hereby certifies, in the capacity of an officer and not in any individual capacity, that:

   i.    Both before and after giving effect to the proposed borrowing, the representations and warranties contained in the Credit Agreement and the other Credit Documents are true and correct in all material respects on and as of the date hereof to the same extent as though made on and as of the date hereof, except to the extent such representations and warranties

---

[2]    Insert bracketed language if the lending institution is not already a Lender.

[3]    Subject to "Sungard" limitations if applicable.

EXHIBIT L-3

specifically relate to an earlier date, in which case such representations and warranties were true and correct in all material respects on and as of such earlier date; <u>provided</u> that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and

    ii.    As of the date hereof, no Default or Event of Default exists immediately before or after giving effect to the Proposed Borrowing.

10.    **Borrower Covenants**.  By its execution of this Agreement, Borrower hereby covenants that Borrower shall deliver or cause to be delivered the following legal opinions and documents: [_____], together with all other legal opinions and other documents reasonably requested by Administrative Agent in connection with this Agreement; and

11.    **Eligible Assignee.**  By its execution of this Agreement, each New Term Loan Lender represents and warrants that it is an Eligible Assignee.

12.    **Notice**.  For purposes of the Credit Agreement, the initial notice address of each New Term Loan Lender shall be as set forth below its signature below.

13.    **Non-US Lenders**.  For each New Term Loan Lender that is a Non-US Lender, delivered herewith to Administrative Agent are such forms, certificates or other evidence with respect to United States federal income tax withholding matters as such New Term Loan Lender may be required to deliver to Administrative Agent pursuant to Section 2.20(d) of the Credit Agreement.

14.    **Recordation of the New Loans**.  Upon execution and delivery hereof, Administrative Agent will record the Series [__] New Term Loans made by New Term Loan Lenders in the Register.

15.    **Amendment, Modification and Waiver.**  This Agreement may not be amended, restated, modified or waived except by an instrument or instruments in writing signed and delivered on behalf of each of the parties hereto.

16.    **Entire Agreement**.  This Agreement, the Credit Agreement and the other Credit Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and verbal, among the parties or any of them with respect to the subject matter hereof.

17.    **GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.**

EXHIBIT L-4

18.   **Severability**.  In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

19.   **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

[Remainder of page intentionally left blank]

EXHIBIT L-5

**IN WITNESS WHEREOF**, each of the undersigned has caused its duly authorized officer to execute and deliver this Joinder Agreement as of [_____ __], 20[__].

**[NAME OF LENDER]**

By:_____

Name:

Title:

Notice Address:

Attention:

Telephone:

Facsimile:

**MURRAY ENERGY CORPORATION**

By: _____

Name:

Title:

**Consented to by:**

**DEUTSCHE BANK AG NEW YORK BRANCH,**

as Administrative Agent

By: _____

      Authorized Signatory

EXHIBIT L-6

SCHEDULE A
TO JOINDER AGREEMENT

| Name of Lender | Type of Commitment | Amount |
|---|---|---|
| [_____] | New Term Loan Commitment | $_____ |
| | | |
| | | Total:  $_____ |

EXHIBIT L-S-1

EXHIBIT M TO
CREDIT AND GUARANTY AGREEMENT

**MODIFIED DUTCH AUCTION PROCEDURES**

*This Outline is intended to summarize certain basic terms of the modified Dutch auction procedures pursuant to and in accordance with the terms and conditions of Section 10.6(i) of the Credit Agreement, of which this Exhibit M is a part (the "**Auction Procedures**"). It is not intended to be a definitive statement of all of the terms and conditions of a modified Dutch auction, the definitive terms and conditions for which shall be set forth in the applicable auction procedures set for each Auction (the "**Offer Documents**"). None of the Administrative Agent, the Auction Manager and any other Agent, or any of their respective Affiliates, makes any recommendation pursuant to the Offer Documents as to whether or not any Lender should sell its Term Loans to Borrower (the "**Purchaser**") pursuant to the Offer Documents, nor shall the decision by the Administrative Agent, the Auction Manager or any other Agent (or any of their Affiliates) in its capacity as a Lender be deemed to constitute such a recommendation. Each Lender should make its own decision on whether to sell any of its Term Loans and, if it decides to do so, the principal amount of and price to be sought for such Term Loans. In addition, each Lender should consult its own attorney, business advisor or tax advisor as to legal, business, tax and related matters concerning this Auction and the Offer Documents. Capitalized terms not otherwise defined in this Exhibit have the meanings assigned to them in the Credit Agreement.*

 **Summary.** The Purchaser may conduct one or more modified Dutch auctions in order to purchase Term Loans (each, an "**Auction**") pursuant to the procedures described herein.

 **Notice Procedures.** In connection with each Auction, the Purchaser will provide notification to the Auction Manager (for distribution to the Lenders) of the Term Loans substantially in the form of Annex A to this Exhibit M that will be the subject of the Auction (an "**Auction Notice**"). Each Auction Notice shall contain (i) the maximum principal amount of Term Loans that the Purchaser is willing to purchase in the Auction (the "**Auction Amount**"), which shall be no less than $10,000,000 or an integral multiple of $1,000,000 in excess thereof; (ii) the range of discounts to par (the "**Discount Range**"), expressed as a range of prices per $1,000 (in increments of $5), at which the Purchaser would be willing to purchase Term Loans in the Auction; and (iii) the date on which the Auction will conclude, on which date Return Bids (as defined below) will be due by 1:00 p.m. New York time, as such date and time may be extended (such time, the "**Expiration Time**") for a period not exceeding three Business Days upon notice by the Purchaser to the Auction Manager received not less than 24 hours before the original Expiration Time; provided, however, that only one extension per offer shall be permitted. An Auction shall be regarded as a "**Failed Auction**" in the event that either (x) Purchaser withdraws such Auction in accordance with the terms hereof or (y) the Expiration Time occurs with no Qualifying Bids having been received. In the event of a Failed Auction, Purchaser shall not be permitted to deliver a new Auction Notice prior to the date occurring five (5) Business Days after such withdrawal or Expiration Time, as the case may be.

**Reply Procedures.**  In connection with any Auction, each Lender holding Term Loans wishing to participate in such Auction shall, prior to the Expiration Time, provide the Auction Manager with a notice of participation substantially in the form of Annex B to this Exhibit M (the "**Return Bid**") which shall specify (i) a discount to par expressed as a price per $1,000 (in increments of $5) of Term Loans (the "**Reply Price**") within the Discount Range and (ii) the principal amount of Term Loans, in an amount not less than $1,000,000 or an integral multiple in excess thereof, that such Lender is willing to offer for sale at its Reply Price (the "**Reply Amount**"); provided, that Lender may submit a Reply Amount that is less than the minimum amount and/or incremental amount requirements described above only if the Reply Amount comprises the entire amount of Term Loans held by such Lender.  Lenders may only submit one Return Bid per Auction but each Return Bid may contain up to three component bids, each of which may result in a separate Qualifying Bid (as defined below) and each of which will not be contingent on any other component bid submitted by such Lender resulting in a Qualifying Bid.  In addition to the Return Bid, the participating Lender must execute and deliver, to be held by the Auction Manager, an Affiliate Assignment Agreement.  The Purchaser will not purchase any Term Loans at a price that is outside of the applicable Discount Range, nor will any Return Bids (including any component bids specified therein) submitted at a price that is outside such applicable Discount Range be considered in any calculation of the Applicable Threshold Price (as defined below).

**Acceptance Procedures.**  Based on the Reply Prices and Reply Amounts received by the Auction Manager, the Auction Manager, in consultation with the Purchaser, will calculate the lowest purchase price (the "**Applicable Threshold Price**") for the Auction within the Discount Range for the Auction that will allow the Purchaser to complete the Auction by purchasing the full Auction Amount (or such lesser amount of Term Loans for which the Purchaser has received Qualifying Bids (as defined below)).  The Purchaser shall purchase Term Loans from each Lender whose Return Bid is within the Discount Range and contains a Reply Price that is equal to or less than the Applicable Threshold Price (each, a "**Qualifying Bid**").  All Term Loans included in Qualifying Bids (including multiple component Qualifying Bids contained in a single Return Bid) received at a Reply Price lower than the Applicable Threshold Price will be purchased at the applicable Reply Price and shall not be subject to proration.

**Proration Procedures.**  All Term Loans offered in Return Bids (or, if applicable, any component bid thereof) constituting Qualifying Bids at the Applicable Threshold Price will be purchased at the Applicable Threshold Price; provided that if the aggregate principal amount of all Term Loans for which Qualifying Bids have been submitted in any given Auction at the Applicable Threshold Price would exceed the remaining portion of the Auction Amount (after deducting all Term Loans to be purchased below the Applicable Threshold Price), the Purchaser shall purchase the Term Loans for which the Qualifying Bids submitted were at the Applicable Threshold Price ratably based on the respective principal amounts offered and in an aggregate amount equal to the amount necessary to complete the purchase of the Auction Amount.  No Return Bids (or any component thereof) will be accepted above the Applicable Threshold Price.

**Notification Procedures.**  Auction Manager will calculate the Applicable Threshold Price and post the Applicable Threshold Price and proration factor onto an internet site (including an IntraLinks, SyndTrak or other electronic workspace) in accordance with the Auction Manager's standard dissemination practices by 4:00 p.m. New York time on the same

M-2

Business Day as the date the Return Bids were due.  The Auction Manager will insert the principal amount of Term Loans to be assigned and the applicable settlement date into each applicable Affiliate Assignment Agreement received in connection with a Qualifying Bid.  Upon request of the submitting Lender, the Auction Manager will promptly return any Affiliate Assignment Agreement received in connection with a Return Bid that is not a Qualifying Bid (as defined below).

**Additional Procedures.**  Once initiated by an Auction Notice, the Purchaser may withdraw an Auction only in the event that, as of such time, no Qualifying Bid has been received by the Auction Manager.  Furthermore, in connection with any Auction, upon submission by a Lender of a Return Bid, such Lender will not have any withdrawal rights.  Any Return Bid (including any component bid thereof) delivered to the Auction Manager may not be modified, revoked, terminated or cancelled by a Lender.  However, an Auction may become void if the conditions to the purchase of Term Loans by the Purchaser required by the terms and conditions of Section 10.6(i)(ii) of the Credit Agreement are not met.  The purchase price for each purchase of Term Loans shall be paid by the Purchaser directly to the respective assigning Lender on a settlement date as determined by the Auction Manager in consultation with the Purchaser (which shall be no later than ten (10) Business Days after the date Return Bids are due).  The Purchaser shall execute each applicable Affiliate Assignment Agreement received in connection with a Qualifying Bid.

All questions as to the form of documents and validity and eligibility of Term Loans that are the subject of an Auction will be determined by the Auction Manager, in consultation with the Purchaser, which determination will be final and binding.  The Auction Manager's interpretation of the terms and conditions of the Offer Document, in consultation with the Purchaser, will be final and binding.

None of the Administrative Agent, the Auction Manager, any other Agent or any of their respective Affiliates assumes any responsibility for the accuracy or completeness of the information concerning the Purchaser, the Credit Parties, or any of their Affiliates (whether contained in the Offer Documents or otherwise) or for any failure to disclose events that may have occurred and may affect the significance or accuracy of such information.

This Exhibit M shall not require the Purchaser to initiate any Auction.

M-3

## AUCTION NOTICE

[Murray Energy Corporation Letterhead]

[Deutsche Bank AG New York Branch], as Auction Manager
[60 Wall Street
New York, New York 10005]
Attention: [_____]
Fax No.: [_____]
Email: [_____]

Re: <u>Loan Auction</u>

Ladies and Gentlemen:

Reference is made to that certain Credit and Guaranty Agreement, dated as of April [__], 2015 (as amended from time to time, the "**Credit Agreement**"), by and among **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**"), **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain subsidiaries of Borrower, as guarantors, the lenders party thereto from time to time (the "**Lenders**"), DEUTSCHE BANK AG NEW YORK BRANCH, as administrative agent, and the other agents named therein.  Capitalized terms used but not defined herein have the meanings given to such terms in the Credit Agreement.

Borrower hereby gives notice to the Lenders that it desires to conduct the following Auction:

- Auction Amount:  $[_____] in principal amount of Term Loans[1]

- Discount Range:  Not less than $[_____] nor greater than $[_____] per $1,000 principal amount of Term Loans.

Borrower acknowledges that this Auction Notice may not be withdrawn other than in accordance with the Auction Procedures.  The Auction shall be consummated in accordance with the Auction Procedures with all Return Bids due no later than 1:00 p.m. (New York time) on [_____].

Borrower hereby represents and warrants that (i) no Default or Event of Default has occurred and is continuing or would result from such repurchase and (ii) Borrower will not use the proceeds of any loans under the Revolving Credit Agreement to acquire such Term Loans.  Borrower is not making any representation that it is not in possession of any information regarding Borrower, its Subsidiaries or its Affiliates, or their assets, Borrower's ability to perform its Obligations or any other matter that may be material to a decision by any Lender to participate in any Auction or enter into any Affiliate Assignment Agreement or any of the transactions contemplated thereby.

Very truly yours,

**MURRAY ENERGY CORPORATION**

By: _____
      Name:
      Title:

---

[1]  Modify, as appropriate, to: "$[_____] maximum cash value to be paid for all tendered Term Loans"

# RETURN BID

[Deutsche Bank AG New York Branch], as Auction Manager
[60 Wall Street
New York, New York 10005]
Attention: [_____]
Fax No.: [_____]
Email: [_____]

Ladies and Gentlemen:

Reference is made to that certain Credit and Guaranty Agreement, dated as of April 16, 2015 (as amended from time to time, the "**Credit Agreement**"), by and among **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**"), **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain subsidiaries of Borrower, as guarantors, the lenders party thereto from time to time (the "**Lenders**"), **DEUTSCHE BANK AG NEW YORK BRANCH**, as administrative agent, and the other agents named therein.   Capitalized terms used but not defined herein have the meanings given to such terms in the Credit Agreement.

The undersigned Lender hereby gives notice of its participation in the Auction by submitting the following Return Bid [1]                                                        :

| Reply Price (price per $1,000) | Reply Amount (principal amount of Term Loans) |
|---|---|
| US$_____ | US$_____ |
| US$_____ | US$_____ |
| US$_____ | US$_____ |

The undersigned Lender acknowledges that the submission of this Return Bid along with an executed Affiliate Assignment Agreement, to be held in escrow by the Auction Manager, obligates the Lender to sell the entirety or its pro rata portion of the Reply Amount in accordance with the Auction Procedures, as applicable.

Very truly yours,

[Name of Lender]

By:   _____
      Name:
      Title:

---

[1]     Lender may submit up to three component bids but need not submit more than one.  The sum of Lender's bid(s) may not exceed the aggregate principal face amount of Term Loans held by it as lender of record on the date of submission of its Return Bid.

Annex C to Exhibit M to
Credit and Guaranty Agreement

## AFFILIATE ASSIGNMENT AND ASSUMPTION AGREEMENT

This Affiliate Assignment and Assumption Agreement (this "**Assignment**") is dated as of the Affiliate Assignment Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "**Assignee**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto (the "**Standard Terms and Conditions**") are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Affiliate Assignment Effective Date [*in the case of an Auction*: inserted by the Auction Manager as contemplated in the Auction Procedures], (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including without limitation guarantees included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**").  Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | _____ |
| 2. | Assignee:<br>Markit Entity Identifier (if any): | _____<br>_____ |
| 3. | Borrower: | **MURRAY ENERGY CORPORATION** |
| 4. | Administrative Agent: | **DEUTSCHE BANK AG NEW YORK BRANCH**, as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | The Credit and Guaranty Agreement, dated as of April 16, 2015, by and among **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**"), **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain subsidiaries of Borrower, as guarantors, the lenders party thereto from time to time, **DEUTSCHE BANK AG NEW YORK BRANCH**, as administrative agent, and the other agents named therein. |

CH\2055450.10

6.      Assignor's Interest under the Credit Agreement:

| Facility | Aggregate Principal Face Amount of Term Loans of Assignor | Percentage of Term Loans of Assignor[1] |
|---|---|---|
| Term Loans | $_____ | _____% |

7.      Assigned Interest:

List below the Term Loans to be assigned by Assignor to Assignee **[in the case of an Auction:** , which shall be subject to the terms and conditions of the Auction, including, without limitation, the pro rata reduction procedures set forth in the Auction Procedures].

**[in the case of an Auction:**

| Reply Price with respect to Term Loans being offered for assignment to Assignee (price per $1,000 principal amount)[2] | Reply Amount (principal face amount of Term Loans to be Assigned to Assignee at relevant Reply Price) (subject to pro rata reduction)[3] | Pro Rated Principal Face Amount of Term Loans Assigned[4] | Percentage Assigned of Term Loans[5] |
|---|---|---|---|
| $_____ | $_____ | $_____ | _____% |
| $_____ | $_____ | $_____ | _____% |
| $_____ | $_____ | $_____ | _____% |

**[in the case of an open market purchase:**

---

[1]     Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders thereunder.  To be completed by Assignor.

[2]     To be completed by Assignor.

[3]     To be completed by Assignor.  **[In the case of an Auction:** The sum of Lender's Reply Amount(s) may not exceed the aggregate principal face amount of Term Loans held by it as lender of record on the date of submission of its Return Bid.]

[4]     **[In the case of an Auction:** To be completed by the Auction Manager, if necessary, based on the proration procedures set forth in the Auction Procedures.]

[5]     **[In the case of an Auction:** To be completed by the Auction Manager to at least 9 decimals as a percentage of the Term Loans of all Lenders thereunder.]

| Facility Assigned | Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans[6] |
|---|---|---|---|
| _____[7] | $_____ | $_____ | _____% |
| _____ | $_____ | $_____ | _____% |
| _____ | $_____ | $_____ | _____% |

8.      Affiliate Assignment Effective Date: _____, 20__ [*in the case of an Auction:*  TO BE INSERTED BY AUCTION MANAGER AND WHICH SHALL BE THE AFFILIATE ASSIGNMENT EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

---

[6]      Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[7]      Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Term Loan Commitment", "Term Loan", "New Term Loan Commitment", etc.)

9.       Notice and Wire Instructions:

**ASSIGNOR:**                                      **ASSIGNEE:**

**[NAME OF ASSIGNOR]**                   **[NAME OF ASSIGNEE]**

Notices:                                             Notices:

_____       _____
_____       _____
_____       _____
Attention:                                         Attention:
Telecopier:                                        Telecopier:

with a copy to:                                   with a copy to:

_____       _____
_____       _____
_____       _____
Attention:                                         Attention:
Telecopier:                                        Telecopier:

Wire Instructions:

        [*In the case of an assignment via Dutch Auction only:*  The Assignor acknowledges and agrees that (i) submission of a Return Bid in respect of the Term Loans will constitute a binding agreement between the Assignor and the Assignee in accordance with the terms and conditions of the Auction Procedures and the Credit Agreement; (ii) Term Loans will be deemed to have been accepted by the Assignee to the extent such Term Loans are validly offered by Assignor to Assignee in accordance with the terms and conditions of the Auction Procedures and the Credit Agreement upon notification by the Auction Manager to the Assignor that such Term Loans are part of a Qualifying Bid (subject to applicable proration in accordance with the terms and conditions of the Auction); and (iii) it does not have any withdrawal rights with respect to any offer to assign of its Term Loans.

        Subject to and effective upon the acceptance by the Assignee for purchase of the principal amount of the Term Loans to be assigned by the Assignor to the Assignee, the Assignor hereby irrevocably constitutes and appoints the Auction Manager as the true and lawful agent and attorney-in-fact of the Assignor with respect to such Term Loans, with full powers of substitution and revocation (such power of attorney being deemed to be an irrevocable power coupled with an interest) to complete or fill-in the blanks in this Assignment and deliver the completed Assignment to the Assignee and the Assignor.]

*[Signature page follows]*

The Assignor acknowledges and agrees that its offer to assign Term Loans [pursuant to the Auction Procedures] constitutes the Assignor's acceptance of the terms and conditions (including the proration procedures) contained in [the Auction Procedures,] the Credit Agreement and this Assignment.

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR
**[NAME OF ASSIGNOR]**

By:_____
Name:
Title:

ASSIGNEE
**[NAME OF ASSIGNEE]**

By:_____
Name:
Title:

Accepted:

**[DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent [and Auction Manager]] [[_____], as Auction Manager]

By:_____
Name: _____
Title: Authorized Signatory

**[MURRAY ENERGY CORPORATION**, as Borrower

By:_____
Name: _____
Title: _____]

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR AFFILIATE
ASSIGNMENT AND ACCEPTANCE

1.      Representations and Warranties.

1.1     Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is, and on the applicable Affiliate Assignment Effective Date will be, free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own decision to enter into this Assignment and to sell and assign the Assigned Interest on the basis of which it has made such decision, and (v) it is not a Defaulting Lender; [and] (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "**Credit Documents**"), or any collateral thereunder, (iii) the financial condition of Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document, [***in the case of an Auction***: and (c) has read and agrees to all of the terms and conditions (including the pro ration procedures) of the Auction Procedures set forth in the Offer Documents].  The Assignor will, upon request, execute and deliver any additional documents deemed by Administrative Agent or the Assignee to be necessary or desirable to complete the sale, assignment and transfer of the Assigned Interest.  In the event that the Assignor has determined for itself to not access any information disclosed by Assignee in connection with [the Auction or] this Assignment, the Assignor acknowledges that (i) other Lenders may have availed themselves of such information and (ii) none of Borrower, [the Auction Manager,] and Administrative Agent has any responsibility for the Assignor's decision to limit the scope of the information it has obtained in connection with [its evaluation of the Auction or] its decision to enter into this Assignment.  [***In the case of an assignment to an Affiliated Lender:*** The Assignor hereby acknowledges and agrees that in connection with this Assignment (A) the Assignee may have Excluded Information, (B) the Excluded Information may not be available to it, (C) it has independently and without reliance on any other party made its own analysis and determined to assign Term Loans to the Assignee pursuant to Section 10.6(j) of the Credit Agreement notwithstanding its lack of knowledge of the Excluded Information and (D) it waives and releases any claims it may have against the Administrative Agent, the Assignee, Borrower and its Subsidiaries with respect to the nondisclosure of the Excluded Information.]

1.2     Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement until such time as the Loans are automatically cancelled without further action by any Person on the Affiliate Assignment Effective Date, (ii) it meets the requirements of an Eligible Assignee under the Credit Agreement, (iii) it has transmitted same day funds to the Assignor on the Affiliate Assignment Effective Date, (iv) from and after the Affiliate Assignment Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (v) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising

discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (vi) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.1 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest, (vii) it has, independently and without reliance upon Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest and (viii) as of the Affiliate Assignment Effective Date, after giving effect to this Assignment, the aggregate principal amount of all Term Loans held by all Affiliated Lenders does not exceed 20% of the aggregate principal amount of all Term Loans outstanding under the Credit Agreement at the time of such purchase; and (b) agrees that (i) it will, independently and without reliance on Administrative Agent, [the Auction Manager,] the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, [*in the case of an assignment to Borrower:* (ii) it acknowledges that the Assigned Interest shall, from and after the Affiliate Assignment Effective Date, and without further action by any Person, be deemed cancelled for all purposes and no longer outstanding and that the Assignee shall have no ability to vote or receive payments in respect of the Assigned,] [*in the case of an assignment to an Affiliated Lender:* (iii) in connection with any (x) consent to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Credit Document or (y) direction to Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Credit Document, except with respect to any amendment, modification, waiver, consent or any action described in Section 10.5(b) of the Credit Agreement or that adversely affects it in a disproportionate manner as compared to other Lenders, it shall be deemed to have voted its interest as a Lender without discretion in such proportion as the allocation of voting with respect to such matter by Lenders who are not Affiliated Lenders,] (iv) solely in its capacity as a Lender, if any Credit Party shall be subject to any voluntary or involuntary proceeding commenced under any Debtor Relief Law, it shall be deemed to have voted in such proceedings in the same proportion as the allocation of voting with respect to such matter by those Lenders who are not Affiliated Lenders, except to the extent that any plan under the Debtor Relief Laws proposes to treat the Obligations of the Credit Parties under the Credit Documents held by it in a manner that is disproportionately less favorable to it than the proposed treatment of similar Obligations of the Credit Parties under the Credit Documents held by other Lenders, and it acknowledges that the foregoing constitutes an irrevocable proxy in favor of Administrative Agent to vote or consent on behalf of it in any proceeding in the manner set forth above, and (v) notwithstanding anything to the contrary in the Credit Agreement, it shall not have any right to (a) attend (including by telephone or electronic means) any meeting or discussions (or portion thereof) intended to be solely among Administrative Agent and Lenders other than the Affiliated Lenders, or (b) receive any information or material prepared by Administrative Agent intended to be disseminated solely to Lenders other than the Affiliated Lenders.

1.3    <u>No Violation of Laws</u>.  Each of the Assignor and Assignee acknowledges that it has not violated any applicable laws relating to this Assignment or the transactions contemplated herein.

2.    <u>Payments</u>.  Payment to the Assignor by the Assignee in respect of the settlement of the assignment of the Assigned Interest shall be paid by Assignee directly to the Assignor and shall include all unpaid interest that has accrued in respect of the Assigned Interest through the Affiliate Assignment Effective Date.  [*In the case of an assignment to Borrower:* No interest shall accrue with respect to the Assigned Interest from and after the Affiliate Assignment Effective Date and such Assigned Interest shall, from and after the Affiliate Assignment Effective Date,

and without further action by any Person, be deemed cancelled for all purposes and no longer outstanding.] [*In the case of an assignment to an Affiliated Lender:* From and after the Affiliate Assignment Effective Date, Administrative Agent shall make all payments in respect of the Assigned Interests (including payments of principal, interest, fees and other amounts) to the Assignor for amounts that have accrued to but excluding the Affiliate Assignment Effective Date and to Assignee for amounts that have accrued from and after the Affiliate Assignment Effective Date.]

3.      <u>No Default</u>.  On the Affiliate Assignment Effective Date, no [*in the case of an assignment to Borrower:* Default or] Event of Default has occurred and is continuing or would result from this Assignment.

4.      <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page of this Assignment by facsimile or in electronic format (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York without regard to conflict of laws principles thereof that would require the application of any law other than the law of the State of New York.

EXHIBIT N TO
CREDIT AND GUARANTY AGREEMENT

## INTERCREDITOR AGREEMENT

**[See attached]**

EXHIBIT N-1

EXECUTION VERSION

**AMENDED AND RESTATED INTERCREDITOR AGREEMENT**

between

**GOLDMAN SACHS BANK USA,**

**AS ABL AGENT,**

and

**U.S. BANK NATIONAL ASSOCIATION,**

**AS TERM DEBT TRUSTEE,**

Dated as of April 16, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE OF CONTENTS

**Page**

I.         DEFINITIONS ...................................................................................2
    1.1.       Defined Terms ...........................................................2
    1.2.       Terms Generally........................................................21

II.        LIEN PRIORITIES ............................................................22
    2.1.       Relative Priorities......................................................22
    2.2.       Prohibition on Contesting Liens ...............................24
    2.3.       Similar Liens and Agreements...................................24
    2.4.       Hedging Obligations ..................................................25

III.       EXERCISE OF REMEDIES; ENFORCEMENT ....................................25
    3.1.       Restrictions on the Term Debt Trustee and the Term Debt
               Claimholders...............................................................25
    3.2.       Restrictions on the ABL Agent and the ABL
               Claimholders...............................................................29
    3.3.       Enforcement; Collateral Access Rights ....................32
    3.5.       Turn Over and Tracing of and Priorities in Proceeds .........34
    3.6.       Inspections and Account Statements .......................36

IV.        PAYMENTS ................................................................36
    4.1.       Application of Proceeds.............................................36
    4.2.       Payments Over in Violation of Agreement..............37
    4.3.       Application of Payments............................................37
    4.4.       Revolving Nature of Obligations under the ABL Credit
               Agreement ..................................................................37

V.         OTHER AGREEMENTS .......................................................38
    5.1.       Releases......................................................................38
    5.2.       Insurance....................................................................39
    5.3.       Amendments to ABL Loan Documents and Term  Debt
               Documents ..................................................................40
    5.4.       Bailees for Perfection................................................41
    5.5.       Refinancings: When Discharge of ABL Obligations and
               Discharge of Term Debt Obligations Deemed to Not
               Have Occurred .............................................................43
    5.6.       Additional Term Debt .................................................44

VI.        INSOLVENCY OR LIQUIDATION PROCEEDINGS ...........................44
    6.1.       Finance and Use of Cash Collateral.........................44

CH\2049272.8

# TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| 6.2. | Relief from the Automatic Stay | 47 |
| 6.3. | Adequate Protection | 48 |
| 6.4. | Avoidance Issues | 50 |
| 6.5. | Reorganization Securities | 50 |
| 6.6. | Post-Petition Interest | 50 |
| 6.7. | Separate Grants of Security and Separate Classification | 51 |
| 6.8. | Asset Dispositions in an Insolvency or Liquidation Proceeding | 52 |
| VII. | RELIANCE; WAIVERS; ETC | 52 |
| 7.1. | Reliance | 52 |
| 7.2. | No Warranties or Liability | 52 |
| 7.3. | No Waiver of Lien Priorities | 53 |
| 7.4. | Obligations Unconditional | 54 |
| VIII. | MISCELLANEOUS | 55 |
| 8.1. | Conflicts | 55 |
| 8.2. | Effectiveness; Continuing Nature of this Agreement; Severability | 55 |
| 8.3. | Amendments; Waivers | 55 |
| 8.4. | Information Concerning Financial Condition of the Grantors and their Subsidiaries | 56 |
| 8.5. | Subrogation | 56 |
| 8.6. | APPLICABLE LAW, SUBMISSION TO JURISDICTION; WAIVERS JUDICIAL REFERENCE | 57 |
| 8.7. | Notices | 58 |
| 8.8. | Further Assurances | 58 |
| 8.9. | [RESERVED] | 58 |
| 8.10. | Specific Performance | 59 |
| 8.11. | Headings | 59 |
| 8.12. | Counterparts | 59 |
| 8.13. | Authorization | 59 |
| 8.14. | No Third Party Beneficiaries | 59 |
| 8.15. | Provisions Solely to Define Relative Rights | 60 |
| 8.16. | Marshaling of Assets | 60 |
| 8.17. | Exclusive Means of Exercising Rights under this Agreement | 60 |
| 8.18. | Interpretation | 61 |
| 8.19. | Term Debt Trustee | 61 |

CH\2049272.8

## AMENDED AND RESTATED INTERCREDITOR AGREEMENT

This AMENDED AND RESTATED INTERCREDITOR AGREEMENT (this "Agreement") is dated as of April 16, 2015 and entered into by and between GOLDMAN SACHS BANK USA, in its capacity as agent under the ABL Credit Agreement (as defined below), including its successors and assigns from time to time (the "ABL Agent"), and U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity, but solely in its capacity as collateral trustee under the Term Debt Documents (as defined below), including its successors and assigns from time to time (the "Term Debt Trustee") and is acknowledged by MURRAY ENERGY CORPORATION, an Ohio corporation (the "Company"), MURRAY ENERGY HOLDINGS CO., a Delaware corporation that directly or indirectly owns all of the Capital Stock of the Company ("Holdings"), and the Domestic Subsidiaries (as defined below) of the Company listed on the signature pages hereof (together with any Domestic Subsidiary that becomes a party hereto after the date hereof, each a "Company Subsidiary", and, collectively, the "Company Subsidiaries").  Unless otherwise specified herein, capitalized terms used in this Agreement have the meanings assigned to them in Article 1.

## RECITALS

The Company, Holdings, certain subsidiaries of the Company, the ABL Lenders, and the ABL Agent have entered into that certain Revolving Credit Agreement, dated as of December 5, 2013 (as amended by that certain Amendment No. 1, dated as of December 23, 2013, by that certain Amendment No. 2, dated as of the date hereof, and as may be further amended, restated, supplemented, modified, replaced, or Refinanced from time to time, in each case in accordance with this Agreement, the "Initial ABL Credit Agreement");

The Company, Holdings, certain subsidiaries of the Company, Deutsche Bank AG New York Branch, as administrative agent, other agents and lenders party thereto from time to time have entered into that certain Credit and Guaranty Agreement, dated as of the date hereof (as amended, restated, supplemented, modified, replaced, or Refinanced from time to time, in each case in accordance with this Agreement, the "Initial First Lien Term Loan Agreement");

The Company has issued 8.625% senior secured notes in a principal amount of $350,000,000 (the "Initial Senior Secured Notes") under an indenture, dated as of May 24, 2013 (as amended by that certain First Supplemental Indenture, dated as of November 5, 2013, by that certain Second Supplemental Indenture, dated as of May 8, 2014, by that certain Third Supplemental Indenture, dated as of April 1, 2015, by that certain Fourth Supplemental Indenture, dated as of April 10, 2015, and as may be further amended, supplemented, modified, replaced, or Refinanced from time to time, the "Initial Senior Secured Note Indenture") among the Company, Holdings, each Company Subsidiary, the Term Debt Trustee, as collateral trustee and The Bank of New York Mellon Trust Company, as trustee;

The Company has issued 9.50% senior secured notes in a principal amount of $400,000,000 (the "Secondary Senior Secured Notes") under an indenture, dated as of May 8, 2014 (as amended by that certain First Supplemental Indenture, dated as of April 1, 2015, by that certain Second Supplemental Indenture, dated as of April 10, 2015, and as may be further

amended, restated, supplemented, modified, replaced, or Refinanced from time to time, the "Secondary Senior Secured Note Indenture") among the Company, Holdings, each Company Subsidiary, the Term Debt Trustee, as collateral trustee and The Bank of New York Mellon Trust Company, as trustee;

The Company has issued 11.25% senior secured notes in a principal amount of $1,300,000,000 (the "Tertiary Senior Secured Notes") under an indenture, dated as of the date hereof (as amended restated, supplemented, modified, replaced, or Refinanced from time to time, the "Tertiary Senior Secured Note Indenture") among the Company, Holdings, each Company Subsidiary, the Term Debt Trustee, as collateral trustee and The Bank of New York Mellon Trust Company, as trustee;

The Grantors have granted to the ABL Agent, for the benefit of the ABL Claimholders, a first priority Lien on the ABL Collateral and a third priority lien on the Fixed Asset Collateral all as more particularly described in the ABL Loan Documents (as defined below);

The Grantors have granted to (a) the Term Debt Trustee, for the benefit of the First Lien Term Debt Claimholders, a first priority Lien on the Fixed Asset Collateral and a second priority Lien on the ABL Collateral, and (b) the Term Debt Trustee, for the benefit of the Second Lien Term Debt Claimholders, a second priority Lien on the Fixed Asset Collateral and a third priority Lien on the ABL Collateral, in each case, with such priorities among the Term Debt Claimholders as more particularly described in the Collateral Trust Agreement and other Term Debt Documents; and

The Term Debt Trustee, on behalf of the Term Debt Claimholders, and the ABL Agent, on behalf of the ABL Claimholders, wish to set forth their agreement as to certain of their respective rights and obligations with respect to the ABL Collateral and Fixed Asset Collateral of the Grantors and their understanding relative to their respective positions in certain other assets and properties of the Grantors, in each case by amending and restating that certain Intercreditor Agreement dated as of December 5, 2013 (the "Existing Intercreditor Agreement") among the ABL Agent, the Term Debt Trustee, the Company, Holdings and the Company Subsidiaries party thereto.

## AGREEMENT

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## I.
## DEFINITIONS.

1.1.    Defined Terms.    As used in this Agreement, the following terms shall have the following meanings:

CH\2049272.8

"ABL Account Debtor" means any Person that is obligated to make payments on any ABL Accounts.

"ABL Accounts" means all Accounts of each Grantor that constitute ABL Collateral.

"ABL Agent" has the meaning assigned to that term in the Preamble to this Agreement, and shall include one or more other agents or similar contractual representatives for one or more lenders, banks, purchasers, noteholders or investors that at any time succeeds to, substitutes, replaces or Refinances any or all of the ABL Obligations at any time and from time to time.

"ABL Claimholders" means, at any relevant time, the holders of ABL Obligations at that time, including, without limitation, the ABL Lenders and the ABL Agent.

"ABL Collateral" means all right, title and interest of any Grantor in and to the following types of property, whether now-owned or hereafter created, acquired or arising and wherever located:

        (a)    Accounts (but excluding any Accounts which constitute identifiable Proceeds of Fixed Asset Collateral);

        (b)    any Collection Account and any other Deposit Accounts and Securities Accounts (including all cash, cash equivalents, Money, checks, Instruments, funds, ACH transfers, wired funds and other funds and property, in each case, to the extent held in or on deposit in any of the foregoing, but excluding (x) other Investment Property, (y) any cash, cash equivalents, Money, checks, Instruments, funds, ACH transfers, wired funds and other funds and property, in each case held in or on deposit in the Fixed Asset Collateral Proceeds Account and (z) any identifiable Proceeds of Fixed Asset Collateral held in the Collection Account or any other Deposit Accounts or Securities Accounts;

        (c)    Inventory;

        (d)    Cash Collateral;

        (e)    Letter of Credit Rights arising out of, or related to, or derivative of any of the property or interests in property described in subsections (a), (b) and (c) of the definition of "ABL Collateral";

        (f)    letters of credit transferred to the ABL Agent or any ABL Lender, or with respect to which the Proceeds thereof have been assigned to the ABL Agent or any ABL Lender, or on which the ABL Agent or any ABL Lender is named as beneficiary, in each case arising out of, related to, or derivative of the property or interests described in subsections (a), (b) and (c) of the definition of "ABL Collateral";

CH\2049272.8

(g)      Supporting Obligations and Commercial Tort Claims, in each case, solely to the extent arising out of, or related to, or derivative of the property or interests in property described in subsections (a), (b) and (c) of the definition of "ABL Collateral";

(h)      contracts, contract rights and other General Intangibles (including, without limitation, Supporting IP but excluding Intellectual Property constituting Fixed Asset Collateral or identifiable Proceeds of Fixed Asset Collateral), all Documents, Chattel Paper, and Instruments (including promissory notes), in each case, to the extent arising out of, or related to, or derivative of the property or interests in property described in subsections (a), (b) and (c) of the definition of "ABL Collateral";

(i)      books and Records relating to the items referred to in the preceding clauses (a) through (h) (including all books, databases, data processing software, customer lists, and Records, whether tangible or electronic, to the extent containing any information relating to any of the items referred to in the preceding clauses (a) through (h)); and

(j)      collateral security and guarantees with respect to any of the foregoing and all Proceeds, products, substitutions, replacements, accessions, cash, Money, insurance proceeds, Instruments, Securities, Security Entitlements, Financial Assets, Deposit Accounts and Securities Accounts, in each case, received as Proceeds of any of the foregoing, but excluding (x) any cash, cash equivalents, Money, checks, Instruments, funds, ACH transfers, wired funds, Investment Property, and other funds and property, in each case held in or on deposit in the Fixed Asset Collateral Proceeds Account and (y) any identifiable Proceeds of Fixed Asset Collateral in accordance with Section 3.5.

Notwithstanding anything to the contrary herein, the term "ABL Collateral" shall exclude assets described in the definition of "Excluded Property".  All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the UCC.

"ABL Credit Agreement" means collectively, (a) the Initial ABL Credit Agreement and (b) any other credit agreement or credit agreements, one or more debt facilities, indenture, note purchase agreements and/or commercial paper facilities, in each case, with banks or other lenders, institutional investors or purchasers providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from (or sell such receivables to) such lenders), letters of credit, bankers' acceptances, notes, bonds, securities or other borrowings, in each case, that have been incurred to increase, replace (whether upon or after termination or otherwise), Refinance or refund in whole or in part from time to time the ABL Obligations outstanding under the Initial ABL Credit Agreement or any other agreement or instrument referred to in this clause, whether or not such increase, replacement, Refinancing or refunding occurs (i) with the original parties thereto, (ii) on one or more separate occasions or (iii) simultaneously or not with the termination or repayment of the Initial ABL Credit Agreement or any other agreement or instrument referred to in this clause, unless such agreement or instrument expressly provides that it is not intended to be and is not an ABL Credit Agreement, or such agreement or instrument is not a Permitted

-4-

Refinancing Agreement.  Any reference to the ABL Credit Agreement hereunder shall be deemed a reference to any ABL Credit Agreement then in existence.

"ABL Default" means an "Event of Default" as defined in the ABL Credit Agreement.

"ABL DIP Financing" has the meaning assigned to that term in Section 6.1(a).

"ABL Hedging Obligations" means Hedging Obligations (other than any First Lien Term Loan Hedging Obligations) that are secured under the ABL Loan Documents.

"ABL Lenders" means the "Lenders" under and as defined in the ABL Credit Agreement and any other Person which extends credit under the ABL Credit Agreement.

"ABL Loan Documents" means the ABL Credit Agreement and the "Loan Documents" (as defined in the ABL Credit Agreement), and each of the other agreements, documents and instruments executed pursuant thereto, and any other document or instrument executed or delivered at any time in connection with any ABL Obligations including any intercreditor or joinder agreement among holders of ABL Obligations, to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, extended or Refinanced from time to time, in each case, in accordance with the provisions of this Agreement.

"ABL Obligations" means all "Obligations", "Hedging Liability", and "Bank Product Liability" (each as defined in the Initial ABL Credit Agreement, as in effect on the date hereof). "ABL Obligations" shall include all interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant ABL Loan Document, whether or not the claim for such interest, fees and expenses is allowed as a claim in such Insolvency or Liquidation Proceeding.  Notwithstanding anything to the contrary herein, the term "ABL Obligations" shall exclude as of any date of determination that portion of the Obligations then outstanding under the ABL Loan Documents in excess of the following amount determined as follows (such amount, the "ABL Obligations Cap"): (a) $225,000,000, *plus* (b) solely as a component of an ABL DIP Financing with respect to any Insolvency or Liquidation Proceeding, an additional amount equal to the lesser of (i) 10% of the revolving loan commitments (funded and unfunded) under the ABL Loan Documents outstanding immediately prior to the date of commencement of such Insolvency or Liquidation Proceeding, and (ii) $22,500,000, *plus* (c) interest, fees, costs, expenses, indemnities and other amounts payable pursuant to the terms of the ABL Loan Documents, whether or not the same are added to the principal amount of the ABL Obligations and including the same as would accrue and become due but for the commencement of an Insolvency or Liquidation Proceeding, whether or not such amounts are allowed or allowable in whole or in part in any such Insolvency or Liquidation Proceeding, *plus* (d) five (5) percent of the letters of credit, bankers acceptances or similar instruments outstanding under the ABL Credit Agreement, *plus* (e) an amount sufficient to terminate and repay in full in cash all ABL Hedging Obligations and all Bank Product Liability under the ABL Loan Documents.

"ABL Security Documents" means the Collateral Documents (as defined in the ABL Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any ABL Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, restated, renewed, extended, supplemented or otherwise modified from time to time, in each case, in accordance with the provisions of this Agreement.

"ABL Standstill Period" has the meaning set forth in Section 3.2(a)(i).

"Access Rights Notice" has the meaning assigned to that term in Section 3.3(b).

"Access Period" has the meaning set forth in Section 3.3(b).

"Account Agreements" means any lockbox account agreement, pledged account agreement, blocked account agreement, securities account control agreement, or any similar deposit or securities account agreements among one or more of the Agents, one or more Grantors and the relevant financial institution depository or securities intermediary.

"Additional Facilities Amount" means the "Additional Facilities Amount" as defined in the Initial  First Lien Term Loan Agreement as in effect on the date hereof.

"Additional First Lien Term Debt Debtholders" means the "Holders", lenders, banks, noteholders, investors or purchasers (or terms similar thereto) as defined in any Additional First Lien Term Debt Facility.

"Additional First Lien Term Debt Facility" means one or more debt facilities, credit agreements, note purchase agreements, commercial paper facilities, indentures or other agreements for which the requirements of Section 5.6 of this Agreement have been satisfied, in each case with banks, lenders, purchasers, investors or trustees, agents or other representatives of any of the foregoing providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables or interests in such receivables to such lenders or other Persons or to special purpose entities formed to borrow from such lenders or other Persons against such receivables or sell such receivables or interests in such receivables), letters of credit, notes, bonds, securities or other borrowings or extensions of credit, in each case, as amended, restated, modified, renewed, refunded, restructured, increased, supplemented, replaced or Refinanced in whole or in part from time to time in accordance with this Agreement and each applicable First Lien Term Debt Security Document; provided that neither the ABL Credit Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture, and the First Lien Term Loan Agreement, nor any Refinancing of any of the foregoing shall constitute an Additional First Lien Term Debt Facility at any time.

"Additional Second Lien Term Debt Debtholders" means the "Holders", lenders, banks, noteholders, investors or purchasers (or terms similar thereto) as defined in any Additional Second Lien Term Debt Facility.

-6-

"Additional Second Lien Term Debt Facility" means one or more debt facilities, credit agreements, note purchase agreements, commercial paper facilities, indentures or other agreements for which the requirements of Section 5.6 of this Agreement have been satisfied, in each case with banks, lenders, purchasers, investors or trustees, agents or other representatives of any of the foregoing providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables or interests in such receivables to such lenders or other Persons or to special purpose entities formed to borrow from such lenders or other Persons against such receivables or sell such receivables or interests in such receivables), letters of credit, notes, bonds, securities or other borrowings or extensions of credit, in each case, as amended, restated, modified, renewed, refunded, restructured, increased, supplemented, replaced or Refinanced in whole or in part from time to time in accordance with this Agreement and each applicable Second Lien Term Debt Security Document; provided that neither the ABL Credit Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture and the First Lien Term Loans, nor any Refinancing of any of the foregoing shall constitute an Additional Second Lien Term Debt Facility at any time.

"Additional Term Debt" has the meaning assigned to that term in Section 5.6.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.  For purposes of this definition, a Person shall be deemed to "control" or be "controlled by" a Person if such Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through ownership of equity interests, by contract or otherwise.

"Agents" means, collectively, the ABL Agent and the Term Debt Trustee, and "Agent" means, individually, the ABL Agent or the Term Debt Trustee, as applicable.

"Agreement" means this Amended and Restated Intercreditor Agreement, as amended, restated, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Bank Product Liability" has the meaning assigned such term in the Initial ABL Credit Agreement as in effect on the date hereof.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Business Day" means a day that is a "Business Day" under both the Term Debt Documents and the ABL Credit Agreement.

"Capital Stock" means (a) in the case of a corporation, capital stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of capital stock, (c) in the case of a partnership, partnership interests (whether general or limited), (d) in the case of a limited liability company, membership interests and (e) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person and all rights, warrants or options exchangeable for or convertible into any of the items described in clauses (a) through (e) above; provided that with respect to the foregoing, Capital Stock shall exclude any debt securities convertible into Capital Stock, whether or not such debt securities include any right of vote or participation with Capital Stock.

"Cash Collateral" means "Cash Collateral" as defined in the ABL Credit Agreement as in effect on the date hereof.

"Claimholders" means, collectively, the Term Debt Claimholders and the ABL Claimholders, and individually, each a "Claimholder".

"Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, constituting or purporting to constitute either ABL Collateral or Fixed Asset Collateral.

"Collateral Trust Agreement" means that certain amended and restated collateral trust agreement dated as of December 5, 2013 by and among the Term Debt Trustee on behalf of the First Lien Term Debt Claimholders and the Second Lien Term Debt Claimholders, and acknowledged by the Grantors specifying the relative lien priorities and related matters as among the holders of Term Debt Obligations.

"Collection Account" has the meaning assigned such term in the Initial ABL Credit Agreement, as in effect on the date hereof.

"Company" has the meaning assigned to that term in the Preamble to this Agreement.

"Company Subsidiary" has the meaning assigned to that term in the Preamble to this Agreement.

"Conforming Plan of Reorganization" means any Plan of Reorganization whose provisions are consistent with the provisions of this Agreement or that has been accepted by the voluntary required vote of each class of the ABL Claimholders and the Term Debt Claimholders.

"Deposit Accounts" has the meaning given such term in the UCC, except that such term shall exclude the Fixed Asset Collateral Proceeds Account.

"Discharge of ABL Obligations" means, except to the extent otherwise expressly provided in Section 5.5:

(a)     payment in full in cash of all ABL Obligations (other than (x) contingent obligations or contingent indemnification obligations described in clauses (c) and (d)

below, (y) contingent obligations or contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time, and (z) obligations that expressly survive the satisfaction and discharge of the ABL Loan Documents);

(b)     termination or expiration of all commitments, if any, to extend credit under all ABL Loan Documents;

(c)     termination, cash collateralization (in an amount and manner reasonably satisfactory to the ABL Agent, but in no event greater than 105% of the aggregate undrawn face amount, plus commissions, fees, and expenses) or backstop of all letters of credit issued under the ABL Credit Agreement in compliance with the terms of therewith; and

(d)     cash collateralization (or support by a letter of credit) for any contingent indemnification obligations consisting of ABL Obligations not yet due and payable but with respect to which a claim or demand for payment, whether oral or written, has been made at such time (in an amount and manner reasonably satisfactory to the ABL Agent).

"Discharge of Term Debt Obligations" means, except to the extent otherwise expressly provided in Section 5.5, payment in full in cash of all Term Debt Obligations, satisfaction and discharge of the First Lien Term Loan Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture, the Additional First Lien Term Debt Facility, if any, and the Additional Second Lien Term Debt Facility, if any (other than obligations that expressly survive such satisfaction and discharge) and cash collateralization (or support by a letter of credit) for any contingent obligations (including any reimbursement obligations for costs and expenses) and contingent indemnification obligations consisting of any Term Debt Obligations not yet due and payable but with respect to which a claim or demand for payment, whether oral or written, has been made at such time (in an amount and manner reasonably satisfactory to the Term Debt Trustee).

"Disposition" or "Disposes of" means any sale, lease, exchange, transfer or other disposition of any Collateral.

"Domestic Subsidiary" means with respect to any Person, any Subsidiary of such Person other than a Foreign Subsidiary.

"Enforcement" means, collectively or individually for one or both of the ABL Agent and the Term Debt Trustee, when an ABL Default or a Term Debt Default, as applicable, has occurred and is continuing, to exercise or enforce or attempt to exercise or enforce any right or remedies against any ABL Collateral under the ABL Loan Documents, the Term Debt Documents and/or under any applicable law, by self-help repossession, by judicial enforcement, by non-judicial foreclosure sale, by set-off, by notification to account obligors or depository institutions of any Grantor, by any sale, lease, or other disposition implemented by any Grantor following an ABL Default or a Term Debt Default, as applicable, in connection with which the ABL Agent or the Term Debt Trustee has agreed to release its Liens on the subject property

pursuant to Section 5.1(a) or Section 5.1(c) hereof, or otherwise, but in all cases excluding (i) the establishment of borrowing base reserves, collateral ineligibles, or other conditions for advances, (ii) the changing of advance rates or advance sublimits, (iii) the imposition of a default rate or late fee, (iv) the cessation of lending pursuant to the provisions of the ABL Credit Agreement, including upon the occurrence of a default or the existence of an overadvance, (v) the filing of a proof of claim in any Insolvency or Liquidation Proceeding, (vi) the consent by the ABL Agent to disposition by any Grantor of any of the ABL Collateral pursuant to Section 5.1(a)(C) following the occurrence and during the continuance of any ABL Default, (vii) the consent by the Term Debt Trustee to disposition by any Grantor of any of the Fixed Asset Collateral pursuant to Section 5.1(c)(C) following the occurrence and during the continuance of any Term Debt Default, (viii) the acceleration of the Term Debt Obligations or the ABL Obligations, (ix) the commencement or joining with any Person to commence, or filing a petition to commence, an Insolvency or Liquidation Proceeding and (x) the imposition of cash dominion by the ABL Agent unless such cash dominion is imposed following the occurrence and during the continuance of an ABL Default and the concomitant cessation of lending and/or the imposition of a restriction on the amount of proceeds of ABL Collateral that may be used by any or all of the Company and the Company Subsidiaries to pay operating expenses in the ordinary course of business or unless the ABL Agent has delivered written notice to the Term Debt Trustee that the exclusion under this clause no longer applies**).**

"Enforcement Notice" means a written notice delivered, at a time when an ABL Default or a Term Debt Default has occurred and is continuing, by either the ABL Agent or the Term Debt Trustee to the other Agent announcing that an Enforcement by any or all of the ABL Claimholders or any or all of the Term Debt Claimholders, as the case may be, has commenced, specifying the relevant ABL Default or Term Debt Default, as applicable, stating the current balance of the ABL Obligations or the Term Debt Obligations, as applicable, and requesting the current balance of the ABL Obligations and/or the Term Debt Obligations, as applicable, owing to the notified party.

"Excluded Property" means, collectively: (i) (x) any fee-owned real property in existence on the date hereof, with a fair market value below $2,500,000 for each such real property and below $10,000,000 in the aggregate for all such fee-owned real properties  and any leasehold real property in existence on the date hereof having annual lease payments below $1,500,000 for each such leasehold property and  (y) any fee-owned real property acquired after the date hereof, with a fair market value below $5,000,000 for each such real property and any leasehold real property leased after the date hereof having annual rent payments below $5,000,000 and in the aggregate amount for all such fee-owned and leasehold real properties not to exceed $25,000,000, (ii) letter of credit rights and commercial tort claims below $2,500,000 in the aggregate for all letter of credit rights and commercial tort claims; (iii) pledges and security interests prohibited or restricted by applicable law (including requirement to obtain the consent of any governmental authority or third party), (iv) margin stock and interests in any Person other than wholly-owned subsidiaries to the extent not permitted by the terms of such Person's organizational or joint venture documents or could not be pledged without the consent of third parties (provided that any equity interests in Foresight GP and Foresight LP owned by a Grantor shall not be excluded), (v) any assets to the extent a security interest in such assets could reasonably be expected to result in adverse tax consequences or adverse regulatory consequences, in each case,

as reasonably determined by the Company, (vi) any intent-to-use United States trademark applications for which an amendment to allege use or statement of use has not been filed under federal law or, if filed, has not been deemed in conformance with federal law, (vii) any lease (other than real property leases not excluded in item (i) above), license, permit or other agreement, or any property subject to a purchase money security interest, capital lease obligation or similar arrangement to the extent that a grant of a security interest therein would require consent thereunder, or would violate or invalidate such lease, license, permit, or agreement, purchase money arrangement, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than a Grantor), after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law, (viii) any governmental license or state or local franchises, charters and authorizations to the extent a security interest therein is prohibited or restricted by applicable law, (ix) motor vehicles, airplanes and other assets subject to certificate of title, (x) any equity interests in Excluded Subsidiaries (except for equity interests in Foresight GP and Foresight LP owned by a Grantor and 65% of the equity interests in any first-tier foreign subsidiaries); (xi) any assets where the cost of obtaining a security interest therein exceeds the practical benefit to the Term Debt Claimholders afforded thereby as agreed by the Company and the Term Debt Claimholders; (xii) mineral rights and/or constructed coal mine assets, in each case securing installment notes issued to Governmental Authorities for the purchase of such mineral rights and/or rights to construct coal mines not in excess of the maximum principal amount of $10,000,000 in the aggregate at any time outstanding for all such notes); (xiii) (x) cash posted as margin by the Existing Designated Coal Contract Counterparty (as defined in the Term Loan Agreement) pursuant to the Existing Designated Coal Contract and (y) cash and cash equivalents deposited in (1) local petty cash accounts up to a maximum aggregate cash deposit amount of $500,000, (2) payroll accounts, (3) benefits accounts, (4) tax accounts, (5) escrow accounts, (6) trust accounts, (7) any accounts held solely for the benefit of customers, (8) restricted investment accounts, (9) any accounts holding deposits in connection with permitted Liens and (10) any accounts used for customs or other fiduciary purposes. and (xiv) any assets located outside the United State of America or assets that require action under the law of any foreign jurisdiction to create or perfect a security interest in such assets under such foreign jurisdiction, including any intellectual property registered in any foreign jurisdiction (and no security agreements or pledge agreements governed under the laws of any foreign jurisdiction shall be required).

"Excluded Subsidiary" means (i) a Foreign Subsidiary, (ii) any direct or indirect Domestic Subsidiary of a Foreign Subsidiary, (iii) any direct or indirect Domestic Subsidiary the primary asset of which is the Capital Stock of Foreign Subsidiaries and, if applicable, Indebtedness of such Foreign Subsidiaries, (iv) Subsidiaries designated as unrestricted pursuant to the First Lien Term Loan Agreement, (v) captive insurance companies, (vi) special purpose entities established for purposes of an accounts receivable factoring arrangement, (vii) Immaterial Subsidiaries, (viii) any other Person to the extent a guarantee by such Person is prohibited or restricted by contracts or applicable law (including any requirement to obtain Governmental Authority or third party consent, approval, license or authorization) or could result in adverse tax consequences as reasonably determined by the Company.

"Existing Intercreditor Agreement" has the meaning assigned to that term in the Recitals.

"First Lien Term Debt Claimholders" means, at any relevant time, the holders of First Lien Term Loan Obligations at that time, the Additional First Lien Term Debt Debtholders, if any, and the Term Debt Trustee.

"First Lien Term Debt Documents" means the First Lien Term Loan Documents, the Additional First Lien Term Debt Facility, if any, and the First Lien Term Debt Security Documents.

"First Lien Term Debt Obligations" means the First Lien Term Loan Obligations and "Obligations" as defined in the Additional First Lien Term Debt Facility, if any.

"First Lien Term Debt Security Agreement" means the amended and restated priority lien debt pledge and security agreement, dated as of the date hereof, among the Company, each Company Subsidiary and the Term Debt Trustee.

"First Lien Term Debt Security Documents" means the First Lien Term Debt Security Agreement and any other agreement, mortgage, deed to secure debt, document or instrument pursuant to which a Lien is granted securing any First Lien Term Debt Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, restated, renewed, extended, supplemented or otherwise modified from time to time, in accordance with the provisions of this Agreement.

"First Lien Term Loan Agreement" means, collectively, (a) the Initial First Lien Term Loan Agreement and (b) any other credit agreement or credit agreements, one or more debt facilities, indenture, note purchase agreements and/or commercial paper facilities, in each case, with banks or other lenders, institutional investors or purchasers providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from (or sell such receivables to) such lenders), letters of credit, bankers' acceptances, notes, bonds, securities or other borrowings, that have been incurred to increase (including through additional and separate debt facilities), replace (whether upon or after termination or otherwise), Refinance or refund in whole or in part from time to time the Obligations outstanding under the Initial First Lien Term Loan Agreement or any other agreement or instrument referred to in this clause, whether or not such increase, replacement, Refinancing or refunding occurs (i) with the original parties thereto, (ii) on one or more separate occasions or (iii) simultaneously or not with the termination or repayment of the Initial First Lien Term Loan Agreement or any other agreement or instrument referred to in this clause, unless such agreement or instrument expressly provides that it is not intended to be and is not a First Lien Term Loan Agreement, or such agreement or instrument is not a Permitted Refinancing Agreement.  Any reference to the First Lien Term Loan Agreement hereunder shall be deemed a reference to any First Lien Term Loan Agreement then in existence.

"First Lien Term Loan Documents" means the First Lien Term Loan Agreement, the "Credit Documents" (as defined in the First Lien Term Loan Agreement) and each of the other agreements, documents and instruments executed pursuant thereto, and any other document or instrument executed or delivered at any time in connection with any First Lien Term Loan Obligations, including any intercreditor or joinder agreement among holders of First Lien Term

Loan Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, extended or Refinanced from time to time in accordance with the provisions of this Agreement.

"First Lien Term Loan Hedging Obligations" means Hedging Obligations (other than any ABL Hedging Obligations) that are secured under the First Lien Term Debt Security Documents.

"First Lien Term Loan Obligations" means all "Obligations" as defined in the First Lien Term Loan Agreement and the other First Lien Term Loan Documents.  "First Lien Term Loan Obligations" shall include all interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Lien Term Loan Document, whether or not the claim for such interest, fees and expenses is allowed as a claim in such Insolvency or Liquidation Proceeding in accordance with the provisions of this Agreement.

"First Lien Term Loans" means the "Loans" as defined in the First Lien Term Loan Agreement.

"Fixed Asset Collateral" means all right, title and interest of any Grantor in and to any property whether now owned or hereafter created, acquired or arising and wherever located, other than the ABL Collateral.  The term "Fixed Asset Collateral" shall include the following types of property:

(a)    Real Estate and fixtures;

(b)    Equipment;

(c)    Term Debt Pledged Collateral;

(d)    Intellectual Property;

(e)    Letter of Credit Rights arising out of, or related to, or derivative of any of the property or interests in property described in subsections (a), (b), (c) and (d) of the definition of "Fixed Asset Collateral";

(f)    letters of credit transferred to any Term Debt Claimholders, or with respect to which the Proceeds thereof have been assigned to any Term Debt Claimholder, or on which any Term Debt Claimholder is named as beneficiary, in each case arising out of, related to, or derivative of the property or interests in property described in subsections (a), (b), (c) and (d) of the definition of "Fixed Asset Collateral";

(g)    Supporting Obligations and Commercial Tort Claims, in each case, to the extent arising out of, or related to, or derivative of, the property or interests described in subsections (a), (b), (c) and (d) of the definition of "Fixed Asset Collateral";

-13-

(h)    contracts, contract rights and other General Intangibles, Documents, Chattel Paper, and Instruments (including promissory notes), in each case, to the extent arising out of, or related to, or derivative of the property or interests in property described in subsections (a), (b), (c) and (d) of the definition of "Fixed Asset Collateral";

(i)    books and Records relating to the items referred to in the preceding clauses (a) through (h) (including all books, databases, data processing software, customer lists, engineer drawings, and Records, whether tangible or electronic, to the extent containing any information relating to any of the items referred to in the preceding clauses (a) through (h)); and

(j)    all collateral security and guarantees with respect to any of the foregoing and all Proceeds, products, substitutions, replacements, accessions, cash, Money, insurance proceeds, Instruments, Securities, Security Entitlements and Financial Assets received as Proceeds of any of the foregoing, but excluding identifiable Proceeds of ABL Collateral in accordance with Section 3.5.

Notwithstanding anything to the contrary herein, the term "Fixed Asset Collateral" shall exclude assets described in the definition of "Excluded Property".  All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the UCC.

"Fixed Asset Collateral Proceeds Account" means the deposit accounts and/or securities accounts specifically designated by the Company and the administrative agent under the Term Loan Agreement to receive Proceeds of Fixed Asset Collateral (and all cash, cash equivalents, Money, checks, Instruments, funds, ACH transfers, wired funds and other funds and property, in each case, held in or credited thereto), provided that notice of such designation has been delivered to the ABL Agent.

"Foreign Subsidiary" means a Subsidiary that is a "controlled foreign corporation" under Section 957 of the Internal Revenue Code of 1986.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Grantors" means the Company, Holdings, each Company Subsidiary and each other Person that has or may from time to time hereafter execute and deliver an ABL Security Document or a Term Debt Security Document as a grantor of a security interest (or the equivalent thereof).

"Hedging Obligations" shall mean (a) with respect to any Person, the obligations under hedge agreements of such Person of the type described in the definition of "Hedging Liability" in the Initial ABL Credit Agreement as in effect on the date hereof and (b) obligations of the type described in the definitions of "Hedge Agreement", "Secured Commodities Hedge Obligations"

-14-

and "Secured Designated Coal Contract Obligations" in the Initial First Lien Term Loan Agreement as in effect on the date hereof.

"Immaterial Subsidiary" means, as of any date, any Subsidiary (i) whose total assets, as of that date, are less than $100,000 individually and, when combined with the total assets of all Immaterial Subsidiaries, as of that date, are less than $2,500,000 and (ii) whose total revenues for the most recent 12-month period do not exceed $100,000 individually and, when combined with the total assets of all Immaterial Subsidiaries, as of that date, do not exceed $2,500,000; provided that a Subsidiary will not be considered to be an Immaterial Subsidiary if it, directly or indirectly, guarantees or otherwise provides direct credit support for any Indebtedness of the Company.

"Indebtedness" means and includes all Obligations that constitute "Debt," "Indebtedness," or any similar term within the meaning of the ABL Credit Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture, the First Lien Term Loan Agreement, the Additional First Lien Term Debt Facility (if any) or the Additional Second Lien Term Debt Facility (if any), as applicable.

"Incremental Facilities Amount" means the "Incremental Facilities Amount" as defined in the Initial First Lien Term Loan Agreement as in effect on the date hereof.

"Initial ABL Credit Agreement" has the meaning assigned to that term in the Recitals.

"Initial Access Date" has the meaning assigned to that term in Section 3.3(b).

"Initial First Lien Term Loan Agreement" has the meaning assigned to that term in the Recitals.

"Initial Senior Secured Note Indenture" has the meaning assigned to that term in the Recitals.

"Initial Senior Secured Notes" has the meaning assigned to that term in the Recitals.

"Insolvency or Liquidation Proceeding" means:

(a)    any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor;

(b)    any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets;

(c)    any composition of liabilities or similar arrangement relating to any Grantor, whether or not under a court's jurisdiction or supervision;

-15-

(d)    any liquidation, dissolution, reorganization or winding up of any Grantor, whether voluntary or involuntary, whether or not under a court's jurisdiction or supervision, and whether or not involving insolvency or bankruptcy; or

(e)    any general assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Grantor.

"Intellectual Property" means, all of the following in any jurisdiction throughout the world:   (a) patents, patent applications and inventions, including all renewals, extensions, combinations, divisions, or reissues thereof, ("Patents"); (b) trademarks, service marks, trade names, trade dress, logos, internet domain names and other business identifiers, together with the goodwill symbolized by any of the foregoing, and all applications, registrations, renewals and extensions thereof, ("Trademarks"); (c) copyrights and all works of authorship including all registrations, applications, renewals, extensions and reversions thereof, ("Copyrights"); (d) all computer software, source code, executable code, data, databases and documentation thereof; (e) all trade secret rights in information, including trade secret rights in any formula, pattern, compilation, program, device, method, technique, or process, that (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; (f) all other intellectual property or proprietary rights in any discoveries, concepts, ideas, research and development, know-how, formulae, patterns, inventions, compilations, compositions, manufacturing and production processes and techniques, program, device, method, technique, technical data, procedures, designs, recordings, graphs, drawings, reports, analyses, specifications, databases, and other proprietary or confidential information, including customer lists, supplier lists, pricing and cost information, business and marketing plans and proposals and advertising and promotional materials; and (g) all rights to sue at law or in equity for any infringement or other impairment or violation thereof and all products and Proceeds of the foregoing.

"Inventory" means all "inventory," as such term is defined in the UCC and in any event including all Coal (as such term is defined in the Initial ABL Credit Agreement, as in effect on the date hereof).

"Investment Property" has the meaning assigned to that term in the Term Debt Security Documents.

"Lien" means any mortgage, pledge, hypothec, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any other security agreement (including, without limitation, any conditional sale or other title retention agreement and any interest of a lessor under a Capital Lease (as defined in the ABL Credit Agreement) having substantially the same economic effect as any of the foregoing).

"New Agent" has the meaning assigned to that term in Section 5.5.

"New Debt Notice" has the meaning assigned to that term in Section 5.5.

-16-

"Non-Conforming Plan of Reorganization" means any Plan of Reorganization whose provisions are inconsistent with the provisions of this Agreement, unless such Plan of Reorganization has been accepted by the voluntary required vote of each class of the ABL Claimholders and the Term Debt Claimholders.

"Obligations" means all present and future loans, advances, liabilities, obligations, covenants, duties, and debts from time to time owing by any Grantor to any agent or trustee (including any Agent), the ABL Claimholders, the Term Debt Claimholders or any of them or their respective Affiliates, arising from or in connection with the ABL Loan Documents or any of the Term Debt Documents, whether for principal, interest or payments for early termination, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees and any other sums chargeable to the Grantors, including, without limitation, the "Obligations", as defined in the ABL Credit Agreement, the First Lien Term Loan Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture, the Additional First Lien Term Debt Facility, if any or the Additional Second Lien Term Debt Facility, if any, and for the avoidance of debt, including, without limitation, the ABL Obligations, the First Lien Term Debt Obligations and the Second Lien Term Debt Obligations.

"Permitted Refinancing" means any Refinancing the governing documentation of which constitutes Permitted Refinancing Agreements.

"Permitted Refinancing Agreements" means, with respect to either the ABL Credit Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture, the First Lien Term Loan Agreement, Additional First Lien Term Debt Facility or any Additional Second Lien Term Debt Facility, as applicable, any credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to increase, replace, Refinance or refund in whole or in part the Obligations outstanding under the ABL Credit Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture, the First Lien Term Loan Agreement, any Additional First Lien Term Debt Facility or any Additional Second Lien Term Debt Facility, as applicable, but solely to the extent such increase, replacement, Refinancing or refunding would not be prohibited by Section 5.3(c), Section 5.3(d) or Section 5.3(e), as applicable, and whether or not such increase, replacement, Refinancing or refunding occurs (i) with the original parties thereto or (ii) on one or more separate occasions, unless such agreement or instrument expressly provides that it is not intended to be and is not a Permitted Refinancing Agreement, in each case, as such financing documentation may be amended, restated, supplemented or otherwise modified from time to time in accordance with the provisions of this Agreement.

"Person" means any natural Person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

CH\2049272.8

"Plan of Reorganization" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any Insolvency or Liquidation Proceeding.

"Pledged Collateral" has the meaning set forth in Section 5.4(a).

"Recovery" has the meaning set forth in Section 6.4.

"Real Estate" means, at any time of determination, any real property then owned or leased by the Company or any other Grantor.

"Refinance" means, in respect of any Indebtedness, to refinance, extend, renew, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other indebtedness, in exchange or replacement for, such Indebtedness, in any case in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings.

"Second Lien Term Debt Claimholders" means, at any relevant time, the Senior Secured Noteholders at that time, the Additional Second Lien Term Debt Debtholders, if any, and the Term Debt Trustee.

"Second Lien Term Debt Documents" means the Senior Secured Documents, the Additional Second Lien Term Debt Facility, if any, and the Second Lien Term Debt Security Documents.

"Second Lien Term Debt Obligations" means the Senior Secured Obligations and "Obligations" as defined in the Additional Second Lien Term Debt Facility, if any.

"Second Lien Term Debt Security Agreement" means the amended and restated parity lien debt pledge and security agreement, dated as of the date hereof, among the Company, each Company Subsidiary and the Term Debt Trustee.

"Second Lien Term Debt Security Documents" means the Second Lien Term Debt Security Agreement and any other agreement, mortgage, deed to secure debt, document or instrument pursuant to which a Lien is granted securing any Second Lien Term Debt Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, restated, renewed, extended, supplemented or otherwise modified from time to time, in accordance with the provisions of this Agreement.

"Secondary Senior Secured Note Indenture" has the meaning assigned to that term in the Recitals.

"Secondary Senior Secured Notes" has the meaning assigned to that term in the Recitals.

"Securities Accounts" has the meaning given such term in the UCC, except that such term shall exclude the Fixed Asset Collateral Proceeds Account.

-18-

"Senior Secured Documents" means the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture, the Senior Secured Notes, the Collateral Trust Agreement and each of the other agreements, documents and instruments executed pursuant thereto, and any other document or instrument executed or delivered at any time in connection with any Senior Secured Obligations, including any intercreditor or joinder agreement among holders of Senior Secured Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, extended or Refinanced from time to time in accordance with the provisions of this Agreement.

"Senior Secured Noteholders" means the "Holders" as defined in the Initial  Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture and the Tertiary Senior Secured Note Indenture.

"Senior Secured Notes" means, collectively, (a) the Initial Senior Secured Notes and any senior secured notes issued under the Initial Senior Secured Note Indenture in exchange for the Initial Senior Secured Notes, (b) the Secondary Senior Secured Notes and any senior secured notes issued under the Secondary Senior Secured Note Indenture in exchange for the Secondary Senior Secured Notes, (c) the Tertiary Senior Secured Notes and any senior secured notes issued under the Tertiary Senior Secured Note Indenture in exchange for the Tertiary Senior Secured Notes, (d) additional senior secured notes with terms identical to the Initial Senior Secured Notes issued pursuant to the Initial Senior Secured Note Indenture from time to time and any senior secured notes issued under the Initial Senior Secured Note Indenture in exchange for such additional senior secured notes, (e) additional senior secured notes with terms identical to the Secondary Senior Secured Notes issued pursuant to the Secondary Senior Secured Note Indenture from time to time and any senior secured notes issued under the Secondary Senior Secured Note Indenture in exchange for such additional senior secured notes, (f) additional senior secured notes with terms identical to the Tertiary Senior Secured Notes issued pursuant to the Tertiary Senior Secured Note Indenture from time to time and any senior secured notes issued under the Tertiary Senior Secured Note Indenture in exchange for such additional senior secured notes and (g) any other credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governing the terms of any indebtedness or other financial accommodation that has been incurred to increase, replace, Refinance or refund in whole or in part the Obligations outstanding under clauses (a), (b), (c),(d), (e) and (f) or any other agreement or instrument referred to in this clause, unless such agreement or instrument expressly provides that it is not intended to be and is not an Initial Senior Secured Note, a Secondary Senior Secured Note or a Tertiary Senior Secured Note, or such agreement or instrument is not a Permitted Refinancing Agreement.  Any reference to the Senior Secured Notes hereunder shall be deemed a reference to any Senior Secured Notes then in existence.

"Senior Secured Obligations" means all "Obligations" as defined in the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture, the Senior Secured Notes and the other Senior Secured Documents. "Senior Secured Obligations" shall include all interest, fees and expenses accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified

-19-

in the relevant Senior Secured Document, whether or not the claim for such interest, fees and expenses is allowed as a claim in such Insolvency or Liquidation Proceeding.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Supporting Collateral" means has the meaning set forth in Section 3.3(b).

"Supporting IP" means all Intellectual Property rights of any Grantor for use in connection with Accounts constituting ABL Collateral, including Intellectual Property rights licensed to any Grantor by third parties.

"Term Debt Trustee" has the meaning assigned to that term in the Preamble to this Agreement, and shall include one or more other agents or similar contractual representatives for one or more lenders, banks, purchasers, noteholders or investors that at any time succeeds to, substitutes, replaces or Refinances any or all of the Obligations outstanding under the Term Debt Documents at any time and from time to time.

"Term Debt Claimholders" means, at any relevant time, the First Lien Term Debt Claimholders and/or the Second Lien Term Debt Claimholders.

"Term Debt Default" means an "Event of Default" as defined in the First Lien Term Loan Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture, the Additional First Lien Term Debt Facility, and/or the Additional Second Lien Term Debt Facility.

"Term Debt DIP Financing" has the meaning assigned to that term in Section 6.1(b).

"Term Debt Documents" means the First Lien Term Debt Documents and the Second Lien Term Debt Documents.

"Term Debt Obligations" means all First Lien Term Debt Obligations and/or the Second Lien Term Debt Obligations.  Notwithstanding anything to the contrary herein, the term "Term Debt Obligations" shall exclude as of any date of determination that portion of the Obligations then outstanding under the Term Debt Documents in excess of the following amount determined as follows (such amount, the "Term Debt Obligations Cap"): (a) $2,000,000,000, *plus* (b) the Incremental Facilities Amount, *plus* (c) $1,300,000,000, *plus* (d) the Additional Facilities Amount, *plus* (e) solely as a component of a Term Debt DIP Financing with respect to any Insolvency or Liquidation Proceeding, an additional amount equal to 10% of the loans and notes under the Term Debt Documents outstanding immediately prior to the date of commencement of

such Insolvency or Liquidation Proceeding, *plus* (f) interest, fees, costs, expenses, indemnities and other amounts payable pursuant to the terms of the Term Debt Documents, whether or not the same are added to the principal amount of the Term Debt Obligations and including the same as would accrue and become due but for the commencement of an Insolvency or Liquidation Proceeding, whether or not such amounts are allowed or allowable in whole or in part in any such Insolvency or Liquidation Proceeding, *plus* (g) an amount sufficient to terminate and repay in full in cash all First Lien Term Loan Hedging Obligations (including, without limitation, all "Secured Designated Coal Contract Obligations" (as defined in the Initial First Lien Term Loan Agreement as in effect on the date hereof)) under the Term Debt Documents.

"Term Debt Pledged Collateral" means (i) Term Debt Pledged Stock, (ii) Term Debt Pledged Notes and (iii) any other Investment Property.

"Term Debt Pledged Notes" has the meaning assigned to the term "Pledged Debt" in the applicable Term Debt Security Document.

"Term Debt Pledged Stock" has the meaning assigned to the term "Pledged Equity Interests" in the applicable Term Debt Security Document.

"Term Debt Security Documents" means the First Lien Term Debt Security Documents and/or the Second Lien Term Debt Security Documents.

"Term Debt Standstill Period" has the meaning set forth in Section 3.1(a)(i).

"Tertiary Senior Secured Note Indenture" has the meaning assigned to that term in the Recitals.

"Tertiary Senior Secured Notes" has the meaning assigned to that term in the Recitals.

"UCC" means the Uniform Commercial Code (or any similar equivalent legislation) as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Agents' security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other that the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

1.2.    Terms Generally.  The definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise:

CH\2049272.8

(a)    any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, modified, renewed or extended;

(b)    any reference herein to any Person shall be construed to include such Person's permitted successors and assigns;

(c)    the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(d)    all references herein to Sections or Articles shall be construed to refer to Sections or Articles of this Agreement;

(e)    terms defined in the UCC but not otherwise defined herein shall have the same meanings herein as are assigned thereto in the UCC;

(f)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights;

(g)    any reference herein to a Person in a particular capacity or capacities excludes such Person in any other capacity or individually;

(h)    any reference herein to any law shall be construed to refer to such law as amended, modified, codified, replaced, or re-enacted, in whole or in part, and in effect on the pertinent date; and

(i)    in the compilation of periods of time hereunder from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to, but not through or including."

## II.
## LIEN PRIORITIES.

2.1.    <u>Relative Priorities</u>.

(a)    Irrespective of (i) the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the Term Debt Obligations granted on the ABL Collateral or of any Liens securing the ABL Obligations granted on the ABL Collateral (including, in each case, irrespective of whether any such Lien is granted (or secures Obligations relating to the period) before or after the commencement of any Insolvency or Liquidation Proceeding), or (ii) whether the Term Debt Trustee or the ABL Agent, either directly or through agents, holds possession of, or has control over, all or any part of the ABL Collateral, and notwithstanding any provision of the UCC, Bankruptcy Law or any other applicable law, or the ABL Loan Documents or the Term Debt Documents or any defect or deficiencies in, or failure to attach or perfect, the Liens on the ABL Collateral securing the ABL Obligations or the Term Debt Obligations or any other

circumstance whatsoever, the ABL Agent, on behalf of the ABL Claimholders and the Term Debt Trustee, on behalf of the Term Debt Claimholders, hereby agree that as among the Claimholders, any Lien of the ABL Agent on the ABL Collateral securing the ABL Obligations, whether such Lien is now or hereafter held by or on behalf of the ABL Agent, any other ABL Claimholder or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the ABL Collateral securing any Term Debt Obligations and any Lien of the Term Debt Trustee on the ABL Collateral securing any Term Debt Obligations, whether such Lien is now or hereafter held by or on behalf of the Term Debt Trustee, any other Term Debt Claimholder or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Collateral securing any ABL Obligations.

(b)    Notwithstanding any failure by the ABL Claimholders or the Term Debt Claimholders to perfect their security interests in the ABL Collateral (to the extent any action is required for purposes of perfection) or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the ABL Collateral granted to the ABL Claimholders or the Term Debt Claimholders, the priority and rights as between the ABL Claimholders and the Term Debt Claimholders with respect to the ABL Collateral shall be as set forth herein.

(c)    Irrespective of (i) the date, time, method, manner or order of grant, attachment or perfection of any Liens securing the ABL Obligations granted on the Fixed Asset Collateral or of any Liens securing the Term Debt Obligations granted on the Fixed Asset Collateral (including, in each case, irrespective of whether any such Lien is granted (or secures Obligations relating to the period) before or after the commencement of any Insolvency or Liquidation Proceeding), or (ii) whether the Term Debt Trustee or the ABL Agent, either directly or through agents, holds possession of, or has control over, all or any part of the Fixed Asset Collateral, and notwithstanding any provision of the UCC, Bankruptcy Law or any other applicable law, or the ABL Loan Documents or the Term Debt Documents or any defect or deficiencies in, or failure to attach or perfect, the Liens on the Fixed Asset Collateral securing the ABL Obligations or the Term Debt Obligations or any other circumstance whatsoever, the ABL Agent, on behalf of the ABL Claimholders and the Term Debt Trustee, on behalf of the Term Debt Claimholders, hereby agree that as among the Claimholders, any Lien of the Term Debt Trustee on the Fixed Asset Collateral securing the Term Debt Obligations, whether such Lien is now or hereafter held by or on behalf of the Term Debt Trustee, any other Term Debt Claimholder or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Fixed Asset Collateral securing any ABL Obligations, and any Lien of the ABL Agent on the Fixed Asset Collateral securing any ABL Obligations, whether such Lien is now or hereafter held by or on behalf of the ABL Agent, any other ABL Claimholder or any other agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Fixed Asset Collateral securing any Term Debt Obligations.

(d)    Notwithstanding any failure by the ABL Claimholders or the Term Debt Claimholders to perfect their security interests in the Fixed Asset Collateral (to the extent any action is required for purposes of perfection) or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the Fixed Asset Collateral granted to the ABL Claimholders or the Term Debt Claimholders, the priority and rights as between the ABL Claimholders and the Term Debt Claimholders with respect to the Fixed Asset Collateral shall be as set forth herein.

2.2.    <u>Prohibition on Contesting Liens</u>.  Each of the Term Debt Trustee, on behalf of each Term Debt Claimholder, and the ABL Agent, on behalf of each ABL Claimholder, consents to the granting of Liens on the ABL Collateral and the Fixed Asset Collateral in favor of the other to secure the ABL Obligations and the Term Debt Obligations, as applicable, and agrees that no Claimholder will be entitled to, and it will not (and shall be deemed to have irrevocably, absolutely, and unconditionally waived any right to), contest (directly or indirectly) or support (directly or indirectly) any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding):  (a) the attachment, perfection, priority, validity or enforceability of any Lien on the Collateral held by or on behalf of any of the ABL Claimholders to secure the payment of the ABL Obligations or any Lien on the Collateral held by or on behalf of any of the Term Debt Claimholders to secure the payment of the Term Debt Obligations; or (b) the validity or enforceability of the provisions of this Agreement; <u>provided</u> that nothing in this Agreement shall be construed to prevent or impair the rights of the ABL Agent, on behalf of the ABL Claimholders, or the Term Debt Trustee, on behalf of the Term Debt Claimholders, to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the Obligations as provided in <u>Sections 2.1</u>, <u>3.1</u> and <u>6.1</u>.

2.3.    <u>Similar Liens and Agreements</u>.  The parties hereto acknowledge and agree that it is their intention that (i) the ABL Collateral securing the ABL Obligations and the ABL Collateral securing the Term Debt Obligations be identical in all material respects and (ii) the Fixed Asset Collateral securing the Term Debt Obligations and the Fixed Asset Collateral securing the ABL Obligations be identical in all material respects.   In furtherance of the foregoing, the parties hereto agree:

(a)    subject to the other provisions of this Agreement, upon request by the ABL Agent or Term Debt Trustee, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Collateral or the Fixed Asset Collateral and the steps taken to perfect their respective Liens thereon;

(b)    that the documents, agreements and instruments creating or evidencing the Liens of such parties in the ABL Collateral and the Fixed Asset Collateral, as of the date hereof, are in all material respects substantively similar, other than with respect to the relative priority of the Liens created or evidenced thereunder; and

(c)    any Lien obtained by any Claimholder in respect of any judgment obtained in respect of any Obligations on ABL Collateral and Fixed Asset Collateral shall be subject in all respects to the terms of this Agreement.

2.4    Hedging Obligations . The parties hereto acknowledge and agree that any Hedging Obligations may constitute either ABL Hedging Obligations or First Lien Term Loan Hedging Obligations, but not both. The ABL Agent agrees to provide the Term Debt Trustee a copy of a notice or designation whereby an obligation is designated as an ABL Hedging Obligation under the ABL Credit Agreement reasonably promptly upon ABL Agent's receipt thereof, and the Term Debt Trustee agrees to provide the ABL Agent a copy of a notice or designation whereby an obligation is designated as a First Lien Term Loan Hedging Obligation under the First Lien Term Loan Agreement reasonably promptly upon Term Debt Trustee's receipt thereof. If an obligation is designated as both an ABL Hedging Obligation and a First Lien Term Loan Hedging Obligation, such obligation shall constitute that Hedging Obligation which it was designated first in time. The parties hereto acknowledge and agree that the obligations under the Existing Designated Coal Contract (as defined in the First Lien Term Loan Agreement) constitute First Lien Term Loan Hedging Obligations.

## III.
## EXERCISE OF REMEDIES; ENFORCEMENT.

3.1.    Restrictions on the Term Debt Trustee and the Term Debt Claimholders.

(a)    Until the Discharge of ABL Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, the Term Debt Trustee and each Term Debt Claimholder:

(i)    will not take or seek to take any Enforcement with respect to any ABL Collateral; provided, however, that the Term Debt Trustee may take or seek to take any Enforcement with respect to any ABL Collateral after a period of at least 180 days has elapsed since the later of: (1) the date on which the Term Debt Trustee declared the existence of a Term Debt Default, accelerated (to the extent such amount was not already due and owing) the payment of the principal amount of the applicable Term Debt Obligations, and demanded payment thereof and (2) the date on which the Term Debt Trustee delivers the Enforcement Notice to the ABL Agent relating to such Term Debt Default, which 180-day time period shall be tolled for any period during which the ABL Agent is stayed from taking Enforcement against the ABL Collateral during the pendency of any Insolvency or Liquidation Proceeding or pursuant to any court order so long as the ABL Agent has used its commercially reasonable efforts to have such stay lifted (such time period, the "Term Debt Standstill Period"); provided, further, however, that neither the Term Debt Trustee nor any other Term Debt Claimholder shall exercise any rights or remedies with respect to the ABL Collateral if, notwithstanding the expiration of such Term Debt Standstill Period, the ABL Agent or the other ABL Claimholders shall have commenced, whether before or after the expiration of the Term Debt Standstill Period, and be diligently pursuing in good faith Enforcement with respect to all or any material portion of such ABL Collateral (prompt written notice of such exercise to be given to the Term Debt Trustee);

(ii)    will not, directly or indirectly, contest, protest or object to or hinder any judicial or non-judicial foreclosure proceeding or action (including any partial or

complete strict foreclosure) brought by the ABL Agent or any other ABL Claimholder relating to the ABL Collateral or any other Enforcement by the ABL Agent or any other ABL Claimholder against the ABL Collateral so long as the Liens of the Term Debt Trustee in such ABL Collateral attach to the Proceeds thereof subject to the relative priorities set forth in Section 2.1, and such proceeding, action or other Enforcement are being pursued in good faith; provided, however, that the Term Debt Trustee may join in any such proceeding, action or other Enforcement to enforce its Lien on the applicable ABL Collateral in accordance with the relative priorities set forth in Section 2.1 and subject to the provisions of Section 3.3(a);

(iii)    subject to Section 3.1(a)(i) and Section 3.1(c)(vi), will not object to the forbearance by the ABL Agent or the ABL Claimholders from bringing or pursuing any Enforcement with respect to the ABL Collateral in accordance with the provisions of this Agreement;

(iv)    will not object to the manner in which the ABL Agent or the other ABL Claimholders may seek to (A) enforce or collect (or attempt to collect) the ABL Obligations or (B) realize or seek to realize upon or otherwise enforce the Liens in and to the ABL Collateral securing the ABL Obligations, in each case, to the extent not in violation of this Agreement, regardless of whether any action or failure to act by or on behalf of the ABL Agent or the other ABL Claimholders is adverse to the interest of the Term Debt Trustee or the other Term Debt Claimholders.  Without limiting the generality of the foregoing, and except as otherwise provided herein, the Term Debt Claimholders shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right to object (and seek or be awarded any relief of any nature whatsoever based on any such objection), at any time prior to or subsequent to any disposition of any ABL Collateral, on the ground(s) that any such disposition of any ABL Collateral (x) would not be or was not "commercially reasonable" within the meaning of any applicable UCC and/or (y) would not or did not comply with any other requirement under any applicable UCC or under any other applicable law governing the manner in which a secured creditor is to realize on its collateral; and

(v)    subject to the provisions of this Agreement, acknowledge and agree that no covenant, agreement or restriction contained in the Term Debt Documents (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the ABL Agent or the other ABL Claimholders with respect to the ABL Collateral as set forth in this Agreement and the ABL Loan Documents;

provided, however, that in the case of (i) through (v) above, the Liens granted to secure the Term Debt Obligations shall attach to any Proceeds resulting from actions taken by the ABL Agent or any other ABL Claimholder with respect to the ABL Collateral in accordance with this Agreement after application of such Proceeds to the extent necessary to meet the requirements of a Discharge of ABL Obligations.

(b)    Until the Discharge of ABL Obligations, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, and subject to Section

-26-

3.1(a)(i), the ABL Agent shall have the sole right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and, in connection therewith (including, subject to the provisions of Section 5.1(a), voluntary Dispositions of ABL Collateral by the respective Grantors after an ABL Default) make determinations regarding the release, disposition, or restrictions with respect to the ABL Collateral without any consultation with or the consent of the Term Debt Trustee or any other Term Debt Claimholder; provided, however, that the Liens securing the Term Debt Obligations shall remain on the Proceeds (other than those properly applied to the ABL Obligations in accordance with Section 4.1(a)) of such Collateral released or disposed of subject to the relative priorities described in Section 2.1.  In exercising all or any rights, powers, and remedies with respect to the ABL Collateral, the ABL Agent may enforce the provisions of the ABL Loan Documents and exercise rights, powers, and/or remedies thereunder and/or under applicable law or otherwise, all in such order and in such manner as they may determine in the exercise of their sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of the ABL Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction.

(c)    Notwithstanding anything to the contrary contained herein, the Term Debt Trustee on behalf of Term Debt Claimholders may:

(i)    file a claim or statement of interest with respect to the Term Debt Obligations and the ABL Collateral securing the Term Debt Obligations; provided, that an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor;

(ii)    take any action (not adverse to the priority status of the Liens on the ABL Collateral, or the rights of the ABL Agent or any of the other ABL Claimholders to take Enforcement in accordance with the provisions hereof, including those under Article VI) in order to create, perfect, preserve or protect (but not enforce) its Lien on any of the ABL Collateral;

(iii)    file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims or Liens of the Term Debt Claimholders, including any claims secured by the ABL Collateral, if any, in each case in accordance with the terms of this Agreement, or otherwise make any agreements or file any motions or objections (not adverse to the priority status of the Liens on the ABL Collateral, or the rights of the ABL Agent or any of the other ABL Claimholders to take Enforcement in accordance with the provisions hereof, including those under Article VI) pertaining to the claims or Liens of any Term Debt Claimholders, in each case, in accordance with the terms of this Agreement;

(iv)    file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors, including, without limitation, arising in connection with any Insolvency or Liquidation Proceeding or applicable

CH\2049272.8

non-bankruptcy law, in each case not inconsistent with the terms of this Agreement or applicable law (including the Bankruptcy Laws of any applicable jurisdiction);

(v)     vote on any Plan of Reorganization, file any proof of claim, make other filings and make any arguments and motions (including in support of or opposition to, as applicable, the confirmation or approval of any Plan of Reorganization) that are, in each case, in accordance with the terms of this Agreement;

(vi)     exercise any of the rights, powers and/or remedies with respect to any of the ABL Collateral after the termination of the Term Debt Standstill Period to the extent permitted by Section 3.1(a)(i); and

(vii)     take any action described in clauses (iii), (v), (vii), (viii) and (ix) of the definition of "Enforcement".

The Term Debt Trustee agrees that no Term Debt Claimholder will take or receive any ABL Collateral (including Proceeds) in connection with the exercise of any right or remedy (including set-off) with respect to ABL Collateral in its capacity as a creditor in violation of this Agreement. Without limiting the generality of the foregoing, unless and until the Discharge of ABL Obligations has occurred, except as expressly provided in Sections 3.1(a)(i), Article VI and clause (vi) of this Section 3.1(c), the sole right of the Term Debt Trustee and the Term Debt Claimholders with respect to the ABL Collateral is to hold a Lien on such ABL Collateral pursuant to the Term Debt Security Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, in accordance with Section 4.1.

(d)     Except as otherwise specifically set forth in Sections 3.3 and 3.5 and Article VI, the Term Debt Trustee and the Term Debt Claimholders may exercise rights and remedies as unsecured creditors against any Grantor in accordance with the terms of the Term Debt Documents and applicable law; provided, however, that in the event that the Term Debt Trustee or any other Term Debt Claimholder becomes a judgment Lien creditor in respect of any ABL Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to any Term Debt Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the ABL Obligations) as the other Liens securing the Term Debt Obligations are subject to this Agreement.

(e)     Nothing in this Agreement shall prohibit the receipt by the Term Debt Trustee or any other Term Debt Claimholder of the required payments of interest, principal and other amounts owed in respect of the Term Debt Obligations, so long as such receipt is not the direct or indirect result of the exercise by the Term Debt Trustee or any other Term Debt Claimholder of rights or remedies as a secured creditor (including set-off) with respect to ABL Collateral or Enforcement in contravention of this Agreement of any Lien on ABL Collateral held by any of them. For avoidance of doubt, neither payments made by any Grantor in respect of the Term Debt Obligations with Proceeds of loans or advances under the ABL Loan Documents nor, so long as the ABL Claimholders have not commenced Enforcement, payments of Term Debt Obligations in the ordinary course of business made with Proceeds of the ABL Collateral, shall

be required to be transferred or paid over to the ABL Agent for the benefit of the ABL Claimholders.

3.2.    <u>Restrictions on the ABL Agent and the ABL Claimholders</u>.

(a)    Until the Discharge of Term Debt Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, the ABL Agent and each ABL Claimholder:

(i)    will not take or seek to take any Enforcement with respect to any Fixed Asset Collateral; <u>provided</u>, <u>however</u>, that the ABL Agent may take or seek to take any Enforcement with respect to any Fixed Asset Collateral after a period of at least 180 days has elapsed since the later of: (1) the date on which the ABL Agent declared the existence of an ABL Default, accelerated (to the extent such amount was not already due and owing) the payment of the principal amount of the applicable ABL Obligations, and demanded payment thereof and (2) the date on which the ABL Agent delivers the Enforcement Notice to the Term Debt Trustee relating to such ABL Default, which 180-day time period shall be tolled for any period during which the Term Debt Trustee is stayed from taking Enforcement against the Fixed Asset Collateral during the pendency of any Insolvency or Liquidation Proceeding or pursuant to any court order so long as the Term Debt Trustee has used its commercially reasonable efforts to have such stay lifted (such time period, the "<u>ABL Standstill Period</u>"); <u>provided</u>, <u>further</u>, <u>however</u>, that neither the ABL Agent nor any other ABL Claimholder shall exercise any rights or remedies with respect to the Fixed Asset Collateral if, notwithstanding the expiration of such ABL Standstill Period, the Term Debt Trustee or the other Term Debt Claimholders shall have commenced, whether before or after the expiration of the ABL Standstill Period, and be diligently pursuing in good faith Enforcement with respect to all or any material portion of such Fixed Asset Collateral (prompt written notice of such exercise to be given to the ABL Agent);

(ii)    will not, directly or indirectly, contest, protest or object to or hinder any judicial or non-judicial foreclosure proceeding or action (including any partial or complete strict foreclosure) brought by the Term Debt Trustee or any other Term Debt Claimholder relating to the Fixed Asset Collateral or any other Enforcement by the Term Debt Trustee or any other Term Debt Claimholder against the Fixed Asset Collateral so long as the Liens of the ABL Agent in such Fixed Asset Collateral attach to the Proceeds thereof subject to the relative priorities set forth in <u>Section 2.1</u>, and such proceeding, action or other Enforcement are being pursued in good faith; <u>provided</u>, <u>however</u>, that the ABL Agent may join in any such proceeding, action or other Enforcement to enforce its Lien on the applicable Fixed Asset in accordance with the relative priorities set forth in <u>Section 2.1</u> and subject to the provisions of <u>Section 3.3(a)</u>;

(iii)    subject to <u>Section 3.2(a)(i)</u> and <u>Section 3.2(c)(vi)</u>, will not object to the forbearance by the Term Debt Trustee or the Term Debt Claimholders from bringing or pursuing any Enforcement with respect to the Fixed Asset Collateral in accordance with the provisions of this Agreement;

-29-

(iv)     will not object to the manner in which the Term Debt Trustee or the other Term Debt Claimholders may seek to (A) enforce or collect (or attempt to collect) the Term Debt Obligations or (B) realize or seek to realize upon or otherwise enforce the Liens in and to the Fixed Asset Collateral securing the Term Debt Obligations, in each case, to the extent not in violation of this Agreement, regardless of whether any action or failure to act by or on behalf of the Term Debt Trustee or the other Term Debt Claimholders is adverse to the interest of the Term Debt Trustee or the other Term Debt Claimholders.  Without limiting the generality of the foregoing, and except as otherwise provided herein, the ABL Claimholders shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right to object (and seek or be awarded any relief of any nature whatsoever based on any such objection), at any time prior to or subsequent to any disposition of any Fixed Asset Collateral, on the ground(s) that any such disposition of any Fixed Asset Collateral (x) would not be or was not "commercially reasonable" within the meaning of any applicable UCC and/or (y) would not or did not comply with any other requirement under any applicable UCC or under any other applicable law governing the manner in which a secured creditor is to realize on its collateral; and

(v)     subject to the provisions of this Agreement, acknowledge and agree that no covenant, agreement or restriction contained in the ABL Loan Documents (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the Term Debt Trustee or the other Term Debt Claimholders with respect to the Fixed Asset Collateral as set forth in this Agreement and the Term Debt Documents;

provided, however, that in the case of (i) through (v) above, the Liens granted to secure the ABL Obligations shall attach to any Proceeds resulting from actions taken by the Term Debt Trustee or any other Term Debt Claimholder with respect to the Fixed Asset Collateral in accordance with this Agreement after application of such Proceeds to the extent necessary to meet the requirements of a Discharge of Term Debt Obligations.

(b)     Until the Discharge of Term Debt Obligations, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor and subject to Section 3.2(a)(i), the Term Debt Trustee shall have the sole right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and, in connection therewith (including, subject to the provisions of Section 5.1(c), voluntary Dispositions of Fixed Asset Collateral by the respective Grantors after a Term Debt Default) make determinations regarding the release, disposition, or restrictions with respect to the Fixed Asset Collateral without any consultation with or the consent of the ABL Agent or any other ABL Claimholder; provided, however, that the Liens securing the ABL Obligations shall remain on the Proceeds (other than those properly applied to the Term Debt Obligations in accordance with Section 4.1(b)) of such Collateral released or disposed of subject to the relative priorities described in Section 2.1.  In exercising all or any rights, powers, and remedies with respect to the Fixed Asset Collateral, the Term Debt Trustee may enforce the provisions of the Term Debt Documents and exercise rights, powers, and/or remedies thereunder and/or under applicable law or otherwise, all in such order and in such manner as they may determine in the exercise of their sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise

-30-

dispose of the Fixed Asset Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction.

(c)     Notwithstanding anything to the contrary contained herein, the ABL Agent on behalf of ABL Claimholders may:

(i)     file a claim or statement of interest with respect to the ABL Obligations and the Fixed Asset Collateral securing the ABL Obligations; provided, that an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor;

(ii)     take any action (not adverse to the priority status of the Liens on the Fixed Asset Collateral, or the rights of the Term Debt Trustee or any of the other Term Debt Trustee Claimholders to take Enforcement in accordance with the provisions hereof, including those under Article VI) in order to create, perfect, preserve or protect (but not enforce) its Lien on any of the Fixed Asset Collateral;

(iii)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims or Liens of the ABL Claimholders, including any claims secured by the Fixed Asset Collateral, if any, in each case in accordance with the terms of this Agreement, or otherwise make any agreements or file any motions or objections (not adverse to the priority status of the Liens on the Fixed Asset Collateral, or the rights of the Term Debt Trustee or any of the other Term Debt Claimholders to take Enforcement in accordance with the provisions hereof, including those under Article VI) pertaining to the claims or Liens of any ABL Claimholders, in each case, in accordance with the terms of this Agreement;

(iv)     file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors, including, without limitation, arising in connection with any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement or applicable law (including the Bankruptcy Laws of any applicable jurisdiction);

(v)     vote on any Plan of Reorganization, file any proof of claim, make other filings and make any arguments and motions (including in support of or opposition to, as applicable, the confirmation or approval of any Plan of Reorganization) that are, in each case, in accordance with the terms of this Agreement;

(vi)     exercise any of the rights, powers and/or remedies with respect to any of the Fixed Asset Collateral after the termination of the ABL Standstill Period to the extent permitted by Section 3.2(a)(i); and

(vii)     take any action described in clauses (i), (ii), (iii), (iv), (v), (vi), (viii), (ix) and (x) of the definition of "Enforcement".

-31-

The ABL Agent agrees that no ABL Claimholder will take or receive any Fixed Asset Collateral (including Proceeds) in connection with the exercise of any right or remedy (including set-off) with respect to Fixed Asset Collateral in its capacity as a creditor in violation of this Agreement. Without limiting the generality of the foregoing, unless and until the Discharge of Term Debt Obligations has occurred, except as expressly provided in Sections 3.2(a)(i), Article VI and clause (vi) of this Section 3.2(c), the sole right of the ABL Agent and the ABL Claimholders with respect to the Fixed Asset Collateral is to hold a Lien on such Fixed Asset Collateral pursuant to the ABL Security Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, in accordance with Section 4.1.

(d)     Except as otherwise specifically set forth in Sections 3.3 and 3.5 and Article VI, the ABL Agent and the ABL Claimholders may exercise rights and remedies as unsecured creditors against any Grantor in accordance with the terms of the ABL Loan Documents and applicable law; provided, however, that in the event that the ABL Agent or any other ABL Claimholder becomes a judgment Lien creditor in respect of any Fixed Asset Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to any ABL Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Term Debt Obligations) as the other Liens securing the ABL Obligations are subject to this Agreement.

(e)     Nothing in this Agreement shall prohibit the receipt by the ABL Agent or any other ABL Claimholder of the required payments of interest, principal and other amounts owed in respect of the ABL Obligations, so long as such receipt is not the direct or indirect result of the exercise by the ABL Agent or any other ABL Claimholder of rights or remedies as a secured creditor (including set-off) with respect to Fixed Asset Collateral or Enforcement in contravention of this Agreement of any Lien on Fixed Asset Collateral held by any of them. For avoidance of doubt, neither payments made by any Grantor in respect of the ABL Obligations with Proceeds of loans or advances under the Term Debt Documents nor, so long as the Term Debt Claimholders have not commenced Enforcement, payments of ABL Obligations in the ordinary course of business made with Proceeds of the Fixed Asset Collateral, shall be required to be transferred or paid over to the Term Debt Trustee for the benefit of the Term Debt Claimholders.

3.3.    Enforcement; Collateral Access Rights.

(a)     The ABL Agent and the Term Debt Trustee agree not to commence Enforcement until an Enforcement Notice has been given to the other Agent. Subject to the provisions of Section 3.1 and Section 3.2, either Agent may join in any judicial proceedings commenced by the other Agent to enforce Liens on the ABL Collateral or the Fixed Asset Collateral, provided that, in the case of the ABL Collateral, neither the Term Debt Trustee nor the Term Debt Claimholders, as applicable, shall take any action that would reasonably be expected to interfere in any material respect with the Enforcement actions of the ABL Agent or the other ABL Claimholders with respect to ABL Collateral and that, in the case of the Fixed Asset Collateral, neither the ABL Agent nor the ABL Claimholders, as applicable, shall take any action that would reasonably be expected to interfere in any material respect with the Enforcement actions

CH\2049272.8

of the Term Debt Trustee or the other Term Debt Claimholders with respect to Fixed Asset Collateral.

(b)    If the Term Debt Trustee (including through any agent or representative of the Term Debt Trustee) or any third party pursuant to any Enforcement against the Fixed Asset Collateral undertaken by the Term Debt Trustee obtains possession or control of any Fixed Asset Collateral, the Term Debt Trustee shall promptly notify the ABL Agent in writing of that fact, and the ABL Agent shall, within ten (10) Business Days thereafter, notify the Term Debt Trustee in writing as to whether the ABL Agent desires to exercise its access and use rights under this Agreement (an "Access Rights Notice").  Upon the timely delivery of an Access Rights Notice or an Enforcement Notice by the ABL Agent to the Term Debt Trustee, the Term Debt Trustee shall permit the ABL Agent, its employees, agents, advisers and representatives, at the sole and joint and several expense of the ABL Claimholders, to access and use the Supporting IP and Fixed Asset Collateral under such possession and control and consisting of real property and the improvements, structures, buildings thereon and all related rights, processors, computers and other data processing equipment related to the storage or processing of Accounts, equipment or machinery related to the storage or processing of raw coal and other Inventory, and/or records, documents or files pertaining to the ABL Collateral (including the Supporting IP, collectively, the "Supporting Collateral") without charge for a period ending on the earlier to occur of the date that is 180 days after the date (the "Initial Access Date") on which the ABL Agent, or its designee, initially obtains the ability to access or actually uses such Supporting Collateral plus such number of days, if any, after the Initial Access Date that the ABL Agent is stayed or otherwise prohibited by applicable law or by court order from exercising its remedies with respect to the ABL Collateral to the extent the ABL Agent has used commercially reasonable efforts to lift such stay or prohibition (the "Access Period"), for purposes of using any of the Supporting Collateral under such control and possession to take reasonable actions to protect, secure, and otherwise enforce the rights of the ABL Claimholders in and to the ABL Collateral (including, but not limited to, the examination and removal of ABL Collateral and the examination and duplication of the books and records of any Grantor related to the ABL Collateral or to otherwise handle, deliver, ship, transport, deal with or dispose of any ABL Collateral, such right to include, without limiting the generality of the foregoing, the right to conduct one or more public or private sales or auctions thereon and (ii) use any of the Supporting Collateral to handle, process, deal with or dispose of any ABL Collateral pursuant to the rights of ABL Agent and the other ABL Claimholders as set forth in the ABL Loan Documents, the UCC of any applicable jurisdiction and other applicable law).  Access rights may apply to different Supporting Collateral at different times, in which case, a differing Access Period may apply to each such property.  The Term Debt Claimholders (to the full extent of their rights and interests) hereby irrevocably grant to the ABL Agent a non-exclusive, royalty-free license with respect to any Supporting Collateral consisting of Intellectual Property during the Access Period, solely for purposes of disposing, collecting or otherwise realizing on any of the ABL Collateral pursuant to the rights of the ABL Claimholders as set forth in the ABL Loan Documents, the UCC or the equivalent laws of any applicable jurisdiction and other applicable law.

(c)    The ABL Agent shall reimburse the Term Debt Trustee for all reasonable, documented, out-of-pocket costs and expenses (including for any damage to any Fixed Asset Collateral) incurred by the Term Debt Trustee or any other Term Debt Claimholder in

-33-

connection with or as a direct result of the actions of the ABL Agent (or any of its employees, agents, advisers and representatives) in exercising its access and use rights as provided in Section 3.3(b) above (but not any diminution in value of the Supporting Collateral resulting from the ABL Agent so dealing with any Supporting Collateral).  Without limiting the reimbursement obligations described in the immediately preceding sentence, the ABL Agent and the other ABL Claimholders shall jointly and severally indemnify and hold harmless the Term Debt Trustee and the other Term Debt Claimholders from and against any actual out-of-pocket liability, cost, expense, loss or damages, including legal fees and expenses, suffered or incurred by any Term Debt Claimholder, resulting from gross negligence or willful misconduct of the ABL Agent in its operation of such facilities as determined by a final order of a court of competent jurisdiction. None of the Term Debt Trustee and the other Term Debt Claimholders shall have any responsibility or liability for the acts or omissions of ABL Agent or any of the other ABL Claimholders, and none of the ABL Agent and the other ABL Claimholders shall have any responsibility or liability for the acts or omissions of Term Debt Trustee or any other Term Debt Claimholder, in each case arising in connection with such other Person's use and/or occupancy of any of the Supporting Collateral.

(d)    The Term Debt Trustee shall not foreclose or otherwise Dispose of any of the Supporting Collateral during the Access Period unless the buyer agrees in writing (i) to acquire the Supporting Collateral subject to the terms of this Section 3.3 and (ii) to comply with the terms of this Section 3.3.  The rights of the ABL Agent and the other ABL Claimholders under this Section 3.3 during the Access Period shall continue notwithstanding such foreclosure or other Disposition by the Term Debt Trustee.  Without limiting the rights granted to the ABL Agent  and the other ABL Claimholders in this Section 3.3, during the period of actual use or control by the ABL Agent or its agents or representatives of any Supporting Collateral, the ABL Agent shall use commercially reasonable efforts to cooperate with the Term Debt Trustee in connection with any sale by the Term Debt Claimholders of the Supporting Collateral, without the involvement of or interference to any of the ABL Claimholders or liability to any of the ABL Claimholders, except as provided in Section 3.3(c).

(e)    The ABL Agent and the other ABL Claimholders shall have the right to bring an action to enforce their rights under this Section 3.3, including, without limitation, an action seeking possession of the applicable Collateral, specific performance of this Section 3.3 and/or recovery of indemnities, expense reimbursement and other amounts owing under Section 3.3, and Term Debt Trustee shall have the right to bring an action to enforce its rights under this Section 3.3, including an action seeking possession of the applicable Collateral, specific performance of this Section 3.3 and/or recovery of indemnities, expense reimbursement and other amounts owing under Section 3.3.

3.4.    [intentionally omitted].

3.5.    Turn Over and Tracing of and Priorities in Proceeds.  (a) The Term Debt Trustee acknowledges and agrees that, to the extent the Term Debt Trustee or any other Term Debt Claimholder receives funds constituting ABL Collateral or Proceeds thereof, and at the time of the Term Debt Trustee's or such Term Debt Claimholder's receipt of same, the Term Debt Trustee or such Term Debt Claimholder, as the case may be, had actual knowledge to that effect,

-34-

the Term Debt Trustee or such Term Debt Claimholder, as the case may be, shall immediately pay over such amount to the ABL Agent, in the same form as received, with any necessary endorsements.  The Term Debt Trustee agrees that prior to the issuance of an Enforcement Notice, and unless the ABL Agent has actual knowledge to the contrary, (i) all funds deposited under Account Agreements (other than the Account Agreement relating to the Fixed Asset Collateral Proceeds Account) and then applied to the ABL Obligations shall be treated as ABL Collateral, and (ii) any claim that payments made to the ABL Agent through the Collection Account, Deposit Accounts or Securities Accounts that are subject to Account Agreements (other than the Account Agreement relating to the Fixed Asset Collateral Proceeds Account) are Proceeds of or otherwise constitute Fixed Asset Collateral are waived.  The Term Debt Trustee acknowledges and agrees that, until satisfaction in full of the ABL Accounts owing by any ABL Account Debtor, all payments made by, or on behalf of, such ABL Account Debtor with respect to Accounts shall be presumed by the ABL Agent and the Term Debt Trustee, in each case acting in good faith, to be payments with respect to ABL Collateral, and the ABL Agent shall, upon receipt thereof, apply such payments to the ABL Obligations until satisfaction in full of such ABL Accounts, in each case, unless (x) the Accounts being paid are identified or otherwise designated as Accounts constituting Fixed Asset Collateral or (y) other evidence exists that such ABL Account Debtor intends for a payment to be applied to Accounts constituting Fixed Asset Collateral (and, in each such case, such payment shall be remitted to the Term Debt Trustee for application to the Term Debt Obligations).  The parties hereto agree, that until satisfaction in full of all ABL Accounts, no such party shall take any action that would cause any account debtor to alter the order of payments of any invoices in connection with such account debtor's Accounts in a manner not reflective of such account debtor's good faith intent.  To the extent the ABL Agent has delivered notice of the ABL Accounts to the Term Debt Trustee, the Term Debt Trustee shall be deemed to have had actual knowledge of such ABL Collateral.  To the extent the ABL Agent or any other ABL Claimholder receives funds deposited under Account Agreements and constituting Fixed Asset Collateral or Proceeds thereof, and at the time of the ABL Agent's or such ABL Claimholder's receipt of same, the ABL Agent or ABL Claimholder, as the case may be, had actual knowledge to that effect, then the ABL Agent or the applicable ABL Claimholder shall immediately pay over such amount to the Term Debt Trustee, in the same form as received, with any necessary endorsements.

(b)   Each Agent and each Claimholder agrees that, prior to an issuance of an Enforcement Notice, any Proceeds of Collateral, whether or not deposited under Account Agreements, which are used by any Grantor to acquire other property which is Collateral shall not (as among the Agents and the various Claimholders) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired.   Each Agent and each Claimholder agrees that after an issuance of an Enforcement Notice, each such Person shall cooperate in good faith to identify the Proceeds of the ABL Collateral and the Fixed Asset Collateral, as the case may be (it being agreed that after an issuance of an Enforcement Notice, unless the ABL Agent has actual knowledge to the contrary, including the receipt of a notice from the Term Debt Trustee delivered in accordance with Section 8.7 hereto certifying that such funds constitute Proceeds of specified Fixed Asset Collateral (as among the Agents and the various Claimholders), all funds deposited under Account Agreements (other than the Account Agreement relating to the Fixed Asset Collateral Proceeds Account) and then applied to the ABL Obligations shall be presumed to be ABL Collateral); provided, however, that no

Claimholder shall be liable or in any way responsible for any claims or damages from conversion of the ABL Collateral or Fixed Asset Collateral, as the case may be (it being understood and agreed that (A) the only obligation of any ABL Claimholder is to pay over to the Term Debt Trustee, in the same form as received, with any necessary endorsements, all Proceeds that such ABL Claimholder received that have been identified as Proceeds of the Fixed Asset Collateral, and (B) the only obligation of any Term Debt Claimholder is to pay over to the ABL Agent, in the same form as received, with any necessary endorsements, all Proceeds that such Term Debt Claimholder received that have been identified as Proceeds of the ABL Collateral). Each Agent may request from the other Agent an accounting of the identification of the Proceeds of Collateral (and the Agent upon which such request is made shall deliver such accounting reasonably promptly after such request is made).

3.6.   Inspections and Account Statements.

(a)   [intentionally omitted.]

(b)   Upon the issuance of an Enforcement Notice and until the Discharge of ABL Obligations, the Company shall deliver to the ABL Agent on a weekly basis account statements with respect to the Fixed Asset Collateral Proceeds Account, naming each of the account debtors that has made payments into the Fixed Asset Collateral Proceeds Account and the payment amounts made by such account debtor from the date of the previously delivered account statement through the date of such account statement. To the extent the Company fails to deliver such account statements, the ABL Agent shall have the right to request delivery of such account statements from the Term Debt Trustee and, to the extent such information is within its possession or control, the Term Debt Trustee shall take reasonable steps to deliver the same.

# IV.
# PAYMENTS.

4.1.   Application of Proceeds. (a)   So long as the Discharge of ABL Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, all ABL Collateral or Proceeds thereof received by the Term Debt Trustee or any other Term Debt Claimholder in connection with any Enforcement by the Term Debt Trustee or any other Term Debt Claimholder shall be delivered to the ABL Agent and shall be applied or further distributed by the ABL Agent to or on account of the ABL Obligations in such order, if any, as specified in the relevant ABL Loan Documents or as a court of competent jurisdiction may otherwise direct. Upon the Discharge of ABL Obligations, the ABL Agent shall deliver to the Term Debt Trustee, any ABL Collateral and Proceeds of ABL Collateral received or delivered to it pursuant to the preceding sentence, in the same form as received, with any necessary endorsements, to be applied by the Term Debt Trustee to the Term Debt Obligations in such order as specified in the Term Debt Documents or as a court of competent jurisdiction may otherwise direct.

(b)   So long as the Discharge of Term Debt Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, all Fixed Asset Collateral or Proceeds thereof received by the ABL Agent or any other ABL

Claimholder in connection with any Enforcement by the ABL Agent or any other ABL Claimholder shall be delivered to the Term Debt Trustee and shall be applied or further distributed by Term Debt Trustee to or on account of the Term Debt Obligations in such order, if any, as specified in the relevant Term Debt Documents (including the Collateral Trust Agreement) or as a court of competent jurisdiction may otherwise direct.  Upon the Discharge of Term Debt Obligations, the Term Debt Trustee shall deliver to the ABL Agent, any Fixed Asset Collateral and Proceeds of Fixed Asset Collateral received or delivered to it pursuant to the preceding sentence, in the same form as received, with any necessary endorsements, to be applied by the ABL Agent to the ABL Obligations in such order as specified in the ABL Loan Documents or as a court of competent jurisdiction may otherwise direct.

4.2.  <u>Payments Over in Violation of Agreement</u>.  So long as neither the Discharge of ABL Obligations nor the Discharge of Term Debt Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, any Collateral received by either Agent or any applicable Claimholder in connection with the exercise of any right, power, or remedy (including set-off) relating to Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the appropriate Agent for the benefit of the applicable Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  Each Agent is hereby authorized by the other Agent to make any such endorsements as agent for the other Agent, any Term Debt Claimholders or any ABL Claimholders, as applicable.  This authorization is coupled with an interest and is irrevocable until the Discharge of ABL Obligations and the Discharge of Term Debt Obligations, as applicable.  Nothing herein or in any of the ABL Loan Documents or the Term Debt Documents shall be deemed or construed to affect the right of the Existing Designated Coal Contract Counterparty (as defined in the First Lien Term Loan Agreement), following a default under the Existing Designated Coal Contract (as defined in the First Lien Term Loan Agreement), to offset the obligations owing by The American Coal Company to the Existing Designated Coal Contract Counterparty against the receivables arising from the sale of coal or other obligations owing by the Existing Designated Coal Contract Counterparty to The American Coal Company under the Existing Designated Coal Contract, and any amounts so offset shall not be subject to claims by any parties hereto or by any other Term Debt Claimholder or ABL Claimholder.

4.3.  <u>Application of Payments</u>.  Subject to the other terms of this Agreement, all payments received by (a) the ABL Agent or the other ABL Claimholders may be applied, reversed and reapplied, in whole or in part, to the ABL Obligations to the extent provided for in the ABL Loan Documents and (b) the Term Debt Trustee or the other Term Debt Claimholders may be applied, reversed and reapplied, in whole or in part, to the Term Debt Obligations to the extent provided for in the Term Debt Documents.

4.4.  <u>Revolving Nature of Obligations under the ABL Credit Agreement</u>.  The Term Debt Trustee acknowledges and agrees that the ABL Credit Agreement includes a revolving commitment and that the amount of the ABL Obligations that may be outstanding thereunder at any time or from time to time may be increased or reduced and subsequently reborrowed.

# V.
# OTHER AGREEMENTS.

5.1.  <u>Releases</u>.

(a)    If the ABL Agent, on behalf of the ABL Claimholders, releases any of its Liens on any part of the ABL Collateral, in connection with (A) any Enforcement (including as provided for in <u>Section 3.1(b)</u> or <u>Section 6.8(a)</u>, but excluding any Disposition described in clause (C) below) by the ABL Agent with respect to such ABL Collateral, (B) so long as such sale, transfer or other disposition is permitted by the ABL Loan Documents and the Term Debt Documents, any Disposition of such ABL Collateral (other than in connection with a Refinancing as described in <u>Section 5.5</u>), irrespective of whether an ABL Default has occurred and is continuing, or (C) the Disposition by any Grantor of such ABL Collateral with the consent of the ABL Agent so long as, in the case of any Disposition of such ABL Collateral pursuant to this clause (C), (i) an ABL Default has occurred and is continuing, (ii) the net cash Proceeds received from such Disposition shall be applied to repay the ABL Obligations and the commitments under the ABL Credit Agreement shall be permanently reduced by an amount equal to the amount of such net cash Proceeds, (iii) such Disposition shall be conducted in a commercially reasonable manner, and (iv) the Term Debt Trustee shall have received no less than five (5) Business Days' prior written notice of such Disposition, then the Liens, if any, of the Term Debt Trustee on the ABL Collateral sold or disposed of in connection therewith, shall be automatically, unconditionally and simultaneously released; provided that, to the extent the Proceeds of such ABL Collateral are not applied to reduce ABL Obligations, the Term Debt Trustee shall retain a Lien on such Proceeds in accordance with the terms of this Agreement, and such Proceeds shall be remitted to the Term Debt Trustee for application to the Term Debt Obligations.  The Term Debt Trustee shall promptly execute and deliver to the ABL Agent or the applicable Grantor such termination statements, releases and other documents as the ABL Agent or such Grantor may reasonably request to effectively confirm such release.

(b)    Until the Discharge of the ABL Obligations shall occur, the Term Debt Trustee, on behalf of the Term Debt Claimholders, hereby irrevocably constitutes and appoints the ABL Agent and any officer or agent of the ABL Agent, with full power and authority in the place and stead of the Term Debt Trustee and the Term Debt Claimholders or in the ABL Agent's own name, from time to time in the ABL Agent's discretion exercised in good faith, for the purpose of carrying out the terms of <u>Section 5.1(a)</u>, including any endorsements or other instruments of transfer or release.

(c)    If the Term Debt Trustee, on behalf of the Term Debt Claimholders, releases any of its Liens on any part of the Fixed Asset Collateral, in connection with (A) any Enforcement (including as provided for in <u>Section 3.2(b)</u> or <u>Section 6.8(b)</u>, but excluding any Disposition described in clause (C) below) by the Term Debt Trustee with respect to such Fixed Asset Collateral, (B) so long as such sale, transfer or other disposition is permitted by the Term Debt Documents and the ABL Loan Documents, any Disposition of such Fixed Asset Collateral (other than in connection with a Refinancing as described in <u>Section 5.5</u>), irrespective of whether a Term Debt Default has occurred and is continuing, or (C) the Disposition by any Grantor of such Fixed Asset Collateral with the consent of the Term Debt Trustee so long as, in the case of any

-38-

Disposition of such Fixed Asset Collateral pursuant to this clause (C), (i) a Term Debt Default has occurred and is continuing, (ii) the net cash Proceeds received from such Disposition shall be applied to repay the Term Debt Obligations, (iii) such Disposition shall be conducted in a commercially reasonable manner, and (iv) the ABL Agent shall have received no less than five (5) Business Days' prior written notice of such Disposition, then the Liens, if any, of the ABL Agent on the Fixed Asset Collateral sold or disposed of in connection therewith, shall be automatically, unconditionally and simultaneously released; provided that, to the extent the Proceeds of such Fixed Asset Collateral are not applied to reduce Term Debt Obligations, the ABL Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement, and such Proceeds shall be remitted to the ABL Agent for application to the ABL Obligations. The ABL Agent shall promptly execute and deliver to the Term Debt Trustee or the applicable Grantor such termination statements, releases and other documents as the Term Debt Trustee or such Grantor may reasonably request to effectively confirm such release.

(d)    Until the Discharge of the Term Debt Obligations shall occur, the ABL Agent, on behalf of the ABL Claimholders, hereby irrevocably constitutes and appoints the Term Debt Trustee and any officer or agent of the Term Debt Trustee, with full power and authority in the place and stead of the ABL Agent and the ABL Claimholders or in the Term Debt Trustee's own name, from time to time in the Term Debt Trustee's discretion exercised in good faith, for the purpose of carrying out the terms of Section 5.1(c), including any endorsements or other instruments of transfer or release.

(e)    Until the Discharge of ABL Obligations and the Discharge of Term Debt Obligations shall occur, to the extent that any Agent or the Claimholders (i) have released any Lien on any Collateral and such Lien is later reinstated or (ii) obtain any new Liens on any Collateral from any Grantor, then, in accordance with Section 2.3, the Grantors shall grant a Lien on any such Collateral, subject to the Lien priority provisions of this Agreement, to the other Agent, for the benefit of the ABL Claimholders or Term Debt Claimholders, as applicable, and to the extent the Grantor does not grant such other Lien, the Agent (having the reinstated or new Lien) shall be deemed to hold such Lien for the benefit of the other Agent and the ABL Claimholders and the Term Debt Claimholders, as applicable.

5.2.    Insurance.

(a)    Unless and until the Discharge of ABL Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the ABL Loan Documents, (i) the ABL Agent, on behalf of the ABL Claimholders, shall have the sole and exclusive right to adjust settlement for any insurance policy covering the ABL Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such ABL Collateral, (ii) all Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the ABL Collateral and to the extent required by the ABL Loan Documents shall be paid to the ABL Agent, for the benefit of the ABL Claimholders, pursuant to the terms of the ABL Loan Documents (including, without limitation, for purposes of cash collateralization of letters of credit) and thereafter, if the Discharge of ABL Obligations has occurred, and subject to the rights of the Grantors under the Term Debt Documents, to the Term Debt Trustee, for the benefit

-39-

of the Term Debt Claimholders, to the extent required under the Term Debt Documents and thereafter, if the Discharge of Term Debt Obligations has occurred, to the owner of the subject property, or such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (iii) if the Term Debt Trustee or any other Term Debt Claimholders shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to ABL Collateral in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such Proceeds over to the ABL Agent in accordance with the terms of <u>Section 4.2</u>.

(b)     Unless and until the Discharge of Term Debt Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the Term Debt Documents, (i) the Term Debt Trustee, on behalf of the Term Debt Claimholders, shall have the sole and exclusive right to adjust settlement for any insurance policy covering the Fixed Asset Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such Fixed Asset Collateral, (ii) all Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the Fixed Asset Collateral and to the extent required by the Term Debt Documents shall be paid to the Term Debt Trustee, for the benefit of the Term Debt Claimholders, pursuant to the terms of the Term Debt Documents and thereafter, if the Discharge of Term Debt Obligations has occurred, and subject to the rights of the Grantors under the ABL Loan Documents, to the ABL Agent, for the benefit of the ABL Claimholders, to the extent required under the ABL Loan Documents and thereafter, if the Discharge of ABL Obligations has occurred, to the owner of the subject property, or such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (iii) if the ABL Agent or any other ABL Claimholders shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to Fixed Asset Collateral in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such Proceeds over to the Term Debt Trustee in accordance with the terms of <u>Section 4.2</u>.

(c)     To effectuate the foregoing, and to the extent that the pertinent insurance company agrees to issue such endorsements, the Agents shall each receive separate lender's loss payable endorsements naming themselves as loss payee and additional insured, as their interests may appear, with respect to any policies which insure Collateral hereunder.

5.3.     <u>Amendments to ABL Loan Documents and Term Debt Documents</u>.

(a)     [intentionally omitted].

(b)     Subject to <u>Sections 5.3(c)</u>, <u>5.3(d),</u> <u>5.3(e)</u> and <u>5.3(f)</u>, each Agent shall use good faith efforts to notify the other Agent of any written amendment or modification to the ABL Loan Documents and the Term Debt Documents, as applicable, but the failure to do so shall not create a cause of action against the party failing to give such notice or create any claim or right on behalf of any third party.

(c)     Without the prior written consent of the Term Debt Trustee, the ABL Agent will not be entitled to agree (and will not agree) to any amendment to or modification of the ABL Credit

Agreement, whether in a Refinancing or otherwise, that is prohibited by the Term Debt Documents, as in effect on the date hereof (or, if less restrictive to the ABL Claimholders, on the date of such amendment or modification).

(d)     Without the prior written consent of the ABL Agent, the Term Debt Trustee and the other Term Debt Claimholders will not be entitled to agree (and will not agree) to any amendment to or modification of the Term Debt Documents, whether in a Refinancing or otherwise, that is prohibited by the ABL Loan Documents, as in effect on the date hereof (or, if less restrictive to the Term Debt Claimholders, on the date of such amendment or modification).

(e)     So long as the Discharge of ABL Obligations has not occurred, the Term Debt Trustee agrees that each Term Debt Document that grants a Lien on any Collateral shall include the following language (or similar language acceptable to the ABL Agent): "Notwithstanding anything herein to the contrary, the liens and security interests granted to U.S. BANK, NATIONAL ASSOCIATION, as Collateral Trustee, pursuant to this Agreement and the exercise of any right or remedy by U.S. BANK, NATIONAL ASSOCIATION, as Collateral Trustee hereunder, are subject to the provisions of the Amended and Restated Intercreditor Agreement dated as of April 16, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among GOLDMAN SACHS BANK USA, as the ABL Agent, U.S. BANK, NATIONAL ASSOCIATION, as the Term Debt Trustee, and the Grantors (as defined in the Intercreditor Agreement) from time to time party thereto.  In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(f)     So long as the Discharge of Term Debt Obligations has not occurred, the ABL Agent agrees that each ABL Loan Document that grants a Lien on any Collateral shall include the following language (or similar language acceptable to the Term Debt Trustee): "Notwithstanding anything herein to the contrary, the liens and security interests granted to GOLDMAN SACHS BANK USA, as Administrative Agent, pursuant to this Agreement and the exercise of any right or remedy by GOLDMAN SACHS BANK USA, as Administrative Agent hereunder, are subject to the provisions of the Amended and Restated Intercreditor Agreement dated as of April 16, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among GOLDMAN SACHS BANK USA, as the ABL Agent, U.S. BANK, NATIONAL ASSOCIATION, as the Term Debt Trustee, and the Grantors (as defined in the Intercreditor Agreement) from time to time party thereto.  In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern and control."

5.4.     Bailees for Perfection.

(a)     Each Agent agrees to hold that part of the ABL Collateral or Fixed Asset Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon (such Collateral, the "Pledged Collateral") as (i) in the case of the ABL Agent, the collateral agent for the ABL Claimholders under the ABL Loan Documents, and in the case of the Term Debt Trustee, the collateral agent for the Term Debt Claimholders under the Term Debt Documents and

(ii) gratuitous bailee for the benefit of the other Agent and Claimholders represented by such Agent (such bailment being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting the security interest granted under the ABL Loan Documents and the Term Debt Documents, respectively, subject to the terms and conditions of this <u>Section 5.4</u>.

(b)    No Agent shall have any obligation whatsoever to the other Agent or to any other Claimholder to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this <u>Section 5.4</u>.  The duties or responsibilities of the respective Agents under this <u>Section 5.4</u> shall be limited solely to holding the Pledged Collateral as bailee in accordance with this <u>Section 5.4</u> and delivering the Pledged Collateral or Proceeds thereof upon a Discharge of ABL Obligations or upon a Discharge of Term Debt Obligations, as applicable, as provided in paragraph (d) below.

(c)    No Agent acting pursuant to this <u>Section 5.4</u> shall have by reason of the ABL Loan Documents, the Term Debt Documents, this Agreement or any other document a fiduciary relationship in respect of the other Agent or the other Claimholders represented by such Agent.

(d)    Upon the Discharge of ABL Obligations, the ABL Agent shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, <u>first</u>, to the Term Debt Trustee, for the benefit of the Term Debt Claimholders, to the extent any Term Debt Obligations remain outstanding and <u>second</u>, to the applicable Grantor to the extent the Discharge of ABL Obligations and the Discharge of Term Debt Obligations have occurred (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as otherwise required by applicable law.  Upon the Discharge of Term Debt Obligations, the Term Debt Trustee shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, <u>first</u>, to the ABL Agent, for the benefit of the ABL Claimholders, to the extent any ABL Obligations remain outstanding and <u>second</u>, to the applicable Grantor to the extent the Discharge of ABL Obligations and the Discharge of Term Debt Obligations have occurred (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as otherwise required by applicable law.   Each Agent further agrees to take all other action reasonably requested by the other Agent in connection with such other Agent obtaining a security interest in the Collateral (with the appropriate priority as indicated herein or as a court of competent jurisdiction may otherwise direct).   Notwithstanding anything to the contrary contained in this Agreement, any obligation of an Agent, which has been discharged, to make any delivery to the other Agent under this <u>Section 5.4(d)</u> or <u>Section 5.5</u> is subject to (i) the order of any court of competent jurisdiction, or (ii) any automatic stay imposed in connection with any Insolvency or Liquidation Proceeding.

(e)    Subject to the terms of this Agreement, so long as the Discharge of ABL Obligations has not occurred, the ABL Agent shall be entitled to deal with the ABL Collateral within its "control" in accordance with the terms of this Agreement, the ABL Loan Documents as if the Liens of the Term Debt Trustee, on behalf of the Term Debt Claimholders, did not exist and so long as the Discharge of Term Debt Obligations has not occurred, the Term Debt Trustee shall be entitled to deal with the Fixed Asset Collateral within its "control" in

-42-

accordance with the terms of this Agreement, the Term Debt Documents as if the Liens of the ABL Agent, on behalf of the ABL Claimholders, did not exist.

5.5.    <u>Refinancings; When Discharge of ABL Obligations and Discharge of Term Debt Obligations Deemed to Not Have Occurred</u>.  The ABL Obligations may be Refinanced without notice to, or the consent of, the Term Debt Trustee or the Term Debt Claimholders and without affecting the Lien subordination or other provisions of this Agreement and the Term Debt Obligations may be Refinanced without notice to, or consent of, the ABL Agent and the ABL Claimholders and without affecting the Lien subordination and other provisions of this Agreement, in each case, so long as such Refinancing is on terms and conditions that would not violate the Term Debt Documents or the ABL Loan Documents, each as in effect on the date hereof (or, if less restrictive to the Company, as in effect on the date of such amendment or Refinancing).  If concurrently with the Discharge of ABL Obligations or the Discharge of Term Debt Obligations, the Company shall enter into any Permitted Refinancing of any ABL Obligation or any Term Debt Obligation, as applicable, then such Discharge of ABL Obligations or Discharge of Term Debt Obligations with respect to such Refinanced ABL Obligations or Refinanced Term Debt Obligations, as applicable, shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken as a result of the occurrence of such Discharge of ABL Obligations or Discharge of Term Debt Obligations in order to effectuate such discharge among (i) the Agent(s) and other Claimholders under the facility to be discharged, (ii) the agents and other claimholders under the new facility, and (iii) the Company and the Company Subsidiaries), and, in any event, whether or not any such Permitted Refinancing is in whole or in part a Refinancing of the ABL Obligations or Term Debt Obligations, from and after the date on which the New Debt Notice is delivered to the appropriate Agent in accordance with the next sentence, the obligations under such Permitted Refinancing shall automatically be treated as ABL Obligations or Term Debt Obligations, as applicable, for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of ABL Collateral set forth herein, and, as applicable, the then existing ABL Agent under this Agreement or the ABL Agent under such new ABL Loan Documents, as applicable, shall be the ABL Agent for all purposes of this Agreement and the then existing Term Debt Trustee under this Agreement or the Term Debt Trustee under such new Term Debt Documents, as applicable, shall be the Term Debt Trustee for all purposes of this Agreement. Upon receipt of a notice from the Company (the "<u>New Debt Notice</u>") stating that the Company has entered into new ABL Loan Documents or new Term Debt Documents, as applicable (which notice shall include a complete copy of the relevant new documents and, as applicable, provide the identity of the new Agent (such agent, the "<u>New Agent</u>") or confirm that the then existing ABL Agent hereunder shall be the ABL Agent for such new ABL Loan Documents or confirm that the then existing Term Debt Trustee hereunder shall be the Term Debt Trustee for such new Term Debt Documents) and an officer's certificate certifying that such new indebtedness is permitted by the terms of the existing ABL Loan Documents and Term Debt Documents that are not being so Refinanced or that are so Refinanced in part, the other Agent, upon written request of the New Agent or the then existing Agent, as applicable, shall promptly (a) enter into such documents and agreements (including amendments or supplements to this Agreement) as the Company or such New Agent or the then existing Agent, as applicable, shall reasonably request in order to provide to the New Agent or the then existing Agent, as applicable, the rights contemplated hereby, in each case consistent in all material respects with the terms of this

-43-

Agreement and (b) if applicable, deliver to the New Agent any Pledged Collateral held by it together with any necessary endorsements (or otherwise allow the New Agent to obtain control of such Pledged Collateral).   Concurrently with the delivery of the New Debt Notice, if applicable, the New Agent shall agree in a writing addressed to the other Agent and the applicable Claimholders, to be bound by the terms of this Agreement or by the terms of another intercreditor agreement as may be acceptable to such other Agent, provided, however, that if such Refinancing debt is secured by a Lien on any Collateral the holders of such Refinancing debt shall be deemed bound by the terms of this Agreement regardless of whether or not such writing is provided.   For the avoidance of doubt, the sale or other transfer of Indebtedness is not restricted by this Agreement but the provisions of this Agreement shall be binding on all holders of ABL Obligations and Term Debt Obligations.

5.6.   Additional Term Debt.   The Company and the other applicable Grantors will be permitted to designate as an additional holder of Obligations hereunder each Person who is, or who becomes or who is to become, the registered holder of Term Debt Obligations incurred by the Company or such other Grantor after the date of this Agreement in accordance with the terms of all applicable Term Debt Documents in existence at such time.   The Company or the other applicable Grantors may effect such designation by delivering to each Agent an Officers' Certificate stating that the Company or such other Grantor intends to incur additional Term Debt Obligations ("Additional Term Debt") which will be additional Senior Secured Notes, additional First Term Loans, an Additional First Lien Term Debt Facility or an Additional Second Lien Term Debt Facility permitted by each applicable Term Debt Document in existence at such time, to be incurred and secured by a Lien on the ABL Collateral in accordance with Section 2.1 and equally and ratably with, or junior to, all previously existing and future Term Debt Obligations.

Notwithstanding the foregoing, nothing in this Agreement will be construed to waive any limitation on the incurrence of Indebtedness or the granting of Liens set forth in either the ABL Credit Agreement or the Term Debt Documents or to allow the Company or any other Grantor to incur additional Indebtedness or grant Liens on its assets to secure such Indebtedness unless otherwise permitted by the terms of the ABL Credit Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, the Tertiary Senior Secured Note Indenture or the First Lien Term Loan Agreement, each as in effect on the date hereof, and any Additional First Lien Term Debt Facility or Additional Second Lien Term Debt Facility.

# VI.
## INSOLVENCY OR LIQUIDATION PROCEEDINGS.

6.1.   Finance and Use of Cash Collateral.

(a)   The Term Debt Trustee, on behalf of the Term Debt Claimholders, hereby agrees that, until the Discharge of ABL Obligations has occurred, if any Grantor shall be subject to any Insolvency or Liquidation Proceeding and the ABL Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) constituting ABL Collateral ("ABL Cash Collateral Use") or to permit any Grantor to obtain financing, whether from the ABL Claimholders or any other Person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law ("ABL DIP Financing") secured by a Lien on ABL Collateral (but

-44-

not on any Lien on any Fixed Asset Collateral), then no Term Debt Claimholder will be entitled to raise (and will not raise or support any Person in raising), but instead shall be deemed to have hereby irrevocably and absolutely waived, any objection to, and shall not otherwise in any manner be entitled to oppose or will oppose or support any Person in opposing, such ABL Cash Collateral Use or ABL DIP Financing (including, except as expressly provided below, that the Term Debt Claimholders are entitled to adequate protection of their interest in the ABL Collateral as a condition thereto) so long as such ABL Cash Collateral Use or ABL DIP Financing meets the following requirements: (i) the Term Debt Trustee and the other Term Debt Claimholders retain a Lien on the ABL Collateral that existed as of the date of the commencement of the applicable Insolvency or Liquidation Proceeding (including Proceeds thereof arising after the commencement of such Insolvency or Liquidation Proceeding); (ii) to the extent that the ABL Agent is granted the corresponding form of adequate protection, the Term Debt Trustee and the other Term Debt Claimholders may request and accept adequate protection as set forth in Section 6.3 below; (iii) the terms of such ABL DIP Financing or ABL Cash Collateral Use do not require any Grantor to seek approval of any Plan of Reorganization that provides a specified treatment of any claim in respect of any Term Debt Obligations or that is otherwise inconsistent with this Agreement; (iv) that the proposed ABL Cash Collateral order or ABL DIP Financing documentation does not directly or indirectly require or compel the sale of all or substantially all of the ABL Collateral other than pursuant to the exercise of remedies after default and acceleration of such ABL DIP Financing pursuant to such order or documentation; (v) the aggregate amount of the ABL Obligations and the ABL DIP Financing shall not at any time exceed the ABL Obligations Cap as of the applicable date of determination; (vi) the Term Debt Trustee and the other Term Debt Claimholders retain the right to object to any arrangements regarding any ABL Cash Collateral Use or the ABL DIP Financing that are adverse to the interests of the Term Debt Trustee or any other Term Debt Claimholders (other than the priority status of their Liens on the ABL Collateral vis-à-vis the Liens thereon of the ABL Claimholders as set forth herein); (vii) such ABL Cash Collateral Use or such ABL DIP Financing is on commercially reasonable terms; and (viii) the ABL DIP Financing or ABL Cash Collateral Use is otherwise subject to, and in compliance with, the terms of this Agreement. The Term Debt Trustee shall be required to subordinate and will subordinate its Liens in the ABL Collateral to the Liens on the ABL Collateral securing such ABL DIP Financing (and all obligations relating thereto, including any reasonable "carve-out" granting administrative priority status to secure repayment of fees and expenses of professionals retained by any debtor or creditors' committee) and, consistent with the preceding provisions of this Section 6.1(a), will not request adequate protection or any other relief in connection therewith (except as expressly provided in Section 6.3). Notwithstanding any of the foregoing, the Term Debt Claimholders shall retain Liens on all Fixed Asset Collateral that existed as of the date of the commencement of the applicable Insolvency or Liquidation Proceedings (including Proceeds thereof arising after the commencement of such Insolvency or Liquidation Proceeding) to secure the Term Debt Obligations and such Liens securing Term Debt Obligations shall have the same priority on the Fixed Asset Collateral as existed prior to the commencement of such proceeding, and this Section 6.1(a) shall not apply to or permit any debtor-in-possession financing or any use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) that in either case grants the ABL Agent or any other ABL Claimholder any Lien on Fixed Asset Collateral that is senior to or *pari passu* with the Liens of the Term Debt Trustee on the Fixed Asset Collateral, and the ABL Agent, on behalf of itself and the ABL Claimholders, agrees that

-45-

no such Person shall provide to any Grantor any debtor-in-possession financing or permit any use of "Cash Collateral" to the extent that the ABL Agent or any other ABL Claimholder would, in connection with such financing or such use of "Cash Collateral", be granted a Lien on the Fixed Asset Collateral that is senior to or *pari passu* with the Liens of the Term Debt Trustee.

(b)    The ABL Agent, on behalf of the ABL Claimholders, hereby agrees that, until the Discharge of Term Debt Obligations has occurred, if any Grantor shall be subject to any Insolvency or Liquidation Proceeding and the Term Debt Trustee shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) constituting Fixed Asset Collateral ("Term Debt Cash Collateral Use") or to permit any Grantor to obtain financing, whether from the Term Debt Claimholders or any other Person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law ("Term Debt DIP Financing") secured by a Lien on Fixed Asset Collateral (but not on any Lien on any ABL Collateral), then no ABL Claimholder will be entitled to raise (and will not raise or support any Person in raising), but instead shall be deemed to have hereby irrevocably and absolutely waived, any objection to, and shall not otherwise in any manner be entitled to oppose or will oppose or support any Person in opposing, such Term Debt Cash Collateral Use or Term Debt DIP Financing (including, except as expressly provided below, that the ABL Claimholders are entitled to adequate protection of their interest in the Fixed Asset Collateral as a condition thereto) so long as such Term Debt Cash Collateral Use or Term Debt DIP Financing meets the following requirements:  (i) the ABL Agent and the other ABL Claimholders retain a Lien on the Fixed Asset Collateral that existed as of the date of the commencement of the applicable Insolvency or Liquidation Proceeding (including Proceeds thereof arising after the commencement of such Insolvency or Liquidation Proceeding); (ii) to the extent that the Term Debt Trustee is granted the corresponding form of adequate protection, the ABL Agent and the other ABL Claimholders may request and accept adequate protection as set forth in Section 6.3 below; (iii) the terms of such Term Debt DIP Financing or Term Debt Cash Collateral Use do not require any Grantor to seek approval of any Plan of Reorganization that provides a specified treatment of any claim in respect of any ABL Obligations or that is otherwise inconsistent with this Agreement; (iv) that the proposed Term Debt Cash Collateral order or Term Debt DIP Financing documentation does not directly or indirectly require or compel the sale of all or substantially all of the Fixed Asset Collateral other than pursuant to the exercise of remedies after default and acceleration of such Term Debt DIP Financing pursuant to such order or documentation; (v) the aggregate amount of the Term Debt Obligations and the Term Debt DIP Financing shall not at any time exceed the Term Debt Obligations Cap as of the applicable date of determination; (vi) the ABL Agent and the other ABL Claimholders retain the right to object to any arrangements regarding any Term Debt Cash Collateral Use or the Term DIP Financing that are adverse to the interests of the ABL Trustee or any other ABL Claimholders (other than the priority status of their Liens on the Fixed Asset Collateral vis-à-vis the Liens thereon of the Term Debt Claimholders as set forth herein); (vii) such Term Debt Cash Collateral Use or such Term Debt DIP Financing is on commercially reasonable terms; and (viii) the Term Debt DIP Financing or Term Debt Cash Collateral Use is otherwise subject to, and in compliance with, the terms of this Agreement.  The ABL Agent shall be required to subordinate and will subordinate its Liens in the Fixed Asset Collateral to the Liens on the Fixed Asset Collateral securing such Term Debt DIP Financing (and all obligations relating thereto, including any reasonable "carve-out" granting administrative priority status to secure repayment of fees and expenses of

-46-

professionals retained by any debtor or creditors' committee) and, consistent with the preceding provisions of this Section 6.1(b), will not request adequate protection or any other relief in connection therewith (except as expressly provided in Section 6.3).  Notwithstanding any of the foregoing, the ABL Claimholders shall retain Liens on all ABL Collateral that existed as of the date of the commencement of the applicable Insolvency or Liquidation Proceedings (including Proceeds thereof arising after the commencement of such Insolvency or Liquidation Proceeding) to secure the ABL Obligations and such Liens securing ABL Obligations shall have the same priority on the ABL Collateral as existed prior to the commencement of such proceeding, and this Section 6.1(b) shall not apply to or permit any debtor-in-possession financing or any use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) that in either case grants the Term Debt Trustee or any other Term Debt Claimholder any Lien on ABL Collateral that is senior to or *pari passu* with the Liens of the ABL Agent on the ABL Collateral, and the Term Debt Trustee, on behalf of itself and the Term Debt Claimholders, agrees that no such Person shall provide to any Grantor any debtor-in-possession financing or permit any use of "Cash Collateral" to the extent that the Term Debt Trustee or any other Term Debt Claimholder would, in connection with such financing or such use of "Cash Collateral", be granted a Lien on the ABL Collateral that is senior to or *pari passu* with the Liens of the Term Debt Trustee.

6.2.    Relief from the Automatic Stay.

(a)    Until the Discharge of ABL Obligations, the Term Debt Trustee agrees that it shall not seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the ABL Collateral, without the prior written consent of the ABL Agent (given or not given in its sole and absolute discretion); provided, however, that in the event that any or all of the ABL Agent and the other ABL Claimholders are seeking or have obtained relief from the automatic stay with respect to any ABL Collateral, any or all of the Term Debt Trustee and the other Term Debt Claimholders may seek corresponding relief from the automatic stay with respect to such ABL Collateral and, upon obtaining such relief, may join in any foreclosure or other Enforcement action commenced by any or all of the ABL Agent and the other ABL Claimholders against any ABL Collateral (even if the Term Debt Standstill Period has not expired) so long as the Term Debt Trustee and the other Term Debt Claimholders do not hinder, delay or interfere with either the efforts by the ABL Agent and/or the other ABL Claimholders to obtain relief from the automatic stay with respect to such ABL Collateral or take any action that is adverse to the priority status of the Liens on the ABL Collateral, or the rights of the ABL Agent or any of the other ABL Claimholders to take Enforcement action in accordance with the provisions of this Agreement.

(b)    Until the Discharge of Term Debt Obligations, the ABL Agent agrees that it shall not seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Fixed Asset Collateral, without the prior written consent of the Term Debt Trustee (based solely on an Act of Required Debtholders (as such term is defined in the Collateral Trust Agreement), in writing); provided, however, that in the event that any or all of the Term Debt Trustee and the other Term Debt Claimholders are seeking or have obtained relief from the automatic stay with respect to any Fixed Asset Collateral, any or all of the ABL Agent and the other ABL Claimholders may seek

-47-

corresponding relief from the automatic stay with respect to such Fixed Asset Collateral and, upon obtaining such relief, may join in any foreclosure or other Enforcement action commenced by any or all of the Term Debt Trustee and the other Term Debt Claimholders against any Fixed Asset Collateral (even if the ABL Standstill Period has not expired) so long as the ABL Agent and the other ABL Claimholders do not hinder, delay or interfere with either the efforts by the Term Debt Trustee and/or the other Term Debt Claimholders to obtain relief from the automatic stay with respect to such Fixed Asset Collateral or take any action that is adverse to the priority status of the Liens on the Fixed Asset Collateral, or the rights of the Term Debt Trustee or any of the other Term Debt Claimholders to take Enforcement action in accordance with the provisions of this Agreement.

6.3.    Adequate Protection.

(a)    So long as the Discharge of ABL Obligations has not occurred, the Term Debt Trustee, on behalf of itself, and the Term Debt Claimholders, agrees that none of them shall be entitled to contest and none of them shall contest (or support any other Person contesting) (but instead shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right to contest):

(i)    any request by the ABL Agent or the other ABL Claimholders for relief from the automatic stay with respect to the ABL Collateral; or

(ii)    any request by the ABL Agent or the other ABL Claimholders for adequate protection with respect to the ABL Collateral; or

(iii)    any objection by the ABL Agent or the other ABL Claimholders to any motion, relief, action or proceeding based on the ABL Agent or the other ABL Claimholders claiming a lack of adequate protection with respect to the ABL Collateral.

(b)    So long as the Discharge of Term Debt Obligations has not occurred, the ABL Agent, on behalf of itself, and the ABL Claimholders, agrees that none of them shall be entitled to contest and none of them shall contest (or support any other Person contesting) (but instead shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right to contest):

(i)    any request by the Term Debt Trustee or the other Term Debt Claimholders for relief from the automatic stay with respect to the Fixed Asset Collateral; or

(ii)    any request by the Term Debt Trustee or the other Term Debt Claimholders for adequate protection with respect to the Fixed Asset Collateral; or

(iii)    any objection by the Term Debt Trustee or the other Term Debt Claimholders to any motion, relief, action or proceeding based on the Term Debt

-48-

Trustee or the other Term Debt Claimholders claiming a lack of adequate protection with respect to the Fixed Asset Collateral.

(c)    The Term Debt Trustee and the other Term Debt Claimholders  may seek any form of adequate protection, and the ABL Agent and the other ABL Claimholders may contest the seeking or granting of any such adequate protection, except that neither the ABL Agent nor the other ABL Claimholders shall contest (or support any other Person in contesting) any request by the Term Debt Trustee or any other Term Debt Claimholders:

(i)     if any or all of the ABL Claimholders are granted adequate protection in the form of additional collateral in connection with any ABL Cash Collateral Use or ABL DIP Financing and such additional collateral is the type of asset or property that would constitute ABL Collateral, to obtain adequate protection in form of additional or replacement Liens on the ABL Collateral (including Proceeds thereof arising after the commencement of any Insolvency or Liquidation Proceeding) to secure the Term Debt Obligations, in connection with any such ABL Cash Collateral Use or any such ABL DIP Financing so long as any such additional or replacement Liens are subordinated to such senior adequate protection Lien securing the ABL Obligations on the same basis as the other Liens securing the Term Debt Obligations are subordinated to the Liens securing the ABL Obligations under this Agreement;

(ii)   to obtain adequate protection in the form of reports, notices, inspection rights and similar forms of adequate protection; and

(iii)   to obtain adequate protection in the form of an administrative expense claim and/or a superpriority administrative expense claim against any or all of the Grantors so long as the ABL Claimholders are also granted as adequate protection an administrative expense claim and/or a superpriority administrative expense claim; provided that the administrative expense claims and/or a superpriority administrative expense claims granted to the Term Debt Claimholders and the ABL Claimholders shall be pari passu.

(d)    The ABL Agent and the other ABL Claimholders  may seek any form of adequate protection, and the Term Debt Trustee and the other Term Debt Claimholders may contest the seeking or granting of any such adequate protection, except that neither the Term Debt Trustee nor the other Term Debt Claimholders shall contest (or support any other Person in contesting) any request by the ABL Agent or any other ABL Claimholders:

(i)     if any or all of the Term Debt Claimholders are granted adequate protection in the form of additional collateral in connection with any Term Debt Cash Collateral Use or Term Debt DIP Financing and such additional collateral is the type of asset or property that would constitute Fixed Asset Collateral, to obtain adequate protection in form of additional or replacement Liens on the Fixed Asset Collateral (including Proceeds thereof arising after the commencement of any Insolvency or Liquidation Proceeding) to secure the ABL Obligations, in connection with any such Term Debt Cash Collateral Use or any such Term Debt DIP Financing so long as any such additional or replacement Liens are subordinated to such senior adequate protection Lien securing the Term Debt Obligations on the same basis as the other Liens

-49-

securing the ABL Obligations are subordinated to the Liens securing the Term Debt Obligations under this Agreement;

(ii)   to obtain adequate protection in the form of reports, notices, inspection rights and similar forms of adequate protection; and

(iii)   to obtain adequate protection in the form of an administrative expense claim and/or a superpriority administrative expense claim against any or all of the Grantors so long as the Term Debt Claimholders are also granted as adequate protection an administrative expense claim and/or a superpriority administrative expense claim; provided that the administrative expense claims and/or a superpriority administrative expense claims granted to the ABL Claimholders and the Term Debt Claimholders shall be *pari passu.*

6.4.   <u>Avoidance Issues</u>.  If any Claimholder is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the applicable Grantor any amount paid in respect of ABL Obligations or Term Debt Obligations, as applicable (a "<u>Recovery</u>"), then such Claimholders shall be entitled to a reinstatement of ABL Obligations or Term Debt Obligations, as applicable, with respect to all such recovered amounts.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

6.5.   <u>Reorganization Securities</u>.  Subject to the ability of the ABL Agent and the Term Debt Trustee, as applicable, to support or oppose confirmation or approval of any Conforming Plan of Reorganization or to oppose confirmation or approval of any Non-Conforming Plan of Reorganization, as provided herein, if, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a Plan of Reorganization on account of the ABL Obligations and/or the Term Debt Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations and/or the Term Debt Obligations are secured by Liens upon the Collateral, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the debt obligations so distributed, to the Liens securing such debt obligations and the distribution of Proceeds thereof.

6.6.   <u>Post-Petition Interest</u>.

(a)   Neither the Term Debt Trustee nor any other Term Debt Claimholder shall oppose or seek to challenge any claim by the ABL Agent or any other ABL Claimholder for allowance in any Insolvency or Liquidation Proceeding of ABL Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien securing any ABL Claimholder's claim; provided, that nothing contained in this <u>Section 6.6(a)</u> prohibits the Term Debt Trustee, on behalf of the Term Debt Claimholders, from seeking adequate protection (to the extent it has not already done so under other provisions of this Agreement) with respect to their rights in the Fixed Asset Collateral in any Insolvency or Liquidation Proceeding if such Fixed Asset Collateral is the source of payment of post-petition interest, fees or expenses payable to the ABL Agent or any other ABL Agent Claimholder.

-50-

(b)    Neither the ABL Agent nor any other ABL Claimholder shall oppose or seek to challenge any claim by the Term Debt Trustee or any other Term Debt Claimholder for allowance in any Insolvency or Liquidation Proceeding of Term Debt Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien securing any Term Debt Claimholder's claim; provided, that nothing contained in this Section 6.6(b) prohibits the ABL Agent, on behalf of the ABL Claimholders, from seeking adequate protection (to the extent it has not already done so under other provisions of this Agreement) with respect to their rights in the ABL Collateral in any Insolvency or Liquidation Proceeding if such ABL Collateral is the source of payment of post-petition interest, fees or expenses payable to the Term Debt Trustee or any other Term Debt Claimholder.

6.7.    Separate Grants of Security and Separate Classification. The Term Debt Trustee on behalf of the Term Debt Claimholders and the ABL Agent, on behalf of the ABL Claimholders, acknowledge and intend that the grants of Liens pursuant to the ABL Security Documents and the Term Debt Security Documents constitute separate and distinct grants of Liens, and because of, among other things, their differing rights in the Collateral, and the Term Debt Obligations are fundamentally different from the ABL Obligations and must be separately classified in any Plan of Reorganization proposed or confirmed (or approved) in an Insolvency or Liquidation Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Claimholder and the Term Debt Claimholders in respect of the Collateral constitute claims in the same class (rather than separate classes of senior, junior and subordinated secured claims), then the ABL Claimholders  and the Term Debt Claimholders hereby acknowledge and agree that all distributions shall be made as if there were separate classes of ABL Obligations and Term Debt Obligations against the Grantors, with the effect being that,

(i)    to the extent that the aggregate value of the ABL Collateral is sufficient, the ABL Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, fees or expenses that is available from the ABL Collateral before any distribution is made in respect of the claims held by the Term Debt Claimholders, with such Term Debt Claimholders hereby acknowledging and agreeing to turn over to the ABL Claimholders amounts otherwise received or receivable by them under such Plan of Reorganization to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries; and

(ii)    to the extent that the aggregate value of the Fixed Asset Collateral is sufficient, the Term Debt Claimholders shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, fees or expenses that is available from the Fixed Asset Collateral before any distribution is made in respect of the claims held by the ABL Claimholders, with such ABL Claimholders hereby acknowledging and agreeing to turn over to the Term Debt Claimholders amounts otherwise received or receivable by them under such Plan of Reorganization to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries.

CH\2049272.8

6.8.   <u>Asset Dispositions in an Insolvency or Liquidation Proceeding</u>. (a)   Without limiting the ABL Agent's and the other ABL Claimholders' rights under <u>Section 3.1(b)</u>, neither the Term Debt Trustee nor other Term Debt Claimholder shall, in any Insolvency or Liquidation Proceeding or otherwise, oppose any sale or disposition of any ABL Collateral that is supported by the ABL Claimholders, and the Term Debt Trustee and each other Term Debt Claimholder will be deemed to have irrevocably, absolutely, and unconditionally consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale of any ABL Collateral supported by the ABL Claimholders and to have released their Liens on such assets at the closing thereof; <u>provided</u>, that the payments and Proceeds of such sale are applied in accordance with this Agreement and to the extent the Proceeds of such ABL Collateral are not applied to reduce ABL Obligations, the Term Debt Trustee shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.

(b)   Without limiting the Term Debt Trustee's and the other Term Debt Claimholders' rights under <u>Section 3.2(b)</u>, neither the ABL Agent nor other ABL Claimholder shall, in any Insolvency or Liquidation Proceeding or otherwise, oppose any sale or disposition of any Fixed Asset Collateral that is supported by the Term Debt Claimholders, and the ABL Agent and each other ABL Claimholder will be deemed to have irrevocably, absolutely, and unconditionally consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale of any ABL Collateral supported by the ABL Claimholders and to have released their Liens on such assets at the closing thereof; <u>provided</u>, that the payments and Proceeds of such sale are applied in accordance with this Agreement and to the extent the Proceeds of such Fixed Asset Collateral are not applied to reduce Term Debt Obligations, the ABL Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.

# VII.
## RELIANCE; WAIVERS; ETC.

7.1.   <u>Reliance</u>.  Other than any reliance on the terms of this Agreement, the ABL Agent, on behalf of the ABL Claimholders, acknowledges that it and the other ABL Claimholders have, independently and without reliance on the Term Debt Trustee or any Term Debt Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the ABL Loan Documents and be bound by the terms of this Agreement, and they will continue to make their own credit decision in taking or not taking any action under the ABL Loan Documents or this Agreement.  The Term Debt Trustee, on behalf of the Term Debt Claimholders, acknowledges that the other Term Debt Claimholders have, independently and without reliance on the ABL Agent or any other ABL Claimholder and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into each of the Term Debt Documents and be bound by the terms of this Agreement, and the other Term Debt Claimholders will continue to make their own credit decision in taking or not taking any action under the Term Debt Documents or this Agreement.

7.2.   <u>No Warranties or Liability</u>.  The ABL Agent, on behalf of the ABL Claimholders, acknowledges and agrees that each of the Term Debt Trustee and the Term Debt Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the Term

Debt Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the Term Debt Trustee and the other Term Debt Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Term Debt Documents, in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The Term Debt Trustee, on behalf the Term Debt Claimholders, acknowledges and agrees that each of the ABL Agent and the other ABL Claimholders have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the ABL Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. Except as otherwise provided herein, the ABL Agent and the other ABL Claimholders will be entitled to manage and supervise their respective loans and extensions of credit or provision of services, as applicable under the relevant ABL Loan Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. Except as otherwise provided in this Agreement, the Term Debt Trustee and the other Term Debt Claimholders shall have no duty to the ABL Agent or any other ABL Claimholder, and the ABL Agent and the other ABL Claimholders shall have no duty to the Term Debt Trustee or any other Term Debt Claimholder.

    7.3.    <u>No Waiver of Lien Priorities</u>.

    (a)    No right of the Agents, or the other Claimholders to enforce any provision of this Agreement, any ABL Loan Document or any Term Debt Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Grantor or by any act or failure to act by such Agents, or Claimholders or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any ABL Loan Document or any Term Debt Document, regardless of any knowledge thereof which the Agents or the Claimholders, or any of them, may have or be otherwise charged with.

    (b)    Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Grantors under the ABL Loan Documents, the Term Debt Documents and subject to the provisions of <u>Section 5.3</u>), the Agents and the other Claimholders may, at any time and from time to time in accordance with the ABL Loan Documents and the Term Debt Documents and/or applicable law, without the consent of, or notice to, the other Agent, or Claimholders (as applicable), without incurring any liabilities to such Persons and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy is affected, impaired or extinguished thereby) do any one or more of the following, so long as such action is not inconsistent with the terms of this Agreement:

        (i)    change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the Obligations or any Lien or guaranty thereof or any liability of any Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the Obligations, without any restriction as to the tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or

supplement in any manner any Liens held by the Agents or any rights or remedies under any of the ABL Loan Documents or the Term Debt Documents, as applicable;

(ii) sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral or any liability of any Grantor or any liability incurred directly or indirectly in respect thereof;

(iii) settle or compromise any Obligation or any other liability of any Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability in any manner or order; and

(iv) exercise or delay in or refrain from exercising any right or remedy against any security or any Grantor or any other Person, elect any remedy and otherwise deal freely with any Grantor.

7.4. <u>Obligations Unconditional</u>. All rights, interests, agreements and obligations of the ABL Claimholders and the Term Debt Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any ABL Loan Documents or any Term Debt Documents;

(b) except, in each case, as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the ABL Obligations or Term Debt Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any ABL Loan Document or any Term Debt Document;

(c) except as otherwise expressly set forth in this Agreement, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the ABL Obligations or Term Debt Obligations or any guaranty thereof;

(d) the commencement of any Insolvency or Liquidation Proceeding in respect of any Grantor; or

(e) any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of the ABL Agent, the ABL Obligations, any ABL Claimholder, the Term Debt Trustee, the Term Debt Obligations or any Term Debt Claimholder in respect of this Agreement.

-54-

# VIII.
# MISCELLANEOUS.

8.1.    <u>Conflicts</u>.  In the event of any conflict between the provisions of this Agreement and the provisions of any ABL Loan Document or any Term Debt Document, the provisions of this Agreement shall govern and control.

8.2.    <u>Effectiveness; Continuing Nature of this Agreement; Severability</u>.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of Lien subordination (as opposed to an agreement of debt or claim subordination), and the ABL Claimholders and Term Debt Claimholders may continue, at any time and without notice to the other Agent, to extend credit and other financial accommodations and lend monies to or for the benefit of any Grantor in reliance hereon.  Each of the Agents, on behalf the ABL Claimholders and the Term Debt Claimholders, as applicable, hereby irrevocably, absolutely, and unconditionally waives any right any Claimholder may have under applicable law to revoke this Agreement or any of the provisions of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Consistent with, but not in limitation of, the preceding sentence, each of the Agents, on behalf of the ABL Claimholders and the Term Debt Claimholders, as applicable, irrevocably acknowledges that this Agreement constitutes a "subordination agreement" within the meaning of both New York law and Section 510(a) of the Bankruptcy Code.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to any Grantor shall include such Grantor as debtor and debtor-in-possession and any receiver or trustee for any Grantor (as applicable) in any Insolvency or Liquidation Proceeding.  Subject to <u>Section 5.5</u>, this Agreement shall terminate and be of no further force and effect:

(a)    with respect to the ABL Agent, the other ABL Claimholders and the ABL Obligations, the date of the Discharge of ABL Obligations, subject to the rights of the ABL Claimholders under <u>Section 6.4</u>; and

(b)    with respect to the Term Debt Trustee, the other Term Debt Claimholders and the Term Debt Obligations date of the Discharge of Term Debt Obligations, subject to the rights of the Term Debt Claimholders under <u>Section 6.4</u>.

8.3.    <u>Amendments; Waivers</u>.  No amendment, modification or waiver of any of the provisions of this Agreement by any Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, no Grantor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights are directly and materially affected.

8.4.    Information Concerning Financial Condition of the Grantors and their Subsidiaries. Neither the ABL Agent, the other ABL Claimholders, the Term Debt Trustee nor the other Term Debt Claimholders shall be responsible for keeping any of the other parties informed of (a) the financial condition of the Company and the Company Subsidiaries and all endorsers and/or guarantors and other Grantors of the ABL Obligations and the Term Debt Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Term Debt Obligations.  Neither the ABL Claimholders nor the Term Debt Claimholders shall have any duty to advise the others of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event that either the ABL Agent, any of the other ABL Claimholders, the Term Debt Trustee or any of the other Term Debt Claimholders undertakes at any time or from time to time to provide any such information to any of the others, it or they shall be under no obligation, (i) to make, and shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (ii) to provide any additional information or to provide any such information on any subsequent occasion, (iii) to undertake any investigation, or (iv) to disclose any information, which pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

8.5.    Subrogation.

(a)    With respect to the value of any payments or distributions in cash, property or other assets that any of the Term Debt Claimholders actually pays over to the ABL Agent or the other ABL Claimholders under the terms of this Agreement, the Term Debt Claimholders shall be subrogated to the rights of the ABL Claimholders; provided, however, that the Term Debt Trustee on behalf of the Term Debt Claimholders, hereby agrees not to assert or enforce any such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of ABL Obligations has occurred.  The Grantors acknowledge and agree that, to the extent permitted by applicable law, the value of any payments or distributions in cash, property or other assets received by the Term Debt Claimholders that are paid over to the ABL Claimholders pursuant to this Agreement shall not reduce any of the Term Debt Obligations.  Notwithstanding the foregoing provisions of this Section 8.5(a), none of the Term Debt Claimholders shall have any claim against any of the ABL Claimholders for any impairment of any subrogation rights herein granted to the Term Debt Claimholders.

(b)    With respect to the value of any payments or distributions in cash, property or other assets that any of the ABL Claimholders actually pays over to the Term Debt Trustee or the other Term Debt Claimholders under the terms of this Agreement, the ABL Claimholders shall be subrogated to the rights of the Term Debt Claimholders; provided, however, that the ABL Agent on behalf of the ABL Claimholders, hereby agrees not to assert or enforce any such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of Term Debt Obligations has occurred.  The Grantors acknowledge and agree that, to the extent permitted by applicable law, the value of any payments or distributions in cash, property or other assets received by the ABL Claimholders that are paid over to the Term Debt Claimholders pursuant to this Agreement shall not reduce any of the ABL Obligations.  Notwithstanding the foregoing provisions of this Section 8.5(b), none of the ABL Claimholders shall have any claim

CH\2049272.8

against any of the Term Debt Claimholders for any impairment of any subrogation rights herein granted to the ABL Claimholders.

8.6.   APPLICABLE LAW, SUBMISSION TO JURISDICTION; WAIVERS; JUDICIAL REFERENCE.

(a)   THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)   ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PERSON ARISING OUT OF OR RELATING HERETO MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.   EACH PARTY, FOR ITSELF AND ON BEHALF OF THE APPLICABLE CLAIMHOLDERS, IRREVOCABLY:

(1)   AGREES THAT THE ONLY NECESSARY PARTIES TO ANY AND ALL JUDICIAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE THE PARTIES HERETO, EXCEPT WHERE IN ANY SUCH JUDICIAL PROCEEDING RELIEF (INCLUDING INJUNCTIVE RELIEF OR THE RECOVERY OF MONEY) IS BEING SOUGHT DIRECTLY AGAINST OR FROM A PERSON THAT IS NOT A PARTY AND EXCEPT THAT, IN ANY SUCH JUDICIAL PROCEEDINGS BETWEEN ANY OF THE AGENTS THAT DOES NOT SEEK ANY RELIEF AGAINST OR FROM THE COMPANY OR ANY OF THE COMPANY SUBSIDIARIES, THE COMPANY AND THE COMPANY SUBSIDIARIES SHALL NOT BE NECESSARY PARTIES.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, AND CONSISTENT WITH THE PROVISIONS OF SECTIONS 8.14 AND 8.17, NONE OF THE ABL CLAIMHOLDERS (OTHER THAN THE ABL AGENT) OR THE TERM DEBT CLAIMHOLDERS (OTHER THAN THE TERM DEBT TRUSTEE) SHALL BE NECESSARY OR OTHERWISE APPROPRIATE PARTIES TO ANY SUCH JUDICIAL PROCEEDINGS, UNLESS IN SUCH JUDICIAL PROCEEDING SUMS ARE BEING SOUGHT TO BE RECOVERED DIRECTLY FROM SUCH PERSONS, INCLUDING PURSUANT TO SECTION 4.2.

(2)   ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS;

(3)   WAIVES ANY DEFENSE OF FORUM NON CONVENIENS IN SUCH COURTS;

(4)     AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PERSON (AND IN THE CASE OF A PARTY, AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH <u>SECTION 8.7</u>); AND

(5)     AGREES THAT SERVICE AS PROVIDED IN CLAUSE (4) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PERSON IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.

(c)     WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY OF THE ABL LOAN DOCUMENTS OR ANY OF THE TERM DEBT DOCUMENTS.  EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE ABL LOAN DOCUMENTS AND THE TERM DEBT DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.6</u>.

8.7.    <u>Notices</u>.  All notices permitted or required under this Agreement need be sent only to the Agents, as applicable, in order to be effective and otherwise binding on any applicable Claimholder.  If any notice is sent for whatever reason to any Claimholder, such notice shall also be sent to the applicable Agent.  Unless otherwise specifically provided herein, any notice hereunder shall be in writing and may be personally served or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by overnight courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex during normal business hours, or three (3) Business Days after depositing it in the United States certified mails (return receipt requested) with postage prepaid and properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

8.8.    <u>Further Assurances</u>.  The ABL Agent, on behalf of the ABL Claimholders, the Term Debt Trustee, on behalf of the Term Debt Claimholders, and the Grantors, agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the other Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

8.9.    [<u>RESERVED</u>].

8.10.    <u>Specific Performance</u>.    Each Agent may demand specific performance of this Agreement.  The ABL Agent, on behalf of itself and the ABL Claimholders and the Term Debt Trustee, on behalf of itself and the Term Debt Claimholders, hereby irrevocably waive any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the ABL Agent or the other ABL Claimholders, the Term Debt Trustee or the other Term Debt Claimholders, as applicable.  Without limiting the generality of the foregoing or of the other provisions of this Agreement, in seeking specific performance in any Insolvency or Liquidation Proceeding, an Agent may seek such relief as if it were the "holder" of the claims of the other Agent's Claimholders under Section 1126(a) of the Bankruptcy Code or otherwise had been granted an irrevocable power of attorney by the other Agent's Claimholders.

8.11.    <u>Headings</u>.    Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

8.11.    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.   In proving this Agreement in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought.  Any signatures delivered by a party by facsimile transmission or by e-mail transmission shall be deemed an original signature hereto.

8.13.    <u>Authorization</u>.    By its signature, each party hereto represents and warrants to the other parties hereto that the individual signing this Agreement (including any Intercreditor Agreement Joinder) on its behalf is duly authorized to execute this Agreement.  The Term Debt Trustee hereby represents that it is authorized to, and by its signature hereon does, bind the other Term Debt Claimholders for which it is acting as Agent to the terms of this Agreement.  The ABL Agent hereby represents that it is authorized to, and by its signature hereon does, bind the other ABL Claimholders to the terms of this Agreement.

8.14.    <u>No Third Party Beneficiaries</u>.    This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and their respective successors and assigns and shall inure to the benefit of (and shall be binding upon) each of the Agents and the other Claimholders and their respective successors and assigns.  Without limiting the generality of the foregoing, each of the First Lien Term Loan Agreement, the First Lien Term Debt Security Documents, the Second Lien Term Debt Security Documents, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, Tertiary Senior Secured Note Indenture, the ABL Credit Agreement, the ABL Security Documents, the Additional First Lien Term Debt Facility, if any, and the Additional Second Lien Term Debt Facility, if any, shall expressly refer to this Agreement and acknowledge that its provisions shall be binding on the Term Debt Trustee, the applicable Term Debt Claimholders (and their respective successors and assigns), the ABL Agent and the ABL Claimholders (and their respective successors and assigns), as applicable, and, in any event, this Agreement shall be binding on the other Agent, the other Claimholders and their respective successors and assigns as if its provisions were set forth

-59-

in their entirety in the ABL Credit Agreement, the First Lien Term Loan Agreement, the Initial Senior Secured Note Indenture, the Secondary Senior Secured Note Indenture, Tertiary Senior Secured Note Indenture, the Additional First Lien Term Debt Facility, if any, and the Additional Second Lien Term Debt Facility, if any.

8.15.    Provisions Solely to Define Relative Rights.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the ABL Claimholders and the Term Debt Claimholders.  No Grantor or any other creditor thereof shall have any rights hereunder, and no Grantor may rely on the terms hereof.  Nothing in this Agreement is intended to or shall impair as between the Grantors and the ABL Agent and the other ABL Claimholders, or as between the Grantors and the Term Debt Trustee and the other Term Debt Claimholders, the obligations of any Grantor, which are absolute and unconditional, to pay principal, interest, fees and other amounts as provided in the other ABL Loan Documents and the Term Debt Documents, respectively, including as and when the same shall become due and payable in accordance with their terms.

8.16.    Marshaling of Assets.  The Term Debt Trustee, on behalf of the Term Debt Claimholders, hereby irrevocably, absolutely, and unconditionally waives any and all rights or powers any Term Debt Claimholder may have at any time under applicable law or otherwise to have the ABL Collateral, or any part thereof, marshaled upon any foreclosure or other enforcement of the ABL Agent's Liens.  Subject in all respects to the provisions of Article III herein, with respect to the exercise of remedies by the Term Debt Trustee against ABL Collateral, the ABL Agent, on behalf of the ABL Claimholders, hereby irrevocably, absolutely, and unconditionally waives any and all rights or powers any ABL Claimholder may have at any time under applicable law or otherwise to have the Fixed Asset Collateral, or any part thereof, marshaled upon any foreclosure or other enforcement of any other Agent's Liens.

8.17.    Exclusive Means of Exercising Rights under this Agreement.  The Term Debt Claimholders shall be deemed to have irrevocably appointed the Term Debt Trustee and the ABL Claimholders shall be deemed to have irrevocably appointed the ABL Agent, as their respective and exclusive agents hereunder.  Consistent with such appointment, the Term Debt Claimholders and the ABL Claimholders further shall be deemed to have agreed that only their respective Agent (and not any individual Claimholder or group of Claimholders) shall have the exclusive right to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement) or the ABL Collateral; provided, that, (i) cash collateral constituting ABL Collateral may be held pursuant to the terms of the ABL Loan Documents and any such individual ABL Claimholder may act against such ABL Collateral, and (ii) ABL Claimholders may exercise customary rights of setoff against depository or other accounts maintained with them. Specifically, but without limiting the generality of the foregoing, each Term Debt Claimholder or group of Term Debt Claimholders, each ABL Claimholder or group of ABL Claimholders, except in each case, the Term Debt Trustee and the ABL Agent shall not be entitled to take or file, but instead shall be precluded from taking or filing (whether in any Insolvency or Liquidation Proceeding or otherwise), any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other

-60-

action to interpret or otherwise enforce the provisions of this Agreement) or otherwise in relation to the ABL Collateral, except solely as provided in the proviso in the preceding sentence.

8.18.    <u>Interpretation</u>.  This Agreement is a product of negotiations among representatives of, and has been reviewed by counsel to, each Agent, the Company, and the Company Subsidiaries and is the product of those Persons on behalf of themselves and the Claimholders they represent.  Accordingly, this Agreement's provisions shall not be construed against, or in favor of, any party or other Person merely by virtue of that party or other Person's involvement, or lack of involvement, in the preparation of this Agreement and of any of its specific provisions.

8.19.    <u>Term Debt Trustee</u> .  The Term Debt Trustee shall be responsible only for the performance of such duties as are expressly set forth herein.  The Term Debt Trustee shall not be responsible for any action taken or not taken by it under this Agreement at the request or direction of any Claimholder.  The parties hereto acknowledge that Term Debt Trustee's duties do not include any discretionary authority, determination, control or responsibility with respect to any Term Debt Document or any Collateral.  The provisions of the Collateral Trust Agreement and Indenture, including, without limitation those provisions relating to the rights, duties, powers, privileges, protections and indemnification of the Term Debt Trustee shall apply with respect to any actions taken or not taken by the Term Debt Trustee under this Agreement.

8.20.    <u>Amendment and Restatement</u>.  This Agreement amends, restates and replaces the Existing Intercreditor Agreement.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Intercreditor Agreement as of the date first written above.

**ABL AGENT:**

GOLDMAN SACHS BANK USA, as ABL Agent

By:
     Name:
     Title:


**Notice Address:**


Goldman Sachs Bank USA

6011 Connection Drive

Irving , TX 75039

EFax: 646-769-7829

Group Email: gsmmg-operations@gs.com

with a copy to:

Goldman Sachs Bank USA

200 West Street

New York, New York  10282-2198

Attention: Douglas Tansey
       Dana Horan

Emails: douglas.tansey@gs.com
      dana.horan@gs.com

[Signature Page to Amended and Restated Intercreditor Agreement]

**TERM DEBT TRUSTEE:**

U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Term
Debt Trustee


By:
     Name:
     Title:


**Notice Address:**

U.S. BANK NATIONAL
ASSOCIATION
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107-2292
Attention: Corporate Trust Department
        Joshua A. Hahn
Facsimile: (651) 466-6309

[Signature Page to Amended and Restated Intercreditor Agreement]

**Acknowledged and Agreed to by:**

COMPANY

MURRAY ENERGY CORPORATION

By _____
   Name _____
   Title _____

HOLDINGS

MURRAY ENERGY HOLDINGS CO.

By _____
   Name _____
   Title _____

AMCA COAL LEASING, INC.
AMCOAL HOLDINGS, INC.
THE AMERICAN COAL COMPANY
AMERICAN COMPLIANCE COAL, INC.
AMERICAN EQUIPMENT & MACHINE, INC.
AMERICAN NATURAL GAS, INC.
ANDALEX RESOURCES, INC.
ANDALEX RESOURCES MANAGEMENT, INC.
AVONMORE RAIL LOADING, INC.
BELMONT COAL, INC.
CANTERBURY COAL COMPANY
COAL RESOURCES HOLDINGS CO.
COAL RESOURCES, INC.
CONSOLIDATED LAND COMPANY
KANAWHA TRANSPORTATION CENTER, INC.
KENAMERICAN RESOURCES, INC.
MILL CREEK MINING COMPANY
MURRAY AMERICAN RESOURCES, INC.
MURRAY SOUTH AMERICA, INC.
OHIOAMERICAN ENERGY, INCORPORATED
OHIO ENERGY TRANSPORTATION, INC.
ONEIDA COAL COMPANY, INC.
PENNAMERICAN COAL, INC.
PINSKI CORP.
PLEASANT FARMS, INC.
PREMIUM COAL, INC.
SPRING CHURCH COAL COMPANY
UTAH AMERICAN ENERGY, INC.
WEST RIDGE RESOURCES, INC.

By _____
    Name _____
    Title _____

[Signature Page to Amended and Restated Intercreditor Agreement]

CH\2049272.8

THE AMERICAN COAL SALES COMPANY
AMERICAN ENERGY CORPORATION
AMERICANMOUNTAINEER ENERGY, INC.
ANCHOR LONGWALL AND REBUILD, INC.
CORPORATE AVIATION SERVICES, INC.
EMPIRE DOCK, INC.
ENERGY RESOURCES, INC.
ENERGY TRANSPORTATION, INC.
PENNSYLVANIA TRANSLOADING, INC.
T D K COAL SALES, INCORPORATED


By _____
  Name _____
  Title _____

[Signature Page to Amended and Restated Intercreditor Agreement]

CH\2049272.8

AMERICANHOCKING ENERGY, INC.


By _____
    Name _____
    Title _____

MAPLE CREEK MINING, INC.
MAPLE CREEK PROCESSING, INC.
THE OHIO VALLEY COAL COMPANY
OHIO VALLEY RESOURCES, INC.
THE OHIO VALLEY TRANSLOADING COMPANY
SUNBURST RESOURCES, INC.
UMCO ENERGY, INC.

By _____
   Name _____
   Title _____

MONVALLEY TRANSPORTATION CENTER, INC.
THE OKLAHOMA COAL COMPANY


By _____

    Name _____

    Title _____

PENNAMERICAN COAL L.P.
By: PINSKI CORP.
Its: Managing Partner


By _____
   Name _____
   Title _____

WEST VIRGINIA RESOURCES, INC.


By _____
    Name _____
    Title _____

[Signature Page to Amended and Restated Intercreditor Agreement]

GENWAL RESOURCES, INC.


By _____
    Name _____
    Title

CONSOLIDATION COAL COMPANY


By _____
   Name _____
   Title

CH\2049272.8

EIGHTY-FOUR MINING COMPANY

By _____
  Name _____
  Title

MCELROY COAL COMPANY

By _____
    Name _____
    Title

SOUTHERN OHIO COAL COMPANY


By _____
     Name _____
     Title

CENTRAL OHIO COAL COMPANY


By _____
    Name _____
    Title

[Signature Page to Amended and Restated Intercreditor Agreement]

KEYSTONE COAL MINING
CORPORATION


By _____
   Name _____
   Title

MON RIVER TOWING, INC.

By _____
    Name _____
    Title

CH\2049272.8

TWIN RIVERS TOWING COMPANY


By _____

   Name _____

   Title

CCC RCPC LLC


By _____
   Name _____
   Title

CCC LAND RESOURCES LLC


By _____
    Name _____
    Title

AMERICAN MINE SERVICES, INC.

By _____
    Name _____
    Title

AMERICANMOUNTAINEER
PROPERTIES, INC.


By _____
    Name _____
    Title

CH\2049272.8

MURRAY AMERICAN ENERGY, INC.

By _____

Name _____

Title

THE OHIO COUNTY COAL COMPANY

By _____
     Name _____
     Title

THE MARSHALL COUNTY COAL
COMPANY

By _____
    Name _____
    Title

THE MONONGALIA COUNTY COAL
COMPANY

By _____
    Name _____
    Title

THE MARION COUNTY COAL
COMPANY

By _____

    Name _____

    Title

THE HARRISON COUNTY COAL
COMPANY

By _____
   Name _____
   Title

MURRAY AMERICAN
TRANSPORTATION, INC.

By _____
    Name _____
    Title

MURRAY KEYSTONE PROCESSING, INC.


By _____
    Name _____
    Title

MURRAY AMERICAN RIVER TOWING, INC.
THE FRANKLIN COUNTY COAL COMPANY
THE MEIGS COUNTY COAL COMPANY
THE MUSKINGUM COUNTY COAL COMPANY
THE WASHINGTON COUNTY COAL COMPANY


By _____
    Name _____
    Title

CH\2049272.8

MURRAY AMERICAN KENTUCKY TOWING, INC.

By _____
   Name _____
   Title

[Signature Page to Amended and Restated Intercreditor Agreement]

MURRAY EQUIPMENT & MACHINE, INC.

By _____
    Name _____
    Title

THE MCLEAN COUNTY COAL COMPANY


By _____
    Name _____
    Title

MURRAY AMERICAN COAL, INC.


By _____
    Name _____
    Title

EXHIBIT Q TO
CREDIT AND GUARANTY AGREEMENT

**SOLVENCY CERTIFICATE**

Dated April [__], 2015

I, [_____], hereby certify to the Administrative Agent (as defined below) that I am the duly elected, authorized and acting Chief Financial Officer of MURRAY ENERGY CORPORATION, an Ohio corporation (the "**Borrower**"), and hereby certify, solely in my capacity as Chief Financial Officer and not in an individual capacity, pursuant to Section 3.1(n) of that certain Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Borrower, Holdings, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent, that as of the date hereof:

(i)     I have reviewed the terms of Sections 3 and 4 of the Credit Agreement and the definitions and provisions contained in the Credit Agreement related thereto, together with each of the Related Agreements, and, in my opinion, have made, or have caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred to herein; and

(ii)     based upon my review and examination described in paragraph (i) above, immediately upon consummation of the Transactions on the Closing Date, after taking into account rights of contribution, the Credit Parties, on a consolidated basis, are Solvent.

As used herein, "Solvent" means, with respect to all Credit Parties, taken as a whole, on a consolidated basis, that as of the date of determination, (a) the sum of the Credit Parties' debt (including contingent liabilities) does not exceed the present fair saleable value, taken on a going concern basis, of the Credit Parties' present assets; (b) the Credit Parties' capital is not unreasonably small in relation to the business of the Credit Parties as contemplated on the Closing Date and reflected in the Projections or with respect to any transaction contemplated or undertaken after the Closing Date; and (c) the Credit Parties have not incurred and do not intend to incur, or believe (nor should they reasonably believe) that they will incur, debts beyond their ability to pay such debts as they become due (whether at maturity or otherwise).  For purposes of this definition of "Solvent", the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standards No.5).

*[Signature Page Follows]*

CH\2055450.10

IN WITNESS WHEREOF, I have executed this Certificate on behalf of the Credit Parties as of the date first set forth above.

**MURRAY ENERGY CORPORATION**

By:_____

Name:

Title:   Chief Financial Officer

EXHIBIT Q-1

EXHIBIT R TO
CREDIT AND GUARANTY AGREEMENT

## COMPLIANCE CERTIFICATE

**THE UNDERSIGNED HEREBY CERTIFIES AS FOLLOWS:**

1.      I am the Chief Financial Officer of each of **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation ("**Holdings**"), and **MURRAY ENERGY CORPORATION,** an Ohio corporation ("**Borrower**").

2.      I have reviewed the terms of that certain Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Borrower, Holdings, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent, and I have made, or have caused to be made under my supervision, a review in reasonable detail of the transactions and condition of Borrower and its Subsidiaries during the accounting period covered by the attached financial statements.

3.      The examination described in paragraph 2 above did not disclose, and I have no knowledge of, the existence of any condition or event which constitutes an Event of Default or Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, except as set forth in a separate attachment, if any, to this Certificate, describing in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event.

The foregoing certifications, together with the computations set forth in the Annex A hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered [_____  ____], 20[__] pursuant to Section [5.1(d)][6.4(f)][6.6(g)] of the Credit Agreement.

**MURRAY ENERGY HOLDINGS CO.**
**MURRAY ENERGY CORPORATION**


By: _____
Name:
Title:  Chief Financial Officer

EXHIBIT R-1

ANNEX A TO
COMPLIANCE CERTIFICATE

FOR THE FISCAL [QUARTER] [YEAR] ENDING [_____], [_____].

1.  Consolidated Adjusted EBITDA[1]:  **(i)+(ii) –(iii)** =                       $[___,___,____]

    (i)    Consolidated Net Income:                                     $[___,___,____]

    (ii)    the sum, without duplication, of:[2]                          $[___,___,____]

        (a)    extraordinary losses plus net losses realized by Borrower or its Restricted Subsidiaries in connection with an Asset Sale, to the extent such losses were deducted in computing Consolidated Net Income:    $[___,___,____]

        (b)    provision for taxes based on income or profits of Borrower and its Restricted Subsidiaries, to the extent such provision for taxes was deducted in computing Consolidated Net Income:    $[___,___,____]

        (c)    Fixed Charges of Borrower and its Restricted Subsidiaries, to the extent such Fixed Charges were deducted in computing Consolidated Net Income:    $[___,___,____]

        (d)    foreign currency translation losses of Borrower and its Restricted Subsidiaries[3], to the extent that such losses were taken into account in computing    $[___,___,____]

---

[1]    For purposes of calculating all financial ratios and tests for any four-Fiscal Quarter period that includes the Fiscal Quarter ending on December 31, 2014, March 31, 2015, June 30, 2015, or September 30, 2015, Consolidated Adjusted EBITDA shall be based on the sum of (a) the applicable amounts specified below for such Fiscal Quarter, and (b) Consolidated Adjusted EBITDA for the portion of such four-Fiscal Quarter period not including such Fiscal Quarter:

| Fiscal Quarter Ending | Consolidated Adjusted EBITDA |
|---|---|
| March 31, 2014 | $247,064,000 |
| June 30, 2014 | $200,716,000 |
| September 30, 2014 | $204,976,000 |
| December 31, 2014 | $178,877,000 |

For purposes of calculating all financial ratios and tests for any four-Fiscal Quarter period that includes the Fiscal Quarter ending on March 31, 2015, Consolidated Adjusted EBITDA shall be based on the actual financial statements delivered pursuant to Section 5.1(b) of the Credit Agreement calculated in a manner consistent with the calculation of Consolidated Adjusted EBITDA for the above-referenced Fiscal Quarters ending on March 31, 2014, June 30, 2014, September 30, 2014 or December 31, 2014.

[2]    In each case of clauses (ii)(a) - (k), on a consolidated basis and determined in accordance with GAAP.
[3]    Including losses related to currency remeasurements of Indebtedness.

EXHIBIT R-2

Consolidated Net Income:

(e)    depreciation, amortization[4] and other non-cash charges and expenses of Borrower and its Restricted Subsidiaries[5] to the extent that such depreciation, amortization and other non-cash charges or expenses were deducted in computing Consolidated Net Income:    $[___,___,____]

(f)    extraordinary, non-recurring or unusual losses, to the extent deducted in computing Consolidated Net Income:    $[___,___,____]

(g)    the amortization of debt discount, to the extent deducted in computing Consolidated Net Income:    $[___,___,____]

(h)    any expenses or charges (other than depreciation or amortization expense) related to any Equity Offering, Permitted Investment, Permitted Acquisition, disposition, recapitalization or the incurrence, amendment or waiver of Indebtedness permitted to be incurred by the Credit Agreement (including a refinancing thereof and, in each case, whether or not successful):    $[___,___,____]

(i)    the amount of any restructuring charge or reserve, integration cost or cost associated with establishing new facilities that is deducted (and not added back) in such period in computing Consolidated Net Income, including any one-time costs incurred in connection with acquisitions after the Closing Date, and costs related to the closure and/or consolidation of facilities[6]:    $[___,___,____]

---

[4]    Including amortization of intangibles but excluding amortization of prepaid cash expenses that were paid in a prior period.

[5]    Excluding any such non-cash charge or expense to the extent that it represents an accrual of or reserve for cash charges or expenses in any future period or amortization of a prepaid cash charge or expense that was paid in a prior period.

[6]    Provided that the aggregate amount of cash charges and cash costs that are added to Consolidated Adjusted EBITDA pursuant to this clause (i) shall not exceed, together with (1) the aggregate amount of cost savings and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to clause (vi) of Section 1.4 of the Credit Agreement and pursuant to clause (j) hereof and (2) the aggregate amount of costs and expenses (including fees) added to Consolidated Adjusted EBITDA pursuant to clause (k) hereof, 10% of Consolidated Adjusted EBITDA in such four-Fiscal Quarter period.

EXHIBIT R-3

(j)    the amount of cost savings, synergies and operating efficiencies anticipated to result from the Transactions and any Specified Transaction[7], net of the amount of actual benefits realized during such period from such actions[8]:    $[___,___,___]

(k)    to the extent deducted in computing such Consolidated Net Income, costs and expenses, including fees, incurred directly in connection with the consummation of the Transactions, including, without limitation, the Closing Date Acquisition, and any amendment or other modification thereof, in each case, deducted (and not added back) in computing Consolidated Net Income[9]:    $[___,___,___]

(iii)    non-cash items increasing such Consolidated Net Income for such period, other than the accrual of revenue in the ordinary course of business:    $[___,___,___]

2.    <u>Consolidated Current Assets</u>:    $[___,___,___]

3.    <u>Consolidated Current Liabilities</u>:    $[___,___,___]

4.    <u>Consolidated Excess Cash Flow</u>:  **(i)-(ii) =**    $[___,___,___]

---

[7]    Calculated on a pro forma basis as though such cost savings, synergies and operating efficiencies had been realized on the first day of such period as if such cost savings, synergies and operating efficiencies were realized during the entirety of such period.

[8]    Provided that (A) such cost savings, synergies and operating efficiencies are reasonably identifiable, (B) such cost savings, synergies and operating efficiencies have been realized or are anticipated by Holdings to be realized within 12 months after the Closing Date or, in the case of a Specified Transaction, within 12 months after the closing date of such Specified Transaction, (C) no cost savings, synergies and operating efficiencies shall be added pursuant to this clause (j) to the extent duplicative of any expenses or charges otherwise added to Consolidated Adjusted EBITDA, whether through a pro forma adjustment or otherwise, for such period and (D) the aggregate amount of cost savings and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to this clause (j), together with (1) the aggregate amount of cost savings, synergies and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to clause (vi) of Section 1.4 of the Credit Agreement, (2) the aggregate amount of cash charges and cash costs added to Consolidated Adjusted EBITDA pursuant to clause (i) hereof and (3) the aggregate amount of costs and expenses (including fees) added to Consolidated Adjusted EBITDA pursuant to clause (k) hereof, 10% of Consolidated Adjusted EBITDA in such four-Fiscal Quarter period.

[9]    Provided that the aggregate amount of costs and expenses (including fees) added to Consolidated Adjusted EBITDA pursuant to this clause (k) shall not exceed, together with (1) the aggregate amount of cost savings and operating efficiencies added to Consolidated Adjusted EBITDA pursuant to clause (vi) of Section 1.4 of the Credit Agreement and pursuant to clause (j) hereof and (2) the aggregate amount of cash charges and cash costs added to Consolidated Adjusted EBITDA pursuant to clause (i) hereof, 10% of Consolidated Adjusted EBITDA for such four-Fiscal Quarter period.

EXHIBIT R-4

(i)   the sum, without duplication, of the amounts for such period of

   (a)    Consolidated Net Income:           $[___,___,___]

   (b)    to the extent reducing Consolidated Net Income, the sum, without duplication, of amounts for non-Cash charges reducing Consolidated Net Income, including for depreciation and amortization (excluding any such non-Cash charge to the extent that it represents an accrual or reserve for potential Cash charge in any future period or amortization of a prepaid Cash charge that was paid in a prior period):    $[___,___,___]

   (c)    the Consolidated Working Capital Adjustment:    $[___,___,___]

(ii)   the sum, without duplication, of:[10]    $[___,___,___]

(a) the amounts for such period paid from Internally Generated Cash except to the extent made using the Cumulative Amount representing amounts allocated to clause (ii) of the Credit Agreement definition of the term "Cumulative Amount" of:    $[___,___,___]

   (1) scheduled repayments of Indebtedness (other than repayments of loans under the Revolving Credit Agreement except to the extent commitments thereunder are permanently reduced in connection with such repayments) and scheduled repayments of obligations under Capital Leases (excluding any interest expense portion thereof):    $[___,___,___]

   (2) Permitted Investments (including Permitted Acquisitions):    $[___,___,___]

   (3) Consolidated Capital Expenditures:    $[___,___,___]

   (4) cash payments made by Borrower or any of its Subsidiaries in such Fiscal Year in respect of any non-current mining-related liability that is not expensed in    $[___,___,___]

---

[10]  As used in this clause (ii), "scheduled repayments of Indebtedness" does not include (x) mandatory prepayments or voluntary prepayments of the Term Loans (but does include prepayments of other Indebtedness) (y) repurchases of Term Loans pursuant to Section 10.6(i) and (z) repayments of Loans made with the Cash proceeds of any Refinancing Indebtedness.

EXHIBIT R-5

such Fiscal Year:

(5) amounts added back to Consolidated Net Income in respect of cash losses, charges and expenses pursuant to clauses (i) and (vi) of the definition thereof in the Credit Agreement:                                                    $[___,___,____]

(6) cash payments in respect of Restricted Junior Payments permitted by Sections 6.4(e), (h) and (o) of the Credit Agreement:                                                          $[___,___,____]

(7) deposits permitted under Section 6.2 (including 6.2(d)) of the Credit Agreement:                                              $[___,___,____]

(8) without duplication of amounts deducted from Consolidated Excess Cash Flow in prior periods, the aggregate consideration required to be paid in cash by the Borrower or any of its Subsidiaries pursuant to binding contracts or executed letters of intent (the "Contract Consideration") entered into prior to or during such period relating to Permitted Acquisitions, Permitted Investments [11], Consolidated Capital Expenditures or acquisitions of intellectual property (to the extent not expensed) to be consummated or made, plus any restructuring cash expenses, pension payments or tax contingency payments that have been added to Consolidated Excess Cash Flow pursuant to clause (i)(b) hereof required to be made, in each case during the period of four consecutive Fiscal Quarters of Borrower following the end of such period[12]:                     $[___,___,____]

(b) other non-Cash gains increasing Consolidated Net Income for such period (excluding any such non-Cash gain to the extent it represents the reversal of an accrual or reserve for potential Cash gain in any prior period):                     $[___,___,____]

(c) to the extent paid in such year, reclamation liabilities required under law to be paid:                                               $[___,___,____]

---

[11]    Other than Investments made pursuant to Section 6.6(a), (d) or (s) of the Credit Agreement.

[12]    Provided that to the extent the aggregate amount of Internally Generated Cash actually utilized to finance such acquisitions, Permitted Investments, Consolidated Capital Expenditures, or acquisitions of intellectual property during such period of four consecutive fiscal quarters is less than the Contract Consideration, the amount of such shortfall shall be added to the calculation of Consolidated Excess Cash Flow at the end of such period of four consecutive Fiscal Quarters

EXHIBIT R-6

5.      <u>Consolidated Net Income</u>[13]:  **(i)-(ii) =**                    $[___,___,____]

     (i)     the aggregate of (a) the net income (loss) of Borrower and its Restricted Subsidiaries for such period, on a consolidated basis [14] , plus (b) without duplication of amounts included in clause (a), cash distributions received by Borrower and its Restricted Subsidiaries from Foresight LP for such period, determined in accordance with GAAP and for the avoidance of doubt including any variable interest entity with financial results that are required by GAAP to be consolidated with Borrower's financial results, and without any reduction in respect of preferred stock dividends:                    $[___,___,____]

     (ii)    provided that, for purposes of clause 5(i)(a) hereof:

          (a)    all extraordinary gains or losses and all gains (but not losses) realized in connection with any Asset Sale or the disposition of securities or the early extinguishment of Indebtedness, together with any related provision for taxes on any such gain:                    $[___,___,____]

          (b)    the net income (but not loss) of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that net income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders:                    $[___,___,____]

          (c)    the cumulative effect of a change in accounting principles:                    $[___,___,____]

          (d)    any (i) extraordinary, exceptional, unusual or nonrecurring gain, loss, charge or expense or any charges, expenses or reserves in respect of any restructuring, redundancy or severance expense and any charge or expense constituting expenses relating to the Transactions, (ii) non-cash items in respect of                    $[___,___,____]

---

[13]   The net income (but not loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting will be included only to the extent of the amount of dividends or similar distributions paid in non-cash to the specified Person or a Restricted Subsidiary of the Person:

[14]   For the avoidance of doubt, excluding the net income (loss) of any Unrestricted Subsidiary of such Person.

reclamation liabilities, pension, OPEB and workers' compensation and other employee insurance related liabilities (excluding any active employee medical, dental or related expenses), including any withdrawal liabilities, and (iii) cash payments (excluding the posting of letters of credit and cash collateral) in respect of reclamation liabilities, pension, OPEB and workers' compensation and other employee insurance related liabilities (excluding any active employee medical, dental or related expenses), including any withdrawal liabilities[15]:

(e)    any non-cash compensation charge or expense arising from any grant of stock, stock options or other equity based awards and any non-cash deemed finance charges in respect of any pension liabilities or other provisions:    $[___,___,___]

(f)    non-cash gains and losses attributable to movement in the mark-to-market valuation of obligations under Interest Rate Agreements, Commodities Agreements and Hedging Obligations pursuant to Financial Accounting Standards Board Statement No. 133:    $[___,___,___]

(g)    any expense (or income) as a result of adjustments recorded to earnout obligations or other contingent consideration liabilities relating to any Acquisition or any Permitted Acquisition or other Permitted Investment:    $[___,___,___]

6.    <u>Consolidated Net Total Debt</u>:  **(i)-(ii)**=    $[___,___,___]

(i)    (a) the aggregate stated balance sheet amount of all Indebtedness described in clauses (i) through (iv) of the definition of the term "Indebtedness" in the Credit Agreement of Borrower and its Restricted Subsidiaries (for the avoidance of doubt, (i) excluding any undrawn portion of the Revolving Credit Agreement and (ii) for this purpose, letters of credit will be deemed to have a principal amount equal to the amount drawn and not reimbursed thereunder, if any) determined on a consolidated basis in accordance with GAAP:    $[___,___,___]

---

[15]    With respect to clause (e)(iii), to be deducted only to the extent not already reducing Consolidated Net Income in accordance with GAAP.

EXHIBIT R-8

    (ii)    the aggregate amount of Unrestricted Cash included in the consolidated balance sheet of Borrower and its Subsidiaries as of such date:     $[___,___,___]

7.    <u>Consolidated Working Capital</u>:  **(i)-(ii) =**     $[___,___,___]

    (i)    Consolidated Current Assets:     $[___,___,___]

    (ii)    Consolidated Current Liabilities:     $[___,___,___]

8.    <u>Consolidated Working Capital Adjustment</u>:[16] **(i)-(ii) =**     $[___,___,___]

    (i)    Consolidated Working Capital as of the beginning of such period:     $[___,___,___]

    (ii)    Consolidated Working Capital as of the end of such period:     $[___,___,___]

9.    <u>Fixed Charges</u>:  **(i)+(ii)+(iii)+(iv) =**     $[___,___,___]

    (i)    the consolidated interest expense of Borrower and its Restricted Subsidiaries for such period, whether paid or accrued, including, without limitation, amortization of debt issuance costs and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations, the interest component of all payments associated with Capital Lease Obligations, commissions, discounts and other fees and charges incurred in respect of letter of credit or bankers' acceptance financings, and net of the effect of all payments made or received pursuant to Interest Rate Agreements:     $[___,___,___]

    (ii)    the consolidated interest expense of Borrower and its Restricted Subsidiaries that was capitalized during such period:     $[___,___,___]

    (iii)    any interest on Indebtedness of another Person that is guaranteed by Borrower or one of its Restricted     $[___,___,___]

---

[16]    In calculating the Consolidated Working Capital Adjustment there shall be excluded the effect of reclassification during such period of current assets to long term assets and current liabilities to long term liabilities and the effect of any Permitted Acquisition, the designation of any Unrestricted Subsidiary as a Restricted Subsidiary or any Restricted Subsidiary as an Unrestricted Subsidiary during such period; provided that (i) there shall be included with respect to any Permitted Acquisition during such period an amount (which may be a negative number) by which the Consolidated Working Capital acquired in such Permitted Acquisition as at the time of such acquisition exceeds (or is less than) Consolidated Working Capital at the end of such period and (ii) there shall be included with respect to any Unrestricted Subsidiary that is designated as a Restricted Subsidiary during such period an amount (which may be a negative number) by which the Consolidated Working Capital gained in such designation as at the time of such designation exceeds (or is less than) Consolidated Working Capital at the end of such period.

EXHIBIT R-9

Subsidiaries or secured by a Lien on assets of such Person or one of its Restricted Subsidiaries, whether or not such Guarantee or Lien is called upon:

(iv)    the product of (a) all dividends, whether paid or accrued and whether or not in cash, on any series of preferred stock of Borrower or any of its Restricted Subsidiaries, other than dividends on Equity Interests payable solely in Equity Interests of Borrower (other than Disqualified Equity Interest) or to Borrower or a Restricted Subsidiary of Borrower, <u>times</u> (b) a fraction, the numerator of which is one and the denominator of which is one minus the then current combined federal, state and local statutory tax rate of such Person, expressed as a decimal, in each case, determined on a consolidated basis in accordance with GAAP:    $[___,___,___]

10.    <u>Net Leverage Ratio</u>:  **(i)/(ii)** =    $[___,___,___]

(i)    Consolidated Net Total Debt as of the last day of the Fiscal Quarter then ended:    $[___,___,___]

(ii)    Consolidated Adjusted EBITDA for the four Fiscal Quarter period then ended:    $[___,___,___]

Actual:    _.__:1.00

Required:    _.__:1.00

11.    <u>First Lien Net Leverage Ratio</u>:  **(i)/(ii)** =    $[___,___,___]

(i)    Consolidated Net Total Debt that is secured by a Lien on the assets of Borrower or any of its Restricted Subsidiaries (other than Indebtedness secured on a junior basis to the Liens securing the Obligations under the Credit Documents, including Second Lien Indebtedness and Second Lien Additional Facilities) as of the last day of the four-Fiscal Quarter period ending on such date:    $[___,___,___]

(ii)    Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date:    $[___,___,___]

Actual:    _.__:1.00

Required:    _.__:1.00

EXHIBIT R-10

12.    <u>Cumulative Amount</u>: **(i) + (ii) + (iii) + (iv) + (v) + (vi)  + (vii) − (viii)**
=                                                                                                      $[___,___,___]

      (i)    $50,000,000

      (ii)    (x) the cumulative amount of Consolidated Excess Cash Flow of Borrower and its Restricted Subsidiaries for all Fiscal Years completed after the Closing Date (commencing with the Fiscal Year ending December 31, 2015) and prior to the Cumulative Amount Reference Time, minus (y) the portion of such Consolidated Excess Cash Flow that has been (or is required to be) applied after the Closing Date and prior to the Cumulative Amount Reference Time to the prepayment of Term Loans in accordance with Section 2.14(d) of the Credit Agreement:                                $[___,___,___]

      (iii)    the amount of any cash capital contributions or Net Equity Proceeds from (A) the sale or issuance of any Equity Interests (other than Disqualified Equity Interests) received or made by Holdings (or any direct or indirect parent thereof) and contributed to Borrower or (B) the sale or issuance of Disqualified Equity Interest of Borrower or debt securities of Borrower, in each case that have been converted into or exchanged for Equity Interests (other than Disqualified Equity Interests) of Borrower (other than Equity Interests or debt securities sold to a Subsidiary of Borrower) and contributed to Borrower:                                $[___,___,___]

      (iv)    50% of any dividends received in cash by Borrower or a Restricted Subsidiary of Borrower that is a Guarantor Subsidiary during the period from and including the Business Day immediately following the Closing Date through and including the Cumulative Amount Reference Time from an Unrestricted Subsidiary of Borrower, to the extent such amount is not already included in Consolidated Excess Cash Flow for purposes of clause (ii) hereof:                                $[___,___,___]

      (v)    to the extent that any Unrestricted Subsidiary of Borrower designated as such after the Closing Date is re-designated as a Restricted Subsidiary after the date of the Closing Date or merged into a Restricted Subsidiary after the Closing Date, the Fair Market Value of Borrower's and Restricted Subsidiaries' Investment in such Unrestricted Subsidiary as of the date of such re-designation or merger, to the extent such amount is not already included in Consolidated Excess                                $[___,___,___]

Cash Flow for purposes of clause (ii) hereof:

(vi)    without duplication of clauses (i)-(v), (vii) or (viii) hereof , to the extent that any Investment that was made after the Closing Date pursuant to Sections 6.6(j), (r), (s) or (t) of the Credit Agreement is (a) sold for cash or otherwise cancelled, liquidated or repaid for cash, or (b) made in an entity that subsequently becomes a Restricted Subsidiary of Borrower, the initial amount of such Investment (if less, the amount of cash received upon repayment or sale):    $[___,___,___]

(vii)    the amounts of any prepayments of Term Loans required to be made by Borrower pursuant to Section 2.14(a), (b) or (d) of the Credit Agreement that Term Loan Lenders have declined pursuant to Section 2.15(c) of the Credit Agreement, except to the extent such declined amounts are then required to be applied to prepay other Indebtedness and are not declined by the holders of such other Indebtedness:    $[___,___,___]

(viii)    the aggregate amount of any Investments made pursuant to Section 6.6(t) of the Credit Agreement, any Restricted Junior Payment made pursuant to Section 6.4(f) of the Credit Agreement (and any intercompany loan to a Subsidiary that is not a Guarantor Subsidiary made pursuant to Section 6.6(d)(C) of the Credit Agreement in reliance on Section 6.4(f) of the Credit Agreement) and any Restricted Junior Payment made pursuant to 6.4(g) of the Credit Agreement, in each case, during the period commencing on the Business Days immediately following the Closing Date and ending on or prior to the Cumulative Amount Reference Time[17]:    

---

[17]    For purposes of this clause (viii), without taking account of the intended usage of the Cumulative Amount at such Cumulative Amount Reference Time

EXHIBIT R-12

*Execution Version*

## AMENDMENT NO. 1
## TO CREDIT AND GUARANTY AGREEMENT

This AMENDMENT NO. 1 TO CREDIT AND GUARANTY AGREEMENT (as defined below), dated as of August 15, 2016 (this "Agreement"), is by and among Murray Energy Corporation (the "Borrower"), each of the Credit Parties party hereto, each other Lender party hereto (such Lenders constituting the Requisite Lenders), and Deutsche Bank AG New York Branch, as Administrative Agent.  Goldman Sachs Bank USA is acting as the lead arranger, bookrunner and syndication agent in connection with this Agreement (in such capacities, the "Amendment Arranger").

## RECITALS:

WHEREAS, reference is made to the Credit and Guaranty Agreement dated as of April 16, 2015 (as amended prior to the date hereof, the "Existing Credit Agreement") among the Borrower, each Credit Party named therein, the Lenders party thereto and Deutsche Bank AG New York Branch, as Administrative Agent.  Capitalized terms used but not defined herein shall have the meanings given to such terms in the Credit Agreement (as defined below).

WHEREAS, the Borrower has requested certain amendments to the Existing Credit Agreement as set forth herein.

WHEREAS, subject to certain conditions, Requisite Lenders are willing to agree to such amendments relating to the Credit Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

SECTION 1.    Amendments to Existing Credit Agreement.    Immediately after giving effect to this Agreement upon satisfaction of the conditions set forth in Section 2 of this Agreement:

(a)    Section 1.1 of the Credit Agreement is hereby amended by adding the following new defined terms in their proper alphabetical order:

"**Annual ECF Period**" as defined in Section 2.14(d)(i).

"**ECF Period**" as defined in Section 2.14(d)(i).

"**First Amendment**" means that certain Amendment No. 1 to Credit and Guaranty Agreement dated as of August 15, 2016, by and among the Borrower, Holdings, the other Credit Parties party thereto, the Administrative Agent and each other financial institution party thereto as a Lender.

"**First Amendment Effective Date**" means the "Effective Date" as defined in the First Amendment, which date is August 15, 2016.

"**Mid-Year ECF Period**" as defined in Section 2.14(d)(i).

Amendment No. 1 to
Credit and Guaranty Agreement

"**PIK Fee**" as defined in Section 2.11(b).

"**Retained ECF Amount**" as defined in Section 2.14(d)(ii).

(b)      Section 1.1 of the Credit Agreement is hereby amended by amending the defined term "**Consolidated Adjusted EBITDA**" as follows:  (i) replacing the word "; minus" appearing at the end of clause (xi) of such definition with the word "; plus", (ii) renumbering clause (xii) of such definition as clause (xiii) and (iii) inserting a new clause (xii) as follows:

> "(xii) for each of the four full Fiscal Quarters following the First Amendment Effective Date, the amount of cost savings and operating efficiencies anticipated to result from any changes to any agreement with the United Mine Workers of America (calculated on a pro forma basis as though such cost savings and operating efficiencies were realized during the entirety of such period), net of the amount of actual benefits realized during such period from such actions; provided that (A) such cost savings and operating efficiencies are reasonably identifiable, (B) such cost savings and operating efficiencies have been realized or are anticipated by Holdings to be realized within 12 months after the effectiveness of such changes, (C) no cost savings and operating efficiencies shall be added pursuant to this clause (xii) to the extent duplicative of any expenses or charges otherwise added to Consolidated Adjusted EBITDA, whether through a pro forma adjustment or otherwise, for such period and (D) the cost savings and operating efficiencies added back pursuant to this clause (xii) shall not exceed (1) in the first full Fiscal Quarter following the First Amendment Effective Date, $70,000,000, (2) in the second full Fiscal Quarter following the First Amendment Effective Date, $52,500,000, (3) in the third full Fiscal Quarter following the First Amendment Effective Date, $35,000,000 and (4) in the fourth full Fiscal Quarter following the First Amendment Effective Date, $17,500,000; minus"

(c)      Section 1.1 of the Credit Agreement is hereby amended by amended and restating the following defined terms in their entirety as follows:

> "**Applicable Margin**" means (i) (x) with respect to any Term B-1 Loan that is a Base Rate Loan, a rate equal to 5.75% *per annum* or (y) with respect to any Term B-1 Loan that is a Eurodollar Rate Loan, a rate equal to 6.75% *per annum*, and (ii) (x) with respect to any Term B-2 Loan that is a Base Rate Loan, a rate equal to 6.25% *per annum* and (y) with respect to any Term B-2 Loan that is a Eurodollar Rate Loan, a rate equal to 7.25% *per annum*.

> "**First Lien Net Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) Consolidated Net Total Debt that is secured by a Lien on the assets of Borrower or any of its Restricted Subsidiaries (other than (x) Indebtedness secured on a junior basis to the Liens securing the Obligations under the Credit Documents, including Second Lien Indebtedness and Second Lien Additional Facilities and (y) the PIK Fee) to (ii) Consolidated Adjusted EBITDA for the four-Fiscal Quarter period ending on such date.

(d)      Section 2.11 of the Credit Agreement is hereby amended by (i) re-numbering clause (b) of such Section as clause "(c)" and (ii) inserting the following new clause (b) immediately prior to clause (c):

(b)      Borrower agrees to pay to each Lender with respect to Term B-2 Loans, in each case, that executes the First Amendment on or prior to 5:00 p.m. New York time on August 15, 2016 a non-refundable fee in an amount equal to 4.25% of the Term B-2 Loan of such Lender (the "**PIK Fee**"), which amount shall be deemed an extension of additional Term B-2 Loans on the First Amendment Effective Date pursuant to the terms of, and subject to, the Loan Documents.  The PIK Fee shall be added to the outstanding principal amount of the Term B-2 Loans on the First Amendment Effective Date and shall thereafter be deemed to be principal bearing interest in accordance with Section 2.8.  Unless the context otherwise requires, for all purposes hereof, references to "principal amount" of the Term B-2 Loans of any Lender refers to the original face amount of the Term B-2 Loans of such Lender plus the increase in the principal amount of such outstanding Term B-2 Loans as a result of the PIK Fee, if any, payable to such Lender.

(e)      Section 2.14(d) of the Credit Agreement is hereby amended and restated in its entirety as follows:

(d)      Consolidated Excess Cash Flow.  (i) In the event that there shall be Consolidated Excess Cash Flow for (x) any Fiscal Year (commencing with the Fiscal Year ending December 31, 2015) or (y) the two consecutive Fiscal Quarter period ending June 30 of any Fiscal Year (commencing with the two consecutive Fiscal Quarter period ending June 30, 2017) (the period in (x) being hereinafter referred to as the "**Annual ECF Period**"; the period in (y) being hereinafter referred to as the "**Mid-Year ECF Period**"; and each of the periods in (x) and (y), collectively, an "**ECF Period**"), Borrower shall, no later than one hundred days after the end of such ECF Period, prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to (i) 75% of such Consolidated Excess Cash Flow minus (ii) the sum of (w) solely with respect to the Annual ECF Period, the amount of the Consolidated Excess Cash Flow prepayment for the most recent Mid-Year ECF Period to the extent actually made in accordance with the terms of this Section 2.14(d)(i) hereof, (x) voluntary repayments of the Loans made with Internally Generated Cash (including the amounts actually paid to repurchase Loans pursuant to Section 10.6(i) but excluding, for the avoidance of doubt, repayments of Loans made with the Cash proceeds of any Refinancing Indebtedness), (y) repayments of Permitted First Lien Priority Refinancing Debt and (z) repayments of Incremental Pari Notes, in the case of clauses (x), (y) and (z), made at any time during such ECF Period or on or prior to the date such prepayment is due (except to the extent that such repayments have reduced the prepayment required by this Section 2.14(d) for any prior ECF Period) (such amount, the "**ECF Prepayment Amount**"); provided that (A) solely with respect to the Mid-Year ECF Period, any such prepayment shall be further reduced so that, after giving effect to such payment (together with the Retained ECF Amount

required to be applied for such Mid-Year ECF Period pursuant to Section 2.14(d)(ii)), the aggregate amount of unrestricted Cash and Cash Equivalents included in the consolidated balance sheet of Borrower and its Restricted Subsidiaries as of the last day of such Mid-Year ECF Period is equal to or greater than $265 million and (B) any such prepayment shall be reduced by the amount of any actual overpayment made under this Section 2.14(d)(i) for the immediately preceding ECF Period.

(ii) In the event that there shall be Consolidated Excess Cash Flow for any ECF Period, Borrower shall, solely to the extent permitted under the Revolving Credit Documents, apply an amount equal to (i) 25% of such Consolidated Excess Cash Flow <u>minus</u> (ii) the sum of (w) solely with respect to the Annual ECF Period, the amount of the application of such Consolidated Excess Cash Flow for the most recent Mid-Year ECF Period to the extent actually made in accordance with the terms of this Section 2.14(d)(ii), (x) voluntary repayments of the Loans made with Internally Generated Cash (including the amounts actually paid to repurchase Loans pursuant to Section 10.6(i) but excluding, for the avoidance of doubt, repayments of Loans made with the Cash proceeds of any Refinancing Indebtedness), (y) repayments of Permitted First Lien Priority Refinancing Debt and (z) repayments of Incremental Pari Notes, in the case of clauses (x), (y) and (z), made at any time during such ECF Period or on or prior to the date such application is required to be made (except to the extent that such repayments have reduced the Retained ECF Amount for any prior ECF Period) (such amount, the "**Retained ECF Amount**") to prepay or repurchase (in each case, whether through Dutch auctions or open market purchases) the Loans and, to the extent permitted under Section 6.4(f), the Senior Secured Notes; <u>provided</u> that solely with respect to the Mid-Year ECF Period, any such Retained ECF Amount shall be further reduced so that, after giving effect to the application of such Retained ECF Amount as set forth above (together with the ECF Prepayment Amount for such Mid-Year ECF Period), the aggregate amount of unrestricted Cash and Cash Equivalents included in the consolidated balance sheet of Borrower and its Restricted Subsidiaries as of the last day of such Mid-Year ECF Period is equal to or greater than $265 million.

(f)      Section 6.4 of the Credit Agreement is hereby amended by amending and restating clauses (f) and (k) of such Section in their entirety as follows:

(f)  Borrower may make payments or prepayments of principal of, premium, if any, or interest on, or redeem, purchase, retire, defease (including in-substance or legal defeasance), or make similar payments (including on account of any sinking fund) with respect to any Senior Secured Notes; <u>provided</u> that (i) immediately prior to, and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing and would result therefrom, (ii) no Term B-1 Loans remain outstanding as of the date such Restricted Junior Payment is made and (iii) the aggregate amount of payments pursuant to this clause (f) shall not exceed the lesser of (x) $50,000,000 and (y) the Retained ECF Amount;

(k)    [Reserved];

(g)    Section 6.6 of the Credit Agreement is hereby amended by amending and restating clauses (r), (t) and (aa) of such Section in their entirety as follows:

(r)    other Investments in any Person having an aggregate fair market value (measured on the date each such Investment was made and without giving effect to subsequent changes in value) equal to the sum of (i) the amount of Investments outstanding on the First Amendment Effective Date plus (ii) any other Investments made after the First Amendment Effective Date that when taken together with all other Investments made pursuant to this clause (r)(ii) that are at the time outstanding, do not exceed $20,000,000;

(t)    [Reserved];

(aa)    [Reserved];

(h)    Section 6.7 of the Credit Agreement is hereby amended by replacing the grid appearing therein with the following:

| Fiscal Quarter ending | First Lien Net Leverage Ratio |
| --- | --- |
| September 30, 2015 | 3.25:1.00 |
| December 31, 2015 | 3.00:1.00 |
| March 31, 2016 | 2.75:1.00 |
| June 30, 2016 | 2.75:1.00 |
| September 30, 2016 | 3.75:1.00 |
| December 31, 2016 | 3.75:1.00 |
| March 31, 2017 | 3.75:1.00 |
| June 30, 2017 | 3.75:1.00 |
| September 30, 2017 | 3.75:1.00 |
| December 31, 2017 | 3.75:1.00 |
| March 31, 2018 | 3.50:1.00 |
| June 30, 2018 | 3.50:1.00 |
| September 30, 2018 | 3.50:1.00 |

Amendment No. 1 to
Credit and Guaranty Agreement

| Fiscal Quarter ending | First Lien Net Leverage Ratio |
|---|---|
| December 31, 2018 | 3.50:1.00 |
| March 31, 2019 | 3.50:1.00 |
| June 30, 2019 and each Fiscal Quarter end thereafter | 3.25:1.00 |

(i)    Section 6.11 of the Credit Agreement is hereby amended by amending and restating clause (g) thereof as follows:

(g) Restricted Payments that do not violate Section 6.4 and Investments that do not violate Section 6.6;

SECTION 2.    Conditions to Effectiveness.    The effectiveness of this Agreement is subject to the satisfaction of each of the following conditions (the date such conditions are satisfied, the "Effective Date"):

(a)    The Administrative Agent shall have received a counterpart of this Agreement, executed and delivered by the Borrower, the other Credit Parties named herein and Lenders constituting the Requisite Lenders; and

(b)    (i) The Administrative Agent shall have received an amendment fee, for the ratable benefit of the Lenders executing this Agreement, equal to (x) 0.25% of the Term B-1 Loans of such Lenders and (y) 0.50% of the Term B-2 Loans of such Lenders, (ii) the Administrative Agent and the Amendment Arranger shall have received all fees and other amounts due and payable on or prior to the Effective Date and, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses (including the legal fees and expenses of Latham & Watkins LLP and the fees and expenses of any local counsel) required to be reimbursed or paid by Borrower hereunder, under any other Credit Document or any other agreement and (iii) Wilmer Hale  LLP, as legal counsel for certain of the Lenders, shall have received payment of all reasonable and documented legal fees outstanding as of the Effective Date; provided that, in the case of this clause (iii), such fees shall not exceed $70,000.

SECTION 3.    Representations and Warranties of the Loan Parties.    Borrower represents and warrants to Administrative Agent and Lenders that, after giving effect to this Agreement:

(a)    No Default or Event of Default has occurred and is continuing or would result from the entry into this Agreement.

(b)    Both before and after giving effect to this Agreement, each of the representations and warranties contained in the Credit Agreement and the other Credit Documents is true and

correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) as if made on and as of the date hereof except to the extent that such representations and warranties expressly specifically refer to an earlier date (in which case such representations and warranties are true and correct in all material respects as of such earlier date).

(c)     The execution, delivery and performance of this Agreement have been duly authorized by all requisite corporate, limited liability company or partnership action, as applicable, on the part of each Credit Party;  this Agreement has been duly executed and delivered by each Credit Party; and this Agreement constitutes a valid and binding agreement of each Credit Party, enforceable against each Credit Party in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by general equitable principles relating to enforceability (whether enforcement is sought by proceedings in equity or at law).

SECTION 4.   Acknowledgment and Reaffirmation.

(a)     Each of the Credit Parties hereby acknowledges that it has reviewed the terms and provisions of this Agreement and the Credit Agreement.  Each Credit Party hereby confirms its respective guarantees, pledges, grants of security interests and other obligations, as applicable, under and subject to the terms of each of the Credit Documents to which it is party, and agrees that such guarantees, pledges, grants of security interests and other obligations, and the terms of each of the Credit Documents to which it is a party, are not impaired or affected in any manner whatsoever and shall continue to be in full force and effect.

(b)     Each Credit Party acknowledges and agrees that any of the Credit Documents to which it is a party or otherwise bound shall continue in full force and effect and that all of its obligations thereunder shall be valid and enforceable and shall not be impaired or limited by the execution or effectiveness of this Agreement.

SECTION 5.   Effects on Credit Documents.

(a)     Except as specifically amended herein, the Credit Agreement and all other Credit Documents shall continue to be in full force and effect and are hereby in all respects ratified and confirmed.  Each of the Credit Documents, including the Credit Agreement, and any and all other agreements, documents or instruments now or hereafter executed and/or delivered pursuant to the terms hereof or pursuant to the terms of the Credit Agreement, are hereby amended so that any reference in such Credit Documents to the Credit Agreement, whether direct or indirect, shall mean a reference to the Credit Agreement.

(b)     The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of any Lender or any Agent under any of the Credit Documents, nor constitute a waiver of any provision of the Credit Documents.

(c)     The Borrower and the other parties hereto acknowledge and agree that this Agreement and any agreements, instruments and other documents executed and/or delivered in connection herewith shall constitute a Credit Document.

SECTION 6.   Amendments; Execution in Counterparts.

(a)     This Agreement shall not constitute an amendment of any other provision of the Credit Agreement not referred to herein and shall not be construed as a waiver or consent to any further or future action on the part of the Borrower that would require a waiver or consent of the Lenders or the Agents.

(b)     This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.   Delivery of an executed signature page of this Agreement by facsimile or other electronic submission (including .pdf or .tif format) shall be effective as delivery of a manually executed counterpart hereof.

SECTION 7.   GOVERNING LAW; WAIVER OF JURY TRIAL.   THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

[Signature pages to follow]

Amendment No. 1 to
Credit and Guaranty Agreement

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

MURRAY ENERGY CORPORATION

By: _____

  Name:  Robert D. Moore

  Title:   EVP, COO, CFO


MURRAY ENERGY HOLDINGS CO.

By: _____

  Name:  Robert D. Moore

  Title:   Chief Financial Officer

AMCA COAL LEASING, INC.
AMCOAL HOLDINGS, INC.
THE AMERICAN COAL COMPANY
AMERICAN COMPLIANCE COAL, INC.
AMERICAN EQUIPMENT & MACHINE, INC.
AMERICAN NATURAL GAS, INC.
ANDALEX RESOURCES, INC.
ANDALEX RESOURCES MANAGEMENT, INC.
AVONMORE RAIL LOADING, INC.
BELMONT COAL, INC.
CANTERBURY COAL COMPANY
COAL RESOURCES HOLDINGS CO.
COAL RESOURCES, INC.
CONSOLIDATED LAND COMPANY
KANAWHA TRANSPORTATION CENTER, INC.
KENAMERICAN RESOURCES, INC.
MILL CREEK MINING COMPANY
MURRAY AMERICAN RESOURCES, INC.
MURRAY GLOBAL COMMODITIES, INC.
MURRAY SOUTH AMERICA, INC.
OHIOAMERICAN ENERGY, INCORPORATED
OHIO ENERGY TRANSPORTATION, INC.
ONEIDA COAL COMPANY, INC.
PENNAMERICAN COAL, INC.
PINSKI CORP.
PLEASANT FARMS, INC.
PREMIUM COAL, INC.
SPRING CHURCH COAL COMPANY
UTAH AMERICAN ENERGY, INC.
WEST RIDGE RESOURCES, INC.

By _____

    Name:  Robert D. Moore
    Title:  Authorized Signature

THE AMERICAN COAL SALES COMPANY
AMERICAN ENERGY CORPORATION
AMERICANMOUNTAINEER ENERGY, INC.
ANCHOR LONGWALL AND REBUILD, INC.
CORPORATE AVIATION SERVICES, INC.
EMPIRE DOCK, INC.
ENERGY RESOURCES, INC.
ENERGY TRANSPORTATION, INC.
PENNSYLVANIA TRANSLOADING, INC.
T D K COAL SALES, INCORPORATED

By _____

Name:   Anthony C. Vcelka, II
Title:   Authorized Signature

AMERICANHOCKING ENERGY, INC.

By _____

Name:  Ronnie D. Dietz
Title:    Assistant Treasurer

MAPLE CREEK MINING, INC.
MAPLE CREEK PROCESSING, INC.
THE OHIO VALLEY COAL COMPANY
OHIO VALLEY RESOURCES, INC.
THE OHIO VALLEY TRANSLOADING COMPANY
SUNBURST RESOURCES, INC.
UMCO ENERGY, INC.

By _____

Name:  Ronnie D. Dietz
Title:    Authorized Signature

MONVALLEY TRANSPORTATION CENTER, INC.
THE OKLAHOMA COAL COMPANY

By _____

    Name:  Anthony C. Vcelka, II
    Title:   Authorized Signature

PENNAMERICAN COAL L.P.
By: PINSKI CORP.
Its: Managing Partner

By _____
    Name:  Robert D. Moore
    Title:    Treasurer & Secretary

Amendment No. 1 to
Credit Agreement

WEST VIRGINIA RESOURCES, INC.

By _____

    Name:  Robert D. Moore
    Title:    Vice President

GENWAL RESOURCES, INC.

By _____

    Name:  Robert D. Moore
    Title:    Treasurer

CONSOLIDATION COAL COMPANY

By _____

Name:   Robert D. Moore
Title:    Vice President

EIGHTY-FOUR MINING COMPANY

By _____

    Name:  Robert D. Moore
    Title:    Vice President

US-DOCS\70611782.3

MCELROY COAL COMPANY

By _____

    Name:  Robert D. Moore
    Title:   Vice President

Amendment No. 1 to
Credit Agreement

SOUTHERN OHIO COAL COMPANY

By _____

Name:  Robert D. Moore
Title:   Vice President

CENTRAL OHIO COAL COMPANY

By _____

Name:  Robert D. Moore
Title:    Vice President

Amendment No. 1 to
Credit Agreement

KEYSTONE COAL MINING
CORPORATION

By _____

Name:  Robert D. Moore
Title:    Vice President

MON RIVER TOWING, INC.

By _____
    Name:  Robert D. Moore
    Title:   Vice President

TWIN RIVERS TOWING COMPANY

By _____

Name:  Robert D. Moore
Title:    Vice President

CCC RCPC LLC

By _____

Name:  Robert D. Moore
Title:    Vice President

CCC LAND RESOURCES LLC

By _____

Name:  Robert D. Moore
Title:   Vice President

US-DOCS\70611782.3

AMERICAN MINE SERVICES, INC.

By _____
Name:  Robert D. Moore
Title:    Vice President

AMERICANMOUNTAINEER
PROPERTIES, INC.

By _____

Name:  Robert D. Moore
Title:    Vice President

MURRAY AMERICAN ENERGY, INC.

By _____

    Name:  Robert D. Moore
    Title:    President

THE OHIO COUNTY COAL COMPANY

By _____

    Name:  Robert D. Moore
    Title:    Vice President

THE MARSHALL COUNTY COAL
COMPANY

By _____

    Name:  Robert D. Moore
    Title:   Vice President

THE MONONGALIA COUNTY COAL
COMPANY

By _____

Name:  Robert D. Moore
Title:    Vice President

THE MARION COUNTY COAL
COMPANY

By _____

    Name:  Robert D. Moore
    Title:   Vice President

THE HARRISON COUNTY COAL
COMPANY

By _____

    Name:  Robert D. Moore
    Title:    Vice President

MURRAY AMERICAN
TRANSPORTATION, INC.

By _____

Name:  Robert D. Moore
Title:    Vice President

MURRAY KEYSTONE PROCESSING,
INC.

By _____

Name:  Robert D. Moore
Title:   Vice President

MURRAY AMERICAN RIVER TOWING, INC.
THE FRANKLIN COUNTY COAL COMPANY
THE MEIGS COUNTY COAL COMPANY
THE MUSKINGUM COUNTY COAL COMPANY
THE WASHINGTON COUNTY COAL COMPANY

By _____

    Name:  Robert D. Moore
    Title:   Vice President

MURRAY AMERICAN KENTUCKY TOWING, INC.

By _____
    Name:  Anthony C. Vcelka, II
    Title:   Treasurer

MURRAY EQUIPMENT & MACHINE, INC.

By _____

Name:  Robert D. Moore
Title:    President & Treasurer

THE MCLEAN COUNTY COAL COMPANY

By _____
    Name:  Robert D. Moore
    Title:    Vice President

MURRAY AMERICAN COAL, INC.

By _____
    Name:  Robert D. Moore
    Title:   President

**DEUTSCHE BANK AG NEW YORK BRANCH,**
as Administrative Agent and a Lender

By: *Peter Cucchiara*

Name:
Title: Peter Cucchiara
Vice President

By:

Name:
Title: Marcus M. Tarkington
Director

Amendment No. 1 to
Credit and Guaranty Agreement

## AMENDMENT NO. 2
## TO CREDIT AND GUARANTY AGREEMENT

This AMENDMENT NO. 2 TO CREDIT AND GUARANTY AGREEMENT (as defined below), dated as of November 10, 2016 (this "<u>Agreement</u>"), is by and among Murray Energy Corporation (the "<u>Borrower</u>"), each of the Credit Parties party hereto, each Initial Term B-3 Lender (as defined below), and Deutsche Bank AG New York Branch, as Administrative Agent.  Goldman Sachs Lending Partners LLC is acting as the sole lead arranger, bookrunner and syndication agent in connection with this Agreement (in such capacities, the "<u>Amendment Arranger</u>").

## RECITALS:

WHEREAS, reference is made to the Credit and Guaranty Agreement dated as of April 16, 2015 (as amended prior to the date hereof, the "<u>Existing Credit Agreement</u>") among the Borrower, each Credit Party named therein, the Lenders party thereto and Deutsche Bank AG New York Branch, as Administrative Agent.  Capitalized terms used but not defined herein shall have the meanings given to such terms in the Credit Agreement (as defined below);

WHEREAS, the Borrower is prepaying the Term B-1 Loans pursuant to <u>Section 2.13(a)</u> of the Credit Agreement in an aggregate principal amount of $26,908,412.45;

WHEREAS, pursuant to Section 2.25(a) of the Credit Agreement, the Borrower has made an extension offer (a "<u>Term B-1 Extension Offer</u>") to all of the Lenders holding Term B-1 Loans (each, an "<u>Existing Term B-1 Lender</u>") to extend the Maturity Date of the Term B-1 Loans to April 17, 2020 on terms set forth in the term sheet referenced in the Term B-1 Extension Offer (such Maturity Date together with such terms, the "<u>Extension</u>");

WHEREAS, each Lender holding Term B-1 Loans (collectively, the "<u>Existing Term B-1 Lenders</u>") that executes and delivers a consent to this Amendment in the form of the "Lender Consent" attached hereto as <u>Annex I</u> (a "<u>Term B-1 Lender Consent</u>") agrees to the terms and conditions of this Amendment and agrees to convert its Term B-1 Loans into Term B-3 Loans (each such Lender, a "<u>Continuing Term B-3 Lender</u>" and collectively, the "<u>Continuing Term B-3 Lenders</u>");

WHEREAS, each Existing Term B-1 Lender that fails to execute and deliver the Term B-1 Lender Consent by 3:00 p.m. (New York City time), on November 3, 2016 (each, a "<u>Non-Consenting Term B-1 Lender</u>") will constitute a Declining Lender and will be replaced pursuant to Section 2.23 of the Credit Agreement whereby all of such Declining Lender's Term B-1 Loans will be assigned to a Person identified on signature pages hereto as the "Replacement Term B-1 Lender" (the "<u>Replacement Term B-1 Lender</u>"; and together with the Continuing Term B-3 Lenders, the "<u>Initial Term B-3 Lenders</u>" and each, an "<u>Initial Term B-3 Lender</u>");

WHEREAS, the Replacement Term B-1 Lender agrees to the terms and conditions of this Amendment and agrees to convert all of its Term B-1 Loans so assigned into a portion of the Term B-3 Loans on a dollar-for-dollar basis;

**WHEREAS**, the Borrower, the other Credit Parties, the Administrative Agent and the Continuing Term B-3 Lenders and the Replacement Term B-1 Lender have agreed pursuant to Section 2.25 of the Credit Agreement to amend certain provisions of the Credit Agreement as provided herein to reflect the existence and terms of the Term B-3 Loans.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

SECTION 1.  <u>Amendments to Existing Credit Agreement</u>.  Immediately after giving effect to this Agreement upon satisfaction of the conditions set forth in Section 3 of this Agreement (with the deletions of the stricken text (if any) indicated in the same manner as the following example: ~~stricken text~~ and with the insertions of additional text (if any) indicated in the same manner as the following example: ***bold and italics text*** in the cases of amendments that restate or replace provisions, phrases or other text):

**(a)**  Section 1.1 of the Credit Agreement is hereby amended by adding the following new defined terms in their proper alphabetical order:

"**Initial Term B-3 Lender**" has the meaning assigned to such term in the Second Amendment.

"**Second Amendment**" means that certain Amendment No. 2 to Credit and Guaranty Agreement, dated as of November 10, 2016, by and among the Borrower, the other Credit Parties party thereto, the Administrative Agent and each other financial institution party thereto that is defined as an "Initial Term B-3 Lender" thereunder.

"**Second Amendment Effective Date**" means the "Effective Date" as defined in the Second Amendment, which date is November 10, 2016.

"**Term B-3 Loan**" means a Term B-3 Loan resulting from an extension and conversion of Term B-1 Loans into Term B-3 Loans pursuant to Section 2.1(a)(iii).

"**Term B-3 Loan Commitment**" means the commitment of a Lender to make or otherwise fund a Term B-3 Loan and "**Term B-3 Loan Commitments**" means such commitments of all Lenders in the aggregate, each of which commitment to make or fund a Term B-3 Loan shall be satisfied pursuant to an extension and conversion of the Term B-1 Loans into the Term B-3 Loans in accordance with Section 2.1(a)(iii).  The amount of each Lender's Term B-3 Loan Commitment, if any, is set forth on Appendix A-3 or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the Term B-3 Loan Commitments as of the Second Amendment Effective Date is $175,000,000.

"**Term B-3 Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term B-3 Loans of such Lender; <u>provided</u>, at any time prior to the making of the Term B-3 Loans, the Term B-3 Loan Exposure of any Lender shall be equal to such Lender's Term B-3 Loan Commitment.

2

"**Term B-3 Loan Note**" means a promissory note in the form of Exhibit B-3, as it may be amended, restated, supplemented or otherwise modified from time to time.

(b)　　Section 1.1 of the Credit Agreement is hereby amended by amended and restating the following defined terms in their entirety as follows:

"**Applicable Margin**" means (i) (x) with respect to any Term B-~~1~~*3* Loan that is a Base Rate Loan, a rate equal to ~~5.75~~*6.75*% *per annum* or (y) with respect to any Term B-~~1~~*3* Loan that is a Eurodollar Rate Loan, a rate equal to ~~6.75~~*7.75*% *per annum*, and (ii) (x) with respect to any Term B-2 Loan that is a Base Rate Loan, a rate equal to 6.25% *per annum* and (y) with respect to any Term B-2 Loan that is a Eurodollar Rate Loan, a rate equal to 7.25% *per annum*.

"**Maturity Date**" means, except to the extent extended pursuant to Section 2.25, (i) with respect to the Term B-~~1~~*3* Loan, the earlier of (a) ~~the second anniversary of the Closing Date~~ *April 17, 2020* and (b) the date on which all Term B-~~1~~*3* Loans shall become due and payable in full hereunder, whether by acceleration or otherwise, (ii) with respect to the Term B-2 Loan, the earlier of (a) the fifth anniversary of the Closing Date, and (b) the date on which all Term B-2 Loans shall become due and payable in full hereunder, whether by acceleration or otherwise, (iii) with respect to New Term Loans, the date on which New Term Loans of a Series shall become due and payable in full hereunder, as specified in the applicable Joinder Agreement, including by acceleration or otherwise and (iv) with respect to Incremental Revolving Loans, the date on which the Incremental Revolving Loans shall become due and payable in full hereunder, as specified in the Incremental Revolver Amendment, including by acceleration or otherwise.

"**Lender**" means each financial institution listed on the signature pages hereto as a Lender, *each financial institution that executed and delivered the Second Amendment that is defined therein as an "Initial Term B-3 Lender"*, and any other Person that becomes a party hereto pursuant to an Assignment Agreement, a Joinder Agreement or an Incremental Revolver Amendment.

(c)　　Section 1.1 of the Credit Agreement is hereby further amended by replacing the phrase "Term B-1" in each instance such phrase appears in the definition of the terms "Class", "Note", "Loan", "Pro Rata Share", "Requisite Lenders", "Term Loan", "Term Loan Commitment" and "Voting Power Determinants" with the phrase "Term B-3".

(d)　　Clause (a) of Section 2.1 of the Credit Agreement is hereby amended and restated in its entirety as follows:

(a)　　<u>Loan Commitments</u>.  Subject to the terms and conditions hereof,

(i)　　each Lender severally agrees to make, on the Closing Date, a Term B-1 Loan to Borrower in an amount equal to such Lender's Term B-1 Loan Commitment; ~~and~~

(ii)　　each Lender agrees to make, on the Closing Date, a Term B-2 Loan to Borrower in an amount equal to such Lender's Term B-2 Loan Commitment~~,~~*; and*

3

*(iii)      each Lender agrees to make, on the Second Amendment Effective Date, a Term B-3 Loan to Borrower in an amount equal to such Lender's Term B-3 Loan Commitment; it being understood and agreed that each Initial Term B-3 Lender makes such Term B-3 Loan by extending and converting the principal amount of all of its outstanding Term B-1 Loans into the outstanding Term B-3 Loans of the same principal amount.  The aggregate principal amount of the outstanding Term B-3 Loans on the Second Amendment Effective Date is equal to $175,000,000.*

Borrower may make only one borrowing under each of the Term B-1 Loan Commitment and the Term B-2 Loan Commitment, which shall be on the Closing Date *and Borrower may make only one borrowing under the Term B-3 Loan Commitment, which shall be on the Second Amendment Effective Date*.  Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections 2.13(a) and 2.14, all amounts owed hereunder with respect to the Term Loans shall be paid in full no later than the Maturity Date applicable to such Term Loans.  Each Lender's Term Loan Commitment *(other than Term B-3 Loan Commitment)* shall terminate immediately and without further action on the Closing Date after giving effect to the funding of such Lender's Term Loan Commitment on such date*, and each Lender's Term Loan B-3 Commitment shall terminate immediately and without further action on the Second Amendment Effective Date after giving effect to the extension and conversion of the Term B-1 Loans into Term B-3 Loans of such Lender pursuant to Section 2.1(a)(iii) on such date.*

(e)      Section 2.11 of the Credit Agreement is hereby amended by (i) re-numbering clause (c) of such Section as clause "(d)" and (ii) inserting the following new clause (c) immediately prior to clause (d):

(c)      Borrower agrees to fund on the Second Amendment Effective Date, to each Initial Term B-3 Lender,  a closing adjustment in an amount equal to 11.50% of the stated principal amount of such Lender's Term B-3 Loan, to be funded on the Second Amendment Effective Date.  Such closing adjustment will be in all respects fully earned, due and payable upon the extension and conversion of Term B-1 Loans into Term B-3 Loans pursuant to Section 2.1(a)(iii) on the Second Amendment Effective Date and non-refundable and non-creditable thereafter.

(f)      Clause (a) Section 2.12 of the Credit Agreement is hereby amended and restated in its entirety as follows:

(a) in the case of the Term B-~~1~~3 Loans, in the aggregate amounts set forth below on the four quarterly scheduled Interest Payment Dates applicable to Term B-~~1~~3 Loans, commencing ~~September 30, 2015~~ *March 31, 2017*:

4

| Amortization Date | Installments |
|---|---|
| ~~September 30, 2015~~ | ~~$750,000.00~~ |
| ~~December 31, 2015~~ | ~~$750,000.00~~ |
| ~~March 31, 2016~~ | ~~$750,000.00~~ |
| ~~June 30, 2016~~ | ~~$750,000.00~~ |
| ~~September 30, 2016~~ | ~~$750,000.00~~ |
| ~~December 31, 2016~~ | ~~$750,000.00~~ |
| *March 31, 2017* | *$437,500.00* |
| *June 30, 2017* | *$437,500.00* |
| *September 30, 2017* | *$437,500.00* |
| *December 31, 2017* | *$437,500.00* |
| *March 31, 2018* | *$437,500.00* |
| *June 30, 2018* | *$437,500.00* |
| *September 30, 2018* | *$437,500.00* |
| *December 31, 2018* | *$437,500.00* |
| *March 31, 2019* | *$437,500.00* |
| *June 30, 2019* | *$437,500.00* |
| *September 30, 2019* | *$437,500.00* |
| *December 31, 2019* | *$437,500.00* |
| *March 31, 2020* | *$437,500.00* |
| Maturity Date | Remainder |

(g)    Clause (b)(i) of Section 2.13 of the Credit Agreement is hereby amended and restated in its entirety as follows:

(i)    In the event that all or any portion of the Term B-~~1~~*3* Loans are (x) repaid, prepaid, refinanced or replaced *(other than pursuant to Section 2.14, but including pursuant to Section 2.14(c))* or (y) repriced or effectively refinanced through any waiver, consent or amendment ~~(in the case of clause (x) and clause (y), in connection with any waiver, consent or amendment to the Term B-1~~*3* ~~Loans the primary result of which is the lowering of the effective interest cost or the Weighted Average Yield of the Term B-1 Loans or the incurrence of any syndicated term loans that are secured by Liens on a pari passu basis with the Liens securing the Obligations having an effective interest cost or Weighted Average Yield that is less than the effective interest cost or Weighted Average Yield of the Term B-1 Loans (or portion thereof) so repaid, prepaid, refinanced, replaced or repriced (in each case other than in connection with a change of control) (a~~ **"Repricing Transaction"**~~))~~ occurring on or prior to *April 16, 2017* ~~the first~~ ~~anniversary of the~~ ~~Closing Date~~, such repayment, prepayment, refinancing, replacement or repricing will be made at   101.0% of the principal amount so

5

repaid, prepaid, refinanced, replaced or repriced.  If all or any portion of the Term B-~~1~~3 Loans held by any Lender is repaid, prepaid, refinanced or replaced pursuant to a "yank-a-bank" or similar provision in the Credit Documents as a result of, or in connection with, such Lender not agreeing or otherwise consenting to any waiver, consent or amendment referred to in clause (y) above (or otherwise in connection with ~~a Repricing Transaction~~ *any such repayment, prepayment, refinancing, replacement or repricing*), such repayment, prepayment, refinancing or replacement will be made at 101.0% of the principal amount so repaid, prepaid, refinanced, replaced or repriced*.*

(h)     Sections 2.7(c), 2.15(b), 2.15(c), 2.24, 6.4(f) and 10.5(c)(iii) of the Credit Agreement is hereby amended by replacing the phrase "Term B-1" in each instance such phrase appears in such Sections with the phrase "Term B-3".

(i)     Appendix A-3 attached to this Agreement is hereby inserted in the Credit Agreement as Appendix A-3 thereto.

(j)     Exhibit B-3 attached to this Agreement is hereby inserted in the Credit Agreement as Exhibit B-3 thereto.

SECTION 2.   <u>Initial Term B-3 Lenders; Recordation in Register</u>.

(a)     Each Initial Term B-3 Lender hereby acknowledges and agrees that, upon its execution of this Agreement and effectiveness of this Agreement, such Initial Term B-3 Lender shall be a "Lender" under, and for all purposes of, the Credit Agreement and the other Credit Documents, and shall be subject to and bound by the terms thereof, and shall perform all the obligations of and shall have all rights of a Lender thereunder.

(b)     Upon execution and delivery of this Agreement, the Administrative Agent will record the Term B-3 Loans made by the Initial Term B-3 Lenders in the Register.

SECTION 3.   <u>Conditions to Effectiveness</u>.   The effectiveness of this Agreement is subject to the substantially simultaneous satisfaction of each of the following conditions (the date such conditions are satisfied, the "<u>Effective Date</u>"):

(a)     The Administrative Agent shall have received a counterpart of this Agreement, executed and delivered by the Borrower, the other Credit Parties named herein, the Administrative Agent and each Initial Term B-3 Lender;

(b)     the Administrative Agent and the Amendment Arranger shall have received all fees and other amounts due and payable on or prior to the Effective Date and, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses (including the legal fees and expenses of Latham & Watkins LLP and the fees and expenses of any local counsel) required to be reimbursed or paid by Borrower hereunder, under any other Credit Document or any other agreement;

(c)     no Default or Event of Default shall have occurred and be continuing or would result from the extension and conversion of the Term B-1 Loans into the Term B-3 Loans;

(d)     as of the Effective Date, the representations and warranties set forth in Section 4 of the Credit Agreement and in the other Credit Documents shall be true and correct in all material respects on and as of the Effective Date (both immediately prior to and after giving

effect to the extension and conversion of the Term B-1 Loans into the Term B-3 Loans) to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof;

(e)    Borrower shall have delivered to the Administrative Agent the notice of prepayment of Term B-1 Loans required pursuant to Section 2.13(a) and shall have prepaid the Term B-1 Loans in an aggregate principal amount of $26,908,412.45., together with all interest that has accrued but is unpaid thereon;

(f)    all of the Term B-1 Loans of the Non-Consenting Term B-1 Lenders shall have been assigned or deemed assigned pursuant to Section 2.23 to the Replacement Term B-1 Lender;

(g)    the Administrative Agent shall have received a Funding Notice related to Term B-3 Loans, executed by an Authorized Officer no later than one Business Days prior to the Effective Date or such shorter period of time acceptable to the Administrative Agent and the Amendment Arranger;

(h)    Borrower shall deliver or cause to be delivered the following legal opinions and documents in connection with this Agreement prior to the extension and conversion of the Term B-1 Loans into the Term B-3 Loans:

(i)    executed copies of the customary opinions of Kirkland & Ellis LLP and Porter Wright Morris & Arthur LLP, each a counsel for the Borrower, with respect to this Agreement and the Term B-3 Loans, dated as of the date the Term B-1 Loans are extended and converted into the Term B-3 Loans and in form and substance reasonably satisfactory to Administrative Agent and the Amendment Arranger (and the Borrower hereby instruct such counsel to deliver such opinion to Administrative Agent and the Initial Term B-3 Lenders); and

(ii)    (1) Organizational Documents in respect of the Borrower (or a certification that such Organizational Documents have not been amended or modified since the version previously delivered on April 16, 2015), (2) signature and incumbency certificates of the officers of the Borrower (or certification of the signature and incumbency of the persons named in an exhibit to a prior certificates to the extent no changes occurred since the last certificate), (3) resolutions of the Board of Directors or similar governing body of the Borrower approving and authorizing the execution, delivery and performance of this Agreement and related documents, certified as of the date of the extension and conversion of the Term B-1 Loans into the Term B-3 Loans by its secretary or an assistant secretary as being in full force and effect without modification or amendment and (4) a good standing certificate from the applicable Governmental Authority of the Borrower's jurisdiction of incorporation, dated as of the date of the extension and conversion of the Term B-1 Loans into the Term B-3 Loans or a recent date prior thereto;

7

Amendment No. 2 to
Credit and Guaranty Agreement

(i)    a solvency certificate from the chief financial officer of Holdings dated the Effective Date and addressed to the Administrative Agent and the Amendment Arranger in form of <u>Annex II</u> hereto;

(j)    all documentation and other information with respect to the Credit Parties that shall have been reasonably requested by the Administrative Agent or the Amendment Arranger and that the Administrative Agent and the Amendment Arranger reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) the **"PATRIOT Act"**); and

(k)    to the Administrative Agent and the Amendment Arranger, an executed closing certificate (which shall be substantially in the form of <u>Annex III</u> hereto).

SECTION 4.    <u>Covenant</u>.    Borrower shall deliver or cause to be delivered the following legal opinions and documents in connection with this Agreement on or before the 90th day after the Effective Date (as such date may be extended in writing by the Administrative Agent in its sole discretion):

(a)    amendments to each of the Mortgages encumbering the Closing Date Mortgaged Properties, in form and substance reasonably acceptable to Administrative Agent;

(b)    an opinion of counsel (which counsel shall be reasonably satisfactory to Administrative Agent) in each state in which a Closing Date Mortgaged Property is located with respect to the enforceability of the form(s) of the amendments to the Mortgages to be recorded in such state and such other matters as Administrative Agent may reasonably request, in each case in form and substance reasonably satisfactory to Administrative Agent and the Collateral Trustee; and

(c)    Officer Certificate (as defined in the Collateral Trust Agreement) under Section 7.1(c) of the Collateral Trust Agreement and any opinions and documents pursuant to Section 7.1(c) of the Collateral Trust Agreement.

SECTION 5.    <u>Representations and Warranties of the Loan Parties</u>.    Borrower represents and warrants to Administrative Agent and Lenders that, after giving effect to this Agreement:

(a)    No Default or Event of Default has occurred and is continuing or would result from the entry into this Agreement.

(b)    Both before and after giving effect to this Agreement, each of the representations and warranties contained in the Credit Agreement and the other Credit Documents is true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) as if made on and as of the date hereof except to the extent that such representations and warranties expressly specifically refer to an earlier date (in which case such representations and warranties are true and correct in all material respects as of such earlier date).

(c)    The execution, delivery and performance of this Agreement have been duly authorized by all requisite corporate, limited liability company or partnership action, as

8

Amendment No. 2 to
Credit and Guaranty Agreement

applicable, on the part of each Credit Party;  this Agreement has been duly executed and delivered by each Credit Party; and this Agreement constitutes a valid and binding agreement of each Credit Party, enforceable against each Credit Party in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by general equitable principles relating to enforceability (whether enforcement is sought by proceedings in equity or at law).

SECTION 6.   Acknowledgment and Reaffirmation.

(a)     Each of the Credit Parties hereby acknowledges that it has reviewed the terms and provisions of this Agreement and the Credit Agreement.  Each Credit Party hereby confirms its respective guarantees, pledges, grants of security interests and other obligations, as applicable, under and subject to the terms of each of the Credit Documents to which it is party, and agrees that such guarantees, pledges, grants of security interests and other obligations, and the terms of each of the Credit Documents to which it is a party, are not impaired or affected in any manner whatsoever and shall continue to be in full force and effect.

(b)     Each Credit Party acknowledges and agrees that any of the Credit Documents to which it is a party or otherwise bound shall continue in full force and effect and that all of its obligations thereunder shall be valid and enforceable and shall not be impaired or limited by the execution or effectiveness of this Agreement.

SECTION 7.   Effects on Credit Documents.

(a)     Except as specifically amended herein, the Credit Agreement and all other Credit Documents shall continue to be in full force and effect and are hereby in all respects ratified and confirmed.  Each of the Credit Documents, including the Credit Agreement, and any and all other agreements, documents or instruments now or hereafter executed and/or delivered pursuant to the terms hereof or pursuant to the terms of the Credit Agreement, are hereby amended so that any reference in such Credit Documents to the Credit Agreement, whether direct or indirect, shall mean a reference to the Existing Credit Agreement as amended hereby.

(b)     The execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any right, power or remedy of any Lender or any Agent under any of the Credit Documents, nor constitute a waiver of any provision of the Credit Documents.

(c)     The Borrower and the other parties hereto acknowledge and agree that this Agreement and any agreements, instruments and other documents executed and/or delivered in connection herewith shall constitute a Credit Document.

SECTION 8.   Amendments; Execution in Counterparts.

(a)     This Agreement shall not constitute an amendment of any other provision of the Credit Agreement not referred to herein and shall not be construed as a waiver or consent to any further or future action on the part of the Borrower that would require a waiver or consent of the Lenders or the Agents.

Amendment No. 2 to
Credit and Guaranty Agreement

(b)      This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.   Delivery of an executed signature page of this Agreement by facsimile or other electronic submission (including .pdf or .tif format) shall be effective as delivery of a manually executed counterpart hereof.

SECTION 9.   <u>GOVERNING LAW; WAIVER OF JURY TRIAL</u>.  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

[Signature pages to follow]

10

US-DOCS\71256942.10

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

MURRAY ENERGY CORPORATION

By: _____

Name: Robert D. Moore

Title: Executive Vice President, Chief Operating Officer and Chief Financial Officer

MURRAY ENERGY HOLDINGS CO.

By: _____

Name: Robert D. Moore

Title: Chief Financial Officer

COAL RESOURCES HOLDINGS CO.
GENWAL RESOURCES, INC.
UTAHAMERICAN ENERGY, INC.
WEST RIDGE RESOURCES, INC.
WEST VIRGINIA RESOURCES, INC.
SUNBURST RESOURCES, INC.

By:_____
Name: Robert D. Moore
Title:   Authorized Officer


COAL RESOURCES, INC.

By:_____
Name: Robert D. Moore
Title:   Senior Vice President and Chief Financial Officer


PREMIUM COAL, INC.
PLEASANT FARMS, INC.

By:_____
Name: Robert D. Moore
Title:   Assistant Treasurer and Assistant Secretary

AMCA COAL LEASING, INC.
AMCOAL HOLDINGS, INC.
AMERICAN COMPLIANCE COAL, INC.
AMERICAN NATURAL GAS, INC.
ANDALEX RESOURCES MANAGEMENT, INC.
ANDALEX RESOURCES, INC.
AVONMORE RAIL LOADING, INC.
CONSOLIDATED LAND COMPANY
OHIOAMERICAN ENERGY, INCORPORATED
PENNAMERICAN COAL, INC.
PINSKI CORP.
THE AMERICAN COAL COMPANY

By:_____
Name: Robert D. Moore
Title:   Treasurer

AMERICAN ENERGY CORPORATION
AMERICANMOUNTAINEER ENERGY, INC.
ANCHOR LONGWALL AND REBUILD, INC.
BELMONT COAL, INC.
CORPORATE AVIATION SERVICES, INC.
EMPIRE DOCK, INC.
ENERGY RESOURCES, INC.
ENERGY TRANSPORTATION, INC.
KENAMERICAN RESOURCES, INC.
MILL CREEK MINING COMPANY
MONVALLEY TRANSPORTATION CENTER, INC.
MURRAY AMERICAN KENTUCKY TOWING, INC.
PENNSYLVANIA TRANSLOADING, INC.
T D K COAL SALES, INCORPORATED
THE AMERICAN COAL SALES COMPANY
THE OKLAHOMA COAL COMPANY


By: _____
Name:  Anthony C. Vcelka, II
Title:   Treasurer

AMERICANHOCKING ENERGY, INC.

By: _____

Name:  Ronnie D. Dietz

Title:    Assistant Treasurer

MAPLE CREEK PROCESSING, INC.
THE OHIO VALLEY COAL COMPANY
THE OHIO VALLEY TRANSLOADING COMPANY
UMCO ENERGY, INC.
MAPLE CREEK MINING, INC.

By: _____
Name: Ronnie D. Dietz
Title:   Treasurer

PENNAMERICAN COAL L.P.
By: PINSKI CORP.
Its: Managing Partner

By: _____
Name:  Robert D. Moore
Title:    Treasurer and Secretary

AMERICAN EQUIPMENT & MACHINE, INC.
AMERICANMOUNTAINEER PROPERTIES, INC.
CCC LAND RESOURCES LLC
CCC RCPC LLC
CENTRAL OHIO COAL COMPANY
CONSOLIDATION COAL COMPANY
EIGHTY-FOUR MINING COMPANY
KEYSTONE COAL MINING CORPORATION
MCELROY COAL COMPANY
MON RIVER TOWING, INC.
MURRAY AMERICAN ENERGY, INC.
MURRAY AMERICAN RIVER TOWING, INC.
MURRAY AMERICAN TRANSPORTATION, INC.
MURRAY KEYSTONE PROCESSING, INC.
OHIO VALLEY RESOURCES, INC.
SOUTHERN OHIO COAL COMPANY
THE FRANKLIN COUNTY COAL COMPANY
THE HARRISON COUNTY COAL COMPANY
THE MARION COUNTY COAL COMPANY
THE MARSHALL COUNTY COAL COMPANY
THE MCCLEAN COUNTY COAL COMPANY
THE MEIGS COUNTY COAL COMPANY
THE MONONGALIA COUNTY COAL COMPANY
THE MUSKINGUM COUNTY COAL COMPANY
THE OHIO COUNTY COAL COMPANY
THE WASHINGTON COUNTY COAL COMPANY
TWIN RIVERS TOWING COMPANY

By: _____
Name: Robert D. Moore
Title:   Vice President

AMERICAN MINE SERVICES, INC.
CANTERBURY COAL COMPANY
KANAWHA TRANSPORTATION CENTER, INC.
MURRAY AMERICAN COAL, INC.
MURRAY AMERICAN RESOURCES, INC.
MURRAY EQUIPMENT & MACHINE, INC.
MURRAY GLOBAL COMMODITIES, INC.
MURRAY SOUTH AMERICA, INC.
OHIO ENERGY TRANSPORTATION, INC.
ONEIDA COAL COMPANY, INC.
SPRING CHURCH COAL COMPANY

By: _____
Name:  Robert D. Moore
Title:   President

DEUTSCHE BANK AG NEW YORK BRANCH,
as Administrative Agent

By: _____
Name:
Title:

Marcus M. Tarkington
Director

By: _____
Name:
Title:

Dusan Lazarov
Director

Amendment No. 2 to
Credit and Guaranty Agreement

**APPENDIX A-3**
**TO CREDIT AND GUARANTY AGREEMENT**

**Term B-3 Loan Commitments**

On file with Administrative Agent.

**EXHIBIT B-3**
**TO CREDIT AND GUARANTY AGREEMENT**

**FORM OF TERM B-3 LOAN NOTE**

$[_____]

[_____ __], 2016                                         New York, New York

  **FOR VALUE RECEIVED**, **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**"), promises to pay **[NAME OF LENDER]** ("**Payee**") or its registered assigns the principal amount of [_____] DOLLARS ($[_____]) in the installments referred to below.

  Borrower also promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the rates and at the times which shall be determined in accordance with the provisions of that certain Credit and Guaranty Agreement, dated as of April 16, 2015 (as it may be amended, restated, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Borrower, **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent.

  Borrower shall make scheduled principal payments on this Note as set forth in Section 2.12 of the Credit Agreement.

  This Note is one of the "Term B-3 Loan Notes" and is issued pursuant to and entitled to the benefits of the Credit Agreement, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loan evidenced hereby was made and is to be repaid.

  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds at the Principal Office of Administrative Agent or at such other place as shall be designated in writing for such purpose in accordance with the terms of the Credit Agreement.  Unless and until an Assignment Agreement effecting the assignment or transfer of the obligations evidenced hereby shall have been accepted by Administrative Agent and recorded in the Register, Borrower, each Agent and Lenders shall be entitled to deem and treat Payee as the owner and holder of this Note and the obligations evidenced hereby.  Payee hereby agrees, by its acceptance hereof, that before disposing of this Note or any part hereof it will make a notation hereon of all principal payments previously made hereunder and of the date on which interest hereon has been paid; provided, the failure to make a notation of any payment made on this Note shall not limit or otherwise affect the obligations of Borrower hereunder with respect to payments of principal of or interest on this Note.

  This Note is subject to mandatory prepayment and to prepayment at the option of Borrower, each as provided in the Credit Agreement.

THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

The terms of this Note are subject to amendment only in the manner provided in the Credit Agreement.

No reference herein to the Credit Agreement and no provision of this Note or the Credit Agreement shall alter or impair the obligations of Borrower, which are absolute and unconditional, to pay the principal of and interest on this Note at the place, at the respective times, and in the currency herein prescribed.

Borrower promises to pay all costs and expenses, including reasonable and documented out-of-pocket attorneys' fees, all as provided in the Credit Agreement, incurred in the collection and enforcement of this Note.  Borrower and any endorsers of this Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand notice of every kind and, to the extent permitted by applicable law, the right to plead any statute of limitations as a defense to any demand hereunder.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, Borrower has caused this Note to be duly executed and delivered by its officer thereunto duly authorized as of the date and at the place first written above.

**MURRAY ENERGY CORPORATION**

By: _____
Name:
Title:

## ANNEX I

See attached.

**LENDER CONSENT**

Reference is made to the proposed Amendment No. 2 to Credit and Guaranty Agreement (the "<u>Amendment</u>") to be entered into by and among Murray Energy Corporation (the "<u>Borrower</u>"), each of the Credit Parties party thereto, each Initial Term B-3 Lender (as defined therein), and Deutsche Bank AG New York Branch, as Administrative Agent.  Unless otherwise defined herein, terms defined in the Amendment and used herein shall have the meanings given to them in the Amendment.

The undersigned Lender hereby elects to (i) consent and agree to the Amendment and the Extension effected thereby, (ii) convert its existing Term B-1 Loan into a Term B-3 Loan under the Credit Agreement after giving effect to the Amendment and (iii) waive any payments pursuant to Section 2.18(c) of the Existing Credit Agreement arising from the conversion or prepayment of its Term B-1 Loan. The undersigned agrees that the Administrative Agent is hereby authorized and directed to enter into the Amendment and any other documents or agreements to give effect to the Amendment, agrees to be a party to the Amendment, and agrees that its executed signature page hereto may be attached to the Amendment.

THIS LENDER CONSENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Delivery of an executed signature page hereof by facsimile or other electronic transmission (including .pdf or .tif format) shall be effective as delivery of a manually executed counterpart hereof.

[NAME OF LENDER]

By _____

Name:

Title:

## ANNEX II

See attached.

# SOLVENCY CERTIFICATE

### Dated November 10, 2016

Reference is made to that certain Credit and Guaranty Agreement, dated as of April 16, 2015 (as amended, supplemented or otherwise modified and as may be further amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**") by and among the Borrower (as defined below), Holdings (as defined in the Credit Agreement), certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent.

I, Robert D. Moore, hereby certify to the Administrative Agent (as defined below) that I am the duly elected, authorized and acting Chief Financial Officer of MURRAY ENERGY CORPORATION, an Ohio corporation (the "**Borrower**"), and hereby certify, solely in my capacity as Chief Financial Officer and not in an individual capacity, pursuant to <u>Section 3.(i)</u> of that certain Amendment No. 2 to Credit and Guaranty Agreement, dated as of November 10, 2016, by and among Borrower, Holdings, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent (the "**Second Amendment**"; capitalized terms used but not defined herein shall have the meanings given to such terms therein), that as of the date hereof:

(i)      I have reviewed the terms of Section 3 of the Second Amendment and Section 4 of the Credit Agreement and the definitions and provisions contained in the Second Amendment and the Credit Agreement related thereto, together with each of the Related Agreements, and, in my opinion, have made, or have caused to be made under my supervision, such examination or investigation as is necessary to enable me to express an informed opinion as to the matters referred to herein; and

(ii)      based upon my review and examination described in paragraph (i) above, immediately upon consummation transactions contemplated by the Second Amendment, including the extension and conversion of the Term B-1 Loans into Term B-3 Loans, on the Effective Date, after taking into account rights of contribution, the Credit Parties, on a consolidated basis, are Solvent.

As used herein, "Solvent" means, with respect to all Credit Parties, taken as a whole, on a consolidated basis, that as of the date of determination, (a) the sum of the Credit Parties' debt (including contingent liabilities) does not exceed the present fair saleable value, taken on a going concern basis, of the Credit Parties' present assets; (b) the Credit Parties' capital is not unreasonably small in relation to the business of the Credit Parties as contemplated on the Closing Date and reflected in the Projections or with respect to any transaction contemplated or undertaken after the Closing Date; and (c) the Credit Parties have not incurred and do not intend to incur, or believe (nor should they reasonably believe) that they will incur, debts beyond their ability to pay such debts as they become due (whether at maturity or otherwise).  For purposes of this definition of "Solvent", the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents

the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standards No.5).

[*Signature Page Follows*]

2

IN WITNESS WHEREOF, I have executed this Certificate on behalf of the Credit Parties as of the date first set forth above.

**MURRAY ENERGY CORPORATION**

By:_____

Name:

Title:   Chief Financial Officer

**ANNEX III**

See attached.

# CLOSING DATE CERTIFICATE

November 10, 2016

**THE UNDERSIGNED HEREBY CERTIFY AS FOLLOWS:**

1.      We are, respectively, the chief executive officer and the chief financial officer of **MURRAY ENERGY HOLDINGS CO.**, a Delaware corporation ("**Holdings**"), and **MURRAY ENERGY CORPORATION**, an Ohio corporation ("**Borrower**").

2.      Reference is made to that certain Credit and Guaranty Agreement, dated as of April 16, 2015 (as amended, supplemented or otherwise modified and as may be further amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**") by and among the Borrower (as defined below), Holdings (as defined in the Credit Agreement), certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto from time to time, **DEUTSCHE BANK SECURITIES INC.** and **GOLDMAN SACHS BANK USA**, as Joint Lead Arrangers and Joint Bookrunners, **GOLDMAN SACHS BANK USA**, as Sole Syndication Agent, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent.

3.      We have reviewed the terms of Section 3 of Amendment No. 2 to Credit and Guaranty Agreement, dated as of November 10, 2016, by and among Borrower, Holdings, certain Subsidiaries of Borrower, as Guarantors, the Lenders party thereto, and **DEUTSCHE BANK AG NEW YORK BRANCH**, as Administrative Agent (the "**Second Amendment**"; capitalized terms used but not defined herein shall have the meanings given to such terms therein), and the definitions and provisions contained in the Second Amendment and Credit Agreement relating thereto, and, in each case, in our opinion we have made, or have caused to be made under our supervision, such examination or investigation as is necessary to enable us to express an informed opinion as to the matters referred to herein.

4.      Based upon our review and examination described in paragraph 3 above, we, each acting as an officer of the Borrower but not in any personal capacity, certify, on behalf of Borrower, that as of the date hereof:

(i)      no event has occurred and is continuing or will result from the consummation of the transactions contemplated by the Second Amendment, including the extension and conversion of the Term B-1 Loans into Term B-3 Loans, that would constitute a Default or an Event of Default; and

(ii)      the representations and warranties set forth in Section 4 of the Credit Agreement and in the other Credit Documents are true and correct in all material respects on and as of the Effective Date (both immediately prior to and after giving effect to the extension and conversion of the Term B-1 Loans into Term B-3 Loans) to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties were true and correct in all material respects on and as of such earlier date; provided that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

The foregoing certifications are made and delivered as of the date first written above.

**MURRAY ENERGY HOLDINGS CO.**

_____
Name:
Title:  Chief Executive Officer

**MURRAY ENERGY CORPORATION**

_____
Name:
Title:  Chief Financial Officer