## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[1] | ) Case No. 19-56885 (JEH) |
|  | ) |
| Debtors. | ) Judge John E. Hoffman, Jr. |
|  | ) |
|  | ) (Joint Administration Granted) |
|  | ) |
| BLACK DIAMOND COMMERCIAL | ) |
| FINANCE, L.L.C., as Administrative Agent, | ) Adv. Pro. No. 19-02143 |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| MURRAY ENERGY CORP., | ) |
| MURRAY ENERGY HOLDINGS CO., | ) |
| GLAS TRUST COMPANY LLC, and | ) |
| U.S. BANK, N.A., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Black Diamond Commercial Finance, L.L.C., as Administrative Agent ("Plaintiff") hereby

moves the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable by

Rule 7056 of the Federal Rules of Bankruptcy Procedure, for an order granting summary judgment

on Count I of the First Amended Complaint (Dkt. No. 46) and declaring that: (i) the Specified

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided here.  Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy. The location of Debtor Murray Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

Auction[2] was not a modified Dutch auction; (ii) the Specified Auction violated Section 10.6 of the

Credit Agreement; (iii) the Default precipitated by that violation prevented Section 2 of the Third

Amendment from becoming effective by its terms; and therefore (iv) the 2018 Transaction was

void *ab initio*.

A Memorandum in Support of this Motion is attached hereto.

Respectfully submitted,

Dated:  November 11, 2020          ICE MILLER LLP

*/s/ Tyson A. Crist*
Tyson A. Crist (0071276)
John C. Cannizzaro (0085161)
250 West Street, Suite 700
Columbus, OH  43215
Telephone: (614) 462-2243
Facsimile: (614) 224-3266
Tyson.Crist@icemiller.com
John.Cannizzaro@icemiller.com

Lawrence S. Robbins (*pro hac vice*)
William J. Trunk (*pro hac vice*)
Jack A. Herman (*pro hac vice*)
Jeffrey C. Thalhofer (*pro hac vice*)
Courtney L. Millian
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
lrobbins@robbinsrussell.com
wtrunk@robbinsrussell.com
jherman@robbinsrussell.com
jthalhofer@robbinsrussell.com
cmillian@robbinsrussell.com

*Counsel to Black Diamond Commercial Finance, L.L.C.,*
*as Administrative Agent*

---

[2] Capitalized terms have the meanings set forth in the Statement of Material Facts, *infra*.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MURRAY ENERGY HOLDINGS CO., *et al.*,[3] | ) Case No. 19-56885 (JEH) |
| | ) |
| Debtors. | ) Judge John E. Hoffman, Jr. |
| | ) |
| | ) (Joint Administration Granted) |
| | ) |

|  |  |
|---|---|
| BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as Administrative Agent, | ) Adv. Pro. No. 19-02143 |
| Plaintiff, | ) |
| v. | ) |
| MURRAY ENERGY CORP., MURRAY ENERGY HOLDINGS CO., GLAS TRUST COMPANY LLC, and U.S. BANK, N.A., | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

---

[3] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided here. Such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/MurrayEnergy. The location of Debtor Murray Energy Corporation's principal place of business and the Debtors' service address in these chapter 11 cases is 46226 National Road, St. Clairsville, Ohio 43950.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF MATERIAL FACTS ................................................................ 2

    A.    The Credit Agreement............................................................................ 2

    B.    The 2018 Transaction ........................................................................... 3

    C.    Plaintiff Commences Suit As Administrative Agent For The Existing
           Lenders................................................................................................... 8

ARGUMENT .......................................................................................................... 10

I.    The Specified Auction Was Not A Modified Dutch Auction........................... 11

    A.    Evidence Of Industry Meaning Definitively Shows That The Specified
           Auction Was Not A Modified Dutch Auction ...................................... 11

           1.    The Term "Modified Dutch Auction" Is Well Understood In The
                 Finance Industry...................................................................... 13

           2.    The Specified Auction Was Not A Modified Dutch Auction .................... 15

    B.    Defendants' Expert Fails To Create A Genuine Issue Of Material Fact .............. 17

II.    Plaintiff Is Entitled To A Declaratory Judgment That The 2018 Transaction Is Void
        *Ab Initio* ................................................................................................ 21

CONCLUSION........................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   193 F.3d 415 (6th Cir. 1999) ...............................................................................21

*Bethlehem Steel Co. v. Turner Constr. Co.*,
   2 N.Y.2d 456 (1957) ....................................................................................10, 17

*Brainard v. Am. Skandia Life Assurance Corp.*,
   432 F.3d 655 (6th Cir. 2005) .............................................................10, 11, 13, 19

*Cleveland Wrecking Co. v. Hercules Constr. Corp.*,
   23 F. Supp. 2d 287 (E.D.N.Y. 1998), *aff'd*, 198 F.3d 233 (2d Cir. 1999)..............................22

*Evans v. Ohio Laborers Fringe Benefit Programs*,
   No. 5:12CV01459, 2013 WL 526942 (N.D. Ohio Feb. 11, 2013) .........................................21

*FCCD Ltd. v. State St. Bank & Tr. Co.*,
   No. 10 Civ. 1632 (DLC), 2011 WL 519228 (S.D.N.Y. Feb. 15, 2011) ..................................15

*Fox Film Corp. v. Springer*,
   273 N.Y. 434 (1937) ...................................................................................10

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
   No. 16 Civ. 2767 (GBD), 2019 WL 1649983 (S.D.N.Y. Mar. 28, 2019) ........................11, 21

*J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*,
   106 A.D.3d 559 (N.Y. App. Div. 2013) ........................................................13, 21

*Keiler v. Harlequin Enters. Ltd.*,
   751 F.3d 64 (2d Cir. 2014)..............................................................................10

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010)............................................................................21

*Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*,
   784 F.3d 78 (2d Cir. 2015)..........................................................................10, 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)....................................................................................10

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
   86 N.Y.2d 685 (1995) ..................................................................................22

ii

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Popovich v. Sony Music Entm't, Inc.*,
    508 F.3d 348 (6th Cir. 2007) ................................................10

*Scottsdale Ins. Co. v. Flowers*,
    513 F.3d 546 (6th Cir. 2008) ................................................23

*State v. Home Indem. Co.*,
    486 N.E.2d 827 (N.Y. 1985) ................................................11

*Street v. J.C. Bradford & Co.*,
    886 F.2d 1472 (6th Cir. 1989) ................................................10

*United Specialty Ins. Co. v. Cole's Place, Inc.*,
    936 F.3d 386 (6th Cir. 2019) ................................................23, 24

*Uribe v. Merchs. Bank of N.Y.*,
    91 N.Y.2d 336 (1998) ................................................10

*W. World Ins. Co. v. Hoey*,
    773 F.3d 755 (6th Cir. 2014) ................................................22

*W.W.W. Assocs., Inc. v. Giancontieri*,
    77 N.Y.2d 157 (1990) ................................................20

*In re Wansdown Props. Corp. N.V.*,
    No. 19-13223 (SMB), Adv. No. 20-01056, 2020 WL 5887542 (Bankr.
    S.D.N.Y. Oct. 5, 2020) ................................................15

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995) ................................................22

**Rules**

Fed. R. Bankr. P. 7056 ................................................10

Fed. R. Civ. P. 15(a)(1)(B) ................................................8

Fed. R. Civ. P. 56(a) ................................................10

## TABLE OF AUTHORITIES—Continued

**Page(s)**

**Transaction Documents**

Credit Agreement (Exhibit 5)...........................................................................................2

 § 1.1...............................................................................................................3, 21

 § 2.17..................................................................................................................3

 § 2.25(c)............................................................................................................4

 § 6.1...................................................................................................................3

 § 8.1(e)............................................................................................................21

 § 9.6.................................................................................................................22

 § 10.6.......................................................................................................*passim*

 Ex. M...............................................................................................................16

Intercreditor Agreement (Exhibit 6) ...............................................................................2

Murray Energy Corporation Auction Notice and Auction Documents (Exhibit 15).......................6

Third Amendment (Exhibit 16)

 § 2(*l*)..................................................................................................................7

 § 4(b)...............................................................................................................21

Return Bid (Exhibit 28) .................................................................................................15

**Other Authorities**

Theodore Basta et al., *LSTA Presentation on Syndicated Loan Agreements*
 (LSTA/Morrison & Foerster Nov. 13, 2014), https://bit.ly/3fA8EBm...............................13, 14

Black's Law Dictionary (11th ed. 2019)..........................................................................13

Lewis Carroll, *Through the Looking Glass*, in The Complete Works of Lewis
 Carroll 154 (1994)...........................................................................................2, 19

Ford Motor Credit Company, *Press Release* (Mar. 23, 2009),
 https://bit.ly/2YULVd8.........................................................................................19

## TABLE OF AUTHORITIES—Continued

**Page(s)**

Richard M. Gray, *Debt Buybacks, Defaulting Lenders and Libor Market Disruption* (LSTA Loan Market Chronicle 2009), https://bit.ly/3fxGwPe .................13, 14, 15

Charles T. Haag & Zachary A. Keller, *Honored in the Breach: Issues in the Regulation of Tender Offers for Debt Securities*, 9 N.Y.U. J.L. & Bus. 199 (2012) ..........................................................................................................................13, 14

Sherritt Press Release (Feb. 14, 2018), https://bit.ly/3cpfNCI .....................................................18

Ok-Rial Song, *Hidden Social Costs of Open Market Share Repurchases*, 27 J. Corp. L. 425 (2002) .............................................................................................................17

Weil, Gotshal & Manges LLP, *LevFin Quarterly Q4 2015*, https://bit.ly/3ciw8cj .......................14

Yahoo Finance Marketwired, *Walter Energy Announces Closing of Dutch Auction to Repurchase $250 Million of Its Term Loan A* (Sept. 27, 2013), https://yhoo.it/3fxJaEE..............................................................................................................19

## PRELIMINARY STATEMENT

This case has distilled to a single, straightforward legal question:  Did the 2018 Transaction[4]—in which the Company offered Lenders a take-it-or-leave-it exchange offer with no bidding—constitute a "modified Dutch auction" under the Credit Agreement?  (Spoiler:  No.)

The phrase "modified Dutch auction" is a technical term in the finance industry.  And, as its name implies, it is a type of *auction*—that is, a transaction in which the trading price "is determined by the interaction of competitive bidders."  Ex. 2, Yilmaz Reb. Rep. ¶ 28.  Plaintiff's expert, Bilge Yilmaz, a Wharton professor who writes and teaches on auctions in financial markets, has cogently explained what a "modified Dutch auction" is and why the 2018 Transaction was nothing of the sort.  *See* Ex. 3, Yilmaz Rep. ¶¶ 9-15, 27-60; Ex. 2, Yilmaz Reb. Rep. ¶¶ 7-8, 10-28.  Analyzing dozens of publicly available credit agreements and marshaling his own expert knowledge of the industry, Prof. Yilmaz concludes that the Specified Auction lacked the essential components of a "modified Dutch auction"—namely, a discount range and bidding within that range.  Ex. 3, Yilmaz Rep. ¶ 12 ("The Specified Auction lacked any bidding mechanism, much less one in the form of a modified Dutch Auction.").  Every one of the agreements he compiled included those critical components.  *Id.* ¶¶ 34-35.

Defendants urge a different meaning: that "a modified Dutch auction is whatever Murray and the Administrative Agent say it is."[5]  They offer their own expert, John Stark, whose basic opinion is that a "Dutch auction" is any transaction in which all participants pay the same price.

---

[4] Capitalized terms have the meanings set forth in the Statement of Material Facts, *infra*.

[5] Opinion and Order Granting in Part and Denying in Part Motions to Dismiss Amended Complaint (Dkt. No. 86) (the "Order") at 14.

So, picking up milk at the grocery store?  Dutch auction.  Buying a box of Girl Scout cookies?

Dutch auction.  Paying a parking ticket?  You guessed it—Dutch auction.[6]

As explained below, Mr. Stark's opinion is illogical and unsupported.  Suffice it to say that

Defendants' refrain that a "Dutch auction is whatever we say it is"—a contention they likewise

pressed (unsuccessfully) at the motion to dismiss stage—is not tenable.  Words have meaning.  *See*

Order at 14 (quoting Lewis Carroll, *Through the Looking Glass*, in The Complete Works of Lewis

Carroll 154, 196 (1994)).  Because no reasonable finance-industry participant would think that a

par-for-par debt exchange, with no bidding, is an "auction"—much less a "modified Dutch

auction"—Plaintiff is entitled to summary judgment on Count I.

## STATEMENT OF MATERIAL FACTS

### A.      The Credit Agreement

1.       In April 2015, Defendants Murray Energy Corp. and Murray Energy Holdings Co.

(together, the "Company" or "Murray") entered into the Credit and Guaranty Agreement dated

April 16, 2015, as amended or otherwise modified from time to time (the "Credit Agreement"),

governing a $2 billion term loan facility (the "Term Loans").  *See* Ex. 5, Credit Agreement.

2.       To secure the Term Loans, the counterparty lenders ("Lenders") were granted a

first priority lien on certain fixed asset collateral (the "Term Loan Collateral").  *See* Ex. 6,

Intercreditor Agreement, at 2.

---

[6] Murray's Rule 30(b)(6) witness went even further, testifying that an auction is anything
the Company calls a "auction."  Among several exchanges on this point:

> Q:  So I say -- now, I am going to say, come one come all.  I am auctioning off these
> apartments.  There are a hundred of them. They are each ten grand. You can have one, if
> you bring a check for exactly ten grand. Don't bid more, don't bid less. This is an auction.
> I call it that. Is it an auction? . . . A:  That's your designation, then I think you've got a right
> to call it an auction.

Ex. 4, Robert Moore Dep. Tr.: 80:15-24, 81:1-3.

3.      As is customary, the Credit Agreement contained myriad provisions designed to
protect the Lenders and safeguard their rights in the collateral.  *See* First Amended Complaint,
Dkt. No. 46 ("FAC") ¶¶ 24-44.  Among other things, it limited the Company's ability to incur
additional liens and debt, such as by providing that any "Refinancing Indebtedness" could not be
senior in priority to the Term Loans.  *See* Ex. 5, Credit Agreement, at 41, § 1.1 (defining "Permitted
First Lien Priority Refinancing Debt"); at 109-114, § 6.1 (negative covenants); *see also* FAC ¶¶ 31-
35.

4.      Several provisions of the Credit Agreement also prevented the Company from
extending preferential treatment to any subset of Lenders.  Under Section 2.17 ("Ratable
Sharing"), for example, any Lender that received a "payment" in respect of its Term Loans—
whether in cash or otherwise—was required (with limited exceptions) to share that payment on a
pro rata basis with the remaining Lenders.  *See* Ex. 5, Credit Agreement, at 71-72, § 2.17.

**B.      The 2018 Transaction**



5.      REDACTED certain of its long-time
debtholders (the "Supporting Lenders") REDACTED
REDACTED  *See* Ex. 7, MURRAY-BD00056555 (Board Minutes).

6.      REDACTED
REDACTED, the extending Lenders (the
"Superpriority Lenders") REDACTED
REDACTED  *Id.* at ___564.

7.      REDACTED
REDACTED  *See* Ex. 8,
MURRAY-BD00079111, at ___113 (Term Sheet).

8.      None of this was permitted by the Credit Agreement.  Section 2.25 forbade the Company from granting new collateral to a subset of Lenders in exchange for extending their maturities.  *See* Ex. 5, Credit Agreement, at 85-86, § 2.25(c).



9.      **REDACTED**

the new superpriority term loans ("New Loans") **REDACTED**  *See* Ex. 9, MURRAY-BD00077117, at ___145. **RE**

*Id.* at ___123.

10.      **REDACTED**

*See* Ex. 10, MURRAY-BD00055268, at ___273 (Draft Refinancing Support Agreement).

11.      Under Section 10.6(i), the Company was authorized to repurchase a subset of the Term Loans—*without* granting pro rata treatment to all Lenders—if it conducted the repurchase through one or more "modified Dutch auctions."  *See* Ex. 5, Credit Agreement, at 165-66, § 10.6(i).[7]

---

[7] Such "Dutch auction" provisions had become common features of credit agreements since the 2008 financial crisis, when borrowers wanted the ability to repurchase term loans that were trading at steep discounts to par.  *See* Ex. 3, Yilmaz Rep. ¶ 23.  The animating premise was that such discounted loan repurchases could benefit *all* lenders:  The auction process ensures that the company receives the best possible price for its loans (through the bidding activity of the most bearish of lenders), thus giving participating lenders an off-ramp while safeguarding the interests of non-participating lenders by de-leveraging the company to the maximum extent possible.  *Id.* ¶ 43.

12.    Two provisos gave the Company some latitude in selecting "Auction" procedures: the "Auction" procedures could either be consistent with Exhibit M or "such other procedures as are acceptable to Borrower and Administrative Agent."   Ex. 5, Credit Agreement, at 165, § 10.6(i)(A)(ii).

13.    Notwithstanding the latitude provided by these provisos, the Company was still required to conduct an "Auction," defined as "one or more modified Dutch auctions."  Ex. 5, Credit Agreement, at 165, § 10.6(i)(A).

14.    A modified Dutch auction is understood in the finance industry to be a transaction in which a company uses competitive bidding to repurchase a stated amount of its debt or equity from investors at the lowest price that will enable it to complete the purchase.  Ex. 3, Yilmaz Rep. ¶ 27.

15.    It was clear from the start that the Company's proposed transaction was no auction: not Dutch, not modified Dutch, not any type.  *See* Ex. 3, Yilmaz Rep. ¶¶ 32-54; Ex. 2, Yilmaz Reb. Rep. ¶¶ 26-28.

16.    In a typical modified Dutch auction, the buyer announces the "range of prices" that it is "willing to pay" for the debt.  *See* Ex. 3, Yilmaz Rep. ¶ 27.

17.    In a May 11, 2018 draft Auction Notice, however,  ████ REDACTED ████ ██████████████████████████████████████████████████ ████████████████████████████  *See* Ex. 11, GSLP082779, at ___781 (5/11/18 Draft Auction Notice).

18.    In a typical modified Dutch auction, the sellers indicate how much of their holdings they are willing to sell.  *See* Ex. 3, Yilmaz Rep. ¶ 27.

19. In the draft Auction Notice, however, ███████ REDACTED ███████

████████████████████████████ *See* Ex. 11, GSLP082779, at ___781 (5/11/18

Draft Auction Notice).

20. In a typical modified Dutch auction, the sellers indicate the price(s) at which they

are willing to sell their loans. *See* Ex. 3, Yilmaz Rep. ¶ 27.

21. In the draft Auction Notice, however, ███████ REDACTED ███████

████████████████████████ *See* Ex. 11, GSLP082779, at ___783

(5/11/18 Draft Auction Notice).

22. In other words, there was no *bidding*—just a fixed-price, take-it-or-leave-it offer.

*See id.*

23. This was not lost on the deal parties. ███████ REDACTED ███████

█████████████████████████████████████████████████

███████████████████████ *See* Ex. 12, GSLP067092 & Ex. 13, MURRAY-

BD00034895.

24. In the end, the Company and the Supporting Lenders pressed ahead with the

illusory "auction" concept. ███████ REDACTED ███████

█████████████████████████████████████████████████

████████████████ Ex. 14, MURRAYBD00003844 (Final).

25. ███ REDACTED ███, the Company distributed Auction Notices to the Lenders,

fixed price and all. *See* Ex. 15, Auction Notice.

26. The Auction Notices also required that, as a condition to participating in the

"auction," Lenders consent to an amendment purporting to eliminate the negative covenants

safeguarding the Existing Term Loan's first-lien rights to the Term Loan Collateral. *See* Ex. 15,

Auction Notice; Ex. 16, Third Amendment, § 2(*l*).  This forced Lenders to either acquiesce in the extension or be left holding Term Loans stripped of their most significant rights.

27.     Lenders agreed to exchange approximately 97 percent of the Term Loans.[8]  *See* Ex. 17 (7/2/2018 Press Release).

28.     Despite the so-called "Auction," the parties' public and private messaging betrayed what they were truly up to: an impermissible maturity extension.  Indeed, the Company described the transaction as a "refinancing transaction[] to extend maturities" in press releases, marketing materials, and financial reports.  Ex. 17 (7/2/18 Press Release); *see* Ex. 18 (6/4/2018 Transaction Overview); Ex. 19 (6/4/18 Press Release); Ex. 20 (7/2/18 Current Report) (GSLP053863). ■■■■

REDACTED

■■■■■■■ (Ex. 21, FMR_Murrray-0000653), REDACTED

■■■■■■■■■■■■■■■■■■■■■

■■■ (Ex. 22, GSLP050758).    REDACTED

■■■■■■■■■■■■■■■■■■■■■

■■■■■■■    *See* Ex. 23, GSLP019636, at ___637-38.

---

[8] As Prof. Yilmaz explains, this structure ultimately benefits the company "at the expense of the lenders":

> The company obtained an extension on the terms of its debt with no efficient allocation, no price discovery, and no reduction of leverage.  Non-participating lenders have been subordinated and participating lenders have granted the company an extension to which it was not otherwise entitled.  The lenders have been coerced into competing with each other rushing to participate, or not, but either way solidifying an inferior outcome relative to what a modified Dutch Auction is intended to achieve.

Ex. 3, Yilmaz Rep. ¶ 59.

### C.    Plaintiff Commences Suit As Administrative Agent For The Existing Lenders

29.    Plaintiff became the Administrative Agent for the Term Loans on October 10, 2019. *See* FAC ¶ 15.

30.    <span style="background:black;color:white">REDACTED</span> an ad hoc group of Superpriority Lenders ("the Ad Hoc Group")[9] <span style="background:black;color:white">REDACTED</span> Ex. 24, Letter to Kirkland, at 2 (BD-MEC00010932); Ex. 25, Letter to Davis Polk, at 1 (BD-MEC00010929).

31.    After receiving notice of Plaintiff's objection to the Third Amendment, the Company and its affiliates entered into a Restructuring Support Agreement providing for DIP financing and filed for relief under chapter 11 of the Bankruptcy Code. *See* No. 19-bk-56885, Dkt. No. 10-2 (Restructuring Support Agreement dated October 28, 2019); No. 19-bk-56885, Dkt. No. 1 (Bankruptcy Petition filed October 29, 2019).

32.    On November 20, 2019, Plaintiff initiated this adversary proceeding as Administrative Agent on behalf of the non-extending lenders (the "Existing Lenders"), seeking, among other things, a declaratory judgment that the 2018 Transaction was invalid. *See* Complaint, Dkt. No. 1.

33.    On January 27, 2020, Plaintiff filed its First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), *see* Dkt. No. 46, and on February 10, Defendants filed their motions to dismiss. *See* Dkt. Nos. 55 & 58.

34.    On May 4, 2020, the Court issued the Order. In denying Defendants' motions to dismiss Count I—seeking a declaration that the 2018 Transaction violated the Credit Agreement— the Court rejected Defendants' proffered definition of "modified Dutch auction" as "not a

---

[9] *See* Amended Verified Statement of Davis Polk & Wardwell LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019, Main Case Dkt. No. 857.

reasonable interpretation of the Credit Agreement." *See* Order at 14.  But the Court left open the possibility, albeit with skepticism (Order at 16 n.4), that Defendants might somehow adduce evidence that the term "modified Dutch auction" is "commonly understood" in the finance industry to embrace something (like the 2018 Transaction) that was, as a matter of ordinary English usage, the polar opposite of an auction.  Order at 15-16.

35.     Shortly thereafter, the Court entered a temporary stay at Defendants' request, but made clear it was not meant to "deprive[] [Plaintiff] of a merits judgment." *See* 5/12/2020 Hearing Tr. ("5/12 Tr.") at 26:9-11.  Before entering the stay, the Court heard Defendants' assurances that the stay would not "take away [Plaintiff's] day in court," *id.* at 12:13-14, and that Defendants were not "at all . . . running from trying to get a decision," *id.* at 13:14-16.

36.     Defendants later agreed to add language to the Confirmation Order that, consistent with this Court's instructions, made clear that nothing in the Plan or Confirmation Order would affect this Court's ability to proceed to judgment.  *See* Mot. to Continue, Dkt. No. 114 ¶ 5; Confirmation Order, Main Case Dkt. No. 2135 ¶ 117.

37.     On September 3, the Court modified its stay order so that the stay would terminate at the earlier of substantial consummation of a chapter 11 Plan or September 30.  Dkt. No. 122.  In so holding, the Court declined Defendants' invitation to "permissively abstain" from the matter, noting that upon the lifting of the stay it would "resume hearing" and "exercise its jurisdiction to adjudicate this adversary proceeding." *Id.* at 3.

38.     The stay lifted on September 16, 2020, upon substantial consummation.

39.     The Declaration of William J. Trunk concerning the authenticity of certain of the record documents cited in this Statement of Material Facts is attached as Exhibit 1.

40.     Plaintiff now moves for summary judgment.  It seeks a declaration that (i) the Specified Auction was not a modified Dutch auction; (ii) the Specified Auction violated Section 10.6 of the Credit Agreement; (iii) the Default precipitated by that violation prevented Section 2 of the Third Amendment from becoming effective by its terms; and therefore (iv) the 2018 Transaction was void *ab initio*.

## ARGUMENT

Summary judgment is proper when there are "no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law."  *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 660 (6th Cir. 2005); Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

There are two ways to meet that standard in a contract case governed by New York law. First, "summary judgment is appropriate if the contractual terms"—including by reference to industry understanding[10]—"are unambiguous."  *Popovich v. Sony Music Entm't, Inc.*, 508 F.3d 348, 354 (6th Cir. 2007) (applying New York law); *see Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 460 (1957).  Second, "no genuine dispute will exist," even if a contract term is

---

[10] Evidence of technical understanding does not vary or add to the text's plain meaning; to the contrary, the plain meaning of a term "tak[es] into account 'the reasonable expectation and purpose of the ordinary business[person], in the factual context in which terms of art and understanding are used.'"  *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 91 (2d Cir. 2015) (quoting *Uribe v. Merchs. Bank of N.Y.*, 91 N.Y.2d 336, 341 (1998)).  Thus, much like referring to dictionaries, courts may consider evidence of industry meaning to determine the unambiguous meaning of a term at summary judgment.  *See Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 69 (2d Cir. 2014); *Fox Film Corp. v. Springer*, 273 N.Y. 434, 436 (1937).

ambiguous, where "the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary." *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 88 (2d Cir. 2015); *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, No. 16 Civ. 2767 (GBD), 2019 WL 1649983, at *6 (S.D.N.Y. Mar. 28, 2019) (citing, *inter alia*, *State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985)).

## I.     The Specified Auction Was Not A Modified Dutch Auction

The plain text of the Credit Agreement and conclusive evidence of industry understanding together establish that the Specified Auction was not a "modified Dutch auction." If nothing else, a "modified Dutch auction" requires real bidding within a range of prices—consistent with ordinary English usage, industry practice, and the dozens of credit agreements reviewed by Plaintiff's expert, Prof. Yilmaz. The Specified Auction, which went off at a preordained price and without any bidding whatsoever, plainly does not qualify.

The mere fact that Defendants have submitted competing expert reports does not necessitate a trial. To create a *genuine* factual issue, "an expert opinion must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard*, 432 F.3d at 664 (internal quotation marks omitted). Here, Defendants' expert parrots the same head-scratching argument that this Court already rejected: namely, that a "modified Dutch auction" is whatever the Company and the Administrative Agent say it is. Mr. Stark offers no factual or logical basis for that remarkable assertion. Summary judgment on Count I is therefore warranted.

### A.     Evidence Of Industry Meaning Definitively Shows That The Specified Auction Was Not A Modified Dutch Auction

Section 10.6(i) of the 2015 Credit Agreement carved out an exception from pro rata treatment if the Company "conducted" an "Auction"—which 10.6(i) defined as "one or more modified Dutch auctions." Ex. 5, Credit Agreement, at 165, § 10.6(i)(A). Immediately following

this core textual command, two provisos gave the Company some latitude in selecting how that "Auction" would be conducted.  *Id.* (company shall adopt procedures consistent with Exhibit M or "such other procedures as are acceptable to Borrower and Administrative Agent").  But, as this Court recognized, Order at 11-15, these provisos do not (and cannot) swallow the fundamental requirement: the Company must, first and foremost, conduct an ***Auction***.  *Id.* at 12 ("Under the approach endorsed by Murray, the Specified Auction could have been conducted by means of procedures that did not implement any type of auction at all . . . ."), 13 ("The Proviso, however, cannot be used to turn something that is not a modified Dutch auction into one.").

Although the Court rejected Defendants' assertion that Section 10.6 is boundlessly malleable, *id.* at 14, it recognized that "modified Dutch auction" is a term of art in the finance industry, *id.* at 15.  It therefore invited the parties to submit evidence of the industry meaning of "modified Dutch auction."  *Id.* at 15-16.

The returns are in—and the Court was right to be skeptical that Defendants could muster evidence that "the Specified Auction, with its zero 'range' and no discount to par, was a modified Dutch auction."  *Id.* at 16 n.4.  The evidence conclusively demonstrates that the term "modified Dutch auction," as understood in the finance industry, requires—at the barest of minimums—real bidding within a range of prices.[11]  Plaintiff's expert, a Wharton professor of finance specializing in corporate finance, game theory, and alternative investments, Ex. 3, Yilmaz Rep. ¶¶ 2-6, marshals his own experience and evidence from dozens of publicly available credit agreements to conclude that the Specified Auction was not an auction at all, much less a modified Dutch auction. Defendants' expert, by contrast, quibbles with Prof. Yilmaz's methodology, but when it comes to

---

[11] The stipulated order entered November 7, 2020, states that the parties' expert reports shall be "treated as admissible into evidence to the same extent the Court would admit or not admit the witnesses' statements if they were offered as live, in court testimony."  Dkt. No. 140 ¶ 3.

his own definition of the term gives us nothing but warmed over Lewis Carroll: "a 'modified Dutch

Auction,' as the term is used and understood by industry professionals, is what the parties contract

it to be, and it can be changed as the borrowers and the administrative agent see fit." Ex. 30, Stark

Reb. Rep. at 10.  That bare assertion defies logic and fails to create a genuine issue of material fact

for trial.  *See Brainard*, 432 F.3d at 664.

Because no reasonable person in the finance industry would consider a par-for-par debt

exchange, with no bidding whatsoever, an "auction"—much less a "modified Dutch auction"—

Plaintiff is entitled to judgment on Count I.  *See J.P. Morgan Inv. Mgmt. Inc. v. AmCash Grp., LLC*,

106 A.D.3d 559, 559-60 (N.Y. App. Div. 2013) (granting judgment based on "definitive extrinsic

evidence of industry custom and usage").

1.    **The Term "Modified Dutch Auction" Is Well Understood In The Finance
      Industry**

A modified Dutch auction is understood in the finance industry as a transaction in which a

company uses competitive bidding to repurchase a stated amount of its debt or equity from

investors at the lowest price that will enable it to complete the purchase.  Ex. 3, Yilmaz Rep. ¶ 27;

*see Dutch auction*, Black's Law Dictionary (11th ed. 2019).  To identify that clearing price, the

company announces a range of prices at which it will purchase the asset in question.  *See* Ex. 3,

Yilmaz Rep. ¶¶ 34-37. [12]  By setting a lower bound, the company incentivizes bidding by

guaranteeing a price floor; conversely, by setting an upper bound, it "reduc[es] the risk to the

---

[12] *Accord* Ex. 26, Bridget Marsh et al., *LSTA Model Credit Agreement Provisions Presentation* 54 (LSTA/DLA Piper May 10, 2017); Theodore Basta et al., *LSTA Presentation on Syndicated Loan Agreements* 27 (LSTA/Morrison & Foerster Nov. 13, 2014), https://bit.ly/3fA8EBm; Charles T. Haag & Zachary A. Keller, *Honored in the Breach: Issues in the Regulation of Tender Offers for Debt Securities*, 9 N.Y.U. J.L. & Bus. 199, 245 (2012); Richard M. Gray, *Debt Buybacks, Defaulting Lenders and Libor Market Disruption* 7 (LSTA Loan Market Chronicle 2009), https://bit.ly/3fxGwPe.

remaining debt or equity holders that the company might overpay." *Id.* ¶ 29. Bidders pick a price

within the range. If a bidder comes in at or under the clearing price, its offer will be accepted (and

it will be paid either the clearing price or the price it bid). *See id.* ¶ 37 ("In every auction the goal

is to achieve a clearing price . . . ."); Ex. 26, Marsh, *supra*, at 54; Weil, Gotshal & Manges LLP,

*LevFin Quarterly Q4 2015* at 2, https://bit.ly/3ciw8cj; Basta, *supra*, at 27; Gray, *supra*, at 7; Haag

& Keller, *supra*, at 244-45.

Like every other kind of auction, a modified Dutch auction is a mechanism of trade that

uses bidding to achieve several important goals. One is the efficient allocation of resources (the

assets are purchased from those who value them least, for the lowest possible price). *See* Ex. 3,

Yilmaz Rep. ¶¶ 28, 30. Another is price discovery (the price reflects the assets' market value, as

revealed through bids). *See id.* ¶¶ 28-29, 31. And yet another is transparency (the auction process

is organic, visible, and non-preferential). *See id.* ¶¶ 12, 28, 31.

Those benefits proved especially well suited to the syndicated loan market, where equal

treatment among lenders is a bedrock principle. *See* Ex. 3, Yilmaz Rep. ¶ 21. In the wake of the

2008 financial crisis, loan buybacks became more attractive to borrowers as their loans traded at

steep discounts in the secondary market. *Id.* ¶ 23; Basta, *supra*, at 24; Gray, *supra*, at 5. By

capitalizing on those discounts, buyers could retire debt and de-lever their balance sheets. *See id.*

But credit agreements generally did not provide for repurchases; they would be barred as non-pro

rata payments. *See* Basta, *supra*, at 24; Gray, *supra*, at 5-6. So credit agreements began to include

exceptions to the requirement of pro rata treatment to permit certain kinds of repurchases (such as

open-market repurchases and modified Dutch auctions). Basta, *supra*, at 24; *see* Ex. 3, Yilmaz

Rep. ¶ 26.

The modified Dutch auction mechanism was transparent and optimally de-levering (thanks to market-based price discovery), leaving both participating and non-participating lenders better off.  That result meshed with the animating purpose of ratable treatment provisions—that lenders should not receive preferential treatment at the expense of their fellow syndicate members.  *See* Ex. 3, Yilmaz Rep. ¶¶ 13, 24; Gray, *supra*, at 5-6; *cf. FCCD Ltd. v. State St. Bank & Tr. Co.*, No. 10 Civ. 1632 (DLC), 2011 WL 519228, at *6 (S.D.N.Y. Feb. 15, 2011) (contract term was unambiguous in part because one party's interpretation was "consistent with the sole purpose" for including the term).  Buyback activity slowed in the years that followed, as the economy grew healthier and syndicated loans emerged from the bargain basement; but modified Dutch auction provisions were here to stay.  Ex. 3, Yilmaz Rep. ¶ 23; *see* Ex. 27, LSTA Model Credit Agreement Provisions, at 29 (2014).

### 2.    The Specified Auction Was Not A Modified Dutch Auction

Against that backdrop, the Specified Auction plainly did not constitute an auction—much less a modified Dutch auction.  *See In re Wansdown Props. Corp. N.V.*, No. 19-13223 (SMB), Adv. No. 20-01056, 2020 WL 5887542, at *6 (Bankr. S.D.N.Y. Oct. 5, 2020) (explaining that the ambiguity inquiry turns on "whether the contract is unambiguous with respect to the question disputed by the parties").  There was no bidding, and thus no price discovery.  Indeed, there was no range of prices whatsoever within which to bid.  ███████ REDACTED ███████
███████████████████████████████████████████  Ex. 28, MEC-GLAS-00055652 (Return Bid).  Which is to say, the Specified Auction "lack[ed] the fundamental bidding aspect of an auction."  Ex. 3, Yilmaz Rep. ¶ 42; Ex. 2, Yilmaz Reb. Rep. ¶ 21 ("Regardless of how you define (or design) an auction, one element is key: Competitive bidders interact to determine the price at which the market clears and demand equals supply.").

Lest there be any doubt about whether the 2018 Transaction can be shoehorned into Section 10.6, Plaintiff's expert conducted a systematic empirical study of dozens of publicly filed credit agreements that included a provision for modified Dutch auction repurchases.[13]  While there was some variation around the edges, he found that every single one of them had the following features:

- The borrower indicates that it is willing to repurchase a certain amount of the loans;

- The borrower sets an interval or range—greater than zero—of acceptable prices that it is willing to pay to repurchase the loans (whereas, in the Specified Auction, the Company gave an illusory "range" of $1,000 to $1,000);

- Participating lenders will bid prices within the borrower's stated interval (whereas Lenders did not bid in the Specified Auction; they were given a single, take-it-or-leave-it price certain);

- Participating lenders indicate how much of their holdings they are willing to sell at the bid prices (whereas the Specified Auction required each participating lender to sell all of their loans at a predetermined price); and

- The borrower agrees to buy back the loans from the lenders who bid the lowest prices up to the point within the interval where the total quantity of repurchases is achieved, which becomes the clearing price (whereas the price in the Specified Auction was decreed in advance by the Company, not determined by bidding).

Ex. 3, Yilmaz Rep. ¶ 34.

In addition to lacking the *sine qua non* of an auction—bidding—the Specified Auction diverged from industry understanding in other important respects.  For one, the Specified Auction was not conducted at a discount to par.  *See, e.g.*, Ex. 5, Credit Agreement, at Exhibit M, at M-1 (requiring that the Auction Notice contain a "range of discounts to par . . . , expressed as a range of prices per $1,000").  As a result, the Specified Auction failed to achieve the de-levering that helped incentivize lenders across the syndicated loan industry to agree to the modified Dutch

---

[13] These agreements variously referred to the transactions as "Dutch auctions," "reverse Dutch auctions," and "modified Dutch auctions."  Prof. Yilmaz explains that these terms are frequently used interchangeably in the finance industry. Ex. 3, Yilmaz Rep. ¶¶ 27 n.21, 34.

auction exception in the first place.  *See* Ex. 3, Yilmaz Rep. ¶¶ 13, 23, 59-60.  The Specified Auction thus benefitted the Company at the expense of lenders.  *Id*. ¶ 14.

In short, the 2018 Transaction stands in a class all its own.  Plaintiff's expert—a Wharton finance professor who specializes in corporate finance and "games of incomplete information, including strategic bidding in different auction environments" (*id*. ¶ 4)—has literally never seen a modified Dutch auction "where the offer range is expressed as a single point."  *Id*. ¶ 40; *see id*. ¶ 46 ("The design of the Specified Auction and the failure to allow for a range of reply bids is, in my experience, inconsistent with the notion of any form of auction.").  There is a reason for that. The Specified Auction was not an auction.[14]

## B.    Defendants' Expert Fails To Create A Genuine Issue Of Material Fact

Defendants' expert, John Stark, tries to show that the Specified Auction was a "modified Dutch auction" in some sense of those words.  To say that his arguments "strain[] the contract language beyond its reasonable and ordinary meaning" is an understatement.  *Bethlehem Steel*, 2 N.Y.2d at 459.

Mr. Stark begins with the basic proposition that, in a Dutch auction, "the underwriter does not set a fixed price."  Ex. 29, Stark Rep. at 17.  So far so good.  But then things go off the rails. From there, Mr. Stark draws the remarkable conclusion that the ***only*** precondition to qualify as a

---

[14] The Specified Auction was, instead, a very different (and equally well-defined) type of transaction: a fixed-price tender offer.  *See* Ex. 3, Yilmaz Rep. ¶¶ 54-60.  Such transactions are fundamentally different from auctions and are routinely contrasted as such by industry authorities. *See* Gray, *supra*, at 7 ("If the buyback is launched as a fixed-price tender offer, the borrower or its affiliate, as applicable . . . specifies a price, and all loans tendered by lenders at that price are accepted.  ***Alternatively***, in a reverse or modified Dutch auction, the Initiating Party specifies a range of acceptable prices and either the total amount of loans it is seeking to purchase (or prepay) or the total purchase price (or prepayment amount) it is willing to pay." (emphasis added)); Ok-Rial Song, *Hidden Social Costs of Open Market Share Repurchases*, 27 J. Corp. L. 425, 426 n.3 (2002).

modified Dutch auction is that "each participant pays the same price."  *Id.*  Of course, that is equally true every time a shopper buys a quart of milk at the supermarket—yet no one would say they buy their groceries via a modified Dutch auction.  As Prof. Yilmaz explains, "there are many types of pricing mechanisms that will result in a uniform price," but that end result says nothing about whether the transaction was a Dutch auction.  Ex. 2, Yilmaz Reb. Rep. ¶¶ 17-18.

In support of his claim that a Dutch auction is ***any*** sale that occurs at a fixed price—even a sale (like the Specified Auction) that entails no bidding whatsoever—Mr. Stark says that he has "observed Dutch auctions occur hundreds of times."  Ex. 29, Stark Rep. at 16-17.  But he points to one (and only one) example of a Dutch auction that supposedly did not require bidding within a range: a recent transaction involving Sherritt International, Inc.  The Sherritt auction, says Stark, "set only a maximum price that the company would pay."  *Id.* at 18.

The Sherritt auction, however, proves ***our*** point, not Stark's.  By setting a ***maximum*** price, the company thereby required lenders to bid ***within a range of prices, anywhere between zero and the maximum price***—precisely as a Dutch auction is supposed to work.[15]  *See* Ex. 2, Yilmaz Reb. Rep. ¶ 24 ("To be sure, some buyback auctions do specify only a maximum price (minimum discount) at which the debt will be bought back. However, reply bids in these auctions, just like the Sherritt auction, could have included prices at any point less than the maximum.").  Mr. Stark leaves to the imagination why he believes the Sherritt transaction is helpful to his cause; and,

---

[15] That much is illustrated by the Sherritt transaction itself.  *See* Yilmaz Rep. ¶ 13 n.3 ("[A]fter Sherritt International paid $110 million to repurchase $121 million worth of debt at prices ranging from $870 to $950 per $1,000 of par value, the company's CEO stated in a press release: 'The successful conclusion of our Dutch auction completes the process that we commenced with our unit offering principally aimed at de-leveraging and strengthening our balance sheet.'" (quoting Sherritt Press Release (Feb. 14, 2018), https://bit.ly/3cpfNCI)).

adding to the confusion, he elsewhere acknowledges that an "*acceptable price range*" is a material term of any modified Dutch auction. Ex. 29, Stark Rep. at 18 (emphasis added).[16]

At bottom, Mr. Stark's opinion rests on his supposition that the "other acceptable procedures" proviso permitted Murray to call any fixed-price exchange, bidding or no bidding, a "modified Dutch auction"—a claim this Court has already dispatched as magical thinking.[17]  Mr. Stark thus offers no answer to this Court's question: "[W]hy did the parties to the Credit Agreement bother to use the term 'modified Dutch auction' if they intended that the auction need only comply with the Exhibit M Procedures or the Other Acceptable Procedures?"  Order at 11.  Which is to say, Stark's report "supplies nothing of value to the judicial process."  *Brainard*, 432 F.3d at 664.

Because Mr. Stark cannot point to any textual cue in the Credit Agreement nor any real-life auction that supports his theory, he points to purported acquiescence in the 2018 Transaction as (extrinsic) evidence that the Specified Auction fit the parties' understanding of "modified Dutch auction."  For example, ████████████████ REDACTED ████████████████
████████████████████████████████████████████████████████

---

[16] Other examples demonstrating that modified Dutch auctions are conducted via bidding within an announced range of prices include a Ford Motor Credit Company loan repurchase in 2009 and a Walter Energy loan repurchase in 2013.  *See* Ford Motor Credit Company, *Press Release* at 2 (Mar. 23, 2009), https://bit.ly/2YULVd8 ("The Term Loan Offer was conducted on a 'Dutch auction' basis whereby term loan lenders were invited to submit bids to sell their Term Loan Debt within a price range of not less than 38 percent of par, nor greater than 47 percent of par."); Yahoo Finance Marketwired, *Walter Energy Announces Closing of Dutch Auction to Repurchase $250 Million of Its Term Loan A* (Sept. 27, 2013), https://yhoo.it/3fxJaEE ("Walter Energy Inc. . . . today announced that it has successfully completed a Dutch Auction to repurchase and extinguish $250 million principal amount of its Term Loan A *at an average price* of $98.3 per $100 of principal amount plus accrued interest." (emphasis added)).

[17] *Compare* Ex. 30, Stark Reb. Rep. at 10 (professing that "modified Dutch auction" means "what the parties contract it to be, and it can be changed as the borrowers and the administrative agent see fit"), *with* Order at 14 ("The question is . . . whether you *can* make words mean so many different things." (quoting Lewis Carroll, *Through the Looking Glass*, in The Complete Works of Lewis Carroll 154, 196 (1994))).

[REDACTED] Ex. 29, Stark Rep. at 17. That is neither true nor relevant. **REDACTED**

[REDACTED]

[REDACTED] *See* Ex. 12, GSLP067092 & Ex. 13, MURRAY-BD00034895. But, more importantly, the fact that certain lenders acquiesced does not alter the unambiguous terms of the contract. *E.g.*, *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("[B]efore looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract.").[18]

**REDACTED**

[REDACTED] *See* Ex. 30, Stark Reb. Rep. at 5, 11-12. For example, he says (at 5) that **REDACTED** [REDACTED] and (at 11) **REDACTED** [REDACTED] This is facially illogical. *First*, these "negotiations" did not yield a range—they yielded a fixed price (par). *Second*, **REDACTED** [REDACTED]—the Supporting Lenders—and therefore cannot be imputed to all lenders for purposes of reverse-engineering an auction dynamic. *Third*, and most fundamentally, the Credit Agreement easily could have specified that the Company may scuttle the modified-Dutch-auction format in favor of a fixed-price tender so long as it first haggles with a subset of its lenders. It does not so specify.

In the end, when set against Plaintiff's expert (and the other evidence of industry understanding Plaintiff has provided, not to mention the plain language of Section 10.6(i) itself),

---

[18] In any event, it is scarcely surprising that many lenders acceded to the 2018 Transaction—after all, the transaction was structured precisely to coerce Lenders' participation. *See* Ex. 3, Yilmaz Rep. ¶¶ 58-59.

Mr. Stark provides no "reasonable basis for a difference of opinion." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010). Because definitive evidence of industry meaning shows that the Specified Auction was not a "modified Dutch auction," Plaintiff is entitled to judgment on Count I. *See AmCash*, 106 A.D.3d at 559-60.[19]

## II.    Plaintiff Is Entitled To A Declaratory Judgment That The 2018 Transaction Is Void *Ab Initio*

When Defendants flouted the auction requirement, they violated Section 10.6(i) of the Credit Agreement. Because a violation of Section 10.6(i) constitutes a "Default" under the Credit Agreement,[20] and because the Third Amendment was expressly conditioned upon there *not* being such a Default,[21] it necessarily follows that the Third Amendment failed by its own terms and the 2018 Transaction never became effective. The Court should so declare.

A declaration that the 2018 Transaction was void would provide concrete relief to Plaintiff. Among other things, it would clarify Plaintiff's legal relations with Defendants—and, by extension, the Superpriority Lenders[22]—because if the 2018 Transaction is void, then it follows

---

[19] For all of these same reasons, the Court should rule for Plaintiff even if it were to find the term "modified Dutch auction" ambiguous. *See Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, No. 16 Civ. 2767 (GBD), 2019 WL 1649983, at *6 (S.D.N.Y. Mar. 28, 2019) (where "the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary," then "the court may resolve [an] ambiguity as a matter of law").

[20] *See* Ex. 5, Credit Agreement, at 19, § 1.1; 139, § 8.1(e).

[21] *See* Ex. 16, Third Amendment, § 4(b).

[22] The Superpriority Lenders are in privity with Defendant GLAS. GLAS is the Superpriority Lenders' agent, with authority to litigate on their behalf in bankruptcy. *See Evans v. Ohio Laborers Fringe Benefit Programs*, No. 5:12CV01459, 2013 WL 526942, at *5 (N.D. Ohio Feb. 11, 2013) (a non-party is adequately represented for preclusion purposes if it has an "express or implied legal relationship" in which the party to the first suit is "accountable" to the non-party (emphasis omitted)). Separately, the Ad Hoc Group—which is a key player in the main case; is represented here by GLAS; and is a participant in the adversary proceeding to the extent of filing a brief (Dkt. No. 97) and arguing before the Court on the stay motion—has "controlled" this litigation at least as much as any named party. *See Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 415, 423 (6th Cir. 1999) (en banc) (a non-party will be bound if it had

that the Superpriority Lenders are (and always have been) parties to the antecedent 2015 Credit Agreement. *See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (1995) (explaining that "no contract arises" if a "condition precedent to the formation or existence of the contract itself" fails to occur); *see also, e.g.*, *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 299 (E.D.N.Y. 1998), *aff'd*, 198 F.3d 233 (2d Cir. 1999). In particular, the Superpriority Lenders would remain subject to the obligation to indemnify Plaintiff for the substantial costs it incurred to vindicate the rights of Lenders under the 2015 Credit Agreement. *See* Ex. 5, Credit Agreement, at 145, § 9.6.[23]

The Declaratory Judgment Act "confer[s] on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). In deciding whether to grant declaratory relief, courts in the Sixth Circuit "consider three things: efficiency, fairness, and federalism." *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014). Each factor favors declaratory relief here.

*Efficiency:* This consideration weighs heavily for granting declaratory relief. Having seen this adversary proceeding to the precipice of judgment, this Court is well acquainted with the relevant facts and law. *See* Reply in Support of Plaintiff's Mot. to Lift the Temporary Stay, Dkt. No. 121, at 4; *cf.* Opp. to Lift Stay, Dkt. No. 120, at 14 (raising the failed argument that the Court should abstain from deciding this case because it would be more efficient to leave it to another

---

"effective choice as to the legal theories and proofs to be advanced" and "control over the opportunity to obtain review"). Both groups will be bound by a declaratory judgment running against GLAS, and both groups have substantial adverse legal interests vis-à-vis Plaintiff that will be resolved by the sought-after declaratory judgment.

[23] There should be no remaining dispute that the Court has the authority to award declaratory relief in this case; the Court has already rejected Defendants' arguments to the contrary. *See* Dkt. No. 90 (arguing that case was moot); Dkt. No. 120 at 9 (urging Court to abstain because there is "practically nothing left to do in this proceeding").

court).  Declining declaratory relief would waste that effort and require another court to duplicate it.  Conversely, issuing the declaration Plaintiff seeks will settle the controversy between these parties: whether the Specified Auction breached the Credit Agreement.  Answering that question "serve[s] a useful purpose in clarifying the legal relations in issue," *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 554 (6th Cir. 2008), because it will resolve whether the Superpriority Lenders remain subject to their indemnification and other obligations under the 2015 Credit Agreement. There is no pending state-court action addressing the same question, so "the one live controversy over [the Specified Auction] will be settled by a declaratory judgment."  *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 398 (6th Cir. 2019).  Moreover, as Plaintiff's submissions demonstrate, "a straightforward application of clear state law" settles the question, which tips the scales further in favor of granting declaratory relief.  *Id.*

*Fairness:*  This consideration turns on whether the party seeking declaratory relief has engaged in gamesmanship in the nature of forum-shopping.  *See id.* at 399.  There has been no such "procedural fencing" here; Plaintiff filed in this forum because this is where Murray chose to file its bankruptcy.  It is *Defendants* that are engaged in forum gamesmanship—having tried tactic after tactic to get the case delayed and punted out of bankruptcy court—to a different (hopefully more receptive) audience.  *See* Dkt. Nos. 90 (Mot. to Stay and Dismiss as Moot); 120 (request for abstention).  So while courts often find that the interests of fairness are "neutral" if "there is no evidence of procedural fencing," *Cole's Place*, 936 F.3d at 399, here fairness weighs for Plaintiff. It would be unfair indeed if a stay that was not meant to "deprive[] [Plaintiff] of a merits judgment," 5/12 Tr. at 26:9-11, did just that.  Especially after Defendants assured bench and bar that they were not "at all . . . running from trying to get a decision," *id*. at 13:14-16.

23

*Federalism:*  Granting declaratory relief here would not "increase friction between our federal and state courts and improperly encroach upon state jurisdiction." *Cole's Place*, 936 F.3d at 399.  Instead, this consideration weighs for granting declaratory relief.  Because there is no pending state-court case, there are "no as-yet-unresolved factual issues that stand between a federal court and its informed resolution" of the Specified Auction question.  *Id.* at 400.  Nor must the Court answer a difficult question of state law that would be better left to a state court: "Relevant [New York] law is clear, and a federal court can confidently apply it without fear of creating conflicts with the [New York] courts or intruding on their jurisdiction."  *Id.*  True, the questions underlying Plaintiff's claim are state-law questions.  But, given the lack of "unresolved factual issues" or *difficult* questions of state law, the overall calculus tips for exercising federal jurisdiction.  *See id.* at 401 (federalism considerations were neutral even where the species of legal issue—interpretation of insurance contracts—was "closely entwined with state public policy").  In their abstention briefing, Defendants argued that respect for state law and the "complex" state law defenses they intended to raise counseled for declining to exercise jurisdiction.  Opp. to Lift Stay, Dkt. No. 120, at 13-14.  But the Court mindfully chose to exercise its jurisdiction anyway.  Dkt. No. 122.  Nothing has changed.

## CONCLUSION

For these reasons, the Court should grant summary judgment for Plaintiff and enter an order substantially in the form of the Proposed Order attached as Exhibit 31.

Respectfully submitted,

Dated: November 11, 2020          ICE MILLER LLP


/s/ Tyson A. Crist
Tyson A. Crist (0071276)
John C. Cannizzaro (0085161)
250 West Street, Suite 700
Columbus, OH  43215
Telephone: (614) 462-2243
Facsimile: (614) 224-3266
Tyson.Crist@icemiller.com
John.Cannizzaro@icemiller.com

Lawrence S. Robbins (*pro hac vice*)
William J. Trunk (*pro hac vice*)
Jack A. Herman (*pro hac vice*)
Jeffrey C. Thalhofer (*pro hac vice*)
Courtney L. Millian
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
lrobbins@robbinsrussell.com
wtrunk@robbinsrussell.com
jherman@robbinsrussell.com
jthalhofer@robbinsrussell.com
cmillian@robbinsrussell.com

*Counsel to Black Diamond Commercial Finance L.L.C., as
Administrative Agent*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on November <u>11</u>, 2020, copies of the foregoing *Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment* and the Exhibits thereto, as redacted, were served (i) electronically on the date of filing through the Court's ECF System on all ECF participants registered in this adversary proceeding at the email addresses registered with the Court, and (ii) by email upon the attorneys representing each of the Defendants at the email addresses listed in the attached Service List for Redacted Version.

The undersigned hereby further certifies that November <u>11</u>, 2020, complete and unredacted copies of the foregoing *Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment* and the Exhibits thereto were served by email upon parties to this adversary proceeding that are parties to the *Confidentiality Agreement and Stipulated Protective Order* (Case No. 19-56885, Dkt. No. 1060) (as signatories thereto or through execution of a Declaration) at the email addresses listed in the attached Service List for Complete and Unredacted Version.

*/s/ Tyson A. Crist*
Tyson A. Crist

## SERVICE LIST FOR REDACTED VERSION

Douglas L. Lutz
A.J. Webb
Bryan J.K. Sisto
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, OH  45202
  dlutz@fbtlaw.com
  awebb@fbtlaw.com
  bsisto@fbtlaw.com
*Counsel to Defendant, GLAS Trust
Company LLC, as Administrative Agent*

Andrew N. Goldman (*pro hac vice*)
Craig Goldblatt (*pro hac vice*)
Benjamin W. Loveland (*pro hac vice*)
Chris D. Hampson (*pro hac vice*)
Salvatore M. Daniele (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
250 Greenwich Street
New York, NY  10007
  andrew.goldman@wilmerhale.com
  craig.goldblatt@wilmerhale.com
  benjamin.loveland@wilmerhale.com
  chris.hampson@wilmerhale.com
  sal.daniele@wilmerhale.com
*Counsel to Defendant, GLAS Trust
Company LLC, as Administrative Agent*

Kim Martin Lewis
Alexandra S. Horwitz
DINSMORE & SHOHL LLP
255 East Fifth Street
Suite 1900
Cincinnati, OH  45202
  kim.lewis@dinsmore.com
  allie.horwitz@dinsmore.com
*Counsel to Defendants, Murray Energy
Corp. and Murray Energy Holdings Co.*

Nicole L. Greenblatt, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
  LLP
601 Lexington Avenue
New York, NY  10022
  nicole.greenblatt@kirkland.com
*Counsel to Defendants, Murray Energy Corp.
and Murray Energy Holdings Co.*

Ross M. Kwasteniet, P.C. (*pro hac vice*)
Joseph M. Graham (*pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
  LLP
300 North LaSalle
Chicago, IL  60654
  ross.kwasteniet@kirkland.com
  joe.graham@kirkland.com
*Counsel to Defendants, Murray Energy Corp.
and Murray Energy Holdings Co.*

Mark McKane (*pro hac vice*)
Michael P. Esser (*pro hac vice*)
Joy M. Dineo (*pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
  mmckane@kirkland.com
  michael.esser@kirkland.com
  joy.dineo@kirkland.com
*Counsel to Defendants, Murray Energy Corp.
and Murray Energy Holdings Co.*

Robert C. Folland
Kyle R. Gerlach
BARNES & THORNBURG LLP
41 South High Street, Suite 3300
Columbus, OH 43215-6104
  rob.folland@btlaw.com
  kyle.gerlach@btlaw.com
*Counsel to U.S. Bank, N.A.,
as Collateral Trustee*

Eric Lopez Schnabel (*pro hac vice*)
Alessandra Glorioso (*pro hac vice*)
Kaleb McNeely (*pro hac vice*)
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY  10019
  schnabel.eric@dorsey.com
  glorioso.alessandra@dorsey.com
  mcneely.kaleb@dorsey.com
*Counsel to U.S. Bank, N.A., as*
*Collateral Trustee*

### SERVICE LIST FOR COMPLETE AND UNREDACTED VERSION

Kim Martin Lewis
Alexandra S. Horwitz
DINSMORE & SHOHL LLP
255 East Fifth Street
Suite 1900
Cincinnati, OH  45202
   kim.lewis@dinsmore.com
   allie.horwitz@dinsmore.com
*Counsel to Defendants, Murray Energy Corp.*
*and Murray Energy Holdings Co.*

Nicole L. Greenblatt, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
   LLP
601 Lexington Avenue
New York, NY  10022
   nicole.greenblatt@kirkland.com
*Counsel to Defendants, Murray Energy Corp.*
*and Murray Energy Holdings Co.*

Ross M. Kwasteniet, P.C. (*pro hac vice*)
Joseph M. Graham (*pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL
   LLP
300 North LaSalle
Chicago, IL  60654
   ross.kwasteniet@kirkland.com
   joe.graham@kirkland.com
*Counsel to Defendants, Murray Energy Corp.*
*and Murray Energy Holdings Co.*

Mark McKane (*pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
   mmckane@kirkland.com
*Counsel to Defendants, Murray Energy Corp.*
*and Murray Energy Holdings Co.*

Andrew N. Goldman (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
250 Greenwich Street
New York, NY  10007
   andrew.goldman@wilmerhale.com
*Counsel to Defendant, GLAS Trust Company*
*LLC, as Administrative Agent*

Kaleb McNeely (*pro hac vice*)
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY  10019
   mcneely.kaleb@dorsey.com
*Counsel to Defendant, U.S. Bank, N.A., as*
*Collateral Trustee*